UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

```
UNITED STATES OF AMERICA,      :
                               :          Docket No. CR 21-40
                               :
          vs.                  :          Washington, D.C.
                               :          Friday, February 12, 2021
PATRICK EDWARD MCCAUGHEY,III   :              3:00 p.m.
                               :
          Defendant.           :
-----------------------------x
```

TRANSCRIPT OF ARRAIGNMENT/BOND REVIEW
VIDEO CONFERENCE
BEFORE THE HONORABLE TREVOR N. MCFADDEN
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:      JOCELYN P. BOND, Esquire
                        MELISSA J. JACKSON, Esquire
                        Assistant United States Attorneys
                        555 4th Street, NW
                        Washington, DC  20530


For the Defendant:      LINDY R. URSO, Esquire
                        Attorney at Law
                        810 Bedford Street
                        Suite 3
                        Stamford, CT  06901


Court Reporter:         CRYSTAL M. PILGRIM, RPR, FCRR, RMR
                        Official Court Reporter
                        United States District Court
                        District of Columbia
                        333 Constitution Avenue, NW
                        Washington, DC  20001

```
 1                          P-R-O-C-E-E-D-I-N-G-S

 2              THE COURT:  Is that Mr. Seeger there?

 3              MR. URSO:  No, Your Honor, it's Urso, Lindy Urso.

 4              THE COURT:  Have you talked with him about proceeding

 5    by video for this hearing?

 6              MR. URSO:  Yes, Your Honor, he's prepared to consent,

 7    thank you.

 8              THE COURT:  Okay, thank you.

 9              THE OFFICER: He's present, Your Honor.

10              THE COURT:  Good afternoon, sir.

11              THE DEFENDANT:  Good afternoon, Your Honor.

12              THE DEPUTY CLERK:  Your Honor, this is criminal case

13    21-40, United States of America versus Patrick Edward

14    McCaughey.  From Pretrial we have Christine Schuck.  Counsel

15    please introduce yourselves for the record, starting with the

16    government.

17              MS. BOND:  Good afternoon, Your Honor, Jocelyn Bond

18    on behalf of the United States.

19              THE COURT:  Good afternoon Ms. Bond.

20              MR. URSO:  Good afternoon, Your Honor, Lindy Urso on

21    behalf of Mr. McCaughey.

22              THE COURT:  Good afternoon Mr. Urso and good

23    afternoon Mr. McCaughey.  We're here on an arraignment and a

24    bond hearing.  Ms. Chaclan, can we proceed with the

25    arraignment?
```

1          THE DEPUTY CLERK:  Yes, Your Honor.

2      May the record reflect that the Defendant through counsel

3  has received a copy of the indictment.  Patrick Edward

4  McCaughey, III in criminal case 21-40 in which you are charged

5  by an indictment on Count One, assaulting, resisting or

6  impeding certain officers using a dangerous weapon.

7      Count Two, civil Disorder.

8      Count Three, assaulting, resisting, or impeding certain

9  officers using a dangerous weapon.

10     Count Four, Civil Disorder.

11     Count Five, obstruction of an official proceeding and

12  aiding and abetting.

13     Count Six, disorderly and disruptive conduct in a

14  restricted building or grounds with a deadly or dangerous

15  weapon.

16     Count Seven, engaging in physical violence in a restricted

17  building or grounds with a deadly or dangerous weapon.

18     Count Eight, disorderly conduct in a Capitol building.

19     Count Nine, act of physical violence on in Capitol grounds

20  or building.

21     Do you waive the formal reading of the indictment and how

22  do you wish to plead?

23          THE DEFENDANT:  I would like to waive the formal

24  reading and I would like to plead not guilty.

25          THE COURT:  Okay, thank you Mr. McCaughey.

1          We have a bond motion, but a couple of things before we

2    get to that first.

3          First, I realize I probably should have put on the record

4    beforehand.  Mr. Urso, have you had an opportunity to talk with

5    your client about proceeding virtually rather than in-person?

6                MR. URSO:  I have, Your Honor.

7                THE COURT:  And is he prepared to proceed virtually

8    for today's hearing?

9                MR. URSO:  He is, Your Honor.

10                THE COURT:  Okay, I think in light of the coronavirus

11   and the danger to Mr. McCaughey and others meeting in-person

12   and in light of the provisions under the CARES Act, it is

13   appropriate for us to proceed virtually.

14          Ms. Bond, where do things stand now with the government

15   on this case?

16                MS. BOND:  I'm sorry, Your Honor.  Would you say that

17   one more time?

18                THE COURT:  Yes, where do matters stand in terms of

19   discovery and what are you seeking in terms of next steps here?

20                MS. BOND:  So, Your Honor, we have not yet provided

21   discovery.  We do intend to provide informal discovery in the

22   very near future.  We have spoken to Mr. Urso about that.

23          As far as next step, we would like to address the

24   detention issue.  Of course we oppose his bond review motion

25   and then ideally set a status hearing out about a month from

1    now to assess where we are in the case.

2              THE COURT:  Okay, Mr. Urso.

3              MR. URSO:  That sounds right, Your Honor.  I guess

4    the scheduling aspect depends on what happens with the bail

5    decision.

6              THE COURT:  Okay, so we can come back to that in a

7    moment.

8        I will direct the government in light of the Due Process

9    Protections Act to review their disclosure obligations under

10   Brady v. Maryland and it's progeny as set forth in Local

11   Criminal Rule 5.1 to comply with those provisions.  The failure

12   to comply can result in dismissal of the indictment or

13   information, dismissal of individual charges, exclusion of

14   government evidence or witnesses, continuances or discipline or

15   any other remedy that is just under the circumstance.  I'll

16   also be issuing a written order to that effect.

17        Ms. Bond, I'll hear you on bond.

18             MS. BOND:  Thank you, Your Honor.

19        The government does oppose the bond review motion and

20   we're asking for continued detention.  Our position remains

21   that the factors under 3142(g) still weigh heavily in favor of

22   detaining him because he is both a danger and a potential risk

23   of flight.

24        Going through each of those four factors, with respect to

25   the nature and circumstances of the crime, the Defendant was a

1   willing and enthusiastic participant in the mob violence and he

2   assaulted specific officers on January 6th.  Since his

3   participation in that mob that was violent and dangerous at

4   both the both the macro and the micro level.

5       Of course I imagine Your Honor has heard a lot in recent

6   weeks about the mob on the Capitol, so I won't spend much time

7   on that. There was a lot of violence and a lot of

8   destructiveness as those legislators were forced to pause that

9   electoral college vote count.

10      But the evidence the government has with respect to

11  Mr. McCaughey puts him specifically on the lower West Terrace

12  of the Capitol Building between the times of about 2:40 and

13  3:15 p.m.  Now the lower west terrace is a very visible and

14  familiar part of the Capitol building that many Americans have

15  seen if not in person, they've certainly seen it in movies or

16  on TV.  It is right in the front and center of the building.

17  As a very symbolic place where the inauguration which happened

18  a few weeks ago.  On the lower west terrace there's an archway

19  with a short tunnel that leads directly to a door into the

20  Capitol.  And that archway was the scene of a lot of violence

21  that day particularly against police officers.

22      Because pretty quickly after the mob broke onto the

23  grounds and blasted officers both MPD, Metropolitan Police

24  Department, and the Capitol Police formed a line inside that

25  archway to protect the front door of the Capitol.

1       Over the course of the afternoon, that mob spent about two

2  and a half hours from about 2:45, 3:15 battling with officers.

3  They would come in waves and try to force themselves through

4  the line.   Sometimes the officers would be able to push them

5  back and out of that tunnel, but they would be coming hour

6  after hour.

7       That is where Mr. McCaughey joined into.   That's where he

8  pushed himself that day, right front and center in the most

9  violent crashes with the police.   His conduct was dangerous and

10 violent toward the specific officers, but it also contributed

11 to the, contributed to the overall violence of that mob.

12      Our evidence puts him on the lower west terrace between

13 about 2:40 and 3:15 in the early waves of the rioters trying to

14 breach the center door.   He is now charged in a nine count

15 indictment with most of those charging felonies and two of them

16 being crimes of violence.   And those are the two assaults on

17 Officers Daniel Hodges and Henry Foulds with a dangerous

18 weapon.

19      These assaults were captured on video which we referenced

20 in our pleading Exhibit 1.   The government reference a longer

21 video, but we directed Your Honor's attention to minutes 19

22 through about 23 and those minutes really capture Mr. McCaughey

23 and his conduct as part of the mob that afternoon.

24      I'm sure that Your Honor saw how he was using one of the

25 stolen police riot shields to crush Officer Hodges against that

1    door frame, while Officer Hodges is screaming out with pain he

2    is stuck there, unable to move.  And Mr. McCaughey keeps going

3    after he finishes with Officer Hodges.  You see him in that

4    video engaging with and striking Officer Foulds.  Officer

5    Foulds is the individual, the officer in the green mask who's

6    trying to protect the entry way.

7         We do want to share with Your Honor three additional short

8    clips this afternoon that I think address some of defense

9    counsel's points in his reply about how, his suggestion that

10   maybe Mr. McCaughey was acting because he was pushed by the mob

11   to do so or he really had no choice.

12        We want to show you Exhibit No. 2 and my colleague Melissa

13   Jackson has provided a makeshift way for us to play this

14   through the Jabber platform.  I'm hoping that Your Honor can

15   see at this point.  This Exhibit 2 is a second video from a

16   different angle that shows --

17             MR. URSO:  Judge, can I just interrupt for a moment?

18   I can't see Ms. Bond or whatever Ms. Bond is going to present.

19   I haven't seen it yet.

20             THE COURT:  Yes.  So it should be showing up on the

21   screen this picture.  If you hit, I think is it 8 on the key

22   pad; is that correct Michelle, you should see it?

23             MR. URSO:  I got it.

24             MS. BOND:  Your Honor, we did email it to defense

25   counsel shortly before the hearing started.

1          MR. URSO:  I've got it now, Judge, thank you.

2          THE COURT:  We all see it now.  You may proceed

3  Ms. Bond.

4          MS. BOND:  Thank you.

5     What I want to draw your attention to in this clip is that

6  as you see Mr. McCaughey battling with Officer Foulds, there's

7  a good deal of space between him and the rioter between him.  I

8  want Your Honor to see how there's no one pushing him there.

9  There's no one compelling him to be engaging in this behavior.

10  Please go ahead and play it.

11     (Video played.)

12          MS. BOND:  Is the Court and Mr. Urso able to see

13  that?

14          MR. URSO:  Yes.

15          THE COURT:  Was that a subset of the prior video that

16  I watched that is referenced in your motion, Ms. Bond, or is

17  that from a different angle?

18          MS. BOND:  It's not the same video that was Exhibit

19  1.  It's a different angle, but I do believe that I referenced

20  that there were other videos out there.

21          THE COURT:  Okay.

22          MS. BOND:  But I did want you to see specifically

23  that angle of it.

24          THE COURT:  Okay.

25          MS. BOND:  And to respond to the suggestion that

1  somehow the Defendant was an unwilling participant or even some

2  sort of victim here. I want to emphasize that the government's

3  evidence clearly shows that he was both willing and

4  enthusiastic in the mob violence and in his assault on the

5  officers.

6      One of the things that I neglected to mention is all of

7  the chances Mr. McCaughey had to walk away during that

8  afternoon, but he didn't.  One of the items that we described

9  in our pleading was the Capitol surveillance footage.  And that

10 footage shows the Defendant first coming to the mouth of that

11 entrance around 2:50 p.m. and he lingered there for a few

12 minutes.  He didn't leave.

13      The officer pushed out, he pushed out with a group.  He

14 walks away, he's off camera.  We don't know where he goes.  He

15 didn't have to come back at that point.  He was gone, he was

16 off camera.  There was no evidence of what he was doing, but he

17 did. He was gone for about fifteen minutes.  (Audio

18 interference.)

19          MS. BOND:  Can I continue at this point?

20          THE COURT:  Yes, please Ms. Bond.

21          MS. BOND:  Thank you.

22      So he comes back around 3:05.  He's seen again on that

23 surveillance video in the archway.  He's moving of his own

24 volition, moving back into the fray and in that video he's seen

25 grabbing the stolen riot shields from these officers.  He's

1  helping to pass them back to people behind him.  Eventually he

2  grabs onto one and holds on to it.  That is what we describe in

3  the Capitol surveillance footage.

4      On top of that, which we'll show you right now,

5  Ms. Jackson will show you Exhibit 3.  It's another open source

6  video that captures the Defendant in the archway.  Based on our

7  timelines in comparison with other individuals who were there

8  that day, we believe that this clip was filmed shortly before

9  the assault on Officers Hodges and Foulds.  And it shows that

10 the Defendant was there of his own free will. He's not being

11 pushed by the mob.  No one is forcing him to that spot.  As you

12 can hear, I'm sure it's difficult to hear in this particular

13 format that we're on the phone, but when talking to the person

14 holding the camera, the Defendant actually breaks into a smile

15 when he tells that person this is our building.

16      (Video played.)

17      (Video cut off.)

18          MS. BOND:  What I wanted Your Honor to see -- sorry

19 about that.

20      What I wanted Your Honor to see from that is that he was a

21 willing participant.  He was glad to be there.  He was not

22 forced into that position.  Of course he makes his way to the

23 front of the line at that point.  And Your Honor has seen the

24 assault against Officer Hodges and Foulds.  In Defendant's

25 motion, he suggests that Defendant is only crushing Hodges

1 because of the weight of the crowd behind him, but that is to

2 ignore a couple of things.

3        First, it ignored that even though there was a crowd

4 around, the Defendant was using his own weight and he was

5 really leaning into Officer Hodges.  If Your Honor has seen

6 Exhibit No. 1, right around 30 seconds into the video, you can

7 see where there's a gap between Mr. McCaughey and a person

8 behind him.  That person has his hand on Mr. McCaughey's

9 shoulder, but there's no weight, there's no pushing.

10 Mr. McCaughey is using his own body weight there.

11       The second thing about the suggestion is it ignored the

12 words that the Defendant was saying when he committed these

13 assaults.  Your Honor you have heard as he was crushing Hodges

14 under and against that door frame Mr. McCaughey is saying go

15 home.  He said it multiple times.  Go home.  Do the right

16 thing.  You're going to get squished, go home.  Of course just

17 a few moments after in the earlier video saying this is our

18 building.

19       What the government believes that Mr. McCaughey was saying

20 to that officer is you have a choice; either get out of the way

21 of the mob, let us get into this building or you are going to

22 get squished because that is what he was doing with his

23 actions.

24       The third thing that defense counsel ignores is the

25 Defendant continues to assault Hodges, even as he is seeing

1   other rioters assault the same officer.  He sees another rioter

2   pull off Hodges' gas mask.  He sees another rioter sprays their

3   spray on the officer.  He continues.  He doesn't back away.

4        Of course there's that moment where the Defendant really

5   does show a moment of humanity or regret.  We don't know what

6   it was there.  But he does seem to try to get Hodges some help.

7   He puts Hodges mask down and signals to another officer nearby

8   that this guy needs some help.  That is to the defendant's

9   credit, but it also makes his next step even more baffling

10  because that was a moment where in all honesty, he did a

11  credible thing in that moment, but he could have walked away

12  there. He could have stopped.  He could have laid down his

13  arms.  He could have gotten out of that tunnel, but he didn't.

14  Instead he keeps fighting.

15       He then goes after Officer Foulds, moved to the front of

16  that police line.  That view that we showed you in Exhibit 2

17  sort of really reaffirms that he is there of his own volition.

18  The crowd is not pushing against him. He's there because he

19  wants to be.

20       That touches on defense counsel's suggestion that the

21  Defendant was using the riot shield defensively.  We want to be

22  very clear, there is no self-defense claim here.  Mr. McCaughey

23  and the other members of that mob were the aggressors and had

24  no right to be on the Capitol grounds.  They were attacking

25  uniform officers who were lawfully defending the Capitol.  He

1  wasn't using that stolen shield defensively.  He was using to

2  attack officers so that he could get into the building.  His

3  building.

4       Eventually of course he does leave the tunnel.  But it

5  isn't because he decided to do the right thing and to put down

6  his weapon.  He doesn't stop fighting officers until he's

7  actually physically unable to do so.  After that hand to hand

8  between him and Officer Foulds that we see in Exhibit 1 and 2,

9  the officers are then able to disperse that particular group

10  and force them out of the tunnel at least monetarily.  And

11  that's where we want to show you Exhibit 4 which shows the

12  Defendant exiting the tunnel.  He's squinting, it looks like

13  he's struggling to see. He didn't leave that tunnel because it

14  was the right thing to do.  He left because he couldn't fight

15  anymore.

16          (Video played.)

17          MS. BOND:  Your Honor, this is another place where

18  the Defendant had the opportunity to walk away, but that's not

19  what it was.  He was forced out.  He physically couldn't fight

20  anymore and so then he left the tunnel and the government has

21  no additional evidence at this point about what he did after

22  that time.

23       So with respect to the nature and circumstances of the

24  crime, his conduct was dangerous and violent just standing

25  alone.  It contributed to the overall danger and violence that

1  day. He was a willing and enthusiastic participant throughout

2  the assault, and he kept going.  He didn't stop until he had

3  been physically neutralized and this weighs heavily in favor of

4  his continued detention.

5       The weight of the evidence is similarly weighed in favor

6  of continued detention.  As Your Honor has seen much of his

7  conduct is captured on video.  We have multiple videos not only

8  the ones Your Honor has seen, but the Capitol surveillance

9  videos.  I believe there are a few other source videos out

10  there that we haven't referenced at this point.

11       Another piece of evidence the government has is that brown

12  jacket that Your Honor can see in the video that Mr. McCaughey

13  is wearing.  When he was arrested, law enforcement officers

14  recovered a brown jacket that looks very similar and the

15  government certainly contends it is the same brown jacket.

16       We have also seized his cell phone and that cell phone has

17  provided evidence of his participation and his presence in

18  Washington D.C. on January 6th.

19       First, inside of his phone there is an Apple map search

20  where he is searching for Freedom Plaza in Washington D.C.

21  There are multiple selfies that appear to be taken on his phone

22  that captures his face showing scenes from downtown Washington,

23  D.C. including the Capitol Building as well as the Washington

24  Monument.  There are selfies where you can see portions of the

25  mob up against the Capitol Building.

1      Finally, we have chats that were recovered from his phone,

2  from a flat phone signal in which he discusses scenes in

3  Washington, D.C., sent video links to his friends, that seem to

4  acknowledge not only that he was in Washington, D.C., but at

5  one point in the chat he almost acknowledges that the person in

6  the video was him and the leader in the chat suggesting that it

7  was not him.

8      So we have all of that evidence.  The video evidence.  The

9  coat he is wearing.  The contents of his cell phone.  And the

10 government views this as a very, very, strong case.

11     I just want to touch on his history and characteristics.

12 We do understand that he doesn't have a criminal history, but

13 this is a very significant and violent crime that he has

14 engaged in.  We also have significant concerns about how well

15 they work, his parents putting up the bond here.

16     One of the concerns we have is that the evidence we have

17 shows that Mr. McCaughey went to D.C. with his father, which on

18 its face is innocuous.  Many people came and did not commit any

19 unlawful activities.  But the concern here is that

20 Mr. McCaughey's father has offered to put up property in his

21 name.  And because Mr. McCaughey, the Defendant, committed

22 these crimes, even though he was in the city on a trip with his

23 own father, how much parental pressure is his father really

24 going to be able to exert to keep him in line if he is

25 released.

1      We also have -- we understand that his mother has also

2  offered to put up a substantial bond and we have similar

3  concerns there.  Part of that is that any financial loss here

4  would be to his parents and not directly to him.

5      Finally, one of our concerns is that Mr. McCaughey is a

6  citizen of Germany which I say again is completely innocuous.

7  We do have concerns that that gives him an easier opportunity

8  than most to flee the country to avoid answering for what he

9  has done here.

10      So for all of those reasons, Your Honor, we ask that he

11  remain detained because each of these factors weighs in favor

12  of detention.

13          THE COURT:  Thank you, Ms. Bond.  Mr. Urso, I'll hear

14  from you.

15          MR. URSO:  Thank you, Your Honor.

16      Your Honor, so upon being retained and reviewing what

17  was out there in the public, as Ms. Bond indicated, I haven't

18  gotten before that YouTube link in their opposition papers.  I

19  hadn't gotten anything they were relying on.

20      After reading those documents I expected there would be

21  video out there of Mr. McCaughey wheedling this shield like a

22  baseball bat or like a sword and I was concerned.  And I saw

23  the opposition brief.

24      Judge I want to -- I saw the YouTube video, but I want to

25  focus on those two crimes.  The alleged crimes of violence

1   because I think that's what the government is relying on most

2   for the detention.  The alleged assault on Officers Hodges and

3   Foulds.

4       I watched the YouTube videos and I want to break them

5   down.  Well, I want to break them down each separately.  The

6   alleged assault on Officer Hodges it seems to me in talking

7   about the weight of the evidence.  It seems very clear to me

8   that there was no assaultive intent.  I understand the

9   government's position is that Mr. McCaughey was pushing

10  himself, just himself pushing Officer Hodges in that doorjamb,

11  causing him to be injured which really makes no sense when

12  watching the video in its entirety.

13      As soon as he heard Officer Hodges yelling in pain, he

14  turned back to the crowd.  I noticed again watching it last

15  night, imploring the crowd behind him to back off, to release

16  some of the pressure.  Then afterwards he spent many, many

17  seconds urging the fellow officers.  He kept urging fellow

18  officers, hey, this guy is in trouble.  And he didn't stop

19  until he got a nod from one of the officers saying yes, okay,

20  we understand.

21      The video pans back and does show -- it's not the

22  defense's suggestion that he was there because he was carried

23  forward like a mob pit.  He obviously got into this protest,

24  got too close and this is the result.  But I'm talking about

25  the crowd pushed him with respect to the one assault

1  allegation.  He just happened to be at the front of the pack

2  and you can hear the crowd pushing forward seconds before the

3  officer was hurt.

4      And his conduct, again right after realizing and in aiding

5  the officer when another third party took off his gas mask,

6  took off Officer Hodges gas mask.  He aided, he bent over and

7  helped the officer.  I don't believe the weight of the evidence

8  is nearly as strong as the government contends as to that.

9      Then Officer Foulds' assault.  From what I can gather and

10  I can see again, I think Your Honor touched on it. I think it's

11  a video of the same incident, just a different angle.  It looks

12  like he may have advanced forward at one point with the shield,

13  but not using it as a weapon necessarily.  I don't think that

14  shield could have hurt anybody stepping forward with the shield

15  in that position.  So I think it's very questionable whether

16  that charge, whether they're going to prove that charge by

17  reasonable doubt.

18      But I think most importantly, Your Honor, even if these

19  charges stick, I mean he's convicted of these charges.  Looking

20  at them and looking at their nature and looking at his history,

21  I think the issue is whether he's a danger going forward.

22      This January 6th, 2021 incident was a once in a generation

23  event.  It was a protest.  He obviously got too close and got

24  involved, but everything about this young man's history, even

25  some of what he did on tape in trying to render aid to the

1  officer and did aid indicates that this is a one off event

2  regardless.

3      There's no reason for the Court to be concerned that he's

4  going to somehow get involved in some other violent protest

5  should the Court release him on this significant bail package,

6  so even assuming all of that.  But I think, I really believe

7  that this is a defendable case in terms of those two assault

8  charges.  There's obviously some other charges to deal with,

9  but the two crimes of violence I think are very defendable.

10      So in terms of weight of evidence, I don't think that

11  should carry the day, Your Honor.  There's no mandatory minimum

12  jail sentences here.

13      I have touched on Mr. McCaughey's history that the letters

14  paint.  Various different people really paint a uniform picture

15  of Mr. McCaughey as a kind, intelligent, considerate,

16  compassionate young man who goes out of his way to help lend a

17  hand when needed.

18      A couple of things I didn't put in the submissions, Your

19  Honor, which I got from his family.  In high school he played

20  junior varsity football and a year of varsity football. He's

21  got three different language awards, two for German one for

22  Latin.  One of those awards led to one of two trips overseas.

23  His mother is a native from Germany.  By the way, he's born and

24  raised in the United States, Your Honor.

25      He has dual citizenship by operation of German law because

1   his mom is a German National.  He's taken two trips to Germany.

2   I have both passports, Your Honor, in my possession.  The U.S.

3   passport shows that he has taken two trips to Germany, one in

4   2014, one in 2016.  One of those was paid for as a result of

5   that award.  He thereafter got this EU German passport which

6   has no markings.  So he hasn't used that yet.

7        Your Honor, he was born in California.  I believe at the

8   age of five or six, the parents had to split before he was even

9   born.  So he was raised with split parents.  They moved to

10  Connecticut around the time of age four, five, five or six.

11  And he's lived in Richville, Connecticut since.  He's got very

12  strong ties to the community.

13       He has worked.  He had worked out of high school.  He

14  began working with his father who has a construction company.

15  And obviously business dried up with the COVID, so there was

16  really nothing happening in 2020.  But as I indicated, I think

17  in Exhibit B to my original motion, there is one rather sizable

18  job that Dad has already lined up.  And he's indicated there

19  are several more that he thinks will keep them busy into the

20  spring and summer.  If the Defendant were released, he'd be

21  working with his dad side by side on these jobs.

22        Your Honor, with respect to risk of flight.  Again, he's

23  taken two trips out of the country.  But these crimes do not

24  carry the mandatory minimums, these allegations.  He's born and

25  raised in the United States.  He's not going anywhere.  If the

1   Court really felt concerned that he was a flight risk, the

2   Court could certainly order home confinement with electronic

3   monitoring.

4        I don't know if the Court had a chance to review the SDNY

5   police report.  It was much more narrow than what D.C. has been

6   able to do in a short time, with what D.C. has been inundated

7   with.

8             THE COURT:  I did.

9             MR. URSO:  Thank you, Your Honor.

10       I don't think he's a flight risk.  I really honestly

11   believe that an unsecured bond would be sufficient, but I think

12   putting up all that equity in the father's house and his house

13   sales for almost half a million dollars.  The mother is willing

14   to put up another quarter million dollars unsecured which is a

15   really significant passage, Your Honor.  This young man, he's

16   not going to put his parents in a financial risk in that way.

17   There's nothing in his history to suggest that he would ever

18   flee.

19       So Your Honor, I think, under all of these circumstances,

20   particularly his history and again the weight of the evidence

21   of the crime, the two crimes of violence alleged, I think

22   release on this significant bail package; I don't think the

23   government has met by clear and convincing evidence that he is

24   so dangerous that the Court can't release him on sufficient

25   conditions.

1       I think we proposed -- again, I think we even proposed

2   backup conditions along with the father will wipe out his

3   retirement account and post extra cash if the Court deemed it

4   necessary to secure his appearance.  But I just don't see under

5   these unique facts and circumstance that he is such a danger to

6   the community going forward after living such a stellar life of

7   23 years.  I think the Court can feel comfortable releasing him

8   on sufficient conditions and I ask the Court to do that.

9           THE COURT:  Thank you, Mr. Urso.

10      Ms. Bond, I'll give you the last word.

11          MS. BOND:  Thank you, Your Honor.  No additional

12  argument.  I just want to mention about what defense counsel

13  said that his client had no assaultive intent inside that

14  tunnel.  But we intend the normal consequences of our actions.

15  He knew what he was doing when he walked into that archway,

16  when he grabbed those riot shields, when he walked to the front

17  of the line and he participated in assaulting those officers.

18  That's pretty clear assaultive intent right there.  I have

19  nothing further, Your Honor.

20          THE COURT:  Thank you, Ms. Bond.

21      I've reviewed the parties submissions including the

22  video and I've considered the thoughtful arguments of both

23  attorneys here.  The government has made a motion pursuant to

24  18 U.S.C. 3142(f)(1) for detention pending trial.  A magistrate

25  judge found that the government had carried its burden for

1  detention and defense has now appealed to me.  I reviewed this

2  matter de novo.

3      I find that there is a rebuttable presumption that

4  arises under 18 U.S.C. 3142(e)(2) for detention and because the

5  Defendant is charged with a crime of violence under 18 U.S.C.

6  3142(f)(1).

7      I find that the Defendant has presented evidence

8  sufficient to rebut the presumption.  But after considering the

9  presumption and the other factors discussed that I'll discuss

10  in a moment, I do believe detention is warranted for the

11  following reasons:  I find that by clear and convincing

12  evidence that no condition or combination of conditions of

13  release will reasonably assure the safety of any other person

14  in the community.  I also find by a preponderance of the

15  evidence that no condition or combination of conditions will

16  reasonably assure the Defendant's appearance as required.

17      I make the following findings of fact and conclusions of

18  law as to the nature and circumstances of the offense and the

19  other factors that must be considered under the Bail Reform

20  Act.

21      First, as to the nature and circumstances of the offense,

22  the Defendant was part of a large violent mob that sought to

23  force its way into the U.S. Capitol to disrupt certification of

24  the Presidential election.  In this melee, one officer was

25  killed, approximately 100 were injured.  There were serious

1   property damage and incalculable damage to our body politic.

2       The Defendant entered the west front tunnel entrance.  He

3   saw what was happening.  And then, according to the video I've

4   seen, he returned grabbing a stolen police shield and moving to

5   the front to directly engage with the officers.  There he

6   battled two officers in particular.

7       I believe, based on the evidence that is currently before

8   me, he did use the police shield as a weapon against them.

9   Specifically, it appears to me that he pinned Officer Hodges in

10  a doorway, causing serious pain to him and allowing another

11  rioter to further assault the officer.

12      Based on the evidence before me, and on the requisite

13  standard, I don't think it's correct the Defendant was just

14  using the shield defensively.  And while I don't believe or

15  don't have any reason to believe the Defendant went there

16  intending to assault anyone. I think when he got to the front

17  of the line and found that there were officers standing between

18  him and his object, he was willing to assault them in order to

19  try to force his way into the Capitol building.

20      I thought it was just audacious for him to tell the

21  officers to get out of his house and to go home.

22  Mr. McCaughey, I don't know, you were certainly close enough to

23  observe the officers' patches and badges.  On an MPD shield

24  they have a picture of the Capitol on the patch.  They have a

25  picture of the Capitol Building that they were protecting the

1 Nation's home.  And you were breaking into it as if you were a

2 thief or a robber.

3      To your credit, you did assist Officer Hodges and helped

4 him out of harms way when he was injured in part because of

5 your actions.  I think that speaks well of you.  And there may

6 well be a point down the road where that would be relevant, but

7 right now I don't think that erases what you did to injure him

8 in the first place or what you went on to do when you battled

9 another officer immediately after that.

10      You probably would not have done any of this alone, but

11 the Defendant willingly joined a mob that injured dozen of

12 officers and permanently scared our country.  That is part of

13 the danger of joining a mob or a riot and the Defendant

14 willingly engaged in that very dangerous behavior.

15      Looking at the strength of the evidence, I agree with the

16 government that the strength of the evidence is strong here.

17 I've seen this video footage.  There is body worn camera

18 footage.  There is cell phone evidence and other evidence that

19 ties the Defendant to the crimes charged.

20      I disagree with the government about the Defendant's

21 history and characteristics.  I think that factor would favor

22 release here.  The Defendant has no criminal history.  He has a

23 good reputation in the community.  I've read the numerous

24 letters submitted on his behalf.  I've also considered the

25 Defendant's willingness to a number of substantial assets as a

1    surety; nonetheless, in balancing that factor against the other

2    factors here, I'm considering his dangerousness and the risk of

3    flight.  I don't find that outweighs these other factors.

4        I do think, for the reasons I previously stated, the

5    Defendant poses a danger to the community.  He was willing to

6    participate in such a violent, in fact, deadly riot raises

7    grave questions about the danger he poses to others.  And I

8    should say specifically, the willingness to engage in violence

9    there.

10       There's a number of defendants who are charged in this

11   court, including some in front of me.  He's the only one that

12   I'm aware of charged in front of me who apparently acted in a

13   violent manner and has been charged with acts of violence.

14       I also think there's evidence of the Defendant being a

15   flight risk.  The Court typically considers whether someone is

16   employed.  He is not.  He has no ties to this District.  Of

17   course he has substantial ties elsewhere, but none here.  He

18   also has significant and unusual ties outside of the United

19   States.

20       Although none of those things are inherently wrong of

21   course, I think I must consider the length of time the

22   Defendant is facing, the length of, potential lengthy

23   imprisonment and the Defendant's lack of connections here, I

24   think there is a concern about the Defendant's flight risk.

25       So for all of these reasons, I'm denying the defense

1   motion for release.

2       All right, in light of that the government, as I said, has

3   asked for another status conference in one month.

4       Mr. Urso, what's your position on that?

5           MR. URSO:  I guess one month would be sufficient,

6   Your Honor, because I do have to get discovery and review it,

7   so that seems logical.

8           THE COURT:  Okay, so how about -- well actually

9   Ms. Chaclan, I need to ask you what would appear to work for

10  the Northern Neck Jail?

11          THE DEPUTY CLERK:  Your Honor, was that in one month?

12          THE COURT:  Yes, ma'am.

13          THE DEPUTY CLERK:  Friday, March 12th at 2 p.m. is

14  available.

15          THE COURT:  All right, Ms. Bond does that work for

16  the government?

17          MS. BOND:  That is fine for me.  Just one moment,

18  yes, it's fine for the government.

19          THE COURT:  Okay and Mr. Urso?

20          MR. URSO:  That's fine, Your Honor, thank you.

21          THE COURT:  Okay, we'll set a video status conference

22  for 2 p.m. on Friday March 12th.

23      Ms. Bond, do you have a motion?

24          MS. BOND:  Yes, Your Honor.  Under the Speedy Trial

25  Act, we're asking that the time be excluded between today's

1   date and the next day in the interest of justice.  As Your

2   Honor well knows, the Chief Judge's order is in effect until

3   March 13th and beyond that the government has noted there's

4   going to be voluminous discovery in these cases because it was

5   such a big and broad situation.  And there's going to be

6   extensive preparation required and so we're asking for the

7   exclusion of time to allow the parties to discuss these issues.

8           THE COURT:  Mr. Urso?

9           MR. URSO:  Your Honor, I'm just hesitant in light of

10  his incarceration to agree to any kind of speedy trial waiver.

11          THE COURT:  Okay, nonetheless I find that tolling is

12  appropriate here.  I think that the Chief Judge's standing

13  order would cover all or most of this time.  And regardless, I

14  do imagine there's significant discovery here.  As I say, I'm

15  hoping we're going to be able to get back and start doing

16  trials sooner rather than later and I expect the government to

17  move expeditiously, so that we could be in a position to have a

18  trial and discuss trial dates if that is Mr. McCaughey's wish

19  to proceed to trial.

20     Ms. Bond, anything further?

21          MS. BOND:  Nothing further from the government, Your

22  Honor.

23          THE COURT:  And Mr. Urso?

24          MR. URSO:  No, Your Honor, thank you.

25          THE COURT:  Thanks folks.

1          (Video conference adjourned at 3:45 p.m.)

2                              -oOo-

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                            CERTIFICATE

 2        I, Crystal M. Pilgrim, Official Court Reporter, certify

 3   that the foregoing is a true and accurate transcript, to the

 4   best of my ability, of the proceedings remotely reported in the

 5   above-entitled matter.

 6        Please Note: This hearing occurred during the COVID-19

 7   pandemic and is, therefore, subject to the technological

 8   limitations of court reporting remotely.

 9

10   _____    _____

11   Crystal M. Pilgrim, RPR, FCRR, RMR     Date: March 25, 2021

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```