```
 1                   UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
 2
     * * * * * * * * * * * * * * *     )
 3   UNITED STATES OF AMERICA,         )    Criminal Action
                                       )       No. 21-40
 4                 Plaintiff,          )
                                       )
 5      vs.                            )
                                       )
 6   PATRICK EDWARD McCAUGHEY, III,    )    Washington, DC
     TRISTAN CHANDLER STEVENS,         )    May 4, 2021
 7   DAVID LEE JUDD and                )    11:01 a.m.
     CHRISTOPHER JOSEPH QUALGIN,       )
 8                                     )
                   Defendants.         )
 9                                     )
     * * * * * * * * * * * * * * *     )

10

11

12            TRANSCRIPT OF ARRAIGNMENT/STATUS CONFERENCE
                        CONDUCTED VIA ZOOM
13          BEFORE THE HONORABLE TREVOR N. McFADDEN,
                    UNITED STATES DISTRICT JUDGE

14


15   APPEARANCES:

16   FOR THE GOVERNMENT:       JOCELYN P. BOND, ESQ.
                               MELISSA J. JACKSON, ESQ.
17                             UNITED STATES ATTORNEY'S OFFICE
                                 FOR THE DISTRICT OF COLUMBIA
18                             555 Fourth Street, NW
                               Eleventh Floor
19                             Washington, DC 20530

20
     FOR THE DEFENDANT         LINDY R. URSO, ESQ.
21         McCAUGHEY:          LINDY R. URSO, ATTORNEY AT LAW
                               810 Bedford Street
22                             Suite 3
                               Stamford, Connecticut 06901

23

24

25
```

```
 1        APPEARANCES, CONT'D:

 2        FOR THE DEFENDANT        DANIELLE C. JAHN, ESQ.
                   STEVENS:        OFFICE OF THE FEDERAL PUBLIC
 3                                    DEFENDER
                                   625 Indiana Avenue, NW
 4                                 Suite 550
                                   Washington, DC 20004
 5
                                   LAUREN COBB, ESQ.
 6                                 OFFICE OF THE FEDERAL PUBLIC
                                     DEFENDER
 7                                 3 West Garden Street
                                   Suite 200
 8                                 Pensacola, Florida 32502

 9
          FOR THE DEFENDANT        ELIZABETH A. MULLIN, ESQ.
10                   JUDD:         OFFICE OF THE FEDERAL PUBLIC
                                     DEFENDER
11                                 1650 King Street
                                   Suite 500
12                                 Alexandria, Virginia 22314

13
          FOR THE DEFENDANT        CARLOS DIAZ-COBO, ESQ.
14                QUALGIN:         LAW OFFICES OF CARLOS DIAZ-COBO
                                   33 Court Street
15                                 Freehold, New Jersey 07728

16
          FOR PRETRIAL SERVICES:   CHRISTINE SCHUCK
17

18        REPORTED BY:             LISA EDWARDS, RDR, CRR
                                   Official Court Reporter
19                                 United States District Court for the
                                     District of Columbia
20                                 333 Constitution Avenue, NW
                                   Room 6706
21                                 Washington, DC 20001
                                   (202) 354-3269
22

23

24

25
```

1            THE COURTROOM DEPUTY:  Your Honor, this is

2   Criminal Case 21-40, the United States of America versus

3   Patrick Edward McCaughey and Tristan Chandler Stevens.

4            Counsel, please introduce yourselves for the

5   record, starting with the Government.

6            MS. BOND:  Good morning, your Honor.  Jocelyn Bond

7   on behalf of the United States.

8            THE COURT:  Good morning.

9            MS. JACKSON:  And good morning, your Honor.

10   Melissa Jackson on behalf of the United States.

11           THE COURT:  Good morning, Ms. Jackson.

12           MR. URSO:  Good morning, your Honor.  Lindy Urso

13   on behalf of Mr. McCaughey.

14           THE COURT:  Good morning, Mr. Urso.

15           Good morning, Mr. McCaughey.

16           MS. JAHN:  Good morning, your Honor.  Dani Jahn on

17   behalf of Tristan Stevens as well as AFPD Lauren Cobb, who

18   is also present.

19           THE COURT:  Good morning, ladies.

20           And do we have your client, Ms. Jahn?

21           MS. JAHN:  Yes.  Mr. Stevens is present.  He's

22   appearing via video.  And in light of the CARES Act and the

23   pandemic, Mr. Stevens agrees to appear in this fashion.

24           THE COURT:  Good morning, Mr. Stevens.  I see you

25   now.

```
 1              MR. DIAZ-COBB:  Good morning, your Honor.  Carlos

 2     Diaz-Cobo on behalf of Christopher Qualgin.

 3              THE COURT:  Good morning, Mr. Diaz-Cobo.

 4              And your client is not present.  Correct?

 5              MR. DIAZ-COBB:  That is correct, Judge.

 6              THE COURT:  Okay.

 7              MS. MULLIN:  Your Honor, this is Elizabeth Mullin

 8     from the Office of the Public Defender in the Eastern

 9     District of Virginia.  I represent David Judd, who is also

10     not present.

11              THE COURT:  Good morning, Ms. Mullin.

12              Ms. Mullin, we are having issues with Northern

13     Neck for Mr. Judd.  Am I understanding that correctly?

14              MS. MULLIN:  That's right.  I was just told by the

15     courtroom deputy, your Honor.  For purposes of this status

16     hearing, I'll waive his presence.

17              THE COURT:  Okay.  Were we going to arraign

18     Mr. Judd today or has that already occurred?

19              MS. MULLIN:  He's been arraigned, your Honor.

20              THE COURT:  Okay.

21              MS. MULLIN:  His next court date is a detention

22     hearing before your Honor.

23              THE COURT:  I've got a number of folks here and

24     various things we need to accomplish.

25              Mr. Diaz-Cobo, I understand you wanted to do a
```

```
1     breakout room with me?
2              MR. DIAZ-COBB:  Yes, Judge; and, of course, with
3     the AUSA Melissa Jackson.
4              THE COURT:  Okay.  Now or at the end or does it
5     matter?
6              MR. DIAZ-COBB:  Judge, whatever pleases the Court.
7     It probably makes more sense to go ahead and do that ahead
8     of time.
9              THE COURT:  Okay.  And maybe Mr. Judd will appear
10    in the meantime.
11             Ms. Chaclan, can you do that for us?  I think
12    there are two AUSAs.
13             THE COURTROOM DEPUTY:  So both AUSAs?
14             MR. DIAZ-COBB:  Yes.  Sorry.
15             THE COURTROOM DEPUTY:  It'll just take me a moment
16    to find the names in the list.
17             THE COURT:  That's fine.
18             Mr. Diaz-Cobo, this is off the record?
19             MR. DIAZ-COBB:  Correct, your Honor.
20             THE COURT:  So, Ms. Edwards, I think we won't need
21    you then.  Thank you.
22             (Brief pause in the proceedings.)
23             THE COURT:  All right.  I'm back.
24             THE COURTROOM DEPUTY:  Not yet, your Honor.
25             THE COURT:  No word on Mr. Judd?
```

```
1            THE COURTROOM DEPUTY:  Your Honor, I don't think
2     he'll be joining.  I got a call -- I was in contact with
3     Chashawn, and they weren't able to confirm today's hearing.
4            THE COURT:  Do we need to arraign anyone this
5     morning, Ms. Chaclan?
6            THE COURTROOM DEPUTY:  We do on the second
7     superseding indictment for Mr. McCaughey and also
8     Mr. Stevens.
9            THE COURT:  Okay.  Mr. Urso, have you talked with
10    your client about proceeding virtually for purposes of
11    today's hearing?
12           MR. URSO:  Yes, your Honor.  He will consent to
13    proceeding virtually; and we waive a reading of the second
14    superseding indictment.
15           THE COURT:  Okay.  And, Ms. Jahn, I think you
16    already indicated your client is prepared to proceed
17    virtually for purposes of today's hearing?
18           MS. JAHN:  That's right, your Honor.
19           THE COURT:  I do think it's appropriate that we
20    proceed virtually in light of the pandemic and the fact that
21    we've got people spread around in jails all across the East
22    Coast.  I think it would create complications for them and
23    potential COVID-related hazards.  And so, given the
24    authorization under the CARES Act, I will proceed virtually.
25           Mr. McCaughey and Mr. Stevens, the courtroom
```

1    deputy is going to rearraign you at this point.  This is

2    directed at you, but typically your attorneys respond on

3    your behalf.

4            Ms. Chaclan?

5            THE COURTROOM DEPUTY:  We'll start with

6    Mr. Patrick McCaughey.

7            The record will reflect that the Defendant through

8    counsel has received a copy of the superseding indictment.

9            Patrick Edward McCaughey, III, in Criminal Case

10   No. 21-40, in which you are charged by indictment in Count

11   6, assaulting, resisting or impeding certain officers and

12   aiding and abetting; Counts 11 and 12, assaulting, resisting

13   or impeding certain officers using a dangerous weapon; Count

14   15, obstruction of an official proceeding and aiding and

15   abetting; Count 16, civil disorder; Count 18, disorderly and

16   disruptive conduct in a restricted building or grounds with

17   a deadly or dangerous weapon; Count 22, engaging in physical

18   violence in a restricted building or grounds with a deadly

19   or dangerous weapon; Count 25, disorderly conduct in a

20   Capitol Building; Count 26, act of physical violence in a

21   Capitol grounds or buildings, do you waive the formal

22   reading of the indictment and how do you wish to plead?

23            MR. URSO:  We waive the formal reading and plead

24   not guilty.

25            THE COURTROOM DEPUTY:  May the record reflect that

1    the Defendant through counsel has received a copy of the

2    superseding indictment.

3            Tristan Chandler Stevens, in Criminal Case 21-40,

4    in which you are charged by indictment in Counts 6 and 7

5    with assaulting, resisting or impeding certain officers and

6    aiding and abetting; Count 8, assaulting, resisting or

7    impeding certain officers using a dangerous weapon; Count

8    14, assaulting, resisting or impeding certain officers and

9    aiding and abetting; Count 15, obstruction of an official

10   proceeding and aiding and abetting; Count 16, civil

11   disorder; Count 17, disorderly and disruptive conduct in a

12   restricted building or grounds with a deadly or dangerous

13   weapon; Count 21, engaging in physical violence in a

14   restricted building or grounds with a deadly or dangerous

15   weapon; Count 25, disorderly conduct in a Capitol Building;

16   and Count 26, act of physical violence in a Capitol grounds

17   or building, do you waive the formal reading of the

18   indictment and how do you wish to plead?

19           MS. JAHN:  On behalf of Mr. Stevens, we waive

20   formal reading of the indictment; we enter not guilty pleas

21   to each count in which he is named; we'd assert all of his

22   constitutional rights, including his right to a speedy jury

23   trial, and also continue to request discovery in the matter.

24           THE COURT:  Thank you, Ms. Jahn.

25           And thank you, Mr. Urso.

1          The next thing I wanted to discuss, we obviously

2    are having an issue getting Mr. Qualgin before us.

3          I understand the Government is expecting to file a

4    motion on this.  Is that still correct?

5          MS. JACKSON:  Yes, your Honor.  I'll confirm with

6    my supervisors whether that is the course we're going to be

7    taking in this.  But we do plan on filing a motion to

8    release the stay on his transfer.

9          THE COURT:  Obviously, it's not before me.  I'm

10   not going to rule on this.  But I'll tell you my instinct

11   here:  I understand that the Government had previously

12   sought the Chief Judge's involvement in directing where the

13   Marshals Service has people, and Mr. Qualgin has consented

14   to him staying there.

15         It's not immediately clear to me why the District

16   Court should be involved in telling the Marshals Service

17   where to hold people.  But I'll also tell you my instinct

18   is, once you invite us to get involved in this, you may be

19   stuck with us.

20         So obviously, I haven't seen what you're going to

21   say.  I haven't seen Mr. Diaz-Cobo's response.  But I think

22   if you want to continue to have him detained, you need to

23   figure out a way to have him appear.  And I'm not sure why,

24   given that we have one person in DC Jail, one person at

25   Northern Neck who we have also not gotten here today, that

1    New Jersey would make much of a difference one way or the

2    other.

3              Ms. Jahn, I understand you wanted to raise a

4    conflict issue?

5              MS. JAHN:  I did, your Honor.

6              As you know, now there's a second superseding

7    indictment.  And upon receipt and review of that indictment,

8    it was determined that there was a personal conflict for me

9    with regard to another individual that I represent.  That

10   was then fleshed out by administration of the Federal

11   Defender's Office; and ultimately, Ms. Cobb, who has

12   appeared from the Pensacola, Florida, Federal Defender's

13   Office, had agreed to replace me if the Court would grant my

14   request for moving to remove my representation due to the

15   conflict.

16             THE COURT:  Any concerns from the Government?

17             MS. BOND:  No, your Honor.

18             MS. JACKSON:  No, your Honor.

19             THE COURT:  Ms. Jahn, thank you for your service.

20             Ms. Cobb, I will appoint you to represent

21   Mr. Stevens going forward.  Thank you for your willingness

22   to assist.

23             MS. COBB:  Thank you, your Honor.

24             THE COURT:  Where do things stand from the

25   Government?  Ms. Bond, are you addressing that?

1          MS. BOND:  Yes, your Honor.  I can begin.

2          So at this point, we have made a good bit of

3     progress since our last status hearing, and particularly in

4     the area of general discovery.

5          With respect to Defendant McCaughey and Defendant

6     Stevens, we have turned over significant discovery at this

7     time.  Mr. McCaughey has gotten almost all of the contents

8     of his FBI file as well as almost all of the contents of

9     Mr. Stevens's FBI file.  He has also received over 100

10    individual body-worn camera video files from January 6th,

11    and our estimation is that that is already hundreds of hours

12    of body-worn camera.

13         Mr. Stevens has received similar discovery.  He

14    has received almost all of the contents of his own FBI file

15    as well as almost all of the contents of Mr. McCaughey's

16    file, the same hundreds of hours of body-worn camera.

17    Discovery is ongoing.  We are regularly giving them things

18    that we find.

19         As we have alluded to in the past in the basis for

20    our motion to exclude time prior to our last hearing, of

21    course there is the big, voluminous discovery that's sort of

22    overarching over all of these cases.

23         That, of course, is still outstanding, but our

24    office as a whole is marching forward on that.  We have been

25    told that the office has a request for proposals to contract

1    with a vendor to establish a cloud-based discovery system.

2    They expect to be able to select a vendor in June.   The

3    timeline is, once they select a vendor later in the summer,

4    they will begin uploading that voluminous discovery such as

5    body-worn camera, [indiscernible] footage and things of that

6    are nature.

7         So we've made significant strides both on

8    case-specific discovery as well as the voluminous discovery.

9         With respect to plea offers, we have not yet

10   extended a plea offer to any of the Defendants; but we were

11   recently given approval to do that.   So Ms. Jackson and I

12   are developing a plea offer, which will require supervisory

13   approval.   But we are hopeful to be able to extend those

14   plea offers in the very near future.

15        Going forward, our request is for 45 -- at least

16   45 additional days until the next status hearing, of course,

17   to begin, giving Mr. Judd and Mr. Qualgin their

18   case-specific discovery.   I believe in that 45-day period,

19   our office will also make additional strides on providing

20   that big, voluminous, overarching discovery.

21        THE COURT:   I'm not thrilled to hear about July.

22   That feels like a long time away, given some of these

23   Defendants were charged almost five months ago.

24        So you're requesting another status conference in

25   45 days, ma'am?

1          MS. BOND:  Yes, your Honor.  We're asking that

2    that time be excluded under the Speedy Trial Act.

3          THE COURT:  And is -- you're expecting to provide

4    pleas for all four Defendants?

5          MS. BOND:  Your Honor, I don't want to speak out

6    of turn.  It is the expectation at this juncture.

7          THE COURT:  Thank you.

8          Mr. Urso, your position?

9          MR. URSO:  Your Honor, we strenuously object to

10   excluding any further time.

11         As I pointed out in the last -- I think our last

12   meeting, the Government chose the way this investigation has

13   gone.  Typical -- as the Court knows, typical federal

14   criminal investigations happen in increments.  The

15   Government does its full investigation, has all of its

16   discovery in place, and then it makes decisions to go to the

17   grand jury.

18         For political or whatever reasons, whatever their

19   reasons, it was for their reasons that they chose to arrest

20   my client in January and other people, and that was their

21   choice.  And the reason there are speedy trial issues is

22   because of prosecutorial discretion or choice.  There's no

23   way around it.

24         If they waited -- there was no pressing urge, no

25   pressing need, just like in RICO cases or any other federal

1    cases.  They leave crime bosses out on the street for two

2    years while they're investigating and buttoning things up.

3    So there was no reason other than their own to proceed in

4    this fashion.

5          My client shouldn't have to sit and wait for his

6    trial while the Government gets its ducks in a row.  It's

7    100 percent the result of the Government's decision to

8    proceed in this piecemeal, rushed fashion, which is

9    completely atypical of how they normally do things.

10          So I don't think my client should have to pay the

11    price from that choice.  I strenuously, strenuously object

12    to any further exclusions.

13          THE COURT:  Thank you, Mr. Urso.

14          Ms. Cobb?

15          MS. COBB:  Your Honor, we're in a little bit of a

16    different position, given that Mr. Stevens is out of custody

17    and also given that I just signed on to this case in the

18    last 48 hours, approximately.  So we don't have any

19    objection at this point.

20          THE COURT:  Okay.  Mr. Diaz-Cobo, let me ask, are

21    you waiving your client's appearance for purposes of today's

22    proceeding, sir?

23          MR. DIAZ-COBB:  I am, Judge.

24          THE COURT:  Thank you.

25          I'll hear from you on the Government's proposal.

1           MR. DIAZ-COBB:  Judge, we also are somewhat

2     situated differently.  At this point, Judge, we're not going

3     to object to 45 days.

4           THE COURT:  And Ms. Mullin?

5           MS. MULLIN:  Your Honor, at this time I would

6     object to the exclusion of the 45 days.

7           My client is detained.  He's been indicted since

8     April.  I recognize that I was just appointed to the case,

9     and Ms. Jackson has given me limited discovery at this

10    point.  But given that he remains detained and, frankly, I

11    haven't had a chance to discuss this issue with him, as

12    obviously he's not here, we object.

13          THE COURT:  Okay.  I think it is appropriate for

14    us to come back in about 45 days and to toll the speedy

15    trial clock in the interim.

16          I understand the concerns, especially from the

17    detained Defendants.  And frankly, we're not just going to

18    let this case meander.  I would expect when we come back

19    that we're going to be picking a trial date unless -- well,

20    for any parties who have not pled guilty.  And you can

21    certainly think then about appropriate discovery timelines

22    in light of the specific Defendants and trial at that point.

23          But frankly, we've got four Defendants here, a

24    couple of whom have just been added.  It's going to be

25    facing difficulties getting a trial date for everybody.  I

1   think there are unusual circumstances about the January 6th

2   cases that mean there's a lot more discovery than normally

3   would be the case.

4           So I do think the interests of justice outweigh

5   the interests of the public and the Defendants in a speedy

6   trial to the extent that we're going to toll the speedy

7   trial clock until mid-June on this.  We're not just going to

8   keep doing this indefinitely, though.  I understand the

9   detained Defendants' desire to move quickly.

10          I think I had previously given the Due Process

11  Protections Act language for some of the Defendants.  But

12  since we have a couple of new Defendants, let me reiterate

13  that, pursuant to the Due Process Protections Act, the Court

14  orders that all Government counsel shall review their

15  disclosure obligations under *Brady versus Maryland* and its

16  progeny as set forth in Local Criminal Rule 5.1 and comply

17  with its provisions.  The failure to comply could result in

18  dismissal of the indictment or information, dismissal of

19  individual charges, exclusion of Government evidence or

20  witnesses, continuances, Bar discipline and any other remedy

21  that is just under the circumstances.

22          We'll also reissue that as a minute order for all

23  of the Defendants.

24          I'm going to address the motion of Mr. McCaughey

25  to modify his conditions of release in a moment.

1          Anything else we should be discussing, Ms. Bond?

2          MS. BOND:  The only remaining thing is this

3    morning we filed a request to extend the protective order to

4    Mr. Judd and Mr. Qualgin.  Both of the attorneys have

5    consented to that.  So we're asking your Honor to issue that

6    order in the near future.

7          THE COURT:  I saw that.  I've already signed it.

8    We should have it uploaded.

9          MS. BOND:  Thank you, Judge.

10         THE COURT:  Before the Court is the Defendant

11   McCaughey's motion to reopen and modify his conditions of --

12   well, his detention order pending trial.  This raises a

13   number of reviews that I want to discuss briefly.

14         And for the following reasons, I do intend to

15   grant the motion to reopen and to modify the conditions of

16   release:

17         First, Defendant McCaughey points out that I

18   applied the wrong rebuttable presumption standard.  That's

19   correct.  There was no rebuttable presumption in this case

20   that would have argued for him being detained.

21         As the Government points out, I also indicated

22   that, given the evidence the defense had applied, that the

23   rebuttable presumption really did not carry any weight in

24   this case and so as a practical matter that made no

25   difference to my detention decision.  And it certainly would

1    not in itself be a reason for me to release the Defendant

2    now.   But for the record, there was no rebuttable

3    presumption for detention.

4            In fact, I should have and do now come with the

5    presumption that the Defendant -- that there are conditions

6    of release less than detention that could operate, and it's

7    only if the Government overcomes that presumption that the

8    Defendant must be held should I be holding him.

9            Among the various filings here -- and I've read

10   all of them, both from the Government and the defense -- is

11   the Government's supplement regarding 18 USC 111, one of the

12   most serious charges the Defendant is facing.  And as the

13   Government points out, the Government must prove that either

14   the Defendant inflicted bodily injury on the officer or used

15   a deadly or dangerous weapon to assault the officer.

16           I hadn't focused on this sufficiently in the past,

17   and I appreciate the Government's candor on this issue.  The

18   Government admits it's not relying on any infliction of

19   bodily injury here as to the officer.  In fact, there's no

20   allegation that the officer was injured.  Both the

21   Government and I had assumed that Officer Hodges had been

22   screaming out in pain in the videos where we saw him

23   screaming.  However, Mr. McCaughey has introduced evidence

24   of an interview with Officer Hodges where he said that he

25   was essentially screaming to signal to other officers that

1    he was trapped.  He doesn't say anything about being injured

2    himself.

3            Now, I think the Government is right:  He could

4    have been both screaming for help and screaming in pain.

5    And I'm not making any finding that he wasn't injured or

6    wasn't in pain.  But I think the record, the very limited

7    record that I have before me now, does not support a finding

8    that the Defendant injured or put Officer Hodges in pain.

9    To the contrary, we do have evidence that Mr. McCaughey

10   lowered Officer Hodges's mask to protect him from OC spray

11   being sprayed by other rioters and that he repeatedly

12   signaled to other rioters to help Officer Hodges.

13           And Officer Hodges does indicate in his interview

14   that he -- that someone made a way up for him.  I don't know

15   if Officer Hodges was referring to the Defendant or another

16   officer.  I'm not going to assume that it was the Defendant

17   there.  But I think, having rewatched the videos and

18   considered this new evidence, it does put that incident into

19   a slightly different light.

20           So the Government is not relying on infliction of

21   bodily injury.  Rather, they're relying on the use of a

22   deadly or dangerous weapon, which here they say is the

23   police shield that the Defendant apparently took from

24   officers.

25           I've got to say, based on what I've seen thus far,

1    I'm dubious that the shield was a dangerous or deadly weapon

2    as used by the Defendant.  I certainly think a shield could

3    be used as a deadly or dangerous weapon, particularly if

4    you're using the straight edge of the shield as some sort of

5    blade or cutting device.  But what I've seen in the tapes

6    that I've seen is the Defendant was primarily using a shield

7    as a shield, to protect himself from baton strikes from the

8    officers and also to push the officers back.

9         None of that is to say that that wasn't assaultive

10   conduct; but I'm not sure there was violent conduct.  And

11   it's not immediately clear to me that he was using this

12   shield as a dangerous weapon or as a deadly weapon rather

13   than as a shield is typically used, which is primarily for

14   protection and a kind of pushing device, not as an

15   assaultive or striking device.

16        As I reviewed the tapes, it looks to me like the

17   Defendant was trying to push his way through the officers

18   with other rioters to enter the Capitol rather than that he

19   was trying to hurt or attack officers.  I certainly think

20   there were other people who were hurting and attacking

21   officers, and perhaps there's evidence that I'm not aware of

22   that that's what the Defendant was doing.  But based on my

23   review of the tapes, it seems to me that the Defendant was

24   primarily just trying to get into the Capitol, forcing his

25   way past the officers.

1        And that I think is relevant both to his

2   dangerousness, but also to a recent DC Circuit decision,

3   *United States versus Munchel*, 991 F.3d 1273, from earlier

4   this year.

5        Now, *Munchel* does have language that frankly

6   upholds the Defendant, where it says, "In our view, those

7   who actually assaulted police officers and broke through

8   windows, doors and barricades and those who aided, conspired

9   with, planned and coordinated such actions are in a

10   different category of dangerousness than those who cheered

11   on the violence or entered the Capitol after others cleared

12   the way."  That's from Page 1284.

13        But it also chided one of my colleagues for

14   failing to demonstrate that it considered the specific

15   circumstances that made it possible on January 6th for

16   Munchel and Eisenhart to threaten the peaceful transfer of

17   power.  "The Appellant had a unique opportunity to obstruct

18   democracy on January 6th because of the Electoral College

19   vote tally taking place that day and concurrently scheduled

20   rally and protest."  That's also on Page 1284.

21        And I think I do need to consider the

22   circumstances of January 6th and the Defendant's actions

23   there and whether there's any evidence from that that the

24   Defendant poses an ongoing risk to the community.

25        As I said, he didn't seem to be primarily focused

1     on violence or assaultive conduct; rather, it seems like he

2     was probably trying to disrupt the election.

3              Now, obviously, this is troubling and likely

4     criminal.  But I'm not sure that that poses the same type of

5     threat moving forward such that detention is the only

6     option.

7              So I want to just briefly reconsider how I would

8     tally the various factors I must consider under the Bail

9     Reform Act.

10             In light of all I said the last time and what I've

11    just said, I think in looking to the first factor, the

12    nature and circumstances of the offense, I'm going to assume

13    that weighs in favor of detention.  But I don't think it

14    weighs very heavily in favor of detention.

15             The strength of the evidence:  Now, unlike what I

16    said before, I think it actually weighs in favor of release.

17    I think there's obviously incredibly strong evidence that

18    the Defendant was at the Capitol on January 6th and quite

19    possibly committed various crimes.  But as to a couple of

20    these really salient issues right now, whether he injured

21    anyone, whether he was using the shield as a dangerous or

22    deadly weapon, I think the strength of the evidence is

23    actually weak as to those points.  And so I would not find

24    that the strength of the evidence weighs in favor of

25    detention.

1          The Defendant's history and characteristics have

2     always argued for release in light of his, as far as I

3     understand it, essentially spotless record, with no evidence

4     of criminal history whatsoever, which again makes his

5     actions on January 6th -- puts a certain light or context on

6     his actions on January 6th.

7          And finally, the Defendant's danger to the

8     community:  I think that also favors release for the reasons

9     I said.  And specifically, in light of *Munchel*, I think

10    whatever criminal activity the Defendant may have committed

11    on January 6th seems to have been a very -- it was a highly

12    unusual event in our country.  It also seems to have been

13    out of character with the Defendant from everything else

14    I've seen of the Defendant.  And in light of my current

15    finding that the evidence before me does not suggest he was

16    attacking or trying to act violently towards or hurt

17    officers, I just don't see him posing an ongoing danger to

18    the community.

19         Of course, the Government's burden is to show by

20    clear and convincing evidence that no condition or

21    combination of conditions of release will reasonably assure

22    the safety of any other person in the community.  I don't

23    believe they've shown that now.

24         The Government apparently is no longer arguing

25    that the Defendant poses a flight risk.  I agree that in

24

1    light of -- though it was always kind of a close case and in

2    light of the additional evidence the Defendant has provided

3    of his willingness to ensure his return, I don't think the

4    flight risk would justify detention either.

5             So for all those reasons, I'm going to order the

6    Defendant released.

7             What does the Government request in terms of

8    release conditions?

9             Well, actually, before I ask you, do we have

10   Pretrial Services on the phone?

11            THE PRETRIAL SERVICES OFFICER:  Good morning, your

12   Honor.  Christine Schuck, Pretrial Services.

13            THE COURT:  Hi, Ms. Shuck.

14            Do you have any recommendations for release of

15   Mr. McCaughey?

16            THE PRETRIAL SERVICES OFFICER:  Yes, your Honor.

17            I just need to put on the record our

18   recommendation as stated in the pretrial report remains the

19   same.  But at the request of chambers, pretrial services did

20   submit a list of of possible conditions based on the report

21   that was submitted by the Southern District of New York.

22            So those conditions would include reporting to the

23   District of Connecticut, because he lives in the state of

24   Connecticut, so he would be under the supervision of the

25   District of Connecticut.  So he'd report to them as

1    directed.

2              Additionally, to surrender all passports to the US

3    Probation Office for the District of Connecticut.

4              Travel would be restricted to the District of

5    Connecticut and Washington, DC, when in-person court

6    appearances are required.  The Court would need to approve

7    any and all other travel.

8              He would need to stay away from and avoid all

9    contact with Co-Defendants and key witnesses; not to possess

10   firearms, a destructive device or other weapons; not to

11   unlawfully use or possess a narcotic drug or other

12   controlled substance unless prescribed by a licensed medical

13   practitioner; submit to drug testing as directed by the US

14   Probation Office for the District of Connecticut;

15   participate in inpatient or outpatient substance abuse

16   therapy or counseling as directed by that office; be placed

17   on home detention, which would be monitored through GPS

18   monitoring, and pay for any associated costs with that --

19   that come with the location monitoring program; and report

20   any contacts with law enforcement to the US Probation Office

21   for the District of Connecticut as soon as possible.

22             THE COURT:  Thank you, Ms. Schuck.

23             Government?

24             MS. BOND:  Thank you, your Honor.

25             The Government's position remains that

1    Mr. McCaughey should be detained.

2            But in light of your Honor's ruling, the most

3    significant release conditions are home detention, the GPS

4    monitoring, as well as surrendering his passports to the

5    probation office there in Connecticut.

6            THE COURT:  Thank you, Ms. Bond.

7            Mr. Urso?

8            MR. URSO:  That's all fine, your Honor.

9            I would just ask, if there's -- to the extent

10   there's paperwork, I'd ask the Court to release him subject

11   to giving us a chance to submit any paperwork that might be

12   necessary.  I don't know if your Honor's -- is it going to

13   be a release without security?  Then it'll probably be

14   simple.  We probably won't have any paperwork.

15           THE COURT:  No.  I do want to take you up on your

16   offer of the bond on the Defendant's father's home in

17   New York; and his release will be subject to that taking

18   place.

19           I'm going to order the Defendant released on the

20   following conditions:  one, that the Defendant offer as bond

21   the $450,000 or so real estate in New York that was

22   mentioned in the Defendant's paperwork; two, that he

23   surrenders all travel documents and passports; three, that

24   he remains in the District of Connecticut except for any

25   in-person visits to US District Court here in DC; four, that

1       he not use illegal narcotics and participate in substance

2       abuse testing and treatment as determined by the US

3       Probation Office; five, that he submits to home detention

4       with GPS location monitoring; six, that he does not obtain

5       or possess any weapons; seven, that he has no contact with

6       any Defendants or likely witnesses in this case; and, eight,

7       that he reports any contacts with law enforcement within 24

8       hours to the US Probation Office.

9               The Defendant must also report in person to the

10      District of Connecticut US Probation Office upon his

11      release.

12              Thank you, Ms. Schuck.

13              MR. URSO:  Judge, if I could, on the home

14      detention, would the Court put in exceptions for work, like

15      if he's going to work, if he's got to meet his lawyer and

16      perhaps medical appointments or church?

17              THE COURT:  So my understanding was the Defendant

18      is not employed at this time.  Was I wrong about that?

19              MR. URSO:  Yes, your Honor.  Well, he works with

20      his father.  They have construction jobs pending now.  So

21      they were not working during the COVID, but the business

22      picked up.  And I put that in my papers.  I even put a job

23      quote, I think, that is pending that his dad is working on

24      right now.

25              THE COURT:  So --

```
 1              THE PRETRIAL SERVICES OFFICER:  Your Honor?

 2              THE COURT:  Yes, Ms. Schuck.

 3              THE PRETRIAL SERVICES OFFICER:  Home detention

 4    allows for what defense counsel is asking for.  Home

 5    incarceration does not.

 6              THE COURT:  Okay.  So it sounds like you're

 7    covered, Mr. Urso.  If you have any issues, I suggest you

 8    talk with the US Probation Office there in Connecticut or

 9    Ms. Schuck, who is very on-the-ball, here in DC.  And if

10    there's still any issue, you can raise it.

11              MR. URSO:  Thank you.

12              THE COURT:  Anything further for us to discuss

13    today, Ms. Bond?

14              MS. BOND:  Your Honor, would you be willing to put

15    on the record that Mr. McCaughey is to surrender both his US

16    and his German travel documents?

17              THE COURT:  Yes.  Thank you.

18              When I said "travel documents," I did mean any US

19    passports and other travel documents.  Thank you.

20              Mr. Urso, anything further for Mr. McCaughey?

21              MR. URSO:  Judge, just so I'm clear, he will be

22    released once we get the paperwork filed for the real estate

23    bond?  Or is he --

24              THE COURT:  And I think the passports also need to

25    be provided.
```

```
 1              MR. URSO:  Well, that's got to go to Connecticut.
 2      Okay.  So should I perhaps get Ms. Schuck's contact
 3      information?
 4              THE COURT:  Yes.  You can do that offline.  Feel
 5      free to contact Ms. Chaclan or my chambers if you don't have
 6      it.
 7              MR. URSO:  Thank you, your Honor.
 8              THE COURT:  Ms. Cobb, anything further on behalf
 9      of your client?
10              MS. COBB:  No, your Honor.  Thank you.
11              THE COURT:  Mr. Diaz-Cobo?
12              MR. DIAZ-COBB:  Nothing further, Judge.
13              THE COURT:  And Ms. Mullin?
14              MS. MULLIN:  No, your Honor.  Thank you.
15              THE COURT:  Ms. Chaclan, do you have a proposed
16      date for the next hearing?
17              THE COURTROOM DEPUTY:  I do, your Honor.  June
18      16th at 11:00 a.m.
19              THE COURT:  Ms. Bond, does that work for the
20      Government?
21              MS. BOND:  Yes, your Honor, it does.
22              THE COURT:  Mr. Urso?
23              MR. URSO:  Yes, your Honor.
24              THE COURT:  Ms. Cobb?
25              MS. COBB:  Yes, your Honor.
```

```
 1              THE COURT:  Mr. Diaz-Cobo?

 2              MR. DIAZ-COBB:  Yes, Judge.  That works.  Thank

 3    you.

 4              THE COURT:  Ms. Mullin, don't mess it up for us.

 5              MS. MULLIN:  It works, your Honor.

 6              I just have a question.  Will the hearings be in

 7    person?  I don't know if your court is -- we started going

 8    in person now, so I'm just inquiring.

 9              THE COURT:  This hearing will be virtual, I think.

10              MS. MULLIN:  Okay.

11              THE COURT:  I think we are going to be switching

12    to more in-person.  But at this point, I think it makes

13    sense for it to be virtual.

14              I will say if there's going to be a plea,

15    obviously, if the Defendant wants to do that in person, I

16    would certainly accommodate that.  But for now, let's assume

17    it's virtual.

18              MS. MULLIN:  Thank you, your Honor.  The 16th of

19    June works for me.

20              THE COURT:  All right.  Thanks, folks.

21              Mr. Stevens, it looks to me like you're

22    maintaining the conditions of your release.  I just want you

23    to continue to maintain those conditions and report for the

24    virtual hearing that we've described.  I don't think I

25    mentioned this to you before.
```

```
 1                  Mr. McCaughey, you should know as well that I do
 2        take the Defendants' behavior while on pretrial status into
 3        consideration when it comes time for sentencing.  So make
 4        sure you maintain all your release conditions and remain in
 5        contact with Pretrial Services and with your attorney.
 6                  Thanks, folks.
 7                  MR. URSO:  Thank you, Judge.
 8                  MS. BOND:  Thank you, your Honor.
 9                  MR. DIAZ-COBB:  Thank you.
10                  (Proceedings concluded.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                          **<u>CERTIFICATE</u>**

2

3                   I, LISA EDWARDS, RDR, CRR, do hereby

4       certify that the foregoing constitutes a true and accurate

5       transcript of my stenographic notes, and is a full, true,

6       and complete transcript of the proceedings produced to the

7       best of my ability.

8                          Please note:  This hearing occurred

9       during the COVID-19 pandemic and is therefore subject to the

10      technological limitations of reporting remotely.

11

12                         Dated this 5th day of May, 2021.

13

14                  <u>/s/ Lisa Edwards, RDR, CRR</u>
                    Official Court Reporter
15                  United States District Court for the
                      District of Columbia
16                  333 Constitution Avenue, NW, Room 6706
                    Washington, DC 20001
17                  (202) 354-3269

18

19

20

21

22

23

24

25