## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:21CR40-TNM |
| | ) | |
| DAVID LEE JUDD | ) | |

### Reply to Government's Opposition to Motion to Compel Discovery in Support of Mr. Judd's Claim of Selective Prosecution

Defendant David Lee Judd, through counsel, submits this reply to the government's opposition to his motion to compel discovery. In his motion for discovery, Mr. Judd made a prima facie case of discriminatory effect and purpose which the government has failed to rebut.  Instead, the cases cited by the government support Mr. Judd's claim that he and other January 6 defendants have a colorable claim of selective prosecution when compared with the government's charging and resolution of cases stemming from violent riots in Portland, Oregon in 2020 as well as riot cases stemming from protests in Washington, D.C., which spanned the summer of 2020.

**1. The Defendant Must Offer a "Colorable Claim" to be Entitled to Discovery on His Selective Prosecution Claim.**

While it is true that prosecutorial decisions enjoy a "presumption of regularity," *United States v. Armstrong*, 517 U.S. 456, 464 (1996), prosecutorial discretion is subject to constitutional constraints. *Armstrong*, 517 U.S. at 464 (quoting *United States v. Batchelder*, 442 U.S. 114, 125 (1979)). "The Equal Protection Clause prohibits **selective** enforcement "based upon an unjustifiable standard such

1

as race, religion, or other arbitrary classification." *United States v. Barnes*, WL 5538550 (D.C. Cir. 2019) (internal citations omitted).

In order to be entitled to discovery in a selective prosecution case, the defendant must offer "at least a colorable claim" that (1) he or she was singled out for prosecution from among others similarly situated, and (2) that his or her prosecution was improperly motivated.  *See United States v. Washington,* 705 F.2d 489, 494 (D.C. Cir. 1983); *Attorney General v. Irish People, Inc.,* 684 F.2d 928, 932 (D.C. Cir. 1982); *Synanon Church v. United States,* 579 F. Supp. 967, 977 (D.D.C. 1984).   Mr. Judd has made a "colorable claim" and therefore, he is entitled to discovery.

i.    **The Charging of the Comparative Group Does Not Bar a Selective Prosecution Claim.**

Mr. Judd has catalogued a number of "Portland Riot" cases in which the government either dismissed the case outright or offered a deferred resolution agreement (DRA).  Doc. 138.  Rather than offer a rational explanation as to why significant numbers of the Portland defendants' cases were outright dismissed by *nolle prosequi* or resolved by DRA when they were similarly situated to that of the January 6 defendants, the government points to three cases cited by Mr. Judd in which defendants were *initially* charged with assault on a police officer while in the same breath admitting that the charges were dismissed: "Although it is true that each case was *eventually dismissed* by the government for unknown reasons (typically after the defendants repeatedly agreed to waive their rights to a preliminary hearing or indictment over a period of months), all were initially facing felony charges.)." Gov't. Opp. Doc. 154 at 17 (emphasis added).

In relying on those three cases, the government argues that because the Portland cases were *initially* pursued, Mr. Judd cannot establish that similarly situated people were "not prosecuted," which he is required to show under *Armstrong*. Gov't Opp. at 16.  But the government misses the mark by conflating charging with prosecution, thereby losing sight of the Equal Protection touchstone of selective prosecution.  Specifically, by the government's logic, it could treat two classes of people differently under the law—i.e., punish only one group—if it merely *charges* both groups first. The result is both absurd and untenable.  The Equal Protection Clause does not operate by form, but by function.  That is why the test for selective prosecution is functional, focusing on discriminatory *effects*.[1]

Moreover, the government cites no direct support for its position that charging disqualifies a comparative class.  Instead, the government relies on an extension of the language and logic in *Armstrong*.  But *Armstrong* does not stand for the proposition that a claim of selective prosecution is *per se* precluded if the government can locate a few similarly situated defendants who were only initially charged and then granted *nolle prosequi*.  Indeed, elsewhere in the *Armstrong* opinion, the Court described the threshold that a defendant must meet as "a credible showing of different treatment of similarly situated persons…"  *Armstrong,* 517 U.S. 456 at 470 ("We think the required threshold—a credible showing of *different treatm*ent of similarly situated persons—adequately balances the Government's interest in vigorous prosecution and the defendant's interest in avoiding selective prosecution.")

---

[1] This is particularly true when discussing higher up decision-making.

(emphasis added).  The Portland cases the government relies upon show just that: different treatment of similarly situated persons.

Finally, while it is true that there is little case law that addresses the issue even indirectly, courts often frame the selective prosecutorial endeavor as a matter of wrongly singling out a defendant or class of defendants for *punishment*, not process. *See, e.g.*, *Gardenhire v. Schubert*, 205 F.3d 303, 318 (6th Cir. 2000) ("The court should dismiss a case, or take other appropriate action, if the defendant can prove that the prosecutor or investigator intentionally singled him out *for punishment*.") (emphasis added). And at least one court has expressly observed that differences in prosecutorial *technique* can support a selective prosecution claim. *United States v. Daniels*, 142 F. Supp. 2d 140, 143 (D. Mass. 2001) ("[T]he [selective prosecution] claimant must prove that the Government's enforcement technique had a discriminatory effect and that it was motivated by a discriminatory purpose.") (citing and quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985) (internal quotations omitted).

ii.   **The Prosecutorial Decision-making Cannot Be Explained By Any Differences in the Strength of the Evidence Between the Portland Defendants and the January 6 Defendants**

In each of the cases the government cites in its opposition, according to the Affidavits in support of arrest, the offenses were witnessed by at least one (and in two cases, multiple) law enforcement witnesses and a law enforcement victim was physically struck or placed in a headlock.  Thus, the evidence was strong. And yet, the cases were ultimately dismissed on the government's motion.

4

The first of those defendants, Jordan Johnson, was observed by two Deputy United States Marshals (DUSM) striking another DUSM in the face with a homemade shield. *United States v. Johnson*, 3:20-mj-170 (D. Or.), Doc. 1 (Aff.). Johnson's belongings were searched and a baton, OC spray, steel plated body armor, helmet, a first aid kit, gas mask, and goggles were recovered. Yet, as the government acknowledges, inexplicably, Johnson's case was dismissed on the government's own motion. Doc. 20.

Next, the government points to the case of Portland rioter Bouchard. In that case, a Special Agent with the Federal Protective Service witnessed Bouchard place his arm around an officer's neck in a "headlock maneuver." Bouchard was also observed carrying a shield. *United States v. Bouchard*, 3:20-mj-165 (D. Or.), Doc. 1-1 (Aff.). Though the offense was witnessed by several federal officers, defendant Bouchard's case was also inexplicably dismissed upon motion by the government. Doc. 17.

Finally, in this subset of cases, the government points to *United States v. Webb*, another felony case dismissed (with prejudice) by the government for reasons unknown. 3:20-mj-169 (D. Or.), Doc. 22. In that case, Webb was observed striking a DUSM in the face with a shield. He then resisted arrest "by pulling his arms away from the DUSMs in an attempt to avoid being restrained." Doc. 1 (Aff.).

Contrast the Portland defendants to Mr. Judd, who has never been before been in trouble, and who was arrested over eight months ago and has twice agreed to toll his speedy trial rights as the government assembles discovery. The only plea offer

extended was to the lead felony count with the enhancement (18 USC §111(b)) and would have Mr. Judd stipulate to a guideline range of a significant sentence of imprisonment. Not only was he never offered an opportunity to participate in a DRA like many of the Portland defendants were, his efforts to negotiate a more favorable plea agreement were met with total resistance.

The government next argues that Mr. Judd is not similarly situated to a defendant charged in D.C. Superior Court, who, during a protest, was alleged to have thrown an M-80 style firework at a police officer, burning his pant leg. *United States v. Alanna Rogers,* 2020 CF3 006970 (D.C. Super. Ct. dismissed Sept. 30, 2020). While that defendant's offense was not captured on video, there was physical evidence that the defendant's firework ignited and *made contact with* a police officer. That defendant's case was dismissed in its entirety by the same U.S. Attorney's Office that charged Mr. Judd. And while the government correctly notes that defendant Rogers could not be charged with 18 USC § 111(b), the government fails to explain why it declined to classify the firecracker as a dangerous weapon under the D.C. Code. In another Portland fireworks case cited by Mr. Judd, the government points out that the defendant, John Ty Fox, was charged with a felony (civil disorder), but again fails to explain why it declined to classify the firework Fox used as a dangerous weapon, removing any potential for an enhancement penalty. Despite the fact that the small object that Mr. Judd is alleged to have tossed did not ignite, the government elected to charge the object as a "dangerous weapon," subjecting Mr. Judd to enhanced penalties. This is clearly disparate treatment of similarly situated defendants.

### iii. The Government's Reliance on a Small Handful of Portland Riot Cases That Resulted in Felony Pleas is Unavailing Because Mr. Judd is Not Similarly Situated to Those Particular Defendants.

The government points to Portland riot cases in which defendants pleaded guilty to felonies. Gov't. Opp. p. 18-19. As an initial matter, it is telling that the government can only point to a handful of Portland riot cases which were resolved in felony plea agreements. Moreover, those particular defendants were not similarly situated to Mr. Judd. For example, the government relies on a case in which a defendant "attacked a door at the Hatfield Courthouse with a sledgehammer, and then assaulted a responding Deputy U.S. Marshal by striking him with the same hammer." *United States v. Jacob Gaines*, 3:20cr223 (D. Or.) Doc. 29 (Gov't Resp. to Motion for Pre-trial Release). In the struggle that ensued, Gaines struck the marshal *three times with a hammer. Id.* Gaines pleaded guilty to one count of 18 U.S.C. § 111(b) and the government agreed to recommend the "low end" of the applicable range as long as the defendant demonstrated acceptance of responsibility. Doc. 53 (Plea Agreement). In another case the government cites, a defendant who *struck a DUSM repeatedly from behind with a wooden baseball bat* pleaded guilty to 18 U.S.C. §111(b). In that case, even though the officer experienced "significant bruising and soreness," the government agreed to recommend a sentence of just 24 months. *U.S. v. Dakotah Ray Horton*, Case No. 3:20CR419 (D. Or.) Doc. 25 (Plea Agreement). It bears emphasis here that Mr. Judd did not cause injury to any officer and the guideline range contemplated in Mr. Judd's plea offer is substantially higher than the 24 months the government agreed was appropriate for defendant Horton.

The government points to two purportedly "comparable" Oregon cases involving allegations of "lighting fireworks or some other pyrotechnic." Gov't Opp. at 19. But in one of these cases, the defendant caused a fire to break out[2] and in the other, the defendant threw a Molotov cocktail. When it twice failed to ignite, the defendant picked it up and threw it again.[3] Those defendants' alleged actions are not comparable to Mr. Judd's and therefore, they are not similarly situated. *Irish People v. Inc.*, 684 F.2d 928, 946 (D.C. Cir. 1982) (an individual is similarly situated if he committed the same crime in "substantially the same manner" as the defendant).

### 2. Mr. Judd Has Made a Prima Facie Showing of Discriminatory Purpose.

The government argues that Mr. Judd cannot produce evidence "linking any Oregon defendant to a particular viewpoint." Gov't. Opp. at 22. But of course, the government cannot with a straight face refute that the Portland protests were associated with left-leaning causes and that the January 6 protests were associated with supporters of President Trump. Indeed, the government made a point that Mr. Judd's was pictured wearing a red "Make America Great Hat." Gov't. Opp. at 5. Mr. Judd does not stand alone in his observation that he and other January 6 defendants are being treated more harshly than the Portland defendants. Indeed, federal lawmakers have also questioned the government's treatment of the January 6 defendants as comparted to the Portland rioters. In a letter to Attorney General Garland, a group of senators observed:

---

[2] *U.S. v. Agard-Berryhill*, 3:20CF352 (D. Or.) Doc. 1-1, Affidavit in support of Arrest Warrant.
[3] *U.S. v. Jospeh Ybarra*, 3:20CR294 (D. Or.) Doc. 1-1, Affidavit in support of Arrest Warrant.

> During the spring and summer of 2020, individuals used peaceful
> protests across the country to engage in rioting and other crimes that
> resulted in loss of life, injuries to law enforcement officers, and
> significant property damage.  A federal courthouse in Portland, Oregon,
> has been effectively under siege for months.   Property destruction
> stemming from the 2020 social justice protests throughout the country
> will reportedly result in at least $1 billion to $2 billion in paid insurance
> claims.[4]

The senators were also troubled by the DOJ's lax treatment of Portland riot
defendants:

> Despite these numerous examples of violence occurring during these
> protests, it appears that the individuals charged with committing crimes
> at these events may benefit from infrequent prosecutions and minimal,
> if any, penalties.   According to a recent article, "prosecutors have
> approved deals in at least half a dozen federal felony cases arising from
> clashes between protesters and law enforcement in Oregon last summer.
> The arrangements — known as deferred resolution agreements — will
> leave the defendants with a clean criminal record if they stay out of
> trouble for a period of time and complete a modest amount of community
> service, according to defense attorneys and court records."[5]

The senators go on to point out—as Mr. Judd has—that the DOJ's treatment
of the Portland cases "stands in stark contrast to the harsher treatment of the
individuals charged in connection with the January 6, 2021, breach of the U.S.
Capitol Building."[6]

The government's decision to treat the January 6 defendants differently than
other similarly situated defendants (that is, defendants arrested for conduct at a
protest) is not limited to its disparate treatment of the Portland protestors.   Its
discriminatory prosecution is also evidenced by the District of Columbia U.S.

---

[4] Letter to the Hon. Merrick B. Garland, June 7, 2021 (citations omitted), attached hereto as Exhibit 1.
[5] *Id.* citing Josh Gerstein, Leniency for defendants in Portland clashes could affect Capitol riot cases, Politico, Apr. 14, 2021, https://www.politico.com/news/2021/04/14/portland-capitol-riot-cases-481346.
[6] *Id.*

Attorney's Office's own handling of civil disorder cases stemming from the widespread protests which occurred in the District in the wake of the death of George Floyd.[7]  Some of those protests became violent.  Based on counsel's analysis of arrest data culled from https://mpdc.dc.gov/publication/mpd-unrest-related-arrest-data-set, between May and September, 2020, 102 protest participants were arrested for felony rioting stemming from the DC protests.   Of those individuals, 39 were charged with criminal offenses.  Of the 39 charged with criminal offenses, 12 were nolle prossed, 15 individuals were offered diversionary programs, two defendants were charged with felonies which were later pleaded down to misdemeanors, one was charged with a felony and sentenced to probation with 10 months suspended, one defendant was charged with a misdemeanor and pleaded and sentenced to probation with 150 days suspended.  There are currently two pending misdemeanor cases stemming from the DC protests and six defendants charged with felonies.  In each of those felony cases, the defendants were arrested for entering and looting a store or establishment.[8]  During the same time period, 37 protest participants were arrested for assaulting a police officer during the DC protests.  Of those individuals, 25 were charged with criminal offenses.  Of the 25 charged, only four were charged with felonies.  Of the four felony cases, one pleaded down to a misdemeanor, and one was

---

[7] *See* George Floyd death: Violence in Washington DC as protests continue, BBC News, June 1, 2020. https://www.bbc.com/news/av/world-us-canada-52876902; Night of Destruction across D.C. after protestors clash with police outside White House, Washington Post, June 1, 2021, https://www.washingtonpost.com/local/dc-braces-for-third-day-of-protests-and-clashes-over-death-of-george-floyd/2020/05/31/589471a4-a33b-11ea-b473-04905b1af82b_story.html

[8] *See U.S v. Daequan Anderson*, 2020 CF3 005107*; U.S. v. Tanisha Bauffer*, 2020 CF3 005095, *U.S. v. Jerrick Dorsey*, 2020 CF3 005099; *U.S v. Hezekiah Grooms*, 2020 CF3 005108; *U.S. v. Marquese Harris*, 2020 CF3 005100; *U.S. v. James Williams*, 2020 CF2 005572.  (D.C. Super. Ct.)

nolle prossed.[9]  Of the 21 cases resulting in misdemeanor charges, six were nolle prossed, and four resulted in deferred prosecution agreements.  While it is true that the D.C. protest defendants were charged in D.C. Superior Court, they were prosecuted by the same U.S. Attorney's Office that charged the January 6 defendants in federal court and even a cursory review of the outcomes of those cases show that the government is taking a much harsher approach to the January 6 defendants for similar conduct.

By presenting evidence of the disparate treatment of January 6 defendants as compared to other protestors associated with left-leaning causes, Mr. Judd has made the "colorable showing of different treatment of similarly situated persons" required by *Armstrong* and is therefore entitled to discovery. 517 U.S. at 470.

### 3.  Mr. Judd is Entitled to Narrowly Tailored Discovery to Support His Claim of Selective Prosecution.

Mr. Judd has requested discovery to support his claim of selective prosecution and because he has made a colorable claim, the Court should grant his request.  At the status conference in this matter, the Court suggested that counsel investigate what types of discovery has been ordered in other cases.

Of course, it is impossible to analogize the January 6 prosecutions to any other prosecution of a group of defendants, simply because a mass prosecution of this

---

[9]  There are two remaining pending felony assault cases: *United States v. Herman McNeal*, 2020CF36380 (D.C. Super. Ct.) (defendant McNeal is charged with throwing rocks at police officers. One of the rocks caused a spiral compound fracture of an officer's tibia); *United States v. Jamar Byrd*, 2020CF32020 (D.C. Super. Ct.) (while being transported to a transport wagon, Byrd is reported to have bit an officer, breaking the skin; inside the transport wagon, Byrd kicked an officer and headbutted another officer).

breadth is unprecedented.  However, district court orders in other cases involving

claims of selective enforcement and/or selective prosecution are instructive as to the

type and scope of discovery the government should be compelled to produce.  The

cases make clear that the discovery should be responsive to the defendant's claim of

selective prosecution.  For example, in one case, a Black defendant charged with

distributing crack cocaine moved to obtain discovery as to whether federal controlled

substance laws prohibiting distribution of cocaine in form of cocaine base were being

unfairly, arbitrarily and discriminatorily enforced against him.  The district judge

held that the defendant had demonstrated the threshold level of selective prosecution

sufficient to warrant discovery.  In that case, the judge granted the defendant's

request for the following discovery:

> A list of all federal cases in which the defendant has been charged
> with a cocaine offense, specifying whether the charge involved
> cocaine base or cocaine powder; 2.the racial or ethnic identity of
> each defendant in the listed case; 3.A statement identifying (a)
> each of the law enforcement agencies, including joint federal-
> state-local task forces or other inter-Governmental organizations,
> involved in the selection of targets for investigation of cocaine
> powder or cocaine base criminal offenses, and (b) the policies
> followed in making that determination; Statements identifying
> (a) the agencies involved and (b) the policies followed in
> determining which particular persons will be prosecuted in state
> or federal court;   A statement of the practices followed in
> implementing each policy articulated in response to requests 3(b)
> and 4(b) including articulable criteria employed in actual
> practice; An explanation of how the decisions to investigate and
> prosecute Defendant Tuitt in the present case were made and how
> they were compliant with the policy and practices articulated in
> responses to requests 3 through 5.

*United States v. Tuitt*, 68 F. Supp. 2d 4, 17 (D. Mass. 1999).  In another case involving

a defendant indicted on charges of stealing secrets about the U.S. nuclear arsenal on

behalf of the People's Republic of China, the district judge granted the defendant's motion for discovery on his selective prosecution claim and ordered the government to produce, among other materials, "the full classified transcript of testimony by the Attorney General and other Department of Justice officials before any congressional committee with respect to the defendant and the investigations in this case." *United States v. Wen Ho Lee*, CR99-1417 JP (D.N.M. August 25, 2000) (Order granting Motion for Discovery of Materials Related to Selective Prosecution).   In a case involving the operation of "phony stash houses," the district judge granted the defendants' motion for discovery to support claims of racial profiling in the investigation and prosecution of the "stash house" cases. *United States v. Paxton*, 2014 WL 1648746 (N.D. Ill. April 17, 2014).   In *Paxton*, the defendants requested broad discovery into the ATF's policies and procedures related to sting operations. The district judge held that "although defendants have made a sufficient showing to entitle them to discovery, the court finds that the scope of the defendants' request to be broader than necessary." *Id.* at 6.   As such, the district judge ordered the parties to "meet and confer regarding which items on the list may be disclosed by agreement" and report back to the court.   *Id.*

In Mr. Judd's case, if the Court is not inclined to compel the government to disclose each of the items listed in his initial motion (Doc. 138 at 10), the Court limit could order the government to produce discovery narrowly tailored to support Mr. Judd's claim. For example, the Court could order the government to produce internal Department of Justice memos regarding charging decisions and plea offers in the

January 6 cases and the Portland riot cases. The Court could also order the government to produce internal memos and emails regarding the charging and plea offer decisions in Mr. Judd's case and the Portland riot cases involving the alleged use of a firework or other explosive devices. Finally, particularly since the protests happened in the same city and were prosecuted by the same office, the Court could order the government to produce internal memos and emails regarding its charging decisions in the Jan. 6 cases and protests that occurred in the District of Columbia during the summer of 2020.

## Conclusion

For the reasons stated herein and Mr. Judd's initial Motion to Compel and any other reasons that may appear to the Court after a hearing, Mr. Judd moves the Court to order the government to produce discovery related to his claim of selective prosecution.

Respectfully submitted,

David Judd

By Counsel

___/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
DC Bar Number 484020
Assistant Federal Public Defender

Office of the Federal Public Defender
1650 King Street, Suite 500
Alexandria, Virginia 22314
(703) 600-0879 (T)
(703) 600-0880 (F)
Elizabeth_Mullin@fd.org (email)

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2021, I will electronically file the foregoing pleading with the Clerk of the Court using the CM/ECF system, which will then send a notification of such filing (NEF) to all counsel of record.

___/s/_____
Elizabeth Mullin
Virginia Bar Number 86668
DC Bar Number 484020
Assistant Federal Public Defender