UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**DAVID LEE JUDD**,<br><br>Defendant. | Case No. 1:21-cr-00040 (TNM) |

## MEMORANDUM ORDER

David Lee Judd faces felony charges for his alleged involvement in the Capitol riot. He now asks the Court to compel production of internal Government communications about its charging decisions. He argues that the Government has prosecuted him—a conservative—more harshly than liberal defendants accused of similar behavior during the riots that plagued Portland in the summer of 2020. Although he raises some troubling patterns in the Portland prosecutions, Judd has not shown that he is similarly situated to those defendants. He thus has not met his burden to compel discovery. The Court denies his motion.

I.

According to the operative indictment and the Government's Complaint,[1] a joint session of Congress gathered at the Capitol on January 6 to certify the Electoral College results of the 2020 Presidential Election. *See* Compl. Ex. 1 (Affidavit) ¶ 5, ECF No. 1-1. Vice President Mike

---

[1] The Court granted motions by co-defendants Patrick McCaughey, Tristan Stevens, Robert Morss, Geoffrey Sills, and Steven Cappuccio to join Judd's Motion to Compel. *See* Min. Order (Dec. 16, 2021); Min. Order (Nov. 19, 2021). None of those defendants has filed any memoranda in support of their respective motions. So the Court will discuss and analyze the facts underlying only Judd's indictment, but the reasoning here applies also to them.

Pence presided over the joint session. *See id.* ¶ 7. The U.S. Capitol Police (USCP) erected barriers to protect the Capitol and the proceedings inside. *See id.* ¶ 6.

As the proceedings began, a large crowd approached Capitol Hill. *See id.* ¶ 8. Judd was in it. He had traveled to Washington from his home in Texas. *See id.* ¶ 28. In the mid-afternoon, many in the crowd breached the police barriers and entered the Capitol grounds. *See id.* ¶ 9. Judd joined a group that engulfed the west side of the building and congregated around the tunnel entrance of the Capitol's Lower West Terrace. *See id.* ¶ 13. USCP officers arrayed themselves in a line across the inside of the tunnel. *See id.* Rioters tried to push through that line to enter the Capitol. *See id.* The rioters and officers packed the narrow tunnel.

According to the Government, Judd joined the crowd pushing against USCP officers. *See id.* ¶ 15. Although Judd was not face-to-face with the officers, he was inside the tunnel. Surveillance footage depicts him yelling for the crowd behind him to pass up riot shields stolen from USCP officers. *See id.* ¶ 19. The same footage also shows him helping to move two shields from the back of the crowd to the front. *See id.* ¶ 20.

Moments later, Judd lit an object on fire and hurled it into the line of USCP officers guarding the tunnel. *See id.* ¶ 21. According to the Government, that object was a firecracker. *See* Fifth Superseding Indictment (Indictment) at 11, ECF No. 179. Although the lit firecracker landed at the feet of the officers, it failed to explode. *See* United States Opposition to Defendant's Motion to Compel (Gov't Opp'n) at 9, ECF No. 9.

Judd remained near the entrance to the tunnel for the next hour. *See* Affidavit ¶¶ 22–23. Video recordings depict him chanting with the crowd and encouraging others to enter the tunnel. *See id.* ¶ 23. Video also shows Judd hoisting an American flag into the air after nearby rioters

hurl a long object at the USCP officers in the tunnel. *See id.* ¶ 25. Judd then re-entered the tunnel and joined rioters pushing the officers. *See id.* ¶ 26.

After the Government identified Judd from the surveillance footage, it charged him with civil disorder; obstructing an official proceeding of Congress; physical violence and disorderly conduct with a deadly weapon in a restricted building; physical violence in the Capitol grounds; and assaulting a federal officer with a deadly weapon. *See* Indictment.

Judd now moves to compel discovery into the Government's charging decisions for January 6 defendants and defendants charged after the Portland riots in the summer of 2020. *See* Def's Mot. to Compel Disco. (Def.'s Mot.), ECF No. 138. He argues that the Government has treated January 6 defendants more harshly than the Portland defendants. *See id.* at 3–6.[2] According to him, politics explain the difference. He says that the Department of Justice (DOJ) treats January 6 defendants more harshly because those defendants are conservative and support former President Trump. In contrast, the rioters in Portland supported causes "more closely associated with the Democratic Party," and thus received more generous treatment. *Id.* at 3. For now, the Court assumes that Judd is correct about the political affiliation of each group.

Judd seeks all communications between DOJ headquarters and the U.S. Attorneys' Offices here and in Oregon about their respective prosecutions of the Portland and Capitol riots. *See id.* at 10–11.[3] The Government opposes. *See* Gov't Opp'n. Judd's motion is now ripe.

---

[2] All page citations refer to the pagination generated by the Court's CM/ECF system and all exhibit numbers refer to the numbered attachments to the CM/ECF filings.
[3] Judd also seeks Government communications about the prosecution of one defendant in D.C. Superior Court.

## II.

Judd must meet a "demanding" standard to show that his prosecution violates the Equal Protection Clause. *United States v. Armstrong*, 517 U.S. 456, 463 (1996). "Few subjects are less adapted to judicial review than the exercise by the Executive of his discretion in deciding when and whether to institute criminal proceedings, or what precise charge shall be made, or whether to dismiss a proceeding once brought." *United States v. Fokker Servs. B.V.*, 818 F.3d 733, 741 (D.C. Cir. 2016) (cleaned up). So "the presumption of regularity applies to prosecutorial decisions and, in the absence of clear evidence to the contrary, courts presume that prosecutors have properly discharged their official duties." *Id.* That said, the Government cannot base its decision to prosecute on some unjustifiable standard, such as a defendant's "political beliefs." *Branch Ministries v. Rossotti*, 40 F. Supp. 2d 15, 21 (D.D.C. 1999), *aff'd* 211 F.3d 137 (D.C. Cir. 2000).

A selective prosecution claim has two elements. *First*, a defendant must establish that the prosecutorial policy "had a discriminatory effect." *Armstrong*, 517 U.S. at 465. To show that effect, a defendant must show that the Government afforded "different treatment" to persons "similarly situated" to him. *Id.* at 470. When a person's circumstances "present no distinguishable legitimate prosecutorial factors that might justify" different prosecutorial decisions between him and the defendant, that person is similarly situated to the defendant. *Branch Ministries*, 211 F.3d at 145. Courts, however, "narrowly" interpret the phrase "similarly situated." *United States v. Stone*, 394 F. Supp. 3d 1, 31 (D.D.C. 2019).

*Second*, a defendant must show that the prosecutorial policy had "a discriminatory purpose," *Armstrong*, 517 U.S. at 465, meaning that the Government prosecuted that defendant "because of" his membership in an identifiable group, *Wayte v. United States*, 470 U.S. 598, 610

(1985). Direct evidence of that purpose is rarely available, so courts permit defendants to use statistical disparities and other indirect evidence to show intent. *See United States v. Khanu*, 664 F. Supp. 2d 28, 33 (D.D.C. 2009).

A selective prosecution claim often requires discovery into the Government's files, an effort that will "divert prosecutors' resources" and possibly disclose their strategy. *Armstrong*, 517 U.S. at 468. To minimize that burden, a defendant must present "at least a colorable claim" of selective prosecution before any discovery is permitted. *Att'y Gen. v. Irish People, Inc.*, 684 F.2d 928, 932 (D.C. Cir. 1982). A colorable claim is one that presents "some evidence tending to show the existence of the essential elements" of selective prosecution. *Armstrong*, 517 U.S. at 468.

This "colorable claim" standard is a "significant" and "rigorous" one not easily surmounted. *Id.* at 464, 468. A defendant must make a "colorable claim" as to both elements of selective prosecution, not just one. *Irish People*, 684 F.2d at 932, 947; *see also United States v. AT&T, Inc.*, 290 F. Supp. 3d 1, 4 (D.D.C. 2018). And that claim requires "some evidence." *Armstrong*, 517 U.S. at 468. A defendant cannot, for example, rely merely on government selectivity in prosecuting individuals for similar conduct—that would amount to a showing of prosecutorial discretion. *See United States v. Diggs*, 613 F.2d 988, 1003 (D.C. Cir. 1979). Instead, for the first prong, a defendant must make "a credible showing of different treatment of similarly situated persons." *Armstrong*, 517 U.S. at 470. And for neither prong can a defendant rely on "personal conclusions based on anecdotal evidence." *Id.*

### III.

For the first prong, Judd argues that he is similarly situated to multiple defendants who faced charges in the District of Oregon. Those defendants rioted outside the Mark Hatfield

Federal Courthouse in Portland during the summer of 2020. *See* Def.'s Mot. at 2–4. The riots erupted after the death of George Floyd in May 2020 and raged for months. Thousands gathered nightly, vandalizing the courthouse and hurling objects at federal agents guarding it. Officers responded with tear gas and rubber bullets to disperse rioters, but the riots continued, causing havoc. *See generally* Mike Balsamo and Gillian Flaccus, *On Portland's Street: Anger, fear, and a fence that divides*, AP News (July 27, 2020).[4] According to a chart provided by Judd, the Government charged 74 people for their involvement in the Portland riots. *See* Appendix to Def.'s Mot. at 1, ECF No. 138-1.

Judd argues that these defendants were, like him, "alleged to have committed violence against federal officers in circumstances where a large crowd was attempting to breach a federal building." *Id.* at 8. Judd then notes that the Government has dismissed charges against some defendants in Portland but has not done so for him. Indeed, his plea offer would require incarceration. *See id.* at 9. He points to these differences as discriminatory effects.

Judd's claim is nontrivial. His chart suggests that Portland defendants generally received much lighter treatment than he has. For example, three Portland defendants allegedly struck officers in various ways. One placed an officer in a headlock. *See United States v. Bouchard*, No. 3:20-mj-00165 (D. Or.), ECF No. 1-1 at 4–5. Another punched and hit an officer in the face with a shield. *See United States v. Webb*, No. 3:20-mj-00169 (D. Or.), ECF No. 1 at 5. Yet another struck officers with a shield after he tried to pick up a smoke grenade. *See United States v. Johnson*, No. 3:20-mj-00170 (D. Or.), ECF No. 1 at 5. The Government charged these three defendants with felony assault on a federal officer, just as it charged Judd here. *See* Gov't Opp'n

---

[4] Available at https://apnews.com/article/virus-outbreak-ap-top-news-race-and-ethnicity-music-or-state-wire-1dd1bb39093a3691f4e78093787ab877.

6

at 17–18. That makes some sense—Judd was likewise allegedly present for a fracas with law enforcement at a federal building and used a firecracker (which if it had exploded, would have caused "bodily injury") to "intimidate" law enforcement. 18 U.S.C. § 111(a). The Government could justifiably seek felony convictions for both Judd and the Portland defendants.

But, incredibly, the Government dismissed the charges against all three Portland defendants. *See Bouchard*, Motion to Dismiss Complaint, ECF No. 16; *Webb*, Motion to Dismiss Complaint, ECF No. 22; *Johnson*, Motion to Dismiss Complaint, ECF No. 9. Judd still faces nine charges, including multiple felonies, even though the Government never alleges that he, unlike the Portland defendants, struck or injured an officer. That he still faces greater charges than the Portland defendants despite that key difference is suspicious.[5] That is the kind of "different treatment" that might warrant discovery. *Armstrong*, 517 U.S. at 470.

The Government responds that it treated Judd and the three Portland defendants equitably because it filed felony charges against all of them. *See* Gov't Opp'n at 18. The Government seems to think that the initial charges are all that matter. Not so. By that logic, the Government could avoid discovery of a race-based selective prosecution claim if it indicted similarly situated black and white persons, dismissed the charges against the whites, and prosecuted the black defendants to conviction or plea. The "administration of a criminal law" is not limited to an initial charging decision. *Armstrong*, 517 U.S. at 464. Nor is it so easily circumvented.

More, the Government's logic would allow it to charge similarly situated black defendants with felonies and white defendants with misdemeanors. But discriminatory effects

---

[5] The D.C. U.S. Attorney's Office also dismissed charges against the one D.C. defendant mentioned by Judd. She allegedly threw a firecracker at police during a Black Lives Matter protest in August 2020. *See* Affidavit in Support of Arrest Warrant, *United States v. Rogers*, No. 2020 CF3 006970 (D.C. Super. Ct. dismissed Sept. 30, 2020). The firecracker burned the pant leg of one officer. *See id.*

7

include disparities in the "crimes charged." *Stone*, 394 F. Supp. 3d at 31. The Government's argument is thus absurd and untenable—that the Government originally indicted the Portland defendants does not erase the potential for discriminatory effect.[6]

Nor does the Court accept the Government's attempt to distinguish these Portland cases on evidentiary grounds. According to the Government, video footage of Judd's actions solidified the case against him, precluding a dismissal. *See* Gov't Opp'n at 20. In contrast, Portland cases relied on officer recollections during nighttime attacks—none captured on video—by mostly masked assailants. *See id.* Fair enough. This could explain why fewer defendants overall were charged in Portland than here. But by indicting those cases, the Portland prosecutors presumably believed they had sufficient evidence to sustain convictions. *See* Justice Manual § 9-27.220 cmt. ("[N]o prosecution should be initiated against any person unless the attorney for the government believes that the admissible evidence is sufficient to obtain and sustain a guilty verdict by an unbiased trier of fact."). If anything, that fact supports Judd's argument. Evidentiary differences notwithstanding, the Government felt it had enough basis to charge both Judd and Portland defendants. Yet the Government dismissed the charges against only Portland defendants. The suggestion that Portland cases suffered from widespread, post-indictment, evidentiary challenges is thus a tough argument to swallow.

That is not to say the Government failed to prosecute Portland defendants with similar alleged offenses to Judd's. It did. But those cases only partially resemble Judd's. For example, Joseph Maza threw a lit object into the Portland Courthouse. *See United States v. Maza*, No. 3:20-cr-00343 (D. Or.), ECF No. 7-1 at 3–5. The object exploded, injuring a law enforcement officer. *See id.* at 6–7. The Government charged him under 18 U.S.C. § 111 with assaulting an

---

[6] The Government wisely dropped this argument at the motion hearing. *See* Hr'g Tr. at 66.

officer with a deadly weapon.  *See* Indictment, *Maza*, ECF No. 14.  Although Judd's firecracker never injured anyone on January 6, his indiscriminate heave into a crowded tunnel easily could have done so.  The Government thus had a basis for charging the two men similarly, though Maza faced only one felony charge.  Maza's case was closed because of his death before trial, but that cannot be held against the Government.  *See* Motion to Dismiss, *Maza*, ECF No. 32.

Similarly, Ty Fox ignited a firework and threw it at Portland officers.  *See* Gov't Opp'n at 16.  Unlike Judd's, that firework exploded.  Like Judd's, nobody reported any injuries.  The Government charged the Oregon defendant with felony civil disorder under 18 U.S.C. § 231.  *See* Indictment, *United States v. Fox*, No. 3:20-cr-00501 (D. Or.), ECF No. 1.  Judd faces the same charge.  But unlike Judd, Fox never faced a charge for assaulting a federal officer.  The Government explains that Fox thew his firecracker at *state* officers.  Gov't Opp'n at 17.  This distinction certainly justifies the failure to bring charges for assaulting federal officers.  *See* 18 U.S.C. §§ 111, 1114.

The individual Portland cases thus cut both ways.  For two Portland defendants whose alleged crimes resembled Judd's, the Government charged them with the some of the same felonies as Judd.  Yet he faces a harsher mix of charges.  And for Portland defendants who struck police officers (something Judd did not do), the Government dismissed felony charges.

Therein lies a troubling theme that emerges from a wholesale analysis of the Government's decisions in Portland.  The Government dismissed 27 cases brought against Portland defendants, including five felony cases.  *See generally* Appendix to Def.'s Mot.  Dismissal of one felony case is unusual.  Dismissal of five is downright rare and potentially

suspicious.[7] Rarely has the Government shown so little interest in vigorously prosecuting those who attack federal officers. Considered in this light, when compared to Portland cases, the disposition of Judd's case appears an outlier.

For any of these discrepancies to matter, however, Judd must show that the Portland defendants are similarly situated to him. He cannot do so. Although both Portland and January 6 rioters attacked federal buildings, the Portland defendants primarily attacked at night, meaning that they raged against a largely vacant courthouse.

In contrast, the January 6 rioters attacked the Capitol in broad daylight. And many entered it. Thousands of congressional staffers walked the Capitol's corridors that day. So did hundreds of legislators and the Vice President, all of whom appeared for a constitutionally mandated proceeding.

Putting aside any claims that January 6 rioters sought to tear down our system of government (an allegation not made against Judd), their actions endangered hundreds of federal officials in the Capitol complex. Members of Congress cowered under chairs while staffers blockaded themselves in offices, fearing physical attacks from the rioters. *See* Lindsay Wise, Catherine Lucey, and Andrew Restuccia, *"The Protestors Are in the Building." Inside the Capitol Stormed by a Pro-Trump Mob*, Wall St. J. (Jan. 6, 2021, 11:53 P.M.).[8] The action in Portland, though destructive and ominous, caused no similar threat to civilians. *Accord United States v. Miller*, No. 21-cr-119 (CBN), slip order at 3 (D.D.C. Dec. 21, 2021) ("Nor did the Portland rioters, unlike those who assailed America's Capitol in 2021, make it past the buildings'

---

[7] By way of comparison, the Court knows of only one January 6 case that the Government has dismissed among the hundreds of defendants charged for their alleged actions on that day. *See United States v. Kelly*, No. 21-mj-00128 (D.D.C., dismissed on June 1, 2021).

[8] Available at https://www.wsj.com/articles/the-protesters-are-in-the-building-inside-the-capitol-stormed-by-a-pro-trump-mob-11609984654.

10

outer defenses."). Given the "narrow[ ]" interpretation of "similarly situated," *Stone*, 394 F. Supp. 3d at 31, the Court cannot say that the Portland defendants "committed roughly the same crime under roughly the same circumstances" as Judd, *Khanu*, 664 F. Supp. 2d at 32.

Judd responds that the Government conflates "similarly situated" with "identically situated" and thus holds him to an impossible standard. His counsel reasoned, "January 6 is not going to replicate itself," making it almost impossible to find defendants similarly situated to him. Hr'g Tr. 53–54. Maybe so, but that *hurts* Judd's argument. Even if the unique context of January 6 render few defendants similarly situated to Judd, "it is precisely because of [that] uniqueness" that the Court would "find it difficult to fault" the Government's prosecution of him. *Irish People*, 684 F.2d at 946. If he can identify no one "to whom [he] could be compared," then "[he] has failed to make out one of the elements of [his] case." *Id.* Given the important distinctions in the threats posed by the two riots, the Portland defendants are not similarly situated to Judd. He has not met "even the threshold" of a selective prosecution claim. *Id.*

Judd has therefore failed to make a "credible showing of different treatment of similarly situated persons." *Armstrong*, 517 U.S. at 470. He thus has not presented a colorable showing of discriminatory effect. That failure dooms his motion to compel discovery.[9]

None of this suggests that the distinctions Judd highlights are irrelevant for all purposes. "Disparate charging decisions in similar circumstances may be relevant at sentencing." *United*

---

[9] Even if the Court is wrong about Judd's showing on the first prong, he also fails the second prong. He argues only briefly that his prosecution was motivated by an improper purpose. But his narrative of Government malfeasance does not fit reality. A Republican-appointed U.S. Attorney (under the direction of a Republican-appointed Attorney General) was responsible for the initial prosecutorial decisions in Portland. Those decisions involved dismissals of charges against Portland defendants, including ones alleged to have struck officers. *See, e.g.*, *United States v. Johnson*, No. 3:20-mj-00170 (D. Or., dismissed Oct. 22, 2020) (defendant accused of

*States v. Griffin*, — F. Supp. 3d —, 2021 WL 2778557 at *7 (D.D.C. July 2, 2021); *cf.* 18 U.S.C. § 3553(a)(6) ("the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"). But on this record, those disparate outcomes fail to justify the discovery he seeks.

### IV.

Justice requires that "like cases be treated alike" and that "there not be one rule for Democrats and another for Republicans." Merrick Garland, Remarks to DOJ Employees on His First Day, (Mar. 11, 2021).[10] Otherwise, prosecutions risk becoming "so unequal and oppressive" as to deny the rights of all. *Yick Wo v. Hopkins*, 118 U.S. 356, 373 (1886). Especially during moments of politically charged unrest, the Justice Department must strive for even-handed justice. Judd raises troubling questions about the Department's adherence to this imperative in Portland. But for the reasons stated above, he has not carried his burden to justify further discovery into the Government's prosecutions.

It is hereby

**ORDERED** that Judd's [138] Motion to Compel is DENIED.

**SO ORDERED**.

Dated: December 28, 2021                                            TREVOR N. McFADDEN, U.S.D.J.

---

striking an officer with a homemade shield). The Trump DOJ also dismissed charges against the D.C. Black Lives Matter protestor who allegedly threw a firework at police. *See* supra note 6. And DOJ began arresting January 6 defendants while still under Republican leadership. *See, e.g.*, *United States v. Chansley*, No. 21-cr-00003 (D.D.C., filed Jan. 8, 2021). More, the Biden DOJ continued to prosecute Portland defendants who allegedly struck officers. *See, e.g.*, *United States v. Horton*, No. 3:20-cr-00419 (D. Or.) (defendant pled guilty in August 2021 to one felony count of 18 U.S.C. § 111 after hitting officer with a baseball bat). Those decisions by both administrations undermine Judd's theory that DOJ purposefully prosecuted him for his politics.

[10] Available at https://www.justice.gov/opa/speech/attorney-general-merrick-garland-addresses-115000-employees-department-justice-his-first.