## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| | : | |
| **v.** | : | **Criminal No. 21-CR-40 (TNM)** |
| | : | |
| | : | |
| **GEOFFREY SILLS,** | : | |
| | : | |
| **Defendant.** | : | |

## GOVERNMENT'S OPPOSITION TO DEFENDANT'S MOTION FOR PRE-TRIAL RELEASE

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this opposition to the motion for release by the Defendant, Geoffrey Sills. Over a half-hour period, the Defendant repeatedly used a weapon to violently attack officers in the effort to overtake the Capitol on January 6, 2021. There are no conditions or combinations of conditions that can effectively ensure the safety of any other person and the community, pursuant to 18 U.S.C. § 3142(e).

The government respectfully requests that the following points and authorities, as well as any other facts, arguments and authorities presented at any hearing, be considered in the Court's determination regarding pre-trial detention.

## Factual Background

### The Attack on the United States Capitol on January 6, 2021

1

On January 6, 2021, a joint session of the United States Congress convened at the United States Capitol, located at First Street Southeast, Washington, District of Columbia. During the joint session, elected members of the United States House of Representatives and Senate met in the United States Capitol to certify the vote count of the Electoral College for the 2020 Presidential Election, which took place on November 3, 2020.

The United States Capitol is secured 24 hours a day by security barriers and USCP occupy various posts throughout the grounds. Restrictions around the United States Capitol include permanent and temporary security barriers and posts manned by USCP. USCP officers wore uniforms with clearly marked police patches, insignia, badges, and other law enforcement equipment. Only authorized people with appropriate identification are allowed access inside the United States Capitol. On January 6, 2021, the exterior plaza of the United States Capitol was also closed to members of the public.

The January 6, 2021 joint session began at approximately 1:00 p.m. Shortly thereafter, by approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Michael R. Pence was present and presiding, first in the joint session, and then in the Senate chamber.

As the proceedings continued in both the House and the Senate, and with Vice President Pence present and presiding over the Senate, a large crowd gathered outside the United States Capitol. As noted above, temporary and permanent barricades were in place around the exterior of the United States Capitol building and USCP were present, attempting to keep the crowd away from the Capitol building and the proceedings underway inside. As the certification proceedings were underway, the exterior doors and windows of the Capitol were locked or otherwise secured.

2

At approximately 2:00 p.m., certain individuals in the crowd forced their way through, up, and over the barricades, and past officers of the USCP, and the crowd advanced to the exterior façade of the building.  The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by the USCP or other authorized security officials.

A short time later, at approximately 2:20 p.m., members of the United States House of Representatives and United States Senate, including Vice President Pence, were instructed to— and did—evacuate the chambers. As such, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. the same day. In light of the dangerous circumstances caused by the unlawful entry to the United States Capitol, including the danger posed by individuals who had entered the United States Capitol without any security screening or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the United States Capitol, and the building had been confirmed secured.  The proceedings resumed at approximately 8:00 p.m. after the building had been secured.  Vice President Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the sessions resumed.

After the Capitol was breached, USCP requested assistance from MPD and other law enforcement agencies in the area to protect the Capitol, keep more people from entering the Capitol, and expel the crowd that was inside the Capitol.  Multiple MPD officers and other law enforcement officers came to assist.

**Facts Specifically Related to Sills**

As captured on USCP surveillance, BWC footage, and various videos posted to social media and YouTube, on January 6, 2021, law enforcement to include USCP and MPD were along a temporary fence line on the Lower West Terrace area of the Capitol. Law enforcement stood behind the metal fencing shoulder to shoulder, as captured in the still below from USCP surveillance.



As time moved on, the crowd started to push and tear down the fencing separating them and law enforcement. Law enforcement attempted to push back and reestablish the fence line. During this time objects were thrown at officers, physical assaults occurred, and chemical irritants were used. Based on video later recovered from his phone, Sills appears to at least at first to have been further back in the crowd and not at the front lines of the rioters confronting police. Specifically, based on a video with metadata showing that it was recorded around 2:13 p.m. that day, at least at that point in the day he stood a few rows behind those on the front lines. That video,

which is included as Exhibit A, shows the officers still able to keep the crowd at bay, although members of the crowd can be heard yelling "Storm the gates" and "They can't take us all."

At approximately 2:28 p.m., rioters breached the line of law enforcement and successfully advanced towards the first landing of the Lower West Terrace. During the breach, multiple officers were assaulted. Sills at that point had joined the very front line of rioters as they pushed police backwards. Specifically, Sills is visible on BWC footage, videos posted to social media, and USCP surveillance near the front lines of the rioters surrounding the officers as they were forced to retreat. Sills can be seen first filming as others push through the line of law enforcement. Then, after the line has completely broken, he can be seen repeatedly throwing items at the officers as they retreat, as described below. Sills is indicated by the red square in the still below from USCP surveillance from around 2:28 p.m., which when zoomed in captures his location as it corresponds to the BWC and videos described below.



At approximately 2:28 p.m., Sills is captured on the BWC of MPD Sgt. J.M., included as Exhibit B, during the aforementioned breach that occurred on the Lower West Terrace.  As shown in the still shot below from Exhibit B, with a red oval around Sills, Sills appears to be taking a video using his phone of officers being assaulted by other rioters as they breach the line.

*Screenshot from BWC of MPD Sgt. J.M.*



From approximately 2:29 p.m. to 2:31 p.m., Sills was captured on the BWC of additional MPD officers and continues to be among the front line of the rioters – filming those assaulting the officers as they are retreating from the first landing of the Lower West Terrace.  For example, he is captured on the BWC of Officer D.P., a clip of which is included as Exhibit C.   As seen in Exhibit C, at approximately 2:31 p.m., Sills was on the first landing of the Lower West Terrace appearing to take a video of multiple USCP officers being assaulted by other rioters, including a rioter who strikes a USCP officer to the ground.  (A screenshot is included below with a yellow circle around Sills.)   The video of the officer being knocked down that Sills can be seen filming was later recovered from his phone pursuant to a warrant, attached as Exhibit D.  Portions of that video were also later included in videos he posted to his Instagram, as described below.

*Screenshot from BWC of MPD Officer D.P.*



As captured on BWC footage and USCP surveillance, law enforcement officers continued to retreat backwards and fell back into a stairwell.  In addition, these same events, and Sills, were also variously captured on videos posted online.  For example, Sills is similarly visible at the forefront of the rioters in a video published by the New York Times, as shown in the still shots below with a red circle around Sills.

*Screenshot Derived New York Times Video*



After rioters had broken the line, Sills threw multiple objects at law enforcement as they retreated, as captured in another video uploaded to YouTube, included as Exhibit E. (Due to technical issues, the undersigned was unable to clip this video and thus included the entire 24 minute video in the exhibit. However, the specific relevant timestamps are listed below.)

Specifically, around 5 minutes and 23 seconds into Exhibit E, Sills can be seen throwing what appears to be a long pole at law enforcement, as shown in the still below with a red oval around Sills. Around this time, other rioters are also throwing objects at the officers, as captured both on Exhibit E and BWC footage.

*Screenshot from Exhibit E*



Then Sills can be seen picking up an unknown object and throwing it at law enforcement, as shown in the still below with a red circle around Sills. (Ex. E at 7 mins, 42 secs.) Sills can then be seen throwing a small black pole at law enforcement, as shown in the still below with red circles

added.  (Ex. E at 7 mins, 46 secs.)  Based on a comparison with BWC, which captures some of the

same events from a different perspective, this likely occurred around 2:32 p.m.

*Screenshots from Exhibit E*





Then moments later Sills can be seen throwing yet another pole or stick at law

enforcement, as shown in the still below with a red circle around Sills and the item. (Ex. E at 8

mins, 1 sec.)

*Screenshots from Exhibit E*



By that point, as shown in the still from USCP surveillance below, rioters had engulfed the west side of the Capitol and officers had begun retreating from the first landing of the Lower West Terrace. The sheer number of rioters overwhelming and surrounding the officers being forced to retreat is even more apparent in surveillance video.   Sills was essentially at the frontline of an enormous crowd surrounding and pushing back the officers. (Sills is outlined in a red box below, where when zoomed in a figure matching his clothing can be seen in the same position as he is visible in the video described above.)



As captured in Exhibit E, surveillance footage, and BWC footage, officers continued to retreat into the door behind them, which was the door built into the inaugural platform. Based on a review of a map of U.S. Capitol grounds, this door appears to be an access point to the stairwell that leads to next level of the Lower West Terrace where the tunnel that led to the Lower West Terrace Capitol building entrance is located. At 2:40 p.m., as shown in the still from surveillance footage below, with a blue circle around Sills, Sills was able to follow through that access point and was one of the very first rioters to reach the second landing of the Lower West Terrace.



Around the same time, additional rioters were climbing on the scaffolding in front of building as well as various features of the building. Although the Capitol Building had already been breached and protesters had flooded in through several entrances, a group of MPD officers and members of the USCP and other agencies called to assist gathered to protect the Capitol at

the very prominent entrance on the second landing of the Lower West Terrace.  (This is the exit through which the President typically comes through during inauguration, as pictured below in a photo from later that night.)  To enter the Capitol through the Lower West Terrace doors on January 6, one had to walk, climb, or scale up to the second landing, go up a set of stairs, walk through an arch and a short tunnel, and then walk through a series of glass doorways that the officers had locked.  The tunnel and doorways are very narrow, with the entryway through the doors measuring only around 10 feet across.



Around 2:40 PM, a group of law enforcement officers were maintaining a line at the second set of glass doors inside the tunnel.  Officers reporting to the scene rushed to the tunnel from within the building while rioters outside of the tunnel continued to summon more men to push their way through the tunnel.  A growing number of rioters made their way into the tunnel with a variety of tools and weapons and the tunnel became the point of one of the more intense and prolonged clashes between rioters and law enforcement at the Capitol on that day.  Many of the rioters in the tunnel were recording video and many of the videos continue to circulate Internet channels, social media, and the news.  Much of the fighting over the next two and a half

hours was also captured on surveillance footage from a camera above the Lower West Terrace doorway.  As captured in those videos, a large group of rioters attempted to break through the line of uniformed law enforcement officers who were in place to prevent rioters from entering the Lower West Terrace door of the United States Capitol.  Law enforcement officers were at the front of the doors inside the tunnel attempting to stop numerous rioters from gaining access to the U.S. Capitol.

USCP surveillance footage captures Sills in the first group of rioters entering the tunnel. USCP surveillance then shows Sills repeatedly striking at the officers guarding the Lower West Terrace doors to the Capitol with a baton and using a strobing light to apparently try to disorient the officers.

Specifically, the following screenshot (with a red circle around Sills) shows Sills entering the mouth of the tunnel at approximately 2:41 p.m. with other rioters in the mob; he is facing the direction of the police line, which is immediately in front of the doors to the Capitol building and holds a phone in his hand.   (Exhibit J is a clip of USCP footage from around 2:41 to 3:03 p.m. with added teal arrows to denote Sills.  His entrance to the tunnel visible at 38 seconds into Exhibit J.)

*Screenshot from USCP Surveillance Footage at approximately 2:41 PM*



The same activity is captured on a video found on the phone recovered from Sills, attached as Exhibit F.  Exhibit F shows the rioters approaching the tunnel where the doors are closed as people yell "let us in." The position of the camera and the events captured corresponds to the USCP footage mentioned above showing Sills with a phone in his hand as if he were recording.

USCP surveillance footage also captures Sills cheering as another rioter thrusts a flagpole in the direction of the doors, as shown in the still below with a red circle around Sills.  (Ex. J at 1 min, 20 sec.)

*Screenshot from USCP Surveillance Footage*



Sills can then be seen grabbing his phone again and holding it up as if it is recording while the crowd moves forward.  The same activity is captured in another video recovered from his phone, included as Exhibit G.   As shown in the stills below, in the video, glass in one of the doors is now broken and the rioters can be seen opening the first set of doors and walking toward the

line of officers standing shoulder to shoulder at the second set of doors.    The rioters can be seen rushing forward towards the officers holding riot shields and one rioter can be seen repeatedly hitting at the officers with a pole.    One rioter then yells "don't hurt the police" while others begin chanting "U.S.A."

*Screenshot from Exhibit G*

 



As evidenced by the USCP surveillance footage of the tunnel (with a red circle around Sills in the screenshot below), Sills continued to make his way to the front of the police line while holding his phone up as if he was recording. (Ex. J at 1 min., 50 sec. to 2 min., 10 sec.)

*Screenshot from USCP Surveillance Footage at approximately 2:43 PM*



As captured on a video filmed by another rioter inside the tunnel, a clip from which is included as Exhibit H, Sills then stole the baton of Officer C.W.  Specifically, the video shows a struggle over the baton with Officer C.W. on one end (under the teal arrow in the still below), Sills on the other (under the yellow arrow), and the baton in the middle (in a red oval).  Sills is captured in the same position in the BWC of Officer C.W. at the same time, as shown in the still below, where his black hat and striped shirt are visible on the other side of Officer C.W.'s arm.  (Officer C.W. did not know who had taken his baton that day, only that it was forcefully stolen shortly after the rioters entered the tunnel and that later on a rioter beat him with what he suspected was his own stolen baton.)

*Still from Exhibit H*



*Still from Officer C.W.*



Moments later, at approximately 2:44 p.m., as captured on BWC from Officer B. S., Sills can then be seen holding up a baton in his hand (circled in red in the still below).



At approximately 2:46 p.m., USCP footage shows Sills exit the tunnel holding what appears to be an extended baton. As Sills exits the tunnel into the sea of rioters, Sills lifts the baton above his head in what appears to be an effort to signal and galvanize the crowd. (Ex. J at 5 min., 25 sec. to 5 min., 36 sec.) He can then be seen on video conversing with members of the crowd and hanging out by the steps to the tunnel.

*Screenshots from USCP Surveillance Footage*

 

18

At 2:48 p.m., USCP video shows Sills then returning into the tunnel.  He again appears to take a photo or video with his phone of the fight with law enforcement as another rioter sprays them with a fire extinguisher.  (Ex. J at 7 min., 46 sec. to 8 min., 39 sec.)   At approximately 2:52 p.m., Sills, who is once again wearing padded tactical gloves on both hands, raises the baton in his right hand and what appears to be a flashlight in his left hand pointed at the officers.  For the next several minutes, Sills uses the strobe and flashing function of the flashlight to disorient and obscure the vision of the officers.  During the same time period, Sills is also captured on USCP surveillance footage using the baton to repeatedly strike the officers at and near the front of the police line numerous times with what appears to be a significant amount of force.  (Ex. J at 11 min., 20 sec. to 14 min., 25 sec.)   Specifically, during that time frame, roughly 2:52 pm to 2:55 p.m., before he disappears from the view of the camera, he can be seen on USCP footage striking at officers five different times.  (Ex. J at 11 min., 29 sec.; 11 min., 48 sec.; 12 min., 25 sec.; 12 min., 28 sec.; and 12 min., 55 sec.)

At least one of those five strikes by Sills from 2:52 to 2:55 p.m. was captured on BWC.  The BWC of MPD Officer V.B. shows Sills using the baton to strike Officer V.B.'s left arm while Officer V. B. was struggling with another rioter in a green gas mask who appeared to be trying to take his baton.  (Exhibit K is a clip from Officer V.B.'s BWC., in addition, the strike is shown in the stills from that video below with a red circle around Sills and/or the baton.)   (The same is partially captured on USCP footage, Ex. J at 11 min., 48 sec., with a still below with a red oval around Sills.)

*Screenshot from USCP Surveillance Footage*



*Screenshots from BWC of Officer V.B.*

  

Officer V.B. was assaulted multiple times on January 6 and had multiple bruises from strikes on various parts of his body. He recalled being struck on the head at one point by the baton wielded by Sills (whom he recognized in video). He also suffered from a severe burning sensation all over his body from the chemical irritants in the air and even threw up at one point as a result of exposure to the irritants. As with other officers who were attacked multiple times that day, it is impossible to determine whether his injuries came from Sills (or those spraying officers while Sills struck them and tried to blind them with a light as described below) or one of the many other rioters that assaulted him that day.

As Sills is striking with the baton and using the light to blind the officers, other rioters are simultaneously attacking the officers. For example, as Sills can be seen shining this light in the officers' eyes and then hitting them with a baton, another rioter next to Sills sprays a chemical at the same officers. (Ex. J at 12 min., 22 sec. – still shots below with red circles around Sills and a

20

yellow arrow above the sprayer.)  In addition, rioters in the tunnel can be seen throwing a large object at the officers (Ex. J at 12 min., 27 sec.), stealing multiple shields from them (Ex. J at 12 min. and 32 sec. and 12 min., 45 sec.), spitting at them (Ex. J at 13 min., 34 sec.), and using flashing lights like Sills to blind them.

*Screenshots from USCP Surveillance Footage*

 

Over the next few minutes, as captured on USCP footage, Sills remains in the tunnel as rioters heave as a group against the officers guarding the doors.  During this heave effort, Sills appears to stay to the side and does not join the pushing – although he is not always visible in the footage.  From approximately 2:58 to 3:00 p.m., USCP footage shows Sills once again repeatedly hitting law enforcement officers with the stolen baton.  (Ex. J at 17 min., 30 sec. to 18 min., 57 sec.)  In the USCP video, Sills repeatedly alters his grip on the baton – changing between overhead swings to downward strikes.  Sills can also repeatedly be seen appearing to use one hand to signal to the other rioters to move aside so that Sills can successfully strike the officers as opposed to accidentally striking the rioters.  Altogether, from 2:58 to 3:00 p.m., he can be seen striking at least seven more times at the officers.  (Ex. J at 17 min., 34 sec.; 17 min., 41 sec.; 17 min., 52 sec.; 18 min., 22 sec.; 18 min., 44 sec.; 18 min., 48 sec.; 18 min., 50 sec.)

Portions of those same events from 2:58 to 3:00 p.m. are captured on a video filmed by another rioter and uploaded to YouTube, a portion of which is included in Exhibit L.   As seen in Exhibit L, after signaling the other rioters to move over, Sills can be seen changing his grip on the baton so that he can strike downward with it instead of swinging it.   He can then be seen repeatedly striking downward with the baton at the officer in front who has his hand up, as shown in the still below with a red circle around Sills and the officer's hand.

*Screenshot from Exhibit L*



The officer being hit is Officer C.W., the same individual from whom Sills stole the baton in the first place.  Officer C.W. recalls being hit in the head by a swinging baton from one of the rioters in the tunnel and had a visible injury to his forehead at the end of the day.  However, because he was attacked so many times on January 6, it is impossible to determine whether the injury came from Sills or one of the other rioters that assaulted him that day.

Throughout his time in the tunnel, as seen on USCP footage, Sills repeatedly gets pushed towards the back or side of the crowd and nonetheless repeatedly makes his way forward towards the front of the police line.  Similarly, although throughout this time in the tunnel multiple people can be seen turning around and leaving, Sills stays.   Indeed, he only stops striking the officers with the stolen baton after being hit in the head by a speaker being thrown forward by another rioter.  (Ex. J at 18 min., 58 sec.)

As captured on USCP footage, at approximately 3:00 p.m. (after being hit on the head by that speaker), Sills turns around and leaves the tunnel.  Sills can then be seen walking out into the crowd and lifting the baton over his head, as captured in another video posted to YouTube, as shown in the stills below.

*Screenshot from YouTube Video*



Based on currently available video evidence, it appears that Sills then left, walking back to the first landing of the Lower West Terrace and then leaving the area.

Sills then posted a video compilation of video clips from the day on his Instagram account "geoff_sills."  Although according to records from his phone, Sills appears to have likely deleted his Instagram account around January 7, 2021, multiple witnesses saw the compilation when it was posted and reported it to the FBI, with at least one individual screen recording it.   In the

Instagram video, which is attached as Exhibit I, Sills included video clips he filmed on January 6 of the attack on the Capitol, with added captions.   For example, under a clip of USCP officers being sprayed and knocked down after the perimeter was breached around 2:31 p.m., he wrote "Visited the Capitol today."   Then under a clip of rioters approaching the Lower West Terrace archway and then breaking the doors, he wrote "Made some friends" and "Took a tour."



After the FBI identified two photographs (via the Sedition Hunters Twitter account) of Sills without his mask and posted them online, as shown below, two witnesses that previously worked with him identified him in the photographs.   They also identified the backpack he can be seen wearing in the footage as a company backpack that was a one-time gift given to employees while Sills still worked at the company.

*Photographs from Twitter Account @SeditionHunters*



Furthermore, after reviewing the photograph released by the FBI, they noticed that the striped shirt worn by Sills appeared to be the same one that Sills wore to a company social event held several years ago, as shown in the picture below.



In addition, based on a review of financial records, Sills appears to have made a purchase at a Metro station in Franconia-Springfield on January 6, 2021.  That Metro stop has Metro trains that go into Washington, D.C., indicating that he was in the Washington, D.C. area on that day. Metro video that lines up with use of the metro card purchased by Sills shows him without the mask, as shown in the still below, at the Metro station in Franconia-Springfield and shows him arriving at Federal Triangle metro station, which is close to the Ellipse.  Video also shows him returning via the same two stations later that day.

25



The same financial account records also show multiple purchases at stores in November 2020 (including "Infidel Body Armor," "Freedom Fighters Tactic," and "Cheaper than Dirt"), which based on their websites, sell body armor, weapons, gas masks, or other combat equipment.

Additionally, records from Zello, a "push-to-talk" walkie talkie application that was used by multiple rioters on January 6 to communicate that day, show that an account was created by Sills on January 6, 2021 and used repeatedly on January 6, 2021.

Finally, records from his phone confirm his plans to travel to D.C. on January 6, including multiple texts about his plans to travel to the "Stop the Steal rally" and a long text thread with his mother where he discusses concerns about threats from Iran and Russia using gas or nuclear bombs. During one of those chats, after his mother notes a concern that there could be such a terrorist attack on the metro ride to the rally, he explains to his mother that he will have his gas mask with him. He also has multiple texts updating his family throughout the day, including sending videos recorded on his phone, and noting at the end of the day that there were "Zero counter protestors" at the event. There are also multiple texts generally acknowledging that he was there on January 6 after the fact. Although there are a few generalized texts about attending

meetings for a group called the Hanover Patriots shortly after January 6, there do not appear to be any recovered texts on his phone regarding potential additional plans for violence.

On June 16, 2021, an arrest warrant was issued for Sills and he was arrested two days later. At that point, his home was searched and multiple pieces of evidence were recovered, including clothing he can be seen wearing or items he can be seen carrying in video footage on January 6, including: the black and white shoes, white gauge earrings, tactical-style gloves with knuckle protection, a scarf, black hat, binoculars, a black flash light with a strobe function, and an Avon black gas mask.  In addition, a black riot-style baton, consistent with the one stolen from Officer C.W., was found hidden under a desk, as shown in the photos below.   (During testimony at the detention hearing, his mother also noted that Sills returned home on January 6 with a baton. Exhibit M- Transcript of Detention Hearing, at 41.)



During the search, he was also found to have multiple weapons, including a large SCAR 7.62 rifle with the magazine inserted, a Glock handgun with the magazine inserted, a pistol, and an AR .223 rifle that was next to the window, standing up, with a loaded magazine, as pictured in Exhibit N.  Also, a loaded shotgun and a Mauser rifle were found in his bedroom.  Finally, in addition to assorted shotgun shells, there were also several canisters of .556 ammunition, a 100-

27

round drum magazine that appeared to be filled with .223 ammunition, and a duffel bag with several loaded AR .223 rifle magazines.  During the detention hearing, Sills admitted that all of these were his firearms.  Ex. M at 56-57.  As none of the items appeared to be illegal, these firearms were not seized during the search.

## Procedural History

Sills has now been indicted on eleven charges, including, among others, one violation of 18 U.S.C. § 2111 (Robbery), four violations of 18 U.S.C. § 111(b) (Assaulting, Resisting, or Impeding Certain Officers or Employees Using a Dangerous Weapon), one violation of 18 U.S.C. § 1512(c)(2)(Obstruction of an  Official Proceeding), and one violation of 18 U.S.C. § 231(a)(3) (Certain Acts During Civil Disorder).

After his arrest, on June 24, 2021, after a hearing that included testimony from an FBI agent, the Defendant's mother, and the Defendant, Magistrate Judge Colombell determined by clear and convincing evidence that no combination of conditions other than detention can adequately obtain the safety of the community. (Ex. M at 82.)

## ARGUMENT

A defendant ordered detained by a magistrate judge may file "a motion for revocation or amendment of the order" with "the court having original jurisdiction over the offense." 18 U.S.C. § 3145(b). Although the D.C. Circuit has not ruled on the matter, every circuit to consider the issue has found that a magistrate judge's detention order is subject to *de novo* review.  *See United States v. Hunt*, 240 F. Supp. 3d 128, 132–33 (D.D.C. 2017).

The government may seek detention under the Bail Reform Act if the case involves any of an enumerated set of offenses, including a crime of violence. 18 U.S.C. § 3142(f)(1).  Here the

Defendant has been indicted on one violation of 18 U.S.C. § 2111 and multiple violations of 18 U.S.C. § 111(b), both of which qualify as a crime of violence.

There are four factors under § 3142(g) that the Court should consider and weigh in determining whether to detain a defendant pending trial: (1) the nature and circumstances of the offense charged; (2) the weight of the evidence against the defendant; (3) his history and characteristics; and (4) the nature and seriousness of the danger to any person or the community that would be posed by his release. *See* 18 U.S.C. §3142(g).  In consideration of these factors, the government respectfully submits that there are no conditions or combinations of conditions which can effectively ensure the safety of any other person and the community. In addition, the analysis emphasized by the D.C. Circuit in *United States v. Munchel*, 991 F.3d 1273 (D.C. Cir. 2021), supports the conclusion that detention is appropriate here.

## <u>Nature and Circumstances of the Offenses Charged</u>

The Defendant's actions on January 6 place him in the category of some of the most serious and dangerous of those charged for their actions that day.  For instance, when analyzing the *Chrestman* factors laid out by the Chief Judge to help distinguish between defendants from the 6th, most of those factors cut against Sills.  *See United States v. Chrestman*, — F. Supp. 3d —, 2021 WL 765662, at *7 (D.D.C. Feb. 26, 2021) (Howell, C.J.).

First, he has been charged with multiple serious felony offenses, including multiple counts of assault on law enforcement with a dangerous weapon, obstruction, and a robbery charge.   As a result he is facing some of the most serious penalties of any of the defendants from January 6.

Second, as evidenced by his attire (which included a full gas mask, binoculars, a strobing flash light, orange ear plugs, and tactical style padded gloves), Sills did engage in some level of

planning.  Sills came to the Capitol wearing tactical gear intending to cause mayhem – wearing a full gas mask (no doubt to avoid smoke or OC spray), downloading a push-to-talk app on January 6 to communicate, and even wearing ear plugs and padded tactical gloves.  To put it simply, you do not need a full gas mask to peacefully attend a rally.  And although based on his text messages that day, he admittedly had some fears about some sort of attack by Iran or Russia while travelling to or attending the Stop the Steal rally, none of that explains why he would need such equipment when storming the Capitol, yet did not wear it when travelling to the rally.

Third, in addition to throwing multiple objects at surrounded and retreating officers, he repeatedly used a weapon to strike and bludgeon the officers.  He can be seen ripping away an officer's baton and then using that baton to strike at the officer he robbed and other officers at least 12 different times within a 10-minute period.   He did not just have a momentary lapse in judgment, such as throwing one item in the moment and then stopping, he kept on assaulting (with weapons) and escalated his behavior over time.

Fourth, although Sills did not specifically organize or coordinate the actions of others, his efforts of at the very forefront of a huge mass of rioters certainly helped those behind and beside him.  For example, his actions in the tunnel assisted those around him who were simultaneously attacking the officers -- such as the rioter that sprayed a chemical irritant at the officers as Sills simultaneously used a strobing light to try to blind them or the rioters ripping away shields from the officers as he was striking.  Similarly, as evidenced by the photos included above, he pushed his way to the very front of the huge mob surrounding and pushing back law enforcement on the first landing of the Lower West Terrace, where he threw poles and other items at the retreating officers.  Again, while he may not have organized those around him, by placing himself at the front line of the attack he was essentially choosing to act as the tip of the spear that day.  His

efforts at the front line of the attack certainly helped clear the way for all those behind him. Similarly, he seemed to take specific efforts to galvanize those around him, such as hoisting his stolen baton in the air for the crowd to see.

In short, Sills came prepared for violence and then repeatedly worked his way to the front of a violent mob so he could violently attack law enforcement officers with a weapon in an effort to overtake the Capitol.   His actions inherently prove he is a danger to the community at large, and the law enforcement officers who stand in the way of his ideological beliefs, whose safety can only be assured by his detention.

As the *Munchel* panel noted, "those who actually assaulted police officers . . . are in a different category of dangerousness than those who cheered on the violence or entered the Capitol after others cleared the way." 991 F.3d at 1284.  Here, Sills did not just cheer on violence, nor was he just a participant in one brief event.  Sills repeatedly engaged in multiple violent assaults with weapons against law enforcement over a prolonged period of time.  He is charged with serious felonies as a result.  He completed these assaults on multiple officers, despite the fact that he was in an extremely public setting, around people filming his behavior, and in the presence of many additional different law enforcement officers.   With all of these factors taken into consideration, the nature and circumstances of these offenses overwhelmingly weigh in favor of detention.

## Weight of the Evidence Against the Defendant

The second factor to be considered, the weight of the evidence, also clearly weighs in favor of detention.  The evidence against the Defendant is also quite strong and compelling.  As noted above, the Defendant was observed on multiple high-definition videos, including U.S. Capitol

surveillance cameras, social media videos, BWC, and media footage, attacking law enforcement officers as part of an unlawful attempt enter the Capitol.  Multiple witnesses identified him and even had photographs of him wearing the same clothing years before.  Financial records tie him to Washington D.C. on January 6.  Many of the clothes and items he can be seen wearing on January 6 were recovered.  He filmed multiple videos of the day that were found on his phone and then posted clips of those videos on his Instagram account. Moreover, multiple texts from before and after January 6 confirm his participation in the event.

Although the Defendant claims in his motion that he was "entitled" to do what he did, Dkt. 188 at 5, and makes various vague, unsubstantiated, and generalized claims about self-defense or unidentified government agents somehow being secretly at fault, *id.* at 5-6 – the evidence speaks loud and clear in this case and none of these purported defenses are viable. The evidence against this Defendant is overwhelmingly strong, and accordingly, the weight of the evidence weighs heavily in favor of detention.

## Defendant's History and Characteristics

The government recognizes that the Defendant has no prior convictions or arrests, steady housing, strong family support, a good employment history and the opportunity to work, and community connections. All of which weighs in favor of release.    However, the Defendant's actions, as demonstrated by his apparent willingness to repeatedly engage in assaultive behavior and lead a violent mob attacking law enforcement officers, should give this Court great concern about the danger he would pose to the community, if released.  In addition, his easy access to firearms (many of which, including an assault rifle and tons of ammunition, were found in his

home) are characteristics that heighten this risk to the community.  Nevertheless, here, the

Defendant's background and characteristics weigh in favor of release.

### Danger to the Community and Flight Risk

The fourth factor, the nature and seriousness of the danger to any person or the community

posed by a defendant's release, also weighs in favor of the Defendant's detention. The charged

offenses involve violent assaultive conduct, and the assaults continued for a sustained period of

time.  He was at the forefront of rioters assaulting law enforcement with the intent to unlawfully

enter the U.S. Capitol and stop the functioning of our government as it met to certify election

results. The danger the Defendant caused by acting at the forefront of this violent mob cannot be

understated. The Defendant was a spoke in the wheel that caused the historic events of January 6,

2021, and he is thus a danger to our society and a threat to the peaceful functioning of our

community.

His dangerousness is not limited to his past actions but presents a future threat.  It is

difficult to fathom a more serious danger to the community—to the District of Columbia, to the

country, or to the fabric of American Democracy—than the one posed by someone who

knowingly and eagerly engaged in a violent insurrection to occupy the United States Capitol and

abort the certification of a lawful and fair election.  Every person who was present without

authority in the Capitol on January 6 contributed to the chaos of that day and the danger posed to

law enforcement, the United States Vice President, Members of Congress, and the peaceful

transfer of power.  However, Sills was an extremely violent participant at the forefront of that

effort and thus his specific conduct severely aggravated that chaos and danger.

The Defendant's highly public and repeated violent assaults of officers at the Capitol Building with a weapon and assistance and encouraging of others engaged in the same illustrate his danger to the community.  The United States submits that the Defendant's lack of respect for the rule of law and his unwillingness to abide by lawful government orders goes directly to his future dangerousness.  The D.C. Circuit has recognized that a "Court's finding as to [a defendant's] potential compliance is relevant to the ultimate determination of 'whether there are conditions of release that will reasonably assure ... the safety of any other person and the community.'"  *Munchel*, 2991 F.3d at 1281; *see also United States v. Hir*, 517 F.3d 1081, 1092-93 (9th Cir. 2008) (explaining that release conditions require "good faith compliance" and that the circumstances of the charged offenses indicate "that there is an unacceptably high risk that [the defendant] would not comply...with the proposed conditions"); *United States v. Tortora*, 922 F.2d 880, 886–90 (1st Cir. 1990).[1]  The Defendant's actions established that his own personal beliefs override the rule of law and that he will readily resort to violence to halt the legitimate functions of the United States government with which he disagrees.  Such blatant disregard of the law and the valid authority of our government weigh in favor of detention.  If Sills is unwilling to obey orders or to conform his behavior to the law while in full view of many law enforcement officers, the press, and a host of cameras, it is unlikely that he would adhere to this Court's directions and release orders, thereby demonstrating his continued dangerousness.

---

[1] The D.C. Circuit has re-iterated this important distinction repeatedly in opinions upholding detention decisions in other Capitol cases.  *See*, *e.g.¸ United States v. Christopher Joseph Quaglin*, No. 21-3028, 21-CR-40 (TNM)-4 (June 24, 2021); *United States v. Christopher John Worrell*, No. 21-3020, 21-CR-292 (RCL)-1 (May 5, 2021).

The fact that the unique circumstances that arose on January 6, 2021, are unlikely to arise in precisely the same context a second time does not minimize his future dangerousness. In contrast to the defendants in *Munchel*, the Defendant's repeated physical attack on officers protecting the Capitol and the people inside it, prove that he poses a threat regardless of the unique circumstances of January 6, 2021.

It is particularly concerning that he chose to keep the stolen baton he used to attack officers as a trophy hidden under a desk for six months. His snide remarks about taking "a tour" and making "some friends" as he posted videos from January 6 on his Instagram of officers being attacked and the doors being broken in are similarly concerning. "It cannot be gainsaid that the violent breach of the Capitol on January 6 was a grave danger to our democracy, and that those who participated could rightly be subject to detention to safeguard the community." *Munchel*, 991 F.3d at 1284–85. Sills is one of those who should be detained to safeguard the community.

## **<u>CONCLUSION</u>**

WHEREFORE, the United States respectfully requests that the Court deny the Defendant's motion for release and continue to detain the Defendant pending trial.

Respectfully
submitted,

Matthew M. Graves
United States Attorney
D.C. Bar No. 481052

By:

**MELISSA JACKSON**
Assistant United States Attorney
D.C Bar Number 996787
United States Attorney's Office
555 Fourth Street, N.W.
Washington, D.C. 20530
Telephone: (202) 815-8585
Email: Melissa.Jackson@USDOJ.GOV