```
                  UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
------------------------------X

UNITED STATES OF AMERICA,
                                     Criminal Case No. 21-40
               Plaintiff,


             v.                          Washington, D.C.
                                     Friday, February 4, 2022
PATRICK EDWARD MCCAUGHEY,            2:00 p.m.
et al.,
               Defendants.


------------------------------x


             TRANSCRIPT OF STATUS CONFERENCE
       BEFORE THE HONORABLE TREVOR N. MCFADDEN
             UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government: Jocelyn Patricia Bond, AUSA
                    Kimberly Nielsen, Esquire
                    Melissa Jackson, Esquire
                    U.S. ATTORNEY'S OFFICE FOR D.C.
                    555 Fourth Street, NW
                    Washington, DC 20001
                    (202) 252-2571

For Defendants:     John C. Kiyonaga, Esq.
                    JOHN C. KIYONAGA LAW OFFICE
                    600 Cameron Street
                    Alexandria, VA 22314
                    (703) 739-0009

                    Lindy R. Urso, Esq.
                    LINDY R. URSO, ATTORNEY AT LAW
                    810 Bedford Street, Suite 3
                    Stamford, CT 06901
                    203-325-4487


Court Reporter: Lisa Walker Griffith, RPR
                U.S. District Courthouse
                Room 6507
                Washington, D.C.  20001
                (202) 354-3247
```

APPEARANCES:  (Cont'd.)

For defendants:          John M. Pierce, Esq.
                         JOHN PIERCE LAW
                         21550 Oxnard Street
                         3rd Floor OMB #172
                         Woodland Hills, CA 91367
                         (213) 279-7648

                         Lauren Cobb, AFPD
                         OFFICE OF THE FEDERAL DEFENDER
                         ND Florida
                         3 W. Garden Street, Suite 200
                         Pensacola, FL 32502
                         850-432-1418

                         Marina Thais Douenat, AFPD
                         FEDERAL PUBLIC DEFENDER'S OFFICE
                         Western District of Texas
                         727 ECesar E.Chavez Blvd., Suite B-207
                         San Antonio, TX 78206
                         210-472-6700

                         Elizabeth Ann Mullin, AFPD
                         FEDERAL PUBLIC DEFENDER D.C.
                         625 Indiana Ave,NW, Suite 500
                         Washington, DC 20004
                         (202) 208-7500

                         Stanley Edmund Woodward, Jr.
                         BRAND WOODWARD LAW
                         1808 Park Road NW
                         Washington, DC 20010
                         202-996-7447

1                    P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  This is criminal case

3     21-40.  United States of America versus McCaughey, et al.

4              Counsel please come forward to identify yourselves

5     for the record starting with the government.

6              MS. BOND:  Good afternoon, Your Honor, Jocelyn

7     Bond on behalf of the United States.

8              THE COURT:  Good afternoon, Ms. Bond.

9              MS. NIELSEN:  Good afternoon, Your Honor, Kimberly

10    Nielsen on behalf of the United States.

11             THE COURT:  Good afternoon, Ms. Nielsen.

12             MS. JACKSON:  Good afternoon, Melissa Jackson on

13    behalf of the United States.

14             THE COURT:  Good afternoon, Ms. Jackson.

15             MR. KIYONAGA:  Good afternoon, Your Honor, John

16    Kiyonaga on behalf of Jeffrey Sills and Robert Morss.  Also,

17    with the Court's permission, I'd like to stand in for Joseph

18    McBride, who is representing Christopher Quaglin.  I have a

19    couple of very brief representations to make to the Court on

20    Mr. McBride's behalf when the Court feels it's appropriate

21    to do so.

22             THE COURT:  Sure.  Now?

23             MR. KIYONAGA:  I can do it now, Your Honor.

24             THE COURT:  Yeah, go ahead.

25             MR. KIYONAGA:  Mr. McBride asked me to convey to

1    the Court that Mr. Quaglin suffers celiac disease and that

2    he has lost 28 pounds since his confinement pretrial, that

3    the authorities at the Northern Neck regional jail behave in

4    a retaliatory fashion against him.

5            They have denied him celiac compliant food and

6    have subjected him to solitary confinement on more than one

7    occasion.  And they have also deprived him of his commissary

8    privileges, which he needs in order to secure celiac

9    compliant food with the result that he has been rendered

10   seriously ill on more than one occasion.

11           THE COURT:  Okay.  So maybe you can suggest to Mr.

12   McBride, if he hasn't talked with the government or the

13   Marshal Service, to see if he can address those issues with

14   them.  If he can't, you should tell him to file a motion.

15           MR. KIYONAGA:  Certainly, Your Honor.

16           THE COURT:  Thank you.

17           MR. KIYONAGA:  Thank you.

18           MR. URSO:  Good afternoon, Your Honor, Lindy Urso

19   for Patrick McCaughey.

20           THE COURT:  Good afternoon, sir, and your client

21   is not here.

22           MR. URSO:  We filed a waiver, yes, thank you.

23           THE COURT:  Okay.

24           MR. PIERCE:  Good afternoon, Your Honor, John

25   Pierce on behalf of David Mehaffie.

 1          THE COURT:  Good afternoon, sir, and your client

 2   has waived his appearance?

 3          MR. PIERCE:  He's waived his appearance, Your

 4   Honor.

 5          THE COURT:  Okay.

 6          MR. PIERCE:  Thank you.

 7          MS. COBB:  Good afternoon, Lauren Cobb for Tristan

 8   Stevens.  He's waived his appearance.

 9          THE COURT:  Good afternoon, Ms. Cobb.

10          MS. COBB:  Good afternoon.

11          MS. DOUENAT:  Good afternoon, Your Honor, Marina

12   Douenat on behalf of Steven Cappuccio, and he has waived his

13   appearance, Your Honor.

14          THE COURT:  Good afternoon, Ms. Douenat.

15          MS. DOUENAT:  Thank you.

16          MS. MULLIN:  Good afternoon, Your Honor, Elizabeth

17   Mullin on behalf of David Judd.  David Judd is present in

18   court.

19          THE COURT:  Good afternoon, Ms. Mullin.  Good

20   afternoon, Mr. Judd.

21          MR. WOODWARD:  Good afternoon, Your Honor, Stanley

22   Woodward on behalf of Frederico Klein, who is also present.

23          THE COURT:  Good afternoon, Mr. Woodward.  Good

24   afternoon, Mr. Klein.

25          All right.  We're here for a status conference.

1    Let me tell you the order I'm hoping to take things in.

2    First, I want to address Mr. Sills' motion to revoke his

3    detention.  Second, I want to hear from the government on

4    the status of discovery in this case.  Third, I'd like to

5    hear from the defendants regarding the government's proposed

6    scheduling order.

7            I'll tell you, it seemed to make sense and I

8    appreciate the government suggesting getting some more dates

9    on the calendar here.  I think it probably will simplify

10   things for all of us.  So but I'm interested to hear if any

11   defendants have concerns with the dates laid out there.

12           So, first, to Mr. Sills' motion, I have read both

13   parties' briefing.  Mr. Kiyonaga, do you wish to be heard

14   further?

15           MR. KIYONAGA:  Briefly, Your Honor.  Your Honor,

16   there's not a great deal to add to what I've put in the

17   pleadings.  I think the salient point is that, taken at face

18   value, the allegations against Mr. Sills do not place him in

19   the small subset of January 6th participants that this Court

20   and this circuit deem appropriate for pretrial confinement.

21           Setting aside the purple adjectives and adverbs in

22   the government's pleadings, it is conduct no worse than a

23   great many defendants whose issues have been considered and

24   who have in fact been released.  I should note that his

25   paternal grandfather died on the 20th of January.

1          THE COURT:  I'm sorry to hear that.

2          MR. KIYONAGA:  Thank you, sir.  And his father is

3  no longer testing positive for COVID.  However, his

4  breathing is still very impaired.  He requires oxygen

5  several times a day.  He, of course, is in treatment for

6  blood cancer.  He gets daily medication, monthly

7  transfusions.  Of course, he survived a stroke a couple of

8  years ago.  So his health is very, very impaired.

9          And I point that out to the Court because my fear,

10  in all candor, is that his continued confinement is going to

11  have ultimately a punitive effect far beyond anything I'm

12  sure this Court wishes.  Thank you, sir.

13          THE COURT:  Thank you, Mr. Kiyonaga.

14          Before the Court is the defense motion to reverse

15  the current detention order entered by a magistrate judge.

16  The government had moved to have the defendant detained

17  pursuant to 18 U.S.C. 3142(f).  The magistrate found and I

18  agree -- and I should say, by the way, that I'm making a de

19  novo review of the magistrate judge's determination.  The

20  magistrate judge found rebuttable presumption under 18

21  U.S.C. 3142(e)(2) given that the defendant is charged with a

22  crime of violence under and in light of 3142(f)(1).

23          I do find that the defendant has presented

24  evidence sufficient to rebut the presumption.  But after

25  considering the presumption and the other factors discussed

1   now, I do believe that detention is nonetheless warranted.

2   And I do so under finding of clear and convincing evidence

3   that no condition or combination of conditions will

4   reasonably assure the safety of any other person and the

5   community.

6            Turning first to the nature and circumstances of

7   the offense, I'm not going to dwell on the general details

8   regarding January 6th, which are well documented in the

9   government's papers and indeed in various court opinions.

10  Looking specifically to the defendant's conduct, initially,

11  he began videoing rioters on the terrace who were fighting

12  with law enforcement officers.  That's on the Capitol

13  terrace.

14           I certainly don't think his conduct there would

15  justify detention, but it escalated from there.  He began

16  throwing items at officers, appears to be poles, sticks,

17  other things.  He then moved into the lower west terrace

18  tunnel where hand-to-hand combat was occurring with law

19  enforcement officers.

20           The defendant at one point and significantly

21  wrestles over a baton that an officer has and in fact grabs

22  the baton from the officer.  This is shown in Exhibit H of

23  the government's materials and appears to me, at least at

24  this very preliminary stage, to make out a case for robbery.

25           The defendant, along with a number of other

1    rioters is, as I said, fighting with officers there in the

2    tunnel.  He uses a strobe flashlight in an attempt to blind

3    officers.  This is clear in Exhibit J in the government's

4    briefing.  Indeed, he's doing that apparently in concert

5    with other rioters who are also using, another one is using

6    a flashlight to similarly blind them.  While he's doing

7    this, another rioter appears to spray the officers with some

8    sort of chemical spray.

9          He also now begins using his, this baton that he's

10   stolen from a police officer to repeatedly strike the

11   officers.  I think you can see that in Exhibit J and Exhibit

12   L.  At some points, you can actually see the officers, but

13   it's clear from all of the exhibits and his actions that

14   that is in fact what he is doing.

15         The government reports that Officer V.B. remembers

16   the defendant hitting him on the head with his baton.

17   Another officer, I believe it was Officer C.W., actually

18   remembers the defendant taking his baton and believes the

19   defendant hit him with it.  These officers were injured and

20   had bruises because there were so many people attacking them

21   at the time.  They're not sure which rioters caused which

22   injuries.

23         Nonetheless, I don't know that that gets the

24   defendant very far.  That is in part what happens with mob

25   action, and he, along with a number of other people, were

1    repeatedly assaulting law enforcement officers in a way that

2    certainly did injure them.

3           For all of those reasons, I find that the nature

4    and circumstances of the offense militate toward detention.

5    I also find that the weight of evidence militates for

6    detention here.  It is certainly strong.  The government has

7    numerous videos, photos showing the events there, apparently

8    has testimony from a couple officers, also has receipts and

9    the recovery of various items of clothing and indeed the

10   baton from the search warrant of the defendant's house.

11          Looking at the defendant's history and

12   characteristics, I agree with the government that that

13   militates for release.  He has no criminal history, and he

14   has a good employment history.  All of these points would

15   certainly push strongly in his favor.  Nonetheless, I think

16   it is outweighed by the nature and circumstances of the

17   offense, the weight of evidence that I've already discussed,

18   and the defendant's dangerousness which I also think weighs

19   in favor of detention.  The defendant apparently came with a

20   gas mask, tactical gloves, strobe light.

21          He says that he did this because he was afraid of

22   Antifa or what have you.  Maybe that's true.  But I think,

23   at this point, I can take this as evidence of planning and

24   as certainly evidence that this is not someone who's just

25   coming for a political rally but expects to get into some

1    sort of violent confrontation.  And that's exactly what he

2    did.

3              I think the fact that he disarmed a police

4    officer, stealing his baton and then using it to assault

5    that officer and other officers also argues heavily for the

6    defendant's dangerousness and the need for him to be

7    detained.

8              I reject the defendant's argument that the

9    President Trump somehow sort of authorized this.  Of course,

10   the President can never authorize someone to violate the

11   law.  And it's not at all clear to me that, whatever else

12   President Trump said, he was somehow blessing what was

13   occurring in the lower west tunnel.  Regardless, it would

14   not be a justification for releasing the defendant here.

15             The defense also points to various other

16   individuals, including the individuals in this case, not all

17   of whom have been detained.  Honestly, these are difficult

18   calls made on a case-by-case basis but by various judicial

19   officers really around the country.  We're certainly aiming

20   for certain consistency, but at the end of the day I need to

21   make an individual assessment about the defendant's

22   dangerousness in light of what I know about him and his

23   actions on that day.

24             I think the circuit in the Munchel case have

25   certainly recognized the general potential for dangerousness

1    of January 6th rioters who were engaged in physical

2    violence.  Munchel is United States versus Munchel, 991 F.3d

3    1273 from the circuit in 2001, and I think that

4    appropriately describes the defendant in this case.  For all

5    those reasons, I'm denying the defense motion.

6                All right.  Can I hear from the government on the

7    status in this case?

8                MS. BOND:  Yes, Your Honor.  To start with Your

9    Honor's request for an update on discovery -- I apologize,

10   Jocelyn Bond on behalf of the United States.  So to update

11   the Court on discovery, the government has made important

12   strides in the last few weeks.  Most notably, on January

13   21st, the federal public defender reached out to all defense

14   counsel, which hopefully that includes all in this room,

15   inviting them to get licenses for Relativity.

16               Up to this point, we've been providing global

17   discovery through USAfx, which is cumbersome, and we

18   understand that most defense counsel have not appreciated

19   that format because it requires the government to upload

20   things very slowly and then defense counsel to download them

21   very slowly.  Of course, it's not a searchable platform.

22   What Relativity allows for the government now to provide all

23   of the global discovery productions, and it is actually

24   searchable within that platform.  So that is now available

25   to all defense counsel.

1          As of today, we have uploaded the productions 8,

2     9, 10 and now 11.  I haven't notified defense counsel that

3     11 is in there, but I will be notifying them no later than

4     Monday.  It's something that was recently produced.  And I'm

5     told by superiors that all prior productions, 1 through 7

6     that were turned over via USAfx, those will be uploaded by

7     February 7th, which is this coming Monday.

8          So we're making huge strides on that front.  Of

9     course, defense counsel has also had access to the evidence

10    dot com platform, which has all of the videos and those

11    sorts of things since October, so hopefully they're well on

12    their way to reviewing those.

13         As far as individual discovery, we have turned

14    over that discovery.  That has been in progress for months,

15    all the way back since the last year, early last year for

16    Mr. McCaughey and going through this year with the newer

17    defendants.  We will, of course, be providing updates but,

18    at this point, it's much more minimal since it's just any

19    new investigation which has been little since the last time

20    we provided discovery.

21         So that is where I am on discovery, Your Honor,

22    unless you have specific questions.

23         THE COURT:  So in terms of what is left, I

24    understand you've turned over a lot, in terms of what is

25    left, I think I'm hearing you say you're really not

1   expecting much more specifically applicable to these

2   defendants.  Is that right?

3          MS. BOND:  So there will be some.  There will not

4   be a lot.  And that's with the defendants' specific

5   discovery, things in their FBI files, their phones.  For

6   example, I know Mr. Mehaffie still needs his scoped and

7   unscoped phone materials.  That will also be distributed to

8   the other defendants.

9          There is minimal investigation, a handful of

10  additional 302s that they are entitled to, and we will of

11  course produce that in the near term.  But there is nothing

12  substantial that is defendant specific.  I do want to

13  contrast that from the more global, all-riot kind of

14  discovery.

15         THE COURT:  So where are we on that?

16         MS. BOND:  That's what I was just discussing as

17  far as Relativity and the global productions 1 through 11

18  and how defense counsel will now have access to that--

19         THE COURT:  I get that.  I'm asking what's left.

20         MS. BOND:  For global production?

21         THE COURT:  Yes.

22         MS. BOND:  That, I can't answer.  We will be

23  filing another status update.  We are told that it will be

24  available today.  Usually, those come out at the end of the

25  day.  So I plan to file that early next week, assuming that

1   I receive it on the schedule that's been proposed.  And that

2   should answer many of the Court's questions.  I am not privy

3   to the specifics right now.

4           THE COURT:  Okay.  The investigation has been

5   going on for over a year now.

6           MS. BOND:  Sure.

7           THE COURT:  We need to get to the bottom or near

8   the bottom of global discovery.  As I said, I think your

9   scheduling order makes a lot of sense.  But it's hard for

10  defense or the Court to really make any sort of kind of come

11  to rest when we don't even know the universe with which the

12  defense is dealing.

13          MS. BOND:  Understood, Your Honor.  I really can't

14  provide any more information than that, but I am hoping that

15  there will be a filing by early next week.

16          THE COURT:  All right.  We're going to need to get

17  better than that in terms of kind of some sort of end date,

18  kind of getting the sunset here.

19          MS. BOND:  I understand where Your Honor is coming

20  from, and I understand that these cases have existed for a

21  year.  But as of right now, we have trial dates in August

22  and the beginning of October, and I have no reason to

23  believe that we won't have provided substantial discovery in

24  sufficient time for all defense counsel to delve into that

25  and to be able to delve into that for months before our

1   scheduled trial dates.  So while I can't say when we will

2   actually have substantial discovery, I am fully confident

3   that it will be in enough time for defense counsel to do the

4   investigation that they want to do.

5           THE COURT:  All right.  Well I'll hear if the

6   defendants have speedy trial concerns, but I think my

7   willingness to continue to toll the speedy trial clock while

8   the government doesn't tell me how long, much longer this is

9   going to take, is wearing thin.

10          MS. BOND:  Understood.

11          THE COURT:  Okay.  Mr. Urso, do you wish to be

12  heard on the government's post-scheduling order, and do you

13  have any other issues to discuss?

14          MR. URSO:  Yes, Your Honor.  Thank you.  I have

15  issues, in terms of the just in general personally.  I'm a

16  sole practitioner.  Me going through discovery has been slow

17  going for sure.  I had a murder trial I finished two months

18  ago.  I've got a trial starting next month and maybe another

19  trial after that.  I have concerns about the actual August

20  trial date in particular, certainly in terms of this

21  proposed schedule by the government with the outstanding

22  discovery and the fact that there is still a lot to go

23  through.

24          I don't think we're going to, based on that

25  schedule, I'm not going to have months.  On their proposed

1    schedule, I only have two months to do a motion to suppress.

2    So I think I'd prefer that we set a schedule at the next

3    status conference seeing where we are.  At least we'll know

4    where we are with the discovery.  I'll personally have had a

5    better chance to dive into the discovery hopefully at least

6    this month.  But I'm concerned about the -- it's a little

7    compressed for me.

8              THE COURT:  Okay.  Is that based on what you

9    currently have?  You don't think, even what you currently

10   have, you could --

11             MR. URSO:  I don't think I could get through it.

12   I haven't got to this license issue yet.  I haven't signed

13   up for a license or whatever that process is that the

14   government talked about to get access to the global

15   discovery.  So I haven't started getting through all that.

16   USAfx has been untenable for me, because it just takes me

17   half a day to download some of this stuff.  So I'm happy

18   that that's going to go up on that, and it sounds like a

19   much more user friendly situation, but I'm not there yet.

20             THE COURT:  Okay.

21             So I think what I'm going to propose we do is try

22   to come back in a month.  I'm going to expect the government

23   to have more precise answers about what is left.  You also

24   need to get the license, sir.

25             MR. URSO:  Of course, of course.

1          THE COURT:  I understand you've got other cases

2   that you're juggling, but you're part of a big co-defendant

3   case.  If you don't think this is the right one for you, now

4   is the time to let me know.  Otherwise, I'm going to look

5   for all defense counsel to, at the very least, make use of

6   what the government has provided them and try to get so that

7   we can stay on schedule here.

8          MR. URSO:  And we have no speedy trial concerns.

9          THE COURT:  All right.  Why don't I just, I'll ask

10  for a hand for an objection to -- anybody not available for

11  Friday, March 11th, at 11:00 A.M., Friday, March 11th, at

12  11:00 A.M.?

13          We've got one, two hands.  Okay.  Is that the day,

14  Ms. Bond, or just the time?

15          MS. BOND:  Your Honor, I'm not available that day

16  but could be available Thursday, the 10th or the 9th.

17          THE COURT:  Your colleagues have me in trial

18  basically nonstop other than Fridays.  How about the 4th at

19  4:00 o'clock, March 4th, 4:00 P.M.?

20          MS. BOND:  I'm afraid I'm completely unavailable

21  that day.

22          THE COURT:  So, Ms. Bond, I think one of your two

23  colleagues will need to take it then.

24          Defense counsel all available on Friday, March

25  4th?

1          All right.  So let's assume that we're going to be

2    doing our next status conference Friday, March 4th, at 4:00

3    P.M.  I've heard from Mr. Urso.  Thank you, sir.

4          Ms. Cobb?

5          MS. COBB:  Good afternoon, sir.  I don't have any

6    objection to tolling until the March 4th date.  As far as

7    the proposed scheduling order, I generally think the

8    scheduling order is probably a good idea.  I'm hesitant

9    right now for the same reason I think the Court is, just

10   that I don't want to agree to dates when I don't know what

11   other discovery I'm going to be getting.

12         So I'm from a federal public defenders office.  We

13   do have some resources.  I have people helping me with these

14   different databases.  But I can tell you I signed up for my

15   Relativity password on the first day that it was available,

16   and I just now am able to log into it.  And I absolutely

17   don't know how to use it.  So I can tell you that's just,

18   it's a learning curve.  It takes some time.  So that's sort

19   of my issue.  I'd like to wait till I know more about the

20   discovery before I agree to certain dates.

21         THE COURT:  Okay.  What's your client's position

22   on waiving speedy trial clock until March 4th?

23         MS. COBB:  He doesn't object to that.

24         THE COURT:  Thank you, ma'am.

25         Ms. Mullin?

1          MS. MULLIN:  Your Honor, on behalf of Mr. Judd, I

2     have received the Relativity license.  I had some technical

3     difficulties getting in, but that was more my fault than

4     anyone else's.  I'm working on it.

5          With respect to Mr. Judd, we do not have any

6     speedy trial issues.  We are in discussions with the

7     government.  And with respect to Mr. Judd, we would request

8     a status hearing in three weeks.  If it needs to be removed

9     from the calendar, the parties will notify chambers.  Or, in

10    the alternative for efficiency purposes, we could all come

11    back on the March 4th.  But Mr. Judd has a different issue

12    that we may need to address.

13         THE COURT:  Okay.  I'm going to stick with March

14    4th, but if you want to file a motion, we can look to get it

15    earlier.  As I said, I'm in trial a lot the next couple

16    months.

17         MS. COBB:  Right.

18         THE COURT:  Did I ask you about waiver of the

19    speedy trial clock?

20         MS. COBB:  No speedy trial issues.

21         THE COURT:  Otherwise, did you say do you feel

22    like you're on track for trial or you just can't tell?

23         MS. COBB:  Yes.  The technology is difficult, but

24    that's my own problem.  I did file a motion to sever

25    Mr. Judd's case from the others and reviewed the

1    government's proposed timeline and agree with it.

2              THE COURT:  Okay.  Thank you, ma'am.

3              Mr. Kiyonaga?  Sir, you're representing three

4    folks.  You can handle them in whatever order you want.

5              MR. KIYONAGA:  I'm busy today, Your Honor.  As to

6    Messrs. Morss and Sills, Your Honor, discovery is a problem.

7    But I have an ongoing speedy trial objection and that takes

8    precedence.  So I would note objection to a further, any

9    exclusion of the speedy trial time.

10             THE COURT:  So does that mean that you think

11   you're going to be ready for trial?

12             MR. KIYONAGA:  Your Honor, I'll make myself ready.

13   These guys are locked up.  So if discovery is a problem,

14   I'll deal with it.  But as to Mr. Morss and Mr. Sills, I

15   would note my speedy trial objections.

16             Mr. Quaglin, in an access, I haven't actually

17   discussed that issue with Mr. McBride, but I believe he's

18   already noted a speedy trial objection.  So I would simply

19   reiterate that for him.

20             THE COURT:  Okay.  Anything else you wish to be

21   heard on, sir?

22             MR. KIYONAGA:  No, sir.

23             THE COURT:  Okay.

24             MR. KIYONAGA:  Thank you.

25             THE COURT:  Mr. Pierce?

1          MR. PIERCE:  Thank you, Your Honor.  We have no

2    objection to tolling the speedy trial.  I would just echo

3    Your Honor and a couple of the other defense counsel that I

4    think that it's a challenge to set sort of pretrial dates

5    without having any idea at this point when the full

6    discovery is going to be completed.  I know that the

7    government has a large job to do with respect to that, but

8    it has been quite a while and we just need some clarity so

9    that we know what we're looking attend.  So that's really

10   all I have, Your Honor.

11          THE COURT:  All right.  Thank you, Mr. Pierce.

12          MR. PIERCE:  Thank you.

13          THE COURT:  Ms. Douenat?

14          MS. DOUENAT:  Yes, Your Honor.  First to the

15   speedy trial matter, Mr. Cappuccio does not object to the

16   March 4th setting status conference.  As far as the

17   discovery, we do echo the Court's concern.  As far as

18   Relativity, I do have my password that was given to me

19   today.  I am able to access the database.  There is over

20   19,000 documents in that database.  Yes, I do have a team

21   that is helping me go through it.  But that's just, that

22   does not include global production 1 through 7, and that

23   does not include any further discovery that is yet to come.

24          The evidence dot com, which is basically a

25   repository of 24,000 plus videos, they all span between 15

1    minutes to three hours long, is a little bit harder to

2    trudge through because you can't really, you can't search

3    videos.  So you have to actually go through them, each one

4    at a time, just to see if there is anything relevant for

5    these cases.

6            So those are my concerns as far as the scheduling

7    order and having pretrial matters as close to April or April

8    1st just because that's a lot of information to go through

9    before we know what to anticipate the trial would look like.

10           Also we did file a motion to sever.  Those

11   deadlines that are proposed by the government are okay with

12   us on just the motion to sever, Your Honor.  But the motion

13   to sever is also important for trial purposes because, if we

14   are going to be tried together with a bunch of other

15   individuals, Your Honor, then that is a lot more discovery

16   to go through and more objections to be made.

17           THE COURT:  Understood.

18           MS. DOUENAT:  Thank you, Your Honor.

19           THE COURT:  All right.  Mr. Woodward?

20           MR. WOODWARD:  Thank you, Your Honor.  We do, yes,

21   we have concerns.  And I think Your Honor touched on this

22   earlier.  We do not want a trial date in 70 days.  That's

23   not, that's not what we're asking, but we have concerns with

24   the way that the process has played out, and we think it

25   might be helpful to discuss with Your Honor sort of a more

1   practical approach to what's happening here in discovery.

2           Up until recently, the government has requested a

3   tolling of the speedy trial deadlines based on the amount of

4   video that they were collecting and producing.  We don't

5   disagree with that characterization.  There are 7,000 hours

6   of video that's been produced.  I can't physically watch all

7   of that video between now and the trial date.  I'm not

8   suggesting that I need to, but of course that's a decision

9   that my client needs to consciously make as we prepare for

10  trial.

11          Now, we're talking about an entirely separate

12  group of discovery.  I also applied for my Relativity

13  license the day that it was made available to me.  I have

14  not yet gotten my password.  Given what my co-colleague has

15  said, I'm hopeful that I get it soon.  It is a several step

16  process.  You first apply with the federal defenders office

17  and then you have to go through a Deloitte specific process

18  to get it.  But I have no idea what's going to be in that

19  database and what we're going to be looking at.

20          What I do know, based on the government's prior

21  productions to us, is that the discovery is difficult to

22  parse through what is relevant for purposes of trial

23  preparation versus the, I'll call them, system files that

24  we're getting.  So every time the FBI does anything, they're

25  logging that, and that's an important step.  But in a normal

1    case, you get some of that FBI file.  You know what you're

2    looking for, 302s, et cetera, evidence logs, et cetera, and

3    you're able to identify those, review those, and make a

4    pretrial objection as to whether something was seized or

5    searched improperly.

6              In the data we provided so far, the file names do

7    not reflect what it is that we're looking at.  So, it's

8    extraordinarily difficult to go through and look at 19,000

9    files just in the last three productions to understand

10   exactly what you have and how it is going to be relevant to

11   your trial preparation.  We're doing the best that we can,

12   but it's a ton of work.

13             And I would note that Mr. Klein, who was arrested

14   on or about March 4th, I think, the government has had the

15   benefit of eight or so months of collecting this discovery.

16   Over that entire period, they keep asking to toll speedy

17   trial, speedy trial.  We're just getting started effectively

18   when they made this Relativity database available to us.

19             So we do have concerns, again, not ready to go to

20   trial in 70 days, very seriously concerned about going to

21   trial in September, but also concerned about continuing to

22   toll this while the government, in this case, is unable to

23   make a representation about when discovery would be

24   completed.

25             With respect to the case specific discovery, as we

1  noted a month ago or two months ago, we also have concerns

2  about the government's representation that that is

3  substantially complete.  We think that the Court should

4  set -- we would ask the Court to set a deadline on when the

5  government has to substantially complete its discovery,

6  because we're not convinced that the FBI file is sufficient

7  to satisfy the government's obligations under Rule 16,

8  Brady, Giglio, and this Court's rule, as well as the Due

9  Process Protections Act.

10        With all due respect to the FBI, we're not sure

11  that they're putting in all of the materials into their file

12  that is going to be necessary for us to prepare our defense.

13  So, while we're reviewing that, and we'll be prepared to

14  have -- we'll have reviewed that in advance of trial and the

15  deadlines set by the Court, we think there's going to be

16  challenges.

17        We don't want to be in a situation where April 1st

18  passes, or whatever date the Court sets, we relied on the

19  government's representation to the Court and to counsel that

20  they substantially completed a case specific discovery, but

21  now we're searching in this voluminous database for records

22  that the FBI, not intentionally, but that the FBI may not

23  have included in the FBI file and that therefore was not

24  produced to us.

25        So from a practical matter, we think it's easy of

1    course to talk about all of the discovery in these cases.

2    It is a large investigation.  But when you think back, and

3    Your Honor has done this, I know, and you look at the files

4    that are on the computer and you're trying to ascertain what

5    the government's case is going to look like and how we

6    defend it, we don't think we're doing ourselves a service by

7    broadly categorizing all of this.

8          We think the government should be required to meet

9    deadlines on discovery so that we can ensure that the

10   defense counsel has the time that the government has had to

11   prepare for trial.

12         THE COURT:  Thank you, Mr. Woodward.

13         I am going to toll the speedy trial clock between

14   now and March 4th.  I recognize that most defendants have

15   waived, several have not.  Regardless, I do think it is

16   appropriate to toll the speedy trial clock between now until

17   March 3rd in light of the significant discovery that has

18   gone over, that apparently some perhaps significant

19   discovery still needs to go over, and all of the

20   complications relating to such a large multi codefendant

21   case.

22         I am sympathetic with the concerns that the

23   defense has raised.  And, Ms. Bond, by March 4th, I need

24   much more clarity on where we are with what remains

25   outstanding on discovery.  I mean, Mr. Quaglin will have

1    been locked up for almost a year at that point.  It's really

2    hard for me to understand why I should be tolling speedy

3    trial clock and holding someone when the government can't

4    even tell me when the end is in sight in terms of discovery.

5    So I need a lot more clarity there.

6              I appreciate the government's proposed scheduling

7    order.  I think something along those lines makes sense.

8    I'll ask the attorneys to be in touch between now and March

9    4th and see if there can be some sort of agreement or get

10   closer to an agreement on dates, because I think the

11   government has kind of a general good outline but I

12   understand that the defense, it's difficult for the defense

13   to agree to specific dates when they don't even know when

14   discovery will be completed.  So I'm hoping we can make some

15   progress on that.

16             Ms. Bond, anything further we should be discussing

17   today?

18             MS. BOND:  Yes, Your Honor.  So the government

19   actually requested this status hearing specifically to

20   address the outstanding plea offers for all of the

21   defendants.  With the nine, we have had all plea offers

22   outstanding for several months now, and I appreciate that

23   both Mr. McCaughey and Mr. Stevens filed, as the Court

24   requested, in writing that they are rejecting the

25   government's plea offer and that they have in fact discussed

1    that with their counsel.

2           Unfortunately, we don't have closure for everyone.

3    As Ms. Mullin said, Mr. Judd, we are continuing in

4    discussions.  We believe that these are good faith

5    discussions.  So we are asking for that status.  I think

6    March 4th is fine, but I'm certainly open to another date if

7    that is preferred by the Court and counsel to consider the

8    counter offer that Ms. Mullin has proposed.

9           As far as the other defendants, we have not

10   received any response on our plea offer from Mr. Quaglin,

11   Mr. Morss, Mr. Sills or Mr. Klein.  With respect to

12   Mr. Mehaffie and Mr. Cappuccio, they did file a rejection in

13   writing, but unfortunately, it was not signed by the

14   defendant himself.

15          So I would like to get these on the record that,

16   at this point, these plea offers or no longer available.  I

17   can read those plea offers and have counsel or the

18   defendants themselves come up to say whether they have

19   rejected them, but it's an issue that we need closure on.

20          THE COURT:  I agree.  So you gave a lot of names

21   very quickly there.  What do you want to put on the record?

22          MS. BOND:  So in my mind, where we don't have

23   closure is for Mr. Quaglin, Morss, Sills, Mehaffie,

24   Cappuccio and Klein.  So that's six defendants.  If Your

25   Honor permits, I can read a one-sentence summary of those

1    plea offers, and then counsel or the defendants themselves

2    can speak their position on that plea offer.

3            THE COURT:  That sounds good to me.  Let's start

4    with Mr. Quaglin.

5            MS. BOND:  Starting with Mr. Quaglin, the plea

6    offer that was extended on August 10th is to the following

7    charges:  Three counts of 111(b), one for spraying Officer

8    O.S. in the tunnel, one for assaulting Sgt. T.R., and one

9    for using a shield to assault multiple officers, and then

10   one count of 111(a) for shoving one of the other officers at

11   2:34 P.M.  If Mr. Quaglin accepts that plea offer, the

12   government would dismiss the remaining charges.

13           THE COURT:  Okay.  Mr. Quaglin, could you stand

14   up, sir?

15           Sir, have you had an opportunity to talk with your

16   attorney about that plea offer?

17           THE DEFENDANT:  I have.

18           THE COURT:  Are you rejecting it?

19           THE DEFENDANT:  I fully reject it.

20           THE COURT:  Thank you, sir.

21           THE DEFENDANT:  Thank you.

22           THE COURT:  Obviously, I should say, with all of

23   these, I just, so the defendants know, it's important for

24   the government and the Court to be sure that you've

25   knowingly made a decision.  I am in no way trying to

1    influence you one way or the other on your decision.

2            As to Mr. Morss?

3            MS. BOND:  If Mr. Morss pleads guilty to two

4    counts of 2111, the first for ripping the fence from

5    Sgt. J.C., and the second for ripping the shield from

6    Detective P.N., and then to one count of 111(a) for joining

7    the group Heave Ho in the pushing effort in the tunnel from

8    3:07 to 3:14 P.M., the government would dismiss the

9    remaining charges.

10           THE COURT:  Okay.

11           Mr. Morss, could you stand up please, sir?  Sir,

12   have you had an opportunity to talk with your attorney about

13   that plea offer?

14           THE DEFENDANT:  I have, Your Honor.

15           THE COURT:  Are you rejecting it?

16           THE DEFENDANT:  I reject it.

17           THE COURT:  Okay.  Thank you, sir.

18           MR. KIYONAGA:  Your Honor, can I have a moment

19   before the government proceeds to Mr. Sills?

20           THE COURT:  Sure.  You want to talk with him

21   privately?

22           MR. KIYONAGA:  Yes, sir.

23           THE COURT:  Okay.

24           (There was a pause in the proceedings.)

25           THE COURT:  All right.

1              Ms. Bond?

2              MS. BOND:  The plea offer for Mr. Sills is if he

3    pleads to the following charges, one count of 2111 for

4    ripping the baton from Officer C.W., one count of 111(b) for

5    assaulting Officer V.B. with that stolen baton, and one

6    count of 111(b) for assaulting officer C.W. with that stolen

7    baton.  If Mr. Sills pleads to these charges, the government

8    would dismiss the remaining charges in the indictment.

9              THE COURT:  All right.  Mr. Sills, could you stand

10   please, sir?  Are you familiar with this plea offer, sir?

11             THE DEFENDANT:  Yes, sir.

12             THE COURT:  Have you decided to reject it?

13             THE DEFENDANT:  I have decided to reject it.

14             THE COURT:  Okay.  Thank you, sir.  As to

15   Mr. Mehaffie?

16             MS. BOND:  The plea offer for Mr. Mehaffie is if

17   he pleads guilty to one count of 18 U.S.C. 1512(c)(2),

18   obstruction of an official proceeding, and one count of 18

19   U.S.C. 231(a)(3), civil disorder, the government would

20   dismiss the remaining charges in the indictment.

21             THE COURT:  Okay.  He is not here.  Why don't you

22   keep going as to Mr. Cappuccio?

23             MS. BOND:  For Mr. Cappuccio, the plea offer is if

24   he pleads guilty to a single count of 18 U.S.C. 111(b) for

25   his conduct on January 6 of 2021, the government would

1    dismiss the remaining charges in the indictment.

2              THE COURT:  Okay.  And as to Mr. Klein?

3              MS. BOND:  The plea offer for Mr. Klein is if

4    Mr. Klein pleads guilty to one count of 18 U.S.C. 111(b),

5    the government would dismiss the remaining counts in the

6    indictment.

7              THE COURT:  All right.  Thank you, Ms. Bond.

8              Mr. Klein, are you here?

9              THE DEFENDANT:  Yes, sir.

10             THE COURT:  If you could approach the podium, sir,

11   with your attorney.  Mr. Klein, are you familiar with this

12   plea offer that Ms. Bond just described?

13             THE DEFENDANT:  Yes, Your Honor.

14             THE COURT:  Have you decided to reject the plea

15   offer?

16             THE DEFENDANT:  In full, Your Honor.

17             THE COURT:  Thank you, sir.  You may have a seat.

18             All right.  Mr. Pierce, your client has waived his

19   appearance.  I think you indicated that he was rejecting,

20   but I think it's fair for the government to ask for a signed

21   confirmation from your client.  Can you file that within the

22   week?

23             MR. PIERCE:  Absolutely, Your Honor.

24             THE COURT:  All right.  Thank you, sir.

25             Ms. Douenat, can you do the same?

1          MS. DOUENAT:  Yes, Your Honor.  He would have been

2    here today, Your Honor.

3          THE COURT:  That's fine.  Thank you.  Ms. Bond, I

4    appreciate you raising that.  Anything further for the

5    government?

6          MS. BOND:  Yes, Your Honor, one last thing.  If

7    Your Honor is not going to be setting motions deadlines

8    today, we are asking for a stay of our response to the

9    severance motions for Mr. Cappuccio and Mr. Judd simply to

10   allow us to set those dates so we can respond to any

11   severance motions at the same time.

12         THE COURT:  I will hold it in abeyance, the

13   government's duty to respond to those motions.  I completely

14   agree it makes sense for us to try to handle them en masse,

15   but we need to get the defense closer on the same page.

16         MS. BOND:  Thank you, Your Honor.

17         THE COURT:  Ms. Bond, I'm going to ask you to work

18   with the defense attorneys in preparation for March 4th to,

19   A, give them a better sense of kind of end in sight on

20   discovery and, B, try to talk about dates for your proposed

21   scheduling order.

22         MS. BOND:  Absolutely, Your Honor.  If you would

23   like to set this more quickly within 10 days or two weeks, I

24   think we're going to have those answers.  I might be wrong

25   and fall flat on my face, but I do think that we're going to

1    have some significant answers very soon.

2              THE COURT:  All right.  I don't want to pull

3    everyone back here quite so quickly.  But to the extent, I

4    mean, if ideally you all could agree well in advance, if you

5    send in a consent scheduling order, I will enter it the next

6    day.

7              MS. BOND:  Thank you, Your Honor.

8              THE COURT:  So I do encourage you to just have

9    those conversations sooner than later.

10             All right.  Thank you, Ms. Bond.

11             Any defense counsel wish to be heard on any other

12   issue?

13             All right.  Thanks folks.  I'll see you on March

14   4th.

15             (Whereupon, the proceedings were concluded at 2:52

16   P.M.)

17

18

19

20

21

22

23

24

25

CERTIFICATE OF REPORTER

I, Lisa Walker Griffith, certify that the foregoing is a correct transcript from the record of the remotely reported proceedings in the above-entitled matter, and is subject to the technological limitations of court reporting remotely, including signal interference and other restrictions.

_____   5-2-2022
Lisa Walker Griffith, RPR                  Date