**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Crim. Action No. 21CR40(TNM)** |
| **DAVID LEE JUDD,** | |
| **Defendant.** | |

## DAVID JUDD'S REPLY TO THE GOVERNMENT'S RESPONSE TO HIS MOTION TO SEVER COUNTS

The government has elected to charge well over 700 individuals who attended the events at the Capitol on January 6. Some of those defendants are charged in conspiracies. Most of the defendants are not. And among the January 6 cases, mass-defendant trials like the one proposed for David Judd are the exception. As the trials that have already occurred in this courthouse demonstrate, single defendant trials of persons who participated in the same day's activities are the norm. Pursuant to Rules 8(b) and 14 of the Federal Rules of Criminal Procedure, and Mr. Judd's constitutional rights to due process and a fair trial, Mr. Judd's trial too should be un-joined and separate from other January 6 defendants.

As the government repeatedly invokes in its discovery disclosure updates to the Court, this prosecution is unprecedented. Perhaps as a result, the government stretches and takes unprecedented actions—some of which fly in the face of bedrock constitutional principles. That has happened here where the government has clumped together a group of men for trial simply because they were in one another's

1

proximity on January 6 and because the government assumes that these men shared the same objective, that is, to disrupt the electoral count. But when it is working, our legal system does not countenance mass trials.

David Judd is scheduled for a joint trial with defendants Cappuccio, Quaglin, Sills, and Klein to begin on October 3, 2022. *See* ECF 277, Government's Opposition to Joinder and Severance Motion [hereinafter "ECF 277, Gov't Opp."]. As to each of these men, Mr. Judd had nothing to do with them before the afternoon of January 6 and nothing to do with them since. Nor did he have anything unique or specific to do with them on the afternoon of January 6. Hence, in its response to Mr. Judd's Motion to Sever, the government cannot, and does not, cite to a single case that supports joinder of Mr. Judd to these other, randomly selected defendants. The government's argument that a group trial of Mr. Judd and these defendants will promote judicial efficiency is unavailing. Finally, even if joining Mr. Judd to the trial of these others would create some efficiencies for the government's presentation of its evidence and the testimony of its police officers, Mr. Judd's right to a fair trial outweighs the government's purported interest in judicial economy.

The government improperly joined Mr. Judd's case with those of other defendants. This Court should order that his case is no longer joined to them. In the alternative, this Court should sever Mr. Judd's trial from that of the other defendants. The government proposes a political spectacle designed to advantage the government's prosecution efforts with disregard for his constitutional rights to a trial.

Mr. Judd, however, is entitled to his own trial that both is, and appears to be, fair and in accord with due process.

1. **Mr. Judd is misjoined with defendants Cappuccio, Quaglin, Sills, and Klein.**

    A. The Indictment and pretrial information provided by the government demonstrate that Mr. Judd is improperly misjoined with defendants Cappuccio, Quaglin, Sills, and Klein.

Mr. Judd and the government each recognize that in this Circuit joinder "is determined as a legal matter by evaluating only the indictment [and] any other pretrial evidence offered by the Government." *Compare* ECF 206, Judd Joinder and Severance Motion [hereinafter "ECF 206, Judd Motion"] at 7 *with* ECF 277, Gov't Opp. at 5. In addition to describing the indictment, ECF 277, Gov't Op. at 2-3, the government takes great pains to set out in detail what it thinks that additional pretrial evidence includes. *Id.* at 7-10. Missing from the government's recitation and analysis is the awareness that any fair reading of its six pages of single-spaced factual representations rejects the joinder of Mr. Judd to the four other defendants.

Let's start with the indictment. Mr. Judd is charged in Counts 16, 22, 33, 34, 35, 38, 46, 52, and 53. Mr. Judd is the only defendant as to his charges concerning a dangerous weapon – assault on a police officer using a dangerous weapon in Count 22, disorderly conduct with a dangerous weapon in Count 38, and engaging in physical violence with a dangerous weapon in Count 46. Mr. Judd is also charged with aiding and abetting Mr. Stevens, who is not joined, in Counts 16 and 33. The only charges that Mr. Judd faces that any of the joined defendants also face are the January-6 ubiquitous charges of obstruction and civil disorder in Counts 34 and 35

and the ubiquitous misdemeanor charges in Counts 52 and 53. Looked at from another direction, Mr. Judd is not charged in the majority of the 22 charges that are scheduled to be presented to a jury in his current joint trial with defendants Cappuccino, Quaglin, Sills, and Klein. And while the government contends, "Notably, Mr. Judd is charged with aiding and abetting in counts 16, 33, and 34" to support its joinder argument, *id.* at 6 n.2, the government's flawed logic can be understood when one realizes that the four joined defendants are not included in Counts 16 and 33, and that Count 34 is the ubiquitous obstruction charge that traverses January 6 defendants across hundreds of cases in the courthouse.

The overlap of *charges* between Mr. Judd and his joined co-defendants is, therefore, minimal and non-specific – the generalized obstruction and civil disorder charges that literally many dozens to hundreds of other defendants equally face and hundreds more of un-charged persons are subject to face when arrested in the future. *See* ECF 277, Gov't Opp. at 6 (identifying "many dozens of others" in the Lower West Terrace tunnel). Thus, the indictment refutes that Mr. Judd "participated in the same act or transaction, or in the same series of acts of transactions constituting an offense or offenses." Fed. R. Crim. P. 8(b); *United States v. Perry*, 731 F.2d 985, 991 (D.C. Cir. 1984).

The government also provides "the trial evidence" that it anticipates it will prove. ECF 277 Govt' Opp. at 6. Mr. Judd and the Court benefit from this recitation, because it highlights the paucity of any objective connection between the extent of evidence that relates to the joined co-defendants (and not Mr. Judd) and evidence

concerning what Mr. Judd accused. Whereas at the time of his motion, Mr. Judd had a vague sense from pre-trial of the government's representations that purportedly supported the government's joinder action, the government's representations in his Opposition lay bare the lack of a "logical relationship," *Perry*, 731 F.2d at 990, between Mr. Judd and defendants Cappuccino, Quaglin, Sills, and Klein.

The government sets out 25 bullet-point, single-space paragraphs of anticipated trial evidence. Within, Mr. Judd is mentioned *only 7 times*. The government's first 12 paragraphs concern the approximate time period between 12:50 and 2:43 p.m. Defendants Quaglin, Sills, and Klein are alleged to be "in the front row of rioters who were facing off with police on the West Plaza of the Capitol Building." ECF 277, Gov't Opp. at 7. Not Mr. Judd; he is allegedly somewhere else in the crowd, first seen at the inaugural stage going toward the Capitol Building at 2:43 p.m. *Id.* at 8. What is the government's evidence as to what happened prior?

- Between 12:55 and 1:10, Defendant "Quaglin and other rioters repeatedly assaulted the initial officers," *id.* at 7, "rip[ped] away fences and protective equipment the officers were using," *id.*

- Between 2:25 and 2:35, Defendants "Sills, Quaglin, [] and Klein took leading roles in pushing back the police," *id.* "For instance, [] Sills and others pushed through the line of police officers on the West Plaza. Then, after the line had completely broken, [Sills] repeatedly threw items at the officers as they retreated up on the inaugural stage," *id.* "Klein pushed against an officer who tried to move him away from the same defensive

line," *id.* "Quaglin lunged at an officer on the same police line who was trying to protect a fallen colleague…. Quaglin grabbed several police shields," *id.* Around 3:06 p.m., "Quaglin sprayed a chemical irritant in the face of Officer O.F.," *id.* at 9.

- At 2:40, "Sills ripped away a police baton from Officer C.W. [] and used the baton to strike at officers, including Officer C.W. and Officer V.B.," *id.* at 8. Between 2:58 and 3:00, "Sills continued to use the stolen baton to strike at officers, including Officer C.W.," *id.*

- "Klein entered the tunnel at 2:43 and beckoned other rioters to join him," *id.* Between 3:00 and 3:01, "Klein used a stolen riot shield as a wedge.," *id.*

- From 3:07 to 3:14, "Quaglin, Cappuccio, and Klein continued to battle the police . . . and assisting in the group effort to heave against the police line," *id.* at 9.

- At 3:00, "Cappuccio violently yanked a gas mask off the face of Officer D.H., stole his baton, and then used the baton as a weapon to beat Officer D.H.," *id.* As this occurred, "Quaglin used a stolen shield to push against the officers standing directly next to Officer D.H. while he was pinned," *id.* at 10, with Klein assisting Quaglin, *id.* Cappuccio and Klein continued to assault the police from 3:13 to 3:19, at which time, the police pushed them out," *id.*

As for Mr. Judd, he is alleged to be in the vast overall crowd, *id.* at 7, 8, and *eventually* after the unrelated actions of others, in the tunnel at 2:56, *id.* at 8. Mr.

Judd is alleged to be with a group (including Defendant Klein) that pushed toward the officers at that time. He was outside the tunnel at 3:01, "speaking to Klein," *id.* At 3:06, Mr. Judd and particular persons who are *not* any of the four joined defendants are alleged to have passed stolen shields, *id.* at 9. "Judd then threw a lit firecracker at the line of officers [and] then retreated from the tunnel," *id.* For the next hour, "Judd stayed by the entrance of the tunnel until 4:15, re-entering the tunnel (without any of the four joined defendants) at 4:20," *id.* at 10.

While the allegations about Mr. Judd may not paint him in the most admirable light, they also make clear that his actions were materially separate and apart from the other defendants in his trial group – not "participation in a common scheme or plan spanning both "transactions and the other four joined defendants." 731 F.2d at 991. Mr. Judd did not "participate[] in the same act or transaction, or in the same series of acts or transactions, constituting an offense or offenses." Fed. R. Crim. P. 8(b). Others were committing acts and alleged offenses around and at the same time, but *similar* occurrences at similar time and place do not make a common plan or a series.

This absence of a logical nexus between Mr. Judd's acts and the four joined defendants' individual acts is unsurprising. They did not know one another prior to January 6. They did not travel to the Capitol together. They are not associated with the same group or organization. They are not alleged to have conspired together. Consequently, Mr. Judd's alleged firecracker assault is distinct from the alleged assaults of the co-defendants.

The government asserts without support either in the indictment or its 25 factual allegations that each of the joined defendants was "motivated by the same goal: to disrupt the Congressional certification of the 2020 Presidential Electoral College vote, based on their beliefs that the 2020 Presidential Election had been stolen." ECF 277, Gov't Opp. at 4. The government believes and asserts the same about the 700+ defendants throughout the January 6 cases. But assertions are not evidence; they are at most assumptions. The government asserts wrongly. Mr. Judd was not motivated to disrupt the certification, and his motivations were different than those of the four joined defendants. That he and the four joined defendants were in the same proximity when they acted apart from Mr. Judd is insufficient to establish that he participated in the same series of acts or transactions constituting the offenses with the joined defendants.[1]

B. <u>The continued joinder of Mr. Judd's of trial with those of defendants Cappuccio, Quaglin, Sills, and Klein would be a legal error.</u>

It is telling that the government cannot point to a single case in which a court authorized grouping of defendants in the manner that has been done here as to Mr. Judd with the other four defendants. Instead, the government seeks to erase all the classic examples of when joinder *is* proper, distinguish in footnotes those cases that

---

[1] As if it mitigates the misjoinder of Mr. Judd and the four joined defendants, the government observes that the nine defendants in the indictment have been grouped in two separate groups for trial. ECF 277, Gov't Opp. at 4. But that the nine defendants could be separated into two trial groups based solely on attorney schedules—and nothing to do with the facts of each case— underscores that their joinder is meritless. Likewise, that one attorney is permitted to represent two defendants named in the same indictment also suggests misjoinder.

discourage joinder of Mr. Judd to the four other defendants, and then cites a case so remarkably different than the facts here that the government misapprehends that the case actually supports Mr. Judd's joinder motion.[2]

*First*, anyone who has handled any federal criminal cases knows that the classic cases in which joinder is sought, and regularly denied, are conspiracy cases, racketeering cases, and cases where the defendant engaged in one or more acts to support the conspiracy or racketeering enterprise. Such cases are the textbook examples as to when joinder is upheld. Mr. Judd's factual circumstances are the antipodal meridian of those cases, the conspiracy-case decisions shed little light on the issue before *this* Court.

Consequently, the government's heavy reliance upon, and repeated citations to conspiracy cases to support the joinder of Mr. Judd's case to the four defendants are inapposite. *See, e.g.*, *United States v. Mason*, 951 F.3d 567, 575 (D.C. Cir. 2020) ("The indictment's allegation that [the defendants] conspired to distribute drugs made joinder of their trials proper": "'The mere allegation of a conspiracy presumptively satisfies Rule 8(b), since the allegation implies that the defendants named have engaged in the same series of acts or transactions constituting an

---

[2] Cases that the government cites to give reasons in favor of joint trial are cases in which the D.C. Circuit determined that joint trial of offenses was in error. *See United States v. Brown*, 16 F.3d 423, 428 (D.C. Cir. 1994) (offenses "do not belong to 'the same act or transaction or in the same series of acts or transactions" although defendant's trial counsel waived the claim by failing to cite Rule 8(b) to the district court); *United States v. Nicely*, 922 F.2d 850, 851 (D.C. Cir. 1991) ("we hold that the conspiracies charged in the indictment were misjoined and caused prejudice to the defendants"), *cited in* ECF 277, Gov't Opp. at 5.

offense.'" (quotation omitted)); *United States v. Bostick*, 791 F.3d 127, 145 (D.C. Cir. 2015) (Kavanaugh, J.) ("D.C. offenses were committed in furtherance of the charged drug conspiracy or were predicate acts committed in furtherance of the charged RICO conspiracy, or both"); *United States v. (George) Wilson*, 605 F.3d 985, 997 (D.C. Cir. 2009) (per curiam) (conspiracy and RICO conspiracy case); *United States v. Carson*, 455 F.3d 336, 373 (D.C. 2005) (per curiam) ("all of these counts were overt acts in furtherance of the narcotics conspiracy and predicate acts in furtherance of the RICO conspiracy"); *United States v. Gbemisola*, 225 F.3d 753, 760 (D.C. Cir. 2000) ("if a conspiracy count makes initial joinder of defendants permissible, the mid-trial dismissal of that count does not render joinder improper under Rule 8(b)"); *United States v. Spriggs*, 102 F.3d 1245, 1255 (D.C. 1996) (per curiam) ("all of the defendants participated in a single conspiracy … joinder of the defendants was proper"), *amended*, 102 F.3d 1245 (D.C. 1997); *United States v. (Lance) Wilson*, 26 F.3d 142, 153-54 (D.C. 1994) (defendants were indicted and unindicted co-conspirators in same conspiracies); *United States v. Delpit*, 94 F.3d 1134, 1142-43 (8th Cir. 1996) (interconnected drug conspiracies and evidence sole defendant not alleged part of conspiracy was hired as contract killer to advance the conspiracy); *United States v. Eiland*, 406 F. Supp.2d 46, 50 (D.D.C. 2005) ("While each defendants' alleged role in the overall scheme may vary, all counts relate either directly or indirectly to the underlying conspiracy."); *United States v. Gray*, 173 F. Supp.2d 1 (D.D.C. 2001) (joinder motions denied where defendants participated in RICO conspiracy and related charges); *United States v. Hubbard*, 474 F. Supp. 64, 87 (D.D.C. 1979) (joinder

proper of overlapping and interlocking charges related to one conspiracy to collect data and the other conspiracy to cover-up unlawful data collection); *United States v. Moore*, 216 F. Supp.3d 566, 584 (E.D. Pa. 2016) ("The presence of a conspiracy count linking the two bank robberies made the initial joinder of the offenses appropriate."), *cited in* ECF 277, Gov't Opp. at 5, 6, 10, 16, 18.[3]

*Second*, the government struggles unconvincingly in seeking to distinguish *Kotteakos v. United States*, 328 U.S. 750, 773 (1946), *United States v. Jackson*, 562 F.2d 789 (D.C. Cir. 1979), and *United States v. Whitehead*, 539 F.2d 1023 (4th Cir. 1976), *cited in* Jackson, 562 F.2d at 796. *See* CEF 277, Gov't Opp. at 12-13, 12 n.6, 13 n.7, 20 n.10. While the government wishes that *Kotteakos* "has no application here," observing that the decision arises from a conspiracy case and contending it is limited to a sufficiency-of-the-evidence analysis, *id.* at 13 n.7, in *Kotteakos*, the Supreme Court held that each defendant has "the right not to be tried *en masse* for the conglomeration of distinct and separate offenses committed by others." 328 U.S. at 775. Nor did the fact that it was a conspiracy case drive the Court's decision: "We

---

[3] The two cases that the government cites for its argument "[t]hat the Defendants are not charged with conspiracy, [ECF 206, Judd Mot.] at 1 . . . is of no moment," ECF 277, Gov't Opp. at 6, do not help the government. *Gbemisola*, the D.C. Circuit case cited by the government, *was* a conspiracy case and "the government 'presented evidence that [defendants'] offenses arose out of their participation in the same drug distribution scheme.'" 225 F.3d at 760 (quotation omitted). In the other citation, another federal circuit court upheld the joinder of "two conspiracies that shared a common plan or scheme and a substantial overlap of facts or participants." *United States v. Rittweger*, 524 F.3d 171, 174 (2d Cir. 2007) (Sotomayor, J.). In doing so, the Second Circuit noted the unique factual nature of its analysis, *id.* at 178, and admonished: "Rule 8(b) does not provide the government with limitless discretion to join defendants and does not absolve the government from an independent obligation to consider the unfairness that may result from joinder," *id.* at 180.

have not rested our decision particularly on the fact that the offense charged, and those proved, were conspiracies." *Id.* at 776. *Kotteakos* announces a clarion warning – especially apt in non-conspiracy cases:

> Criminal they may be, but it is not the criminality of mass conspiracy. They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift toward totalitarian institutions. True, this may be inconvenient for the prosecution. But our Government is not one of mere convenience or efficiency. It too has a stake, with every citizen, in his being afforded our historic individual protections, including those surrounding criminal trials. About them we dare not become careless or complacent when that fashion has become rampant over the earth.

*Id.* at 773. As to this limitation and warning to avoid the drift toward totalitarian regimes, the government's Opposition is tellingly and ominously silent.

The government acknowledges, as it must, that in *Jackson*, the D.C. Circuit held that spatial and temporal proximity were not enough to authorize joinder. ECF 277, Gov't Opp. at 12 n.6. Where "the fundamental question remains: Are crimes committed by the same persons around the same place and around the same time automatically sufficiently 'connected together' to be joined" as different parts of "the same series of acts or transactions" under Rule 8(b), the D.C. Circuit answered, "No" absent a logical link between the different offenses. 562 F.2d at 796-797. Because the government's hypothetical about "two men separately entering the same bank at the same time both intending to rob it and then carrying off the robberies simultaneously," ECF 277, Gov't Opp. at 13, is not Mr. Judd's case, *see supra*, Part I.A., it is a false analogy. And the court's proscription in *Whitehead* meets Mr. *Judd's* facts. Just because there may have been "a common denominator" between Mr. Judd

and one or more of the four joined defendants, the government has not established that he participated in the same act or same series of acts as did they. They were independent actors, at most contemporaneously present in similar, parallel acts, not "related events or things, one following the other." "Series," CAMBRIDGE DICTIONARY, *available at* SERIES | meaning in the Cambridge English Dictionary, last accessed May 5, 2022.

*Finally*, the government bizarrely relies on *United States v. Slatten* in support of its argument that the defendants are properly joined. 865 F.3d 767 (D.C. Cir, 2017) (per curiam). In doing so, the government fails to acknowledge that in *Slatten*, the issue of severance, not joinder, was before the Court, and that the D.C. Circuit held that the district court abused its discretion in ***failing to sever*** Slatten from his co-defendant where his co-defendant. *Slatten*, 865 F.3d at 811.

Setting aside that the contrary holding of the case, the government's reliance on *Slatten* is misplaced for other reasons. In *Slatten*, the "defendants were members of Blackwater's Raven 23 *team*." *Slatten*, 865 F.3d at 777 (emphasis added). The defendants "*convoy[ed] together*" to a car bombing in Baghdad. *Id.* (emphasis added). They stopped together at a city square. *Id.* Together, the convoy members engaged in heavy gunfire and multiple grenade attack at a particular vehicle, destroying the car and killing its passengers. *Id.* at 778. The defendants all left together in the same convoy in which they arrived. *Id.*

Eight of the defendants were charged and tried in this Court. The *Slatten* defendants, unlike Mr. Judd and the four joined defendants, were part of the same

team and convoy that traveled to the scene of together, worked in concert together as a trained military unit, and left together. While not charged with conspiracy as it relates to pre-planning the unauthorized attack, the defendants worked as a cohesive unit "with a mutual intent to commit a crime [who] ha[d] joined others in participating in the same act or transaction constituting a crime or crimes." *Id.* at 788.

In contrast, Mr. Judd and the four joined defendants did *not* travel together to the Capitol together, they were *not* taking direction from one another, and while they were in the same proximity (along with hundreds of other rally-goers), they did *not* engage in the same series of acts. Unlike the defendants in *Slatten*, who acted in concert to shoot their victims, Mr. Judd and his co-defendants are alleged to have committed distinct, separate, and different acts. Indeed, the government's recitation of the defendants' alleged acts *supports* that the alleged offenses are distinct. *See supra*, Part I.A. These distinct acts are not comparable to the shooting at issue in *Slatten*, whose only fair reading is that pre-planned concerted acts of a cohesive group exemplify when joinder is appropriate. On the other hand, if the evidence is just that "the crimes occurred at about the same time and about the same place," joinder is reversible error. *Jackson*, 562 F.2d at 790-97.

C. A joint trial with the four other joined defendants will not create substantial efficiencies but, instead, will result in an unfair trial for Mr. Judd.

To be sure, joint trials can have certain efficiencies. It certainly is easier for the government to present evidence one time as opposed to multiple times. Yet the

consideration of efficiencies occurs long before potential jurors are summonsed. They first start with the government's charging decision.

The government elected to charge over 700 individuals who, for the most part, came to the Capitol to exercise their free speech. To date, the government has not offered alternative ways of disposing of cases, such as deferred prosecution agreements, which were, for example, widely offered to defendants charged with offenses arising out of the riots at the federal courthouse in Portland.[4] The government seeks jail time for misdemeanor pleas and requires guidelines ranges of lengthy prison sentences as part of any pleas in felony cases. First offenders are given plea offers where the defendants know that they face prison time. Plea offers that disincentive pre-trial settlement of cases are inefficient. In short, bringing 700 plus U.S. citizens to trial on charges ranging from trespass to assault on a police officer without meaningful pretrial resolution *a priori* creates inefficiencies.

The U.S. criminal legal system is supposed to prioritize fairness over rank efficiency. China, Russia, Cuba, Venezuela, and other foreign regimes have *efficient* legal systems. Persons with political viewpoints against the political leadership's grain or rallygoers who speak and act in defiance of those governments are dealt with *efficiently*. In this country, all – regardless of their political views –are to be given equal justice under the law. And, if pretrial settlement offers are unreasonable, then we will have definitionally-inefficient American jury trials, with prosecutors seeking

---

[4] *See* ECF 138, Mr. Judd's Motion to Compel Discovery on Claim of Selective Prosecution, *and* ECF No. 138-1, Appendix to Mr. Judd's Motion to Compel (chart compiling cases).

convictions, defense lawyers upholding due process and the rule of law, and Article III judges presiding to ensure and protect that our courts function as beacons of justice.

The government argues that it will have to repeat the introduction of some evidence if the trials are severed. The government argues, for example, that with respect to the issues as to whether the defendants intended to disrupt the electoral count and whether the defendants knowingly entered a restricted area for purposes of 18 U.S.C. §§ 1512 and 1752, respectively, the government "will present a host of witnesses who would have to testify repeatedly in the event of severed trials." ECF 277, Gov't Opp. at 19. That evidence is necessarily going to be repeated verbatim in any number of January 6 trials. By the government's logic, hundreds of defendants charged with violations of §§ 1512 and 1752 should be forced to stand to trial together to streamline that evidence. Of course, the Court would not countenance such a spectacle.

Likewise, the Court should not countenance a group trial including Mr. Judd simply because the government has charged him with similar or the same offenses as the other four defendants. The government has already advised the defense that it intends to present substantially similar evidence in Mr. Judd's trial as previously presented in January 6 jury trials in this District. Such evidence, the government admits, "will consume a substantial portion of the trial." ECF 277, Gov't Opp. at 18. The amount of evidence that the government presents that is non-specific to Mr. Judd is a tactical decision by the government. The government complains that it "will

present a host of witnesses who would have to testify repeatedly in the event of severed trials." *Id.* at 19. That is correct, and it is consistent with our legal system.

Left unsaid by the government is that its witnesses are not secret cooperating witnesses whose safety may be jeopardized by testimony, civilian witnesses pulled away from their jobs or child care, or foreign nationals whose travel and attendance militate against multiple appearances. *Cf.*, *Slatten*, 865 F.3d at 788 ("concerns for efficiency are especially compelling here because many of the witnesses reside in Iraq. Multiple trails would mean arranging multiple international trips for the witnesses, which would likely be both difficult to schedule and costly."). The government's witnesses are primarily law enforcement and other government individuals, who work and reside in the local area and whose jobs regularly include and/or require testimony.

The government's decision to take up large amounts of court time with presentation of evidence that may not be disputed at all but that may advance political points for the government is not reason to disregard the lack of a basis of joinder of Mr. Judd's trial with the four other defendants. Similar, any red herrings that the government says it wants to avoid repeating in multiple trials, *see id.*, are irrelevant in the trial of Mr. Judd's case (or the trial of other defendants) if those issues are not litigated to the degree that trial evidence is necessary. "Efficient" prosecutors seek stipulations and agree to stipulations proposed by defense counsel – not the regurgitation case-after-case of gratuitous testimony and other evidence. *See, e.g., Old Chief v. United States*, 519 U.S. 172, 186 (1997).

Moreover, the government minimizes the inefficiencies of trying Mr. Judd's case together with others who committed different actions at different times. *See* ECF 277, Gov't Opp. at 17 ("most, if not all, of the government's evidence" will be mutually admissible in the trials of Mr. Judd and each of the four joined defendants). This simply is inaccurate. Much evidence will not be admissible. And almost inevitably, one can forecast objections, *in limine* motions, bench conferences, the need for curative instructions, and incipient motions for mistrial and to sever.

Put aside the objections that the lawyers for co-defendants will have as to evidence related to Mr. Judd, which there undoubtedly will be. Mr. Judd will focus here simply on his own objections as to evidence related to his co-defendants that are inadmissible as to him – including photographs, videos, police officer testimony, and other witness testimony, whether F.R.E. 401, 403, hearsay, or other grounds. The government seems to think that it can sweep in tranches of inadmissible evidence under a "background evidence theory." ECF 277, Gov't Opp. at 16-17. But, at minimum, all evidence must be relevant, F.R.E. 401. "Evidence is relevant if it has any tendency to prove or disprove the existence of a consequential fact; "in complex cases it is sometimes difficult to establish relevance prior to the introduction of all evidence and without being able to analyze and explain its relevance in relation to other evidence." 2 WEINSTEIN'S FEDERAL EVIDENCE § 401.04(1). Good faith objections will lead to numerous interruptions and side issues that could easily be avoided in the appropriate separate trial of Mr. Judd. And a trial with multiple defendants, with evidence that relates to one but not others and concomitant legal proceedings, extends

the trial time, which expands the number of potential jurors who are excused for cause based upon hardship and extends the time that particular citizens are removed from their lives for jury service. The government estimates that the joint trial will take 3-4 weeks, ECF 277, Gov't Opp. at 22, a time estimate that should be extended to account for defense objections and the defense cases. When trials do not conglomerate defendants, the trials are shorter, more efficient for jurors, attorneys, and judicial staff alike. *See, e.g.*, *Gray*, 173 F. Supp.2d at 9-10 (addressing hardships on jurors, trial judge, defendants (some of whom need to fund trial representation), attorneys, and other court personnel); *United States v. Gaston*, 37 F.R.D. 476, 477 (D.D.C. 1965) ("It would be very unfair to require a defendant and his counsel to sit and listen to testimony in regard to counts in which he may not be involved," because of inefficiencies of added cost and time).[5] Thus, while joinder may seem more efficient at first blush, critical analysis of the improper joinder compels the opposite conclusion.

### III. In the event, the Court fails to correct the government's misjoinder of Mr. Judd's case with that of the four joined defendants, the Court should exercise its discretion and sever his trial from theirs.

Mr. Judd takes no position as to whether any other defendants should be tried jointly. *See* ECF 277, Gov't Opp. at 20. But *his* trial should be severed from the other

---

[5] As a practical matter, the severance of a defendant's case not only provides him a fairer trial but it also can increase the possibility that the government will offer a more reasonable plea offer to that defendant as opposed to expending resources on the trial, resulting in efficient pretrial settlement and court proceedings.

four defendants. The government's opposition to Mr. Judd's severance motion is brief, *see id.* at 20-24; Mr. Judd will keep his reply similarly brief.

The government's recitation of relevant facts requires some correction. There is *no* allegation that Mr. Judd "push[ed] aggressively against the police." *Id.* at 21. With regard to his four joined defendants, Mr. Judd stood, spoke, and beckoned. *Id.* at 8-9. He did not help any of his four joined co-defendants "create a 'shield wall,'" *id.* at 21; *see id.* at 7-10. He *did* allegedly throw a firecracker. *Id.* at 9. No other defendant is alleged to have knowledge or co-action of that act. And toward the end of afternoon, Mr. Judd is alleged to have re-entered the tunnel to push against the police – but not with any of his four joined co-defendants. *Id.* at 10. Finally, as already discussed, his four joined defendants are alleged to have engaged in a host of direct, violent, assaultive conduct that Mr. Judd had nothing to do with. *See supra*, Part I.A.

Additionally, the government's cases are worth a second look. In *Manner*, the D.C. Circuit observed, "The few cases in which we have overturned a trial court's denial of a motion to sever have involved clear disparities between the weight, quantity, or type of the evidence against the movant and against the other defendants." *United States v. Manner*, 887 F.2d 317, 324 (D.C. Cir. 1989). Such is the reported evidence here. Fast-forwarding 32 years, just last year, the D.C. Circuit listed, as the government puts it, "salient factors that militate against severance," ECF 277, Gov't Opp. at 21 (citing *United States v. Tucker*, 12 F.4th 804, 825 (D.C. Cir. 2021) (per curiam)). None of those factors – presentation of the same evidence, testimony by the same witnesses, and the same illegal conduct, *id.* – are present here.

*E.g., supra*, Part I.A. The testimonial and other evidence as to the four joined defendants is not testimony necessary in Mr. Judd's trial, and his alleged criminal acts were not conspiratorially, jointly, or otherwise the same as those committed by the others. Severance can be warranted "when evidence that the jury should not consider against a defendant and that would not be admissible if a defendant were tried alone is admitted against a codefendant" in a joint trial. *Zafiro v. United States*, 506 U.S. 534, 539 (1993). *See Carson*, 455 F.3d at 374 (absence of mutual admissibility supports severance); *Perry*, 731 F.2d at 992 (same); *United States v. Drew*, 331 F.2d 85, 89-90 (D.C. Cir. 1980) (same regarding severance of counts for defendant).

Mr. Judd's trial should be severed. *See Gaston*, 37 F.R.D. at 478 (judicial member of committee that revised federal rules 8 and 14 granting severance into as many as four separate trials for eight defendants "in such a way that no defendant will be required to participate or be present at the trial of any count in which he is not involved and in which he is not charged," because "a mass trial is contrary to the basic principles of our jurisprudence" that Rule 14 is designed to give district judges authority to prevent).

## Conclusion

Certain bedrock principles set the American legal system apart of from others. Among them are that an individual criminal defendant is afforded individual protections. David Judd is not charged with a mass conspiracy. Indeed, the government could never even allege that he conspired with any of the other

individuals in his indictment. Our justice system strives to be fair and just to each individual charged with offenses against the government. To be sure, our criminal legal system has faltered at times in the past. The country has experienced mass political trials that have resulted in mass convictions of those hailed before the bar. Federal trial examples that come to mind include the joint trial of slavery abolitionist John Brown and his compatriots at Harper's Ferry, West Virginia; the World War II-era sedition trials of those on the left and on the right who disagreed with President Roosevelt; and the joint trial in Oregon of Cliven Bundy and his followers who protested federal land management control policies less than a decade ago. Federal prosecutors can use the U.S. Code to prosecute those express unpopular voices and do disagreeable actions. But when unchecked, such prosecutions inevitably deprive the accused of treasured constitutional rights.

The U.S. Supreme Court's caution in *Kotteakos* applies with special force here: "They do not invite mass trial by their conduct. Nor does our system tolerate it. That way lies the drift towards totalitarian institutions. True, this may be inconvenient for the prosecution.  But our government is not one of mere efficiency.  It too has a stake, with every citizen, in his being afforded historic individual protections, including those surrounding criminal trials." 328 U.S. at 773. *See Perry*, 731 F.2d at 989 ("The purpose of [Rule 8(b)] is to put some reasonable limitation on the conduct of mass trials.").

For the foregoing reasons, those in Mr. Judd's ECF 206, those he will present at a hearing on his motion, Mr. Judd respectfully submits that this Court should sever his trial from that of the four joined defendants.

_____/s/_____
ELIZABETH MULLIN
Assistant Federal Public Defender
625 Indiana Avenue, N.W., Suite 550
Washington, D.C.  20004
(202) 208-7500


_____/s/_____
EDWARD J. UNGVARSKY
Ungvarsky Law, PLLC
114 N. Alfred Street
Alexandria, VA 22314
(571) 207-9710