UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>DAVID LEE JUDD,<br><br>              Defendant. | Crim. Action No. 21CR40(TNM) |

**MR. JUDD'S REPLY TO GOVERNMENT OPPOSITION TO DEFENSE MOTION FOR TRANSFER OF VENUE**

In its opposition to Mr. Judd's motion, the government cites *United States v. Skilling*, 561 U.S. 358, 381 (2010) for the premise that a "presumption of prejudice … attends only the extreme case."  ECF No. 292, Govt. Opp. at 18.

Time after time, both in court and to the press, the government has argued that the January 6 prosecutions are the extreme case:

> "The investigation and prosecution of the Capitol Breach will be the largest in American history, both in terms of the number of defendants prosecuted and the nature and volume of the evidence," the Justice Department wrote in a filing Monday that was later cited by [the Honorable Beryl A.] Howell.[1]

The case law is clear: only the extreme case will require a venue transfer.  And the government is very clear: this is the extreme case.  The circumstances of this

---

[1] Hsu, Spencer S., *As mountain of video evidence grows, Capitol riot trials are pushed to 2022 and beyond*, The Washington Post (July 16, 2021), available at: https://www.washingtonpost.com/local/legal-issues/capital-riot-evidence-cost/2021/07/16/d5e81bdc-e404-11eb-8aa5-5662858b696e_story.html.

extreme case, evident in the survey data and the pretrial publicity, require a transfer or venue to safeguard Mr. Judd's constitutional rights.

Mr. Judd has submitted survey data from two separate surveys that confirm that significant majorities of potential jurors in the District of Columbia have materially prejudicial views of January 6 defendants in ways that *voir dire* will not necessarily reveal or be able to cure. In its response, the government only addresses the survey conducted by Select Litigation, ignoring that a comprehensive second survey, conducted at the request of defendants Caldwell and Meggs, supports the results of Select Litigation's Survey. *See* ECF No. 265, Mr. Judd's Notice of Additional Authority. The data is just one of the factors upon which Mr. Judd relies, including the size and demographics of the D.C. jury pool, potential jurors' connection to the events and the aftermath of January 6, and the number of January 6 cases scheduled for jury trials. In response, the government offers an unavailing critique of the survey and points to distinguishable cases. Because the government fails to refute that the cumulative impact of the issues Mr. Judd raises will deprive him of a fair trial, the Court should grant his motion to transfer venue.

I. **The government fails to undermine the value of the defense's survey results as evidence supporting transfer of venue.**

The survey results that Mr. Judd submitted to the Court show that 71% of District of Columbia respondents said that they had formed the opinion that January 6 defendants were "guilty" of the charges against them and show many other signs of having prejudged all of these cases indiscriminately. ECF No. 257, Def. Motion., Ex.

2

1.[2] The government attempts to undermine these results by suggesting that courts have determined that no survey has value in the evaluation of whether a transfer of venue is appropriate in a given case, and by attempting to critique this specific survey. Neither effort is successful.

> A. *The government fails to establish that survey data can never support a transfer of venue.*

The government wrongly suggests that survey results cannot support a finding of presumed prejudice, citing select cases in which courts have declined to rely on surveys for that purpose. ECF No. 292 at 6. Each of these cases is distinguishable.

First, in all of the cases the government cites, survey respondents were asked entirely different questions than were asked here. Second, in many of these cases, survey respondents were not even asked to opine on the "guilt" of the defendants at issue. *See, e.g., United States v. Campa*, 459 F.3d 1121 (2006) (reflecting that respondents in survey submitted in support of transfer motion by five men accused in Miami district of acting as unregistered Cuban intelligence agents were not asked to opine on anyone's guilt); *United States v. Causey, et al.*, Case No. H-04-205, 2005 WL 8160703 (S.D. Tx. Jan. 1, 2005) (noting that in the *Skilling* case, respondents were asked to name all executives they believed were guilty of Enron crimes, which took for granted that the respondent must believe some were, and noting that 87.7% of respondents did *not* name Skilling in response).

---

[2] For example, 84% have unfavorable opinions of those arrested for participating in the January 6 demonstrations; 62% would characterize these individuals as criminals; and 85% have already concluded that those who entered the Capitol planned to overturn the election. ECF Nos. 35, 101-2.

3

Third, in the other cases upon which the government relies, the court rejecting survey evidence as grounds to transfer venue did so only after discrediting many of the techniques employed by the survey-givers at issue. This was the case in *Campa*, in which the district and circuit courts rejecting survey data submitted by the defendants relied on many critiques of the survey techniques employed by the poll-taker the defense had hired, including criticisms the government had offered through its own expert. *Campa*, 459 F.3d at 1130-31, 1145-46 (describing several critiques offered by the government and the district court, and adopting many of them). As discussed further below, the government cannot level the same criticism of the methods here.

Finally, in the one case cited by the government in which the reviewing court rejected survey results as useful evidence in a venue analysis more generally, the majority betrayed a generalized bias against surveys that the government does not assert here, and which may have been a function of the era. *United States v. Haldeman*, 559 F.3d 31, 64 n. 43 (1979) (characterizing *all* polls as "suspect" and noting that district court did not have to consider poll-giver "paid for by one side" as an expert without offering specific critique of pollster whose results the defense had submitted).

Over forty years later, the government does not suggest that polls are uniformly suspect, and it offers only one attempt to undercut Select Litigation's results and completely ignores the result of the Caldwell and Meggs survey, which surveyed potential jurors in the District of Columbia and three other federal districts.

4

As shown below, the government's critique of Select Litigation's survey fails to establish that the Court should disregard the defense's survey evidence that Mr. Judd will not be able to find an impartial jury at his trial in October

> B.  *The critique that the defense's survey did not include an option to answer "don't know" fails to undermine results.*

The only critique of the instant survey's mechanics that the government offers is that Select Litigation did not provide survey respondents with instruction that they could say they were "unsure" about the guilt of the January 6 defendants (or about other issues explored in the survey). ECF No. 292 at 10. The government asserts that such an option is "required" by standards issued by a professional organization, the American Society of Trial Lawyers (ASTL). *Id.* This attempt to undermine Select Litigation's methods fails.

First, there is good reason for Select Litigation's choice not to include a "don't know" prompt in its survey. This is established in a research and literature summary published in 2010, four years after the most recent study cited by the cited ASTL standards. This peer-reviewed article notes that although there is evidence that offering "don't know" answers may "encourage people without information to admit it," such questions "may go too far and discourage people who do have information with which to generate a meaningful answer from expressing it."[3]  "In fact, there is

---

[3] Jon A. Krosnick & Stanley Presser, *Question and Questionnaire Design*, in HANDBOOK OF SURVEY RESEARCH (2d. ed. 2010, Peter V. Marsden & James D. Wright, eds.) at 263, 282 [hereinafter Krosnick & Presser], Exhibit 1. Mr. Hickman of Select Litigation informs undersigned counsel that this compendium is the "bible" of survey research.

considerable evidence that these questions do not improve measurement." *Id.* After reviewing studies of this issue, the authors of this research summary conclude that "data quality does *not* improve when" the option to answer, "don't know" "is explicitly included in questions." *Id.* at 285 (emphasis added).

Second, the government implies that the ASTC standards provide that there must be an "unsure" option given with each question. ECF No. 292 at 11. But, in fact, the standards only require that respondents be "made aware that they can say they do not know or have no opinion." ASTL Standards at 9, *cited in* ECF No. 292 at 11. Select Litigation's results show that respondents *were* aware of that here. As the government notes, about a quarter of respondents did answer with some variation of "I don't know," or "it depends," or refused to answer altogether. *See* ECF No. 257-1 at 14. This is evidence that a specific cue is not necessary to identify those who do not hold a strong concrete opinion on a particular issue examined in a survey.[4] The government itself embraces data from another survey that did not explicitly prompt respondents to answer "don't know," the CBS/YouGov survey. *See* ECF No. 38 at 13

---

[4] Mr. Hickman of Select Litigation informs undersigned counsel that those giving the surveys are instructed to do their best to sort *any* volunteered non-committal answer into one of these categories, and to never press or admonish anyone who give any such an answer. Thus, the technique effectively achieves what the American Society of Trial Lawyers standards seeks to achieve, awareness in respondents that they can say that they do not know or have no opinion.

Indeed, common sense (and the results here) suggest that Select Litigation's strategy would be better at capturing the widest universe possible of non-committal respondents, and more than surveys that restrict respondents to "don't know, guilty, or not guilty." A respondent may think, "well, I know what I think, but I prefer not to say," or "well, I know that I think all who went *into* the Capitol are guilty, but that's not all of them, so I have to say, 'it depends.'" Select Litigation's strategy is more likely to accurately capture all such respondents as not having a firm opinion.

(citing the results of Question 2 of that poll to argue that this case should not be transferred to another venue).[5] In short, the government fails to discredit the Select Litigation survey results.

II. **The government fails to refute the ways in which the survey shows that *voir dire* will be inadequate in this case.**

The government argues that the fact that 71% of DC residents believe those arrested in the wake of January 6 are guilty (Q4 in the survey) does not support presuming prejudice. According to the government, the fact that "only" 52% say that they are "more likely to vote that the person is guilty" if they were on a jury (the Q5 results) arises from these jurors' discerning a meaningful difference between those "merely arrested," and those "charged." *Id.* And, the government argues, the differential in results for Q5 and Q4 proves that D.C. potential jurors are committed to keeping an open mind once "reminded of the presumption of innocence." ECF No. 38 at 12-13 (arguing that the Select Litigation question yielding the 52% result – how respondents would vote on a jury of a defendant charged with crimes after January 6 – is more akin to the *Haldeman* question that yielded the 61% result in that case, which offered respondents the option to answer "Not Guilty Until Proven" in addition to Guilty, Not Guilty, and Don't Know).

Mr. Judd's arguments do not rise or fall on analysis of any one question, or even just the questions about "guilt." The sum of responses reveals a pervasive

---

[5] *See* CBS News Poll, December 27-30, 2021, Question 2, *available at* https://drive.google.com/file/d/1QNzK7xBJe_WzKlTrHVobLgyFtId9Cgsq_/view.

prejudice. In its critiques, the government is also relying on a host of assumptions in its analysis of these particular results.

There is reason to believe that the differential arises from the facts that 1) the bias against January 6 defendants D.C. residents, revealed in their answers to many questions, is deeply felt, *and* 2) many potential jurors are reluctant to admit their bias, consistent with research showing that people are prone to give socially acceptable answers. The risk that jurors will not reveal their true biases in *voir dire* – coupled with the many obvious grounds for D.C. residents to harbor bias that jurors in other venues would not – weighs in favor of transferring this case to another venue to ensure that Mr. Judd's right to an impartial jury are protected.

  A. *The survey reveals bias that jurors may not report in voir dire.*

The government assumes that the fact that "only" 52% of potential D.C. jurors reported that they would be likely to "vote guilty" if they were on a January 6 jury, though 71% say they believe January 6 defendants "are guilty," reflects the power of reminding individuals of the presumption of innocence insofar as it refers to trials. From this, the government concludes that similar reminders, and the formalities of the *voir dire* process, absent from polls, will move potential jurors to approach the case with an open mind. ECF No. 292 at 11. But this is an article of faith, not a conclusion supported by data. And the substantial data of the surveys calls this article of faith into doubt.

As Mr. Judd has already laid out, the various ways in which Select Litigation probed pretrial bias against these defendants suggests that formalities and

8

reminders about the presumption of innocence may do nothing more than induce virtue signaling, rather than the actual virtue the government assumes they will induce.

The results show that potential jurors will admit (1) that they view the January 6 defendants unfavorably (84%), and (2) that they have prejudged the defendants as guilty (71%), etcetera – when they are given no signals to not confess these beliefs. Even reminded that there will be trials, a large portion of them – knowing their own prejudices and their neighbors' – would not expect a fair trial if they were charged with a January 6 offense (67%). ECF No. 257 at 3. It is only when prodded to say what *they* would do as jurors – where, as the government acknowledges, most know that the law requires a presumption of innocence – that many fewer admit to such bias (52%). *Id.*

These results are consistent with study findings that "[o]n questions about socially desirable (or undesirable matters), . . . there are grounds for expecting . . ." misreporting. Krosnick & Presser, *supra*, at 285. For example, one study found that "many more people said that they voted when polling place records showed they did not vote than said they did not vote when records showed they did." *Id.* And, contrary to the government's assumptions, studies show that people are *especially* likely to lean toward the socially desirable response when face-to-face with others. For example, "Catholics in one study were more likely to report favoring legalized abortion and birth control on a self-administered questionnaire than to an

9

interviewer." *Id.* at 286.[6] Given Select Litigation's results and these studies, we should expect many potential jurors to *mask* potential prejudices in *voir dire*, rather than expect *voir dire* to unmask or erase biases that jurors know to contravene what is expected of jurors.

To be clear, the defense's concern about the D.C. jury pool does not rest on the assumption that potential jurors would deliberately mislead the Court in *voir dire*. The concern is that true partiality may not be discernable to the Court, or even to jurors themselves, given what we know about how people respond to social cues, and given Select Litigation's results in this case. *See Irvin v. Dowd*, 366 U.S. 717, 728 (1961) ("No doubt each juror was sincere when he said that he would be fair and impartial to petitioner, but psychological impact requiring such a declaration before one's fellows is of its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can be given little weight.").

In short, the Court should credit and consider Select Litigation's results showing what potential D.C. jurors said about bias when they didn't know what the "socially right answer" was as powerful evidence of deep prejudice in the D.C. juror pool, and not join the government in assuming without evidence that *voir dire* will root out partial jurors.

---

[6] Krosnick & Presser also note that answering "don't know" may help respondents "provide cover for socially undesirable responses," Krosnick & Presser, *supra*, at 287, so it is possible that the Select Litigation results showing high rates of pretrial bias against the January 6 defendants may actually underestimate the pretrial bias these defendants are facing. (And this is another reason "that it is better not to provide explicitly DK options for sensitive items[.]" *Id.*)

> **B.** *The government fails to refute the clear evidence that the survey results show that huge swaths of potential D.C. jurors already think they know the purpose of defendants' actions on January 6.*

Potential jurors' responses to other questions that were not obviously about how they would comport themselves as jurors in a trial were also particularly telling. Again, for example, 85% of D.C. jurors believe those who went into the Capitol on January 6 were trying to "overturn the election and keep Donald Trump in power." ECF No. 257-1 ¶¶ 15, 18.[7] This view is extraordinarily pervasive in D.C. relative to Northern District of Georgia and the nation as a whole. *See id.* ¶ 25.

Without using lawyerly terms or making clear that the question had to do with a trial, the survey brings out that prosecutors will have to do nothing to convince almost 9 out of 10 jurors of one element of proof at trial that Mr. Judd acted "corruptly" as charged, that is, that "the defendant acted with the intent to obstruct or impede the official proceeding:" jurors already believe this. *See, e.g.,* Final Jury Instructions, ECF No. 119, *United States v. Reffitt*, Case No. 21-cr-00032-DLF, at 25 (filed Mar. 7, 2022). And this *includes* 78% of the potential D.C. jurors who expressed confidence in January 6 defendants being able to have a fair trial. ECF No. 257-1 ¶ 16. The results show that these optimistic jurors are wrong, because even they, and many others, have drawn conclusions about an essential element at the heart of the government's case. It is likely that most respondents do not understand this – because they do not know what the elements of proof of obstruction are. *See United States v.*

---

[7] In addition, 76% would describe those who went into the Capitol as "insurrectionists," and 72% would describe them as "trying to overthrow the United States government." *See* ECF No. 35-1 ¶¶ 15, 18.

11

*McVeigh*, 918 F. Supp. 1467, 1472 (W.D. Okla. 1996) ("The existence of prejudice . . . may go unrecognized in those who are affected by it.") But it is true, nonetheless. And it is concerning because "[t]he prejudice that may deny a fair trial . . . includes an impairment of the deliberative process of deductive reasoning from evidentiary facts resulting from an attribution to something not included in the evidence." *Id.*

Unless *voir dire* examines jurors' views on every element the government must prove that may align with articles of faith uniquely pervasive in the D.C. community (such as what protestors' goals were on January 6, and whether police responded appropriately), there is extraordinary risk that Mr. Judd will not be tried by an impartial jury in this district. And the strong signs of prejudice, and signs that any *voir dire* in these cases will have to be prolonged and extraordinarily searching is itself evidence that prejudice should be presumed. *See Murphy v. Florida*, 421 U.S. 794, 802 (1975) (noting that the "length to which the trial court must go in order to select jurors who appear to be impartial" is a factor suggesting that prejudice should be presumed); *United States v. Rodriguez-Cardona*, 924 F.2d 1148, 1158 (1st Cir. 1991) ("When so many jurors admit to a disqualifying prejudice, the trial court may legitimately doubt the avowals of impartiality made by the remaining jurors.").

### III. The government fails to address the cumulative effect of the issues with the D.C. jury pool.

Just as the government picks at individual findings of the survey, it argues that media coverage of January 6 does not by itself establish that the Court should presume prejudice. Mr. Judd never said that it did, though he did offer evidence and argument that the coverage of January 6 has been of a type and volume capable of

inducing unusual levels of pretrial prejudice. To the contrary, Mr. Judd has emphasized that multiple unusual factors combine to justify transfer here. And the government has yet to squarely address this central argument.

For example, the government offers that "January 6 is now more than a year in the past" as apparent evidence of the dilution of that date's impact on the Washington community. ECF No. 292 at 16. This argument requires willful blindness to the ongoing arrests,[8] trials,[9] and headlines[10] related to January 6, 2021 that inundate D.C.'s local news, in particular, the Washington Post, which is the District's local paper. The Post covers January 6 consistently, including those cases that are not widely followed in the national news, bond hearings, indictments, plea hearings and trials. The Post's coverage has been so extensive it won a Pulitzer Prize for its coverage of January 6 cases.[11] The impact of the local paper's coverage of these cases

---

[8] Slevin, Colleen, *Man accused of assaulting police, AP photographer on Jan. 6,* THE WASHINGTON POST (May 24, 2022), available at: https://www.washingtonpost.com/politics/man-accused-of-assaulting-police-ap-photographer-on-jan-6/2022/05/24/9777e28a-dbb4-11ec-bc35-a91d0a94923b_story.html.

[9] Hsu, Spencer S., *Two officers fought in the Jan. 6 Capitol riot. Who did wrong?*, THE WASHINGTON POST (April 30, 2020), available at: https://www.washingtonpost.com/dc-md-va/2022/04/30/thomas-webster-police-jan6-trial/.

[10] Jacqueline Alemany and Josh Dawsey, *Jan. 6 Panel is told that Trump indicated support for hanging Pence during Insurrection*, THE WASHINGTON POST (May 26, 2020), available at: https://www.washingtonpost.com/politics/2022/05/25/jan-6-panel-is-told-that-trump-indicated-support-hanging-pence-during-insurrection/.

[11] The 2022 Pulitzer Prize Winner in Public Service, The Pulitzer Prizes, https://www.pulitzer.org/winners/washington-post-3 (last visited June 6, 2022).

has particularly significant impact in this town, where residents are especially news aware.[12]

This case is not exactly like *Rideau v. Louisiana*, 373 U.S. 723, 724 (1963), and it is not exactly like any other case in which federal courts have granted a transfer. But it is also *unlike* the many cases not transferred. For example, it is *unlike* the many such cases in which potential jurors had no reason to identify as victims, such as *United States v. Haldeman*, 559 F.2d 31, 64, 52 (1976). And it is also *unlike* the many such cases in which potential jurors could not confuse the individual defendant at issue with hundreds of others accused of perpetrating similar crimes on the same day (or worse). And it is also *unlike* the many such cases in which trial was to be held in a large federal district, such as *United States v. Skilling*, 561 U.S. 358, 382 (2010) (noting that Houston was the fourth most populous city in the nation). And it is also *unlike* such cases in which the presiding judge was not presented with credible data

---

[12] Yingjie Hu et al, International Journal of Geographical Information Science, Extracting and Analyzing Semantic Relatedness Between Cities Using News Articles, at 2440-2441 (2017) (analyzing which cities consume the most news from a general, popular news source and illustrating that, at least for political news, Washington, D.C. plays a "more significant role" and comparable to New York City which has a greater population); see Subject Matter, The Fear of Every Washington Insider: Being Uninformed (2021), https://teamsubjectmatter.com/blog/the-fear-of-every-washington-insider-being-uninformed/ (last visited on June 6, 2022) (explaining that in the "nation's capital, FOMO—the Fear of Missing Out—could more aptly be described as FOBU, the Fear of Being Uninformed. FOBU drives a nearly insatiable appetite for the best source of information); See also Chris Ariens, Adweek Network, TV Trends: Which Cities Watch the Most Local News, https://www.adweek.com/tvspy/which-cities-watch-the-most-local-news/194071/ (last visited on June 6, 2022) (analyzing TV news consumption for the first four months in 2017 in which Washington D.C. ranked in the top 13 cities in the most weekly time spent watching news per adult).

demonstrating that potential jurors in the venue harbored extraordinary levels of bias against the defendant and those with whom he might be confused, such as *Campa*, 459 F.3d at 1130-31, 1145-46.[13] Indeed, as to every one of these factors, the contrary is true here, and like *Rideau*, this case is also unusual, to say the least.

---

[13] While the cases cited by the government did not result in transfer of venue, the trial courts had taken significant measures to assure a fair trial. For example, in *United States v. Rodriguez,* 581 F.3d 775, 785 (8th Cir. 2009), cited by the government's opposition at 9, the trial court:

> … moved the trial from Grand Forks to Fargo, 80 miles away, and excluded Grand Forks-area residents from the venire. The court assembled a 590–person jury pool, twelve times the normal size, and required jurors to answer a 121–question form, including detailed questions on their knowledge and beliefs about the case. Rodriguez received ten additional peremptory strikes, for 30 total. The court spent 21 days conducting voir dire.

In *Haldeman,* 559 F.2d at 65–66, during voir dire,

"the court focused on the venireman's exposure to pretrial publicity and possible biases. Before the publicity was mentioned the venireman was asked if he believed that any defendant was probably guilty. He was then asked if he had heard of the case and, if so, whether anything he had heard or read about the case stood out in his mind. The next questions asked whether the venireman had seen the defendants or their lawyers in the newspapers or on television and whether he remembered anything in particular about them. Subsequently the court determined which newspapers and magazines the venireman read and with what degree of regularity; which television news programs he watched; whether he had followed the legislative inquiries related to Watergate or read any of the books or other lengthy pieces concerning Watergate, including the presidential tape transcripts; whether he had followed Watergate closely or casually; and whether (and how recently) he had discussed the case.
After determining the venireman's degree of interest in and exposure to the case, the court inquired whether he had formed or expressed an opinion of the guilt or innocence of any defendant. In addition, the judge determined whether the venireman knew of Ehrlichman's trial and conviction in the " plumbers" case, whether he knew of the pardon of

Put another way, the Court should transfer the case pursuant to either the Constitution or Rule 21 because of the cumulative impact of many factors that were not present in cases in which other courts have denied transfer, specifically that:

- 92% of D.C. residents were the targeted victims of Mr. Judd's offense of obstruction of justice, according to the government's theory, which is that he had the specific intent to corruptly obstruct the counting of electoral votes in order to prevent the election of Joseph Biden, the person that 92% of the city voted to elect in the one federal election in which they have a say (ECF No. 257 at 15);
- very large shares of D.C. jurors have personal connections to people who were or could have been on the scene on January 6, given the huge numbers who work for, or know people who work for, Congress (*Id.* at 13-14);
- only D.C. jurors were subjected to the curfews, restricted access to roads, police and military patrols, and closures that followed the events of January 6 (and again in September 2020), and many locals felt fear, lost business, or were simply aggravated by the local fallout from that day (*Id.* at 14);
- the D.C. jury pool, which happens to include a lot of "politics junkies" and "news junkies," has been inundated with unending coverage in its local paper of these events, which has included jarring, unforgettable videos and pictures of the scene of the alleged crimes, and of defendants easily confused with Mr. Judd;
- by the time of Mr. Judd's trial, not even two years will have passed since January 6;

---

former President Nixon, whether he thought it unfair to prosecute appellants in light of the pardon, whether the pardon caused the venireman to believe appellants were guilty or innocent, and whether the fact that Nixon had been named an unindicted co-conspirator affected the venireman's view of appellants. If the venireman had formed an opinion, the judge attempted to determine whether that opinion was firmly held or could be set aside. In closing he was asked whether he could return a fair and impartial verdict based solely on the evidence presented at trial and the court's instructions on the law. After the basic questioning was completed, the venireman was excused while the court considered counsel's objections and suggestions for additional inquiries. This step often resulted in recall of the venireman for more questioning.

- survey results show that material majorities of potential D.C. jurors have prejudged these cases, and that overwhelming majorities have prejudged essential elements, to a degree materially more significant than in at least one other, not dissimilar, district (and the nation as a whole);

- the pool of potential jurors in this District is particularly small (*Id.* at 12); and

- the pool of potential jurors in D.C. will get more and more shallow as trials progress this year, and potential jurors are excused for various reasons (including partiality), or become unavailable because they have participated in juries or *voir dire* in these cases.

## IV. The court should rule that transfer is appropriate, and then turn to which district should receive the case.

Mr. Judd's request for transfer does not arise from a desire to be tried in a particular district, but rather from a desire to not face trial in this uniquely impartial district.

The Northern District of Georgia and national results both parties cite do show that these defendants will face an uphill battle anywhere they are tried. But Select Litigation's results from the Northern District of Georgia – which is quite similar to the District demographically – show that the bias against Mr. Judd and others like him in the District is *uniquely pervasive. See, e.g., id.* (noting that only 48% of Atlantans, but 62% of D.C. residents, thought of most arrested for involvement in January 6 events as "criminals," one of only many disparate results noted by Select Litigation).

The most likely reason for these disparities, again, is that there are a combination of factors at play in the District of Columbia due to characteristics that are unique to this venue. Mr. Judd has presented evidence that these many factors –

17

and maybe others – have resulted in there being a distinctly high level of pretrial prejudgment in the pool of potential jurors here that *voir dire* cannot be counted on to cure. Common sense dictates that as publicity about the trials continues, and the pool dwindles, the problem will grow, and that the bias in this district will be overwhelming by the time Mr. Judd goes to trial in October. If the Court agrees and grants the motion to transfer the case from the District of Columbia, where Mr. Judd's trial should be held would be secondary question. For now, Mr. Judd respectfully requests that the Court grant his motion to transfer this case away from this venue pursuant to either the Constitution or the Court's discretion under the Federal Rules.

                                          Respectfully Submitted,

                                          A.J. KRAMER
                                          FEDERAL PUBLIC DEFENDER

                                          _____/s/_____
                                          ELIZABETH MULLIN
                                          Assistant Federal Public Defender
                                          625 Indiana Avenue, N.W., Suite 550
                                          Washington, D.C.  20004
                                          (202) 208-7500

                                          _____/s/_____
                                          EDWARD J. UNGVARSKY
                                          Ungvarsky Law, PLLC
                                          114 N. Alfred Street
                                          Alexandria, VA 22314
                                          (571) 207-9710