**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | |
| **v.** | : | **Criminal No. 21-cr-40-TNM** |
| | : | |
| **DAVID MEHAFFIE** | : | |
| | : | |
| Defendant. | : | |

**UNITED STATES' OPPOSITION TO DEFENDANT DAVID MEHAFFIE'S**
**MOTION _IN LIMINE_ NO. 1 – NARRATION OF VIDEO EVIDENCE**

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby files its opposition to defendant David Mehaffie's overbroad "Motion _In Limine_ No. 1 – Narration of Video Evidence," filed on June 3, 2022. (ECF No. 328). Codefendants Robert Morss and Geoffrey Sills moved to join the motion (ECF Nos. 334, 335), and the United States also opposes the motion with respect to those two codefendants.

In his motion, defendant Mehaffie asks the Court to "preclude any government witness from offering testimony in the form of narration of events depicted on any video footage offered into evidence during either the Government's case-in-chief or rebuttal case." (Def.'s Mot. at 2, ECF No. 328). This broad and unqualified request would preclude a substantial array of otherwise admissible and relevant testimony at trial and would close the door to testimony that would otherwise be helpful to the jury. Video narration, which is not a stand-alone category of evidence, falls at the intersection of the federal evidentiary rules governing relevance, personal knowledge of a witness, lay opinion testimony, expert testimony, and authenticity. Fed. R. Evid. 401 (Relevance); 602 (Need for Personal Knowledge); 701 (Lay Opinion Testimony); 702 (Expert Witnesses; 703 (Bases of Expert). Just as every other type of evidence must be analyzed in

accordance with these rules, so must video narration.  Under the Federal Rules of Evidence, video narration is permissible unless the specific narration in question would run afoul of a specific rule. The defendant's overly broad motion seeking to exclude all video narration at trial ignores the admissibility of broad categories of relevant testimony, without undertaking the more nuanced analysis required with respect to each witness and that person's relationship to the video in question.  Thus, the Court should deny the defendant's motion and, instead, take a rule-based, witness-by-witness approach and consider any video narration offered at trial through the lens of the applicable evidentiary rules, permitting video narration where relevant and otherwise admissible.

## FACTUAL BACKGROUND

On January 6, 2021, a Joint Session of the United States House of Representatives and the United States Senate ("the Joint Session") convened in the United States Capitol building ("the Capitol") to certify the vote of the Electoral College of the 2020 U.S. Presidential Election ("the Electoral College vote"). The Capitol is secured 24 hours a day by United States Capitol Police ("Capitol Police") and, on that date, only authorized individuals with appropriate identification were allowed on the Capitol grounds or inside the Capitol

At 1:00 p.m., the Joint Session convened in the Capitol to certify the Electoral College vote.  Vice President Michael R. Pence, in his constitutional duty as President of the Senate, presided over the Joint Session.  As the proceedings continued, a large crowd gathered outside the U.S. Capitol.  Temporary and permanent barricades were in place around the exterior of the

building and Capitol Police were present and attempting to keep the crowd away from the building. Members of the Metropolitan Police Department later joined Capitol Police to assist.

At approximately 2:00 p.m., certain individuals forced their way over the barricades, past the officers, and the crowd advanced to the exterior of the building.  Shortly thereafter, individuals in the crowd violently forced their way into the building, breaking windows and assaulting law enforcement officers along the way, while others in the crowd cheered them on.  At 2:20 p.m., members of the House and Senate were evacuated from their respective chambers because of rioters' breach of the Capitol. The Joint Session was halted while Capitol Police and other law-enforcement officers worked to restore order and clear the Capitol building and grounds of the unlawful occupants.

While some individuals entered the Capitol building, a large crowd remained outside, including on the West Front and Lower West Terrace.  Individual members of that crowd engaged in mob-like activity, including repeatedly attempting to breach the established police lines, assaulting officers, destroying property, and attempting to enter the building.  On the Lower West Terrace specifically, law enforcement spent almost three hours physically defending the center entryway to the building as waves of rioters – who far outnumbered police – sought to force their way past the police line and through the door.

Defendant David Mehaffie, as well as codefendants Robert Morss, and Geoffrey Sills, joined the mob that overwhelmed law enforcement on the West Front of the U.S. Capitol and forced their way into the "tunnel" created by the structures present on the Lower West Terrace,

meant to form the Inauguration stage for the Inauguration of President Joe Biden on January 20, 2021.

At approximately 2:09 p.m., defendant Morss was challenging officers below the Inaugural stage, in an attempt to get past the police line. Specifically, defendant Morss grabbed a Metropolitan Police Department officer's baton and attempted to rip it away. About five minutes later, defendant Morss reached through the crowd and grabbed a fence held by another Metropolitan Police Department officer—as the officer tried to keep the crowd back—ultimately ripping the fence out of the officer's hands. At approximately 2:33 p.m., defendant Morss lunged at a third Metropolitan Police Department officer, and struggled with him over a visor. Defendant Morss then made his way up to the Inaugural stage.

At approximately 2:40 p.m., defendant Mehaffie was one of the first defendants to enter the tunnel at the back of the Inaugural stage, and make it to the double doors, which granted access to the Capitol building. Mehaffie then pounded on the glass doors, which were ultimately broken by another rioter. Police inside the building then formed a line blocking entrance to the building, as the tunnel swelled with members of the mob. While other rioters entered the tunnel, defendant Mehaffie positioned himself on an elevated platform at the archway to the tunnel and began directing and assisting other rioters entering and exiting the tunnel and fighting against the line of officers inside.  During the 26 minutes that defendant Mehaffie directed other rioters, members of the mob conducted numerous assaults against the line of officers inside, particularly those who participated in a heave-ho against the police line, many of whom entered the tunnel at Mehaffie's direction and encouragement.

Defendants Sills was among those who entered the tunnel shortly after 2:40 p.m. At approximately 2:43 p.m., defendant Sills ripped a police baton away from a Metropolitan Police

Department officer, who was in the police line that had been established near the now-broken double doors leading into the Capitol.  Between 2:49 p.m. and 3:15 p.m. Sills participated in assaults on law enforcement officers, including pushing against the line in an effort to get into the building and using baton he had stolen from an officer to strike at those in the police line.

Law enforcement was able to push rioters out of the tunnel and on to the Lower West Terrace at approximately 3:18 p.m., reestablishing the police line at the mouth of the tunnel. For the next two hours, officers continued to battle the rioters who remained, and the Lower West Terrace was not cleared until after 5:00 p.m. At approximately 8:00 p.m., the Joint Session reconvened, the electoral ballots were fully counted, and the Electoral College vote was certified early the next morning.

While on Capitol Grounds, defendants Mehaffie, Morss, and Sills were captured on numerous video cameras which memorialized some of their conduct.  These videos include, but are not limited to: (1) numerous Capitol CCTV surveillance cameras which were stationed throughout the Capitol Grounds, including in the Lower West Terrace "tunnel"; (2) the body worn camera footage of numerous Metropolitan Police Department officers on the scene, some of whom came into contact with the defendants on that day; (3) videos recorded by members of the media; and (4) videos recorded by other members of the mob that day, including other individuals who have been charged for their activities on Capitol Grounds.  The videos contain highly relevant evidence related to the conduct, intent, and identification of the defendants.  For example, some of the videos clearly depict the appearance of defendants Mehaffie, Morss, and Sills on January 6, 2021, including their facial features, eyes, hair, stature, build, clothing, and shoes.  Some of the videos are live-action recordings of one or more of the defendants engaging in assaultive or other unlaw conduct against officers.  Some, but not all, of the videos include audio and memorialize

the words of one or more of the defendants on that day.  Moreover, all of the videos capture the movement and positioning of the defendants at given locations on January 6, 2021, showing that they were, in fact, on Capitol Grounds on that date.  The United States intends to admit numerous video exhibits as evidence at trial.  Further, because much of this footage contains chaotic scenes with numerous people moving at a fast pace, often with jerky hand-held or body-word camera footage, the United States intends to call witnesses to orient the finder of fact by identifying relevant individuals and/or activities contained therein.

## **PROCEDURAL HISTORY**

On January 29, 2021, the grand jury returned an indictment charging lead defendant Patrick McCaughey with various charges for his conduct at the U.S. Capitol on January 6, 2021. (ECF No. 5).  The grand jury returned the First Superseding Indictment charging Tristan Stevens as a co-defendant with Patrick McCaughey on March 4, 2021. (ECF No. 19).  On April 16, 2021, the grand jury returned the Second Superseding Indictment, joining David Judd and Christopher Quaglin to the case. (ECF No. 37).   On June 16, 2021, the grand jury returned the Third Superseding Indictment, adding Robert Morss and Geoffrey Sills. (ECF No 68).  The grand jury returned the Fourth Superseding Indictment on August 4, 2021, adding David Mehaffie, Steven Cappuccio and Federico Klein as defendants in this action. (ECF No. 102).  On December 1, 2021, the grand jury charged the nine co-defendants in the Fifth Superseding Indictment, which is the currently operative charging document for this matter. (ECF No. 179).  That document charges fifty-three counts, including violations involving Assaulting, Resisting, or Impeding Certain Officers, in violation of 18 U.S.C. § 111(a)(1) and (b), Robbery, in violation of 18 U.S.C. § 2111, Obstruction of an Official Proceeding, Aiding and Abetting, in violation of 18 U.S.C. § 1512(c)(2), Civil Disorder, in violation of 18 U.S.C. § 231(a)(3), and related charges.

Trial in this nine-codefendant case is scheduled in two groups, with "Group 1," including defendants McCaughey, Stevens, Morss, and Mehaffie, to begin on August 29, 2022, and "Group 2," including defendants Judd, Quaglin, Sills, Cappuccio, and Klein, to begin on October 3, 2022. Consistent with the Scheduling Order in this case, defendant David Mehaffie filed the instant motion on June 3, 2022, which was joined by defendants Morss and Sills.  The government now opposes this motion.

## ARGUMENT

The admissibility of testimony involving video narration falls at the intersection of the federal rules governing relevance, personal knowledge of a witness, lay opinion testimony, expert testimony, and authenticity.  Fed. R. Evid. 401 (Relevance); 602 (Need for Personal Knowledge); 701 (Lay Opinion Testimony); 702 (Expert Witnesses; 703 (Bases of Expert Opinion); and 901 (Authenticating Evidence).  Just as every other type of evidence must be analyzed in accordance with these rules, so must video narration.  Under the Federal Rules of Evidence, video narration is permissible unless the specific narration in question would run afoul of a specific rule.  The defendant's overly broad motion seeking to exclude all video narration at trial ignores the admissibility of broad categories of relevant testimony, without undertaking the more nuanced analysis required with respect to each witness and that person's relationship to the video in question.  Thus, the Court should deny the defendant's motion and, instead, take a rule-based, witness-by-witness approach and consider any video narration offered at trial through the lens of the applicable evidentiary rules, permitting video narration where relevant and otherwise admissible.  Furthermore, any specific challenges are properly resolved not in a *limine* motion, but during trial itself.

**A. The Federal Rules of Evidence Provide the Relevant Legal Framework for the Admissibility of Video Narration**

Courts routinely admit video narration where it is relevant and where there is a foundation for the witness to testify based on some specialized knowledge that may be helpful to a jury including, but not limited to, personal knowledge due to presence on the scene, familiarity with the appearance of a person for the purposes of identification, repeated viewing of a video even where there has been no personal observation of the events in question, or expert opinion. *See United States v. Shabazz*, 564 F.3d 280 (3rd Cir. 2009) (affirming trial court's admission of video narration by co-perpetrator where testimony was limited to portions of video where co-conspirator was percipient witness and identification testimony); *United States v. Begay,* 42 F.3d 486 (9th Cir.1994) (finding no error in the admissibly of officer's lay opinion testimony under Rule 701 narrating a video of a riot involving 200-300 people where officer had watched video over 100 times and testimony would be helpful to jury); *United States v. Torralba-Mendia*, 784 F.3d 652 (9th Cir. 2015) (affirming trial court's admission of video narration by officer offering lay testimony where the officer had viewed the video numerous times and provided details helpful to the jury).[1]

---

[1] Additional cases in which Courts throughout the United States have addressed the issue of video narration include: *United States v. West*, 877 F.3d 434 (1st Cir. 2017) (affirming convictions related to bank robbery where trial court permitted officer witness to narrate redacted video of defendant's alleged flight from robbery scene); *United States v. Garcia-Zarante*, 419 F. Supp. 3d 1176 (N.D. Cal. 2020) ("Witnesses may narrate and describe events in a video based on their perceptions. They may not speculate as to the intention of other actors captured in the video, nor may they describe the shooting as a murder."); *Allen v. Klee*, Case No. 14-cv-13409, 2016 WL 5791189 (E.D. Michigan, Northern Division, Oct. 4, 2016) (denying ineffective assistance habeas claims where non-expert officer narrated video and his opinions were helpful to the jury where he "had the benefit of reviewing the video numerous times, giving him the opportunity to comprehend the events that were transpiring on the video and to determine the identity of the participants."); *Humphries v. Brewer*, 2019 WL 3943074 (E.D. Michigan, Southern Div., August 21, 2019) (denying ineffective assistance habeas claims where law enforcement and civilian witnesses

These rules have been interpreted broadly where narration would be helpful to a jury, and at least one circuit has specifically held that "an officer who has extensively reviewed a video may offer a narration, pointing out particulars that a casual observer might not see." *Torralba-Mendia*, 784 F.3d at 659, *citing Begay,* 42 F.3d at 502-03.  *Torralba-Mendia* is particularly instructive here, where video exhibits are expected to be offered into evidence and narrated by a variety of law enforcement and civilian witnesses.[2]  There, the Ninth Circuit affirmed the defendant's convictions where a law enforcement officer provided extensive narration of video as a lay witness.  In the trial of *Torralba-Mendia*, which involved the smuggling of undocumented immigrants into the United States, the government called Agent Frazier to offer both expert and lay witness testimony. *Id.* at 657-58.  In his capacity as expert, Frazier testified about the standard practices of alien smuggling organizations.   He then testified as a lay witness and narrated surveillance videos that showed cars driving to and from a specific company believed to be involved in the smuggling conspiracy. *Id.*  at 657-58.  During his narration, Agent Frazier specifically explained to the jury time lapses in the videos, specific identifying marks on vehicles, how the vehicles related to

---

narrated apartment surveillance video, had personal knowledge of the physical location in which the video was taken, and the testimony was helpful to the jury); *Hunt v. Davis*, Civ. No. SA-17-CA-0986-XR, 2018 WL 2306900 (W.D. Texas, May 21, 2018) (unpublished opinion) (denying ineffective assistance habeas claim where counsel had "no valid reason" to object to officer's narration of store surveillance video where officers was present during recording and personally witnessed recorded events); *James v. People of the Virgin Islands*, 60 V.I. 311, 2013 WL 6585638 (S. Ct. of Virgin Islands, Dec. 12, 2013) (finding no abuse of discretion where surveillance video was admitted and detective with firsthand knowledge of the events narrated video for the jury, although "better practice" for purposes of authenticating the video would have been to have a different detective testify video's accuracy).

[2] While the testimony of a properly-qualified expert is admissible to narrate videos entered into evidence, the United States has not noted an expert in this case and does not intend to call an expert to narrate any videos during trial.

various conspirators, and the number of people exiting and entering those vehicles.  *Id.* at 659-60.

Finding that the Frazier's testimony was proper lay testimony, the Court noted that,

> Frazier testified that he had watched each video roughly fifty times, and that he would often watch the video feed live while it was being recorded. The narratives helped the jury understand what they were seeing. For example, Frazier provided the length of time lapses between video clips. He pointed out unique characteristics of the vehicles—like their makes, models, and whether any bodywork had been done to them—that helped the jury identify the same cars in subsequent videos. He linked the different cars to specific conspirators. He counted the number of passengers exiting or entering the vehicles (a difficult task because the video's angle obscured the view). And he pointed out the particular clothing of certain passengers, to show that a person dropped off in one video was the same person picked up in a later video. Frazier's narratives were based on his repeated viewing of the recordings, and helped the jury understand the import of the videos.

*Id.* at 659-60.  The Ninth Circuit found Frazier's lay testimony video narration to be proper and helpful to the jury.[3]

The holding in *Torralba-Mendia* rested in part on the Circuit's prior decision in *Begay*, which is similarly relevant to the question of video narration here.  There, the Circuit admitted the testimony of an officer as he narrated video that he had viewed numerous times on the basis that his testimony would be helpful to the jury as lay opinion testimony under Rule 701. *Begay,* 42 F.3d at 502.  In *Begay*, appellants were among 32 individuals charged with multiple counts – including conspiracy, robbery, assault, burglary, and kidnapping – related to a riot involving 200-300 individuals who violently sought to take over the Navajo Nation Administration and Finance Building in Window Rock, Arizona on July 20, 1989.  *Id.* at 489, 502.

At trial, Officer Stewart Calnimptewa*,* narrated events depicted in a video, even though he did not have first-hand knowledge of the events in question.  *Id.* at 502.  Calnimptewa testified that

---

[3] Unrelated to the issue here, the Ninth Circuit found error in the district court's failure to instruct the jury about Frazier's different roles when offering expert and lay testimony, but concluded that error was harmless. *Torralba-Mendia*, 784 F.3d at 661.

he had viewed the original videotape ("Exhibit 1) "over 100 times" with the aid of a magnifying glass. *Id.* He then "had portions of the videotape copied in slow motion and their quality enhanced to help his identification of the demonstrators and their actions during the incident." *Id.* This altered version of the video was admitted as "Exhibit 105" at trial, over a defense objection. *Id.* Calnimptewa then narrated the video, including explaining the alterations that he had made to the original.

On appeal, the defendant challenged the video narration because Calnimptewa was not qualified as an expert and the testimony was improper under Rule 602 because "Calnimptewa lacked personal knowledge of the events depicted in the videotape." *Id.* at 502. The court rejected the arguments, holding that Calnimptewa's testimony was properly admitted as opinion testimony by a lay witness under Rule 701, where the testimony was "rationally based on [Calnimptewa's] own perceptions and that the testimony would be helpful to the jury." *Id.* at 502. With respect to the witness's perception of the events, the court specifically explained that, under Rule 701,

> Calnimptewa's perceptions need not be based on the "live" events of July 20th because he was not testifying to his eyewitness account of those events. Calnimptewa's testimony concerned only the scenes depicted in Exhibit 105 as extracted from Exhibit 1, the original videotape. Thus, Calnimptewa need only have perceived the events depicted in Exhibit 1.

*Id.* at 502. With respect to whether his testimony regarding the altered video tape would be helpful to the jury, the court emphasized that Calnimptew's repeated viewing of a video that captured over 200 people simultaneously would be helpful to a jury, even where the jury had the original unaltered video tape as evidence. The court reasoned that

> Calnimptewa's testimony about Exhibit 105 was likely to have been helpful to the jury in evaluating Exhibit 1. Although the jury viewed Exhibit 1 in its entirety, it is reasonable to assume that one viewing a videotape of a demonstration involving over 200 people would likely not see certain details, given the tremendous array of events all occurring simultaneously. Officer Calnimptewa spent over 100 hours viewing Exhibit 1. To have the jury do likewise would be an extremely inefficient

> use of the jury's and the court's time. Therefore, Calnimptewa's testimony concerning which persons were engaged in what conduct at any given moment could help the jury discern correctly and efficiently the events depicted in the videotape.

*Id.* at 503. As with *Torralba-Mendia,* the *Begay* court looked to the relevant evidentiary rules in determining whether the video narration was admissible in the specific context of the trial.

A judge on this Court endorsed the same approach in *Buruca v. District of Columbia et al.*, 902 F. Supp. 2d 75 (D.D.C. 2012) (Contreras, J.). There Judge Contreras granted the District of Columbia's summary judgment motion where the plaintiff submitted only a single affidavit in which she described the contents of video surveillance that was never submitted to the court as evidence. *Id.* at 82-83. In determining that the plaintiff should not be permitted to describe the video without actually providing the video as evidence, Judge Contreras explained that the "best evidence rule," Fed. R. Evid. 1002, required the video to be submitted. He went on to explain that:

> Even if the best evidence rule did not apply, the court sees no independent reason to allow the plaintiff to narrate the video's content. The plaintiff does not purport to be an expert, whose testimony could be based on the video footage. Fed. R Evid. 703. Nor does the plaintiff claim that she has some unique knowledge that would be helpful to the jury's understanding of the video. *See* Fed. R. Evid. 701(b) (requiring testimony to be "helpful to clearly understanding ... a fact in issue").

*Id.* at 83. In a footnote, Judge Contreras further clarified that "helpful" information could include identifying a person in the video which, as the next of kin to the deceased, the plaintiff was "in a better position than the jury" to do. *Id.* at 83, n. 5. That analysis applied here suggests that the admissibility of the plaintiff's affidavit regarding the video was dependent on its admissibility under Rule 701, 703, or another evidentiary basis.

Where courts have held video narration to be improper, it has typically been because the testimony exceeded the bounds of an applicable evidentiary rule. *See United States v. Foster*, 743 Fed. Appx. 129 (3d Cir. 2018) (unpublished opinion) (finding harmless error where the

government conceded a Rule 701 violation when officer witnesses narrated surveillance footage and provided identification-related information); *United States v. Isaac*, 763 Fed. Appx. 478 (6th Cir. 2019) (unpublished opinion) (finding harmless error under Rule 701 where non-expert officer witness narrated and interpreted videos of controlled drug buys where he was not a percipient witness to the events); *see also United States v. Bougouneau*, 837 Fed. Appx. 893 (3d Cir. 2020) (unpublished opinion) (affirming convictions and declining to decide whether error occurred where civilian witness testified to details in surveillance video where she was not a percipient witness).  But that will not be the case here, where any witnesses called to explain or narrate a video will have an adequate evidentiary basis to offer the explanation or narration.

The United States accordingly urges the Court to reject the defendant's overly broad request to exclude all video narration and, instead, to adopt the same rule-based approach used in *Torralba-Mendia*, *Begay*, and *Buruca* and determine the admissibility of video narration on a witness-by-witness basis in light of the Federal Rules.

**B. Defendant Mehaffie Fails to Provide Legal Support for His Extreme Request to Exclude Video Narration**

The cases cited by defendant Mehaffie in his motion fail to support his overbroad request to prohibit relevant and probative testimony by excluding "testimony in the form of a narration of events depicted on *any* video footage offered into evidence during either the Government's case-in-chief or rebuttal case."  (Def's Mot., ECF No. 328, at 2) (emphasis added).  This unqualified request ignores the Federal Rules of Evidence, as well as the fact that the cases on which the defendant relies only support limiting video narration in a manner consistent with already-established rules.

For example, the defendant cites *United States v. Shabazz*, 564 F.3d 280 (3rd Cir. 2009), suggesting that *Shabazz* supports the proposition that an individual is "*prohibited* from testifying

to what is being shown on video evidence" unless the witness is an expert, was present on scene, or has greater ability to identify the defendant that the jury.[4]  (Def's Mot., ECF No. 328, at 2) (emphasis added).  *Shabazz* supports no such prohibition.

Instead*, the *Shabazz* court approved the trial court's handling of video narration.  *Shabazz*, 564 F. 3d at 286-87.  There, the trial court permitted a co-perpetrator to narrate surveillance video of a robbery but limited the witness's testimony to only portions of the video in which that witness had taken part.  *Id.*  Further, the trial court permitted the co-perpetrator to identify the defendant in the video based on personal knowledge of the defendant's appearance.  *Id.*  In upholding the trial court's approach, the *Shabazz* court considered the witness's testimony in light of Rule 701 and confirmed that the identification of the defendant in the video, which was based upon the co-conspirator's personal knowledge of the defendant, was proper and helpful to the jury.  *Id.* at 287.  The court further held that the remainder of the witness's testimony – which included narration of portions of the surveillance video – was "admissible as ordinary fact testimony."  *Id.*

Neither does *United States v. Dixon*, 413 F.3d 540 (6th Cir. 2005) provide support for the defendant's request for a total prohibition on video narration.  There, the Sixth Circuit affirmed the trial court's exclusion of identification testimony related to video surveillance where the identification by the defendant's son and one ex-wife would not have been "helpful" to the jury, and the identification by a second ex-wife would have precluded the defendant from pursuing a line of bias cross-examination.  *Id.* at 544-45.  Looking to Rule 701, the Court found no abuse of

---

[4] Notably, while the defendant specifically lists the exceptions discussed by the *Shabazz* court to include video narration by experts, those with first-hand knowledge of events, and individuals with a "greater ability to correctly identify the defendant than the jury," he does not appear to ask the court to carve out those same exceptions here.  (Def's Mot., ECF No. 328, at 2).  Instead, the defendant appears to make a much broader request, and does not include any exceptions in the testimony that he is asking the court to exclude.

discretion where identification testimony of the defendant's son and one ex-wife would not have been helpful where an evidentiary hearing failed to establish that these witnesses were familiar with the defendant's appearance at the time of the crime. *Id.* at 445. The Court also found no abuse of discretion where the excluded identification testimony of the second ex-wife would have been highly prejudicial to the defendant, because cross examination would have prejudiced the defendant by eliciting information such as "alleged spousal abuse, nonpayment of child support, and the effect of [the defendant's] actions on his daughter." *Id.* at 546. Again, the holding here supports only the significance of the evidentiary rules in the final admissibility analysis, and not a total prohibition on video narration.

Similarly *State v. Buie*, 194 N.C. App. 725 (N.C. App. Ct. 2009), cited by the defendant, does not provide support for his overbroad request. On the contrary, it provides another example of a rule-based, witness-by-witness approach to admitting video narration. There, the North Carolina Court of Appeals found harmless error where the trial court permitted a detective to provide lay opinion testimony as to whether surveillance video was "consistent with" earlier testimony provided by a rape victim. The court clarified that the error was not because the detective provided testimony regarding the surveillance video but, rather, that the detective had no first-hand knowledge of the facts or circumstances regarding the surveillance video. The court further distinguished the detective's testimony in *Buie* from permissible testimony in prior cases where witnesses had testified regarding their observations of a surveillance video, but also had first-hand factual knowledge regarding the circumstances in that video. Specifically, the court explained:

> The evidence at issue here is distinguishable from that in *Mewborn* and *Thorne* [the earlier cases distinguished by the court] in that it was not based on any firsthand knowledge or perception by the officer, but rather solely on the detective's viewing of the surveillance video. Indeed, Detective Welborn was not offering his

15

interpretation of the similarities between evidence he had the opportunity to examine firsthand and a videotape, but rather offering his opinion that the actions depicted in the surveillance video were similar to the female's recollection of the alleged kidnapping and robbery.

*Buie*, 194 N.C. App. at 733.

The cases cited by defendant Mehaffie in support of his motion do not support the request to exclude all video narration at trial.  Instead, they provide additional examples of the nuanced and rule-based approach that trial courts should utilize in determining the admissibility of video narration.

## CONCLUSION

In light of the foregoing, the United States asks the court to deny the defendant's overly broad motion and, instead, take a rule-based, witness-by-witness approach and consider any video narration offered at trial through the lens of the applicable evidentiary rules, permitting video narration where relevant and otherwise admissible.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney
D.C. Bar No. 481052


By:      */s/ Jocelyn Bond*
JOCELYN BOND
Assistant United States Attorney
D.C. Bar No. 1008904
555 Fourth Street, N.W.
Washington, D.C. 20530
(202) 809-0793
Jocelyn.Bond@usdoj.gov