## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF THE DISTRICT OF COLUMBIA

_____

|  |  |  |
|---|---|---|
|  | ) |  |
| UNITED STATES, | ) |  |
|  | ) |  |
| v. | ) | Crim. No. 21cr40 |
|  | ) | Hon. Trevor McFadden |
| CHRISTOPHER JOSEPH QUAGLIN, | ) |  |
| Defendant. | ) |  |
|  | ) |  |

_____ )

## DEFENDANT'S EMERGENCY MOTION FOR IMMEDIATE PRE-TRIAL RELEASE

Comes now Defendant Christopher Quaglin, by counsel, and moves the Court to order the immediate temporary release from pretrial confinement to the custody of his wife, on conditions suitable to the Court, because (1) he is in imminent danger of serious bodily harm or death; (2) release is necessary for the preparation of his defense; (3) the length of Mr. Quaglin's pretrial confinement demands his immediate release; (4) the conditions of confinement violate his civil rights and human rights and demand immediate release; and (5) his family is experiencing an unforeseeable tragic hardship.

The urgency of the situation cannot be understated.  The Court must act swiftly to review this motion and order his immediate release, as Mr. Quaglin is in imminent danger of severe bodily harm or death.

## BACKGROUND

Mr. Quaglin has been detained without trial and without bail for over sixteen (16) months since April of 2021.  His trial was scheduled for October 3, 2021 but at a status conference on August 8, 2022, it was brought to the Court's attention that Quaglin's undersigned counsel was

recently diagnosed with a chronic illness and accordingly requested a continuance, which the Court granted.  A new trial date has not been scheduled, but it is anticipated that the trial will take place sometime in April of 2023.

Over the last 16 months of confinement, Mr. Quaglin has been hauled around to six different facilities and at each facility subjected to inhumane conditions and gross violations of his civil and human rights.  The nature of his conditions are set forth in detail in Mr. Quaglin's Petition for Writ of Habeas Corpus pending in this Court, attached as Exhibit A and incorporated as if set forth fully herein.

Mr. Quaglin is currently detained in solitary confinement at Northern Neck Regional Jail ("NNRJ" of the "Jail"), in Warsaw, Virginia, under the direction of Jail Superintendent Ted Hull. Superintendent Hull has stubbornly and unlawfully refused to recognize that Mr. Quaglin is a pretrial detainee, not a convicted inmate, - *see, e.g.,* Exhibit A, ¶¶ 91-92, PP 93-94 - and as such, the Superintendent has allowed Mr. Quaglin to be subjected to unlawful punitive measures reserved for inmates, as well as punishments that cross the threshold into the realm of torture, in clear violation of the law and Mr. Quaglin's rights.   *See S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec*., Civil Action No. 18-760 (CKK), 2020 U.S. Dist. LEXIS 106416, at *59 (D.D.C. June 17, 2020) (quoting Y*oungberg v. Romeo*, 457 U.S. 307, 322 (1982)) ([P]re-trial detainees, are therefore "entitled to more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish."); *Hardy v. Dist. of Columbia*, 601 F. Supp. 2d 182, 188 (D.D.C. 2009) ("While a convicted prisoner is entitled to protection only against 'cruel and unusual' punishment [under the Eighth Amendment], a [civil] detainee, not yet found guilty of any crime, may not be subjected to punishment of any description.").

1

Mr. Quaglin has made it clear to the Jail on countless occasions that he has celiac disease, a serious medical condition, and that the ingestion of gluten or gluten-contaminated food[1] could lead to grave illness or even death. *See, e.g.,* Exhibit A, ¶ 91. The Jail has persistently refused to comply with Mr. Quaglin's essential dietary needs and has served him food trays that were either gluten contaminated or that contained actual gluten ingredients.  *See, e.g.,* Exhibit A, ¶¶ 77-81.  As a result, Mr. Quaglin has suffered serious medical injuries from ingesting gluten-contaminated food and has lost over forty five (45) pounds - ten pounds in the last two weeks alone - from refusing to eat the gluten-contaminated food provided to him by the Jail.  *See* Exhibit B, Decl. of Moira Quaglin, ¶ 10.  Mr. Quaglin has suggested that the Jail obtain a neutral third party to provide gluten-free meals since the Jail is either unable or unwilling to ensure that the food provided does not contain gluten and is not gluten-contaminated. The Jail has consistently refused to consider this reasonable accommodation.  As a result, Mr. Quaglin has subsisted by purchasing the only gluten-free food available to him, gluten-free protein bars for sale in the Jail commissary.

For "medical reasons" Mr. Quaglin has been placed in solitary confinement.  All day he is locked in a windowless room with no human contact and with no staff or cameras to monitor his safety.  The sporadic "medical treatment" consists only of staff periodically peering at him through the door.  He has not been sufficiently examined by a doctor or other health care practitioner since he was moved to "medical."  The Jail is allowing him to wither away.

To make an already untenable situation worse, the Jail has recently punished Mr. Quaglin by revoking his ability to purchase commissary food.  If this persists much longer, Mr. Quaglin will starve to death.  Mr. Quaglin and undersigned counsel have consistently rang the alarm by

---

[1] The Jail denies the well-known science of the dangers of gluten-contaminated food to people, like Mr. Quaglin, who suffer from celiac disease.  *See, e.g. 7 Tips for Avoiding Gluten Cross-Contact at Home,* Gluten Intolerance Group®, https://gluten.org/2021/01/08/cross-contact.

seeking every available remedy to alleviate the dire situation before it came to this life-threatening crisis.

## LEGAL STANDARD

After an initial determination of pre-trial detention, the Bail Reform Act provides that a "judicial officer may, by subsequent order, permit the temporary release of the person, in the custody of a United States marshal or another appropriate person, to the extent that the judicial officer determines such release to be necessary for preparation of the person's defense or for another compelling reason." 18 U.S.C. § 3142(i).  Under this statutory provision, the defendant otherwise subject to pretrial detention may be granted temporary release by showing the presence of two (2) factors: (1) that his temporary release is necessary for the preparation of his defense or another compelling reason; and, (2) that he could be released to the custody of the an "appropriate person." *United States v. Dhavale*, No. 19-mj-00092, 2020 U.S. Dist. LEXIS 69800, at *12-13 (D.D.C. Apr. 21, 2020).

## ARGUMENT

I. **Release is necessary both for the preparation of his defense and for other compelling reasons.**

A. **Mr. Quaglin is at serious risk of imminent bodily harm or even death due to the deliberate indifference to his medical condition.**

As stated above, the Jail has proved itself incapable of providing Mr. Quaglin with a diet that accommodates his serious medical condition.  It is not an exaggeration to say that this could cost Mr. Quaglin his life.  *See* Exhibit B, ¶ 12.  For months, the Government has shown deliberate indifference to Mr. Quaglin's medical condition.  Until recently, he was subsisting solely on gluten-free protein bars from the commissary, but recently the Jail has deprived him of his ability to purchase food from the commissary.  He now has nothing to eat.  He is in solitary confinement and is not being given access to adequate medical care.  He is left with the impossible choice of

either starving or eating food that could cause him serious bodily harm or death.  This is an untenable situation and demands immediate release.  *Cf. United States v. Dabney*, No. 20-cr-27 (KBJ), 2020 U.S. Dist. LEXIS 67127, at *4 (D.D.C. Apr. 13, 2020) ("In this Court's view, having an underlying medical condition that could heighten a defendant's risk of harm during the period of pretrial detention has a 'material bearing' on the required detention determination.").

The Government may argue that Mr. Quaglin is exaggerating his plight so that he can be released to his wife and infant child.  But it is worth noting that the Government's argument for detention in April of 2021 was that Mr. Quaglin, an electrician from New Jersey with no criminal history, was so dangerous that "it is difficult to fathom a more serious danger to the community — to the District of Columbia, to the country, or to the fabric of American Democracy" than Mr. Quaglin.  ECF No. 8, ¶ 59.  Unlike the Government's hysterical hyperbole, Mr. Quaglin's plight is real, and the threat of serious harm is not an exaggeration.  During his detention he has lost forty-five pounds - ten in the last two weeks.  The months of long detention and deliberate indifference to his serious medical condition have taken a great toll.  To the extent that he posed any threat to the safety of the community or to the "fabric of American Democracy" in April of 2021, today after 16 months of detention under terrible conditions, even the Government must concede that he poses no such threat.

There is no longer any justification to detain him and doing so risks further bodily injury and even possibly death.  For this reason alone, Mr. Quaglin should be released.

**B.  The current conditions at the detention facility prevent him from adequately preparing for trial and thus make his pretrial release necessary for the preparation of his defense.**

The Jail has made it impossible for Mr. Quaglin to meaningfully participate in his defense and prepare for trial by depriving him of his discovery materials.  In September of 2021,

undersigned counsel delivered his discovery materials to the DC Jail where Mr. Quaglin was confined at the time.  On the very same day, Counsel delivered discovery materials for another January 6th defendant, Ryan Nichols.  Within a few days, Mr. Nichols received his materials, but Mr. Quaglin's were never delivered to him.  Undersigned counsel persistently called the prison and informed them that Mr. Quaglin had not received his materials and demanded that the materials be delivered to him.

Petitioner was transferred to NNRJ on December 20, 2021, and his discovery materials were not provided to him.  Undersigned counsel repeatedly demanded that the Jail Superintendent deliver the discovery materials that were in the Jail's possession, but to no avail.  To date, the discovery materials were delivered almost a year ago and have still not been delivered, despite repeated requests.  *See* Exhibit A, ¶¶ 91-100, 111.

The Jail has also deprived Mr. Quaglin of communicating via video conference call with his attorney, which Superintendent Hull falsely considers "a privilege not a right."  *See e.g.,* Exhibit A, ¶ 94.  If the Jail will not provide Mr. Quaglin with the discovery materials delivered to the Jail by his attorney, he has an absolute right to communicate via video conference so that he can at the very least view his discovery in a limited manner through the video screen.  *See S. Poverty Law Ctr. v. U.S. Dep't of Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 U.S. Dist. LEXIS 106416, at *104 (D.D.C. June 17, 2020) (finding that pretrial detainees have a right to "orderly and fair" access to video conference with counsel).  The Jail has also failed to provide a laptop or tablet to view his discovery, as is done in other facilities.  *See id.*

The unprofessional and hostile email communications from Superintendent Hull to undersigned counsel demonstrate gratuitous obstinance and an unwillingness to make any accommodations.  *See generally* Exhibit A, pages 24-29.

To make matters worse, Mr. Quaglin is currently in solitary confinement without access to food that meets his dietary needs.  Under such physically and psychologically oppressive conditions, it is impossible for him to adequately prepare for trial, even if he had his discovery materials. *United States v. Ali,* 965 F. Supp. 2d 139, 151-52 (D.D.C. 2013) (citing *Barker v. Wingo,* 407 U.S. 514, 520, 533 (1972)) ("a pretrial detainee generally is 'hindered in his ability to gather evidence, contact witnesses, or otherwise prepare his defense." *Id.* at 533 … Moreover, the physical and psychological toll of pretrial detention, particularly a detention lasting for several years, where the defendant is effectively cut off from everyone but his attorneys, can significantly affect a defendant's ability to participate in his own defense. *Cf. id.* at 520 ("Lengthy exposure to these [pretrial detention] conditions 'has a destructive effect on human character. . . .'")).

This situation is untenable and incurable such that the only possible relief that would restore Mr. Quaglin's constitutional right to participate in his defense and adequately prepare for trial is for the court to grant his immediate release.

### C.   The sheer length of Mr. Quaglin's pretrial confinement is a violation of his due process rights.

Mr. Quaglin has been detained without trial for 16 months in violation of his due process rights.  Pretrial detention violates due process when it "become[s] excessively prolonged, and therefore punitive," rather than regulatory. *United States v. Salerno*, 481 U.S. 739, 747-48 & 747 n.4 (1987). The length of pretrial detention is excessive when it is no longer related to its regulatory purposes, including protecting the public from dangerous defendants and ensuring that they will not flee. *United States v. Torres*, 995 F.3d 695, 709-10 (9th Cir. 2021). There is no set time when pretrial detention crosses the line from regulatory to punitive because due process is a flexible

concept and, thus, its limits depend on the facts of the case. *United States v. Zannino*, 798 F.2d 544, 547 (1st Cir. 1986).

Courts consider six factors when evaluating whether the length of pretrial detention violates due process: (1) the seriousness of the charges; (2) the strength of the government's proof that the defendant poses a risk of flight or a danger to the community; (3) the strength of the government's case on the merits; (4) the length of the detention; (5) the complexity of the case; and (6) whether the strategy of one side or the other has added needlessly to that complexity. *United States v. Accetturo*, 783 F.2d 382, 388 (3d Cir. 1986); *see also United States v. Hare*, 873 F.2d 796, 801 (5th Cir. 1989); *United States v. Ojeda Rios*, 846 F.2d 167, 169 (2nd Cir. 1988); *United States v. Zannino*, 798 F.2d 544, 547 (1st Cir. 1986) (same); *United States v. Theron*, 782 F.2d 1510, 1516 (10th Cir. 1986).  In some cases, the evidence admitted at the initial detention hearing, evaluated against the background of the duration of pretrial incarceration and the causes of that duration, may no longer justify detention.  *Accetturo*, 783 F.2d at 388.

Beginning with the length-of-detention factor, it is worth noting, as a guidepost, that the First Circuit has expressly stated "we shall assume that in many, perhaps most, cases, sixteen months would be found to exceed the due process limitations on the duration of pretrial confinement." *Zannino*, 798 F.2d at 547-48.  In *Zannino,* "the charges against Zannino are of the gravest order, including predicate acts of murder and conspiracy to commit murder. If convicted of all offenses charged, Zannino would face a maximum sentence of imprisonment for 130 years." The government's case on the merits was found to be strong, and he was found to be dangerous. The court also found Zannino to have "played a continuing leadership role in mob activities."  With all that, the Court found that 16 months would have been unconstitutionally excessive for pretrial detention, but for the fact that it was Zannino who had delayed his trial, and not the government.

The Second Circuit condemned as unconstitutionally excessive the fourteen-month (14) detention of two defendants charged with participating in the robbery of a Wells Fargo depot by paramilitary Puerto Rican nationalists. *United States v. Gonzales Claudio*, 806 F.2d 334, 343 (2d Cir. 1986). The Ninth Circuit has recently stated that a twenty-one-month detention is "significant under any metric and is deeply troubling," when the defendant was a five-time convicted violent drug dealer, caught with an outstanding warrant, a gun with live ammunition, and 64 grams of methamphetamine. *Torres*, 995 F.3d at 709.

Court's not only consider the time already spent in detention, but also "the non-speculative nature of future detention," *i.e.,* the time until trial, and the length of the trial. *See Hare*, 873 F.2d at 801; *see also Ojeda Rios*, 846 F.2d at 168-69. In *Ojeda Rios*, the Second Circuit ordered the release of the defendant even though the district court found that the defendant "posed a risk of flight and also presented a danger to the community," because after considering the length of his confinement *and the fact that the trial was anticipated to take months*, the court found "we do not believe that due process can tolerate any further pretrial detention in this case."

Mr. Quaglin has been detained for 16 months solely on the basis of certain alleged acts captured on video during the riot at the Capitol on January 6. He has no prior criminal history and there is no evidence that he poses a flight risk. If Mr. Quaglin's alleged offenses were committed in a vacuum, there is no doubt that he would have been granted release upon arrest, and in fact U.S. Magistrate Judge Zahid Nisar Quraishi in the District of New Jersey saw fit to release him before the Government appealed the release order. In the Government's own words, the only reason the Government has relentlessly argued for Mr. Quaglin's continued detention is that Mr. Quaglin's alleged offense took place within the context of a highly charged political protest and

therefore Mr. Quaglin "was a spoke in the wheel that caused the historic events of January 6, 2021."

The Government admitted that "the defendant has no prior convictions and limited prior contacts with law enforcement. All of which weighs in favor of release. In addition, his steady housing and community connections weigh in favor of release." The Government never argued that Mr. Quaglin posed a flight risk, the entire argument for his detention was based on their assertion that his involvement in the January 6th riot and some of his social media posts and text messages showed that there was a danger to the safety of the community. Even if true, Courts have considered 16 months of pretrial detention to be unconstitutional for defendants charged with far more dangerous crimes and with prior criminal history.

Regarding the complexity of the case, the Government continues to needlessly add to the complexity of the case by relentlessly engaging in an unprecedented crusade to find and prosecute hundreds of American citizens who were present at the Capitol on January 6, even for the most minimal non-violent participation. The riot at the Capitol on January 6 lasted about four hours, yet it has produced the most expansive federal law enforcement investigation in US history, both in terms of the number of defendants prosecuted and the nature and volume of the evidence collected. There are currently over 600 defendants from all 50 states facing charges, with more defendants being investigated, hunted down, and arrested to this day.

The complexity of the case was further compounded by the Government by its decision to charge a multitude of defendants, including Mr. Quaglin, with 18 U.S.C. § 1512(c)(2), a charge that was dismissed on March 7, 2022, in a separate case by Judge Carl Nichols of this Court, rejecting the government's broad interpretation of that statute. *See United States v. Miller*, 2022 WL 823070 (D.D.C. Mar. 7, 2022). The Government has decided to appeal the dismissal to the

Court of Appeals for the District of Columbia, and if successful, this issue may go to the Supreme Court. As the Government has insisted on maintaining this highly questionable and unprecedented charge against Mr. Quaglin, the issue has already added to and will continue to add to the complexity of this case, through no fault of Mr. Quaglin.

The complexity of the case was further compounded by the Congress' made-for-television production of the January 6th Committee. The one-sided show trial aired during prime time television, where all January 6th defendants, including Mr. Quaglin, were portrayed to millions of Americans as "insurrectionists" and "domestic terrorists," irreparably tainting any possible jury pool. This will certainly be an issue at trial adding to the complexity of the case, through no fault of Mr. Quaglin.

The complexity of the case was further compounded with the recent developments that came to light in a Michigan court, where it was revealed that the alleged plot by alleged right wing extremists to kidnap the Michigan Governor in 2020 was in fact an FBI operation, and one of the key FBI players in the operation was Steven D'Antuono, who at the time was special agent in charge of the Detroit Field Office, and was then coincidentally promoted to assistant director in charge of the FBI's Washington Field Office, just before January 6, 2021. This recent revelation that the FBI orchestrated an elaborate scheme to entrap American citizens for political purposes, and that the mastermind behind the scheme was moved to Washington D.C. just prior to January 6, has led millions of Americans to suspect that the FBI may have played a similar role in the events on January 6th. At a Senate hearing in January of 2022, when Jill Sanborn, the FBI's executive assistant director of the National Security Branch, was given a chance to publicly dispel suspicions of FBI involvement, she refused to confirm or deny whether FBI agents or informants incited crimes of violence on January 6. The suspicion of the Government targeting political

opponents, including January 6 defendants, was further compounded by the recent raid on President Trump's private residence, authorized by Attorney General Merrick Garland. These recent developments that suggest Government involvement in the events of January 6 events will directly add to the complexity of the January 6 trials, including Mr. Quaglin's, through no fault of Mr. Quaglin.

The recent delay due to the medical diagnosis of Mr. Quaglin's counsel is not the fault of Mr. Quaglin (or his counsel for that matter) and even if the Court were to consider it Mr. Quaglin's fault, it does not outweigh the aforementioned complexity of this case that is solely the fault of the Government.

For all of these reasons, the government, not Mr. Quaglin, has added complexity to the case, whereby, this factor should weigh heavily in favor of releasing Mr. Quaglin.

### D.  Mr. Quaglin's conditions of confinement violate his civil rights and human rights.

As set forth in Mr. Quaglin's Petition for Writ of Habeas Corpus, attached as Exhibit A, the conditions of confinement violate several of Mr. Quaglin's constitutional rights.  Any one of the violations by itself justify release, all the more so, the multitude of violations combined.

### E.  His family is undergoing additional hardships since his detention.

Mr. Quaglin leaves at home his wife Moira and his infant son Nathan.  He was arrested and detained when his son was just eight weeks old and Mr. Quaglin has not seen Nathan since his arrest 16 months ago.  Moira Quaglin is a nurse by profession and works intensive shifts every Saturday, Sunday, and Monday.  The rest of the week she stays home and cares for Nathan.  During Mr. Quaglin's incarceration, Ms. Quaglin has depended on her father who lives nearby and watches Nathan while she is at work.  On August 16, 2022, her father suffered a tragic accident and broke his neck.  He underwent life-saving surgery and is currently in the hospital.  This

unexpected tragedy, even under normal circumstances, would be a devastating hardship to any family. Ms. Quaglin now must care for infant son as a single mother without the support of her husband or her father.

In addition to all of the reasons stated above, and as there is no justifiable reason to continue to detain Mr. Quaglin, the Court should release him to the custody of his wife.

**II.    Moira Quaglin could be released to the custody of his wife who is an appropriate third-party custodian.**

Mr. Qualgin proposes to the Court that his wife Moira Quaglin is an appropriate third-party custodian.  Ms. Quaglin has been deemed eligible to be a third-party custodian by Pretrial Services, has no criminal history, and resides at her and Mr. Quaglin's home in New Jersey.

Judge Qurashi found that Mr. Quaglin was not a danger to the community or a flight risk and saw fit to order his release.  *See* Exhibit C, Order Setting Conditions of Release.  The Government has never argued that Mr. Quaglin was a flight risk.  ECF No. 8 ¶¶ 58-61.  Instead, "the government recognizes that the defendant has no prior convictions and limited prior contacts with law enforcement. All of which weighs in favor of release. In addition, his steady housing and community connections weigh in favor of release."  *Id.* ¶¶ 53-54.

Most importantly, Ms. Quaglin is a registered nurse and has experience preparing food for someone with celiac disease.  Exhibit B, ¶¶ 5-6.  She is without question the single most qualified custodian for Mr. Quaglin, especially given his particular medical condition.  *See id.*

Mr. Quaglin has agreed to participate in any supervision program recommended by the Court.  Ms. Quaglin's nursing schedule allows for her to supervise Mr. Quaglin at home from Tuesday-Friday.  *See id.,* ¶¶ 13-14.  On the days that she works, Mr. Quaglin will be occupied with caring for his infant son Nathan.  The Government does not allege that Mr. Quaglin is a flight risk,

and because Mr. Quaglin will be occupied with caring for his infant son, he will not pose any threat to the community when Ms. Quaglin is working her nursing shifts.

In light of these facts, Mr. Quaglin's wife is an appropriate person into whose custody Mr. Qualgin may be released pursuant to § 3142(i).

## <u>CONCLUSION</u>

For the aforementioned reasons, the Court should order Mr. Quaglin's immediate release to the custody of his wife, Moira Quaglin.

Dated: Washington, DC
August 21, 2022

                       Respectfully submitted,

                       /s/ Joseph D. McBride, Esq.
                       Bar ID:  NY0403
                       THE MCBRIDE LAW FIRM, PLLC
                       99 Park Avenue, 6th Floor
                       New York, NY 10016
                       p: (917) 757-9537
                       e: jmcbride@mcbridelawnyc.com
                       *Counsel for the Defendant*

<u>Certificate of Electronic Service</u>

I hereby certify that on August 10, 2022, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, with consequent service on all parties.

/s/ Joseph D. McBride, Esq.