**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| | : | **CASE NO. 21-cr-40 (TNM)** |
| **v.** | : | |
| | : | |
| **CHRISTOPHER JOSEPH QUAGLIN,** | : | |
| **STEVEN CAPPUCCIO, and FEDERICO** | : | |
| **KLEIN,** | : | |
| | : | |
| **Defendants.** | : | |

**UNITED STATES' CORRECTED TRIAL BRIEF**[1]

The United States of America, by and through its attorneys, respectfully submits this trial brief in advance of the July 10, 2023, trial scheduled before this Court in this case. The brief is divided below into a summary of the defendants' alleged conduct that will support the charged offenses; a summary of the charges and elements; a summary of the anticipated government witnesses' testimony; and a discussion of legal issues anticipated to arise.

**I.      The January 6 Capitol Riot and the Defendants' Actions**

On January 6, 2021, thousands of people descended on the U.S. Capitol and interrupted the joint session of Congress that had convened to certify the votes of the Electoral College for the 2020 Presidential Election. The government's evidence will briefly set the stage for the joint session and the riot in which the defendants participated, and then focus on the defendants' criminal conduct and intent that day.

As the Court is aware, Vice President Michael Pence, as the President of the Senate, was present at the Capitol to preside over the joint session and Senate proceedings. On that day, Secret

---

[1] The government inadvertently excluded elements for violations of 18 U.S.C. §§ 2111 and 2 in its Trial Brief filed on July 6, 2023 (Dkt. Entry 667). This corrected brief includes the government's proposed elements and definitions on those charges.

Service was present for the protection of the Vice President and his family members, and physical barriers and police officers surrounded the U.S. Capitol building and grounds.  At all relevant times, the United States Capitol building and its grounds—including the Lower West Terrace on the West Front, and the entire Capitol building itself—were closed to members of the public.

The defendants, Christopher Quaglin, Steven Cappuccio and Federico Klein. were among the group of rioters who illegally entered the U.S. Capitol grounds that day. After joining a mob of rioters that overwhelmed the police lines on the West front – Quaglin and Klein at the forefront – these three defendants converged on the "tunnel," a stairway that had been converted into a narrow entryway due to construction of the temporary inaugural platform on the Lower West Terrace of the Capitol building. Some of the most violent assaults on law enforcement officers on January 6, 2021, took place in the tunnel, as rioters sieged the doors and the officers protecting it for hours attempting to storm the Capitol building.

Each of the defendants traveled from their respective residences to Washington, D.C. Cappuccio attended all or most of the former president's "Stop the Steal" rally at the Ellipse, where the former president and others spoke about the recent presidential election and the events that were set to take place at the Capitol that day: namely, the certification of the electoral college vote.

Starting at approximately 12:55 p.m. on January 6, 2021, members of the mob began to penetrate the restricted perimeter of the U.S. Capitol grounds.  Defendant Quaglin marched over the recently toppled barriers as he and others illegally entered the grounds and approached the Capitol on the West Front in the first surge of rioters. As the mob first approached after breaking past the Peace Circle barriers, vastly outnumbered police officers attempted to establish and maintain a defensive barrier on the Lower West Plaza to keep the mob away from the Capitol and protect the proceedings and lawmakers inside. As more rioters approached and some rioters

became increasingly aggressive with the officers, the line eventually fell back to the Upper West Plaza or the foot of the inaugural stage.



*Map of U.S. Capitol and Grounds with Upper West Plaza highlighted (red box)*

By approximately 12:59 p.m., defendant Quaglin marched past the fallen bike racks and approached the police line on the Upper West Plaza of the U.S. Capitol building with the first group of rioters. Quaglin was carrying a large olive green backpack and wearing a helmet with a recording device attached to the top, full face gas mask, and jacket that was American flag patterned and read vertically "MAKE AMERICA GREAT AGAIN."

Once he arrived on the West Plaza and before he made his way to the tunnel, Quaglin spent nearly two hours antagonizing and attacking officers, damaging property, and aggressively tearing at the barriers. For example, at approximately 12:59 p.m., Quaglin approached police officers and aggressively pointed his fingers and waved his arms while screaming at officers. Quaglin pushed

---

[2] Govt Ex. 108.

an officer several times at about 1:06 p.m. Shortly thereafter, Quaglin swung at an officer and then remained at the front of the mob.

At approximately 1:08 p.m., Quaglin forcefully pushed a police officer at least twice while that officer was attempting to hold back the crowd.[3] Quaglin then started swatting his hands at the officers, making contact with them. Less than three minutes after the first charged assault, at approximately 1:11 p.m., Quaglin approached and attacked Officer Troy Robinson. Quaglin first assertively pointed a finger in the officer's face and as the officer put his arm up to keep Quaglin back, Quaglin suddenly grabbed the officer around the neck and pulled the officer to the ground.[4] This assault led to a brawl between the police and the rioters, including Quaglin, during which more officers were assaulted.

About this same time, MPD reinforcements arrived and began erecting a new bike rack barrier in front of the mob to protect themselves, the building, and those inside of it. Before the barricades were erected, Quaglin continued to aggressively confront the officers still holding the police line. Quaglin pushed, hit, and resisted several officers as they tried to corral him behind the bike racks. As one example, Quaglin charged an officer and violently pushed him with both arms outstretched. In another instance, an officer bent down to pick something off the ground and Quaglin struck the officer directly in his helmet. Quaglin then approached a USCP Officer and forcefully pushed him twice.[5] As officers came to the assistance of the officer, Quaglin started fighting other officers, including pushing one officer with outstretched arms, and grabbing another

---

[3] These facts are the basis for Count One, which charges Quaglin with Assaulting, Resisting or Impeding Certain Officers, in violation of Title 18, United States Code, Section 111(a)(1).

[4] These facts are the basis for Count Two, which charges Quaglin with Assaulting, Resisting or Impeding Certain Officers Causing Bodily Injury, in violation of Title 18, United States Code, Section 111(a)(1) and (b).

[5] These facts are the basis for Count Three, which charges Quaglin with Assaulting, Resisting, or Impeding Certain Officers, in violation of Title 18, United States Code, Section 111(a)(1).

officer, both of whom were trying to corral Quaglin behind the bike rack barricades with the rest of the rioters.

At approximately 1:14 p.m., almost immediately after Quaglin was moved behind the bike rack barricades, he began pulling on the bike racks in an attempt to disassemble them, and ignored officers' commands to "Move back!" Quaglin grabbed a bike rack and pulled at it.  Then, a rioter close to Quaglin who was also pulling at the bike racks was able to successfully take partial possession of a bike rack and pull it into the crowd, breaking the barrier line.  Due to the breach, officers stepped into the mob in an attempt to retrieve the bike rack. The rioter and Quaglin yanked the bike rack as officers pulled on the other side attempting to maintain control. Quaglin then pushed and smacked the hands of one of the officers trying to prevent the rioters from stealing the bike rack. Ultimately, the rioters successfully pulled the bike rack away.[6] This led to another brawl between officers and rioters.

At about 1:37 p.m., Quaglin remained on the West Front where police had managed to reestablish several of the barricades. Quaglin approached police officers standing at one of the barricades and shouted, "You don't want this fight! You do not want this fucking fight! You are on the wrong fucking side! You're going to bring a fucking pistol! I'm going to bring a fucking cannon! You wait! You wait! You wait! Stay there like a fucking sheep! This guy doesn't know what the fuck is going on." Quaglin then grabbed onto a bike rack, shook it, and pushed it at police officers.

Between approximately 2:00 p.m. and 2:34 p.m., Quaglin continued his assaults of officers on the West Front. Specifically, at approximately 2:34 p.m., another rioter pushed an officer to the

---

[6] These facts are the basis for Count Four, which charges Quaglin with Robbery and Aiding and Abetting, in violation of Title 18, United States Code, Sections 2111 and 2.

ground on the Upper West Plaza. Quaglin, who was standing nearby, then lunged forward, reached out his hand, and forcefully pushed at least one officer who was holding a U.S. Capitol police riot shield, and then grabbed the face mask of another officer.[7] Seconds later, Quaglin bent down, picked up a fallen USCP shield, and passed it to rioters behind him.

Around this same time, at about 2:32 p.m., defendant Federico Klein had also reached the front of the mob of rioters and directly faced the police line on the Upper West Plaza. Klein was dressed in an olive green jacket, light blue collared shirt, bright red baseball cap with white lettering that read "Make America Great Again,"[8] and wore, at times, a while cloth face mask. As Klein stood at the front of the police line, officers yelled, "Move back!" to the rioters and attempted to move the rioters back. Klein ignored the orders and pushed hard against the police officers. Klein told the officers, "You can't stop this!" As Klein continued to push forward, Officer Laschon Harvell attempted to push Klein back with his baton, but Klein pressed back against him, driving his left shoulder into Officer Harvell repeatedly.[9]

At about 2:29 p.m., the rioters' aggression cased the police line to retreat. Rioters pushed forward, forcing officers to fall back until the officers were pushed up against a wall. Officers eventually escaped up a temporary staircase that had been built as part of the inaugural stage construction and regrouped on the Lower West Terrace.

---

[7] These facts are the basis for Count Eleven which charges Quaglin with Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of Title 18, Untied States Code, Sections 111(a)(1) and 2.

[8] Later in the day, Klein's red baseball cap fell off and he picked up and put on a different red baseball cap with a Marine Corps logo.

[9] These facts are the basis for Count Nine which charges Klein with Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of Title 18, Untied States Code, Section 111(a)(1) and 2.



*Map of U.S. Capitol and Grounds with Lower West Terrace, which is also known as the Inaugural Stage, highlighted (red box)*

As officers retreated, Quaglin attacked another officer – pushing the officer with both arms and using his body and shoulder to ram into the officer. Not far behind Quaglin and Klein at this time, defendant Cappuccio marched on the Upper West Plaza towards the Capitol building. As Cappuccio reached the Lower West Terrace, he yelled, "Storming the Castle, boys!" and chanted, "Fight for Trump! Fight for Trump!" When Cappuccio reached the Lower West Terrace, he stood near the inaugural stage and chanted, "Our house!"

After each defendant pushed through the West Plaza, the defendants then converged at a pivotal location: the Lower West Terrace "tunnel." The tunnel was a temporary corridor entryway that led into the U.S. Capitol building and that was created as part of the construction of the inaugural platform. At the end of the tunnel were two sets of glass double doors, emblazoned with the sign "Members Entrance Only," which opened directly into the heart of the U.S. Capitol building. After the police perimeter was breached on the West Plaza, many of the police officers retreated into the tunnel to regroup. However, the rioters – including the defendants – followed

them up to the Lower West Terrace and streamed into the tunnel in large numbers where they began to fight the police in an effort to get into the U.S. Capitol building.

At 2:43 p.m., defendant Klein entered the tunnel in the first wave of rioters. Right before Klein entered the tunnel, he paused on the steps, turned toward the rest of the mob as it swarmed toward the tunnel, and waved his arm, beckoning others to enter the tunnel with him. Klein then rushed into the tunnel where dozens of other rioters were confronting police. With the alarm to the building blaring overhead and as rioters screamed at the police, Klein pushed forward in the crowd and quickly maneuvered closer to the police, all while ignoring commands to leave. By this time, one of the "member's only" glass doors had been shattered and both doors were open, exposing the very center of the Capitol building. A group of officers barricading their bodies in the tunnel was the only barrier between the rioters in the tunnel and free access to the Capitol building. In the tunnel, Klein yelled at officers, ignored commands to leave, and maintained his ground at the forefront of the mob of rioters. He reached towards the police line and attempted to grab a police shield, but was unsuccessful. By approximately 2:56 p.m., Klein had been at the front of the mob directly in front of the police for more than ten minutes. At this point, the rioters had become increasingly more aggressive. Klein used both of his arms and his body to forcefully push against officers, including Officer Acquilino Gonell.[10] As a result of Klein's and other rioters' pushing, one officer fell to the ground.

At approximately 3:00 p.m., while Klein was still at the police line inside the tunnel, a police officer repeatedly ordered the crowd, including Klein, to "back up," but Klein ignored his commands. For a short time, rioters stopped actively attacking the officers, and there was enough

---

[10] These facts are the basis for Count Seventeen which charges Klein with Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of Title 18, Untied States Code, Sections 111(a)(1) and 2.

space between the rioters and the police officers to close the metal doors, which would have been immensely advantageous for the officers. But just as officers attempted to pull the doors closed, Klein quickly took a stolen USCP riot shield and, with the help of another rioter, successfully wedged the riot shield in between the two doors so could the officers could not shut them.[11] With the shield as a wedge, Klein and other rioters pried the doors open again and continued their attacks on the police in the tunnel, which lasted for more than two more hours. After Klein battled the officers at the front of the tunnel for several more minutes, he turned towards the mouth of the tunnel and yelled to the rioters, "We need fresh people!" Klein exited the tunnel for the first time at about 3:05 p.m. to rinse his eyes from chemical irritant after being at or near the front lines for nearly twenty minutes.

Meanwhile, at about 3:03 p.m., Quaglin entered the tunnel and quickly pushed his way to the front of the mob, just as rioters started coordinated pushes against the police line. After pushing several times, another rioter (co-defendant Morss) grabbed a riot shield held by MPD Officer Phuson Nguyen. Morss and the officer each yanked at the shield, fighting for possession. Quaglin quickly grabbed onto the shield to assist Morss and, almost immediately afterward, Quaglin and Morss successfully pulled the shield away from Officer Phuson Nguyen and passed it back into the crowd of rioters.[12] As a result of Quaglin's and Morss' theft of the shield, Officer Nguyen slipped and fell on the ground.

Wasting no time, Quaglin immediately handed the shield off and returned to the front of the police line where he pointed at the officers, as other rioters yelled things like, "Traitors!" Then,

---

[11] These facts are the basis for Count Nineteen which charges Klein with Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of Title 18, United States Code, Sections 111(a)(1) and 2.

[12] These facts are the basis for Count Twenty which charges Quaglin with Robbery and Aiding and Abetting, in violation of Title 18, United States Code, Sections 2111 and 2.

at approximately 3:06 p.m., Quaglin lifted a can of oleoresin capsicum ("OC") spray and sprayed it directly into the faces of police officers.[13] Officer Omar Forrester attempted to block the direct stream of the spray by lifting a USCP shield in front of his face, but after spraying numerous other officers, Quaglin reached his arm around the shield and sprayed Officer Forrester directly in the face at point blank range.

Then, between approximately 3:07 p.m. and 3:12 p.m., Quaglin – still at the front of the police line – obtained another stolen U.S. Capitol Police riot shield. Quaglin used his body and the shield to forcefully push up against and hit police officers, as rioters behind him collectively pushed against the police line. At one point, Quaglin raised the shield above his head and jammed it with the edge in the direction of the police officers' heads and helmets. While Quaglin was pushing against and pinning officers with the shield and restricting their movements, another rioter approached behind Quaglin and sprayed the officers with a chemical irritant.[14]

At approximately 3:06 p.m., defendant Cappuccio approached the entrance to the tunnel. Cappuccio wore a light grey hooded sweatshirt with black stripes on the sleeves, a grey baseball hat with a black beanie on top, and, at times, a royal blue Hanukkah print mask with black ear straps. Outside the tunnel, Cappuccio recorded a video on his phone that shows rioters passing police shields into the tunnel and talking about making a shield wall in the tunnel. Cappuccio offered a water bottle to one of many rioters who exited the tunnel with injuries or effects from chemical irritant. Despite these clear indications of the battle going on inside the tunnel, at about

---

[13] These facts are the basis for Count Twenty-Three, which charges Quaglin with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of Title 18, United States Code, Sections 111(a)(1) and (b).

[14] These facts are the basis for Count Twenty-Six, which charges Quaglin with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of Title 18, United States Code, Sections 111(a)(1) and (b).

3:08 p.m., Cappuccio entered the tunnel with his right arm extended in the air holding his phone. As he entered, rioters around him were screaming, "shield wall!" and "we can do this all fucking night!"  As Cappuccio entered the tunnel, several rioters had just left the tunnel, leaving plenty of room to move about or turn around. Cappuccio quickly surged to the police line. Cappuccio pressed his body up against the rioters directly in front of him and forcefully pushed, along with other rioters, against the police line, at times gripping the edge of a USCP riot shield.[15] All the while, Cappuccio continued to hold his phone in the air, recording the violence between the rioters and the police line.

At approximately 3:08 p.m., after Klein had rinsed out his eyes of chemical irritant outside the tunnel, he started to push his way back into the tunnel for a second time, this time carrying several bottles of water, which he handed out to other rioters in the tunnel. After he distributed the water bottles, Klein joined the rioters aggressively pushing in unison against the police line and chanted, "HEAVE! HO!" At the front of the line, officers were getting crushed as they bore the brunt of the collective force.

At about 3:10 p.m., a number of rioters started to cycle out of the tunnel. As a result, the police officers gained some momentum and pushed rioters – including Klein and Cappuccio – back towards the mouth of the tunnel. Both defendants forcefully pushed their way back to the front of the line, face-to-face with police officers. Klein joined in a second concerted pushing effort

---

[15] These facts are the basis for Count Twenty-Eight, which charges Cappuccio with Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of Title 18, United States Code, Sections 111(a)(1) and 2.

with other rioters, once again calling out "HEAVE! HO!" as they violently thrusted into the police line.[16]

At approximately 3:11 p.m., while the rioters were screaming "HEAVE! HO!" and thrashing their bodies against the police line, MPD Officer Daniel Hodges was pinned between one of the metal doors in the tunnel and a shield held by co-defendant Patrick McCaughey. At the time, Officer Hodges was wearing full riot gear, including a gas mask worn over his face and hard shelled helmet, and he was holding a riot baton. As Quaglin and Klein forcefully pushed against the officers at the front of the line, and McCaughey pinned Officer Hodges against the door, Cappuccio put his phone – while still recording – in his mouth, forcefully yanked the gas mask away from Officer Hodges' face in hard quick movements, causing Officer Hodges' head and neck to be yanked violently in various directions. As Officer Hodges continued to be pressed against the door by the mob's (including Klein and Quaglin) "HEAVE! HO!" pushes, Cappuccio succeeded in ripping Officer Hodges' gas mask off his face and dislodging his helmet. As he viciously ripped off Officer Hodges' gas mask, Cappuccio appeared to say, "How do you like me now, fucker?!" Cappuccio then took Officer Hodges' riot baton out of his hands and used the baton to strike Officer Hodges in the face.[17] Throughout this vicious assault, Officer Hodges screamed and pleaded for help. After Cappuccio's assault, Officer Hodges was able to get free of the door but struggled to make his way through the dense crowd to obtain medical attention.

---

[16] These facts are the basis for Count Twenty-Seven, which charges Klein with Assaulting, Resisting, or Impeding Certain Officers and Aiding and Abetting, in violation of Title 18, United States Code, Sections 111(a)(1) and 2.

[17] These facts are the basis for Counts Twenty-Nine, which charges Cappuccio with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of Title 18, Untied States Code, Sections 111(a)(1) and (b), and Count Thirty, which charges Cappuccio with Robbery and Aiding and Abetting, in violation of Title 18, Untied States Code, Sections 2111 and 2.

At approximately 3:13 p.m., Cappuccio walked back toward the mouth of the tunnel still carrying the stolen police baton. As he approached the mouth of the tunnel, a nearby rioter grabbed the baton from Cappuccio. Cappuccio exited the tunnel, looked to the crowd, and pumped his fist into the air victoriously.

At the same time that Cappuccio left the tunnel, so did several other rioters, which left space in the tunnel. However, Klein and Quaglin remained. At about 3:13 p.m., a gap opened up between the crowd and the officers. Again, the officers attempted to pull the doors shut to create another barrier between themselves and the crowd. This time, Quaglin lodged his foot in front of the door, preventing the officers from closing it. Then, at approximately 3:14 p.m., one of the remaining rioters handed Klein a stolen U.S. Capitol Police riot shield. One minute later, Klein used the shield to push hard against the police officers in the tunnel.[18] As Klein pushed into the officers with the shield, rioters – including Quaglin – next to and behind him chanted "Heave! Ho!" and repeatedly hit the police line in coordinated movements. Klein continued to hold the shield, forcibly pressing it against the officers, amplifying the weight of the rioters' pushes behind him. Klein pushed so forcefully against officers – pressing his entire face and body against the riot shield – that Officer Henry Foulds called out during the assault, "I'm exhausted!"

At approximately 3:18 p.m., the police in the tunnel started to gain ground and push the rioters toward the mouth of the tunnel. Quaglin and Klein were both still in the tunnel at this time. Klein actively resisted the police officers' efforts to move him out of the tunnel by aggressively pushing the stolen riot shield against the police line and using the weight of his body to press

---

[18] These facts are the basis for Count Thirty-One which charges Klein with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of Title 18, United States Code, Sections 111(a)(1) and (b).

forward.[19]   As MPD Officer Morris Moore tried to push Klein back, Klein adjusted the shield, allowing another rioter to join Klein pushing the officer. As Klein continued to push into Officer Moore with the riot shield, another rioter grabbed Officer Moore's baton by reaching over Klein's riot shield. The rioter who grabbed the baton held on and dragged Officer Morris forward away from the police line and into the mob. At this same time, MPD Officer Michael Fanone had also gotten separated from the police line and a rioter had his arm around Officer Fanone's neck and had started to drag Officer Fanone out of the tunnel. As Klein repeatedly pushed against Officer Moore, he turned his head towards the crowd of rioters and shouted, "I need support!"

Klein and Quaglin were pushed out of the tunnel at approximately 3:19 p.m. and 3:20 p.m. respectively. After the tunnel was cleared, however, neither Klein nor Quaglin immediately left Capitol grounds. In fact, at approximately 3:20 p.m., after being pushed out of the tunnel, Klein stood on the steps outside the tunnel while officers tried to rescue Officer Fanone who had been dragged into the crowd. As an officer approached Klein on his way to help Officer Fanone, he directed Klein to "move, move!" Klein turned toward the officer, shook his head no and said, "no way." Another officer joined the first and told Klein, "Let me get my friend." Officer Fanone was then pushed up past Klein to the officers who helped Officer Fanone back into the Capitol building.

Klein remained at the front of the mob near the police – who were now at the entrance to the tunnel – until approximately 4:10 p.m. From about 3:42 p.m. to 4:07 p.m., Klein stood at the front of the line of police officers and constantly pushed into them, at times using a stolen police shield, as the officers continued to defend against the attacks and maintain the police line.

---

[19] These facts are the basis for Count Thirty-Two which charges Klein with Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, in violation of Title 18, Untied States Code, Sections 111(a)(1) and (b).

Despite the defendants' and other rioters' considerable efforts, the police line at the tunnel did not fail. Not long after 5 p.m., officers who had been defending the Lower West Terrace doors for hours were relieved by members of the Virginia State Police, who helped the officers finally clear the terrace of all rioters.

## II.    The Government's Proof

### A.  Charges Alleged Against Each Defendant

Quaglin, Klein, and Cappuccio are part of a multi-co-defendant 53-count superseding indictment. These defendants are charged as follows:

#### 1.  Christopher Quaglin

Count One: 18 U.S.C. §§ 111(a)(1) and 2, Assaulting, Resisting or Impeding Certain Officers and Aiding and Abetting at or around 1:08 p.m.

Count Two: 18 U.S.C. § 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers, that is Officer T.R., Using a Dangerous Weapon at or around 1:11 p.m. to 1:13 p.m.

Count Three: 18 U.S.C. § 111(a)(1), Assaulting, Resisting or Impeding Certain Officers, at or around 1:11 p.m. to 1:13 p.m.

Count Four: 18 U.S.C. § 2111 and 2, Robbery and Aiding and Abetting at or around 1:14 p.m. to 1:15 p.m.

Count Eleven: 18 U.S.C. §§ 111(a)(1) and 2, Assaulting, Resisting or Impeding Certain Officers and Aiding and Abetting at or around 2:34 p.m.

Count Twenty: 18 U.S.C. §§ 2111 and 2, Robbery and Aiding and Abetting at or around 3:02 p.m. to 3:05 p.m.

Count Twenty-Three: 18 U.S.C. § 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers, that is O.F., Using a Dangerous Weapon at or around 3:06 p.m.

<u>Count Twenty-Six</u>: 18 U.S.C. § 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon at or around 3:07 p.m. to 3:12 p.m.

<u>Count Thirty-Four</u>: 18 U.S.C. §§ 1512(c)(2), 2, Obstruction of an Official Proceeding, Aiding and Abetting

<u>Count Thirty-Five</u>: 18 U.S.C. § 231(a)(3), Civil Disorder

<u>Count Thirty-Nine</u>: 18 U.S.C. § 1752(a)(2) and (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

<u>Count Forty-Seven</u>: 18 U.S.C. § 1752(a)(4) and (b)(1)(A) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

<u>Count Fifty-Two</u>: 40 U.S.C. §§ 5104(e)(2)(D), 2, Disorderly Conduct in a Capitol Building

<u>Count Fifty-Three</u>: 40 U.S.C. §§ 5104(e)(2)(F), 2, Act of Physical Violence in the Capitol Grounds of Buildings

2. *Steven Cappuccio*

<u>Count Twenty-Eight</u>: 18 U.S.C. §§ 111(a)(1), and 2, Assaulting, Resisting or Impeding Certain Officers and Aiding and Abetting at or around 3:08 p.m. to 3:10 p.m.

<u>Count Twenty-Nine</u>: 18 U.S.C. § 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers, that is D.H., Using a Dangerous Weapon at or around 3:11 p.m. to 3:13 p.m.

<u>Count Thirty</u>: 18 U.S.C. §§ 2111 and 2, Robbery and Aiding and Abetting at or around 3:11 p.m. to 3:13 p.m.

<u>Count Thirty-</u>Four: 18 U.S.C. §§ 1512(c)(2), 2, Obstruction of an Official Proceeding, Aiding and Abetting

<u>Count Thirty-Five</u>: 18 U.S.C. § 231(a)(3), Civil Disorder

16

Count Forty-Two: 18 U.S.C. § 1752(a)(2) and (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

Count Fifty: 18 U.S.C. § 1752(a)(4) and (b)(1)(A) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

Count Fifty-Two: 40 U.S.C. §§ 5104(e)(2)(D), 2, Disorderly Conduct in a Capitol Building

Count Fifty-Three: 40 U.S.C. §§ 5104(e)(2)(F), 2, Act of Physical Violence in the Capitol Grounds of Buildings

### 3. *Federico Klein*

Count Nine: 18 U.S.C. §§ 111(a)(1), and 2, Assaulting, Resisting or Impeding Certain Officers, that is L.H., and Aiding and Abetting at or around 2:32 to 2:34 p.m.

Count Seventeen: 18 U.S.C. §§ 111(a)(1), and 2, Assaulting, Resisting or Impeding Certain Officers, that is A.G., and Aiding and Abetting at or around 2:56 p.m. to 2:58 p.m.

Count Nineteen: 18 U.S.C. §§ 111(a)(1), and 2, Assaulting, Resisting or Impeding Certain Officers, that is C.W., and Aiding and Abetting at or around 3:00 p.m.

Count Twenty-Seven: 18 U.S.C. §§ 111(a)(1), and 2, Assaulting, Resisting or Impeding Certain Officers and Aiding and Abetting at or around 3:07 p.m. to 3:14 p.m.

Count Thirty-One: 18 U.S.C. §§ 111(a)(1), and (b), Assaulting, Resisting or Impeding Certain Officers, that is H.F., Using a Dangerous Weapon at or around 3:15 p.m. to 3:18 p.m.

Count Thirty-Two: 18 U.S.C. §§ 111(a)(1), and (b), Assaulting, Resisting or Impeding Certain Officers, that is M.M., Using a Dangerous Weapon at or around 3:15 p.m. to 3:18 p.m.

Count Thirty-Four: 18 U.S.C. §§ 1512(c)(2), 2, Obstruction of an Official Proceeding, Aiding and Abetting

Count Thirty-Five: 18 U.S.C. § 231(a)(3), Civil Disorder

Count Forty-Three: 18 U.S.C. § 1752(a)(2) and (b)(1)(A), Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

Count Fifty-One: 18 U.S.C. § 1752(a)(4) and (b)(1)(A) Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon

Count Fifty-Two: 40 U.S.C. §§ 5104(e)(2)(D), 2, Disorderly Conduct in a Capitol Building

Count Fifty-Three: 40 U.S.C. §§ 5104(e)(2)(F), 2, Act of Physical Violence in the Capitol Grounds of Buildings

## B.  Elements of the Crimes Alleged

### 18 U.S.C. § 111(a)(1)

Counts One, Three, Nine, Eleven, Seventeen, Nineteen, Twenty-Seven, and Twenty-Eight of the Fifth Superseding Indictment charge the defendants with assaulting, resisting, and impeding certain law enforcement officers, in violation of 18 U.S.C. § 111(a)(1). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt with respect to each charge against each defendant:

1. First, the defendants assaulted, resisted, opposed, impeded, intimidated, or interfered with officers of the Metropolitan Police Department and the U.S. Capitol Police.
2. Second, the defendants did such acts forcibly.
3. Third, the defendants did such acts voluntarily and intentionally.
4. Fourth, the person assaulted, resisted, opposed, impeded, intimidated, or interfered with was an officer or an employee of the United States who was then engaged in the performance of his official duties assisting officers of the United States who were then engaged in the performance of their official duties.
5. Fifth, the defendants made physical contact with a person who was an officer or an employee of the United States who was then engaged in the performance of his official duties or assisting officers of the United States who were then engaged in the performance of their official duties, or acted with the intent to commit another felony. For purposes of this element, "another felony" refers to the other felony offenses charged in the Fifth Superseding Indictment, specifically 18 U.S.C. § 231

18

and 18 U.S.C. § 1512.

## Definitions

The defendants acted "forcibly" if he used force, attempted to use force, or threatened to use force against the officer. Physical force or contact is sufficient but actual physical contact is not required. You may also find that a person who has the present ability to inflict bodily harm upon another and who threatens or attempts to inflict bodily harm upon that person acts forcibly. In such case, the threat must be a present one.[20]

The term "assault" means any intentional attempt or threat to inflict injury upon someone else, when coupled with an apparent present ability to do so. To find that the defendant committed an "assault," you must find beyond a reasonable doubt that the defendant intended to inflict or to threaten injury. Injury means any physical injury, however small, including a touching offensive to a person of reasonable sensibility.[21]

---

[20] *United States v. Taylor*, 848 F.3d 476, 493 (1st Cir. 2017) (The element of "forcible" action can be met by a showing of either physical contact with the federal agent, or by such a threat or display of physical aggression toward the officer as to inspire fear of pain, bodily harm, or death.) (quotation marks omitted) (citing cases).

[21] *United States v. Watts*, 798 F.3d 650, 654 (7th Cir. 2015) ("An assault may also be committed by a person who intends to threaten or attempt to make offensive rather than injurious physical contact with the victim."); *United States v. Acosta-Sierra*, 690 F.3d 1111, 1117 (9th Cir. 2012) ("Because Section 111 does not define assault, we have adopted the common law definition of assault as either (1) a willful attempt to inflict injury upon the person of another, or (2) a threat to inflict injury upon the person of another which, when coupled with an apparent present ability, causes a reasonable apprehension of immediate bodily harm.") (quotation marks omitted); *Comber v. United States*, 584 A.2d 26, 50 (D.C. 1990) (en banc) (explaining that the crime of simple assault "is designed to protect not only against physical injury, but against all forms of offensive touching, . . . and even the mere threat of such touching"); Criminal Jury Instructions for the District of Columbia, No. 4.100 (2022 ed.) ("Injury means any physical injury, however small, including a touching offensive to a person of reasonable sensibility."). For other January 6 trials that have used similar instructions, see *United States v. Jensen*, No. 21-cr-6 (TJK) (ECF No. 97 at 30), and *United States v. Webster*, No. 21-cr-208 (APM) (ECF No. 101 at 14).

The terms "resist," "oppose," "impede," "intimidate," and "interfere with" carry their everyday, ordinary meanings.

It is not necessary to show that the defendant knew the person being forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with was, at that time, carrying out an official duty so long as it is established beyond a reasonable doubt that the person was, in fact, carrying out an official duty and that the defendant intentionally forcibly assaulted, resisted, opposed, impeded, intimidated, or interfered with that officer.[22]

In this case, the government further alleges that the defendants aided and abetted others in assaulting, resisting, opposing, impeding, intimidating, or interfering with certain officers.  To satisfy its burden of proof in proving that the defendant aided and abetted others in committing this offense, the Court must find that the government proved beyond a reasonable doubt:

1. First, that others committed assaulting, resisting, opposing, impeding, intimidating, or interfering with law enforcement officers, by committing each of the elements of the offense charged;

2. Second, that the defendants knew that assaulting, resisting, opposing, impeding, intimidating, or interfering with law enforcement officers was going to be committed or was being committed by others;

3. Third, that the defendants performed an act or acts in furtherance of the offense;

4.  Fourth, that the defendants knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of assaulting, resisting, opposing, impeding, intimidating, or interfering with law enforcement officers; and

5. Fifth, the defendants did that act or acts with the intent that others commit the offense of assaulting, resisting, opposing, impeding, intimidating, or interfering with law enforcement officers.

To show that the defendant performed an act or acts in furtherance of the offense charged,

---

[22] *United States v. Thomas*, No. 21-cr-552 (DLF) (ECF No. 150 at 30).

the government must prove some affirmative participation by each defendant which at least encouraged others to commit the offense.  That is, you must find that each defendant's act or acts did, in some way, aid, assist, facilitate, or encourage others to commit the offense.  Each defendant's act or acts need not further aid, assist, facilitate, or encourage every part or phase of the offense charged; it is enough if the defendant's act or acts further aided, assisted, facilitated, or encouraged only one or some parts or phases of the offense.  Also, the defendant's acts need not themselves be against the law.

In deciding whether each defendant had the required knowledge and intent to satisfy the fourth requirement for aiding and abetting, the Court may consider both direct and circumstantial evidence, including each defendant's words and actions and other facts and circumstances.  However, evidence that a defendant merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator during the commission of the offense is not enough for you to find the defendant guilty as an aider and abettor.  If the evidence shows that the defendant knew that the offense was being committed or was about to be committed, but does not also prove beyond a reasonable doubt that it was the defendant's intent and purpose to aid, assist, encourage, facilitate, or otherwise associate the defendant with the offense, you may not find the defendant guilty of assaulting, resisting, opposing, impeding, intimidating, or interfering with law enforcement officers as an aider and abettor.  The government must prove beyond a reasonable doubt that the defendant in some way participated in the offense committed by others as something the defendant wished to bring about and to make succeed.

### 18 U.S.C. § 111(a)(1) and (b)

Counts Two, Twenty-Three, Twenty-Six, Twenty-Nine, Thirty-One, and Thirty-Two of the Fifth Superseding Indictment charge the defendants with assaulting, resisting, and impeding

certain law enforcement officers with a deadly or dangerous weapon, in violation of 18 U.S.C. §111(a)(1) and (b). In order to find the defendants guilty of this offense, the Court must find that the government proved all of the above elements of § 111(a)(1) with respect to each charge against each defendant, and additionally:

> Sixth, in doing such acts, the defendants intentionally used a deadly or dangerous weapon or inflicted bodily injury.

An object may be a "deadly or dangerous weapon" in one of two ways. First, an object is a deadly or dangerous weapon if it is inherently or obviously dangerous or deadly. Such inherently dangerous weapons include guns, knives, and the like. Second, if the object is not inherently or obviously dangerous or deadly, an object is a deadly or dangerous weapon if the object is "capable of causing serious bodily injury or death to another person" when used in the "manner" in which the defendant used it.  *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002) (citation omitted).In determining whether the object is a "deadly or dangerous weapon," you may consider both the physical capabilities of the object used and the manner in which the object was used.[23]

The term "bodily injury" means an injury that is painful and obvious, or is of a type for which medical attention ordinarily would be sought. Bodily injury includes a cut, abrasion, bruise, burn or disfigurement; physical pain; illness; impairment of the function of a bodily member,

---

[23] *United States v. Arrington*, 309 F.3d 40, 44 (D.C. Cir. 2002) ("For an object that is not inherently deadly . . . the following additional element is required: (4) the object must be capable of causing serious bodily injury or death to another person *and* the defendant must use it in that manner."); *United States v. Smith*, 561 F.3d 934, 939 (9th Cir. 2009) ("An object is a dangerous weapon . . . if it is either inherently dangerous or otherwise used in a manner likely to endanger life or inflict great bodily harm. . . . Inherently dangerous weapons . . . are obviously dangerous objects such as guns, knives, and the like.") (quotation marks omitted); *United States v. Guilbert*, 692 F.2d 1340, 1343 (11th Cir. 1982) ("Thus, the term 'dangerous weapon' is not restricted to such obviously dangerous weapons as guns, knives, and the like, but can include virtually any object given appropriate circumstances.").  For another January 6 trial that used a similar instruction, *see United States v. Webster*, No. 21-cr-208 (APM) (ECF No. 101 at 15).

organ, or mental faculty; or any other injury to the body, no matter how temporary.[24]

### 18 U.S.C. § 1512(c)(2)

Count Thirty-Four of the Fifth Superseding Indictment charges the defendants with obstruction of an official proceeding and aiding and abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and (2). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt with respect to each defendant:

1. First, the defendants attempted to or did obstruct or impede an official proceeding;

2. Second, the defendants intended to obstruct or impede the official proceeding;

3. Third, the defendants acted knowingly, with awareness that the natural and probable effect of their conduct would be to obstruct or impede the official proceeding; and

4. Fourth, the defendants acted corruptly.

To "obstruct" or "impede" means to block, interfere with, or slow the progress of an official proceeding.

The term "official proceeding" includes a proceeding before Congress. The official proceeding need not be pending or about to be instituted at the time of the offense. If the official proceeding was not pending or about to be instituted, the government must prove beyond a reasonable doubt that the official proceeding was reasonably foreseeable to the defendant. For purposes of this count, the term "official proceeding" means Congress' Joint Session to certify the Electoral College vote.[25]

---

[24] Fifth Circuit Model Jury Instruction No. 2.07; Tenth Circuit Model Jury Instruction No. 2.09; 18 U.S.C. § 1365(g)(4).

[25] In *United States v. Fischer*, 64 F.4th 329, 342 (D.C. Cir. 2023), the D.C. Circuit held "that congressional certification of the Electoral College count is an 'official proceeding'" for purposes of § 1512(c)(2). *See also* 18 U.S.C. § 1515(a)(1)(B) (defining "official proceeding" to include "a proceeding before the Congress"); § 1512(f)(1) ("For the purposes of this section—(1) an official

A person acts "knowingly" if he realizes what he is doing and is aware of the nature of his conduct, and does not act through ignorance, mistake, or accident.   In deciding whether the defendant acted knowingly, you may consider all of the evidence, including what the defendant did, said, or perceived.[26]

To act "corruptly," the defendant must use independently unlawful means or act with an unlawful purpose, or both. The defendant must also act with "consciousness of wrongdoing." "Consciousness of wrongdoing" means with an understanding or awareness that what the person is doing is wrong or unlawful.

While the defendant must act with intent to obstruct the official proceeding, this need not be his sole purpose. A defendant's unlawful intent to obstruct an official proceeding is not negated by the simultaneous presence of another purpose for his conduct.[27]

The government further alleges that the defendants aided and abetted others in committing obstruction of an official proceeding.   To satisfy its burden of proof in proving that the defendants aided and abetted others in committing this offense, the government must prove the following beyond a reasonable doubt:

---

proceeding need not be pending or about to be instituted at the time of the offense"). For the nexus requirement (that the official proceeding need be reasonably foreseeable), *see United States v. Sandlin*, 575 F. Supp. 3d 16, 32 (D.D.C. 2021); *United States v. Aguilar*, 515 U.S. 593, 599-600 (1995).  For other January 6 trials that have used this instruction, *see, e.g.*, *United States v. Reffitt*, No. 21-cr-32 (DLF) (ECF No. 119 at 25-26), *United States v. Robertson*, No. 21-cr-34 (CRC) (ECF No. 86 at 12), *United States v. Thompson*, No. 21-cr-161 (RBW) (ECF No. 832 at 26), *United States v. Williams*, No. 21-cr-377 (BAH) (ECF No. 112 at 7); and *United States v. Thomas*, No. 21-cr-552 (DLF) (ECF No. 150 at 23).

[26] *See* The William J. Bauer Pattern Criminal Jury Instructions of the Seventh Circuit §§ 1512 & 1515(a)(1); *see also Arthur Andersen LLP v. United States*, 544 U.S. 696, 705 (2005); *United States v. Carpenter*, No. 21-cr-305 (JEB) (ECF No. 97 at 11) (including instruction that the evidence to be considered includes "what [the defendant] did, said, or perceived"); *United States v. Kelly*, No. 21-cr-708 (RCL) (ECF No. 101 at 9) (same).

[27] *United States v. Carpenter*, No. 21-cr-305 (JEB) (ECF No. 97 at 11); *United States v. Kelly*, No. 21-cr-708 (RCL) (ECF No. 101 at 10).

1. First, that others committed obstruction of an official proceeding by committing each of the elements of the offense charged;

2. Second, that the defendants knew that obstruction of an official proceeding was going to be committed or was being committed by others;

3. Third, that the defendants performed an act or acts in furtherance of the offense;

4.  Fourth, that the defendants knowingly performed that act or acts for the purpose of aiding, assisting, soliciting, facilitating, or encouraging others in committing the offense of obstruction of an official proceeding; and

5. Fifth, the defendants did that act or acts with the intent that others commit the offense of an obstruction of an official proceeding.

To show that the defendant performed an act or acts in furtherance of the offense charged, the government must prove some affirmative participation by each defendant which at least encouraged others to commit the offense.  That is, you must find that each defendant's act or acts did, in some way, aid, assist, facilitate, or encourage others to commit the offense.  Each defendant's act or acts need not further aid, assist, facilitate, or encourage every part or phase of the offense charged; it is enough if the defendant's act or acts further aided, assisted, facilitated, or encouraged only one or some parts or phases of the offense.  Also, the defendant's acts need not themselves be against the law.

In deciding whether each defendant had the required knowledge and intent to satisfy the fourth requirement for aiding and abetting, the Court may consider both direct and circumstantial evidence, including each defendant's words and actions and other facts and circumstances. However, evidence that a defendant merely associated with persons involved in a criminal venture or was merely present or was merely a knowing spectator during the commission of the offense is not enough for you to find the defendant guilty as an aider and abettor.  If the evidence shows that the defendant knew that the offense was being committed or was about to be committed, but does not also prove beyond a reasonable doubt that it was the defendant's intent and purpose to aid,

assist, encourage, facilitate, or otherwise associate the defendant with the offense, you may not find the defendant guilty of obstruction of an official proceeding as an aider and abettor.  The government must prove beyond a reasonable doubt that the defendant in some way participated in the offense committed by others as something the defendant wished to bring about and to make succeed.

### 18 U.S.C. §§ 2111 and 2

Counts Four, Twenty and Thirty of the Fifth Superseding Indictment charge defendants Quaglin and Cappuccio with robbery within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. §§ 2111 and (2). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt as to each defendant:

1. That the defendant obtained property that he was not lawfully entitled to, from a person, without that person's consent;

2. That the defendant used actual or threatened force, violence, or intimidation to obtain the property;

3. The defendant knowingly obtained the property in this way; and

4. The defendant committed this offense within the special maritime or territorial jurisdiction of the United States.

<u>Definitions</u>

The term "special maritime or territorial jurisdiction of the United States" includes "any lands reserved or acquired for the use of the United States and under the exclusive or concurrent jurisdiction thereof."

**18 U.S.C. § 231(a)(3)**

Count Thirty-Five of the Fifth Superseding Indictment charges the defendants with civil disorder, in violation of 18 U.S.C. § 231(a)(3). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt with respect to each defendant:

1. First, the defendants knowingly committed or attempted to commit an act with the intended purpose of obstructing, impeding, or interfering with one or more law enforcement officers.

2. Second, at the time of the defendants' actual or attempted act, the law enforcement officer or officers were engaged in the lawful performance of their official duties incident to and during a civil disorder.

3. Third, the civil disorder in any way or degree obstructed, delayed, or adversely affected either commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function.

The term "civil disorder" means any public disturbance involving acts of violence by groups of three or more persons, which (a) causes an immediate danger of injury to another individual, (b) causes an immediate danger of damage to another individual's property, (c) results in injury to another individual, or (d) results in damage to another individual's property.

The term "commerce" means commerce or travel between one state, including the District of Columbia, and any other state, including the District of Columbia.  It also means commerce wholly within the District of Columbia.[28]

The term "federally protected function" means any function, operation, or action carried out, under the laws of the United States, by any department, agency, or instrumentality of the

---

[28] Modified definition of 18 U.S.C. § 232(2) from jury instructions in *United States v. Pugh*, 20-cr-73 (S.D. Ala. May 19, 2021); *see also United States v. Schwartz, et al.*, No. 21-cr-178 (APM) (ECF No. 172 at 18); *United States v. Thomas*, No. 21-cr-552 (DLF) (ECF No. 150 at 21).

United States or by an officer or employee thereof, which may include the United States Secret Service or United States Capitol Police.[29]

The term "knowingly" has the same meaning described in the instructions for Count 34.

In Count Thirty-Five, the defendants are also charged with attempt to commit the crime of civil disorder.  The elements of the crime of civil disorder, each of which the government must prove beyond a reasonable doubt, are:

1.    First, that the defendant intended to commit the crime of civil disorder, as defined above; and

2.    Second, that the defendant engaged in conduct that constituted a substantial step toward committing obstruction of an official proceeding, as defined above.

You may not find the defendant guilty of attempt to commit civil disorder merely because he made some plans to or some preparation for committing that crime.  Instead, you must find that the defendants took some firm, clear, undeniable action to accomplish their intent to commit civil disorder.  However, the substantial step element does not require the government to prove that the defendant did everything except the last act necessary to complete the actual commission of the crime.

### 18 U.S.C. § 1752(a)(2) and (b)(1)(A)

Counts Thirty-Nine, Forty-Two, and Forty-Three of the Fifth Superseding Indictment charge the defendants with disorderly or disruptive conduct in a restricted building or grounds, in violation of 18 U.S.C. § 1752(a)(2) and (b)(1)(A). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt with respect to each charge against each defendant:

1.    First, that the defendants engaged in disorderly or disruptive conduct in, or in proximity to, any restricted building or grounds;

---

[29] *See* 18 U.S.C. § 232(3).

2. Second, that the defendants did so knowingly, and with the intent to impede or disrupt the orderly conduct of Government business or official functions;

3. Third, that the defendants' conduct occurred when, or so that, their conduct in fact impeded or disrupted the orderly conduct of Government business or official functions.

4. Fourth, the defendants knowingly used or carried a deadly or dangerous weapon during and in relation to the offense.

"Disorderly conduct" occurs when a person is unreasonably loud and disruptive under the circumstances, or interferes with another person by jostling against or unnecessarily crowding that person. "Disorderly conduct" also occurs when a person acts in such a manner as to cause another person to be in reasonable fear that a person or property in a person's immediate possession is likely to be harmed or taken, uses words likely to produce violence on the part of others.[30]

"Disruptive conduct" is a disturbance that interrupts an event, activity, or the normal course of a process.[31]

The term "restricted building or grounds" means any posted, cordoned off, or otherwise restricted area of a building or grounds where a person protected by the Secret Service is or will be temporarily visiting.

The term "person protected by the Secret Service" includes the Vice President and the immediate family of the Vice President.

The term "knowingly" has the same meaning described in the instructions for Count Thirty-Four.

The term "deadly or dangerous weapon" has a similar meaning as in Counts Two, Twenty-Three, Twenty-Six, Twenty-Nine, Thirty-One, and Thirty-Two.

---

[30] *United States v. Schwartz, et al,*, No. 21-cr-178 (APM) (ECF No. 172 at 27)
[31] Redbook 6.643.

**18 U.S.C. § 1752(a)(4) and (b)(1)(A)**

Counts Forty-Seven, Fifty, and Fifty-One of the Fifth Superseding Indictment charge the defendants with entering and remaining in a restricted building or grounds with physical violence, in violation of 18 U.S.C. § 1752(a)(4) and (b)(1)(A). In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt with respect to each charge against each defendant:

1. First, that the defendants engaged in any act of physical violence against a person or property in, or in proximity to, a restricted building or grounds.

2. Second, that the defendants did so knowingly.

3. Third, in doing such acts, the defendant used or carried a deadly or dangerous weapon.

The term "act of physical violence" means any act involving an assault or other infliction of bodily harm on an individual; or damage to, or destruction of, real or personal property.

The term "knowingly" has the same meaning as previously defined.

The term "deadly or dangerous weapon" has the same meaning as previously defined.

**40 U.S.C. § 5104(e)(2)(D)**

Count Fifty-Two of the Fifth Superseding Indictment charges the defendants with disorderly or disruptive conduct in a Capitol building or grounds, aiding and abetting, in violation of 40 U.S.C. § 5104(e)(2)(D) and 18 U.S.C. § 2. In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt with respect to each defendant:

1. First, that the defendants engaged in disorderly or disruptive conduct in any of the United States Capitol Buildings or Grounds.

2. Second, that the defendants did so with the intent to impede, disrupt, or disturb the orderly conduct of a session of Congress or either House of Congress.

3.   Third, that the defendants acted willfully and knowingly.

The term "Capitol Buildings" includes the United States Capitol located at First Street, Southeast, in Washington, D.C. The "Capitol Grounds" are defined by the United States Code, which refers to a 1946 map on file in the Office of the Surveyor of the District of Columbia. The boundaries of the Capitol Grounds include all additions added by law after that map was recorded. The Capitol Grounds includes the portion of Pennsylvania Avenue Northwest from the west curb of First Street Northwest to the curb of Third Street Northwest.

The terms "knowingly" and "willfully" have the same meaning as previously defined.

### 40 U.S.C. § 5104(e)(2)(F)

Count Fifty-Three of the Fifth Superseding Indictment charges the defendants with acts of physical violence in the Capitol Grounds or Building, aiding and abetting, in violation of 40 U.S.C. § 5104(e)(2)(F), and 18 U.S.C. § 2.  In order to find the defendants guilty of this offense, the Court must find that the government proved each of the following elements beyond a reasonable doubt:

1.   First, that the defendants engaged in an act of physical violence within the Capitol Buildings or Grounds.

2.   Second, that the defendants acted willfully and knowingly.

The term "act of physical violence" means any act involving an assault or other infliction or threat of infliction of death or bodily harm on an individual; or involving damage to, or destruction of, real or personal property. For purposes of this offense, unlike the offenses in Counts Forty-Seven, Fifty, and Fifty-One, the threat of infliction of bodily harm is sufficient to meet this definition.

The terms "Capitol Buildings" and "Capitol Grounds" have the same meaning as previously defined.

The terms "knowingly" and "willfully" have the same meaning as previously defined.

31

### C.  Stipulated Testimony

The government has proposed submitting the following two transcripts as evidence in this case:

In *United States v. Couy Griffin*, 21-cr-00092-TNM (March 21-22, 2022), this Court heard the testimony of United States Secret Service (USSS) Inspector Lanelle Hawa.  Inspector Hawa testified regarding the restricted perimeter surrounding the U.S. Capitol building and grounds and the presence of then Vice President Pence and his immediate family within the restricted perimeter from the afternoon of January 6, 2021 until the morning of January 7, 2021.

In *United States v. Timothy Hale-Cusanelli*, 21-cr-00037 (TNM) (May 24-26, 2022), this Court heard the testimony of Daniel Schwager, who, on January 6, 2021, was the general counsel to the Secretary of the United States Senate.  Mr. Schwager testified regarding Congress's Certification of the Electoral College vote (the "Certification proceeding"), including an explanation of the provisions governing the Certification proceeding.  Mr. Schwager also testified about the Certification proceeding, as it occurred on January 6 and 7, 2021.

To save time, and to focus on the matters that will likely be in dispute, the government intends – upon agreement by defense counsel – to offer into evidence a transcript of Inspector Hawa's testimony and the accompanying exhibits from the *Griffin* trial and Mr. Schwager's testimony and the accompanying exhibits from the *Hale-Cusanelli* trial.

### D.  Trial Stipulations

The government has proposed stipulations[32] to the following facts: (1) a description of the Capitol Building and Grounds; (2) the certification of the electoral college vote; (3) the "civil

---

[32] *See* Exhibit A. If all three defendants do not agree to these stipulations, we expect to present witnesses who will testify before the Court to these facts.

disorder" that took place on January 6, 2021; (4) the civil disorder affected interstate commerce; (5) the civil disorder affected a "federally protected function"; (6) U.S. Capitol Police Officers and Metropolitan Police Department Officers were engaged in their official duties as officers or employees of the United States on January 6, 2021; (7) the authenticity of video footage from closed-circuit video monitoring and recording equipment and handheld recording devices utilized by the USCP on January 6, 2021; (8) authenticity of body worn camera; (9) certain stipulated testimony (as noted above); (10) the authenticity of open source videos; (11) the authenticity of videos recovered from private individuals; (12) the authenticity of photographs; (13) the proper chain of custody regarding items seized pursuant to lawfully executed search warrants; (14) the use of proper and reliable techniques to extract cell phone data from the defendants' cell phones; and (15) the defendants' identities and presence in the Capitol on January 6, 2021.

### E.  Summary of Expected Testimony

#### 1.  Lieutenant George McCree, USCP

Lieutenant McCree was on duty and present at the U.S. Capitol on January 6, 2021.  At that time, he was assigned to the House Chamber area of the U.S. Capitol.  Lt. McCree was physical present with members of the United States House of Representatives in the House Gallery at or near the time of the defendants' charged conduct on U.S. Capitol grounds.  He is familiar with the video surveillance system and radio and phone communications systems.  He will provide an overview of the Capitol and the events of the day, including a description of the restricted perimeter and identify a map of the U.S. Capitol's restricted perimeter.  Lt. McCree may testify as to – but not limited by – the timeline of January 6, 2021; the existence and perimeter of the restricted grounds and the barriers, such as racks, fencing, and "Area Closed" signs; the interactions between rioters and law enforcement at relevant locations on Capitol grounds, such as

the Lower West Terrace; and his personal experience at the Capitol during the breach, including evacuation of members of the House of Representatives. Lt. McCree may also testify that former Vice President Michael Pence, a U.S. Secret Service protectee, was visiting the Capitol on January 6, 2021. Lt. McCree may testify regarding the congressional proceedings that took place on January 6, 2021, including the interruption caused by the rioters.

### 2.  Sergeant Troy Robinson, USCP

U.S. Capitol Police Sergeant Troy Robinson is expected to testify that, on January 6, 2021, he was on duty with the U.S. Capitol Police and, along with his colleagues and other law enforcement, defended the U.S. Capitol building from the riotous mob. His testimony in this trial will focus on the Upper West Plaza, where Counts One, Two, Three, Four, and Nine took place.

Sergeant Robinson may testify to placement of bike rack barricades as a means to keep the rioters under control after the Lower West Plaza had been breached. He may also testify to the actions of the crowd that ultimately led to the fall of the police line and subsequent retreat to the Lower West Terrace, as well as the constant threats that officers faced, including physical assaults and breaches of the police line.

Sergeant Robinson is the named victim in Count Two, which charges defendant Quaglin with assault causing bodily injury. Sergeant may testify as to the specifics of that assault, as well as the brawl that ensued as a result of the assault. Sergeant Robinson may testify that he suffered injuries to his back and left knee as a result of Quaglin's assault.

### 3.  Sergeant William Bogner, MPD

Sergeant Bogner was a MPD Sergeant on January 6, 2021, and is expected to testify regarding his observations and experiences on January 6, 2021.  He was (and is) part of the special operations division in the MPD, where he is responsible for training officers on topics including

training and usage of OC spray and using a riot shield, civil disturbance, and riot control.  Sergeant Bogner is expected to testify about the effect of the onslaught from the crowd in the tunnel. He may testify to his role as a supervisor in the tunnel and his efforts to coordinate a defense against the rioters, including the impact of Klein's and Quaglin's successful efforts to prevent the officers from closing the metal doors. Sergeant Bogner may testify about the OC spray that rioters – Quaglin included – used against officers, as well as the impact of that spray (and other chemical irritant) had on him and other officers in the tunnel. Sergeant Bogner may also testify to the effects of the USCP shields that were used against the officers in the tunnel, as well as other mechanisms the rioters used to attack the officers.

### 4.  Officer Daniel Hodges, MPD

MPD Officer Daniel Hodges will testify about his experience as an officer in Civil Disturbance Unit 42, called to the Capitol on January 6, 2021. Specifically, Officer Hodges may testify about his time in the LWT tunnel, including the impact of being on the receiving end of violent collective thrusts against the officer line. Officer Hodges is the named victim in Counts Twenty-Nine and Thirty. As such, he may testify about how, while he was pinned against the frame of a door by a riot shield and defenseless, defendant Cappuccio grabbed his gas mask and thrashed his head back and forth, ultimately ripping his gas mask off of his face and dislodging his helmet.  Officer Hodges may testify that Cappuccio then disarmed him of his riot baton and struck him in the face with the baton. Officer Hodges may testify that, at the same time, the entire mob behind defendant Cappuccio – which included defendant Klein to his back and defendant Quaglin to his right – pushed in a concerted heave-ho effort against the police line. Officer Hodges may testify about injuries he received that day, including a bloody lip, head injury, lacerations, a swollen hand, and generalized pain across his entire body.

### 5. Sergeant Jason Mastony, MPD

Sergeant Jason Mastony was a MPD Sergeant on January 6, 2021, and is expected to testify regarding his observations and experiences on January 6, 2021.  He will describe being on duty that day and having a platoon of MPD officers under his command.  He will testify generally regarding his experience on the Upper West Plaza, where Counts One, Two, Three, Four, and Nine took place. Sergeant Mastony may testify about a physical altercation involving Quaglin charged in Count Eleven, as well as the break of the police line.

Sergeant Mastony may also testify about his experience in the tunnel. He may testify about various incidents where the defendants attacked the police line during a number of the charged counts, including Count Seventeen, when he was at or nearby the assaultive conduct. He may explain the impact of the rioters' collective heave ho pushing, the impact of the rioters' use of shields against officers, and the overall riotous actions from the tunnel.

### 6. Officer Henry Foulds, MPD

MPD Officer Foulds was on duty as a member of Civil Disturbance Unit 74 on January 6, 2021. Officer Foulds is expected to testify regarding his experience generally on January 6, which included protecting the Capitol on the Upper West Plaza, as well as in the LWT tunnel. Officer Foulds was near Klein as he approached the police line (and ultimately assaulted Officer Harvell) and was involved in the altercation with Quaglin underlying Count Eleven, wherein Quaglin pushed Officer Foulds, hit Officer Mastony to the ground, and then grabbed the facemask of a third officer. Officer Foulds may testify that he was nearby when Quaglin and other rioters backed

police officers into a wall before they were able to escape up a temporary set of stairs leading to the Lower West Terrace.

Officer Foulds may also testify to his experience defending the Capitol inside the tunnel, including the effects of being in constant battle with the rioters. Officer Foulds was in the tunnel during the commission of the assault in Count Twenty-Seven, where Klein entered the tunnel, joined a heave ho pushing effort, and injured at least one officer – Officer Hodges – at the front of the line. Officer Foulds' body-worn camera captures Klein aggressively using a shield to push against the officer line, weakening the ability of officers to respond while also amplifying the weight of the mob's force on the police line. Officer Foulds may also testify to his experience at the front of the police line when Quaglin and Klein faced off with the officers after the assault on Officer Hodges. Officer Foulds' may testify to his body worn camera footage that shows Cappuccio holding the baton that he stole from Officer Hodges. Finally, Officer Foulds is also the victim in Count Thirty-One, which charges Klein with assaulting, resisting, and impeding law enforcement. Klein used a stolen U.S. Capitol Police riot shield to use against Foulds forcibly and offensively, including during a group "heave ho" effort in the LWT tunnel. Klein used the shield to shove Officer Foulds and apply so much pressure that Officer Foulds can audibly be heard exclaiming, "I am exhausted."

### 7. Officer Omar Forrester, MPD

MPD Officer Omar Forrester defended the Capitol on January 6, 2021 on the West front and inside the tunnel at the front of the police line. Officer Forrester may testify about his experience in the tunnel and the impacts of being at the receiving end of a prolonged battle with the rioters. Officer Forrester is the named victim in Count Twenty-Three, which charges Quaglin with assaulting, impeding, or restricting officers. Officer Forrester may testify that Quaglin

sprayed OC spray across the line of officers and, as Officer Forrester moved his shield in front of his face to protect himself, Quaglin reached around the shield and sprayed Officer Forrester directly in the face with the spray. Officer Forrester may also testify about the impact, repercussions, and pain of being exposed to chemical irritant in this manner, particularly in a tightly crammed in the tunnel where he was bearing the collective and repeated force of the rioters' pushes and was exhausted from fighting in the tunnel.

### 8. Lawrence Lofzewski, former MPD

Former MPD Officer Lawrence Lofzewski may testify about his experience defending the Capitol on January 6 on the West Plaza. Officer Lofzewski may testify about the demeanor of the crowd, the confrontations between officers and the crowd, and the officers' attempts to establish a perimeter using bike racks. Officer Lofzeswki is a named victim in Count Four, which charges Quaglin with robbery of a bike rack. Officer Lofzeswski may testify to that experience, including the force that Quaglin and others in the crowd used to pull away the bike rack, as well as his fear that the crowd would use the bike rack as a weapon against officers.

### 9. Officer Laschon Harvell, MPD

MPD Officer Laschon Harvell is expected to testify that, on January 6, 2021, he responded to the U.S. Capitol Police and, along with his colleagues and other law enforcement, defended the U.S. Capitol building from the riotous mob. Officer Harvell's body-worn camera captures Klein during one of his early confrontations with police officers on January 6. Officer Harvell may testify about the fall of the officer line on the West front and all the stress and aggravators in defending the Capitol that day. Officer Harvell is a named defendant in Count Nine. Officer Harvell may

testify that, as he attempted to move Klein backwards, he was met with resistance. Officer Harvell may also testify that Klein yelled things like, "We need more people!"

### 9.  Officer Morris Moore, MPD

Officer Morris Moore is a MPD officer. He is a named victim in Count Thirty-Two. Officer Moore may testify about the tunnel, which may include the aggressive nature of the crowd in the tunnel. Klein aggressively pushed into Officer Moore as officers attempted to clear the tunnel. Officer Moore may testify about the force that Klein used to resist and assault him during this push.  During Klein's assault, another rioter approached Officer Moore and pulled at Officer Moore's baton, attempting to disarm him.

### 10.  Detective Phuson Nguyen, MPD

Detective Phuson Nguyen is an MPD Officer who was fighting in the tunnel on January 6. Detective Nguyen is a named victim in County Twenty, which is based on Quaglin's actions of ripping a police shield out of Detective Nguyen's hands. Detective Nguyen is expected to testify that, after the rioters forcefully took his shield, he slipped and fell in the tunnel, leaving him in an incredibly vulnerable situation.

### 11.  Other Officers

Several other officers—Officers Katherine Lieto, Johniqua Chance, Joshua Spicer, Laschon Harvell, Sarah Beaver, Jeffrey Todd, Jonathan Chen, Jayson Cropper, Joseph Austin, Tyrone Toran, Michelle Turner, Kyle Kimball, Gavin Nelson, Michael Dowling, Paul Riley, and Hernandez-Martinez—may testify to the authenticity of their body worn camera videos, which capture the defendants at various points between 1:00 p.m. and 4:15 p.m., while illegally on the grounds, pushing forward with the mob, and obstructing the official proceeding. The officers may

also testify generally that they were on duty on January 6, 2021, and to the actions they witnessed of rioters, specifically the three defendants charged here.

### F. Civilian Witnesses

The government expects to call at least four civilian witnesses to testify as to the identities of the defendants and the defendants' stated purposes for coming to Washington, D.C. on January 6, 2021. The testimony of some of these witnesses may not be necessary if defendants stipulate to identity.

#### 1. Brian Wright

Brian Wright will testify about defendant Quaglin. Mr. Wright has known Quaglin for many years and was "friends" with Quaglin on Facebook. Mr. Wright contacted the FBI after seeing a photograph of Quaglin posted in a BOLO ("Be On The Lookout") on FBI's website. Mr. Wright is likely to testify that, as of January 6, 2021, Quaglin owned and operated a Facebook account under the name "Chris Trump." Mr. Wright will authenticate videos posted on that account depicting Quaglin and events that took place on January 6.

#### 2. Alina Banasyak

Alina Banasyak is expected to testify about defendant Klein. Ms. Banasyak met Klein in early January 2021. She will testify regarding conversations she had with Klein prior to and on January 6, 2021. She will also identify Klein as the person depicted in video and photographic evidence from January 6, 2021.

#### 3. Gregory Sprow

Gregory Sprow may also testify regarding defendant Klein. Mr. Sprow was a colleague of Klein before and on January 6, 2021 and can identify Klein as the person depicted in photographs and video from January 6, 2021.

### 4.  Michael Ingersoll

Michael Ingersoll may testify regarding defendant Cappuccio. Mr. Ingersoll has known Cappuccio since they were in high school. Mr. Ingersoll drove from Texas to Washington, D.C. with Cappuccio to attend the "Stop the Steal" rally. Mr. Ingersoll walked to the Capitol grounds with Cappuccio, but was eventually separated when Cappuccio made his way to the tunnel. Mr. Ingersoll can identify Cappuccio as the person depicted in footage from January 6, 2021.

### G.  Video Evidence

The government will present much of its evidence through video footage that captured the defendants on the Capitol grounds on January 6, 2021. The video includes U.S. Capitol Police surveillance and handheld footage, MPD body worn camera footage, open source and third party footage that can cross-corroborated.

The government also intends to present clips of President Trump's speech at the "Stop the Steal" rally on the morning of January 6. As set out below, there is evidence that at least one of the defendants – Cappuccio – observed all or the majority of Former President Trump's Speech, including statements by Former President Trump that Vice President Mike Pence was at the Capitol that day and that Former President Trump wanted Vice President Pence to "recertify" the votes during the certification proceeding set for that afternoon.

### H.  Demonstrative Exhibits and Physical Evidence

The government intends to present the following demonstrative exhibits relevant to charged assaults in this case: (1) USCP Riot Shield, (2) law enforcement-issued OC spray, (3) MPD riot baton, (4) MPD gas mask, and (5) MPD helmet.

The capitol riot shield is similar in size, weight, and shape to the shield used by defendants Klein and Quaglin in their assaults on officers. The Court will be able to feel the weight of this

shield, feel its size, and understand more fully how this object—when used both to strike officers affirmatively and to crush officers behind the weight of multiple rioters—meets the legal definition of a deadly and dangerous weapon.

Second, the government will introduce as a demonstrative a can of OC spray similar to the spray used by Quaglin inside the tunnel during his assault on officers. At trial, at least one witness will testify that the specific OC spray is consistent with the type of OC spray manufactured for law enforcement agencies; that, based on their training and experience, one of the effects of the spray is its debilitating nature; and that the manner of how the spray was used on January 6 made it a dangerous weapon against officers.

Third, the government intends to introduce as a demonstrative a police riot baton, similar to the baton that Cappuccio stole from Officer Hodges and used to strike Officer Hodges in the face. The Court will be able to feel the weight of the baton, its size, and understand more fully how this object—when used to strike an officer in the face—meets the legal definition of a deadly and dangerous weapon.

Fourth, the government intends to introduce as a demonstrative an MPD-issued gas mask, similar to the gas mask worn by Officer Hodges on January 6 that Cappuccio ripped off his face. The Court will be able to see how the gas mask is properly secured on the face under a helmet, and better understand the force that Cappuccio had to use to rip the gas mask off of Officer Hodges' face.

Fifth, the government intends to introduce as a demonstrative an MPD-issued police helmet, similar to the helmet worn by Officer Hodges on January 6 that was dislodged from his head when Cappuccio ripped off his gas mask that was secured under the helmet. The Court will

be able to understand the force that Cappuccio had to use to tear off the gas mask that was secured under the helmet.

Finally, the government recovered cell phones from each defendant, pursuant to the lawful execution of search warrants. These cell phones were subsequently downloaded by law enforcement and an extraction report was created that mirrors the contents of the cell phones. The cellphones contain photographs and videos from the Capitol grounds, as well as communications with others before, during, and after January 6, 2021 about the events of the day.  For example, Cappuccio's phone contained a video leading up to and during his attack on Officer Hodges, as well as a number of other videos taken on U.S. Capitol grounds. Klein's phone contained numerous messages with others about his understanding of the certification proceeding and his attendance at the riot on January 6. Defendant Quaglin's phone, which was purchased after January 6, includes photos and messages with relevant discussion about former president Trump.

## I.  Social Media

The government executed search warrants on defendant Quaglin's social media accounts.. In his Facebook and Instagram, Quaglin spoke extensively about the 2020 presidential election, his plans to travel to D.C. for January 6, the anticipated violence on January 6, and the certification of the electoral college vote. The government intends to offer a summary exhibit in the form of a Microsoft Word PowerPoint that summarizes Quaglin's Facebook content. Quaglin also used Instagram to speak about his disappointment with the presidential election results and his plans for January 6. Quaglin also used various "search" features to look for his own Facebook account "Chris Trump" and to search – after January 6 – for which countries allow you to buy citizenship.

In addition to the Facebook and Instagram accounts subject to the search warrant, Quaglin also maintained a Facebook account with the username "Chris Trump" on and before January 6.

That account was deleted. However, on January 6, Quaglin posted videos on that account during his time at the Capitol and in Washington, D.C., including videos that showed his face, videos where his voice can be heard, and videos where he described his conduct on January 6, consistent with the other video footage. Those videos were memorialized and preserved by members of the public who submitted them to the FBI. The government intends to introduce four of those videos into evidence.

### J.  902(11) Notice

On July 4, 2023, the government provided a Rule 902(11) Notice to defense counsel.  This Notice indicates that, to promote efficiency at trial, the government intends to introduce into evidence certain business records pursuant to FRE 902(11) and 803(6) in lieu of calling records custodians for authentication.

### K.  Defendants' Statements

The government intends to introduce statements made by each defendant while on the Capitol grounds on January 6. For example, defendant Quaglin posted videos of himself on Capitol grounds on his Facebook account. During one of these videos, Quaglin appears to be walking from the Ellipse to the Capitol building. He says, "Well! Trump is speakin.' And everyone's walkin' there. I'm walkin' here [flips camera to show U.S. Capitol building] and I'm ready [holds up gas mask]. We'll see how it goes. Proud of your boy." Quaglin is also seen on MPD body worn camera throughout the day saying things like, "You don't want this fight. You do not want this fucking fight. You are on the wrong fucking side. You're going to bring a fucking pistol, I'm going to bring a fucking cannon. You wait! You wait! You wait! Stay there like a fucking sheep! This guy doesn't know what the fuck is going on." After the day finished, Quaglin video recorded himself

saying, for example, "We do own this shit. . . . I was the guy in the red, white, and blue hoodie and the black helmet . . . I'm absolutely on a loop on Fox News. . . . It was a great time. . . ."

Similarly, defendant Cappuccio recorded a number of videos on his cell phone throughout the day. For example, Cappuccio recorded a video on the West Plaza at approximately 2:36 p.m. during which he stated, "Sorry [inaudible] you couldn't be here! You woulda loved it! You'd have been able to kick in some doors! Ha ha!" At 2:44 p.m., Cappuccio recorded a video depicting the West Plaza and yelled, "Stormin' the castle boys!" During another video taken at approximately 3:03 p.m. as Cappuccio was entering the tunnel, he said, "Stomp your feet! Stomp your feet! Let them hear us inside! Bring the shields!" In that same video, Klein is visible and says to Cappuccio and others, "we need fresh fucking bodies in there!" as he squeezes his eyes shut, possibly feeling the effects of OC spray. Cappuccio also recorded a video on his phone during his assault of Officer Hodges where he can be heard screaming at Officer Hodges, "How do you like me now, fucker?!" as Hodges can be heard screaming "help!" in the background.

Klein's statements were also captured on various videos on January 6. For example, in a video posted to Parler depicting the West Plaza at approximately 2:32 p.m., Klein, who is pushing against Officer Harvell, turns to the crowd and yells, "I need support! Let's go!" Officer Harvell's body worn camera footage includes numerous statements made by Klein while Klein pushed hard against him, including, "Fight with us!" and "You can't stop this!" Similarly, at approximately 3:18 p.m., while pushing against officers in the tunnel using a U.S. Capitol Police riot shield that he had turned sideways, Klein yells out to other rioters, "I need support!"

### III.    ANTICIPATED DEFENSES AND LEGAL ARGUMENTS

The government anticipates that the central questions will relate to the defendants' intent and the legal implications of their actions. As such, the government briefly addresses arguments that could be raised by defense and refutes them below.

### A. The Defendants Had the Corrupt Intent Necessary To Establish A Violation Of Section 1512(c)(2) Beyond A Reasonable Doubt.

The government submits that the evidence relating to each of the defendants' actions and statements on January 6, alone, is sufficient to establish their intent to interrupt the certification proceeding. All three defendants entered and remained in the LWT tunnel, fighting in a gruesome battle with police officers barricading their own bodies and risking their own safety in an effort to prevent the rioters from gaining access to the building. The defendants voluntarily joined these efforts, each of them committing willful and intentional actions to achieve their goal: to get inside the Capitol. Klein stayed in the tunnel for an hour and twenty minutes, much of the time at the front of the police line engaging with officers head-to-head and at one time using a stolen police shield to prevent officers from securing the doors, leading to hours of additional violence; Quaglin used a shield to bolster his assaultive efforts, he sprayed officers directly in the face with OC spray, and he used to body to not only resist, but also attack officers for nearly 15 minutes straight; and Cappuccio viciously tore off Officer Hodges' gas mask and dislodged his helmet, and bashed Officer Hodges in the face with a riot baton, in a pivotal moment in the tunnel. These defendants' willingness to physically battle police officers and do anything within their power – no matter how barbaric – to gain access to the Capitol is strong evidence of their intent to interrupt the certification.

As explained above, the defendants' statements on January 6 are similarly indicative of their intent. None of these three defendants were passive participants in the riot, and their verbiage proves the contrary.

In addition to evidence of their statements and actions on January 6, the government will also present evidence of defendants' statements before and after January 6 which show their knowledge of the certification proceeding. For example, numerous messages on Klein's phone indicate he knew about the certification proceeding scheduled to take place on January 6 and was hoping Vice President Pence would stop the election being called in favor of Joe Biden. Below is an example of one exchange from Klein's phone dated December 28, 2020:

| | |
|---|---|
| Individual A: | Do we have any other chance of winning? |
| Klein: | Sure. Jan 6. |
| Individual A: | What happens then |
| Klein: | Pence will refuse to certify the election, so it will get kicked into the house where each state gets one vote determined by its legislature. We would win that by a lot |
| | . . . |
| Individual A: | Can't [t]he democrats do anything else if pence refuses to verify the election? |
| | . . . |
| Klein: | No |
| Klein: | He's the president of the senate |

The government will also present evidence of statements made by Quaglin before and after January 6. For example, Quaglin posted numerous statements to his Facebook account prior to January 6, indicating, for example: (1) his belief that the 2020 presidential election was fraudulent or "stolen"; (2) his plans to travel to Washington, D.C. on January 6, including his plan to bring

"gas masks, body armor, and other things" to start a "civil war"; (3) his intent in traveling to Washington D.C. – *i.e.*, statements like "time for the government to understand who the fuck they work for" and "Understand, this is why we are fighting. 1776 2.0"; and (4) his knowledge that January 6 was the day that the certification was set to take place.

As for Cappuccio, he traveled by car from Texas to Washington, D.C. While in the car ride, Cappuccio recorded a video where he said, in part, "It's all true." Cappuccio's co-traveler, Michael Ingersoll, will likely testify that Cappuccio was referring specifically to the election being stolen.

**B. The Riot Shields Used By The Defendants On January 6 Were Deadly And Dangerous Weapons.**

The defense may argue that the riot shields used by defendants Klein and Quaglin were not deadly or dangerous weapons, as charged in 18 U.S.C. § 111(a)(1) and (b), 18 U.S.C. § 1752(a)(2) and (b)(1)(A), and 18 U.S.C. § 1752(a)(4) and (b)(1)(A). Specifically, defendant Quaglin is charged with using a riot shield to assault officers in violation of 18 U.S.C. § 111(b) in Count Twenty-Six and defendant Klein is charged with using riot shields to assault officers in violation of 18 U.S.C. § 111(b) in Counts Thirty-One and Thirty-Two.

All three counts charge the defendants with using a riot shield inside the LWT tunnel to push forcibly against, hit, resist, and impede officers defending the Capitol building. With respect to Count Twenty-Six, the government's evidence will show that Quaglin possessed a stolen U.S. Capitol riot shield during a stint of violence between rioters and officers in the tunnel. At the time, Quaglin had just finished spraying police officers in the face with chemical irritant, another rioter – co-defendant Judd – had just thrown a firecracker into the tunnel, and several layers of rioters were aggressively pushing into the officers.

Quaglin held the shield so that the two black handles were pointed toward himself. He held the shield upright and pushed its flat side against officers for several seconds. At this time, another rioter sprayed chemical irritants in officers' faces. Quaglin was then pushed backwards by police at which point he flipped the shield so that it was parallel to the ground and its edges were pointed toward the police. With the help of other rioters, Quaglin pushed the shield's edge toward the heads of the police.

The government's evidence on Counts Thirty-One and Thirty-Two will similarly show that Klein possessed a stolen U.S. Capitol Police riot shield that he used offensively to push against, hit, and impede police. Specifically, at approximately 3:15 p.m., Klein was at the police line in the tunnel. He held a shield by the handles and forcefully pushed it against police officers. In fact, Klein pushed the shield so hard against the police that his entire body, including his face, was visibly pressed up against the police officers. Klein continued to push against the officers as rioters behind him began to rock back and forth in unison and called "heave! ho!" These rioters supplied even more force to push against the police that was concentrated through Klein's shield. A few minutes later, at approximately 3:18 p.m., Klein still possessed the shield and used it to forcibly push against officers, including USCP Officer Morris Moore, as the officers were attempting to push him and other rioters out of the tunnel. Again, Klein held the shield by the handles and maneuvered it so that it was squarely pushing against Officer Moore. As Klein lost ground, other rioters joined him and used the shield to push against the officers. One rioter reached over the shield that Klein was pushing against Officer Moore and grabbed Officer Moore's baton. Other rioters soon joined in grabbing and pulling the baton. As a result of this struggle with Klein and other rioters, Officer Moore was separated from his fellow officers and pulled into the mob.

As set out above, an object may be a "deadly or dangerous weapon" in one of two ways. First, an object is a deadly or dangerous weapon if it is inherently or obviously dangerous or deadly. Such inherently dangerous weapons include guns, knives, and the like. Second, if the object is not inherently or obviously dangerous or deadly, an object is a deadly or dangerous weapon if the object is capable of causing serious bodily injury or death to another person and the defendant used it in that manner. *United States v. Arrington*, 309 F.3d 40, 45 (D.C. Cir. 2002).

In each of these three attacks, the defendants used the U.S. Capitol Police riot shields in a manner such that the shields were capable of causing serious bodily injury or death. Specifically, the defendants used the shields in at least two different ways. First, with respect to Count Twenty-Six, Quaglin used the "blade side" of the shield to strike at officers. This is clearly an offensive use of the shield and the government anticipates that law enforcement witnesses will testify that using a shield in this way can cause serious bodily injury or death. Each of the defendants also used the broad or flat side of the shield to forcefully push against police officers in the tunnel. It is this second use of the shield by the defendants that the government believes to be the most contentious.

This Court has expressly rejected that "only the blade end of the shield can cause serious bodily injury" and has acknowledged that "a flat surface like a shield can certainly cause serious bodily injury or death, especially when the victim is wedged between it and a hard narrow surface like a door frame." *United States v. McCaughey et. al.*, Transcript of Trial Verdict at 26, lines 2-14. However, the Court has also held that a rioter's use of the flat side of a shield to push against officers in a crowd might not qualify for the 111(b) enhancement. *Id.* at 30-31. The Court reasoned that this use of a shield by rioters is "substantially similar" to the way in which law enforcement

uses shields. We respectfully submit that this analysis does not apply in this case. The defendants in this trial used the shields in a manner and with a force that could cause serious bodily injury.

For example, when law enforcement utilized riot shields on January 6, it was typically in a defensive manner, preventing individuals from attacking them, blocking objects or irritants thrown or sprayed at them, or moving individuals back. By contrast, rioters – specifically, Quaglin and Klein – used the riot shields offensively, as a tool to amplify force against the officers as they physically engaged those officers in attempts to force their way through the police line and into the building. The defendants did not simply rebuff the officers by pushing against them with all of their strength. Rather, the rioters were forcefully and perpetually holding the shields at the front of the police line and using the weight of the mob's "heave ho" pushes to physically injure officers. For example, Quaglin hoisted the edge of the shield into officers' faces and Klein used the shield to push into officers with such force that Officer Moore was pulled ahead of the police line.

Both defendants also used the shields in a manner that aided and abetted other rioters' commission of dangerous and injury-causing assaults against the officers. While Quaglin had pinned officers with his shield, another rioter sprayed officers with chemical irritant. And while Klein thrusted with all of his might behind the shield when fighting Officer Moore, another rioter attempted to steal Officer Moore's police baton. The only thing the police could do to stop the defendants under these circumstances was to combine their strength in a similar way and push equally as hard if not harder against the rioters. But the circumstances of the tunnel – the narrow area, the tight compaction, the chemical spray in the air, the barrage of attacks, the use of weapons, and other offensive tactics by the rioters – rendered the shields more dangerous when used against officers. Indeed, in many ways, the rows of police behind the front line officers who were getting crushed by shields were akin to a "hard narrow surface" or an immovable object. The use of the

shield amplified the weight of the rioters' thrusts and prevented the officer line from deploying defensive mechanisms, which led to further impact and injury. As we will demonstrate at trial, the defendants' offensive use of the shields was capable of causing serious bodily injury or death.

## IV.    CONCLUSION

The defendants were aggressive, violent, and active participants in the breach of the U.S. Capitol on January 6, 2021. Acting together and with others around them, they corruptly obstructed the joint session of Congress to Certify the Electoral College vote.  At trial, the evidence will prove beyond a reasonable doubt that the defendants committed each offense charged in the Fifth Superseding Indictment.

Respectfully submitted,

MATTHEW M. GRAVES
United States Attorney

By:    /s/ Ashley Akers
ASHLEY AKERS
Trial Attorney
U.S. Department of Justice

KAITLIN KLAMANN
Assistant United States Attorney