**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-40-TNM** |
| **STEVEN CAPPUCCIO,** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Steven Cappuccio to 121 months' incarceration, three years of supervised released, $2,000 in restitution, and the mandatory special assessment of $610. A 121-month sentence is at the top of the advisory Guidelines' range of 97-121 months.

## I.    INTRODUCTION

The defendant, Steven Cappuccio, participated in the January 6, 2021, attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in over 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

1

On January 6, 2021, Cappuccio entered the restricted grounds around the U.S. Capitol, made his way to the Lower West Terrace (LWT) tunnel, watched the violence within the tunnel for several minutes, and then decided to—and did—become an active participant in that violence. Cappuccio made his way to the front of the rioters inside the tunnel, where he twice assaulted police officers. First, he, along with a group of other rioters, pushed against the line of Metropolitan Police Department (MPD) and U.S. Capitol Police (USCP) officers. Just minutes later, Cappuccio engaged in one of the most visceral and prolonged attacks against a police officer that occurred on January 6—he viciously assaulted Metropolitan Police Department Officer Daniel Hodges.

Officer Hodges was pinned against a door by the mob of rioters. Taking advantage of Officer Hodges' vulnerable position, Cappuccio forcefully yanked Officer Hodges' gas mask away from his face in vigorous, quick movements, causing Officer Hodges' head and neck to be jerked in various directions. During this attack, Cappuccio jeered, "How do you like me now, fucker?!" Cappuccio then grabbed Officer Hodges' riot baton out of his hands and struck the officer in the head with it. Throughout this assault, Officer Hodges screamed and pleaded for help.

Owing to the sadistic cruelty of Cappuccio's assault of a defenseless police officer, the government recommends that the Court sentence him to 121 months of incarceration, the top of the advisory Guidelines' range of 97-121 months. A 121-month sentence reflects the gravity of Cappuccio's conduct.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021, Attack on the Capitol

The government refers the Court to the parties' stipulations, ECF 698, Attachment 1, for a short summary of the January 6, 2021, attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020, presidential election.

### B.     Cappuccio's Role in the January 6, 2021, Attack on the Capitol

Prior to January 6, Cappuccio drove from Texas to Washington, D.C. En route, he stopped to buy goggles to prepare for the upcoming events in the District. Trial Tr. 1112:16-17. After arriving in Washington, D.C., Cappuccio attended the Stop the Steal Rally at the Ellipse, where President Trump and others spoke about the recent presidential election and the events that were set to take place at the Capitol that day: namely, the certification of the Electoral College vote in downtown Washington, D.C. Trial Tr. 1113:1-1114:2. After attending the Stop the Steal rally, Cappuccio marched to the Capitol with other rioters. Trial Tr. 1114:15-20. En route, he recorded a video of himself and other rioters chanting, "Stop the steal!" Trial Tr. 18-25.

*Approach to the Capitol, Entrance onto Restricted Grounds*

Cappuccio entered restricted Capitol grounds and marched to the Upper West Plaza. Trial Tr. 1119:5-8, 1124:4-7; Image 1, Government Trial Ex. 611.12.



*Image 1, Government Trial Ex. 611.12*

In this area, Cappuccio described a change in the atmosphere; he noticed that the crowd "got angry." Trial Tr. 1056:6-9, 1119:12-25. Instead of leaving the restricted Capitol grounds when he felt this shift, Cappuccio remained and, in fact, progressed farther toward the Capitol Building by climbing on top of a railing to access the Lower West Terrace. Trial Tr. 1124:19-1125:2, 1125:15-17. At trial, he testified he thought about climbing the scaffolding but decided against it, only because he is an "old guy." Trial Tr. 1055:7-9. On the Lower West Terrace, Cappuccio yelled, "Dirty Deuce," a reference to his time in the military. Government Trial Ex. 612.15; Trial Tr. 1053:22-1054:7. He also shouted, "Storming the Castle, boys!" and "Fight for Trump! Fight for Trump!" Trial Tr. 1053:22-1054:20; Government Trial Ex. 612.13. Shortly after, he stood near the inaugural stage on the Lower West Terrace and chanted, "Our house!" He also sarcastically yelled, "Deplorables up here, baby!" a reappropriated term for supporters of former President Trump, based on a statement once made by  Hillary Clinton when she was a candidate to be President of the United States. Trial Tr. 1126:17-23; Government Trial Ex. 612.15.

### *Cappuccio Witnesses Battle Between Police, Rioters Outside the LWT Tunnel*

At approximately 3:06 p.m., Cappuccio approached the entrance to the Lower West Terrace tunnel. He stood outside the tunnel for several minutes, witnessing the effects of the battle

occurring inside and, at times, participating in the incitement.

Cappuccio heard rioters encouraging violence against the police, and he joined the chants. In a video Cappuccio recorded on his cell phone, a rioter next to Cappuccio exclaimed, "We need fresh fucking bodies in there!" and another voice that appears to be Cappuccio's chants, "Stomp your feet, stomp your feet. Let them hear us inside," referring to the members of Congress inside the building. Trial Tr. 1130:18-25; Government Trial Ex. 612.21 at 2:20-2:30. Another rioter threatened, "We can fucking do this all fucking night!" Trial Tr. 1139:8-18; Government Trial Ex. 612.21.

Beyond mere words, Cappuccio also saw rioters employ violent tactics against the police officers inside the tunnel. For instance, he recorded a video on his phone that shows rioters passing police shields with police insignia out of the tunnel, talking about making a shield wall in the tunnel, and then passing the shields back into the tunnel. Trial Tr. 1134:24-1135:9, 1135:22-23; Image 2, Government Trial Ex. 612.21 at 1:47-2:00, 2:35-2:50; *see also* Transcript of Oral Ruling at 30-31 ("He . . . saw riot shields being passed out of the tunnel to cheers from the crowd and, moments later, passed back in. These shields had clearly visible police insignia on them.").



*Image 2, Government Trial Ex. 612.21 at 1:56, Cappuccio's cell phone video showing rioters passing police shields*

Not only did Cappuccio hear the battle cries of the rioters and witness the rioters' violent tactics, but he also saw the aftereffects of the fighting inside. Cappuccio testified that he saw people who "had been beaten" coming out of the tunnel. Trial Tr. 1128:25-1129:2. He also saw that rioters had been pepper sprayed inside the tunnel. Trial Tr. 1131:6-17, 1131:24-1132:5; Government Trial Ex. 612.21. At one point, Cappuccio offered a water bottle to one of many rioters who exited the tunnel and was showing effects from a chemical irritant spray. Trial Tr. 1138:2-1139:3; Government Trial Ex. 612.1 at 3:20-3:30.

Despite witnessing this violence against police officers, Cappuccio failed to leave. Instead, he entered the fray. *See* Transcript of Oral Ruling at 30 ("By the time he entered the tunnel, I believe he fully realized that people inside were battling officers.").

***Cappuccio Enters the LWT Tunnel, Assaults Multiple Police Officers***

At 3:08 p.m., Cappuccio, with his right arm extended in the air holding his phone, entered the tunnel. *See* Image 3, Government Trial Ex. 305.5.



*Image 3, Government Trial Ex. 305.5*

Immediately upon entering the tunnel, Cappuccio surged to the front of the line of rioters. He pressed his body against the rioters directly in front of him and forcefully pushed, along with other rioters, against a line of MPD and USCP officers, at times gripping the edge of a USCP riot shield. During this push, Cappuccio held his phone in the air, recording the violence between the rioters and the police line. *See* Image 4, Government Trial Ex. 509 at 5:30; *see also* Government Trial Ex. 515.5.  When confronted with his cell phone videos at trial, Cappuccio testified he was "just filming stuff to send to my friends." Trial Tr. 1136:9-10.



*Image 4, Government Trial Ex. 509 at 5:29*

At about 3:10 p.m., a number of rioters started to cycle out of the tunnel. As a result, the police officers gained some momentum and pushed rioters, including Cappuccio, back toward the mouth of the tunnel. Undeterred, Cappuccio forcefully pushed his way back to the front of the line of rioters, this time finding himself directly in front of the officers. At that time, he grabbed a police riot shield and used it against the officers. *See* Image 5, Government Trial Ex. 510.33.



*Image 5, Government Trial Ex. 510.3*

At 3:11 p.m., while still at the front of the line of rioters, Cappuccio physically assaulted MPD Officer Hodges, who was pinned between a door frame and a stolen police shield held by co-defendant Patrick McCaughey. As Officer Hodges was pinned, he bore the repeated brunt of the rioters' collective pushes into the officer line.  With Officer Hodges in this vulnerable position, Cappuccio put his phone – while still recording – in his mouth and, with both hands free, forcefully yanked the gas mask away from Officer Hodges' face in vigorous, quick movements.  Images 6-10, Government Trial Exs. 5016.6, 501.7, 501.9, 501.16, 501.32.



*Image 6, Government Trial Ex. 501.6*



*Image 7, Government Trial Ex. 501.7*



*Image 8, Government Trial Ex. 501.9*



*Image 9, Government Trial Ex. 501.16*



*Image 10, Government Trial Ex. 501.32*

As Cappuccio yanked the gas mask, he violently thrashed Officer Hodges' head and neck in various directions. As the mob's collective heave ho pushes continued to crush Officer Hodges against the door frame, Cappuccio succeeded in ripping Officer Hodges' gas mask off his face and dislodging his helmet. While Cappuccio assaulted Officer Hodges, he jeered, "How do you like me now, mother fucker? How do you like me now, fucker? How do you like me now?" Trial Tr. 18-19; Ex. 612.23 at :45-1:15. Cappuccio then snatched Officer Hodges' riot baton out of his hand and struck the officer in the head with it. *See, e.g*., Transcript of Oral Ruling at 33. Throughout this assault, Officer Hodges screamed and pleaded for help. *See, e.g*., Trial Tr. 402:15. After Cappuccio's assault, Officer Hodges broke free from the doorway but struggled to make his way through the dense crowd to obtain medical attention.

At approximately 3:13 p.m., Cappuccio walked back toward the mouth of the tunnel carrying the stolen police baton. Image 11, Government Trial Ex. 403.8.

12



*Image 11, Government Trial Ex. 403.8, Cappuccio holding Ofc. Hodges' riot baton*

As he approached the mouth of the tunnel, Cappuccio handed the baton to another rioter, "despite the likelihood that the baton would be used against officers as a weapon again." Transcript of Oral Ruling at 35. Cappuccio then exited the tunnel, looked to the crowd, and pumped his fist into the air victoriously. Image 12, Government Trial Ex. 533.1 at :34.



*Image 12, Government Trial Ex. 533.1 at 34s*

### ***Injuries to Officer Hodges***

During the assault, which Officer Hodges testified as feeling like being physically punched in the face, Cappuccio bloodied Officer Hodges' lip, twisted his neck, and caused a contusion to Officer Hodges' head. Transcript of Oral Ruling at 33; Image 13, Government Trial Ex. 510 at 1:23; Image 14, Government Trial Ex. 847.

14

 

*Image 13, Government Trial Ex. 510 at 1:23*      *Image 14, Government Trial Ex. 847*

Officer Hodges was required to seek medical attention after January 6, including visiting a doctor and obtaining an MRI. Trial Tr. 413-14. He also missed a period of work as a result of his injuries.

## III.    THE CHARGES AND VERDICT

On December 1, 2021, a federal grand jury returned a fifth superseding indictment charging Cappuccio with nine counts. On July 20, 2023, this Court, following a bench trial, convicted Cappuccio of seven of the nine counts: Assaulting, Resisting, or Impeding Certain Officers in violation of 18 U.S.C. § 111(a)(1); Assaulting, Resisting, or Impeding Certain Officers with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 111(a)(1) and (b); Robbery, in violation of 18 U.S.C. § 2111; Civil Disorder in violation of 18 U.S.C. § 231(a)(3); Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A); and Act of Physical Violence in the Capitol

15

Grounds or Buildings, in violation of 40 U.S.C. § 5104(e)(2)(F).

The Court found Cappuccio not guilty beyond a reasonable doubt as to two other counts in the Fifth Superseding Indictment, Obstruction of an Official Proceeding and Aiding and Abetting, in violation of 18 U.S.C. §§ 1512(c)(2) and (2), and Disorderly Conduct in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(D).

## IV.    STATUTORY PENALTIES

Cappuccio now faces sentencing on the seven counts of conviction. The maximum sentences for each count are set forth in the Presentence Report.  PSR ¶¶ 134-40.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

### A.    Guidelines Analysis

The Guidelines analysis follows:

Count Twenty-Eight: 18 U.S.C. § 111(a)(1)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[2] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

Count Twenty-Nine: 18 U.S.C. §§ 111(a)(1) and (b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[3] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |

---

[2] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

[3] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(3)(D) | Bodily Injury | +4 |
| U.S.S.G. § 2A2.2(b)(7) | 111(b) Conviction | +2 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
|  | **Total** | **30** |

Counts Thirty: 18 U.S.C. § 2111

|  |  |  |
|---|---|---|
| U.S.S.G. § 2B3.1(a) | Base Offense Level | 20 |
| U.S.S.G. § 2B3.1(b)(3)(D) | Bodily Injury | +3 |
| U.S.S.G. § 3A1.2(c) | Assault of Officer | +6 |
|  | **Total** | **29** |

Count Thirty-Five: 18 U.S.C. § 231(a)(3)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[4] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(D) | Injury | +4 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
|  | **Total** | **28** |

Count Forty-Two: 18 U.S.C. §§ 1752(a)(2) and (b)(1)(A)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(D) | Injury | +4 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
|  | **Total** | **28** |

Count Fifty: 18 U.S.C. §§ 1752(a)(4) and (b)(1)(A)

|  |  |  |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3)(D) | Injury | +4 |
| U.S.S.G. § 3A1.2(a), (b) | Official Victim | +6 |
|  | **Total** | **28** |

[4] By cross-reference from U.S.S.G. § 2A2.4(c)(1) (Obstructing or Impeding Officers), which directs that Section § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault.

Count Fifty-Three is a Class B misdemeanor. As such, the U.S. Sentencing Guidelines do not apply to this count of conviction.

**B.      Grouping Analysis**

Counts 29, 30, and 50 involve the same victim, Officer Hodges and, thus, form a group, Group 1. *See* U.S.S.G. § 3D1.2(a) and (b). Additionally, the § 111(b) assault with a dangerous weapon in Count 29 "embodies conduct that is treated as a specific offense characteristic in, or other adjustment to, the guideline applicable to" Counts 35 and 42, specifically, the +4 enhancements for a dangerous weapon and (near) serious bodily injury, pursuant to U.S.S.G. § 2A2.2(b)(2) and U.S.S.G. § 2A2.2(b)(3)(D), respectively. Count 29 is the charge with the highest offense level, with a total offense level of 30.

Count 28 involves a different victim, certain MPD and USCP officers and, thus, forms a separate group, Group 2. Count 28 is the charge with the highest offense level in this group, with a total offense level of 20.

Therefore, counts are grouped in the following manner:

Group One
Count 29 – 18 U.S.C. §§ 111(a)(1), (b)        (Officer Hodges)        (OL:30)
Count 30 – 18 U.S.C. § 2111                   (Officer Hodges)        (OL:29)
Count 35 – 18 U.S.C. § 231(a)(3)              (Certain MPD and
                                              USCP officers &
                                              Officer Hodges)         (OL:28)
Count 42 – 18 U.S.C. §§ 1752(a)(2), (b)(1)(A) (Congress)              (OL:28)
Count 50 – 18 U.S.C. §§ 1752(a)(4), (b)(1)(A) (Officer Hodges)        (OL:28)

Group Two

Count 28 – 18 U.S.C. § 111(a)(1)              (Certain MPD and
                                              USCP officers)          (OL:20)

**Multiple Count Adjustment:** Units are assigned pursuant to U.S.S.G. § 3D1.4(a), (b), and (c).

One unit is assigned to the group with the highest offense level. "[A]ny Group that is 9 or more levels less serious than the Group with the highest offense level" shall be "disregard[ed]." U.S.S.G. § 3D1.4(c).

| Count | Adjusted Offense Level | Units |
|---|---|---|
| Group 1 | 30 | 1 |
| Group 2 | 20 | 0 |
| **Total Number of Units:** | | 1 |
| Greater of the Adjusted Offense Levels Above: | | 30 |
| Increase in Offense Level: the offense level is increased pursuant to the number of units assigned by the amount indicated in the table at U.S.S.G. § 3D1.4: | | +0 levels |
| **Combined Adjusted Offense Level:** | | **30** |

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.   Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Cappuccio's felonious conduct on January 6, 2021, was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Cappuccio was an active participant in this massive riot. After entering Capitol grounds, he worked his way from the West front to the LWT tunnel. At the entrance of the tunnel, he watched the violence inside for several minutes before deciding to enter the tunnel himself. Once inside, he rushed forward and, along with other rioters, engaged in a push against a line of MPD and USCP officers. Minutes later, Cappuccio brutally assaulted MPD

19

Officer Hodges by yanking on his gas mask, stealing his riot baton, and beating Officer Hodges on the head with his own baton. The nature and circumstances of Cappuccio's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 121 months of incarceration.

### B.  Cappuccio's History and Characteristics

In two prior instances, Cappuccio was arrested and pleaded nolo contendere. Draft PSR ¶¶ 87, 91. Notably, in 2001, Cappuccio was arrested for Assault. *Id.* ¶ 87. During this incident, Cappuccio pushed a third-party to the floor and choked him. He pleaded nolo contendere and sentenced to four months of probation. *Id.*

### C.  The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a substantial sentence of incarceration. Cappuccio's criminal conduct on January 6 was the epitome of disrespect for the law. As Cappuccio neared the entrance to the LWT tunnel, it was abundantly clear to him that rioters were fighting with police officers, yet he chose to enter. Immediately after entering the LWT tunnel, Cappuccio joined with the group of rioters to push against MPD and USCP officers. Then, in one of the most violent attacks on a police officer that occurred on January 6, Cappuccio assaulted MPD Officer Hodges.

### D.     The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[5] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

Cappuccio lacks remorse for his actions on January 6. The defense produced a 25-minute video, attached as Exhibit 1 to its Sentencing Memorandum. ECF 707, Ex. 1 ("Def. Ex. 1"). During the 25 minutes, Cappuccio addresses his actions on January 6 for a mere 50 seconds. Def. Ex. 1 at 16:00-16:40, 22:24-22:34. Cappuccio also directly addresses Officer Hodges in the video, stating, "What happened that day was horrible, man." Def. Ex. 1 at 16:00-16:40. He says he is "sorry for what happened" and that he "never planned on doing anything like that." *Id*. But Cappuccio characterizes his assault of Officer Hodges as a "reaction." *Id.* at 22:30.

Not only has Cappuccio failed to recognize or apologize for his actions on January 6, let alone express remorse, but he continues to blame his criminal acts on Post-Traumatic Stress Disorder. The Court found this incredible during trial—after hearing both from Cappuccio and Dr. Stephen Xenakis. The Court held:

> In other words, I'm rejecting . . . the theory that his PTSD negates his scienter for any of the crimes charged. On the contrary, I think his attack on Officer Hodges is completely consistent with his other actions upon entering the Capitol Grounds.

Transcript of Oral Ruling at 35. In the lengthy record that exists in this case, no evidence supports Cappuccio's claim that he suffered from a PTSD episode on January 6. Similarly, other than vague

---

[5] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

assertions from Cappuccio himself, there is no evidence demonstrating that Cappuccio's experience in the military caused him to engage in criminal activity on January 6.

Finally, Cappuccio's failure to accept responsibility for his actions is especially concerning given that Cappuccio listened to Officer Hodges testify about the effects of Cappuccio's crimes. For instance, Officer Hodges testified:

- "And the man who was grabbing at my gas mask had a firm grip on the front and was pulling and pushing the mask on while it was attached to my head with violence and force. So, effectively, punched me in the face a few times and strained my neck while he was assaulting me." Trial Tr. 390:13-19.

- "After I was struck with my baton, I cried out for help, as I knew that such strike with such a weapon and such a place can be lethal, and I could tell that it had done serious damage already. If I had received another strike, especially in the same place, it could have very easily done more permanent damage. So I called out for help." Trial Tr. 398:7-13.

- In discussing Government Trial Ex. 612.23, a video Cappuccio took while assaulting Officer Hodges, Officer Hodges stated that he heard himself "Screaming in pain and fear." Trial Tr. 402:15.

- "The pain and disorientation from being struck in the skull by my own riot baton. And from my neck, from the violent pushing and pulling on my gas mask, was cumulatively very significant, a bit overwhelming." Trial Tr. 405:22-25.

Cappuccio's lack of appreciable remorse so far, despite such powerful testimony concerning the impact of his criminal acts, weighs heavily in favor of a lengthy term of incarceration.

### E.        The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and

adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F. Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007). In short, "the Sentencing Guidelines are themselves an anti-disparity formula." *United States v. Blagojevich*, 854 F.3d 918, 921 (7th Cir. 2017); *accord United States v. Sanchez*, 989 F.3d 523, 540 (7th Cir. 2021). Consequently, a sentence within the Guidelines range will ordinarily not result in an unwarranted disparity. *See United States v. Smocks*, D.D.C. 21-cr-198 (TSC), Sent. Hrg. Tr. at 49 ("as far as disparity goes, … I am being asked to give a sentence well within the guideline range, and I intend to give a sentence within the guideline range.") (statement of Judge Chutkan).

Moreover, Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[6]

In cases for which the Sentencing Guidelines apply, "[t]he best way to curtail 'unwarranted' disparities is to follow the Guidelines, which are designed to treat similar offenses

---

[6] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022, Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

and offenders similarly." *United States v. Bartlett*, 567 F.3d 901, 908 (7th Cir. 2009); *see id.* ("A sentence within a Guideline range 'necessarily' complies with § 3553(a)(6).").[7]

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences. While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the sentences in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

Cappuccio was one of nine individuals charged in this case, each of whom committed crimes during the same approximate time in the Lower West Terrace tunnel. To aid the Court in sentencing Cappuccio, and to address this § 3553(a) factor, the government provides the following table summarizing the sentences entered for each of Cappuccio's co-defendants to-date:

| Defendant | Gov. Guidelines Calculation | Gov. Recommendation | Court Guidelines Calculation | Sentence |
|---|---|---|---|---|
| Robert Morss | 97-121 months | 109 months | 57-71 months | 66 months |
| David Lee Judd | 87-108 months | 90 months | 37-46 months | 32 months |
| Geoffrey Sills | 97-121 months | 108 months | 57-71 months | 52 months |
| David Mehaffie | 57-71 months | 64 months | 6-12 months | 14 months |
| Tristan Stevens | 70-87 months | 78 months | 41-51 months | 60 months |
| Patrick McCaughey | 151-188 months | 188 months | 151-188 months | 90 months |

---

[7] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

While no case is a perfect comparison for the specific facts and circumstances present here, the government has identified the following additional cases that share some of the aggravating and mitigating circumstances with Cappuccio's case and serve as apt comparators.

### 1. *United States v. Patrick McCaughey*, 21-cr-40-1 (TNM)

The Court has sentenced six of Cappuccio's co-defendants. Of those co-defendants, Patrick Edward McCaughey's conduct most closely resembles Cappuccio's. McCaughey was sentenced to 90 months' incarceration.

At the LWT tunnel, McCaughey participated in a heave-ho push that hampered officers at the police line. Shortly after, he used a stolen riot shield to crush Officer Hodges in a doorframe for over two minutes. While McCaughey pinned Officer Hodges, Cappuccio stepped in, ripping off Officer Hodges' gas mask, stealing his riot baton, and beating him on the head with the stolen baton. Like Cappuccio, McCaughey engaged in one additional assault, when he struck a separate officer who was attempting close the doors to the building.

McCaughey and Cappuccio were side-by-side assailants in the attack against Officer Hodges, but Cappuccio was the more violent aggressor. While McCaughey put Officer Hodges in a position of extreme vulnerability by pinning him against the door frame and saying, "go home," Cappuccio took advantage of the situation and yanked Officer Hodges' gas mask with such force that he pulled it off under a secured helmet. He then stole Officer Hodges' own riot baton and beat him on the head with it, all while yelling, "How do you like me now, fucker?" For that reason, Cappuccio deserves a significantly higher prison sentence than this Court imposed on McCaughey.

26

### 2.  *United States v. Thomas Webster*, 21-cr-208 (APM)

In *United States v. Thomas Webster*, Judge Mehta sentenced the defendant Thomas Webster after a jury trial to 120 months' incarceration. Webster, a military veteran and former police officer from the New York City Police Department, came prepared for a battle on January 6. He brought his NYPD-issued bulletproof vest and a firearm. As he approached the Capitol, Webster came to a police line, standing behind metal bike racks. Rather than retreat, Webster became enraged, repeatedly hitting a flagpole on the metal bike rack in front of a specific officer, Officer Rathbun. Webster swung the flagpole with such force that the officers, including Officer Rathbun, were required to take a step back, allowing the mob to surge forward and breach the barricade. After the crowd had surged past the bike racks, Webster charged directly at Officer Rathbun and tackled him to the ground. While he was pinned to the ground, Webster attempted to rip off his gas mask. Webster was charged with violations of 18 U.S.C. §§ 111(a)(1) and (b), 231(a)(3), among other charges, and he was convicted of all counts.

Similar to Cappuccio's assault of Officer Hodges, Webster viciously assaulted a single officer who the defendant had picked out from the police line on the West Front. Although Judge Mehta imposed multiple enhancements against Webster for destroying evidence and using body armor that are not at issue here, Cappuccio, unlike Webster, was also found guilty of robbery and a second assault. It should also be noted that Webster, like Cappuccio, had honorably served in the military. Webster, however, had no prior arrests and was a decorated twenty-year veteran of the New York Police Department. These aggravating and mitigating factors largely balance out so that the government's recommended sentence here would not create an unwarranted disparity with Judge Mehta's sentence in *Webster*.

27

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Cappuccio was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as

"a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[8]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses").

More specifically, the Court should require Cappuccio to pay $2,000 in restitution for his convictions on Counts 28, 29, 30, 35, 42, and 50. This amount fairly reflects Cappuccio's

---

[8] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 121 months' incarceration, three years of supervised released, $2,000 in restitution, and the mandatory special assessment of $610.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     /s/ Laura Hill
LAURA HILL
Trial Attorney, Detailed
NV Bar No. 13894
175 N Street, NE, 9th Floor
Washington, D.C. 20002
(202) 514-7900
Laura.e.hill@usdoj.gov

ASHLEY AKERS
Trial Attorney, Detailed

KAITLIN KLAMANN
Assistant United States Attorney