**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

United States of America,      ) Criminal Action
                               ) No. 1:21-cr-0040-TNM-8, 9
                  Plaintiff,   )
                               )
vs.                            ) **Bench Trial (Day 3)**
                               )
Steven Cappuccio and Federico  )
Guillermo Klein,               ) Washington, D.C.
                               ) **July 12, 2023**
                  Defendants.  ) Time:  9:30 a.m.
_____

**Transcript of Bench Trial (Day 3)**
**Held Before**
**The Honorable Trevor N. McFadden**
**United States District Judge**


A P P E A R A N C E S

For the Government:      **Laura Hill**
                         **Kaitlin Klamann**
                         **Laura E. Hill**
                         UNITED STATES ATTORNEY'S OFFICE
                         FOR THE DISTRICT OF COLUMBIA
                         601 D Street, Northwest
                         Washington, D.C. 20579

On Behalf of the Defendant Steven Cappuccio:
                         **Marina T. Douenat**
                         FEDERAL PUBLIC DEFENDER'S OFFICE
                         Western District of Texas
                         727 E. Cesar E. Chavez Boulevard
                         San Antonio, Texas 78206

                         **Edgar H. Holguin**
                         FEDERAL PUBLIC DEFENDER
                         Western District of Texas
                         700 East San Antonio, Suite D-401
                         El Paso, Texas 79901

515

1              A P P E A R A N C E S (continued)

2    On Behalf of the Defendant Federico Guillermo Klein:
                            **Stanley E. Woodward, Jr.**
3                           BRAND WOODWARD LAW, LP
                            400 Fifth Street, Northwest
4                           Washington, D.C. 20001

5    _____

     Stenographic Official Court Reporter:
6                           Nancy J. Meyer
                            Registered Diplomate Reporter
7                           Certified Realtime Reporter
                            333 Constitution Avenue, Northwest
8                           Washington, D.C. 20001
                            202-354-3118
9
     Proceedings recorded by mechanical stenography.  Transcript
10   produced by computer-aided transcription.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                          I N D E X

 2                                                    PAGE:

 3      Witnesses:

 4      Morris Moore
             Direct Examination By Ms. Klamann............... 527
 5           Cross-Examination............................... 550
        Gabriela Mancini
 6           Direct Examination By Ms. Hill.................. 559
             Cross-Examination By Mr. Woodward............... 570
 7      Jon Comottor
             Direct Examination By Ms. Klamann............... 577
 8           Cross-Examination Mr. Holguin .................. 654
             Cross-Examination By Mr. Woodward............... 667
 9           Redirect Examination By Ms. Klamann............. 669
        Brian Cutler
10           Direct Examination By Ms. Douenat............... 680
             Cross-Examination By Ms. Hill .................. 699
11           Redirect Examination By Ms. Douenat............. 712
        Benjamin Fulp
12           Direct Examination By Ms. Akers................. 714

13


14      Exhibits Admitted:

15           Government Exhibit 501.60........................ 527
             Government Exhibit 509........................... 639
16           Government Exhibit 533.1......................... 548
             Government Exhibit 620........................... 565
17           Government Exhibit 620.1......................... 569
             Government Exhibit 803........................... 719
18           Government Exhibit 807........................... 723
             Government Exhibit 808........................... 723
19           Government Exhibit 1001.1........................ 599
             Government Exhibit 1001.2........................ 599
20           Government Exhibit 1001.3........................ 599
             Government Exhibit 1001.4........................ 599
21

22           Defendant Klein Exhibit 2....................... 557

23


24


25
```

1                   P R O C E E D I N G S

2          THE COURTROOM DEPUTY:  Your Honor, this is Criminal

3   Action 21-40, United States of America v. Steven Cappuccio and

4   Federico Guillermo Klein.

5          Counsel, please come forward to identify yourselves for

6   the record, starting with the government.

7          MS. AKERS:  Good morning, Your Honor.  Ashley Akers

8   on behalf of the United States.  With me is co-counsel

9   Kaitlin Klamann, Laura Hill; Special Agents Ben Fulp and

10  Jon Comottor; and paralegal specialist Kyle Clements.

11         THE COURT:  Good morning, folks.

12         MS. DOUENAT:  Good morning, Your Honor.  Marina

13  Douenat and Mr. Edgar Holguin on behalf of Mr. Steven

14  Cappuccio.  We also have Deedra Alexander, our paralegal.

15         THE COURT:  Good morning, everyone.  And good

16  morning, Mr. Cappuccio.

17         MR. WOODWARD:  Good morning, Your Honor.  Stanley

18  Woodward on behalf of Federico Klein, who is present and on

19  time.

20         THE COURT:  Good morning, Mr. Woodward.  And good

21  morning, Mr. Klein.

22         Ms. Akers, I want to try to come to rest on this expert

23  witness point.  Do you agree with the defense that there are

24  several specific intent crimes that this would be relevant to,

25  including civil disorder, disorderly and disruptive conduct

1    with a deadly or dangerous weapon, and physical violence in a

2    restricted building or grounds, and the two misdemeanor charges

3    under 5104?

4            MS. AKERS:  We agree, Your Honor, that those are

5    specific intent crimes.  We disagree that the expert has

6    provided notice of opinion as to those crimes.

7            THE COURT:  Okay.  Before me are two motions

8    *in limine* from the government to exclude Mr. Cappuccio's expert

9    witnesses.  ECF 675 pertains to Dr. Brian Cutler, who plans to

10   testify about the effects of various variables on eyewitness

11   testimony.  ECF 677 pertains to General Xenakis, who plans to

12   testify about Mr. Cappuccio's PTSD and what influenced him for

13   a brief period on January 6th.

14           For the following reasons, I'm going to deny both

15   motions *in limine*.

16           I'll handle the one involving Dr. Xenakis first.

17           The government moves to exclude this testimony on

18   several grounds, including that the expert report is deficient

19   under FRE 702 and that the testimony will be irrelevant.  I

20   agree with the government that General Xenakis's report is

21   fairly terse.  But I do think that he has demonstrated that,

22   quote, link or relationship between the specific psychiatric

23   evidence offered and the *mens rea* at issue in the case, close

24   quote.  That's from *United States v. Childress*, 58 F.3d 693,

25   page 730, from the D.C. Circuit in 1995.

1        I note that the defense initially described

2   General Xenakis's testimony as relevant to all of the charged

3   crimes.  I think that's incorrect.  I'm only going to admit

4   General Xenakis's testimony to the limited question of how

5   Defendant Cappuccio's PTSD impacted his *mens rea* in the

6   specific intent crimes and -- and as to the -- what I think

7   General Xenakis describes as a matter of seconds involving the

8   alleged attack on Officer Hodges.

9        Cases to address PTSD experts -- or experts testifying

10   to a mental disorder or disturbance more broadly -- are

11   consistent in reasoning that such evidence is not admissible to

12   negate the *mens rea* of general intent crimes like assaulting

13   officers under 18 U.S.C. 111(a) or (b) or robbery under

14   18 U.S.C. 2111.  And I'm, again, looking to the *Childress* case,

15   but also *United States v. Hutchinson*, 253 F. App'x 883,

16   pages 884 and -85 from the Eleventh Circuit in 2007, which

17   explained that the psychiatric evidence is admissible to negate

18   specific intent if it focuses on the defendant's state of mind

19   at the time of the charged offense.

20        I think *United States v. Taoufik* from the Fourth Circuit

21   in 2020 is instructive.  There, the Fourth Circuit affirmed the

22   exclusion of an expert who planned to testify about a

23   defendant's PTSD and how it affected his ability to weigh -- or

24   to act willfully when he assaulted a law enforcement officer

25   and was charged with 18 U.S.C. 111(a).  And I'm looking to

1    pages 839 and -40 of that opinion.

2         The circuit reasoned that the Insanity Defense Reform

3    Act prohibits defendants from asserting defenses based on a

4    lack of volitional control, including a diminished ability to

5    reflect adequately on the consequences of one's actions.  As

6    such, unless the defendant is claiming insanity, which is not

7    the case here, it is generally difficult to use psychiatric

8    evidence of a mental condition to excuse his conduct.

9         Of course, agreeing with the authorities already cited,

10   the circuit was careful to say that such evidence may still be

11   relevant to negating an essential element of the government's

12   prima facie case, such as specific intent *mens rea*.

13        The defense rightly notes that the government has

14   charged aiding and abetting for several of Mr. Cappuccio's

15   offenses, including the officer assaults and the robbery charge

16   of Officer Hodges.  And aiding and abetting does have a

17   specific intent element.

18        However, the government now at trial disclaims its

19   desire to pursue any aiding and abetting theory for this

20   defendant on those charges.  It represents that it is pursuing

21   a principal-only theory on those two counts as to the

22   defendant's guilt.

23        Wisely, since yesterday, defense has backed away from

24   its theory that General Xenakis's testimony is relevant to the

25   general intent crimes charged here.  But I think it is

1    appropriate to consider the general's testimony for the

2    specific intent crimes charged.

3         I believe both parties now agree that those crimes

4    include civil disorder in violation of 18 U.S.C. 231(a),

5    disorderly or disruptive conduct in a restricted building or

6    grounds with a deadly or dangerous weapon; physical violence in

7    a restricted building or grounds with a deadly or dangerous

8    weapon; and the two misdemeanor charges under 40 U.S.C. 5104.

9         I will also note that I'm skeptical that

10   General Xenakis's testimony will have much relevance to the

11   obstruction of an official proceeding charge, 1512(c), because

12   his report focuses on a specific moment during January 6th.

13   General Xenakis describes it at the bottom of page 4.  He

14   states that Mr. Cappuccio reports feeling shocked and startled

15   when struck in his shoulders and when his phone was knocked out

16   of his hand.

17        Mr. Cappuccio remembers feeling like he was, quote,

18   sucker punched, and General Xenakis writes that he, quote,

19   experienced a complete shift in his mental state from calm to a

20   high vigilance and great intensity, going from zero to a

21   hundred, and getting into combat mode, close quote.  The report

22   then implies that the defendant fought with one or more

23   officers.  General Xenakis reports this mental shift, according

24   to the defendant himself, lasted seconds or less than a minute.

25   After that, he stopped fighting with the officers.

1          I think this puts the government on notice that this

2     expert could be speaking to the civil disorder charge and those

3     other charges that I listed a moment ago.  I think this would

4     certainly have limited relevance to the 1512 obstruction

5     charge.  Although to the extent that the government intends to

6     rely on the defendant's alleged attack on Officer Hodges to --

7     to buttress its 1512 charge, I think the general's testimony

8     could be relevant there.  Although, as I say, I think the

9     government's evidence as to 1512 presumably encompasses a much

10    larger time frame that would not be covered by the general's

11    testimony.

12          Thus, I'll deny ECF No. 677 for all the reasons just

13    discussed.

14          I do want to kind of note a couple caveats there.  I

15    think the defense is a -- the defense's notice is, as I say,

16    limited to the defendant's conduct during those few seconds.

17    And I think that's the only appropriate -- to the extent that

18    the -- the general would look to describe PTSD or call into

19    question the defendant's state of mind as to the rest of the

20    day, I think the government could properly object, saying that

21    that is outside of the scope of the defendant's notice.

22          And so I'm just looking for, really, the -- the

23    general's insight into the defendant's state of mind during

24    those few seconds of the alleged attack against Officer Hodges.

25          I believe the second caveat that the government raises

1    concerns about, the general being a -- a backdoor way to bring

2    in a lot of hearsay testimony or, essentially, introduce the

3    defendant's story.  I think especially as this is a bench

4    trial, I'm happy to hear the -- or the general's background

5    impressions of the defendant's state of mind as to that day and

6    his intent.

7         But I certainly understand the government's point that

8    would be hearsay as to all of the other counts and as to the

9    rest of the day and really would just go into helping me

10   understand the general's diagnosis of the defendant's state of

11   mind during that brief period of time.  So I think we can

12   easily handle the government's hearsay concerns, especially

13   given that this is a bench trial.

14        Next up is the motion to exclude Dr. Cutler's testimony,

15   ECF 675.  This expert testimony will be about the effect of

16   stress and the repetition on eyewitness identification.

17        The government raises several arguments against

18   admitting it, but I'm not persuaded.  Their primary argument is

19   Dr. Cutler cannot use methodology, which the government submits

20   would include interviewing Officer Hodges, who is the person

21   making the eyewitness identification of Mr. Cappuccio.

22        I don't think that Dr. Cutler needs to meet with

23   Officer Hodges specifically because he's offering an opinion,

24   more generally, about how stress and reputation may affect

25   eyewitness identification.  I note Ms. Douenat laid a solid

1   foundation for this kind of testimony by crossing

2   Officer Hodges about all of the assaults he experienced prior

3   to being allegedly assaulted by Mr. Cappuccio in the lower west

4   terrace tunnel, and she also brought out various additional

5   stressors on that day.

6       The government objects that his opinions may be too

7   general, but I think the government misconstrues his caveats.

8   He includes references to his testimony possibly be relevant

9   because he acknowledges that I, as a trier of fact, must find

10  certain conditions precedent, such as that Officer Hodges

11  experienced distraction during the assault, was under extreme

12  stress, and more.  I think it's, frankly, pretty common to

13  receive testimony of this type when dealing with an eyewitness

14  identification issue.

15      Next, the government argues that his conclusions are not

16  the product of reliable methodology.  I disagree because he

17  summarized various studies and states that he would, quote,

18  rely on these references, as well as his 40 years of studying

19  the psychology of eyewitness memory, when rendering opinions,

20  close quote, from his report, page 5.  I'm satisfied given the

21  scope of his testimony, his methods are acceptable to meet the

22  Federal Rule of Evidence 702.

23      Lastly, the Government argues the defense not timely

24  notified them of all of the cases in which Dr. Cutler testified

25  until the day of trial.  And I think that's, frankly, a

1    complaint as to both -- both experts.  I understand the

2    government's frustration there, but I think the -- since then,

3    the defendant -- but this is kind of an unusual situation in

4    that the -- this case was originally scheduled to go prior to

5    this rule -- rule change, which was December of 2022.  I think

6    the defense properly satisfied the requirements at the time

7    that they made the -- made the -- made the notification.

8         The defense has since remedied the problem, hereby

9    providing a list of cases.  Obviously, this is very late in the

10   day.  And I understand the government's frustration with just

11   getting this list of cases a few days ago, but -- but given

12   that this case was continued due to the request of a different

13   defendant and that the defense -- the defense filing otherwise

14   satisfied the prerequisites under the rules at the time that it

15   was filed, I don't think it would be appropriate to exclude the

16   defense witnesses on that basis.

17        For all these reasons, I'm going to deny Government 675

18   seeking to exclude Dr. Cutler and Government 677 seeking to

19   exclude General Xenakis.

20        Ms. Akers, do you have a question?

21         MS. AKERS:  Thank you, Your Honor.

22        We'd just like to make a legal point.  We agree that

23   18 U.S.C. 111(a)(1) is a general intent crime with the

24   exception if the government's relying on the intent to commit

25   another felony prong --

```
1              THE COURT:  Okay.

2              MS. AKERS:  -- which we may be here.  So for that

3    purpose, we would concede that's a specific intent crime on

4    that prong.

5              THE COURT:  Thank you.

6         Well, all the better that we've got the -- we'll allow

7    the defense to introduce this evidence, and we can figure out

8    at closing what exactly --

9              MS. AKERS:  Understood.

10             THE COURT:  -- the expert testimony would rely --

11   would relate to.

12        All right.  Ms. Akers, I think we're ready for your next

13   witness.

14             MS. KLAMANN:  The United States calls Morris Moore.

15        And, Your Honor, before Mr. Moore takes the stand, his

16   testimony is going to go to Count 32 in the indictment.

17        There are just two exhibits I'm going to use with him

18   that have not already been admitted.  These are Exhibits

19   501.60, which is just a still image of 501, which has already

20   been admitted, and Government's Exhibit 533.1, which may not be

21   on your exhibit list.  This was a modified version of 533.

22             THE COURT:  All right.  Ms. Douenat, any objection to

23   any of those exhibits?

24             MS. DOUENAT:  No, Your Honor.

25             THE COURT:  And Mr. Woodward?
```

1          MR. WOODWARD:  Could the government remind me whether

2     533 has already been admitted.

3          MS. KLAMANN:  It has not.

4          MR. WOODWARD:  We would object and ask the government

5     to lay a foundation.

6          THE COURT:  So 501.60 is in.  And then 533 you can

7     handle when it comes up.

8          MS. KLAMANN:  Sure.

9          (Government Exhibit 501.60 admitted into evidence.)

10          THE COURT:  Good morning, sir.  If you can just

11     remain standing there for a moment.

12          THE COURTROOM DEPUTY:  Please raise your right hand,

13     please.

14          (Oath administered.)

15          THE WITNESS:  Yes.

16          THE COURTROOM DEPUTY:  Thank you.

17          THE COURT:  All right.  Feel free to have a seat and

18     make yourself comfortable, sir.

19                         DIRECT EXAMINATION

20     BY MS. KLAMANN:

21     Q.  Good morning.

22     A.  Good morning.

23     Q.  Please state and spell your full name for our reporter.

24     A.  My name is Morris Rudolph Moore, Jr.  Mary, ocean, Robert,

25     Robert, Ida, Sam.  Rudolph, Robert, union, David, ocean, Larry,

528

```
1     Paul, Henry.  Last name Moore, Mary, ocean, ocean, Robert,
2     Edward.  Junior, J-r.
3                THE COURT:  I can tell you're a former police
4     officer.
5                THE WITNESS:  Excuse me?
6                THE COURT:  I can tell you're a former police
7     officer.
8                THE WITNESS:  Yeah.  Thank you.
9     BY MS. KLAMANN:
10    Q.  Mr. Moore, are you currently employed?
11    A.  No.
12    Q.  Are you retired?
13    A.  Yes.
14    Q.  What did you do before you were retired?
15    A.  I worked for the United States Capitol Police.
16    Q.  How long did you work there?
17    A.  Thirty-five years, five months, three days.
18    Q.  And when did you retire?
19    A.  December 30th, 2022.
20    Q.  What was your position with the Capitol Police before you
21    retired?
22    A.  Private first class.
23    Q.  And what were your duties in that position?
24    A.  My duties for Capitol Police were to protect and serve
25    Congress, Senate -- Congress, the buildings, assisting people
```

1    that -- like tourists that came up, heads of state.  So those

2    were my duties.  And also to enforce the law.

3    Q.  And, Mr. Moore, were you working for the United States

4    Capitol Police on January 6th, 2021?

5    A.  Yes.

6    Q.  Before we talk about your experience that day, what were

7    you wearing on duty that day?

8    A.  Actually, was kind of like a -- had a winter outfit, which

9    is BDUs.  Shirt and pants, boots, a jacket, winter jacket, and

10   also a visibility vest, which separate us, police officers,

11   from other people that we deal with, like a traffic vest.

12   Q.  A couple things on that.  You said BDU?

13   A.  Yes.

14   Q.  What's a BDU?

15   A.  It's like a utility uniform we wear when we're outside and

16   when we're dealing with, like, trucks.  Because that's what I

17   dealt with that day, which was trucks coming in and out of the

18   House side of the -- of the Capitol itself.

19   Q.  That's where you were originally stationed that morning; is

20   that correct?

21   A.  Absolutely.

22   Q.  Okay.  And you also described what you called a visibility

23   vest.

24   A.  Yes.

25   Q.  What color is a visibility vest?

1    A.  It was like a lime color.

2    Q.  And just as the name suggests, I'm assuming that's worn so

3    that you can be seen?

4    A.  Absolutely.

5    Q.  Easily; right?

6    A.  Yes.

7    Q.  Okay.  In your work with the Capitol Police, were you

8    equipped with body-worn camera?

9    A.  No.

10   Q.  And is that because no officers with the Capitol Police are

11   equipped with body-worn camera?

12   A.  No.

13   Q.  So -- yes, no officers are equipped?

14   A.  No officers were equipped with cameras.

15   Q.  And at least in the morning on January 6th, were you

16   equipped with a helmet?

17   A.  No, I wasn't.  Not until I arrived over at the Capitol.

18   Q.  So once you arrived at the Capitol, at some point did you

19   put on a helmet?

20   A.  Yes, I did.  What happened was when I arrived over at

21   the Capitol, I arrived by myself.  And I looked over the

22   West Front and everything.  And I saw what we had to face,

23   which was a lot of rioters.

24       When I got down on the lower west terrace, to the fence

25   line, I was confronted with a lot of individuals that were

1    protesters.  And I looked down and saw a helmet, which was an

2    MPD helmet.  So I put that helmet on to protect myself.

3    Q.  And you mentioned that you walked over to the Capitol by

4    yourself that morning.  Where were you coming from?

5    A.  I was coming from my assignment, which was Delaware Avenue,

6    which is right in the back of the Rayburn House Office

7    Building.  Like Delaware Avenue and C Street.  And what I did

8    was -- when the calls came out that officers were in trouble

9    and needed help so I closed down my assignment with a

10   lieutenant that was walking -- walking past.

11   Q.  And did you ask that lieutenant if you could go help at the

12   Capitol?

13   A.  Absolutely.  Because I explained to him that I called my

14   detail office on three different occasions and no supervisors

15   were there.  So I asked him could I close her down.  He said

16   yes, and he said to get over to the fight.

17   Q.  And so you walked there by yourself?

18   A.  Absolutely.

19   Q.  And you said you arrived on the West Front; is that right?

20   A.  Yes.  I actually -- what happened was my path was going up

21   Delaware Avenue, turn right on C Street, walking up C Street,

22   turn left on South Capitol Street, walking over to the Capitol,

23   on the south side of the Capitol, which was the south

24   barricade.

25        But then walking up on the upper west terrace looking

1    over the Capitol, then walking down the steps where the

2    inauguration, let's say, stage were being built.  Then walking

3    down to the lower west terrace, which were where the fence

4    lines were.

5    Q.  And tell us again, what did you see when you got to that

6    area?

7    A.  When I got to that area, I just saw not only my comrades,

8    but also Metropolitan, but also a -- seemed like a vicious

9    crowd pulling at the barricades.  Nothing I have ever seen

10   since I worked at the Capitol, for Capitol Police.

11        And mace were being sprayed.  Bicycle racks were being

12   thrown.  You had a lot of different projectiles, like sticks,

13   poles.  I mean, the whole works.

14        So for me, by grabbing that helmet and putting it on, at

15   least I protected my face and my head.  But also there was --

16   there was mace being sprayed, bear spray, mace, the whole

17   works.

18        So there was a lot of officers going down.  When I say

19   going down, being sprayed by mace, being injured, going over to

20   the decon area where we administered, like, water in their eyes

21   and also water in my eyes.  And we just got back out on the

22   line and -- and did the best that we could to -- with what --

23   what was there.  I mean, basically, we were outnumbered.

24        I can contest [sic] that by walking over to the upper

25   west terrace and envisioning through a movie, like the movie

1    *300*; where it was 300 soldiers against thousands of people.

2    And I just wondered how are we going to handle this situation,

3    you know.  A movie is a movie because it's always predicted.

4    But this was real life, and we couldn't predict a real life

5    situation that I went through and all the rest of my fellow

6    police officers went through.

7         So it was a -- it was a frightening situation.  But

8    doing this job for 35 years and dealt with some of the things

9    that I dealt with, you know, I just couldn't turn back.  I -- I

10   just had to move forward.

11   Q.  And so, Mr. Moore, you described the scene on the west

12   plaza, and then I think you also mentioned that at some point

13   you went to the upper west terrace; is that right?

14   A.  Absolutely.

15   Q.  Why did you go up to the upper west terrace?

16   A.  Being overpowered and hearing over the radio to retreat to

17   the next level, which is going up to the next level.  So that's

18   what we did because we were just being overpowered.  So we had

19   to move to the next level, safe level, hopefully.

20   Q.  Where did you go on the upper west terrace?

21   A.  Actually, when I went up to the -- actually, I went up to

22   the lower west terrace door, which is called the tunnel.  I

23   went in the tunnel.  And most of the officers were there with

24   that single entrance where normally during the state -- not the

25   State of the Union, but the inauguration, that's where the

1    President comes out to get sworn in as the President.

2         We stood our ground there.  We -- it was almost like a

3    tug of war, back and forth, pushing back and forth.  Mace was

4    being sprayed.  Shields were being thrown at -- at us through

5    the tunnel.  Sticks, batons, the whole works.  And it was like

6    a back-and-forth situation, which we were trying to gain

7    control of that situation and push, possibly, the rioters out

8    of that tunnel.

9    Q.  Was one of the ways -- well, the principal way you were

10   trying to push rioters out of the tunnel, by forming a police

11   line?

12   A.  Absolutely.

13   Q.  Can you describe for us what the police line looked like in

14   the tunnel.

15   A.  I can describe it as a bunch of officers, front, with rows

16   of officers in the back and -- with shields, with batons, with

17   mace canisters that we're spraying to push the rioters back so

18   we can gain -- so we can gain control.  But, evidently, there

19   were so many rioters coming -- and also they were being

20   relieved by other rioters coming up.

21        But with us as police officers, we were stretched thin

22   all over the Capitol.  So we didn't have a lot of resources,

23   but we just held our own.  It was like a tug of war there, just

24   pushing back and forth.

25   Q.  And are you maintaining -- are you and your fellow officers

1   in the tunnel trying to stay, sort of, side by side, for the

2   most part?

3   A.  Yes.  We stayed side by side for the most part, pushing and

4   shoving back and forth.  In some ways we would gain a little

5   control.  In other ways we would lose some footing.

6   Q.  Was it important that you stay side by side with

7   your colleagues as you were trying to push folks out of the

8   tunnel?

9   A.  I would say so because the fact that if the chain breaks,

10  that's where you become weak.  If we stayed together by pushing

11  and pushing and staying together, then we would gain some type

12  of stability.

13  Q.  Mr. Moore, at some point while you were in the tunnel, were

14  you actually separated from the line of your colleagues?

15  A.  I was separated.  Actually, by moving up front, almost to

16  the very front of the standoff, and pulling out my baton and

17  swinging it and everything.  And then it was like I was being

18  sucked into the crowd.

19       And I remember being sucked into the crowd and going

20  down in the crowd.  And I was like, oh, my God, you know, this,

21  you know, so.  But as I can remember, two of the individuals

22  that were in the crowd, two white males -- one was maybe about

23  six-two and one was, like, maybe -- about maybe five-ten, the

24  one that was six-two, he had on all black.  The other one, he

25  had, like, all tan on.

1          And they guided me to my right.  And one of them said,

2     "You don't want to go left because of the fact they're crazy.

3     They might do some bodily harm."  So they guided me out to the

4     right, which was going down the steps and going out to the

5     north side of the West Front.

6     Q.  Okay.  And -- and this interaction that you're describing,

7     Officer, that happened after you had been pulled out of the

8     tunnel; right?

9     A.  Absolutely.

10    Q.  Okay.  Let's look at a couple of videos.

11    A.  Sure.

12          MS. KLAMANN:  Mr. Clements, can you pull up what's

13    been admitted as Government's Exhibit 501.  I'm going to ask

14    you to move us to 27 minutes and 7 seconds into the video.

15    BY MS. KLAMANN:

16    Q.  Officer Moore, you've watched this video in preparation for

17    your testimony today; right?

18    A.  Yes.

19    Q.  Do you recognize anyone on the screen right now at this

20    time stamp?

21    A.  I recognize myself with the visibility vest.

22    Q.  Can you -- the screen in front of you, you can actually,

23    sort of, interact with.  Can you use your finger and just

24    circle yourself for us.

25    A.  (Witness complying.)

1          MS. KLAMANN:  And, Your Honor, may the record reflect

2    that Officer Moore circled a police officer near the center of

3    the frame wearing a bright yellow visibility vest?

4          THE COURT:  It will so reflect.

5    BY MS. KLAMANN:

6    Q.  And, Officer Moore, before I play this clip, what was

7    immediately in front of you at this point?

8    A.  Actually, a shield.  Shield with an individual.

9    Q.  And were you in possession of that shield?

10   A.  No.

11   Q.  Who was?

12   A.  The individual on the other side of the shield.

13   Q.  I'm circling an individual on this screen.  Is that the man

14   who was possessing the shield?

15   A.  Yes.

16   Q.  What was he --

17          MS. KLAMANN:  And, Your Honor, may the record reflect

18   that I've circled an individual near the middle of the screen

19   with a red hat on?

20          THE COURT:  It will so reflect.

21          MS. KLAMANN:  Thank you.

22   BY MS. KLAMANN:

23   Q.  And, Officer Moore, what was that individual doing at that

24   time?

25   A.  Actually, he was pushing, pushing forward.  That's what he

1    was doing.

2    Q.  And what were you doing?

3    A.  Actually, I was pushing back, you know, just trying to gain

4    control.

5         MS. KLAMANN:  Let's play the video from here,

6    Mr. Clements.

7         (An audio-visual recording was played.)

8         MS. KLAMANN:  Pausing the video at 28 minutes in.

9    BY MS. KLAMANN:

10   Q.  Mr. Moore, we watched about 53 seconds of that clip.  What

11   did we see?  What were you doing at that time?

12   A.  Actually, I was pushing the gentleman that had the shield

13   in front of me, pushing forward, trying to gain control of that

14   tunnel there.

15   Q.  And were you feeling force being pushed back against you?

16   A.  Absolutely.  With every intent.  And -- and I just felt

17   like back in high school and college, playing football and

18   pushing a sled.  And a sled, when you're pushing forward,

19   you're trying to push forward and keep pushing forward with

20   this.  It was a -- it was a struggle.  Absolutely a struggle;

21   a, you know, terrifying situation because the fact that if this

22   group had gained control of that tunnel, I mean, no matter --

23   no telling what could happen.

24   Q.  So what's going through your mind at this point?

25   A.  I would say fear of disbelief, of what's going on.  But I

1    realized that, you know, being -- being a police officer, you

2    put your life on the line each and every day.  You know, you

3    don't run from it.  You go to it.  The situation is going on.

4    So, you know, I had a sworn duty to do that and to hold my own,

5    and other officers as well.

6    Q.  So during this time when you're pushing towards the front

7    of the tunnel, the entire time is the rioter using the shield

8    against you too?

9    A.  Yes.

10   Q.  What effect did the rioter's use of the shield have on your

11   ability to push him out?

12   A.  I would say they had leverage because the fact there was

13   another individual with his hand on the shield as well.

14   When -- when the shield turned horizontal, actually, I would

15   say, there was an advantage.  You know, being that that

16   individual had the shield vertical, in some way he had an

17   advantage, almost like a one-on-one, maybe.

18        But when it turned horizontal, he made room for other

19   rioters to tag on and to push, per se.  So -- and plus the

20   handle -- the handles were on the other side, so -- and plus

21   with, you know, all the mace that was sprayed, things were

22   slippery out there.  So it was a challenge.

23   Q.  While this is going on, again, during these, you know,

24   50 or so seconds, are you just laser-focused on this shield in

25   front of you and -- and pushing, pushing it out?

540

1    A.  I mean, I would say yes, because the fact that the totality

2    of the situation where we were, like, in -- in a can, sardines,

3    and you couldn't move as much.  But you just have to focus on

4    what's in front of you, and that's what I did.

5         I focused on what was in front of me.  I didn't focus on

6    what's to the left or the right because I believed in -- my

7    officers that were to my right and my left, they had their

8    responsibility.  Mine was just focused straight ahead because,

9    like I say, you know, if you break the chain, you got -- it's

10   weak.  But if the chain stays strong, you know, we -- we could

11   move mountains.

12   Q.  And towards the end of this clip, it looks like when you

13   get to the mouth of the tunnel, something else happens.  Did

14   you have your baton in your hand during this time?

15   A.  I had my baton in my hand, yes.  Absolutely.

16   Q.  And did something happen with that baton as you got closer

17   to the entryway to the tunnel?

18   A.  Yes, it did.  I actually -- when I proceeded to pull my

19   baton out to kind of, like, get people possibly in control, an

20   individual, he grabbed my baton.  And then he -- with one hand.

21   And I was -- as I was possibly, I believe, holding off the

22   individual with the shield, I had my baton in my other hand, my

23   right hand.

24        And then the next thing you know, there was two hands on

25   that baton versus one hand, which was my hand, as -- as you

1    possibly can see in the video.  And they just gained control of

2    my baton.

3    Q.  Ultimately, what happened to your baton?

4    A.  Excuse me?

5    Q.  Ultimately, what happened to your baton?

6    A.  My baton was taken away from me.

7              THE COURT:  I didn't understand.  What did you say

8    about the person with the shield?  What did he do?

9              THE WITNESS:  Excuse me?

10             THE COURT:  You said the person with the shield did

11   something.

12             THE WITNESS:  No.  Actually, in that situation, by

13   dealing with the shield, but also with my baton, in some way it

14   kind of, I would say, weakened myself maybe, because I was

15   depending on -- I was, actually, fending two things.

16             THE COURT:  I see what you're saying.

17             THE WITNESS:  The shield and the baton.

18             THE COURT:  Got it.  Got it.  But the person with the

19   shield did not also grab the baton?

20             THE WITNESS:  No, I don't believe so.

21             THE COURT:  Okay.  Thank you.

22             MS. KLAMANN:  Let's look at Government's

23   Exhibit 501.60.

24   BY MS. KLAMANN:

25   Q.  Officer Moore, are you depicted in this still image from

1    the video?

2    A.  Yes.  Do you want me to circle?

3    Q.  Yes, please.

4           MS. KLAMANN:  And, Your Honor, may the record reflect

5    Officer Moore circled the officer with the -- the helmet

6    with -- I believe the number is 2272, appearing on the left

7    side of the exhibit.

8           THE COURT:  It will so reflect.

9    BY MS. KLAMANN:

10   Q.  So, Officer Moore, you were describing for us how the

11   shield was turned horizontally; right?

12   A.  Yes.

13   Q.  Is it turned horizontally in this exhibit?

14   A.  Yes.

15   Q.  Okay.  And, again, which direction are the handles facing?

16   A.  Horizontally.

17   Q.  Are the handles facing you or the rioters?

18   A.  The rioters.

19   Q.  Okay.  And I think you said -- let me ask this way:  How

20   many people are pushing on that shield against you at this

21   time?

22   A.  As I can see, it's two.

23   Q.  Okay.

24          MS. KLAMANN:  Mr. Clements, can we pull up

25   Government's Exhibit 301.2.  And can we move forward to

1    time stamp 3:18:16.

2    BY MS. KLAMANN:

3    Q.  Officer Moore, is this additional video footage that you

4    reviewed before your testimony today?  Did we watch this before

5    you testified?

6    A.  Yes.

7    Q.  And according to the time stamp in the upper left-hand

8    corner, was this video footage taken on January 6th at

9    3:18 p.m. and 16 seconds?

10   A.  Yes.

11   Q.  Do you recognize the area of the U.S. Capitol that's

12   depicted here?

13   A.  Yes.  That's actually the lower west terrace door, which is

14   a secured area, which is now called the tunnel.

15   Q.  Okay.  I'm going to circle something on the bottom of the

16   screen here.  Do you see that?

17   A.  Yes.

18   Q.  What did I circle?

19   A.  Circled an individual with a red hat and a shield.

20   Q.  Do you recognize that individual from the previous video?

21   A.  Yes.

22           MS. KLAMANN:  Mr. Clements, can we play from there

23   just for a few seconds.

24           (A video recording was played.)

25           MS. KLAMANN:  Let's pause right there.

1    BY MS. KLAMANN:

2    Q.  Officer Moore, are you visible on the screen right now?

3    A.  Yes, I am.  I'll circle.

4    Q.  Thank you.

5          MS. KLAMANN:  And, Your Honor, may the record reflect

6    Officer Moore circled a -- a police officer in the bottom

7    center of the screen with a yellow visibility vest on?

8          THE COURT:  It will so reflect.

9          MS. KLAMANN:  And this was at time stamp 3:18 and

10   25 seconds.

11       Okay.  Mr. Clements, can we resume playing the exhibit,

12   please.

13          (A video recording was played.)

14          MS. KLAMANN:  Pausing the exhibit at time stamp 3:18

15   and 40 seconds.

16   BY MS. KLAMANN:

17   Q.  Officer Moore, I've circled something on the screen.  Do

18   you recognize what I've circled?

19   A.  An individual's hand.

20   Q.  I'm sorry.  Can you say that again?

21   A.  An individual's hand.

22   Q.  Okay.

23   A.  And I believe my hand with the baton.

24          MS. KLAMANN:  Mr. Clements, can you resume playing

25   the video from there.

```
 1                    (A video recording was played.)

 2    BY MS. KLAMANN:

 3    Q.  Officer Moore, did you see yourself sort of fall backwards

 4    at the end of that clip?

 5    A.  I didn't see myself fall backwards but just forward as I

 6    was being pulled by holding onto the baton and almost at the

 7    end of the tunnel on the outside.

 8    Q.  And at about this time, is this when the rioters actually

 9    were successful in pulling the baton out of your hands?

10    A.  Yes.

11              THE COURT:  It's sustained.

12              THE COURT REPORTER:  I'm sorry.  I didn't hear the

13    objection.

14              MR. WOODWARD:  I said there was an objection.

15    BY MS. KLAMANN:

16    Q.  When did the rioters pull the baton out of your hands?

17    A.  I would say right about to the edge as I held onto the

18    baton.  As you can see, I was battling at least anywhere from

19    two to three individuals reaching for the baton, I believe.

20    Q.  So you think the baton was pulled from you around -- once

21    you got close to the entrance of the tunnel; is that right?

22    A.  Around that time.

23    Q.  Okay.

24              MS. KLAMANN:  Mr. Clements, can we resume playing the

25    video from there, please.
```

```
 1                    (A video recording was played.)
 2                    MS. KLAMANN:  Pausing the video at 3:19 and
 3     20 seconds.
 4     BY MS. KLAMANN:
 5     Q.  Officer Moore, by this point, where are you?
 6     A.  I am, I believe, at the steps or maybe below the steps into
 7     the crowd.
 8     Q.  Are you surrounded by your fellow officers at that point?
 9     A.  No.
10     Q.  Who's around you?
11     A.  The rioters.
12     Q.  And can you describe for us the entryway to the tunnel.  Is
13     it flat -- flat ground?
14     A.  I would say some parts of it were flat.  But, like I say,
15     it was under construction.  So some of it was steps.
16                    MS. KLAMANN:  Mr. Clements, can we pull up now
17     Government's Exhibit 533.1.  Can we move us forward to
18     5 minutes -- actually, let's do 4 minutes and 58 seconds into
19     this video.
20     BY MS. KLAMANN:
21     Q.  Officer Moore, have you reviewed this video before your
22     testimony today?
23     A.  I believe so.  And one thing I want to say, as you can see
24     the elevation of the individuals, looks like they're going up.
25     So there was steps there that I was being pulled down.  So as
```

1    you can see, the elevation.

2    Q.  Are you depicted in this video?

3    A.  Right now, I don't see myself.

4         MS. KLAMANN:  Mr. Clements, can we just go frame by

5    frame a few times over the next couple of seconds here.

6    A.  Actually, I can see myself with the visibility vest.  I

7    will circle.

8         Also, I just want to point out for -- I guess for the

9    record, that the individual to your -- to my right, that I'm

10   facing this individual right here, he kind of helped me to get

11   out of the way of, I would say, an unruly crowd.  And there was

12   another individual, like I explained to you earlier, that

13   individual had all tan on, had a ballistic vest, I believe.

14   BY MS. KLAMANN:

15   Q.  Okay.  But, generally speaking, we're going to play this

16   for about a minute.  But before I do, what does this depict?

17   A.  To me, it depicts an angry crowd, a crowd that's frustrated

18   about what went on, and, basically, took matters in their own

19   hands.  They did not take the orders of police officers that

20   were on the front line that explained to them that they were

21   doing unlawful things.  The building was closed that day.  And

22   the destruction of the Capitol itself.  So it was just an angry

23   crowd that day that we dealt with.

24   Q.  I'm sorry.  I don't mean to interrupt you.  Does this

25   video, though, depict what you were describing earlier when you

1    were pulled down from the tunnel and into the crowd?

2    A.  Yes.

3    Q.  And based on your previous review of this video, is it fair

4    and accurate?  Does it reflect what your experience was in that

5    moment?

6    A.  Absolutely.

7         MS. KLAMANN:  Your Honor, the government moves to

8    admit Government's Exhibit 533.1.

9         THE COURT:  Mr. Woodward?

10         MR. WOODWARD:  Renewed objection to lack of

11   foundation.

12         THE COURT:  All right.  And Ms. Douenat?

13         MS. DOUENAT:  No objections, Your Honor.

14         THE COURT:  All right.  Over objection, I'm admitting

15   533.1.

16         (Government Exhibit 533.1 admitted into evidence.)

17   BY MS. KLAMANN:

18   Q.  Okay.  Mr. Moore -- Officer Moore, I'm going to play

19   Government's Exhibit 533.1 from time stamp 4 minutes and

20   58 seconds into the video.

21         (An audio-visual recording was played.)

22         MS. KLAMANN:  Let's pause there, Mr. Clements.

23   Pausing the video at 6 minutes and 30 seconds in.

24   BY MS. KLAMANN:

25   Q.  Officer Moore, did we just see you walk out of the frame at

```
 1          the bottom of the frame there?
 2          A.  Yes.
 3                  MR. WOODWARD:  Objection.
 4                  THE COURT:  Overruled.
 5          BY MS. KLAMANN:
 6          Q.  Officer Moore, what was going through your mind as this was
 7          happening on January 6th?
 8          A.  I would say just trying to get to a safe place.  Just
 9          trying to move, possibly along with the crowd, to a safe place.
10          Q.  And were you able to make it to a safe place?
11          A.  Yes.
12          Q.  Where did you go?
13          A.  I went to the north side of the building.  Actually, down
14          on the grounds to the north side, which is -- points towards
15          north Capitol and Constitution.
16          Q.  What did you do once you got to the north side?
17          A.  Once I got to the north side, I spoke to maybe a few
18          officers briefly, but, also, I went back into the building to
19          get in a fight -- I mean, I didn't take a break or anything.  I
20          just went back in because of the fact that I had to -- I had --
21          as long as I knew that, you know, we had to defend and we had
22          to protect the lawmakers, also the building itself, and to
23          possibly regain some -- some type of footage, I just had to be
24          there.  So I stayed there until, like, the later part of that
25          night, like around 9:30, 10 o'clock.
```

```
1              MS. KLAMANN:  Your Honor, may I have one moment?

2              THE COURT:  You may.

3              MS. KLAMANN:  No further questions.

4     BY MS. KLAMANN:

5     Q.  Thank you, Officer Moore.

6     A.  Thank you.

7              THE COURT:  All right.  Mr. Woodward.

8                         CROSS-EXAMINATION

9     BY MR. WOODWARD:

10    Q.  Good morning, Officer Moore.

11    A.  Good morning.

12    Q.  My name is Stanley Woodward.  I represent Defendant

13    Federico Klein.  Thank you for your service, and I hope you're

14    enjoying some of retirement.

15         Can I ask, how did you get back into the

16    Capitol Building on January 6th?

17    A.  North side.

18    Q.  And --

19    A.  North door.

20    Q.  And so what -- what did you see when you returned to the

21    Capitol Building?

22    A.  Total chaos.  Individual rioters all over the place.

23    Q.  Inside the building?

24    A.  Absolutely.  And outside, on the east side of the Capitol

25    itself.
```

1   Q.  And so you went in through the north door -- forgive me.

2   Is that the Senate or the House?

3   A.  The Senate side of the Capitol.

4   Q.  That's the Senate side.  And if I'm not mistaken, there

5   was a fair amount of violence happening inside the building

6   just outside the Senate Chamber, wasn't there?

7   A.  Absolutely.

8   Q.  And so did you -- did you participate in the defense of the

9   Senate Chamber, or what were you doing at that time?

10  A.  Actually, I entered the Senate side of the Capitol itself.

11  Then I moved myself up to the Rotunda.  From the Rotunda, where

12  these bronze doors that were so heavy, we tried to get rioters

13  out, which we couldn't.  We tried to shut those doors, which

14  the lock was broke.  So that's where I was.  I went up.

15  Q.  Those are the Columbus doors; right, sir?

16  A.  I believe so.

17  Q.  Ornate?  Hundreds of years old?

18  A.  (Witness nods.)

19  Q.  And so from the Rotunda, you assisted in removing

20  rioters who were actually inside the Capitol at that point;

21  correct?

22  A.  We tried to.

23  Q.  And so when you were defending the line in the tunnel, at

24  that time you didn't know, in fact, rioters had already

25  breached the Capitol, had entered the Capitol?

1    A.  Well, I didn't know particular on the east side of the

2    Capitol, but I know on the west side, that's the side I

3    defended at that time period.

4    Q.  And so you just didn't know -- your testimony was if this

5    group had gained control of the tunnel, no telling what could

6    happen.  You didn't know that rioters had already entered the

7    Capitol?

8    A.  No, I didn't.

9    Q.  And so you understood your efforts at that time in the

10   tunnel to be the last line of defense in keeping people out of

11   the Capitol Building; correct?

12   A.  Absolutely.

13   Q.  And you were going to do whatever it took to keep those

14   rioters in that tunnel out of the building?

15   A.  Absolutely.

16   Q.  And, in fact, you know that the tunnel leads to the Crypt?

17   A.  Absolutely.

18   Q.  Which is just below the Rotunda?

19   A.  Yes.

20   Q.  Right.  All right, sir.

21             MR. WOODWARD:  And so if the government would be so

22   kind to assist me in bringing back 301.2.  If we could just

23   move to the video timer -- excuse me, the time on the video to

24   3, let's say, 17.  If we could just play that.

25             (A video recording was played.)

1    BY MR. WOODWARD:

2    Q.  And, Officer, I'm going to ask you a couple of questions

3    about what we're seeing here.  Your testimony was that you

4    were -- you're here at this -- the front of this police line;

5    correct?

6    A.  Yes.

7    Q.  Do you see there are multiple red hats in the tunnel at

8    this point, aren't there?

9    A.  Absolutely.

10   Q.  And even as we look out into the crowd, beyond the tunnel,

11   we see more red hats, don't we?

12   A.  Absolutely.

13   Q.  And you see this pushing that you described in your

14   testimony happening here; correct?

15   A.  Yes, tug of war.

16   Q.  They're pushing you and you're pushing them?

17   A.  Absolutely.

18   Q.  You see the riot shields that are being passed back to the

19   crowd of --

20   A.  Yes.

21   Q.  And here it -- at time marker 3:18 and, roughly,

22   39 seconds --

23            MR. WOODWARD:  You can keep playing.  Thank you, sir.

24   BY MR. WOODWARD:

25   Q.  You were asked about this particular moment where you have

MOORE - CROSS

1    your baton.  You see the multiple individuals with red hats?

2    A.  Yes.

3    Q.  And -- and this individual here, you see him ducking

4    or being pushed down in the crowd as these officers are

5    pushing the last of the rioters out of the tunnel; correct?

6    A.  Yes.

7         MS. KLAMANN:  All right.  If we can just go back,

8    Mr. Clements, 10 or 20 seconds.

9    BY MR. WOODWARD:

10   Q.  I just want to focus your attention on the folks that are

11   standing here, if you would, please.

12        MR. WOODWARD:  Go ahead, Mr. Clements.

13        (A video recording was played.)

14   BY MR. WOODWARD:

15   Q.  You see these people on the wall being pulled off the wall.

16   And now we have just this woman standing here.  Do you see

17   what's happening there?  Do you see what's happening there,

18   sir?

19   A.  Yes.

20   Q.  That officer is -- is getting her off the wall?

21   A.  Absolutely.

22   Q.  And then you see this -- and this flag here in the -- in

23   the background, black stripes -- black-and-white stripes with a

24   blue stripe in the middle of it?

25   A.  Yes.

```
1    Q.  Okay.  I'm just -- I'm going to ask you about that from a

2    different vantage point.

3              MR. WOODWARD:  If the government would assist me in

4    pulling up what's been marked as Government's Exhibit 532.  Not

5    532.  Maybe 534.

6              MS. KLAMANN:  Stanley, are you looking for the video

7    that I played from earlier?

8              MR. WOODWARD:  I'm not.

9         This is not in evidence, Your Honor.

10             THE COURT:  Okay.

11             MR. WOODWARD:  And if we can advance to 1:22 on the

12   video, 1 hour and 22 minutes.  If you can play that for us,

13   please, Mr. Clements.

14             MS. KLAMANN:  Objection, Your Honor.  Not in

15   evidence.

16             MR. WOODWARD:  I need to authenticate it.

17             THE COURT:  Okay.  So overruled.

18             (An audio-visual recording was played.)

19             MR. WOODWARD:  Can we pause for a moment.

20   BY MR. WOODWARD:

21   Q.  If I can direct your attention, do you see the officer

22   standing up here on the wall?

23   A.  Yes.

24   Q.  And he's holding something?

25   A.  Yes.
```

```
 1                MR. WOODWARD:  All right.  If we can play again.

 2                (An audio-visual recording was played.)

 3                MR. WOODWARD:  If we can pause.

 4   BY MR. WOODWARD:

 5   Q.  And you saw him remove the woman from the wall there with

 6   the flagpole or stick or object?

 7   A.  Yes.

 8                MR. WOODWARD:  Okay.  If we can play again, please.

 9                (An audio-visual recording was played.)

10                MR. WOODWARD:  If we can pause.

11   BY MR. WOODWARD:

12   Q.  And do you see the flag here with the black-and-white

13   stripes and the blue in the middle?

14   A.  Yes.

15   Q.  Do you know what that flag symbolizes?

16   A.  Looks like an American flag with a blue stripe.  To me it

17   represents the Thin Blue Line.

18   Q.  You didn't know that it was a Blue Lives Matter?

19   A.  Who?

20   Q.  Blue Lives Matter?

21   A.  No.

22   Q.  Do you agree that what we've just watched is a fair and

23   accurate depiction of the scene that we had watched in the

24   previous exhibit --

25   A.  Yes.
```

1   Q.  -- from a different angle?  I'm sorry.  I was talking over

2   you.

3   A.  Yes.

4           MR. WOODWARD:  Your Honor, we would move to admit

5   Government's Exhibit 532 as Defendant Klein's Exhibit 2.  I

6   think we had 1 earlier.

7           THE COURT:  Okay.  Any objection?

8           MS. KLAMANN:  No, Your Honor.

9           THE COURT:  Without objection, Klein Exhibit 2 is in.

10          (Defendant Klein Exhibit 2 admitted into evidence.)

11  BY MR. WOODWARD:

12  Q.  Officer Moore, you know you were not the only officer

13  pulled into the crowd at this time; correct?

14  A.  Yes.

15  Q.  You know that in addition to yourself, Officer Fanone of

16  the Metropolitan Police Department was pulled into the crowd;

17  correct?

18  A.  Yes.

19          MR. WOODWARD:  If we could play, Mr. Clements, for

20  another 2 minutes or so.

21          (An audio-visual recording was played.)

22  BY MR. WOODWARD:

23  Q.  Sir, you see the individual depicted there wearing a red

24  hat and a green jacket?

25  A.  Yes.

1   Q.  That person has his hand on the back of Officer Fanone?

2   A.  Yes.

3           MR. WOODWARD:  If we could finish playing,

4   Mr. Clements.

5           (An audio-visual recording was played.)

6   BY MR. WOODWARD:

7   Q.  Thank you, sir.  No further questions.

8           THE COURT:  Ms. Douenat, any questions for this

9   officer?

10          MS. DOUENAT:  No, Your Honor.

11          THE COURT:  All right.  Any redirect?

12          MS. KLAMANN:  No, Your Honor.

13          THE COURT:  All right.  Mr. Morris [sic], thank

14  you for being here today.  You may step down.  You're free to

15  go.

16          THE WITNESS:  Thank you.

17          (Witness excused.)

18          THE COURT:  All right.  The government may call its

19  next witness, Ms. Hill.

20          MS. HILL:  The United States calls Gabriela Mancini.

21          THE COURTROOM DEPUTY:  Please raise your right hand.

22          (Oath administered.)

23          THE WITNESS:  I do.

24          THE COURTROOM DEPUTY:  Thank you.

25          THE COURT:  Good morning, ma'am.  You may have a

1    seat.

2              THE WITNESS:  Thank you.

3                    DIRECT EXAMINATION

4    BY MS. HILL:

5    Q.  Good morning, Ms. Mancini.

6              Will you please state and spell your name for the

7    record?

8    A.  My name is Gabriela M. Mancini.  G-a-b-r-i-e-l-a, M., and

9    then M-a-n-c-i-n-i.

10   Q.  Are you employed, Ms. Mancini?

11   A.  Yes, I am.

12   Q.  Who are you employed with?

13   A.  I'm employed with the Federal Bureau of Investigation, the

14   FBI.

15   Q.  How long have you been with the FBI?

16   A.  I've been with the FBI for approximately six years.

17   I've been a digital forensic examiner for approximately

18   five years.

19   Q.  What is your current title with the FBI?

20   A.  My current title is information technology specialist,

21   digital forensic examiner.

22   Q.  How long have you been in that role with the FBI?

23   A.  I've been a digital forensic examiner for approximately

24   five years.  Since June of 2018.

25   Q.  Can you briefly describe your educational background.

1   A.   Yes.   I have a bachelor of science degree in digital

2   forensics.

3   Q.   Do you have any certifications that relate to your current

4   job?

5   A.   I do.   I have an AccessData Certified Examiner

6   certification, which relates to the tool AD Lab, also known as

7   Forensic Toolkit.

8        I have the GIAC Certified Forensic Examiner

9   certification, which is provided by the SANS Institute, who is

10  a vendor that provides cybersecurity and digital forensics

11  training.

12       I also have the CompTIA A+ certification.   And that is a

13  certification in computer repair, computer setup, computer

14  maintenance, and computer software.

15       I also have some certifications that are provided

16  through the FBI for Mac forensics.   So Apple Mac computers,

17  phones, phone forensics, and Linux command line, which is

18  entering code for the Linux console.

19  Q.   Is it fair to say that you have industry training as well

20  as FBI training that relates to your current position with the

21  FBI?

22  A.   Yes.

23  Q.   Tell me about your job duties.

24  A.   So I am a CART forensic examiner.   CART stands for the

25  Computer Analysis Response Team.   I'm responsible for the

MANCINI - DIRECT

1    preservation, collection, and examination of digital evidence;

2    so phones, computers, et cetera.  I also participate in search

3    and seizure operations.  I'm also provided the opportunity for

4    continuing education at my job to further my roles in digital

5    forensics.

6    Q.  Do you know FBI Special Agent Ben Fulp?

7    A.  I do.

8    Q.  Did there come a time in the recent time when Agent Fulp

9    gave you a cell phone that was seized from Mr. Federico Klein?

10   A.  Yes.

11            MS. HILL:  May I approach the witness, Your Honor?

12            THE COURT:  You may.

13   BY MS. HILL:

14   Q.  I've handed you what's been marked as Government

15   Exhibit 620.  Will you please open up the Redweld that I've

16   just handed you.

17   A.  Would you like me to --

18   Q.  And take out what's in the Redweld.

19        Is what I've shown you what's been marked as Government

20   Exhibit 620 for identification the cell phone that Agent Fulp

21   gave to you?

22   A.  Yes.

23   Q.  And it is Federico Klein's cell phone?

24   A.  Yes.

25   Q.  How do you know?

1    A.  I know because on the front of the Redweld there is the

2    evidence number, the case ID number, and the evidence barcode

3    number.  I also see this evidence was sealed, which has my

4    initials and the dates that I sealed the evidence on.

5    Q.  Let's go through each of those in turn.  You said the case

6    number was on the Redweld?

7    A.  Yes.  The case number is the FBI internal identification

8    number for an FBI open case.

9    Q.  Is that specific to Mr. Klein?

10   A.  To my knowledge, yes.

11   Q.  And you said a barcode is also on the Redweld; is that

12   right?

13   A.  Yes.  The barcode number is specific to an evidence item in

14   the FBI system.  So this is used for identifying an evidence

15   item.

16   Q.  And so here this barcode is specific to Mr. Klein's phone?

17   A.  Yes.

18   Q.  Okay.  And then you mentioned the bubble wrap around the

19   cell phone itself.  Could you explain that.

20   A.  Yes.  So this phone is sealed in a bubble wrap evidence bag

21   along with FBI evidence tape, which has my initials and the

22   date that I sealed this.  This is to show since I returned it

23   to our evidence control center, no one else has opened it since

24   I last sealed it.

25   Q.  Okay.  And is that evidence tape, in fact, intact?

1    A.  Yes, it appears to be intact.

2    Q.  Is there also a chain of custody form on that Redweld?

3    A.  Yes, there is.

4    Q.  Could you explain what that is.

5    A.  So the chain of custody tracks who had possession of the

6    item on what dates and what times.  So when I received the

7    evidence item from Special Agent Benjamin Fulp, I signed for

8    the evidence item with the date and time.  When I returned that

9    phone to our evidence control center, I signed off on it with a

10   date and time.

11   Q.  Okay.  And are those dates and times, in fact, marked on

12   the chain of custody form that's in front of you?

13   A.  Yes, they are.

14   Q.  After you received the cell phone from Agent Fulp, did you

15   review a search warrant associated with the cell phone?

16   A.  Yes, I did.

17   Q.  Okay.  And what did you do after that?

18   A.  After I reviewed the search warrant, I began my physical

19   examination procedures.  So I examined the phone itself.  I

20   look for identifiers, such as model number, serial number, to

21   determine whether the device is powered on or just to verify

22   the overall state of the phone.  After I do my physical

23   examination procedures, I begin my extraction procedures.

24   Q.  And what is an extraction?

25   A.  An extraction is a copy, in some form, of the data on the

1    device.

2    Q.  Okay.  How did you engage in those procedures?

3    A.  So for the extraction procedure, I used a tool called

4    GrayKey, which is a cell phone extraction tool.  I then

5    connected the phone to the GrayKey tool and pressed the correct

6    buttons to initiate the extraction of the device.

7    Q.  Was the phone unlocked in this instance?

8    A.  No.  The phone was locked.

9    Q.  And can you do an extraction if the phone is locked?

10   A.  Yes.  Depending on the circumstances, you can do an

11   extraction if the phone is locked.

12   Q.  And did you, in fact, do that here?

13   A.  I did, yes.

14   Q.  Was that extraction comprehensive?

15   A.  No.  So the type of extraction I performed was what we call

16   an after-first-unlock extraction.  And that type of extraction

17   typically grabs 90 to 95 percent of data on the phone.

18   Q.  What type of information is missed in that partial

19   extraction?

20   A.  Typically information that's not grabbed in

21   after-first-unlock extraction is Apple Health data, Apple

22   email data, Apple significant locations, and Safari

23   preferences.

24   Q.  Is the information that is extracted from the phone a

25   current and accurate copy of the information on the phone?

1    A.  Yes.

2    Q.  Okay.

3         MS. HILL:  Your Honor, I would move the admission of

4    the phone itself, Government Exhibit 620.

5         THE COURT:  Mr. Woodward, any objection?

6         MR. WOODWARD:  No objection.

7         THE COURT:  All right.  Without objection, 620 is in.

8         (Government Exhibit 620 admitted into evidence.)

9         THE COURT:  Why don't we take a break right now.

10   Take about 10 minutes.

11        I'll ask you, Ms. Mancini, not to discuss the contents

12   of your testimony with anyone over the break.  Thanks.

13        (Recess taken.)

14        THE COURT:  All right.  Ms. Mancini, I'll remind you,

15   you're still under oath.  We'll go until about noon.

16        MS. HILL:  Okay.

17        THE COURT:  You may proceed, Ms. Hill.

18        MS. HILL:  Your Honor, I only have approximately

19   ten minutes.

20        THE COURT:  Well, you'll find somebody else to

21   testify then for the rest of the morning.

22        MS. HILL:  Yes, we will, Your Honor.

23        THE COURT:  Mr. Woodward has a very lengthy

24   examination.

25        Go ahead.

1    BY MS. HILL:

2    Q.  Ms. Mancini, what types of information do you expect to

3    find in an extraction?

4    A.  So I typically expect to find data such as picture files;

5    video files; audio files; text messages; third-party messaging

6    apps, such as Signal and WhatsApp; voice messages; call logs;

7    any sort of user data; in addition to the operating system:

8    the databases, the log files, the data that makes the phone run

9    and operate.

10   Q.  And why did Agent Fulp ask you to do the extraction rather

11   than just have him do the extraction?

12   A.  Because I have the knowledge and training on how to extract

13   a phone and analyze it.

14   Q.  You have specialized training --

15   A.  Yes.

16   Q.  -- that the typical FBI special agent may not have?

17   A.  Correct.

18   Q.  Okay.  And how do you actually do the extraction?

19   A.  So I connect the phone to the GrayKey tool, which is the

20   tool that we used to extract the phone in this case, and push

21   the button to start the extraction.  And the tool initiates and

22   completes the extraction.

23   Q.  How can you tell if the data is altered in any way after

24   you do the extraction?

25   A.  So after the extraction is complete, our tools generate

1    something called a hash value.  A hash value is generated when

2    you run a set of data through a mathematical algorithm that

3    generates this unique alphanumeric output that we call a hash

4    value.  You think of it as a fingerprint.  It's unique to that

5    data.  And if the data changes, that output completely changes.

6         And during my examination procedures, we do what's

7    called a pre-examination verification and a post-examination

8    verification.  So once I first complete the extraction, I

9    verify that the hash of the extraction matches the one in the

10   progress report, which is a log that our tool generates and

11   lists the hash value in there.

12        And at the end of my examination, at a minimum, I do a

13   post-examination hash verification to see if the data was

14   altered in any way during the course of my examination.

15        In this case the hashes matched both pre-examination and

16   post examination.  Therefore, we can verify that the data of

17   that extraction was not changed.

18   Q.  And we have pulled up what's been marked for identification

19   as Government Exhibit 620.1.  Do you recognize this document?

20   A.  I do.

21   Q.  What is it?

22   A.  It is a Cellebrite extraction report.

23   Q.  And what is a Cellebrite extraction report?

24   A.  So Cellebrite is one of the forensic tools that we use to

25   parse or make human-readable the data from an extraction.  This

1    is a PDF version of that Cellebrite report.

2              MS. HILL:  Okay.  And, Mr. Clements, if you could

3    scroll down just slightly on the page.

4    BY MS. HILL:

5    Q.  Ms. Mancini, do you recognize this Cellebrite report?

6    A.  I do.

7    Q.  Have you reviewed this document in preparation for your

8    testimony today?

9    A.  I have.

10   Q.  What is this Cellebrite report?

11   A.  So the Cellebrite report -- this page here contains a

12   listing of the metadata from the extraction.  So it contains

13   items such as the Apple ID, the name of the phone, the model

14   number of the device, the phone number of the device.  So this

15   is the preliminary information on the report.

16   Q.  And what does the rest of the report contain?

17   A.  The rest of the report would contain data that was marked

18   as scoped by the case agent.  In this case, Special Agent

19   Benjamin Fulp.  So items that he identified as relevant.

20   Q.  And who created the report itself?

21   A.  I created the report.

22   Q.  Okay.  Is it a fair and accurate copy of the items that

23   Agent Fulp marked as relevant to this case?

24   A.  Yes.

25   Q.  And this information, it fairly and accurately comes from

1    the phone itself, which we've marked as Exhibit 620?

2    A.  Yes.

3           MS. HILL:  Okay.  Your Honor, I move the admission of

4    Government 620.1.

5           MR. WOODWARD:  No objection.

6           THE COURT:  Without objection, 620.1 is in.

7           (Government Exhibit 620.1 admitted into evidence.)

8    BY MS. HILL:

9    Q.  Ms. Mancini, did you create a copy of the extraction for

10   the defendant?

11   A.  Yes, I did.

12   Q.  Okay.  Was that a fair and accurate copy of the extraction?

13   A.  Yes.

14   Q.  Did you confirm that that data was accurate?

15   A.  Yes.  I also performed an examination -- excuse me, a hash

16   verification on that copy, and that hash value did match the

17   one of the original extraction.

18   Q.  And what does that mean?

19   A.  That means that the data did not change.  The data that I

20   put on the hard drive as the defense copy matched the data that

21   we looked at during the course of our examination.

22   Q.  Okay.  Was -- you actually created this report from the

23   scoped items from Agent Benjamin Fulp, and you provided the

24   defense copy to the defense.  Was that the end of your

25   interaction with this phone?

1    A.  So the end of my -- my physical interaction with the phone

2    itself ended after I completed the extraction.  After we

3    provided these discovery copies, I believe we did a little more

4    review, but there was nothing else.

5    Q.  Okay.  And what did you do with the phone itself at the end

6    of your interaction with the phone?

7    A.  After I was done with my examination of the physical phone

8    itself, I powered off the phone.  I sealed it within the

9    evidence bag with evidence tape and checked it back into our

10   evidence control center.

11   Q.  Was your extraction done in line with FBI policies and

12   procedures?

13   A.  Yes.

14   Q.  Was it done in line with industry standard?

15   A.  Yes.

16   Q.  Is there anything that we haven't discussed that would

17   affect the data in the extraction?

18   A.  No.

19               MS. HILL:  May I have a moment, Your Honor?

20          Nothing further, Your Honor.

21               THE COURT:  Mr. Woodward.

22                         CROSS-EXAMINATION

23   BY MR. WOODWARD:

24   Q.  Good morning, ma'am.

25   A.  Good morning.

MANCINI - CROSS

```
1    Q.  Could you repeat your name for us, please.

2    A.  Yes.  Gabriela Mancini.

3    Q.  Mancini?

4    A.  Mancini.

5    Q.  Would you spell that for me.

6    A.  Yes.  M-a-n-c-i-n-i.

7    Q.  Now, in the extraction report that the government just

8    asked you about, that identifies all of the unique information

9    about the phone that you examined; correct?

10   A.  I'm not sure I understand the question.  When you say

11   unique information, what are you referring to?

12   Q.  Does every cell phone have a unique identification number?

13   A.  Has some form of identifier, yes.  A serial number, an IMEI

14   number, or something to that effect.

15   Q.  Okay.  A brand and model number?

16   A.  There is usually a model number, yes.

17   Q.  And the model number can give you a sense of what brand the

18   phone is?

19   A.  Can you spell that?  Rand?

20   Q.  Brand, B-r-a-n-d.

21   A.  Oh, brand.  It depends.  Some -- some phones, like iPhones,

22   there are different model numbers, depending on how you look at

23   it.  So there's the friendly model number name, like A1994.

24   There's an Apple proprietary model number.  But, generally,

25   yes, it gives you an idea of the brand.
```

MANCINI - CROSS

```
1      BY MR. WOODWARD:

2      Q.  Okay.  And that's all in the report that you generated?

3      A.  It typically is.

4      Q.  Okay.  Ma'am, are you familiar with the FBI's link system?

5      A.  I -- I'm not sure what you're referring to.  Are you

6      referring to the Skype system?

7      Q.  Well, you and -- and Agent Fulp, you communicated about

8      this particular device; correct?

9      A.  Yes.

10     Q.  And you communicated about the device using a messaging

11     system that the FBI has; correct?

12     A.  I believe I did, yes.

13     Q.  Okay.  And your first name is -- remind me of your first

14     name again.

15     A.  Gabriela, G-a-b-r-i-e-l-a.

16     Q.  Okay.  And do you sometimes go by Gabby?

17     A.  Yes.

18              MR. WOODWARD:  Okay.  Thank you.  No questions.

19              THE COURT:  All right.  Any redirect?

20              MS. HILL:  No redirect, Your Honor.

21              THE COURT:  All right.  Thank you, Ms. Mancini.  You

22     may step down.  You're free to go.

23          The government may call its next witness.

24              MS. KLAMANN:  The United States calls Special Agent

25     Jon Comottor.
```

573

```
1              THE COURT:  All right.  You may step down.
2         Oh, thank you.  If you can hand that back to the
3     prosecutor.
4              (Witness excused.)
5              THE COURT:  All right.  And, Agent Comottor, just
6     hold on one moment.
7         Mr. Woodward.
8              MR. WOODWARD:  We received communications from
9     Agent Fulp that indicate that he was communicating with
10    Ms. Mancini, but we received no Jencks for Ms. Mancini herself.
11    So he's directing communications at her.  It's clear that she's
12    responding, but that's all redacted.
13             So, I mean, we move to strike her testimony because the
14    government failed to provide Jencks at the conclusion of their
15    direct examination of the witness.
16             THE COURT:  All right.  Do you have any Jencks
17    material for this witness?
18             MS. AKERS:  We don't, Your Honor.  And if Your Honor
19    would like to review the unredacted version, Your Honor can.
20    But, no, there no Jencks material for this witness that's not
21    already produced that's referenced.
22             MR. WOODWARD:  I don't get the redacted information.
23    So if they want to provide chambers with the unredacted version
24    and the Court can see the references to Gabby.  And if there,
25    in fact, is no response from Gabby, then I'm wrong.
```

1          THE COURT:  All right.  So I guess is this, like, an

2     email chat system or something where you're seeing one side but

3     not the --

4          MR. WOODWARD:  No.  It's a -- so I think it's in

5     link.  It may not be in link.  But it's a spreadsheet that is

6     exported from the FBI system.  And either the agent himself or

7     the government has gone in and redacted communications that are

8     not from the agent him- or herself.  So I can't see who the

9     agent is communicating with or what the responses are.  What I

10    see is a communication from Agent Fulp to somebody that I don't

11    know who it is, except the message reads:  Gabby, could you

12    blah, blah, blah cell phone.

13         THE COURT:  Uh-huh.

14         MR. WOODWARD:  Sorry.  Blah is a terrible word for

15    the transcript.

16         MS. AKERS:  Your Honor, I would like to be heard.

17         There's nothing in that material that hasn't been

18    duplicated elsewhere in her written reports that she talked

19    about today.

20         Second, the government is not obligated to produce

21    *Jencks* before testimony.  We're obligated to produce after.  So

22    if there's an issue, counsel can chat with the government as

23    opposed to moving to strike.  That's not the appropriate remedy

24    anyway.

25         THE COURT:  So have you been taking the position

1    you're not providing *Jencks* until after?

2           MS. AKERS:  No.  We have been -- I provided *Jencks*

3    for almost all witnesses a couple weeks ago, and we've been

4    updating those as we've continued our -- our obligations.

5           But the proper recourse here --

6           THE COURT:  I understand.  But you think you've

7    provided the *Jencks*?

8           MS. AKERS:  Yes.

9           THE COURT:  Okay.

10          MR. WOODWARD:  And there are none for this witness.

11   There's no *Jencks* for this witness.  That's why I asked her to

12   spell the name so I could run the search.

13          THE COURT:  Yes.  No, I think that's what I'm hearing

14   from the government.

15          MS. AKERS:  But the point here is that if there were

16   *Jencks*, we haven't missed our window to provide it.

17          THE COURT:  I get that.  I get that.  But I'm trying

18   to figure out if there is *Jencks*.

19          MS. AKERS:  Right.  And I -- our representation is at

20   this point, no.  If counsel believes otherwise, we can discuss

21   off the record.  And then if there's an issue, we can bring it

22   to Your Honor's attention.  It's just a premature issue to

23   bring to the Court.

24          THE COURT:  Well, I don't think it's premature,

25   but -- yeah, I mean, I'm inclined to follow the government's --

1    take the government's representation that there is no *Jencks*

2    here.  But let's proceed with the next witness.  You-all can

3    chat over lunch.  I'm sure the government can -- maybe you can

4    keep -- Ms. Hill, perhaps you can ask Ms. Mancini to stick

5    around, making sure she's around after -- after lunch in case

6    we do need to recall her.

7                MS. HILL:  Yes, Your Honor.

8                THE COURT:  Okay.  All right.  Can you call your next

9    witness.

10               MS. KLAMANN:  United States calls Special Agent Jon

11   Comottor.

12               THE COURT:  All right.

13               MS. KLAMANN:  Your Honor, there are a few exhibits

14   I'm going to use with Agent Comottor that have not been yet

15   been admitted.  Those are Exhibits 1001.1 to 1001.4.

16               THE COURT:  All right.  And so have you reached a

17   stipulation on those, or are you just going to be discussing

18   those?

19               MS. KLAMANN:  We have not, Your Honor.  But I'm not

20   sure if there's really any objection.  Those are clips from

21   former President Trump's speech taken directly from C-SPAN.

22               THE COURT:  All right.  Well --

23               MS. DOUENAT:  I have no objections.

24               THE COURT:  All right.  Mr. Woodward, any objection?

25               MR. WOODWARD:  I do actually object.  Why are

```
 1       President Trump's -- why is President Trump's speech on

 2       January 6th relevant to either of these defendants?

 3              THE COURT:  All right.  So I think we'll just deal

 4       with this as it comes up.

 5          Let's swear in the agent.

 6              THE COURTROOM DEPUTY:  Raise your right hand.

 7              (Oath administered.)

 8              THE WITNESS:  I do.

 9              THE COURT:  You may have a seat, Agent.

10                         DIRECT EXAMINATION

11       BY MS. KLAMANN:

12       Q.  Good morning.

13       A.  Good morning.

14       Q.  Can you please state and spell your full name for us.

15       A.  Jon Comottor, J-o-n C-o-m-o-t-t-e-r.

16       Q.  Mr. Comottor, are you employed?

17       A.  Yes.

18       Q.  Where do you work?

19       A.  The FBI.

20       Q.  What's your position there?

21       A.  I'm a special agent.

22       Q.  How long have you been a special agent with the FBI?

23       A.  Eleven years.

24       Q.  And, currently, are you assigned to a particular office?

25       A.  Yes.
```

1    Q.   Which office?

2    A.   The Washington Field Office.

3    Q.   And do you work for a special squad at the Washington Field

4    Office?

5    A.   Yes, I'm assigned to the violent crimes task force in

6    Washington, D.C.

7    Q.   Did you work for the violent crimes task force with the

8    Washington Field Office in January of 2021?

9    A.   Yes.

10   Q.   What are some of your duties and responsibilities as a

11   member of the violent crimes task force?

12   A.   Typically, we investigate violent crimes in Washington,

13   D.C.  So bank robberies, kidnappings, extortions, commercial,

14   homicide, robberies.

15        But we were also tasked with investigating the

16   assault-on-federal-officer cases that resulted as -- after

17   January 6th, 2021, at the U.S. Capitol.

18   Q.   Okay.  And as part of that, sort of, latter assignments,

19   working on the assault-of-federal-officer cases on January 6th,

20   were you assigned to a particular investigation of an

21   individual named Steven Cappuccio?

22   A.   Yes.

23   Q.   What was your role in that investigation?

24   A.   Initially, that investigation was assigned to me as what we

25   termed AFO BOLO No. 123, which was originally an unidentified

1    individual that we recovered evidence of committing an assault

2    at the U.S. Capitol on January 6th, 2021.

3    Q.  Were you the case agent on that investigation?

4    A.  I was.

5    Q.  What are the responsibilities of a case agent?

6    A.  In the general sense, a case agent is responsible for a

7    case from beginning to end, responsible for coming up with a

8    strategy using all available resources, and ultimately

9    gathering evidence to present to the U.S. Attorney's Office for

10    a potential prosecution.

11    Q.  You mentioned when this case was originally assigned to you

12    it came up in as AFO 123; right?

13    A.  Yes.

14    Q.  Okay.  During the investigation, did you identify the

15    individual that FBI was dubbing AFO 123 as Steven Cappuccio?

16    A.  Yes.

17    Q.  And did you seize and search a cell phone belonging to

18    Steven Cappuccio as part of this investigation?

19    A.  The FBI did, yes.

20    Q.  Okay.  And did the FBI identify items on Mr. Cappuccio's

21    phone relating to Mr. Cappuccio's travel on January 5th to

22    Washington, D.C.?

23    A.  Yes.

24    Q.  I'm going to show you a few of those items from his

25    cell phone now.

580

1           MS. KLAMANN:  Let's pull up Government's Exhibit 613.

2    Mr. Clements, just for this exhibit, can you just zoom in on

3    the top half of this report.

4    BY MS. KLAMANN:

5    Q.  Agent Comottor, do you recognize Government's Exhibit 613

6    as an extraction report from the cell phone image of

7    Steven Cappuccio?

8    A.  Yes.

9    Q.  And is this a text message conversation between

10   Steven Cappuccio and another individual?

11   A.  Yes, it is.

12   Q.  According to the image of Mr. Cappuccio's phone, who's the

13   person that he's talking to in this exchange?

14   A.  It's an individual that was saved in the phone as Mike.

15           MS. KLAMANN:  Okay.  Mr. Clements, can we zoom back

16   out and look at the full exhibit.  Thank you.

17   BY MS. KLAMANN:

18   Q.  And, generally speaking, when we -- we're going to refer to

19   this exhibit a couple of times during your testimony today.

20   And, generally speaking, when we look at text messages on a

21   Cellebrite report, are the messages that appear in blue, are

22   those the messages that were received from the phone?

23   A.  Yes, typically.

24   Q.  Okay.  What about the messages in green?

25   A.  Those usually represent messages that were sent.

1    Q.  Okay.

2              MS. KLAMANN:  Mr. Clements, can we turn to page 5 of

3    the exhibit.  And can we zoom in on the first blue bubble

4    there.

5    BY MS. KLAMANN:

6    Q.  Agent Comottor, is this a message, a text message, that was

7    received by Mr. Cappuccio on December 28th, 2020?

8    A.  Yes.

9    Q.  Let's talk just briefly about the way that the time is

10   recorded in the Cellebrite report, looking down here at the

11   bottom of the exhibit.  That time, at least on this report, is

12   record as 9:03:04 a.m., but that is UTC minus 6; is that right?

13   A.  That's correct.

14   Q.  So has that time -- does that time appear in Central Time?

15   A.  Yes.  UTC minus 6 corresponds to Central Time in the month

16   of January.

17   Q.  Okay.

18   A.  I'm sorry.  The month of December.

19   Q.  So this message we've got up on the screen here, this was

20   December on 28th, 2020, at 9:03 a.m. Central Time; right?

21   A.  Yes.

22   Q.  And what does it say?

23   A.  It says, "So you up for a road trip."

24   Q.  And who sent that message?

25   A.  Mike.

1      MS. KLAMANN:  Mr. Clements, can we go to the next

2   message.

3   BY MS. KLAMANN:

4   Q.  Agent, is this another message sent by Mike on the same

5   date?

6   A.  Yes, sir.

7   Q.  What does it say?

8   A.  "Leaving Sunday around 11 if you are in."

9      MS. KLAMANN:  Mr. Clements, can we go to the next

10  page of the exhibit, what would be page 6.  Can we ready the

11  first message on that page.  Pull up.  Thank you, Mr. Clements.

12  BY MS. KLAMANN:

13  Q.  Agent Comottor, is this a message that was sent from

14  Mr. Cappuccio's phone?

15  A.  Yes.

16  Q.  Was it sent on the same day?

17  A.  Sent on December 30th, yes.

18  Q.  And what does it say?

19  A.  "How is this being funded?"

20      MS. KLAMANN:  Mr. Clements, can we go to the next

21  message.

22  BY MS. KLAMANN:

23  Q.  What did Mike respond?

24  A.  "I'll pay for gas and hotels because I was going to do that

25  anyway.  I'd rather not go alone."

1     MS. KLAMANN:  Can we go to the next message.

2     BY MS. KLAMANN:

3     Q.  Is this Mr. -- is this a response from Mr. Cappuccio's

4     phone?

5     A.  Yes.

6     Q.  What does it say?

7     A.  "Ok let me talk to Jen about it and I will get back with

8     you."

9          MS. KLAMANN:  Can we turn to page 7 of the exhibit,

10    please, Mr. Clements.

11    BY MS. KLAMANN:

12    Q.  Looking at the first message on the top there, is this a

13    message from Mike to Mr. Cappuccio?

14    A.  Yes.

15    Q.  Same date?

16    A.  Yes.

17    Q.  What does he say?

18    A.  "Be good to have you."

19          MS. KLAMANN:  Let's zoom in on the second message.

20    BY MS. KLAMANN:

21    Q.  Is this a message sent by Mr. Cappuccio to Mike?

22    A.  Yes.

23    Q.  In response?

24    A.  It appears to be, yes.

25    Q.  And what did he say?

```
1    A.  "Yeah it would be cool to hang out."

2              MS. KLAMANN:  Can we turn to page 8.  Zoom in on that

3    first message.

4    BY MS. KLAMANN:

5    Q.  Is this a text message from Mike a couple of days later, on

6    January 1st, 2021?

7    A.  Yes.

8    Q.  And what does he say?

9    A.  "I figured out when and where we need to meet the cavalry.

10   About 6 hour drive Sunday and 9 on Monday to meet Tuesday

11   morning in Lexington, KY.  It's going to be like saying you

12   were at Woodstock except bigger and better."

13   Q.  And, Agent Comottor, does it appear that Mike attached --

14   well, sent an attachment along with that text message?

15   A.  Yes.  It appears an image was attached to that message.

16             MS. KLAMANN:  Mr. Clements, can we go to the next

17   message.

18   BY MS. KLAMANN:

19   Q.  What was Mr. Cappuccio's response?

20   A.  "Ha right."

21   Q.  Was that on the same day?

22   A.  I believe so, yes.

23             MS. KLAMANN:  Mr. Clements, can we go to page 10 of

24   the exhibit.  I'm sorry.  Mr. Clements, did we skip page 9?  My

25   fault.  Can we zoom in on the first message.
```

1    BY MS. KLAMANN:

2    Q.  Is this another message from Mike on January 1st, 2021?

3    A.  Yes.

4    Q.  What does he say?

5    A.  "So [are] you squared away?"

6            MS. KLAMANN:  Can we look at the next message.

7    BY MS. KLAMANN:

8    Q.  Is this from Mr. Cappuccio on the same day?

9    A.  Yes.

10   Q.  What does he say?

11   A.  "Are you?"

12           MS. KLAMANN:  Can we look at the next message.

13   BY MS. KLAMANN:

14   Q.  Is this another message from Mr. Cappuccio on January 1st?

15   A.  Yes.

16   Q.  What does he say?

17   A.  "What time are we leaving on Sunday?"

18           MS. KLAMANN:  Can we turn to page 10 now,

19   Mr. Clements.

20   BY MS. KLAMANN:

21   Q.  Let's look at that first message.  What does Mike say on

22   January 1st in response?

23   A.  "I'll pick you up at 12."

24           MS. KLAMANN:  If we can look at the next.  Thank you,

25   Mr. Clements.

COMOTTOR - DIRECT

586

```
 1    BY MS. KLAMANN:
 2    Q.  What's the next message Mike sends?
 3    A.  "Can I call you in a few."
 4    Q.  And let's look at the last message on page 10.  Does this
 5    indicate that Mr. Cappuccio liked Mike's message, quote, I'll
 6    pick you up at 12?
 7    A.  Yes.
 8    Q.  And he liked that message on January 1st; right?
 9    A.  That's correct.
10         MS. KLAMANN:  Okay.  And, Your Honor, I'm actually
11    not sure if Government's Exhibit 613 is in evidence.  If it's
12    not, I'd move to admit it now.
13         THE COURT:  It is.
14         MS. KLAMANN:  Oh.  Great.
15      Mr. Clements, can we pull up Government's
16    Exhibit 611.16.
17    BY MS. KLAMANN:
18    Q.  Agent Comottor, is this a screenshot that was on
19    Mr. Cappuccio's cell phone?
20    A.  Yes.
21    Q.  Is this the same photo that was attached to the message
22    from Mike that we saw in the previous exhibit?
23    A.  Yes.
24    Q.  What's the title of -- of this image or this document?
25    A.  MAGA_CAVALRY.
```

1    Q.   Okay.  What does he say under that?

2    A.   "To Connect Patriot Caravans to StopTheSteal in D.C."

3    Q.   And can you read this portion of the exhibit for the Court,

4    please.

5    A.   "Depart from the rally points on 01/05, at the times below.

6    Follow the routes.  Stay together."

7    Q.   Okay.  And, Agent Comottor, did the FBI also recover from

8    Mr. Cappuccio's phone videos that he took on January 5th as he

9    drove with Mike to Washington, D.C.?

10   A.   Yes.

11          MS. KLAMANN:  Mr. Clements, can you pull up

12   Government's Exhibit 612.51.  It's a video, Mr. Clements.  It

13   might be in your --

14   BY MS. KLAMANN:

15   Q.   Agent Comottor, do you recognize this as a video from

16   Mr. Cappuccio's phone?

17   A.   Yes.

18          MS. KLAMANN:  Mr. Clements, can we play Government's

19   Exhibit 612.15 in its entirety.

20          (An audio-visual recording was played.)

21   BY MS. KLAMANN:

22   Q.   Agent Comottor, during that video --

23          THE COURT:  Sorry.  Can you play back those last few

24   seconds.

25          MS. KLAMANN:  Sure.  Can we go back 10 seconds,

COMOTTOR - DIRECT

1      Mr. Clements.  You can play from there.

2                  (An audio-visual recording was played.)

3                  THE COURT:  All right.  Thank you.

4      BY MS. KLAMANN:

5      Q.  Agent Comottor, during that video, did you see the person

6      filming pan to a man in the driver's seat?

7      A.  Yes.

8      Q.  Did you hear a voice refer to that man as Mike?

9      A.  Yes.

10     Q.  Okay.  And then did you hear a separate voice during that

11     video?

12     A.  I did.

13     Q.  Okay.  To whom does that voice belong?

14     A.  I believe that voice belongs to Mr. Cappuccio.

15     Q.  Showing you Government's Exhibit 612.50 now.

16                 MS. KLAMANN:  This is not a video, Mr. Clements.

17     Thank you.  Can we zoom in on the text box up there,

18     Mr. Clements.  Perfect.

19     BY MS. KLAMANN:

20     Q.  Agent Comottor, is Government's Exhibit 612.50 a Cellebrite

21     report relating to that video we just watched?

22     A.  Yes.

23     Q.  And according to the Cellebrite report, on what date and

24     time was that video created?

25     A.  On January 5th, 2021, at 2:16 p.m. UTC plus 0.

COMOTTOR - DIRECT

1    Q.  And when the Cellebrite report says UTC plus 0, does that

2    mean that time is in UTC?

3    A.  Yes.

4    Q.  So what time would that have been Eastern Time?

5    A.  That would have been minus 5 Eastern Time.  So 10:16 a.m.

6    Eastern Time.

7    Q.  Is minus 5 hours actually 9:16?

8    A.  Yes, it is.  Sorry for my math.

9    Q.  No problem.

10        Okay.  Agent Comottor, did Mr. Cappuccio record another

11   video on his phone -- at least one other video on his phone on

12   January 5th?

13   A.  Yes.

14   Q.  Okay.  Let's look at that now.

15        MS. KLAMANN:  Mr. Clements, can you pull up

16   Government Exhibit 612.49.

17   BY MS. KLAMANN:

18   Q.  Agent Comottor, is this another video from Mr. Cappuccio's

19   phone?

20   A.  Yes.

21        MS. KLAMANN:  Mr. Clements, can we play the video in

22   its entirety now.

23        (An audio-visual recording was played.)

24   BY MS. KLAMANN:

25   Q.  Agent Comottor, at the end of that video, did you hear a

1    voice saying, "Whoever is on the tail end, what's your status?"

2    A.  Yes.

3    Q.  Do you know whose voice that was?

4    A.  No, I do not.

5    Q.  Okay.  Did that voice belong to -- did that sound like the

6    voice of Mike as compared to the video from earlier?

7    A.  No.

8               MR. HOLGUIN:  Objection, Your Honor.  Speculation.

9               THE COURT:  Sustained.

10   BY MS. KLAMANN:

11   Q.  During that video, did Mr. Cappuccio turn the camera to the

12   back seat?

13   A.  Yes.

14   Q.  Okay.  Was there anyone else in the car?

15   A.  Not that I could see, no.

16   Q.  Okay.  Does it appear during that video that Mr. Cappuccio

17   was still driving as part of the caravan at this point?

18   A.  Yes.  It looked like an on-ramp to a freeway where he was

19   behind several other cars following the same route.

20              MS. KLAMANN:  Let's pull up Government's

21   Exhibit 612.48.  Thank you, Mr. Clements.

22   BY MS. KLAMANN:

23   Q.  Is this the Cellebrite report for the video we just

24   watched, Government's Exhibit 612.49?

25   A.  Yes.

1    Q.  And according to this the Cellebrite report, what date and

2    time was that video created?

3    A.  January 5th, 2021, at 9:28 a.m. Eastern Time.

4    Q.  Okay.  Agent Comottor, did the FBI also identify items on

5    Mr. Cappuccio's phone relating to his activities after he

6    arrived in Washington, D.C.?

7    A.  Yes.

8    Q.  Specifically, did FBI locate items that indicate that

9    Mr. Cappuccio attended the "Stop the Steal" rally on the

10   morning of January 6th?

11   A.  Yes.

12   Q.  Let's look at Government's Exhibit 613 again.  These are

13   the text messages that Mr. Cappuccio was exchanging with Mike;

14   right?

15   A.  Yes.

16          MS. KLAMANN:  Let's turn to page 19 of the exhibit.

17   Let's start with the second green message on that page.

18   Mr. Clements, if you could zoom in.

19   BY MS. KLAMANN:

20   Q.  Okay.  Agent Comottor, is this a message sent from

21   Mr. Cappuccio's phone?

22   A.  Yes.

23   Q.  What's the date and time that it was sent?

24   A.  January 6th, 2021, at 9:13 a.m. UTC minus 6.

25   Q.  So what time would that be in Eastern Time?

1    A.  That would be one hour ahead.  So 10:13 a.m.

2    Q.  Great.  And what did the message say?

3    A.  "You still in line?"

4          MS. KLAMANN:  Mr. Clements, can we go to the next

5    message.

6    BY MS. KLAMANN:

7    Q.  Is this a message that was received from Mike on

8    January 6th at 10:51 a.m.?

9    A.  Yes.

10   Q.  What did he say?

11   A.  "Just got through."

12         MS. KLAMANN:  Can we turn to page 20 of the exhibit,

13   Mr. Clements.  Can we zoom in on that first message.

14   BY MS. KLAMANN:

15   Q.  Is this another message received from Mike on January 6th?

16   A.  Yes.

17   Q.  And what does it say?

18   A.  "Where r u?"

19   Q.  Is that at 10:51 a.m. Eastern Time?

20   A.  Yes.

21         MS. KLAMANN:  Mr. Clements, can we go to the next

22   message.

23   BY MS. KLAMANN:

24   Q.  Is this another message from Mike to Mr. Cappuccio at

25   10:56 a.m. Eastern Time on January 6th?

COMOTTOR - DIRECT

```
1    A.  Yes.

2    Q.  And what does it say?

3    A.  "Just got through."

4           MS. KLAMANN:  Mr. Clements, can we go to the next

5    message.

6    BY MS. KLAMANN:

7    Q.  And is this another message from Mike on January 6th at

8    10:56 a.m. Eastern Time?

9    A.  Yes.

10   Q.  What does he say?

11   A.  "Where r u?"

12          MS. KLAMANN:  Can we turn to page 21 of the exhibit,

13   Mr. Clements.

14   BY MS. KLAMANN:

15   Q.  And then did Mr. Cappuccio respond?

16   A.  Yes.

17   Q.  Did he send his response on January 6th, 2021, 10:58 a.m.?

18   A.  Yes.

19   Q.  What did he say?

20   A.  "West side of [the] stage."

21          MS. KLAMANN:  Can we look at the next message,

22   Mr. Clements.

23   BY MS. KLAMANN:

24   Q.  And did Mike respond?

25   A.  Yes.
```

1    Q.  What did he say?

2    A.  "By the front?"

3    Q.  Okay.  And was that response also on January 6th at

4    10:59 a.m. Eastern Time?

5    A.  Yes.

6              MS. KLAMANN:  Can we look at the next message.

7    BY MS. KLAMANN:

8    Q.  Is this another message from Mike to Mr. Cappuccio on

9    January 6th, 2021, sent at 11:04 a.m. Eastern Time?

10   A.  Yes.

11   Q.  What does he say?

12   A.  "I'll meet you by the ports potties after Trump speaks."

13             MS. KLAMANN:  Mr. Clements, can we turn to page 22 of

14   the exhibit.  Can we zoom in on that first message.

15   BY MS. KLAMANN:

16   Q.  And then does Mike send a message saying, quote, I just

17   found Brian?

18   A.  Yes.

19             MS. KLAMANN:  Okay.  Can we go to the next message,

20   Mr. Clements.

21             THE COURT:  Is this all just showing that he was

22   there?

23             MS. KLAMANN:  Yes, Your Honor.

24             THE COURT:  Are you disputing that?

25             MR. HOLGUIN:  We are not, Your Honor.

```
1              THE COURT:  Okay.

2              MS. KLAMANN:  Okay.

3              THE COURT:  Can we move through?

4              MS. KLAMANN:  Okay.

5              THE COURT:  This is in evidence, but this is not

6    showing much.

7              MS. KLAMANN:  Okay.

8    BY MS. KLAMANN:

9    Q.  Did the FBI also locate videos on Mr. Cappuccio's phone

10   that appear to have been taken at the "Stop the Steal" rally?

11   A.  Yes.

12             MS. KLAMANN:  Showing you Government's

13   Exhibit 612.41.

14   BY MS. KLAMANN:

15   Q.  Is this a video taken from Mr. Cappuccio's phone?

16   A.  Yes.

17             MS. KLAMANN:  Okay.  Let's play this in its entirety.

18             (An audio-visual recording was played.)

19             MS. KLAMANN:  Mr. Clements, can you pull up

20   Government's Exhibit 612.40.  Can we zoom in on that table

21   again.

22   BY MS. KLAMANN:

23   Q.  Agent Comottor, is this the Cellebrite report for that

24   video that we just watched?

25   A.  Yes.
```

1   Q.  According to the Cellebrite report, on what day and time

2   was that video created?

3   A.  January 6th, 2021, 5:01 UTC plus 0 -- or 1:00 p.m. plus

4   UTC 0.  So minus 5 would be 12:01 Eastern Time.

5            MS. KLAMANN:  Mr. Clements, can you pull up

6   Government's Exhibit 612.43.

7   BY MS. KLAMANN:

8   Q.  Is this another video from Mr. Cappuccio's phone?

9   A.  Yes.

10            MS. KLAMANN:  Mr. Clements, can we play that in its

11   entirety.

12            (An audio-visual recording was played.)

13   BY MS. KLAMANN:

14   Q.  Agent Comottor, did you recognize the voice that we heard

15   during that short video?

16   A.  Yes.

17   Q.  Whose was it?

18   A.  Former President Trump.

19            MS. KLAMANN:  Can we pull up Government's

20   Exhibit 612.42.

21   BY MS. KLAMANN:

22   Q.  Agent Comottor, is this a Cellebrite report for the video

23   we just watched?

24   A.  Yes.

25   Q.  According to the Cellebrite report, on what day and time

COMOTTOR - DIRECT

1    was that video created?

2    A.   January 6th, 2021, at 1:04 p.m. Eastern Time.

3    Q.   Okay.  Agent Comottor, we're going to come back to the

4    items that you found on -- the other items that the FBI found

5    on Mr. Cappuccio's phone in a moment.

6         But during the investigation, did you review portions of

7    the speech given by former President Trump on January 6th?

8    A.   Yes.

9    Q.   In fact, did you watch portions of this speech on C-SPAN's

10   website in preparation for your testimony today?

11   A.   I did.

12   Q.   Approximately how long was that speech?

13   A.   It's about an hour and 11 minutes.

14        MS. KLAMANN:  Your Honor, at this point I would like

15   to move to admit the clips of that speech.  Those are

16   Government's Exhibit 1001.1 through 1001.4.

17        THE COURT:  All right.  What's the purpose here?

18        MS. KLAMANN:  Your Honor, Mr. Cappuccio's charged

19   with violating 18 U.S.C. 1512, obstruction of Congress.  Part

20   of our burden is to establish that he knew what was going on

21   inside that building.  He -- we've just shown that he attended

22   the "Stop the Steal" rally.

23        THE COURT:  So you -- are admitting this against

24   Defendant Cappuccio?

25        MS. KLAMANN:  It's from Mr. Cappuccio's phone,

1    Your Honor.

2            THE COURT:  The speeches?

3            MS. KLAMANN:  Oh, I'm sorry.  No, we're admitting it

4    against both defendants, to the extent that there's evidence

5    that Mr. Klein also attended the "Stop the Steal" rally.

6            THE COURT:  Okay.  All right.  So keep going.

7            MS. KLAMANN:  I'm sorry, Your Honor?

8            THE COURT:  Keep going.  I was misunderstanding.  I

9    thought you were just introducing this against him, the one

10   defendant.

11           MS. KLAMANN:  Our burden is to establish that the

12   defendants knew there was an official proceeding going on at

13   the Capitol.  If they heard former President Trump's speech,

14   there are moments during that speech where President Trump

15   indicates what's happening at the Capitol, indicates that Vice

16   President Mike Pence is there, indicates that other congressmen

17   and -women are there at work.  It goes to their mindset as they

18   went to the Capitol and their mindset while they did what they

19   did at the Capitol that day.

20           THE COURT:  All right.  Mr. Holguin, do you object?

21           MR. HOLGUIN:  Your Honor, actually, if the government

22   is intending to use it for that purpose, we do object,

23   Your Honor.  Frankly, the government is trying to impute the

24   words of someone into the mindset of my client.  So we're

25   objecting for that purpose as to relevance, Your Honor, as it

1    relates to Mr. Cappuccio's state of mind.

2              THE COURT:  All right.  Mr. Woodward?

3              MR. WOODWARD:  Similar objection, Your Honor.  Lack

4    of authentication and hearsay.  There's been no foundation laid

5    that Mr. Klein heard the words that were spoken.  So to the

6    extent they're trying to establish that this had an effect on

7    the listener, we submit that the foundation is lacking.

8              THE COURT:  Okay.  So I'm going to admit these over

9    objection.  I do think it would be potentially relevant to

10   showing the defendants' state of mind.  I hear Mr. Woodward's

11   point that at this point it's not clear to me that Mr. Klein

12   was even there.  I imagine the government will be proving this

13   up afterwards if they're not.  Then if they can't, then I think

14   it would only go to Mr. Cappuccio.

15        But I think at this point, the government has shown that

16   at least he was there, and it's -- it's some evidence to -- to

17   suggest why the defendant subsequently did what he did.  So I'm

18   overruling the objections.  You may play the report.

19              (Government Exhibit 1001.1 through 1001.4 admitted

20   into evidence.)

21              MS. KLAMANN:  Thank you, Your Honor.

22        Mr. Clements, can you pull up Government's

23   Exhibit 1001.1, please.

24   BY MS. KLAMANN:

25   Q.  Agent Comottor, is this one of the clips of former

COMOTTOR - DIRECT

1    President Trump's speech that you reviewed prior to your

2    testimony today?

3    A.  It is.

4            MS. KLAMANN:  Okay.  Mr. Clements, can we play

5    Government's Exhibit 1001.1 in its entirety now.

6            (An audio-visual recording was played.)

7            MS. KLAMANN:  Mr. Clements, can we pull up

8    Government's Exhibit 1001.2 now.

9    BY MS. KLAMANN:

10   Q.  Agent Comottor, is this one of the clips that you reviewed

11   in preparation for your testimony today?

12   A.  Yes.

13           MS. KLAMANN:  Okay.  Let's play this exhibit in its

14   entirety as well.

15           (An audio-visual recording was played.)

16           MS. KLAMANN:  Mr. Clements, can you pull up

17   Government's Exhibit 1001.3.

18   BY MS. KLAMANN:

19   Q.  Is this other clip from former President Trump's speech

20   that you reviewed in preparation for your testimony today?

21   A.  Yes.

22           MS. KLAMANN:  Okay.  Mr. Clements, can we play

23   Government's Exhibit 1001.3 in its entirety.

24           (An audio-visual recording was played.)

25           MS. KLAMANN:  Mr. Clements, can we pull up

1   Government's Exhibit 1001.4 now.

2   BY MS. KLAMANN:

3   Q.  Agent Comottor, same question.  Is this one of the clips of

4   former President Trump's speech that you reviewed in

5   preparation for your testimony today?

6   A.  Yes.

7            MS. KLAMANN:  Okay.  Let's play this, Government's

8   Exhibit 1001.4, in its entirety.

9            (An audio-visual recording was played.)

10  BY MS. KLAMANN:

11  Q.  Okay.  Returning to items that the FBI found on

12  Mr. Cappuccio's phone, in addition to photos and videos

13  depicting the rally --

14           THE COURT:  Ma'am, why don't we break here for lunch.

15  I plan to be back at 1:00.

16       And, Agent Comottor, I'll direct you not to discuss the

17  substance of your testimony over the lunch break.

18           THE WITNESS:  Understood.

19           THE COURT:  Thanks.

20           MR. WOODWARD:  Your Honor, I'm sorry.  I scheduled a

21  fingerprint appointment at 12:40.  I can keep in touch with

22  Ms. Chaclan.  It shouldn't take long.

23           THE COURT:  It's here in the building?

24           MR. WOODWARD:  It is not.  I tried that, but it's

25  right next door.  I'll see if I can go early.  For some reason

1   if it's going longer, I will check with Ms. Chaclan.

2              THE COURT:  Okay.  Why don't we say 1:10, just to

3   give you a bit more time.

4         And you two are going to chat about the *Jencks* issue as

5   well.

6              MR. WOODWARD:  I have some case law when we get back,

7   but I think the strike is -- is an appropriate remedy.  So

8   I'm -- if there is no *Jencks*, I don't think the government is

9   in violation.  But if there is *Jencks*, I'm going to renew my

10  motion to strike her testimony.

11             THE COURT:  So try to figure out if there's *Jencks* or

12  not.

13             (Recess taken.)

14             THE COURT:  All right.  Is Agent Comottor coming in?

15             MS. KLAMANN:  I think he might be in the hallway,

16  Your Honor.

17             THE COURT:  Welcome back, Agent Comottor.  You

18  can retake the stand, and I'll remind you you're still under

19  oath.

20             THE WITNESS:  Yes, sir.

21             THE COURT:  Ms. Klamann.

22  BY MS. KLAMANN:

23  Q.  Agent Comottor, before the break we were discussing items

24  recovered by the FBI in Mr. Cappuccio's phone.  During the

25  investigation, did the FBI recover photos and videos from

COMOTTOR - DIRECT

1    Mr. Cappuccio's phone depicting his march from the rally to the

2    U.S. Capitol?

3    A.  Yes.

4            MS. KLAMANN:  Mr. Clements, can we pull up

5    Government's Exhibit 612.45.

6    BY MS. KLAMANN:

7    Q.  Agent Comottor, is this video from Mr. Cappuccio's phone?

8    A.  Yes.

9            MS. KLAMANN:  Mr. Clements, can we play the exhibit

10   in its entirety.

11            (An audio-visual recording was played.)

12            MS. KLAMANN:  Mr. Clements, can you pull up

13   Government's Exhibit 612.44.

14   BY MS. KLAMANN:

15   Q.  Agent Comottor, is this the Cellebrite report for the video

16   we just watched?

17   A.  Yes.

18   Q.  According to the Cellebrite report --

19            MS. KLAMANN:  Mr. Clements, can you zoom in on the --

20   thank you.

21   BY MS. KLAMANN:

22   Q.  What date and time was that video created?

23   A.  January 6, 2021, at 1:42 p.m. Eastern.

24            MS. KLAMANN:  Mr. Clements, can you pull up

25   Government's Exhibit 611.18.

604

1    BY MS. KLAMANN:

2    Q.  Agent Comottor, is this a photo recovered from

3    Mr. Cappuccio's phone?

4    A.  Yes.

5    Q.  And is that the United States Capitol Building depicted

6    right in the middle of the photograph?

7    A.  It is.

8              MS. KLAMANN:  Mr. Clements, can you pull up

9    Government's Exhibit 611.17.  Can we zoom in.  Thanks,

10   Mr. Clements.

11   BY MS. KLAMANN:

12   Q.  Agent Comottor, is this the Cellebrite report for that

13   photograph?

14   A.  Yes.

15   Q.  On what date and time was that photograph created?

16   A.  January 6th, 2021, at 2:03 p.m. Eastern.

17             MS. KLAMANN:  Mr. Clements, can you pull up

18   Government's Exhibit 612.7.

19   BY MS. KLAMANN:

20   Q.  Agent Comottor, do you recognize this exhibit as another

21   video taken from Mr. Cappuccio's phone?

22   A.  Yes.

23             MS. KLAMANN:  Mr. Clements, can you play the video in

24   its entirety.

25             (An audio-visual recording was played.)

1    MS. KLAMANN:  Can we play that quickly again from the

2    beginning.  It's 25 seconds.

3              (An audio-visual recording was played.)

4              MS. KLAMANN:  Mr. Clements, can you pull up

5    Government's Exhibit 612.6.

6    BY MS. KLAMANN:

7    Q.  Agent Comottor, is this the Cellebrite report for that

8    brief video?

9    A.  Yes.

10   Q.  What's the date and time that that video was created?

11   A.  January 6th, 2021, at 2:16 p.m. Eastern.

12             MS. KLAMANN:  Mr. Clements, can you pull up

13   Government's Exhibit 612.9.

14             (An audio-visual recording was played.)

15   BY MS. KLAMANN:

16   Q.  Agent Comottor, is this another video from Mr. Cappuccio's

17   phone?

18   A.  Yes.

19   Q.  Do you recognize anyone depicted in this video?

20   A.  Yes.

21   Q.  Who do you recognize?

22   A.  Mr. Cappuccio.

23   Q.  Can you please circle him on the screen.

24   A.  (Witness complying.)

25   Q.  What is Mr. Cappuccio wearing?

606

1    A.  A ball cap style with another hat -- or beanie-style hat

2    on top, and you can see a white hooded sweatshirt at the

3    very bottom of the photo with black stripes across the

4    shoulders.

5            MS. KLAMANN:  Mr. Clements, can you play this very

6    brief video.

7            (An audio-visual recording was played.)

8            MS. KLAMANN:  I think we missed out on some of the

9    sounds.  If we can play it one more time.

10           (An audio-visual recording was played.)

11           MS. KLAMANN:  We'll leave it at that.

12           Let's pull up Government's Exhibit 612.8.

13   BY MS. KLAMANN:

14   Q.  Agent Comottor, is this the Cellebrite report for that

15   brief video we just watched?

16   A.  Yes.

17   Q.  And according to the Cellebrite report, what time was that

18   video created?

19   A.  January 6th, 2021, at 2:21 p.m. Eastern.

20   Q.  Agent Comottor, did you also recover photographs and videos

21   from Mr. Cappuccio's phone that appear to depict the

22   United States Capitol Building and Grounds on January 6th?

23   A.  Yes.

24           MS. KLAMANN:  Mr. Clements, can you pull up

25   Government's Exhibit 612.11.

COMOTTOR - DIRECT

1    BY MS. KLAMANN:

2    Q.  Agent Comottor, is this a video from Mr. Cappuccio's phone?

3    A.  Yes.

4    Q.  And based on your experience investigating AFOs relating to

5    the January 6th attack, do you recognize this area of the

6    U.S. Capitol?

7    A.  I do.

8    Q.  What is it?

9    A.  That's the West Front or the west plaza of the

10   Capitol Building.

11          MS. KLAMANN:  Okay.  Mr. Clements, can you play this

12   exhibit just 11 seconds in.

13          (An audio-visual recording was played.)

14   BY MS. KLAMANN:

15   Q.  Agent Comottor, did you hear a voice at the end of that

16   clip?

17   A.  Yes.

18          MS. KLAMANN:  And just for the record, we're pausing

19   at 11 seconds into the exhibit.

20   BY MS. KLAMANN:

21   Q.  Did you recognize that voice?

22   A.  I did.

23   Q.  Whose voice was it?

24   A.  Mr. Cappuccio's.

25          MS. KLAMANN:  Mr. Clements, can we resume playing the

```
1     video from time stamp 11 seconds.  Pause at :20.
2              (An audio-visual recording was played.)
3              MS. KLAMANN:  Pausing the video at time stamp
4     20 seconds.
5     BY MS. KLAMANN:
6     Q.  Agent Comottor, did you hear a voice at the end of that
7     clip?
8     A.  Yes.
9     Q.  Did you recognize that voice?
10    A.  Yes, I recognize it as the same voice from the previous
11    clip.
12    Q.  Okay.  And what did he say?
13    A.  At the beginning he said, "Sorry" and then -- and a word or
14    name unintelligible, followed by "We would have been able to
15    kick in some doors."
16    Q.  And at this point in the video, Agent Comottor, do you see
17    a structure on the screen?
18    A.  I do.
19    Q.  Based on your experience investigating the January 6th
20    attack of the Capitol, do you know what that structure is?
21    A.  Yeah.  That was a temporary structure that was built as a
22    media tower for the upcoming inauguration ceremony.
23    Q.  And do you believe -- are there people on that tower in the
24    video?
25    A.  Yes, several.
```

1    Q.   Okay.  And who do you believe those people to be?

2    A.   Those are rioters.

3    Q.   I'm circling some individuals on the left side of the

4    exhibit now.  Do you recognize the individuals I've circled?

5    A.   Yes.

6    Q.   Who are they?

7    A.   It's a line of police officers.

8    Q.   How are you able to recognize them as police officers?

9    A.   Based on the reflective or highlighter coats that many of

10   them are wearing.  I know that that was a uniform that several

11   officers wore that day.

12            MS. KLAMANN:  Mr. Clements, let's play that for

13   another 10 seconds, please.

14            (An audio-visual recording was played.)

15   BY MS. KLAMANN:

16   Q.   Agent Comottor, I'm circling something on the left side of

17   the screen.  Based on your experience investigating the

18   January 6th attack, do you recognize what that structure is?

19   A.   That's a stairwell.

20   Q.   And are there people on top of it?

21   A.   Yes.

22   Q.   Are those people in uniforms?

23   A.   No.

24   Q.   Do you believe they're civilians?

25   A.   Yes.

1  Q.  Okay.  And then I'm also circling this portion in the

2  middle of the screen.  Do you recognize that area of the

3  United States Capitol Building?

4  A.  Yes, I do.

5  Q.  Is that the upper west terrace?

6  A.  Yes.

7  Q.  And does that appear to be people on the upper west terrace

8  as well?

9  A.  Yes.

10  Q.  In civilian clothing?

11  A.  Correct.

12  Q.  Do you believe those are rioters?

13  A.  Yes.

14        MS. KLAMANN:  Mr. Clements, can we play the video to

15  the end.

16        (An audio-visual recording was played.)

17        MS. KLAMANN:  Mr. Clements, can you pull up

18  Government's Exhibit 612.10.

19  BY MS. KLAMANN:

20  Q.  Agent Comottor, is this the Cellebrite report for the video

21  we just watched?

22  A.  Yes, sir.

23  Q.  And according to the Cellebrite report, on what date and

24  time was that video created?

25  A.  January 6th, 2021, at 1:36 p.m. Eastern.

1      MS. KLAMANN:  Mr. Clements, can you pull up now

2  Government Exhibit 612.13.

3  BY MS. KLAMANN:

4  Q.  And, Agent Comottor, do you recognize this video as a video

5  from Mr. Cappuccio's phone?

6  A.  Yes.

7  Q.  Okay.

8      MS. KLAMANN:  Mr. Clements, can you play that until

9  about 9 seconds.

10      (An audio-visual recording was played.)

11  BY MS. KLAMANN:

12  Q.  Agent Comottor, did you hear a voice at the end of that

13  clip?

14  A.  Yes.

15      MS. KLAMANN:  And just for the record, we're pausing

16  at 9 seconds in the exhibit.

17  BY MS. KLAMANN:

18  Q.  Did you recognize that voice?

19  A.  Yes.  To me that voice sounded consistent with the voice

20  from the previous clips that I've identified.

21  Q.  And whose voice have you identified that as?

22  A.  Mr. Cappuccio's.

23  Q.  And what did the voice say during that portion of the

24  video?

25  A.  "Dirty deuce in the house.  Dirty deuce."

COMOTTOR - DIRECT

1          MS. KLAMANN:  Let's play from there and pause at

2     10 seconds, Mr. Clements.

3          (An audio-visual recording was played.)

4     BY MS. KLAMANN:

5     Q.  Agent Comottor, did you hear a voice at the end of that

6     clip?

7     A.  Yes.

8          MS. KLAMANN:  And we're paused at 15 seconds in the

9     video.

10    BY MS. KLAMANN:

11    Q.  What did that voice say?

12    A.  "Storming the castle, boys."

13    Q.  Do you believe that was the same voice from earlier in the

14    same video?

15    A.  I do.

16    Q.  Mr. Cappuccio's voice?

17    A.  Yes.

18          MS. KLAMANN:  Mr. Clements, can you play for 5 more

19    seconds and pause at 20 seconds in.

20          (An audio-visual recording was played.)

21    BY MS. KLAMANN:

22    Q.  Agent Comottor, did you hear a voice at the end of that

23    clip?  And we're paused at 20 seconds.

24    A.  Yes.

25    Q.  What did that voice say?

COMOTTOR - DIRECT

1    A.  "Fight for Trump.  Fight for Trump."

2    Q.  Okay.  Was that the same voice we've heard throughout this

3    clip?

4    A.  It was.

5    Q.  And who does that voice belong to?

6    A.  Mr. Cappuccio.

7         MS. KLAMANN:  Mr. Clements, can you play the rest of

8    the video.

9         (An audio-visual recording was played.)

10         MS. KLAMANN:  Mr. Clements, can you pull up

11    Government's Exhibit 612.12.

12    BY MS. KLAMANN:

13    Q.  Agent Comottor, is this the Cellebrite report for the video

14    we just watched?

15    A.  Yes.

16    Q.  And according to the report, what time was that video

17    created?

18    A.  January 6th, 2021, at 2:44 p.m. Eastern.

19    Q.  Showing you Government's Exhibit 612.15 now.  What's -- do

20    you recognize this as a video from Mr. Cappuccio's phone?

21    A.  Yes.

22         MS. KLAMANN:  Okay.  Let's play this just for a few

23    seconds, Mr. Clements.  Maybe 5 seconds.

24         (An audio-visual recording was played.)

25         MS. KLAMANN:  Let's pause there.  Thank you,

1    Mr. Clements.

2    BY MS. KLAMANN:

3    Q.  Do you recognize, based on your experience investigating

4    the January 6th attack, what area of the United States Capitol

5    was just panned over from here?

6    A.  It looks like it was taken from an elevated position, like

7    the upper west terrace portion of the Capitol, looking out

8    eastward -- or westward.  I'm sorry.

9    Q.  Overlooking -- just for clarity, overlooking the west

10   plaza?

11   A.  Correct.

12          MS. KLAMANN:  Mr. Clements, can you play the rest of

13   the video in its entirety.

14          (An audio-visual recording was played.)

15          MS. KLAMANN:  Can we pause there, Mr. Clements.

16       We're pausing at time stamp 36 seconds in the exhibit.

17   BY MS. KLAMANN:

18   Q.  Agent Comottor, I've circled a portion of this screen.  Do

19   you recognize some of the people inside that circle?

20   A.  I do.

21   Q.  Are they wearing uniforms?

22   A.  Some are, yes.

23   Q.  And for the people who are wearing uniforms, do you

24   recognize what those uniforms are for?

25   A.  Yes.  They're police officers.

1          MS. KLAMANN:  Okay.  Mr. Clements, can you resume

2     playing the video, please.

3              (An audio-visual recording was played.)

4     BY MS. KLAMANN:

5     Q.  Agent Comottor, did you hear a video -- well, really, a

6     voice throughout that clip?

7     A.  I did.

8     Q.  And what did that voice say?

9     A.  Repeated mentions of dirty deuce, and at the end "Dirty

10    deuce" and "Deplorables up here, baby."

11    Q.  And did you recognize that voice?

12    A.  I did.

13    Q.  Whose voice was that?

14    A.  It, again, sounds as if it was Mr. Cappuccio's voice.

15         MS. KLAMANN:  Okay.  Can we pull up Government's

16    Exhibit 612.14.

17    BY MS. KLAMANN:

18    Q.  Again, Agent Comottor, is this the Cellebrite report for

19    the video we just watched?

20    A.  Yes.

21    Q.  And what time was -- according to the report, what time was

22    that video created?

23    A.  January 6th, 2021, at 2:55 p.m. Eastern.

24         MS. KLAMANN:  Mr. Clements, can we pull up

25    Government's Exhibit 612.17 now.

1    BY MS. KLAMANN:

2    Q.  Agent Comottor, is this another video from Mr. Cappuccio's

3    phone?

4    A.  Yes.

5    Q.  Do you recognize the area of the United States Capitol

6    that's depicted here?

7    A.  I do.

8    Q.  What is it?

9    A.  It is an area of the lower west terrace.  And you can see

10   kind of in the center of the screen here the entrance to what I

11   know as the tunnel.

12           MS. KLAMANN:  And, Your Honor, may the record reflect

13   that Agent Comottor circled the archway in the middle of the

14   image in the first frame of this video?

15           THE COURT:  It will so reflect.

16           MS. KLAMANN:  Thank you.

17       Mr. Clements, let's play this video in its entirety,

18   please.

19           (An audio-visual recording was played.)

20           MS. KLAMANN:  Mr. Clements, can you pull up

21   Government's Exhibit 612.16 now.

22   BY MS. KLAMANN:

23   Q.  Agent Comottor, is this the Cellebrite report for the video

24   we just watched?

25   A.  Yes.

1    Q.  And according to the report, on what date and time was that

2    video created?

3    A.  January 6th, 2021, at 2:59 p.m. Eastern.

4              MS. KLAMANN:  Mr. Clements, can we pull up

5    Government's Exhibit 612.9 now.

6    BY MS. KLAMANN:

7    Q.  Agent Comottor, do you recognize this as another video from

8    Mr. Cappuccio's?

9    A.  Yes.

10             MS. KLAMANN:  Mr. Clements, can you play the video in

11   its entirety now.

12             (An audio-visual recording was played.)

13             MS. KLAMANN:  Mr. Clements, can you pull up

14   Government's Exhibit 612.18.

15   BY MS. KLAMANN:

16   Q.  Agent Comottor, is this the Cellebrite report for the video

17   we just watched?

18   A.  Yes.

19   Q.  And according to the report, on what date and time was that

20   video created?

21   A.  January 6th, 2021, at 2:59 p.m. Eastern.

22             MS. KLAMANN:  Mr. Clements, can you pull up

23   Government's Exhibit 612.21 now.  Let's play it just for a

24   second or two.

25             (An audio-visual recording was played.)

COMOTTOR - DIRECT

1           MS. KLAMANN:  That's perfect.

2    BY MS. KLAMANN:

3    Q.  Agent Comottor, do you recognize this as another video from

4    Mr. Cappuccio's phone?

5    A.  Yes.

6           MS. KLAMANN:  Mr. Clements, can we play the video up

7    until about 30 seconds.

8           (An audio-visual recording was played.)

9    BY MS. KLAMANN:

10   Q.  Agent Comottor, do you recognize where this video was

11   recorded?

12   A.  Yes.

13   Q.  Where was it?

14   A.  It is a little bit closer than the previous videos we

15   watched; approaching the entrance to the tunnel on the lower

16   west terrace.

17          MS. KLAMANN:  Okay.  Let's resume playing the video

18   just for 8 seconds, Mr. Clements.

19          (An audio-visual recording was played.)

20          MS. KLAMANN:  Actually, let's play for just one or

21   two more seconds, Mr. Clements.

22          (An audio-visual recording was played.)

23          MS. KLAMANN:  There we go.  Stop there.

24   BY MS. KLAMANN:

25   Q.  Agent Comottor, I'm circling someone on the screen at

1    time stamp 42 seconds in the video.  Do you recognize this

2    person?

3    A.  I do.

4    Q.  Who is that?

5    A.  Defendant Klein.

6    Q.  And how do you recognize him?

7    A.  I have assisted with that investigation, and I was also

8    present when Mr. Klein was arrested in northern Virginia.

9    Q.  And does Mr. Klein's appearance in this video match his

10   appearance when you arrested him in person?

11   A.  Yes.

12   Q.  Did you hear Mr. Klein's voice say anything during that

13   brief clip?

14           MR. WOODWARD:  Objection, Your Honor.

15           THE COURT:  On what basis?

16           MR. WOODWARD:  Lack of foundation.

17           MS. KLAMANN:  I can lay one, Your Honor.

18           THE COURT:  Okay.

19   BY MS. KLAMANN:

20   Q.  Agent Comottor, when you were present at the arrest of

21   Freddy Klein, did you have occasion to hear his voice?

22   A.  I did.

23           THE COURT:  All right.  So are you saying you see him

24   say something, or you think you heard him say something off

25   camera?

COMOTTOR - DIRECT

1          THE WITNESS:  I was answering the question of

2    whether or not I've heard him speak, and my answer was yes,

3    during --

4          THE COURT:  But you also said you heard him say

5    something -- maybe you didn't answer.  Did you see him say

6    something here on this video?

7          THE WITNESS:  I hadn't yet answered.  And I was going

8    to ask to replay a portion of the video so I could listen

9    again.

10          THE COURT:  Okay.  All right.  So why don't you

11    replay it.  And I'll handle the objection in a moment.

12          MS. KLAMANN:  Mr. Clements, can you -- perfect.

13    Right there is great.  Actually, I think -- yeah, 35 seconds,

14    Mr. Clements.  And can we turn up the volume.  I don't want

15    to blast everyone in the courtroom, but a little louder,

16    maybe.

17          Thank you, Mr. Clements.

18          (An audio-visual recording was played.)

19          MS. KLAMANN:  Pause there.

20    BY MS. KLAMANN:

21    Q.  Did you hear something at the end of that clip that you may

22    have recognized as Mr. Klein's voice?

23    A.  I did.

24          MR. WOODWARD:  Objection.

25          THE COURT:  It's lack of foundation?

```
 1              MR. WOODWARD:  Leading.
 2              THE COURT:  Well, I'm going to overrule the
 3     objection.
 4          I've got to say I'm a little skeptical that he can
 5     identify somebody's voice like that.  But I'll let you
 6     continue, if you'd like.
 7     BY MS. KLAMANN:
 8     Q.  What did you hear Mr. Klein say during that clip?
 9     A.  I heard we need fresh fucking people or fresh fucking
10     patriots.  The last word is unintelligible to me, but it starts
11     with a P.
12              MR. WOODWARD:  Objection.  Move to strike.
13              THE COURT:  All right.  I'm going to make a finding
14     that the agent cannot identify the defendant on -- based on
15     what I have in front of me.  So I'm going to disregard that
16     statement.  You may continue.
17              MS. KLAMANN:  Your Honor, may I ask a few more
18     questions to shore that up a little bit?
19              THE COURT:  All right.
20     BY MS. KLAMANN:
21     Q.  Agent Comottor, during the course of the investigation,
22     have you reviewed other video that depicts Mr. Klein, the
23     individual we've been speaking about here?
24     A.  Yes.
25              MR. WOODWARD:  Objection.  Lack of foundation.
```

```
 1                  THE COURT:  Overruled.

 2     BY MS. KLAMANN:

 3     Q.  And during those videos, have you heard him make statements

 4     relating to needing fresh people?

 5     A.  Yes.

 6                  MR. WOODWARD:  Objection, Your Honor.  This is not an

 7     appropriate way for her to lay the foundation, to insinuate

 8     he's already viewed videos that depict Mr. Klein when there's

 9     not been a foundation Mr. Klein is depicted in the videos.

10     It's ipse dixit at best.

11                  THE COURT:  I'm overruling the objection.

12                  MS. KLAMANN:  Mr. Clements, can we continue playing

13     the exhibit from time stamp 40 seconds.

14                  (An audio-visual recording was played.)

15                  MS. KLAMANN:  Let's pause there.

16     BY MS. KLAMANN:

17     Q.  Again, Agent Comottor, we're pausing at time stamp

18     54 seconds.  Did you see Defendant Freddy Klein do something

19     during that brief clip?

20     A.  Yes.

21                  MR. WOODWARD:  Leading.

22                  THE COURT:  Sustained.

23     BY MS. KLAMANN:

24     Q.  What did you see this man doing during that clip?

25     A.  He took a bottle of Gatorade and poured it over his eyes.
```

1    Q.  And, again, do you recognize this individual?

2    A.  I do.

3    Q.  Who do you recognize him to be?

4    A.  Defendant Klein.

5              THE COURT:  All right.  I just want to make clear

6    for the record, I still don't think the agent can identify --

7    well, let me say, I can't identify the prior statement.  So

8    I'm disregarding the statement about the reinforcements.

9              MR. WOODWARD:  And for the record, we object to the

10   identification of Mr. Klein by the agent.  We continue to

11   submit there's not been a proper foundation for his ability to

12   do that.

13             THE COURT:  Okay.  I'm overruling that objection.

14   You may continue, Ms. Klamann.

15             MS. KLAMANN:  Thank you.

16        Mr. Clements, let's play the exhibit from time stamp

17   54 seconds just through to 1 minute, please.

18             (An audio-visual recording was played.)

19   BY MS. KLAMANN:

20   Q.  Agent Comottor, it's a little cut off, but what am I

21   circling at the bottom of the screen right here?

22   A.  An individual wearing a tan-colored helmet.

23   Q.  What have I circled now immediately to that individual's

24   left?

25   A.  Another individual with a tan-in-color helmet.

1   Q.  Does it appear that these individuals are law enforcement?

2   A.  No.

3          MS. KLAMANN:  Mr. Clements, can we play the exhibit

4   through to a minute 34 seconds, please.

5          (An audio-visual recording was played.)

6          MS. KLAMANN:  Let's pause there.

7   BY MS. KLAMANN:

8   Q.  Did you hear voices coming from the crowd at the end of

9   that clip?

10  A.  Yes.

11         MS. KLAMANN:  And just for the record, we're at

12  time stamp 1 minute 34 seconds.

13  BY MS. KLAMANN:

14  Q.  What did you hear those voices saying?

15  A.  I heard tear gas.

16         MS. KLAMANN:  Mr. Clements, can we resume playing

17  from time stamp 1 minute 34 seconds.

18         (An audio-visual recording was played.)

19         MS. KLAMANN:  Pausing the video at time stamp

20  2 minutes and 1 second.

21  BY MS. KLAMANN:

22  Q.  Agent Comottor, did we see some items coming out of the

23  tunnel during that clip?

24  A.  Yes.

25  Q.  What were they?

1    A.  I saw two clear Capitol Police-branded riot shields being

2    passed from inside the tunnel overhead outside.

3    Q.  What was the crowd's reaction to those shields coming out

4    of the tunnel?

5    A.  They were cheering towards the end of the clip.

6            MS. KLAMANN:  Mr. Clements, can we continue playing

7    the video to time stamp 2 minutes and 27 seconds.

8            (An audio-visual recording was played.)

9    BY MS. KLAMANN:

10   Q.  Pausing the video at time stamp 2 minutes and 27 seconds,

11   did you hear a voice at the end of that clip?

12   A.  I did.

13   Q.  What did the voice say?

14           MR. HOLGUIN:  Objection, Your Honor.  The video

15   speaks for itself.  And, frankly, the noise the government

16   purports to be said on this, there should be a transcript and

17   shouldn't be through this agent.

18           THE COURT:  I'm going to overrule the objection.  You

19   may continue.

20   BY MS. KLAMANN:

21   Q.  Agent Comottor, what was said at the end of that clip?  And

22   we can replay it, if you need.

23   A.  I heard "Stomp your feet.  Stomp your feet.  Let them hear

24   us inside."

25   Q.  Did you recognize that voice?

1   A.  Yes.

2   Q.  Whose voice do you believe it is?

3   A.  That voice sounded consistent that Mr. Cappuccio's voice.

4          MS. KLAMANN:  Mr. Clements, can we resume playing the

5   video at time stamp 2 minutes and 27 seconds.  And we're just

6   going to play it for about 6 seconds, please.

7          (An audio-visual recording was played.)

8   BY MS. KLAMANN:

9   Q.  Did you hear -- pausing the video at time stamp 2 minutes

10  and 33 seconds, did you hear a voice calling "Bring the

11  shield[s]" at the end of that clip?

12  A.  I did.  I heard to me what was two different voices.  "Use

13  the shield" and "Bring the shield."

14         MR. HOLGUIN:  Again, objection, Your Honor.  The

15  video speaks for itself, and same objection as before.

16         THE COURT:  I understand.  And I'm overruling the

17  objection.  I think, as you say, there are a lot of people

18  talking.  And I think the -- the government can ask somebody

19  who's reviewed the tape to say what he hears.  Obviously, if

20  you disagree with what he's hearing or hearing something else,

21  you can bring that out on cross, but I think it is appropriate

22  for the agent to testify.

23         You may proceed.

24         MS. KLAMANN:  Thank you, Your Honor.

25         Mr. Clements, can we resume playing the video at

```
 1    2 minutes and 33 seconds.
 2              (An audio-visual recording was played.)
 3              MS. KLAMANN:  Mr. Clements, let's pause there.
 4         Pausing at time stamp 2 minutes and 55 seconds.
 5    BY MS. KLAMANN:
 6    Q.  Agent Comottor, did you hear a number of voices calling out
 7    at the end of that -- that portion of the video?
 8    A.  I did.
 9    Q.  What were they saying?
10    A.  They were calling "Bring the shields" and "Shield wall."
11              MS. KLAMANN:  Mr. Clements, can we resume playing the
12    video from time stamp 2 minutes and 55 seconds.
13              (An audio-visual recording was played.)
14              MS. KLAMANN:  Let's pause the video right there.
15         Pausing at time stamp 3 minutes and 8 seconds.
16    BY MS. KLAMANN:
17    Q.  Agent Comottor, did we see items being handed into the
18    tunnel during that portion of the video?
19    A.  Yes.
20    Q.  What items were those?
21    A.  There are two clear riot shields being passed back into the
22    tunnel.
23    Q.  Did those riot shields have any insignia on them?
24    A.  I believe they did, yes.  If you could play it again, I can
25    confirm.
```

1          MS. KLAMANN:  Mr. Clements, can we go back 3 minutes

2    quickly.

3          THE COURT:  Three minutes?

4          MS. KLAMANN:  Going back to 3 minutes into the video.

5    Can we play from there, Mr. Clements.

6          (An audio-visual recording was played.)

7          MS. KLAMANN:  We can pause there.

8    We're pausing at 3 minutes and 8 seconds.

9    BY MS. KLAMANN:

10   Q.  Agent Comottor, after reviewing it again, did you recognize

11   any insignia on those shields?

12   A.  Yes.  The Capitol Police insignia was on the shield closest

13   to the camera view here being held by the video with the

14   patterned, checkered hat.

15         MS. KLAMANN:  Okay.  Mr. Clements, can we resume

16   playing the video from time stamp 3 minutes and 8 seconds.

17         (An audio-visual recording was played.)

18         MS. KLAMANN:  Pausing at time stamp 3 minutes and

19   29 seconds.

20   BY MS. KLAMANN:

21   Q.  Agent Comottor, did we hear a voice at the end of that clip

22   as well?

23   A.  Yes.

24   Q.  What was that voice saying?

25   A.  "Water, water, water."

1    Q.  And what did we see?

2    A.  A bottle of water being passed into the view of the

3    camera.

4    Q.  Okay.  Was that water being put to any specific use?

5    A.  It was handed to an individual who poured it over his

6    eyes.

7            THE COURT:  So I think I've seen all this video at

8    this point before; right?

9            MS. KLAMANN:  I believe we played it once very long

10   for Your Honor without stopping.  I am going to -- I think

11   there's another 3 minutes left.  There are certain portions

12   that I did want to stop.  I can play it.

13           THE COURT:  All right.  Let's skip to what we think

14   is the most pertinent.  I don't think somebody having their

15   water -- having their eyes washed out is one of them.

16           MS. KLAMANN:  Okay.

17       Mr. Clements, can we resume playing the video at

18   3 minutes and 29 seconds.

19           (An audio-visual recording was played.)

20           MS. KLAMANN:  I'm sorry, Mr. Clements.  You can keep

21   playing until time stamp 4 minutes and 19 seconds.

22           (An audio-visual recording was played.)

23           MS. KLAMANN:  Let's pause right there.

24       Pausing the video at time stamp 4 minutes and

25   18 seconds.

1    BY MS. KLAMANN:

2    Q.  Agent Comottor, during that video was the camera actually

3    turned around?

4    A.  Yes.

5    Q.  And what did you see when it was turned around?

6    A.  I saw Mr. Cappuccio and heard him saying, "We're going in.

7    We're going in.  They're using tear gas on us.  We're going."

8    Q.  And this portion of the video where Mr. Cappuccio is

9    actually depicted and you can hear his voice, is that part of

10   the basis for your opinion today identifying his voice and

11   other videos?

12   A.  Yes.

13          MS. KLAMANN:  Okay.  Mr. Clements, can we play the

14   government's exhibit from 4 minutes and 18 seconds.

15          (An audio-visual recording was played.)

16          MS. KLAMANN:  Pausing the video at 5 minutes and

17   20 seconds.

18   BY MS. KLAMANN:

19   Q.  Did you hear a word yelled repeatedly during the end of

20   that clip?

21   A.  Yes.  The word push.

22          THE COURT:  This is all still 612.21; is that right?

23          MS. KLAMANN:  I believe so, Your Honor.  Yes.

24          THE COURT:  Thanks.  Okay.

25          MS. KLAMANN:  We're nearing the end.

COMOTTOR - DIRECT

1          THE COURT:  Just wanted to make sure I had my notes

2     right.  Thank you.

3          MS. KLAMANN:  Sure.

4          Mr. Clements, can we play the exhibit starting at

5     time stamp 5 minutes and 20 seconds, and we're going to pause

6     in about 8 seconds.

7          (An audio-visual recording was played.)

8          MS. KLAMANN:  Pause there.

9     BY MS. KLAMANN:

10    Q.  Did you hear a female voice at the end of that clip?

11    A.  Yes.

12    Q.  What did that voice say?

13    A.  "I'm okay.  I'm okay."

14         MS. KLAMANN:  Okay.  Mr. Clements, let's play the

15    rest of the video to the end, please.

16         (An audio-visual recording was played.)

17    BY MS. KLAMANN:

18    Q.  Okay.  Agent Comottor, at the end of that exhibit, was the

19    camera, once again, turned around?

20    A.  Yes.

21    Q.  And what did we see?

22    A.  The camera was turned on to Mr. Cappuccio, and he said,

23    "Can't handle it."

24    Q.  And is that portion of the video also part of the basis of

25    your testimony today when you've identified Mr. Cappuccio's

1    voice?

2    A.  Yes.

3              MS. KLAMANN:  Mr. Clements, can you pull up

4    Government's Exhibit 612.20, please.

5    BY MS. KLAMANN:

6    Q.  Agent Comottor, is this the Cellebrite report for the video

7    we just watched?

8    A.  Yes.

9    Q.  And according to the Cellebrite report, on what date and

10   time was it created?

11   A.  January 6th, 2021, at 3:03 p.m. Eastern.

12   Q.  Agent Comottor, as part of the investigation, did you

13   view CCTV footage from the camera that's located inside the

14   tunnel?

15   A.  Yes.

16             MS. KLAMANN:  Mr. Clements, can you pull up

17   Government's Exhibit 602.1.  I switched my numbers.  It's

18   Government's Exhibit 301.2.  And, Mr. Clements, can we move to

19   time stamp 3:07 p.m.  And we're going to play the exhibit from

20   here, and we'll pause in a few seconds.

21             (A video recording was played.)

22             MS. KLAMANN:  Let's go ahead and pause.  Can we go

23   back just 1 second, Mr. Clements.

24   BY MS. KLAMANN:

25   Q.  Agent Comottor, during that brief clip we just watched, did

1   you see a hand outstretched at the mouth of the tunnel with

2   what looked like a phone in it?

3   A.  Yes.

4   Q.  And through your participation in this investigation, are

5   you familiar with the appearance of the cell phone that was

6   seized from Mr. Cappuccio?

7   A.  Yes.

8   Q.  What color was it?

9   A.  It was red.

10  Q.  Okay.

11          MS. KLAMANN:  Mr. Clements, can we play from 3:07:50.

12  If we just want to move forward just a little.

13          (A video recording was played.)

14          MS. KLAMANN:  Perfect.  Let's play from there.

15          (A video recording was played.)

16          MS. KLAMANN:  Can we pause right there.

17  BY MS. KLAMANN:

18  Q.  I've circled an individual in the middle of the screen.

19  Agent Comottor, do you recognize who that is?

20  A.  Yes.

21  Q.  Who is it?

22  A.  Mr. Cappuccio.

23  Q.  What does Mr. Cappuccio have on his face?

24  A.  Has a blue-in-color face mask on.

25  Q.  During the investigation, did you determine where he

1    purchased that mask from?

2    A.  I did.

3    Q.  Where did he purchase it from?

4    A.  Johnston & Murphy.

5    Q.  I should say, you determined that Steven Cappuccio

6    purchased a mask consistent with the appearance of this mask

7    here from Johnston & Murphy -- right? -- during the

8    investigation?

9              MR. HOLGUIN:  Leading, Your Honor.

10             THE COURT:  I think this is the type of thing I

11   really don't need to know about.

12             MS. KLAMANN:  That's fine, Your Honor.

13        Let's resume playing from there, please.

14             (A video recording was played.)

15             MS. KLAMANN:  We can stop there.

16   BY MS. KLAMANN:

17   Q.  Agent Comottor, where did Mr. Cappuccio go?

18   A.  Out of the frame of the camera towards where I know the

19   police line to be.

20   Q.  During the investigation, did law enforcement identify

21   video footage taken from members of the public or members of

22   the riot that depict Mr. Cappuccio at the front of the police

23   line in the tunnel at approximately the same time as the video

24   we just finished watching?

25   A.  Yes.

1          MS. KLAMANN:  Okay.  Mr. Clements, can we pull up

2     Government's Exhibit 509.  And can we move to time stamp

3     5 minutes and 15 seconds.  Let's play from there.

4               (An audio-visual recording was played.)

5          MS. KLAMANN:  Let's pause there.

6          Can we go back just one second, please.  Can we play

7     just 1 second, please, Mr. Clements.  There we go.

8               (An audio-visual recording was played.)

9     BY MS. KLAMANN:

10    Q.  Agent Comottor, do you see the individual that I circled?

11    A.  Yes.

12    Q.  Who is that?

13    A.  Mr. Cappuccio.

14    Q.  What does he have in his right hand?

15    A.  A cell phone.

16          MS. KLAMANN:  Mr. Clements, we can play the exhibit

17    from there.

18               (An audio-visual recording was played.)

19          MS. KLAMANN:  Mr. Clements, can we stop.

20          Can we go back to time stamp 5:44, please.  Okay.  We

21    can pause there.

22    BY MS. KLAMANN:

23    Q.  Agent Comottor, do you recognize that hand?

24    A.  I do.

25    Q.  What does it appear that hand is doing?

1    A.   Grabbing a riot shield.

2    Q.   Whose hand is it?

3    A.   It's Mr. Cappuccio's left hand.

4    Q.   Earlier in the video, did we see Mr. Cappuccio place his

5    hands on anything else while at the front of the riot line --

6    or the police line?

7             MS. KLAMANN:   Let's go back just about 10 seconds.

8    So 5:34.

9             THE COURT:   What exhibit is this again, ma'am?

10            MS. KLAMANN:   This is 509.

11            THE COURT:   509.   Thank you.

12            MS. KLAMANN:   Yes.   Can we play from time stamp 5:34,

13   Mr. Clements.

14            (An audio-visual recording was played.)

15            MS. KLAMANN:   Pause there.

16   BY MS. KLAMANN:

17   Q.   Did you see Mr. Cappuccio touch anything at the end of that

18   clip?

19   A.   Yes.

20   Q.   What was it?

21   A.   It looks like the door that the officer opens and leads

22   further into the tunnel.

23            MS. KLAMANN:   Let's resume playing from there,

24   Mr. Clements.

25            (An audio-visual recording was played.)

```
 1              MS. KLAMANN:  And, Your Honor, I don't believe this
 2      exhibit has been admitted.  So we'd move to do that now.
 3              THE COURT:  All right.  Mr. Holguin, any objection?
 4              MR. HOLGUIN:  Your Honor, I believe it's been
 5      admitted.
 6              MS. DOUENAT:  All those videos have been admitted.
 7      We all agreed to them.
 8              MS. KLAMANN:  Not Mr. Woodward.
 9              MS. DOUENAT:  Oh, that's right.  You're right.
10              THE COURT:  Thank you.
11         Mr. Woodward, do you object?
12              MR. WOODWARD:  Yes, Your Honor, we object to lack of
13      foundation.
14              THE COURT:  All right.  I'm going to overrule the
15      objection.
16              MR. WOODWARD:  Your Honor, if I may.  I don't think
17      this witness can lay a foundation.  He was not in the tunnel,
18      did not see any of this.  And so with respect to this
19      particular exhibit, any foundation would have to come from
20      somebody other than this witness.
21              MS. KLAMANN:  Your Honor, we just watched video
22      recorded from Mr. Cappuccio that depicts the same exact
23      events.
24              MR. WOODWARD:  So that's --
25              THE COURT:  All right.  So --
```

```
1              MS. KLAMANN:  They cross-authenticate each other.

2              THE COURT:  Why don't I ask you to ask a couple

3    questions to lay a foundation.  I don't think the agent needs

4    to have been there personally.

5              MS. KLAMANN:  I'm sorry, Your Honor.  I didn't hear

6    you.

7              THE COURT:  Why don't you ask the agent a couple of

8    questions to lay a foundation.

9              MS. KLAMANN:  Can we go back about 10 seconds in the

10   video.

11   BY MS. KLAMANN:

12   Q.  Agent, at the end of the video that we watched just before

13   this one, the one from Mr. Cappuccio's phone, you testified

14   that you heard the crowd screaming push; is that right?

15   A.  Yes.

16   Q.  Repeatedly; right?

17   A.  Yes.

18             MS. KLAMANN:  Okay.  Let's just play from there,

19   Mr. Clements.

20             (An audio-visual recording was played.)

21   BY MS. KLAMANN:

22   Q.  At the end of this exhibit, did you hear the same calls for

23   push that you did in Mr. Cappuccio's video?

24   A.  Yes.

25   Q.  And does it appear during this video that Mr. Cappuccio is
```

1    holding his phone up as if he's recording?

2    A.  Yes.

3    Q.  And does he appear to be in roughly the same location as

4    the video taken from his phone?

5    A.  Yes.

6              MS. KLAMANN:  Your Honor, the government moves to

7    admit Government 509.

8              THE COURT:  Over objection, I'm admitting 509.

9              (Government Exhibit 509 admitted into evidence.)

10             MS. KLAMANN:  All right.  Mr. Clements, can we move

11   to Government's Exhibit 515.  And can we move us ahead to

12   18 minutes and 43 seconds.

13        Okay.  And let's play from there, Mr. Clements.  We're

14   going to pause at 18:49.

15             (An audio-visual recording was played.)

16             MS. KLAMANN:  I'm sorry, Mr. --

17   BY MS. KLAMANN:

18   Q.  Agent Comottor, I'm circling someone on the screen right

19   now.  Do you recognize that person?

20   A.  Yes.

21   Q.  Who it is?

22   A.  It's Mr. Cappuccio with a white long-sleeve shirt holding a

23   cell phone in his right hand.

24             MS. KLAMANN:  Mr. Clements, let's play this to

25   20 minutes and 6 seconds, please.

1              (An audio-visual recording was played.)

2    BY MS. KLAMANN:

3    Q.  Agent Comottor, I'm circling someone.  Do you recognize

4    that person?

5    A.  Yes.

6    Q.  Who is it?

7    A.  Mr. Cappuccio.

8    Q.  Is he still located at the police line?

9    A.  Yes.

10             MS. KLAMANN:  And, Mr. Clements, can you play the

11   rest of the video, please.

12             (An audio-visual recording was played.)

13             MS. KLAMANN:  Mr. Clements, can you pull up quickly

14   Government's Exhibit 501.  Can you move us to time stamp

15   18 minutes and 15 seconds.  Can we play from that time stamp

16   just to 18:22.

17             (An audio-visual recording was played.)

18             MS. KLAMANN:  And pause right there, actually.

19   BY MS. KLAMANN:

20   Q.  Agent Comottor, I am circling something on the screen.

21   What is that?

22   A.  It's a red cell phone.

23   Q.  Okay.  And based on your investigation and your review of

24   other videos, do you believe -- do you know who that cell phone

25   belongs to?

1    A.  Yes.  Mr. Cappuccio.

2    Q.  Okay.  And who's holding it?

3    A.  I believe he is in his right hand.

4          MS. KLAMANN:  Mr. Clements, can you just play 8 more

5    seconds of that, please, to 18:30.

6          (An audio-visual recording was played.)

7    BY MS. KLAMANN:

8    Q.  At the end of the last video that we watched for

9    Mr. Cappuccio's phone, it looked as if he was heading back

10   towards the entrance of the tunnel; isn't that right?

11   A.  We did watch one of those videos, yes.

12         MS. KLAMANN:  Mr. Clements, can you pull up

13   Government's Exhibit 301.2.  And let's move ahead to time stamp

14   3:10:35.  Let's play from there.

15         (A video recording was played.)

16         MS. KLAMANN:  Actually, Mr. Clements, let's pause.

17   BY MS. KLAMANN:

18   Q.  Agent Comottor, I've circled someone.  Do you recognize who

19   I've circled?

20   A.  Yes.  Mr. Cappuccio.

21   Q.  Okay.  What does he have in his right hand?

22   A.  Cell phone.

23         MS. KLAMANN:  Okay.  Mr. Clements, go ahead and play,

24   please.

25         (A video recording was played.)

 1    BY MS. KLAMANN:

 2    Q.  Agent Comottor, during that clip, did we see Mr. Cappuccio

 3    actually turn around and head back towards the police line?

 4    A.  Yes.

 5    Q.  And during that time did we see many other rioters leaving

 6    the tunnel?

 7    A.  Yes.  Some can be seen coming and some still come -- some

 8    can be seen going out and some can be seen still coming in.

 9    Q.  Okay.  And did we see a bright light shining on

10    Mr. Cappuccio at the end of that clip?

11    A.  Yes.

12            MS. KLAMANN:  Okay.  Mr. Clements, can you resume

13    playing from time stamp 3:11:04.

14            (A video recording was played.)

15            MS. KLAMANN:  Let's pause there.  Pausing at

16    time stamp 3:11:15.

17    BY MS. KLAMANN:

18    Q.  Agent Comottor, what is Mr. Cappuccio doing now?

19    A.  He's still holding his cell phone.  It looks like the

20    light -- or the flashlight feature has been activated in his

21    right hand.  And looks to be holding a clear riot shield with

22    his left hand.

23            THE COURT:  Remind me what exhibit we're on,

24    Ms. Klamann.

25            MS. KLAMANN:  301.2, Your Honor, is the CCTV footage.

COMOTTOR - DIRECT

```
1                    THE COURT:  Thank you.
2                    MS. KLAMANN:  Sure.
3               Mr. Clements, let's resume playing just until 3:11:27.
4                    (A video recording was played.)
5     BY MS. KLAMANN:
6     Q.  Agent Comottor, did we see Mr. Cappuccio leave the frame at
7     the end of that clip?
8     A.  Yes.
9     Q.  In what direction was he moving?
10    A.  From the bottom of the screen, he was moving out of view,
11    which would indicate he's moving back towards the police line.
12    Q.  Okay.  Let's turn back now to items located on
13    Mr. Cappuccio's cell phone by the FBI.
14                   MS. KLAMANN:  Mr. Clements, can you pull up
15    Government's Exhibit 612.23.
16    BY MS. KLAMANN:
17    Q.  Agent Comottor, is this another video from Mr. Cappuccio's
18    cell phone?
19    A.  Yes.
20                   MS. KLAMANN:  We may need to let it buffer for a
21    second.  Yeah.  Mr. Clements, can we play the video just for
22    about 11 seconds.
23                   (An audio-visual recording was played.)
24    BY MS. KLAMANN:
25    Q.  Agent Comottor, what's happening right next to
```

1    Mr. Cappuccio?

2    A.  The individual that you circled is spraying some sort of

3    orange irritant in the direction of the police officers.

4    Q.  And is there a row of rioters in front of Mr. Cappuccio at

5    this point?

6    A.  There appears to be some, yes.

7    Q.  Okay.

8              MS. KLAMANN:  Mr. Clements, let's resume playing just

9    for 6 seconds to 17 seconds.

10             (An audio-visual recording was played.)

11   BY MS. KLAMANN:

12   Q.  Agent Comottor, does it appear at time stamp 17 seconds in

13   the video that Mr. Cappuccio has something in his hand?

14   A.  Yes.

15   Q.  What is that?

16   A.  It looks to be the -- the butt end or the end of a police

17   baton.

18   Q.  No.  I'm sorry.  Let me circle it.

19   A.  Okay.  I'm sorry.  That is a portion of a clear riot

20   shield.

21   Q.  Okay.  And I think this item in black over here, is that

22   what you were referring to?

23   A.  Yeah.  It's a little bit obscured.

24   Q.  Yeah.  I don't know what that is now.  A handle?  Is that a

25   handle?

1          MR. HOLGUIN:  Objection, Your Honor.  Leading.

2          THE COURT:  Sustained.

3          MS. KLAMANN:  Mr. Clements, let's play the rest of

4    the video to the end, please.

5          (An audio-visual recording was played.)

6    BY MS. KLAMANN:

7    Q.  Agent Comottor, did you hear a voice speaking during that

8    video?

9    A.  I did.

10   Q.  Specifically, did you hear him -- a voice say something

11   towards the end of the video?

12   A.  Yes.

13   Q.  What did you hear?

14   A.  I heard "How do you like me now, fucker?  How do you like

15   me now?"

16   Q.  And did you recognize that voice?

17   A.  Yes.

18   Q.  Whose was it?

19   A.  It appeared to be Mr. Cappuccio's voice.

20   Q.  And based on your review of the video evidence, where was

21   Mr. Cappuccio's phone located during the latter half of that

22   video?

23   A.  In his mouth.

24          MS. KLAMANN:  Mr. Clements, can we pull up

25   Government's Exhibit 612.22.

COMOTTOR - DIRECT

1    BY MS. KLAMANN:

2    Q.  Agent Comottor, is this the Cellebrite report for that

3    video we just watched?

4    A.  Yes.

5    Q.  According to the Cellebrite report, on what date and time

6    was that video created?

7    A.  January 6th, 2021, at 3:11 p.m. Eastern.

8    Q.  Agent Comottor, during the investigation, did you also view

9    video depicting Mr. Cappuccio's exit from the tunnel?

10   A.  Yes.

11   Q.  Showing you Government's Exhibit 533.1.  Do you recognize

12   the area depicted on the screen here?

13   A.  Yes.

14   Q.  Is that the lower west terrace tunnel?

15   A.  It is.

16        MS. KLAMANN:  Mr. Clements, can you move us ahead to

17   time stamp 28 seconds.

18   BY MS. KLAMANN:

19   Q.  And, Agent, I'm going to ask you to keep your eyes on the

20   mouth of the tunnel, please.

21        MS. KLAMANN:  Mr. Clements, let's play from there.

22        (An audio-visual recording was played.)

23        MS. KLAMANN:  Let's pause there.

24   BY MS. KLAMANN:

25   Q.  Agent Comottor, I've circled something on the screen.  Do

1    you recognize what I've circled?

2    A.  Yes.

3    Q.  What have I circled?

4    A.  It's Mr. Cappuccio raising his fist in the air.

5            MS. KLAMANN:  Mr. Clements, can you just play that

6    for a couple more seconds.

7            (An audio-visual recording was played.)

8            MS. KLAMANN:  We can pause there.  And let's move --

9    BY MS. KLAMANN

10   Q.  Agent Comottor, did the FBI also recover text messages

11   from Mr. Cappuccio's phone that were sent around this

12   same time?  And just as a refresher, we were talking about

13   3:11 p.m.

14   A.  Yes.

15           MS. KLAMANN:  Mr. Clements, can you pull up

16   Government's Exhibit 612.25 again.  I'm sorry.  I'm sorry,

17   Mr. Clements.  Can you pull up Government's Exhibit 613.

18   BY MS. KLAMANN:

19   Q.  And just as a reminder, Agent Comottor, are these the text

20   messages between Mr. Cappuccio and an individual saved in his

21   phone as Mike?

22   A.  Yes.

23           MS. KLAMANN:  Can we move to page 24 of the exhibit.

24   And can we zoom in on the first text.

25   ///

1    BY MS. KLAMANN:

2    Q.  Agent Comottor, is this a text message that Mr. Cappuccio

3    sent from his phone on January 6th at 3:29 p.m. Eastern Time?

4    A.  Yes.

5    Q.  What does it say?

6    A.  "Broke my phone."

7           MS. KLAMANN:  Mr. Clements, can we go to the next

8    message on the same page.

9    BY MS. KLAMANN:

10   Q.  Is this another message sent at 3:29 Eastern Time by

11   Mr. Cappuccio?

12   A.  Yes.

13   Q.  And what does it say?

14   A.  "Where you at?"

15          MS. KLAMANN:  Can we move to the next message,

16   Mr. Clements.

17   BY MS. KLAMANN:

18   Q.  Is this another message sent from Mr. Cappuccio on

19   January 6th at 4:04 p.m. Eastern Time?

20   A.  Yes.

21   Q.  What does he say?

22   A.  "Keep walking Mike."

23   Q.  Based on these and other text messages, does it appear that

24   Mike and Mr. Cappuccio were separated around this time?

25   A.  Yes.

```
1            MS. KLAMANN:  Okay.  Now can we pull up Government's

2    Exhibit 612.25, Mr. Clements.

3    BY MS. KLAMANN:

4    Q.  Agent Comottor, is this another video from Mr. Cappuccio's

5    phone?

6    A.  Yes.

7    Q.  Okay.

8            MS. KLAMANN:  Mr. Clements, this is -- this is a

9    quick video.  It's just 25 seconds.  Can we play the entire

10   video.

11            (An audio-visual recording was played.)

12            MS. KLAMANN:  Mr. Clements, can you pull up

13   Government's Exhibit 612.24.

14   BY MS. KLAMANN:

15   Q.  Agent Comottor, is this the Cellebrite report for that

16   video?

17   A.  Yes.

18   Q.  According to the Cellebrite report, at what -- on what date

19   and time was that video created?

20   A.  January 6th, 2021, at 3:47 p.m. Eastern.

21   Q.  Last, Agent Comottor, did you -- or, rather, did FBI

22   recover any items from Mr. Cappuccio's phone relating to FBI's

23   investigation of Mr. Cappuccio?

24   A.  Yes.

25            MS. KLAMANN:  Mr. Clements, can we pull back up
```

1    Government's Exhibit 613.  And can we go to page 45, please.

2    I'm sorry.  Let's move to 46.  Let's move to 47.

3         I apologize, Your Honor.  I'm trying to be efficient.

4         THE COURT:  Thank you.

5         MS. KLAMANN:  Okay.  Let's look at the first text on

6    page 47, please.

7    BY MS. KLAMANN:

8    Q.  Agent Comottor, is this a text message sent by

9    Mr. Cappuccio to Mike on February 20th at 1:43 Eastern Time?

10   A.  Yes.

11   Q.  What does it say?

12   A.  "Don't know if that's a good idea."

13        MS. KLAMANN:  Mr. Clements, can we go to the next

14   message.

15   BY MS. KLAMANN:

16   Q.  Did Mike respond to that asking "Why?"

17   A.  Yes.

18   Q.  Can you go to the next message.  And did Mike say, "You

19   can't just sneak off" in the next message?

20   A.  Yes.

21        MS. KLAMANN:  Can we go to the next page, please,

22   Mr. Clements, 48.

23        Okay.  Can we pull up that first text message.

24   BY MS. KLAMANN:

25   Q.  Is this a text message that Mr. Cappuccio sent to Mike?

```
1    A.  Yes.

2    Q.  On what date and time did he send it?

3    A.  February 20th, 2021, at 1:44 p.m. Eastern.

4    Q.  And is the text message an attachment?

5    A.  Yes.  There is an image attached to the text, yes.

6    Q.  And what does that image appear to be?

7    A.  It is a photo of Mr. Cappuccio.  It appears from the

8    thumbnail at least to be the FBI BOLO poster that was created.

9         MS. KLAMANN:  Mr. Clements, can we move to the next

10   message.

11   BY MS. KLAMANN:

12   Q.  Did Mike respond to that message on the same date,

13   February 20th, 2021?

14   A.  Yes.

15   Q.  What did he say?

16   A.  "Oh shit."

17        MS. KLAMANN:  Okay.  Can we go to the next page,

18   Mr. Clements.  Yes, that first text.  Thank you.

19   BY MS. KLAMANN:

20   Q.  And did Mr. Cappuccio respond?

21   A.  Yes.  He said, "Yeah."

22        MS. KLAMANN:  Can we go to the next message,

23   Mr. Clements.

24   BY MS. KLAMANN:

25   Q.  And then did Mike send Mr. Cappuccio a message stating,
```

1    "They don't know who you are based on that I would guess"?

2    A.  Correct.

3    Q.  Okay.

4           MS. KLAMANN:  Mr. Clements.

5    BY MS. KLAMANN:

6    Q.  Did Mike then ask, "Where did you find that?"

7    A.  Yes.

8           MS. KLAMANN:  Can we turn to the next page,

9    Mr. Clements.

10   BY MS. KLAMANN:

11   Q.  And what did Mr. Cappuccio respond?

12   A.  "Military buddy sent it to me."

13          MS. KLAMANN:  Okay.  Can we go to the next message.

14   BY MS. KLAMANN:

15   Q.  And then what did Mr. Cappuccio say?

16   A.  "It was all over the news during the impeachment trial of

17   trump."

18   Q.  Okay.  And what did Mike respond?

19   A.  "You will be ok."

20          MS. KLAMANN:  Can we go to the next page,

21   Mr. Clements.

22   BY MS. KLAMANN:

23   Q.  What did Mr. Cappuccio say?

24   A.  "I hope."

25          MS. KLAMANN:  Okay.  Next message, please.

```
 1    BY MS. KLAMANN:

 2    Q.  What did Mike say?

 3    A.  "That could be anyone."

 4    Q.  And how did Mr. Cappuccio respond?

 5    A.  "Sure."

 6         MS. KLAMANN:  Go to the next page, Mr. Clements.

 7    BY MS. KLAMANN:

 8    Q.  And did Mr. Cappuccio send one more text?

 9    A.  Yes.

10    Q.  What did he say?

11    A.  "It could be."

12         MS. KLAMANN:  Okay.  Mr. Clements, can you pull up

13    Government's Exhibit 611.38 now.

14    BY MS. KLAMANN:

15    Q.  Does this appear to be -- is this a screenshot recovered

16    from Mr. Cappuccio's phone?

17    A.  Yes.

18    Q.  And does this appear to be consistent with the attachment

19    that we saw from the text string we just reviewed?

20    A.  Yes.

21    Q.  This is consistent with the attachment that Mr. Cappuccio

22    sent to Mike?

23    A.  Yes.

24    Q.  And what is it?

25    A.  It is a screenshot of an article with four individuals
```

COMOTTOR - DIRECT

1    listed, but Mr. Cappuccio's phone is in the top left of those

2    four.

3    Q.  Agent Comottor, was Mr. Cappuccio arrested in this case?

4    A.  He was.

5    Q.  Did he self-surrender?

6    A.  No.

7    Q.  When was he arrested?

8    A.  In August of 2021.

9            MS. KLAMANN:  Your Honor, may I have one moment?

10           THE COURT:  You may.

11           MS. KLAMANN:  No further questions, Your Honor.

12           THE COURT:  All right.  Mr. Holguin.

13                      CROSS-EXAMINATION

14   BY MR. HOLGUIN:

15   Q.  Good afternoon, Agent Comottor.

16   A.  Good afternoon.

17   Q.  I wanted to ask you a little bit about the that BOLO that,

18   I believe, you started and ended your testimony with.  The BOLO

19   was BOLO No. 123?

20   A.  Correct.  AFO BOLO 123 yes.

21   Q.  AFO, what does AFO mean?

22   A.  Assault on federal officer.

23   Q.  Okay.  And BOLO is be on the lookout?

24   A.  That's correct.

25   Q.  And 123, that's the number that you gave to the BOLO prior

1    to your knowing who the person in the picture was?

2    A.  Yeah.  The FBI generated that number sequentially based on

3    other BOLOs that were being used at the time.

4    Q.  And at that time you weren't aware of who that individual

5    was -- correct? -- when it was first generated?

6    A.  Correct.

7    Q.  Okay.  And the BOLO is put out to the public?

8    A.  Yes.

9    Q.  The idea if, hopefully, you get information tips from the

10   public to help you identify that person?

11   A.  Yes.

12   Q.  And that's what happened here?

13   A.  Yes.

14   Q.  Okay.  Now, I believe, though, that there was additional

15   tips received on this particular BOLO No. 123 that did not

16   pertain to Mr. Cappuccio.

17           MS. KLAMANN:  Your Honor, objection.  Relevance.  ID

18   has been stipulated to.  Why are we talking about tips of

19   AFO 123.

20           THE COURT:  I got it.  Why is this relevant?

21           MR. HOLGUIN:  I'm sorry?

22           THE COURT:  Why is this relevant?

23           MR. HOLGUIN:  I was just going to show, Judge, a

24   couple of questions that, basically, the -- the information

25   that had come in, some of it has not been reliable, Judge.  Not

1    so much to challenge the identification, but just some of the

2    information that sometimes the government receives is not

3    reliable.  That was it, Judge.

4           THE COURT:  All right.  I'm going to sustain the

5    objection.

6    BY MR. HOLGUIN:

7    Q.  Continuing on something else with the BOLO.

8           MR. HOLGUIN:  If Mr. Clements could pick -- pull up

9    Picture 611.38.  I believe that was the final exhibit on the

10   government's direct.

11   BY MR. HOLGUIN:

12   Q.  Sir, I believe you testified this was -- this was found on

13   Mr. Cappuccio's phone?

14   A.  Yes.

15   Q.  Okay.  And is it your understanding that this was the -- a

16   clip of this is what Mr. Cappuccio sent to Mike?

17   A.  This is a screenshot from Mr. Cappuccio's phone.

18   Q.  Okay.  Were you able to more closely look at the -- on the

19   text that he sends to Mike in which he puts a picture of the

20   attachment of the BOLO, were you able to look at that thumbnail

21   as part of your investigation?

22   A.  Yes.

23   Q.  Okay.  Is it a thumbnail of this picture?

24   A.  It appears to be, yes.

25   Q.  Okay.  In this picture -- or it's -- it has, like, a

1   caption at the top above the four pictures; correct?

2   A.   There's words above the pictures, yes.

3   Q.   Okay.   And it says, "The FBI has posted 353 images on its

4   website, seeking public help in identifying people at the

5   Capitol on Jan. 6, with a priority of finding those who

6   attacked police officers."   Correct?

7   A.   That's correct.

8   Q.   Okay.   Again, this is a request to the public asking for --

9   for help with these individuals?

10  A.   This article appears to be summarizing that, yes.

11  Q.   Okay.   And the -- Mr. Cappuccio, when he sends this to

12  Mike -- or when he sends the thumbnail to Mike, the information

13  here is -- is something that has been sent out to request

14  information; correct?

15  A.   All I can say is he sent this screenshot that -- via text

16  message to Mike.

17  Q.   Does it say here there's a warrant out for these four

18  people on -- on this thumbnail?

19  A.   On this particular screenshot, no.   The word warrant is not

20  listed.

21  Q.   Okay.   Did the FBI send a warrant to Mr. Cappuccio's home

22  asking him to turn himself in and an arrest warrant?

23  A.   No.

24  Q.   Okay.   And you said that he was arrested in August of 2021;

25  correct?

```
 1    A.  Yes, sir.

 2    Q.  Okay.  And when you were doing your investigation to try

 3    and determine who Mr. Cappuccio was, after you get these tips

 4    from the public, you also, I believe, looked at some of the

 5    cell phone information?

 6    A.  I'm sorry.  Can you clarify your question.

 7    Q.  Yes.  As you're trying to determine who the identity of

 8    this person on -- on this BOLO, BOLO 123, you had done some

 9    follow-up investigation beyond just the tips you received;

10    correct?

11         MS. KLAMANN:  Your Honor, objection.  Same bases.

12    Relevance.  Why are we getting into the identification?  That

13    has been stipulated to.

14         MR. HOLGUIN:  Your Honor, I'm not going into the

15    identification.  However, the government did raise at the end

16    of their direct the issue of Mr. Cappuccio's self-surrendering

17    or turning himself in.  I'm just exploring that.  That was

18    brought on in direct.

19         THE COURT:  All right.  I'll allow it for now.  But

20    let's try to get to the -- where you're going on this.

21         MR. HOLGUIN:  I will, Your Honor.

22    BY MR. HOLGUIN:

23    Q.  Just going back to, Agent, after you had received these

24    tips, you did some follow-up investigation from those tips

25    regarding the identity of Mr. Cappuccio; correct?
```

1   A.  Once we were confident in the identity of Mr. Cappuccio,

2   yes, there was additional investigative steps conducted.

3   Q.  One of those steps was determining his cell phone;

4   correct?

5   A.  Yes.

6   Q.  And, in other words, determining his address?

7   A.  Yes.

8   Q.  He lived in Universal City, Texas?

9   A.  Yes.

10  Q.  That's kind of a suburb of San Antonio?

11  A.  Yes.

12  Q.  This was information that you were able to derive from your

13  investigation; correct?

14  A.  That's correct.

15  Q.  Okay.  And, in fact, that is where he was arrested;

16  correct?

17  A.  Yes.

18  Q.  Now, were you present at the time of his arrest in August

19  of 2021?

20  A.  I was not.

21  Q.  It was other agents that conducted that arrest?

22  A.  Yes.

23  Q.  But you spoke with those agents?

24  A.  Yes.

25  Q.  Okay.  About Mr. Cappuccio's arrest?

```
1    A.  Correct.

2    Q.  And he was found at the location where he had been living?

3    A.  Yes.

4    Q.  That was the information consistent with the information

5    that you had in regards to his residence?

6    A.  Yes.

7    Q.  And he was arrested there along with -- and he lived there

8    along with his wife?

9    A.  Yes.

10   Q.  And his children?

11   A.  Correct.

12   Q.  Okay.  I wanted to ask you -- because you had testified

13   that you were able to recognize Mr. Cappuccio's voice;

14   correct?

15   A.  Yes.

16   Q.  On several of the videos -- and I'm not going to go back

17   and replay each of them, but on several of the videos you said

18   he says the words dirty deuce?

19   A.  Yes.

20   Q.  What does that mean?

21   A.  I know the word -- the phrase dirty deuce to be affiliated

22   with a -- an Army or a military group, battalion.  I'm not

23   exactly sure of the right notation there.

24   Q.  I'm sorry.  I didn't catch the last --

25   A.  I'm not exactly sure of the right notation there, but I
```

COMOTTOR - CROSS

1    know it to be affiliated with a particular subsection of the

2    Army.

3    Q.  Were you yourself in the Army, sir?

4    A.  No, sir.

5    Q.  But you have knowledge that dirty deuce refers to something

6    in the U.S. military?

7    A.  Yes.

8    Q.  In particular, to a unit in the U.S. Army of the military?

9    A.  Yes.

10   Q.  Okay.  And Mr. Cappuccio, he -- I think we've seen a copy

11   of the videos where he had recorded parts of his road trip;

12   correct?

13   A.  Yes.

14   Q.  I think we saw the video where they're even kind of in a

15   convoy and they're getting up on the freeway as they're leaving

16   some parking area; correct?

17   A.  Yes.

18         MR. HOLGUIN:  Okay.  Now, I wanted to go -- if you

19   could call up, Mr. Clements, Exhibit 612.43.  Could you play

20   it, again, sir, with the sound from the beginning.

21         (An audio-visual recording was played.)

22   BY MR. HOLGUIN:

23   Q.  Whose voice is in that video, sir?

24   A.  I can hear former President Trump's voice.

25   Q.  Okay.  And your understanding is this is video taken from

1    Mr. Cappuccio's phone?

2    A.  Yes.

3    Q.  Okay.  And he's -- from your understanding, this is

4    from the -- that "Stop the Steal" rally being held on

5    January 6th?

6    A.  Yes.

7    Q.  And Mr. Cappuccio had filmed a portion of the rally;

8    correct?

9    A.  Yes.

10   Q.  And here he's -- the President's speaking; correct?

11   A.  Yes.

12   Q.  And -- but Mr. Cappuccio isn't filming the President;

13   correct?

14   A.  In this particular clip, no, he -- former President Trump

15   is not visible.

16   Q.  He's filming an individual who's dressed in kind of a

17   costume?

18   A.  Sure.

19   Q.  I mean, the jacket with the stripes, and then he seems

20   to have some kind of tubes that are coming out of him;

21   correct?

22   A.  Yes.

23   Q.  Okay.  Because you also had testified that you had -- as

24   part of your preparation for your testimony or for the case,

25   you had listened to -- to former President Trump's speech from

1     that day; correct?

2     A.  Yes.

3     Q.  Now, you didn't hear that speech from Mr. Cappuccio's

4     phone.  You heard it from a C-SPAN recording?

5     A.  I reviewed the entire speech via C-SPAN's website, but

6     there are portions of the speech that are captured on

7     Mr. Cappuccio's phone.

8     Q.  Yes.  But you reviewed the entire speech on C-SPAN?

9     A.  Yes.

10    Q.  Because Mr. Cappuccio's phone doesn't capture the entire

11    speech?

12    A.  Correct.

13    Q.  And, in fact, earlier today there were four different clips

14    that were played of that speech; correct?

15    A.  There were several.  I don't recall exactly how many, but

16    yes.

17    Q.  And I'm talking -- referring specifically to the C-SPAN

18    speech.  You recall testifying about those four clips; correct?

19    A.  Yes.

20    Q.  Okay.  And that's part of a speech that I believe you said

21    was about an hour and 11 minutes long?

22    A.  Yes, approximately.  Yes.

23    Q.  Okay.  You listened to that entire speech; correct?

24    A.  Yes, I have.

25    Q.  And when you listened to it, you were listening to it --

1    you were paying attention to it?

2    A.  Sure.  Yes.

3    Q.  Because that was part of your investigation?

4    A.  Yes.

5    Q.  And, in fact, it's been presented as part of the case

6    because it was something that, you know, you understood to be

7    important in the case?

8    A.  It was one aspect of the case, yes.

9    Q.  And so you were paying particular attention at that point

10   to what the President was saying?

11   A.  Yes.  I was listening to his words, yes.

12   Q.  Is it fair to say that the clips that were taken are the

13   clips that were considered to be important for you of that

14   1-hour-and-11-minute speech?

15   A.  Yeah.  I would agree there's importance to the clips that

16   we showed here in court today, yes.

17   Q.  And those were speeches -- those were clips, though, that

18   you took out of that C-SPAN speech; correct?

19   A.  I did not create those exhibits, no.  But I listened to

20   them, confirmed they were part of the entirety of the speech.

21   Q.  Who chose those clips?

22   A.  The prosecution team.

23   Q.  Okay.  They were not clips taken from Mr. Cappuccio's

24   phone; correct?

25   A.  No.

1    Q.  And so the reality of it is you can't testify as to what

2    portions of the speech that former President Trump gave

3    Mr. Cappuccio actually paid attention to?

4    A.  No, I can't confirm what he heard and what he listened to.

5              MR. HOLGUIN:  If you could bring up, Mr. Clements,

6    what's marked as Exhibit 612.45.  Can you play the -- can you

7    actually play the whole clip, please, Mr. Clements.

8              (An audio-visual recording was played.)

9              MR. HOLGUIN:  Can you pause there.

10   BY MR. HOLGUIN:

11   Q.  And, Agent Comottor, you're hearing people yell out "Stop

12   the Steal"?

13   A.  Yes.

14   Q.  It's not just one voice; correct?

15   A.  No.

16   Q.  It's various people in the crowd chanting out "Stop the

17   Steal"?

18   A.  Yes.

19             MR. HOLGUIN:  Can you continue playing.

20             (An audio-visual recording was played.)

21             MR. HOLGUIN:  Can you stop there.

22   BY MR. HOLGUIN:

23   Q.  Do you hear Mr. Cappuccio's voice in that clip?

24   A.  I believe I did, a portion of it, yes.

25   Q.  And what does he say?

1    A.  I believe he was the individual that said, "That too."

2    Q.  And then what is he saying that in response to?

3    A.  In response to another individual saying, "I love hot

4    chicks."

5    Q.  And then do you hear someone else start chanting, "I love

6    hot chicks"?

7    A.  I believe so, yes.

8    Q.  And is that Mr. Cappuccio?

9    A.  I don't believe he's the one chanting because that voice

10   sounds like it was coming from a microphone or megaphone.

11   Q.  Well -- okay.

12           MR. HOLGUIN:  Can you call up 612.9, please,

13   Mr. Clements.

14           (An audio-visual recording was played.)

15   BY MR. HOLGUIN:

16   Q.  And you also testified this is the -- this is a --

17   basically, a selfie Mr. Cappuccio took?

18   A.  Yes.

19   Q.  Okay.  I believe the -- and if you want, I can go back.

20   But the Cellebrite evidence, this picture was taken at

21   approximately 2:29 p.m. on January 6th?

22   A.  The approximate time sounds correct.  But without seeing

23   the Cellebrite, I don't have the time memorized, no.

24   Q.  And is it fair to say it looks like Mr. Cappuccio himself

25   took the picture?

```
1    A.   The -- the photo was taken from his phone, yes.

2    Q.   Okay.  And it's a picture of himself?

3    A.   Yes.

4    Q.   And of the Capitol in the background?

5    A.   Yes.

6    Q.   And does he look angry to you?

7    A.   No.  He's smiling in this photo.

8    Q.   Okay.

9          MR. HOLGUIN:  Your Honor, may I have a moment?

10         THE COURT:  You may.

11         MR. HOLGUIN:  Thank you.

12       Pass the witness, Your Honor.

13         THE COURT:  Mr. Woodward.

14         MR. WOODWARD:  Briefly, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. WOODWARD:

17   Q.   Sir, you were at Mr. Klein's arrest?

18   A.   Yes.

19   Q.   What day was that?

20   A.   I don't recall the exact date.

21   Q.   Okay.  Do you recall where he was when he was arrested?

22   A.   Yes.

23   Q.   Where was he?

24   A.   In Falls Church, Virginia.

25   Q.   Okay.  Do you recall physically where he was when handcuffs
```

1    were placed on him?

2    A.  It was outdoors.  He had -- was in a vehicle.  I don't

3    recall the exact location.  In -- in a parked, kind of,

4    posture, but I don't -- I guess I don't understand exactly the

5    question.

6    Q.  Well, I mean, you testified that you could identify him in

7    video from January 6th based on your presence at his arrest.

8    So I'm just trying to understand what role you played in his

9    arrest.  Did you place handcuffs on him?

10   A.  No, I did not.

11   Q.  Okay.  Did you remove him from his vehicle?

12   A.  No, I did not.

13   Q.  Were there -- did you question him?

14   A.  I did not directly question him at his arrest, but I was

15   present while all of that was being conducted.

16   Q.  Do you remember what questions he was asked?

17   A.  Not specifically, no.

18   Q.  Okay.  Do you remember how many officers or law enforcement

19   were present at his arrest?

20   A.  I don't recall the specific number, but it would be noted

21   in the arrest report.

22   Q.  Okay.  Did you complete the arrest report?

23   A.  No.  I completed a portion pertaining to other parts of

24   that day, but I don't believe I wrote the arrest 302.

25   Q.  Do you recall whether there was law enforcement other than

1    FBI present at his arrest?

2    A.  I'd have to refer back to the report to see exactly who was

3    present that day.

4              MR. WOODWARD:  Thank you, sir.  No further questions,

5    Your Honor.

6              THE COURT:  Any redirect, Ms. Klamann?

7              MS. KLAMANN:  Just very briefly, Your Honor.

8                        REDIRECT EXAMINATION

9    BY MS. KLAMANN:

10   Q.  Agent Comottor, did FBI recover from Mr. Cappuccio's phone

11   other items relating to the phrase dirty deuce?

12   A.  Yes.

13             MS. KLAMANN:  Mr. Clements, can you please pull up

14   Government Exhibit 611.36.

15   BY MS. KLAMANN:

16   Q.  Agent Comottor, is this a screenshot or a photograph that

17   was recovered from Mr. Cappuccio's phone?

18   A.  Yes.

19             MS. KLAMANN:  No further questions, Your Honor.

20             THE COURT:  All right.  Agent Comottor, you may step

21   down.  Thank you for your testimony.

22             (Witness excused.)

23             THE COURT:  All right.  Ms. Douenat, where are we on

24   your expert?

25             MS. DOUENAT:  He's waiting in the waiting room, and I

1    let him know that the Court may take a break but we would be

2    right with him.

3              THE COURT:  Great.  Okay.

4         Mr. Woodward, did you work out the *Jencks* issue?

5              MR. WOODWARD:  No, Your Honor.

6              THE COURT:  Okay.

7              MS. KLAMANN:  Your Honor, during the lunch break, the

8    government did provide to Mr. Woodward the item that he

9    referred to at the end of our morning session.  He was speaking

10   specifically of some Skype messages that were redacted.  We

11   provided the unredacted copy of that to him.

12        We maintain our position that that is not *Jencks*.

13   It's not anything substantiative to the witness's testimony,

14   and it's not anything that's not documented elsewhere in her

15   case file.

16        However, she is still here waiting.  And if Mr. Woodward

17   would like to recall her and ask her questions, she's here.  We

18   don't believe that that is necessary, though, because we don't

19   believe there was any Jencks Act violation.

20             THE COURT:  Okay.  Mr. Woodward.

21             MR. WOODWARD:  Sure.  So, Your Honor, as I alluded to

22   before the break, our position is that the -- the only remedy

23   here for the Court is to strike her testimony or mistrial.

24   We're not asking for a mistrial.  We can strike her testimony

25   and -- and move on.

1          Your Honor, we first requested *Jencks* back in March of

2     2021.  The government provided us with *Jencks* for this trial

3     in -- on July 1st of 2023.  The government did not provide us

4     with the *Jencks* from the trial in the fall.  They took the

5     position that those materials weren't relevant to this trial

6     and, therefore, we weren't entitled to them.

7          Your Honor, we have serious concerns about the approach

8     that the government took with respect to the *Jencks* for this

9     particular witness.  For example, on July 1st when it

10    identified its witnesses in this trial, it spelled Ms. --

11    Ms. Mancini's name wrong.  And so all of our research and due

12    diligence in advance of the trial that began on Monday did not

13    produce any information concerning Ms. Mancini.  That's why I

14    asked her to spell her name again.  On the witness list --

15    again, July 1st -- the government spells her name Gabrielle

16    M-a-n-z-i-n-i.

17         Now, the government did produce to us additional link

18    messages.  However, those link messages appear to be

19    exclusively limited to the messages that were exchanged with

20    Agent Fulp.  And so what we understand the government to have

21    done is to have taken Agent Fulp's link messages and to have

22    had them unredacted during the break.

23         Those messages are particularly concerning to us,

24    Your Honor.  Among other things, Agent Fulp and Ms. Man- -- I'm

25    so sorry that I keep --

672

1          THE COURT:  Mancini.

2          MR. WOODWARD:  Thank you.

3          -- Ms. Mancini discuss chain of custody, discuss the

4     fact that although she is already in physical possession of the

5     phone, she does not have complete chain of custody; that she

6     needs Agent Fulp to come see her and to sign off on chain of

7     custody.

8          She also discusses the fact that she began reviewing the

9     phone despite the fact that counsel for the government was then

10    aware that we had concerns about the review of attorney-client

11    privilege.  Now, I don't want to overstate our position.  She

12    says that she -- she had conducted a cursory review of the

13    phone.  But there are facts and circumstances about that that

14    we have concerns with.

15         Now, Your Honor's question would probably be why not

16    simply put her on the stand and I can cross her about all of

17    those statements.  For two reasons, Your Honor.  First, her --

18    this is not about her credibility.  This is about discovery.

19    This is about *Brady*.  They are *Jencks* because any statements

20    about which the witness testified, including chain of custody,

21    are *Jencks* statements.

22         But, in addition, if there is a breach of chain of

23    custody, that is potentially *Brady* information.  If there is a

24    review of the phone that should not have occurred, that is

25    *Brady* information.  And in the middle of trial is not an

1    appropriate juncture for defense counsel to be ferreting those

2    things out.

3         Second, Your Honor, we --

4         THE COURT:  Can you help me understand how that would

5    be a potential *Brady* violation?

6         MR. WOODWARD:  Well, we may have moved to suppress

7    the phone back in -- in May of '21 if we had learned about the

8    information then.

9         If the government is -- has broken chain of custody,

10   then that is potentially exculpatory to Mr. Klein and may have

11   been the basis for a motion to suppress.  It's difficult to

12   think back over the course of the last two, three years and

13   understand what we would have done.  I don't want to speculate

14   about that.  What we -- all we know is that we're receiving

15   this information now in the middle of the trial, again, after a

16   *Jencks* demand had been made in March of '21.

17        Now, I understand the Jencks Act doesn't require the

18   government to produce the information, but that was their

19   decision not to produce it until July.  And when they produced

20   it -- excuse me -- July 1st.  And when they produced it in

21   July 1st, to do so in an incomplete manner -- which leads me to

22   the second reason why cross-examination is not a sufficient

23   remedy.

24        And that is because we are wholly dissatisfied that the

25   government has done what it needs to do to ensure that all of

1    the *Jencks* has been produced.  Again, it appears that they have

2    taken Agent Fulp's export from this link system and they

3    unredacted Agent Fulp's communications with Ms. Mancini.

4        We have low confidence that they have asked her about

5    whether there is other *Jencks* information that may be out

6    there, especially in light of their representation to the

7    Court.  And we're happy to pass up or email, if you'll forgive

8    me, a copy of what was produced to us over lunch.

9        It's *Jencks*, Your Honor.  It's clearly *Jencks*.  They

10   continue to take the position that it's not *Jencks*.  And we're

11   just -- we're not confident that they have done a thorough

12   search for *Jencks* in this case.

13       I'll cite three cases for Your Honor.  We're not

14   suggesting foul play.  We're not suggesting bad faith because

15   we don't have to.  Negligence is a sufficient basis for the

16   Court to strike testimony.

17       And the three cases that we would cite for Your Honor

18   include *United States v. McCallum*.  That's 885 F. Supp. 2d 105.

19   There a mistrial was granted.  However, the mistrial was

20   granted because it had been the sixth discovery violation and

21   presumably, but for the fact that there had been repeated

22   violations, the witness's testimony would have been struck

23   again.

24       The Jencks Act provides for two remedies, and only two

25   remedies:  strike the testimony of the witness or grant a

1    mistrial if the ends of justice require it.

2         The second case for the Court's reference is

3    402 F. Supp. 2d 252, *United States v. Davis*.  We cite that case

4    because we concede that *Jencks* sanctions are not automatic.  It

5    requires this colloquy which we're having now.

6         And then, finally, the D.C. Circuit decision of *United*

7    *States v. North American Reporting*, 740 F.2d 50.  Again, in

8    none of these cases is recross a remedy that is proposed by the

9    court or sanctioned by the D.C. Circuit.  Where a *Jencks*

10   violation occurs, we can strike the witness's testimony or we

11   can order a mistrial.

12        I'm not asking for a mistrial.  We're asking that the

13   testimony be stricken, Your Honor.

14             THE COURT:  All right.  Thank you.

15        Ms. Klamann, are you responding?

16             MS. KLAMANN:  Sure, Your Honor.

17             THE COURT:  So I'll say, I mean, as Mr. Woodward

18   characterizes the materials, that does sound to me like

19   *Jencks*.  So I'd be interested if you disagree with his

20   description of it.  And have you done a thorough *Jencks*

21   conversation with Ms. Mancini and particularly made sure there

22   aren't similar conversations with other agents?  For instance,

23   Agent Comottor.

24             MS. KLAMANN:  Your Honor, my understanding is he

25   believes it's not *Jencks* because there's discussion about chain

1    of custody.  Chain of custody --

2              THE COURT:  He believes it is *Jencks*?

3              MS. KLAMANN:  He believes it's *Jencks* because there's

4    discussion about the chain of custody for the phone.  The chain

5    of custody for the phone has been documented in other places,

6    including FBI reporting and the CART examiner's file.  That

7    documentation has been produced.

8         Mr. Woodward has also heard from at least two witnesses

9    already in this trial who had relevant information relating to

10   the chain of custody of this phone.  Mr. Woodward decided not

11   to cross-examine those witnesses, opting instead for his gotcha

12   moment.  This has been orchestrated.  He knew -- while we only

13   knew just last night that we were going to have to call

14   Ms. Mancini because Mr. Woodward would not tell us whether or

15   not he was going to stip to admission of the phone, we had to

16   call her today and put her on the stand.

17        He -- he knew that she was going to testify as early

18   as this morning.  He knew that there may be things that he

19   thinks he didn't have.  He did not raise that with us.

20   Instead, he let the witness testify, he let the witness leave

21   the bench, and now has left her in the hallway standing all

22   day.

23        This is something that's been orchestrated.  This is

24   not a *Jencks* violation.  To the extent there's conversations

25   about chain of custody, that's documented in other reporting

1    that's been produced.  So that is stuff that he has in front

2    of him.  And the statements by witnesses that are reported

3    other places and that have been disclosed, that's not a *Jencks*

4    violation.

5           THE COURT:  All right.  So I'm pretty sure I disagree

6    with you on your understanding of *Jencks*.  The Jencks Act says

7    after a witness called by the United States has testified on

8    direct examination, the Court shall on motion of the defendant

9    order the United States to produce any statement of the

10   witness.  I don't know.  Did you come over --

11          MS. KLAMANN:  That pertains to her testimony, yeah.

12          THE COURT:  Sure.  She talked about chain of custody.

13   I mean, did you come up over in Superior Court?

14          MS. KLAMANN:  No, Your Honor.  I'm coming from the

15   U.S. Attorney's Office in Chicago.

16          THE COURT:  Okay.  Well, here in this district -- I

17   mean, I -- when I was an AUSA, I would turn over police note --

18   their police notes, despite the fact that it was also in a

19   police report, which I would also turn over, despite the fact

20   that it was in grand jury testimony, which I would also turn

21   over.

22          So you are certainly wrong, at least as it works in

23   this district, as to the scope of *Jencks*.  So I am concerned

24   that you are misconstruing *Jencks*, at least as it is applied

25   here.

1    And I'm going to ask you to go back, do a thorough

2 colloquy with her, and find out if there is any statement

3 relating to -- any written statement relating to her testimony.

4 And if so, you need to get it to Mr. Woodward very quickly.

5    I also -- I mean, I'm sure you're right that he is

6 making a -- taking advantage of the situation.  Nonetheless,

7 you-all have your witness list.  You are responsible for

8 providing and collecting *Jencks* beforehand and not getting

9 yourself in this situation.  And the fact that you have dozens

10 of witnesses -- I realize that is a burden for you.  But that

11 is the burden that the government has shouldered.

12    So I'm not satisfied that you've completed your

13 obligations, and I am going to order you to provide *Jencks*, as

14 I understand it, which is any statement from the witness

15 relating to the subject of their testimony.

16    All right.  We're going to take a break.  And when we

17 come back, we'll hear from the expert.

18    I'm -- I will say, I'm -- I don't think at this point

19 a -- the remedy that Mr. Woodward is suggesting is appropriate.

20 I think the statute also -- the statute does provide for

21 mistrial or striking the testimony.  But that's only if the

22 United States elects not to comply with the order of the Court.

23    And I take it the government is going to comply; is that

24 correct.

25     MS. KLAMANN:  Of course, Your Honor.  We will.

1            THE COURT:  Okay.  So I'll direct you to provide that

2    to defense by 8:00 a.m. in the morning.  I'm going to direct

3    you to make sure Ms. Mancini is available for recross, if

4    Mr. Woodward wishes, tomorrow.  And I think as long as those

5    two things happen, I don't think that striking the witness's

6    testimony is appropriate under the Jencks Act.

7            All right.  We'll be back in 10 minutes.

8            (Recess taken.)

9            THE COURT:  Ms. Douenat, I'll allow you to take a

10   witness out of order and also allow you to proceed by Zoom

11   given the witness's unavailability.  Maybe you should make a

12   record of that.

13           MS. DOUENAT:  Yes, Your Honor.  Thank you.

14           Does he need to be sworn in, first, Your Honor?

15           I'm calling Dr. Cutler, and he's going to be appearing

16   by Zoom from Phoenix, Arizona, Your Honor.  Dr. Cutler was

17   available next week on Wednesday.  Unfortunately, he's unable

18   to be available because he's in staff meetings all of tomorrow

19   through Tuesday.  And because we had four -- three defendants,

20   we thought that we were going to be presenting our case next

21   week, Your Honor, and I apologize for that.

22           THE COURT:  Okay.

23           MS. DOUENAT:  So we call to the stand, Dr. Brian

24   Cutler.

25           THE COURTROOM DEPUTY:  Dr. Cutler, if you can please

1    raise your right hand.

2              (Oath administered.)

3              THE WITNESS:  Yes, I do.

4              THE COURTROOM DEPUTY:  Thank you.

5                        DIRECT EXAMINATION

6    BY MS. DOUENAT:

7    Q.  Good afternoon, Dr. Cutler.

8    A.  Good afternoon.

9    Q.  Could you please state your name and spell it for the

10   record.

11   A.  My name is Brian Cutler.  That's C-u-t-l-e-r.

12   Q.  And where do you live?

13   A.  I live in Fountain Hills, Arizona, which is in the Phoenix

14   area.

15   Q.  And what do you do for a living?

16   A.  I am a professor and administrator at Fielding Graduate

17   University.

18   Q.  Before we get into your opinions, I'm going to go over a

19   little bit about your educational background.  Did you have any

20   particular focus within the field of psychology during the

21   course of your education?

22   A.  Yes.  I was trained in experimental psychology, social

23   psychology, and forensic psychology.

24   Q.  And does forensic psychology and social psychology include

25   eyewitness testimony and eyewitness identification?

1    A.  Yes, it does.

2    Q.  At what point in your education did you first start

3    studying eyewitness identification and eyewitness memory?

4    A.  I started studying eyewitness memory in 1983 when I was

5    enrolled in a master's program.

6    Q.  And have you studied eyewitness identification and memory

7    continuously from 1983 on?

8    A.  Yes, I have.

9    Q.  Has any of your research from your educational studies been

10   published?

11   A.  Yes.

12   Q.  And have those published research materials and articles

13   and journal articles been peer reviewed?

14              MS. HILL:  Your Honor --

15   A.  Yes.  I've had --

16              MS. HILL:  -- we're not requesting *voir dire* here,

17   and the Court has access to all this information in the expert

18   report that's been filed on the docket.  So we would lodge a

19   403 objection.

20              THE COURT:  All right.  Are you stipulating that this

21   witness is qualified and an expert and -- what are you trying

22   to have him qualified as an expert in?

23              MS. DOUENAT:  Eyewitness memory and identification,

24   Your Honor.

25              THE COURT:  Eyewitness memory?

CUTLER - DIRECT

1          MS. DOUENAT:  Memory and identification.

2          THE COURT:  Are you stipulating on that point?

3          MS. HILL:  We're not contesting the witness's

4    background, Your Honor, and we agree the Court ruled earlier

5    about the narrow areas that he can address during his

6    testimony.  So we're not contesting that here.

7          THE COURT:  Okay.  So let's move pretty quickly.

8          MS. DOUENAT:  That would be great.

9    BY MS. DOUENAT:

10   Q.  So, Dr. Cutler, I'm going to specifically ask you about how

11   long have you been a researcher or conducting research on

12   eyewitness memory?

13   A.  I've been conducting research more or less continuously

14   since 1983.

15   Q.  And can you qualify how much research exists on

16   eyewitness memory and identification from a psychological

17   perspective.

18   A.  I can attempt that.  Psychologists have been studying human

19   memory for over a hundred years, and eyewitness memory dates

20   back to about a hundred years ago.  Although most of the

21   research, which includes probably tens of thousands of

22   publications on human memory and thousands of publications on

23   eyewitness memory, has been conducted since the 1970s.

24   Q.  And are you familiar with cases where people have been

25   convicted due to eyewitness memory and then found to be

1    innocent?

2    A.  Yes.

3    Q.  So I'm just going to now ask you about this case.

4         Did you -- were you asked to look at some -- were you

5    hired on this case, on Mr. Cappuccio's case?

6    A.  Yes.

7    Q.  And were you asked to look at some information?

8    A.  Yes.

9    Q.  And what did you look at before -- before rendering your

10   opinion or looking and discussing memory?  Can you tell us what

11   you reviewed in this case.

12   A.  I -- I -- I'll do my best from memory.  I reviewed a large

13   number of documents and video files provided by your office.

14   Those documents included reports, a law enforcement report;

15   videos, videotaped interviews with Officer Hodges; some

16   presentation materials; emails; some videos of the January 6th

17   events in the lower west terrace and elsewhere around the

18   Capitol.  Those are, in general, the materials.  I would have

19   to refer to my notice for more specifics.

20   Q.  But you specifically reviewed Officer Hodges' testimony at

21   several trials that he testified at; is that correct?

22   A.  Yes.

23   Q.  Including his testimony before the House committee -- House

24   Select Committee?

25   A.  Yes.

1    Q.  You also mentioned that?

2    A.  Yes.

3    Q.  Reviewed a lot of his interviews online?

4    A.  Yes.

5    Q.  And I call them 302s.  But they're reports written by

6    police and law enforcement officers who interviewed him?

7    A.  Yes.

8    Q.  As well as different types of videos on January 6th;

9    correct?

10   A.  Correct.

11   Q.  Including Mr. Cappuccio's own videos, as well as videos

12   that the government had tendered us; is that correct?

13   A.  Yes.

14   Q.  Okay.  And for what purpose did you review those materials?

15   A.  My purpose in reviewing those materials was to attempt to

16   gain an understanding of the conditions surrounding the --

17   Officer Hodges' experience and the conditions that were present

18   at the time or times that he was injured.

19   Q.  Did your review of those materials suggest to you any

20   psychological factors that may be relevant in this case?

21   A.  Yes.

22   Q.  And that could affect eyewitness memory?

23   A.  Yes.

24   Q.  Before we begin to discuss those factors, can you give me a

25   brief overview of how memory works.

1    A.  Yes.  Memory is a -- a complex cognitive process consisting

2    of distinct -- distinct stages.  These stages include a

3    perception or encoding stage in which memory is -- which

4    information is perceived in the environment.

5         And then the second stage is storage.  Information that

6    is perceived in the environment is stored into memory.

7         And then a retrieval stage.  Where memory is -- is

8    recalled or recognized in response to an interview or

9    spontaneously.

10        So memory consists of those three stages.  And factors

11   can influence the accuracy and completeness of memory at each

12   of those stages.

13   Q.  Okay.  So let's start with the encoding stage.  What are

14   the types of factors that influence eyewitness ability to

15   remember and to encode information in memory?

16   A.  Well, to start with, attention is important for encoding.

17   Humans have a limited capacity for attention.  So what we don't

18   attend to during an event does not get encoded.  Our intention

19   can be driven by -- by goals, our specific intentions, in the

20   situation; what specifically we are focusing our visual

21   attention on.

22        But our ability to encode information is also influenced

23   by distractions in the environment, obstructions to view, other

24   conditions such as lighting, distance, our -- our arousal

25   level, our stress level, and the types of events that are

1    occurring.  There are a wide variety of factors that can

2    influence our ability to encode information into memory.  And

3    as I mentioned, what we don't encode does not get stored into

4    our memories.

5    Q.  How about the amount of time a person has to view

6    individuals in front of them or around them?

7    A.  We refer to that as exposure time.  The degree -- the

8    amount of time we are exposed to an event is directly

9    related to our ability to encode information.  And encoding

10    takes time.

11    Q.  Does it matter if the individual is wearing some kind of

12    hat or hood or some kind of mask?

13    A.  When it comes to person recognition or eyewitness

14    identification, the answer is yes.  When people are wearing

15    hats that cover the hair and hairline, those are particularly

16    important cues for recognition.  So when individuals cover

17    those cues, they are less easily recognized.  Eyewitnesses make

18    more mistaken identifications when those cues are not

19    available.

20    Q.  What does the research indicate about how stress impacts

21    encoding?

22    A.  Extreme stress is known to impair encoding.  Extreme stress

23    can have multiple effects, including causing vigilance or

24    hypervigilance.  So it draws our attention.  But it also

25    increases anxiety, which can interfere with our ability to

1    encode information.

2        Under extreme stress, people are -- may be subject to

3    perceptual and cognitive distortions.  For example, officers

4    and officer-involved shootings and veterans who have been in

5    combat -- combat have reported they have had perceptual and

6    memory distortions from the events.  So -- so things like time

7    speeding up or time slowing down or -- or tunnel vision or --

8    or a sudden loss of auditory information or magnified audio

9    information.  And these kinds of distortions can affect the --

10   our ability to encode information into memory.

11   Q.  How about distractions?

12   A.  Well, as I mentioned earlier, our attentional capacities

13   are limited.  So to the extent that we are distracted by things

14   in our environment, we have less attention to deploy to other

15   events in our environment.  So, for example, in research on

16   eyewitness identification, the presence of multiple

17   perpetrators increases the risk of -- of mistaken

18   identification of any one perpetrator.

19       Well, as another example, I'll point to what we call the

20   weapon focus.  When there's a weapon that is visually present,

21   eyewitnesses tend to focus their visual attention on the

22   weapon, leaving less attention to deploy on a perpetrator's

23   facial or physical characteristics.  So when a weapon is

24   visually present, eyewitnesses make more mistakes in -- in

25   recognizing people and in recalling detail about people.

1          So those are examples of distractions that can influence

2     eyewitness memory.  But distractions can come from a variety of

3     sources, not just people or weapons.  Distractions can also

4     come from our own thoughts.  Our -- our own thoughts can

5     interfere with our ability to encode information because of the

6     limited capacity of attention.

7     Q.  And I assume pain does as well.  If you're in pain, that

8     would affect encoding?

9     A.  It can affect encoding, yes.

10    Q.  What happens to memory when encoding is incomplete

11    due to factors such as extreme stressors and those

12    distractions?

13    A.  Well, as I mentioned earlier, when we don't encode, we

14    don't -- we -- we can't recall from memory where.  We may learn

15    information from other sources or infer information later.  And

16    these are factors that can affect the -- the storage, the

17    second stage of memory.  But, ultimately, what you don't encode

18    is not in your memory.

19    Q.  So let's talk about that second stage, the storage stage.

20    Can you let us know a little bit about that.

21    A.  Yes.  The storage stage is -- is the stage that happens

22    after information from an event gets encoded.  So if you think

23    about what happens with the video recording, you can aim a lens

24    at a scene and record the detail and just store the information

25    in digital format for a long period of time and it doesn't

1    change much.

2          Memory doesn't operate in that way.  Once information is

3    encoded into our memories, various things can happen.  The mere

4    passage of time can -- can erode information.  It can lead to

5    forgetting over time.  The rehearsal of information, the

6    constantly recalling it can strengthen the memory, or at least

7    keep it -- keep it retained in our memory.

8          But memory doesn't necessarily stay stable over time.

9    When we think about memory, we may add details to our memory

10   that we think should have happened or consistent with what --

11   what -- what the world tells us likely happened.  If we learn

12   information from other sources, such as from other people or

13   the media, that information can affect our memories.  It can be

14   incorporated into our memories.  These changes in memories

15   while in storage can sometimes be accurate and sometimes be

16   inaccurate.

17   Q.  Do eyewitnesses -- I'm sorry.

18   A.  I was -- I was going to add that we may have difficulty

19   distinguishing what we actually remembered from the event with

20   what information we figured out later or recalled later.

21   Q.  So do eyewitnesses store all of the details they witness,

22   would you say?

23   A.  No, they don't.  As I mentioned, attentional -- attention

24   is limited and affected by a variety of internal and external

25   factors.  So the -- certainly expect an eyewitness to encode

1    everything an individual fields, but they certainly do encode

2    information from the visual field.

3    Q.  And you mentioned that memories can change while they're in

4    storage due to either others mentioning or showing them things

5    or people recalling different things or a person recounting it,

6    and the memory can change; is that correct?

7    A.  Yes.  Those are factors that can affect an individual's

8    memory while that memory is in storage.

9    Q.  So if an eyewitness learns incorrect information or thinks

10   of incorrect information on his own, can that incorrect

11   information affect memory while in storage?

12   A.  It certainly can.  There's decades of psychological

13   research on the effect of what we call post-event misleading

14   information; incorrect information that -- that an eyewitness

15   learns after an event that can become -- that becomes

16   incorporated into a witness's recollection.

17   Q.  And is that eyewitness able to distinguish what

18   information they actually witnessed versus what information

19   they learned or thought of later?  Does that make sense?

20   A.  The answer -- yes.  The answer is that both can happen.

21   Eyewitnesses -- some eyewitnesses -- or eyewitnesses in some

22   circumstances may be able to accurately distinguish what they

23   experienced versus what they learned later.  But then in other

24   instances that information can become blended in our memories

25   and -- and it becomes difficult or -- or impossible to

1    distinguish what information was actually experienced and what

2    information was acquired at a later time.

3    Q.  Could you explain the concept of source memory error.

4    A.  Source memory error is a term that we use in psychology

5    to -- to explain the phenomenon where a person or -- or a

6    witness mistakes the source of their memory.  So a witness may

7    recall a detail and -- and think that he experienced that

8    event -- experienced that at the event but, in fact, learned

9    that information from another person or from another source.

10   That would be an example of the source-monitoring error.

11   Q.  So let's say somebody views their body-worn camera and sees

12   footage.  Could that affect memory for an experienced event?

13   A.  Yes.  There's been some, although not -- not much, research

14   on the effect of viewing body-worn-camera footage on memory.

15   But there's also relevant psychological principles that would

16   apply, and this research and -- and principle suggests both

17   potential positive and potential negative effects.

18        On the positive, viewing one's own -- or viewing

19   body-worn camera or viewing footage, in general, can prime

20   memories.  It can -- in psychological terms, reinstate context

21   of the original event and serve as a memory aid to improve the

22   witness's memory.

23        But viewing footage can also impair the eyewitness's

24   memory in some ways.  For one, body-worn-camera footage or

25   any -- any footage, it's not going to capture precisely what

1    the eyewitness was seeing because of different vantage points

2    or because the eyewitness's attention is more goal directed

3    than the camera.

4         So when -- when viewing footage, eyewitnesses may see

5    events that -- that they didn't see at the time but mistake --

6    mistake -- mistakenly incorporate those into memory.  It may

7    not be a mistake in the information, but the mistake is I

8    remember that from the time.  So that's one type of error.

9         Another type of error is -- is a type of forgetting

10   that -- that occurs.  It's called retrieval-induced forgetting.

11   And what this phenomenon shows is when we are in tune to

12   remember some information in an event -- for example, what

13   the -- the camera focused on -- we may be more likely to forget

14   other information that was not the focus of the camera.  So

15   it's a form of selective forgetting.

16   Q.  And you mentioned it could be any footage; right?  So, for

17   example, if you the next day see footage that -- on the news

18   of your attack from a different angle, that may jog your memory

19   or make you believe that that's how things happened; is that

20   correct?

21        MS. HILL:  Objection, Your Honor.  That's outside the

22   scope of the expert report.

23   A.  Well, it can --

24        THE COURT:  Hold on just a moment, Dr. Cutler.

25        What's your response, Ms. Douenat?

1          MS. DOUENAT:  So he just -- it was basically -- and

2     it doesn't specifically have to be about -- I'm talking about

3     different footage.  It didn't have to be body-worn camera.  He

4     talked about different footage from different angles can make

5     you recollect memory differently because you believe you see

6     things and you assume that's how things happened when they may

7     not have.

8          And I was just confirming it could be any other footage,

9     including seeing it on the news from a different angle.

10          THE COURT:  Okay.  I'm going to overrule the

11     objection.

12          All right.  You may answer, Dr. Cutler.

13          THE WITNESS:  Thank you, Your Honor.

14     A.  So seeing other footage can -- can certainly affect a

15     witness's memory or the event in several ways.  If the footage

16     provides a distorted account of the event, that could lead to a

17     distorted memory of the witness.

18          The other form of error that can occur is that the

19     witness comes to believe that he or she witnessed that part of

20     the event personally as opposed to learning about it through

21     the video.  And that's the kind of source memory error that I

22     explained earlier.

23     BY MS. DOUENAT:

24     Q.  So let's move on to the retrieval stage, which I believe is

25     the last stage of memory; is that right?

```
1    A.  Yes.

2    Q.  What happens in the retrieval stage?

3    A.  Retrieval stage is -- is when an individual attempts to --

4            MS. HILL:  Objection.

5            THE COURT:  Sir, if you could just hold one moment,

6    please.

7            MS. HILL:  Objection.  This is not in the report

8    either.

9            MS. DOUENAT:  It's the factors that affect memory.

10           MS. HILL:  The factors that affect memory are not in

11   the report.

12           MS. DOUENAT:  Right.  We just gave notice, and we

13   don't have to really go into every single opinion he's making

14   or -- it's just an overview of what he's going to be testifying

15   to, which is his research and how memory works.

16           THE COURT:  All right.  Give me just a moment.

17       All right.  I agree with the government that this is

18   outside the scope of the report.  So I'm going to sustain the

19   objection.  If you can move on, Ms. Douenat.

20           MS. DOUENAT:  Sure.

21   BY MS. DOUENAT:

22   Q.  When recalling information, how does a person replay the

23   events in their mind?

24   A.  Well, memory is what we call a -- a reconstructive process.

25   And by -- by that, I mean that we don't store whole copies of
```

CUTLER - DIRECT

1    events in our memories.  We basically store the gist of an

2    event, and then we re- -- reconstruct memories based on -- on

3    the gist of --

4              MS. HILL:  Objection, Your Honor.  This is also

5    outside the scope of the expert report.

6              THE COURT:  All right.  Ms. Douenat.

7              MS. DOUENAT:  It -- Your Honor, Rule 16 says that we

8    just notify the Court of what the expert is going to opine on,

9    which is memory and his research about memory, and it

10   doesn't -- I mean, I think Rule 16 doesn't require us to say

11   everything of his research and how -- I mean, it's extensive.

12        We're just putting the government on notice of what the

13   testimony is going to be, and it's about recalling memory and

14   eyewitness identification.

15             MS. HILL:  Your Honor, Dr. Cutler just testified that

16   there are hundreds of years of research on memory.  Narrowing

17   the expert report topic down to memory is not a narrowing at

18   all.

19             THE COURT:  I think this is close enough to his

20   discussion --

21             MS. DOUENAT:  I can wrap it up.

22             THE COURT:  I think this is close enough to his

23   discussion about retrieving memories to allow it.  So I'm

24   overruling the objection.

25             MS. DOUENAT:  Thank you.

1          THE COURT:  Actually, Ms. Douenat, why don't you ask

2     your question again, and Dr. Cutler can answer.

3     BY MS. DOUENAT:

4     Q.  Can reconstructed memories partially or completely be

5     false?  They could be partially false or completely false or

6     not false at all?

7     A.  Reconstructed memories can be accurate, totally false, or

8     partially true or partially false.

9     Q.  And how do we know this?

10    A.  We -- we know this from decades of research on -- on

11    human memory and research on the factors that influence memory

12    and the factors that can affect the likelihood of false

13    memories.

14    Q.  And what does the research say about the effects of

15    recalling an event multiple times or retelling of the events

16    multiple times?

17    A.  Retelling of an event multiple times is a form of memory

18    rehearsal.  Memory rehearsal is known to be a process that can

19    strength or help retain information and memory.  But to the

20    extent that an individual incorporates incorrect information

21    into memory, those incorrect details are likely also to be

22    part -- become part of an individual's recall in multiple

23    instances.  And as an individual recalls an event multiple

24    times, incorrect details can become ingrained or internalized

25    in -- in that recall.

1    Q.  And it's not because the individual's lying.  It's just

2    the way memory works.  And they could be mistaken; is that

3    correct?

4    A.  It is a natural process of memory.  I don't -- people lying

5    about their memory is a completely different line of research,

6    and that's not what I do.

7    Q.  Are eyewitnesses good at judging the accuracy of their own

8    memories?

9    A.  Generally speaking, eye- -- eyewitnesses -- people are --

10   are good at -- at assessing the accuracy of their own memories.

11   We see this in research on the relation between eyewitness

12   confidence and accuracy.  When eyewitnesses are highly

13   confident, they're more likely to be correct than when they're

14   less confident, but there's a lot of room for error in this

15   relationship.

16        There are factors that affect people's assessments of

17   their own memories.  There's factors that affect people's

18   confidence independent of their memories.

19        As a result, the relationship between confidence and

20   accuracy is -- is far from perfect.  And -- and we -- we see

21   many instances in which people are highly confident in their

22   memories and are incorrect, or have low confidence in their

23   memories and they're correct.

24   Q.  Did you summarize any of these opinions in a report or

25   notice that you tendered to me?

```
1    A.  I did.

2              MS. DOUENAT:  And, Your Honor, can I just mark -- and

3    I forwarded a copy of this to Dr. Cutler before his testimony,

4    and I cc'd the government.  I marked both Cappuccio's Defense

5    Exhibit 15 and 16.  And 15 is his CV and 16 is the notice.  And

6    I did forward them to Dr. Cutler so he could review those.

7    BY MS. DOUENAT:

8    Q.  Did you receive those, Dr. Cutler?  I just emailed them.

9    A.  I did not.

10   Q.  I emailed them just a little bit earlier than when we got

11   on here.

12             MS. HILL:  Your Honor, what documents is -- is --

13             MS. DOUENAT:  I tendered an exhibit list, and it's

14   No. 15 and 16.

15             MS. HILL:  And 15 and 16 are the expert report, is

16   that --

17             MS. DOUENAT:  So 15 is his CV, and 16 is the notice

18   that was filed with the Court back in October.  The government

19   got a copy, and then we also put it in our exhibit list.

20             MS. HILL:  We would object to both of those documents

21   on hearsay grounds.

22             THE COURT:  So this is -- you're seeking to move in

23   his résumé and then the report itself?

24             MS. DOUENAT:  Just the notice.

25             THE COURT:  All right.  So why is this not hearsay?
```

699

```
1              MS. DOUENAT:  Pardon me?

2              THE COURT:  Why are those documents not hearsay?

3              MS. DOUENAT:  It's okay.  We don't have to admit

4    them.  They are hearsay.  I just -- it's -- he opined -- what

5    he testified to today is pretty much what's in the report.

6              THE COURT:  I agree.  I think Ms. Hill is right.  So

7    I'm going to sustain the objection.  I can rely on his -- his

8    testimony here.

9              MS. DOUENAT:  And, Your Honor, we're done.

10             THE COURT:  Okay.  Thank you.

11             MS. DOUENAT:  Thank you, Mr. Cappuccio.

12             THE COURT:  Ms. Hill.

13                         CROSS-EXAMINATION

14   BY MS. HILL:

15   Q.  Hi, Dr. Cutler.  I'm Laura Hill.  I represent the

16   United States.

17   A.  Good afternoon.

18   Q.  Is it afternoon where you are as well?  I believe so; is

19   that right?

20   A.  Yes.  Yes.

21   Q.  So I want to start off with something that you just talked

22   about.  You mentioned that when a witness is highly confident

23   their memory is more likely to be accurate; is that right?

24   A.  That's generally true, yes.

25   Q.  So if a witness says that they are a hundred percent
```

CUTLER - CROSS

1    confident their memory is more likely to be accurate than if

2    they're, say, 50 percent confident; is that fair?

3    A.   That's fair.

4    Q.   Okay.  You've talked about some of the factors that can

5    influence the completeness of memory; right?

6    A.   Yes.

7    Q.   You talked about attention?

8    A.   Yes.

9    Q.   And distractions?

10   A.   Yes.

11   Q.   Stress level?

12   A.   Yes.

13   Q.   Lighting?  Distance?  Obstruction to views?

14   A.   Yes.

15   Q.   I won't make you answer yes to every one.

16        But is that a fair characterization?

17   A.   Yes, ma'am.

18   Q.   Okay.  And your testimony here relates to Officer Hodges;

19   right?

20   A.   Yes.

21   Q.   According to your expert report?

22   A.   Yes.

23   Q.   So have you talked to Officer Hodges about whether he was

24   distracted on January 6th?

25   A.   No, I did not.

1    Q.  Have you talked to him about his stress level on

2    January 6th?

3    A.  I did not.

4    Q.  Did you talk to him about lighting on different parts of

5    the day on January 6th?

6    A.  I did not.

7    Q.  Did you talk to him about the distance between him and any

8    of the rioters on January 6th?

9    A.  I've never spoken with Officer Hodges.

10   Q.  Okay.  That's helpful information.

11       Did you talk to Mr. Cappuccio about any of those

12   factors?

13   A.  I did not.

14   Q.  Did you talk to any witnesses that were there on

15   January 6th about any of those factors?

16   A.  I did not.

17   Q.  Okay.  Are you opining on any weapons that were present on

18   January 6th?

19   A.  I -- I -- only what I observed in the videos, but I -- I

20   have -- I have no specific opinions about the weapons -- about

21   the weapons.

22   Q.  Okay.  When you say you haven't spoken with Officer Hodges,

23   have you ever -- have you ever met in person?

24   A.  I have not.

25   Q.  Have you ever exchanged emails with him?

```
 1    A.  I have not.

 2    Q.  What about text messages?

 3    A.  No, ma'am.

 4    Q.  Have you ever spoken with him on the phone?

 5    A.  I have not.

 6    Q.  Have you had a Zoom call with him?

 7    A.  I've had no contact whatsoever with Officer Hodges.

 8    Q.  Okay.  Have you had any contact whatsoever with

 9    Mr. Cappuccio?

10    A.  None.

11    Q.  But you recommended to defense counsel that you interview

12    Officer Hodges; right?

13    A.  No.

14    Q.  You never brought that up with anyone on the defense team?

15    A.  No.

16    Q.  And that's true even though you've been criticized by

17    courts in the past for not interviewing the subjects of your

18    opinions; correct?

19    A.  I don't know that I've been criticized for that in the

20    past.  But it's just not something I would do, as I'm not

21    giving an opinion -- I'm not doing any form of assessment or

22    giving an opinion about the witness's memory or what the

23    witness experienced psychologically.

24    Q.  Is that because -- because your opinion doesn't relate at

25    all to Officer Hodges and is a general opinion?
```

1    A.  My opinion is -- is, I guess, what you would call a general

2    opinion about these factors on memory in general.  I would have

3    no way of knowing what Officer Hodges experienced

4    psychologically, how he experienced these factors.  That's --

5    that's beyond my knowledge and beyond my ability to know.

6    Q.  You have no specific knowledge of Officer Hodges' memory on

7    January 6th; correct?

8    A.  Correct.

9    Q.  In your report you included an Appendix A; right?

10   A.  I did.

11   Q.  And that listed all of the material that you relied on in

12   writing your report?

13   A.  It listed a lot of central material that I relied on.

14   However, I've been studying eyewitness memory for -- for almost

15   40 years, and -- so I couldn't honestly say that everything I

16   relied on is in the references of -- of that report.

17   Q.  So you did not include everything that you relied on in

18   Appendix A?

19   A.  Well, I -- I couldn't possibly put in Appendix A everything

20   I've learned in my study of eyewitness memory.  I think

21   that's -- that's an impossible task.  So I have put pertinent

22   sources that I believe are relevant.

23   Q.  Okay.  So you only included the -- the pertinent sources

24   that you thought were relevant.  So this is a subset of what

25   you relied on in writing your expert report?

1    A.  I think that's fair to say.  I -- I relied on -- relied on

2    my professional experience over the years and my scholarship

3    associated with eyewitness memory which would be pretty hard to

4    document in an appendix report.

5    Q.  So you also include here Government's Exhibit 67, 69, 70,

6    70A, 71, 72, and 73.  The government hasn't marked those

7    exhibits as -- those numbers as exhibits here.  So what are

8    those documents referring to?

9    A.  I would have to consult my report.  Am I able to pick them

10   up, to pull that up on my computer?

11   Q.  Well, the report says Government's Exhibit 67, 69, 70, 70A,

12   71, 72, 73 and doesn't provide additional information.

13   A.  No, I understand.

14   Q.  Okay.  Did you request any additional information from your

15   defense counsel?

16   A.  I did not.

17   Q.  You've talked about how rehearsal of information can

18   strengthen memory; is that right?

19   A.  Yes.

20   Q.  Do you have knowledge of whether Officer Hodges provided

21   multiple interviews on January 6th?

22   A.  Yes.

23   Q.  Okay.  And in your Appendix A, you include reliance

24   material of all body-worn camera from Officer Daniel Hodges; is

25   that right?

1    A.  I believe so, yes.

2    Q.  Excuse me.  It actually does not say that.  It says all

3    body-camera photos of Officer Daniel Hodges.  It does not say

4    all body-worn camera of Officer Daniel Hodges.

5    A.  I'm relying on -- on you because I don't have that in front

6    of me.

7    Q.  And you don't recall what's in your Appendix A?

8    A.  No.  My memory is not perfect either.

9    Q.  Well, are you familiar with body-worn camera?

10   A.  Yes.

11   Q.  Okay.  And you know that it takes video -- right? -- not

12   photographs?

13   A.  Yes.

14   Q.  So were the photographic stills of the body-worn camera

15   that you reviewed just provided to you by Mr. Cappuccio's

16   counsel?

17   A.  Yes.

18   Q.  And you said all body-camera photos.  What does "all" mean?

19   Did counsel take a still shot of every frame in Officer Hodges'

20   body-worn camera?

21   A.  No.  It would have referred to all of the photos provided

22   to me.

23   Q.  Approximately how many was that?

24   A.  I don't recall.

25   Q.  Ballpark.

1    A.  I really don't recall.

2    Q.  Okay.  Were you provided still shots of Officer Hodges from

3    other officers' body-worn camera?

4    A.  There was information from Officer Foulds, I think the name

5    was, and I reviewed that information as well.

6    Q.  Okay.  What about other officers?

7    A.  I don't recall offhand.  If it's listed in their report,

8    then -- then I received it and I reviewed it.

9    Q.  Have you watched all of Officer Hodges' body-worn camera

10   from January 6th?

11   A.  Yes, I did at some -- when I received it, I had watched

12   through entirely.

13   Q.  Is that including the few minutes that you're here to opine

14   on?

15   A.  Yes.

16   Q.  And what did that show you?

17   A.  I'm not sure what that is referring to.

18   Q.  The body-worn camera from Officer Hodges between

19   approximately 3:00 p.m. and 3:15 p.m.

20   A.  I'm -- I'm guessing that is the -- the footage from the

21   lower west terrace.  It showed the -- the rush toward the

22   entrance, the -- basically, capturing Officer Hodges in the

23   door, his -- his gas mask being ripped off, and his -- really

24   writhing in pain and calling for help.  And it was a lot of

25   information, a lot of chaos at the scene.  But that -- that

1    was my general impression of it.  Those were some of the

2    details.

3    Q.  So you know that body-worn camera is worn on an officer's

4    chest; right?

5    A.  Yes.

6    Q.  So when you say that the body-worn camera of Officer Hodges

7    captured his gas mask being ripped off, what are you referring

8    to?

9    A.  Oh, I -- my mistake.  I was confusing other video with his

10   body-worn camera.  I don't recall exactly what his body-worn

11   camera image showed.

12   Q.  You spoke a little bit about video -- is that right? -- and

13   how memory is not like a video?

14   A.  Yes.

15   Q.  Because video records everything?

16   A.  That's fair to say.

17   Q.  And can't be changed?

18   A.  Well, videos can -- can be altered mechanically.

19   Q.  Right.  But if we're talking about unaltered videos,

20   that video is what it is.  It's capturing what's in front of

21   it?

22   A.  I think that's fair to say.

23   Q.  In your report you have a section titled Impact of Viewing

24   Body-Worn-Camera Footage; right?

25   A.  Yes.

1    Q.  And you say that the amount of research on the impact of

2    body-worn is relatively small?

3    A.  Yes.

4    Q.  And, similarly, that there's not much research on the

5    impact of viewing body-worn cameras on memory per se?

6    A.  Yes.  Let me correct.  There is a fair amount of

7    research on body-worn cameras in general, but not much research

8    on the impact of viewing one's body-camera footage on one's

9    memory.

10   Q.  Right.  So you conclude that viewing body-worn-camera

11   footage could affect memory, even though you just made that

12   statement?

13   A.  Yes.

14   Q.  Okay.  And it could enhance memory?

15   A.  Yes.

16   Q.  Tell me about that.

17   A.  So viewing body-worn camera or any video of an event that

18   one experiences could serve as a form of context reinstatement.

19   Essentially, it's a psychological term referring to providing

20   cues of what happened, so to remind the witness of what

21   happened and -- and facilitate memory.

22        Context reinstatement is a technique that's used to

23   enhance memory, and that's one outcome that viewing

24   body-worn-camera footage can have.

25   Q.  Okay.  But you also talk about how reviewing

1   body-worn-camera footage can impair; right?

2   A.  Yes.

3   Q.  And, in fact, in your report, if the fact-finder concludes

4   that Officer Hodges reviewed his body-worn-camera footage prior

5   to testifying, the viewing of such footage could have enhanced

6   or impaired memory for the event details?

7   A.  I did.

8   Q.  And you reviewed Officer Hodges' body-worn camera?

9   A.  Yes.

10  Q.  And so you know that Officer Hodges' body-worn camera

11  actually gets knocked off during the time in question;

12  correct?

13  A.  Yes.  That's consistent with my understanding.

14  Q.  And so it doesn't show any of the events that you're here

15  to opine on?

16  A.  Yes, that would follow.

17  Q.  It's -- it's a black screen during that time frame;

18  correct?

19  A.  I would assume so.

20  Q.  So we've established that you have not met with

21  Officer Hodges; right?

22          THE COURT:  We've got that.

23  BY MS. HILL:

24  Q.  So when you're offering opinions on the psychological

25  factors that could have affected the accuracy of his memories,

1    that is not based on any discussions with him?

2    A.  I've not had any discussions with Officer Hodges.

3    Q.  And in your report, you are not actually opining on

4    any specific psychological factors that affected

5    Officer Hodges?

6    A.  I would have -- I have no opinions about what

7    Officer Hodges in particular was experiencing on January 6th.

8    Q.  No opinions about Officer Hodges' recollection?

9    A.  I would not offer opinions about the accuracy or

10   completeness of Officer Hodges' recollections.

11   Q.  And you are not offering opinions here today about his

12   testimony either; right?

13   A.  That's correct.

14   Q.  Do you have any knowledge of what videos Officer Hodges has

15   watched between January 6th and today?

16   A.  No, I wouldn't -- I wouldn't know that.

17   Q.  Are you offering any opinions about reconstructed memories

18   with respect to Officer Hodges?

19   A.  I offered opinions about reconstructive -- reconstructive

20   memories in general, but I would have no opinion on

21   Officer Hodges' memory per se.

22   Q.  You've been an expert witness before; is that right?

23   A.  Yes.

24   Q.  And multiple courts have questioned your opinions?

25   A.  I've had a wide variety of experiences:  some accepting my

CUTLER - CROSS

1    opinions in full, some not accepting my opinions at all, and

2    some accepting some opinions and not others.

3    Q.  For example, the Eastern District of Virginia has found

4    in at least one instance you were required -- quote,

5    required to show your work, so to speak, and you did not; is

6    that right?

7    A.  I really don't know what you're referring to.

8    Q.  You don't recall a federal court stating that you were

9    required to show your work and you did not?

10   A.  No.

11   Q.  Okay.  Do you recall that that same court ultimately

12   excluded you as an expert?

13   A.  I have been excluded in that district, and I -- and I have

14   also testified in that district.

15   Q.  In fact, you've been excluded multiple times, haven't you?

16   A.  I've been excluded multiple times, and I've testified

17   multiple times.

18            MS. HILL:  May I have a moment, Your Honor?

19            THE COURT:  You may.

20            MS. HILL:  Pass the witness.

21            THE COURT:  All right.  Mr. Woodward, I take it you

22   don't have any cross?

23            MR. WOODWARD:  No, sir.

24            THE COURT:  Ms. Douenat.

25            MS. DOUENAT:  Very few questions, Your Honor.

```
1                      REDIRECT EXAMINATION

2     BY MS. DOUENAT:

3     Q.  Dr. Cutler, I think I failed to make this clear.

4          You did not intend to offer opinions about the accuracy

5     of any of the eyewitnesses who testified in this case; is that

6     correct?

7     A.  That's correct.

8     Q.  You were just testifying how eyewitness memory works and

9     the circumstances that could affect it; is that right?

10    A.  That's correct.

11    Q.  And part of what you reviewed to do so was the chaotic

12    events that transpired on January 6th?

13    A.  Yes.

14    Q.  And that included body-camera footage -- the full

15    body-camera footage of Officer Hodges?

16    A.  Yes.

17    Q.  And Officer Foulds?

18    A.  Yes.

19    Q.  Which included viewing all the chaos they endured in their

20    body-cam footage; is that correct?

21    A.  Yes.

22    Q.  And then multiple open-source media video footage that the

23    government had tendered to counsel in their productions; is

24    that right?

25    A.  Yes.
```

1    Q.  And part of these productions -- I know the government

2    asked about exhibit numbers.  Those exhibit numbers were from

3    grand jury testimony; is that right?

4    A.  That's my understanding.

5    Q.  And -- but you also reviewed and read the transcripts of

6    Officer Hodges' experience during January 6th in his trial

7    testimony; is that right?

8    A.  Yes.

9    Q.  But you're not speaking to and you're not opining about his

10   credibility; is that right?

11   A.  That's correct.

12   Q.  You're here to help assist the trier of fact, which is the

13   Court, on how memory works?

14   A.  Yes.  The opinions I've offered are about eyewitness

15   memory, how it works, the factors that influence it in general.

16   Q.  And how people would have some false memories and be a

17   hundred percent certain?

18           MS. HILL:  Objection.  Leading.

19   A.  Yes.

20           MS. DOUENAT:  Pass the witness, Your Honor.

21           THE COURT:  All right.  Dr. Cutler, thank you for

22   your testimony here today.  You are free to sign off.  Thank

23   you.

24           THE WITNESS:  Thank you, Your Honor.

25           (Witness excused.)

```
 1               THE COURT:  We'll resume with the government's case
 2      in chief.
 3           Ms. Akers.
 4               MS. AKERS:  The government calls Special Agent
 5      Benjamin Fulp.
 6               THE COURTROOM DEPUTY:  Please raise your right hand.
 7               (Oath administered.)
 8               THE WITNESS:  I do.
 9               THE COURT:  Good afternoon, Agent.
10               THE WITNESS:  Good afternoon, sir.
11                           DIRECT EXAMINATION
12      BY MS. AKERS:
13      Q.  Good afternoon, Special Agent Fulp.
14               Could you please state and spell your name for the
15      record.
16      A.  My name is Benjamin Fulp, B-e-n-j-a-m-i-n F-u-l-p.
17      Q.  Are you employed, Mr. Fulp?
18      A.  Yes, I am.
19      Q.  Where do you work?
20      A.  I work for the FBI.
21      Q.  And what is your position with the Federal Bureau of
22      Investigation?
23      A.  I'm a special agent.
24      Q.  How long have you been a special agent?
25      A.  Since 2018.
```

1    Q.  And what did you do before?

2    A.  Prior to my employment with the FBI, I was in the

3    United States Marine Corps.

4    Q.  Are you assigned to a particular office within the FBI?

5    A.  I am.  I'm assigned to the Washington Field Office.

6    Q.  And are you on a particular squad?

7    A.  Yes.  I am on the Washington, D.C., Violent Crime Task

8    Force.

9    Q.  And did the Washington, D.C., violent task -- Violent

10   Crimes Task Force become involved in the investigation into the

11   January 6th Capitol riot?

12   A.  Yes.  The task force did become involved in that

13   investigation.

14   Q.  What sort of responsibilities did the task force have in

15   part of that investigation?

16   A.  So in a typical year, the Violent Crime Task Force deals

17   with violent incident crimes that would occur in

18   Washington, D.C., such as various types of robberies,

19   shootings, general violent acts.

20        A violation that we cover also is assault on federal

21   officers, which, in -- in a non-2021 year, is kind of a one-off

22   thing, but it's in our portfolio.

23        However after January 6th, the events of January 6th, it

24   was determined that a large number of assaults on federal

25   officers likely occurred that day.  So being that it was a

1  violation that our squad covered, we were given primacy on that
2  portion of the investigation.
3           THE COURT:  It's not just that you-all solved violent
4  crime in D.C.?
5           THE WITNESS:  No, sir, we're still working on that.
6           THE COURT:  All right.  Glad to hear it.
7  BY MS. AKERS:
8  Q.  As part of your duties with the FBI and on your particular
9  squad, were you assigned to the investigation of an individual
10  named Federico Klein?
11  A.  Yes.
12  Q.  What was your role on that investigation?
13  A.  On that particular investigation, I was assigned to be the
14  case agent.
15  Q.  And what does that mean?
16  A.  Case agent, generally speaking, is a lead investigator who
17  is responsible for setting the investigative strategy and
18  performing whatever investigative steps are required to -- to
19  move that case forward.
20  Q.  How did the FBI identify people who were at the Capitol and
21  who the FBI believed to have committed criminal conduct?
22  A.  The primary way that the FBI was identifying individuals
23  who committed assaultive conduct, was that your question?
24  Q.  Yes.
25  A.  Was through the review of the video from multiple sources;

1   so video that was posted on open-source platforms, body-worn

2   camera that was provided by the Metropolitan Police Department,

3   surveillance video from the United States Capitol.  And then as

4   individuals were identified and arrested and search warrants

5   were obtained for their device, we were able to obtain

6   additional videos.  As the larger investigation into assaults

7   on federal officers progressed, additional evidence was

8   collected from other defendants.

9   Q.  If the FBI identified a person who they believe assaulted a

10  federal officer, would -- was there any further process by

11  which the FBI would seek assistance from the public to identify

12  that person?

13  A.  Yes.  So absent any ability to identify that person based

14  on tools or techniques possessed by the FBI, we would create

15  seeking-information posters that were disseminated via the

16  internet -- I even saw them on bus stops around

17  Washington, D.C.  So they were physically posted as well --

18  depicting the image that we felt both best captured the

19  likeness of that video.

20       And from time to time, they might be updated if we

21  uncovered a better image of somebody through additional video

22  review.  So we would publish those.  BOLO is the -- the

23  shorthand term that we would use for it and then hope that

24  individuals from the public would reach out with information if

25  they had it.

1    Q.  As part of that process, did the FBI assign an

2    identifying -- an identifier for these people who were unnamed

3    at the point?

4    A.  Yes.  So the vast, vast majority of these individuals were

5    unknown to the FBI.  So in -- in order to reconcile known

6    conduct with an unknown subject, we had to come up with a

7    nomenclature to merge those two ideas.  Assigning a number to a

8    likeness was the way we did that and so that, colloquially, is

9    referred to as a BOLO number or an AFO number on the flyers

10   that were distributed.

11   Q.  In your investigation of Federico Klein, before you knew

12   his identity number, was he assigned a BOLO number?

13   A.  Yes.

14   Q.  What was that?

15   A.  It was 136.

16           MS. AKERS:  We've going to pull up for you Government

17   Exhibit 803.

18   BY MS. AKERS:

19   Q.  Do you recognize this exhibit, Special Agent?

20   A.  I do.

21   Q.  And what is it?

22   A.  This is one of the seeking-information bulletins that I was

23   describing.

24   Q.  I'm going to put a square around a person who's the second

25   person on the top row.  And how is this person identified in

1    this BOLO?

2    A.  As No. 136-AFO.

3    Q.  And how -- how did the FBI come to identify AFO 136.

4    A.  Well, numerous sources went into that, but we received tips

5    from the public as to AFO 136's identity.

6    Q.  Based on your investigation, what attire was AFO 136

7    wearing on January 6th?

8    A.  At various points on that day, AFO 136 was wearing red

9    hats, at least two that I'm aware.  And in this picture there's

10   no hat.  But constant throughout the day was a green jacket, a

11   blue shirt, dark trousers, and, I believe, brown shoes.

12   Q.  And at some point did the FBI become aware of the

13   identification of AFO 136?

14   A.  Yes.

15            MS. AKERS:  Your Honor, we move to admit into

16   evidence Government Exhibit 803.

17            THE COURT:  Mr. Woodward.

18            MR. WOODWARD:  I'm sorry, Your Honor.  But I don't

19   think a proper foundation for the admission of this exhibit has

20   been laid.

21            THE COURT:  All right.  I'm introducing -- I'm

22   admitting it over objection.

23            (Government Exhibit 803 admitted into evidence.)

24   BY MS. AKERS:

25   Q.  Special Agent Fulp, you just testified that the FBI became

1   aware of the identity of AFO No. 136.  How did that happen?

2   A.  So we were receiving voluminous amounts of tips about

3   dozens and dozens and dozens of subjects.  And we did

4   receive -- I believe the first tip we received was the next day

5   after this image was published.  And it was an anonymous

6   tipster purporting to know the identity of 136-AFO and

7   described how they knew that individual.

8   Q.  In addition to receiving tips, did the FBI interview any

9   third parties to determine the identification of AFO No. 136?

10  A.  Yes.

11  Q.  Can you explain that process.

12  A.  Yes.  So after receiving information of who 136 could

13  possibly be, we did some research and discovered where

14  Mr. Klein, who was identified in those tips, worked.  And it

15  was determined that he worked at the State Department.  And we

16  were able to interview a co-worker who provided corroboration

17  that AFO 136 was recognized by that individual as Federico

18  Klein.

19  Q.  Was that the only person who the FBI has spoken to during

20  this investigation who confirmed that AFO No. 136 is

21  Federico Klein?

22  A.  No.

23  Q.  Can you explain what other individuals the FBI has spoken

24  to who have also confirmed the identity of AFO 136?

25  A.  We -- the FBI spoke with an acquaintance of Mr. Klein

1    who had spent some time with him in the days leading up to

2    and shortly after January 6th.  The FBI also spoke with a

3    close friend of Mr. Klein's who resides out of state and

4    also confirmed that that was Mr. Klein and recognized the

5    clothing.

6    Q.  We're going to pull up Government Exhibit 807.  Special

7    Agent Fulp, when you say that one of the third-party

8    identification witnesses recognized Mr. Klein's clothing, what

9    are you talking about there?

10   A.  I'm talking about the green wool or felt jacket that he was

11   wearing on that day.

12   Q.  I'm showing you Government Exhibit 807.  Do you recognize

13   this photo?

14   A.  I do.

15   Q.  What is it?

16   A.  This appears to be a still from Capitol surveillance

17   cameras that were mounted inside the tunnel or the lower west

18   terrace exterior door facing to the west.

19   Q.  And does this still image depict anyone who's part of your

20   investigation?

21   A.  It does.

22   Q.  Who?

23   A.  Mr. Klein.

24   Q.  And we're going to pull up Government Exhibit 808.  And are

25   you familiar with this still image?

```
1    A.  I am.

2    Q.  Do you recognize anyone in this?

3    A.  I do.

4    Q.  Who?

5    A.  Mr. Klein.

6    Q.  And what is he wearing?

7    A.  He's wearing a red hat, a blue shirt that may have a

8    sweater on over it, and a green jacket.

9    Q.  And what date was this still shot taken?  This was part of

10   body-worn-camera footage; right?

11   A.  Yes.  This is --

12   Q.  What date was the body-worn-camera footage taken?

13   A.  January 6th, 2021, at 15:21 and 25 seconds.

14           MS. AKERS:  Your Honor, the government moves to admit

15   Government's 807 and 808.

16           THE COURT:  Mr. Woodward.

17           MR. WOODWARD:  Can we go to 807, please.

18        Your Honor, no objection to 808.

19        With respect to 807, we submit that the proper

20   foundation for the authentication of the photo has not been

21   laid.

22           MS. AKERS:  Your Honor, this is actually already in

23   evidence.  We have submitted the CCTV footage, and it simply

24   has a red box around it.

25           THE COURT:  Okay.  You're not saying this photo.
```

FULP - DIRECT

1    You're saying the video?

2              MS. AKERS:  Correct.

3              THE COURT:  I'm going to admit it over objection.

4    807 and 808 are in.

5              (Government Exhibit 807 and 808 admitted into

6    evidence.)

7    BY MS. AKERS:

8    Q.  Special Agent Fulp, in addition to receiving tips and

9    speaking with numerous members of the public who are personally

10   familiar with Federico Klein, did you as part of your

11   investigation do anything else to corroborate his presence at

12   the United States Capitol on January 6th, 2021?

13             MR. WOODWARD:  Your Honor, just object to the form of

14   the question.  I believe the agent identified three people he

15   spoke with, and that's not numerous.

16             THE COURT:  All right.

17             MS. AKERS:  Amend my question to three.

18             THE COURT:  All right.  You may answer.

19             THE WITNESS:  To clarify, I did not speak to all

20   three.  The FBI spoke to three, that I'm aware of.

21   BY MS. AKERS:

22   Q.  Thank you.

23        In addition to the FBI, as part of its investigation

24   into AFO 136, speaking to at least three individuals who were

25   personally familiar with Federico Klein, and reviewing the tips

1    that were submitted to the FBI, did the FBI do anything else to

2    corroborate Mr. Klein's presence at the United States Capitol

3    on January 6th, 2021?

4    A.  Are you referring to prior to or after his arrest?

5    Q.  Prior to.

6    A.  So prior to his arrest, we were able to determine that

7    Mr. Klein's mobile device utilized cell towers and sectors that

8    are consistent with being at the United States Capitol at the

9    time of the riot.

10   Q.  And based on your -- well, I guess, did you participate in

11   the arrest of Mr. Klein?

12   A.  I did.

13   Q.  Based on your investigation and your personal experience at

14   the arrest, are you generally familiar with the physical

15   attributes and characteristics of Federico Klein?

16   A.  Yes.

17   Q.  And are you able to identify Federico Klein in the

18   courtroom today?

19   A.  I am.

20   Q.  Can you please do so.

21   A.  Sure.  He is the gentleman sitting on the right-hand side

22   of the table, as I'm looking at it, wearing, I think, a green

23   tie, dark suit, white shirt.

24            MS. AKERS:  Your Honor, can the record reflect that

25   Special Agent Fulp has identified Federico Klein in the

 1   courtroom today?

 2          THE COURT:  It will so reflect.

 3          MS. AKERS:  Thank you.

 4          THE COURT:  I take it you were not going to object,

 5   Mr. Woodward.

 6          MR. WOODWARD:  I was not.

 7          THE COURT:  Thank you.

 8   BY MS. AKERS:

 9   Q.  Special Agent Fulp, as part of the investigation into

10   Mr. Klein, did you view CCTV footage from the cameras on the

11   West Front?

12   A.  I did.

13   Q.  And were you able to identify Defendant Klein in that

14   footage?

15   A.  Yes.

16   Q.  And, generally, what does the footage show?

17   A.  Generally, the footage shows the crowd gathering on the

18   West Front and Mr. Klein working his way towards the front of

19   that crowd until he comes into contact -- until and through his

20   contact with law enforcement officers who were attempting to

21   establish a police line.

22          MS. AKERS:  Can we please pull up Government

23   Exhibit 308.  And we're going to jump forward to 2:31:40 p.m.

24   And if we could please zoom in to the area that I'm circling on

25   the screen.

1    BY MS. AKERS:

2    Q.  Special Agent, as part of your investigation, did you

3    become familiar with the grounds of the United States Capitol?

4    A.  I did.

5    Q.  Okay.  And we're going to -- what -- what area of the

6    United States Capitol are we looking at here in Exhibit 308?

7    A.  This is the West Front, generally.  And I hope I don't

8    confuse my terminology, but I think this is the upper west

9    plaza.

10          MS. AKERS:  We're going to play this exhibit for

11   a few seconds, and I'll let you know when to stop,

12   Mr. Clements.

13          (A video recording was played.)

14          MS. AKERS:  Can you please stop.  Can you go a couple

15   frames forward, please.  Okay.  We can stop.

16   BY MS. AKERS:

17   Q.  Special Agent Fulp, I'm circling a person with what appears

18   to be something white on his face.  Do you see that?

19   A.  I do.

20   Q.  I know it's difficult when we're looking at one second, but

21   based on your comprehensive review of this video footage, do

22   you recognize that individual?

23   A.  I do.

24          MR. WOODWARD:  Objection, Your Honor.

25   A.  Yes.  That's Mr. Klein.

1           THE COURT:  All right.  You have an objection?

2           MR. WOODWARD:  Yeah.  I don't think this is the

3    proper line of questioning.  I apologize for not standing.  I

4    think she's leading the witness by circling a mass of people

5    and then asking if she -- if the witness can identify Mr. Klein

6    in that mass of people.

7           Yes, I can cross-examine him on it, but if we're going

8    to do this all afternoon, it's going to take some time.  If we

9    can focus on the videos that matter, sir.

10          THE COURT:  All right.  So --

11          MS. AKERS:  Your Honor --

12          THE COURT:  -- Ms. Akers, I'm skeptical that anybody

13   can identify somebody from this photo.  But I think the agent

14   thinks he sees someone, he can testify to that.  I don't think

15   it was leading.  I'm overruling the objection.

16          MR. WOODWARD:  Thank you, sir.

17   BY MS. AKERS:

18   Q.  All right.  To orient ourselves, looking back down, I

19   circled an individual here.  And you were able to recognize

20   that individual somewhat consistent with Mr. Klein; is that

21   correct?

22   A.  Yes.  So just to clarify, as -- as a part of this

23   investigation and the larger investigation into assaults on

24   federal officers, we were watching probably thousands of hours

25   of video and became very adept at tracking people through

1    crowds because it's important to try to capture as much of that

2    individual as we can on video.

3           So while it may seem difficult to pick somebody out from

4    a still image, if you're familiar with how that person moved

5    and you've seen other videos, you can transfer that -- it

6    becomes a little easier if you know where you're looking and

7    what you're looking for.

8    Q.  And are there, in fact, corroborating videos we're going to

9    look at here today?

10   A.  I believe so.

11   Q.  All right.  I'm going to remove the red circle here.

12          MS. AKERS:  And can we please play until 21:54.

13          (A video recording was played.)

14          MS. AKERS:  Let's start over.  We're starting at

15   2 hours 1 minute and 40 seconds.

16          (A video recording was played.)

17   BY MS. AKERS:

18   Q.  And, Special Agent Fulp, I'm putting a circle around a

19   person in the middle of the screen here.  Do you see that

20   circle I just put?

21   A.  I think the icon is right over the face you're trying to

22   show me, but I see the circle, yes.

23          MS. AKERS:  Mr. Clements, can you move your mouse a

24   little bit.

25   A.  There's some little pencil-looking thing right on it.

FULP - DIRECT

1    BY MS. AKERS:

2    Q.   There we go.

3    A.   I see it.

4    Q.   Did -- are you able to identify Federico Klein in this

5    footage right here?

6    A.   Yes.  Would you like me to circle?

7    Q.   Yes, please.

8         And what identifying feature are you able to see at this

9    point?

10   A.   I can see the red hat and the white mask.

11   Q.   We're going to play until 2 hours 1 minute and 54 -- oh,

12   that's where we're at.

13   A.   Do I need to clear my screen?

14   Q.   Sure.  Thanks.

15        MS. AKERS:  We're going to play until 2 hours

16   2 minutes and 21 seconds, please.

17        (A video recording was played.)

18   BY MS. AKERS:

19   Q.   Are you able to identify where Mr. Klein is at this point?

20   A.   Yes.  That's what I was about to circle.

21   Q.   Sorry.  I should have let you circle.

22   A.   Okay.

23        MS. AKERS:  And, Mr. Clements, can you show us what

24   time it is in the upper left-hand corner.

25   ///

1    BY MS. AKERS:

2    Q.  Could you tell us what time it is, Special Agent Fulp.

3    A.  It is 2:32:21 p.m.

4            MS. AKERS:  Okay.  And can we please resume back up.

5            (A video recording was played.)

6            MS. AKERS:  And, Mr. Clements, can we do a

7    side-by-side with 411.1, please.  And can we please play 411.1

8    at 30 seconds to 47 seconds.

9            (An audio-visual recording was played.)

10           MS. AKERS:  Can we please play one more second.

11           (An audio-visual recording was played.)

12           MS. AKERS:  Mr. Clements, can you just go back

13   25 seconds and do frame by frame, please.  There we go.  We'll

14   stop there.

15       We're stopping at 46 seconds, which in Government

16   Exhibit 411.1 is at 4:23.

17   BY MS. AKERS:

18   Q.  Do you see that, Special Agent Fulp?

19   A.  On the left I do, yes.

20   Q.  And on the left in Government Exhibit 411.1, do you

21   recognize any individuals?

22   A.  Yes.  I see Mr. Klein.

23   Q.  And where do you see him?  Can you identify him on the left

24   as well?

25   A.  Where I'm circling in green.

1    Q.  And what is Mr. Klein wearing at this point?

2    A.  He's wearing a red hat, a white mask, a green jacket, and I

3    can just see the edges of the blue shirt.

4    Q.  What direction is he facing as it relates to the police

5    line?

6    A.  He's facing towards the police line, probably east.

7           MS. AKERS:  Can we please pull up, Mr. Clements, on

8    the left-hand side, Government Exhibit 410.  And at Government

9    Exhibit 410, can we please go to 2:32:34.  And play until

10   2:32:42.

11          (An audio-visual recording was played.)

12   BY MS. AKERS:

13   Q.  Special Agent Fulp, on Government Exhibit 410, on the

14   left-hand side, what time is this being filmed at?

15   A.  2:32:42.

16   Q.  Is that consistent with the footage on the right where

17   you've testified that Mr. Klein is facing and in front of the

18   police officers?

19   A.  I believe that's right.

20   Q.  On the left-hand-side video, which is 410, did you just

21   hear any audio come from that body-worn-camera footage?

22   A.  Yes.

23   Q.  And what did you hear in the body-worn-camera footage?

24   A.  Could you run it back one more time.

25          MS. AKERS:  Sure.  Can we go 10 seconds back, please.

```
 1              (An audio-visual recording was played.)

 2     BY MS. AKERS:

 3     Q.  Did you hear any audio in that body-worn-camera footage?

 4     A.  Yes.

 5     Q.  What did you hear?

 6     A.  I heard an officer say, "Move back."  And then I heard an

 7     individual say, "I need support.  Let's go."

 8     Q.  And at the same --

 9              MR. WOODWARD:  Objection, Your Honor.

10              THE COURT:  What basis, sir?

11              MR. WOODWARD:  Best evidence.  The video speaks for

12     itself.  If the government wants to prepare a transcript and

13     have us prepare our own transcript, we don't have any issues

14     with what the officer is saying, that the officer [sic]

15     testified about what his words were.  But we disagree that the

16     agent is correctly translating what he's hearing others say in

17     the video and believe that the best evidence of what was said

18     is the video itself.

19              THE COURT:  All right.  I think it is appropriate for

20     the agent to testify as to what he believes he heard.

21     Obviously, the defense can cross him on that and produce their

22     own interpretation.  But I think it's -- it's fair for the

23     agent to say what he heard.  So I'm overruling the objection.

24     BY MS. AKERS:

25     Q.  Special Agent Fulp, in Government Exhibit 410, when you
```

FULP - DIRECT

1    testified you heard someone say, "I need support.  Let's go,"

2    did you recognize anyone in that footage in front of this

3    officer's body-worn camera?

4    A.  I recognized the individual in the green jacket.

5    Q.  Okay.  And who did you recognize the individual in the

6    green jacket as?

7    A.  Mr. Klein.

8             MS. AKERS:  All right.  And on the left-hand side,

9    Mr. Clements, can we please now pull up Government Exhibit 523.

10   And can we please go to 25 seconds.  And play until 32 seconds.

11            (An audio-visual recording was played.)

12   BY MS. AKERS:

13   Q.  Special Agent Fulp, on Government Exhibit 523, are you able

14   to recognize any individual in this image?

15   A.  Yes.

16   Q.  Can you please circle and state who you recognize.

17   A.  Mr. Klein.

18   Q.  And are you circling a person in a green jacket and red

19   hat who's facing away from the camera next to some police

20   officers?

21   A.  Yes.

22            MR. WOODWARD:  Objection.  Leading.

23            THE COURT:  Sustained.

24   BY MS. AKERS:

25   Q.  Can you please describe the attire and direction that the

1    person who you circled is facing.

2    A.  Yes, I can see a red hat, a green jacket, and shortish

3    brown hair.

4    Q.  What direction is this individual facing?

5    A.  Towards the police line and the Capitol.

6    Q.  What would you say is the proximity to the police line at

7    this point?

8    A.  Less than a foot.

9    Q.  All right.  And, Special Agent Fulp, as part of your

10   investigation into Federico Klein, have you had an opportunity

11   to review ample video footage of him?

12   A.  Yes.

13   Q.  In some of that video footage, has there been audio in the

14   footage as well?

15   A.  Yes.

16   Q.  And have you listened to the audio footage?

17   A.  Yes.

18   Q.  Have you in those instances seen Mr. Klein's mouth moving

19   in the video footage?

20   A.  Yes.

21   Q.  And at the same time that Mr. Klein's mouth is -- was

22   moving, did you hear audio in the video footage?

23   A.  I -- yes.

24   Q.  Okay.  And during your investigation, in addition to

25   reviewing video evidence where you saw Mr. Klein's mouth

1    moving and heard audio coming from what appeared to be it,

2    have you been able to listen to his voice at any other times?

3    A.  Yes.

4    Q.  Can you explain to the Court how else you're familiar with

5    his voice.

6    A.  So subsequent to his arrest, one of my partners and I

7    transported Mr. Klein to the seventh police district for an

8    attempted interview and booking.  So there was some

9    conversating that occurred.

10   Q.  By conversating, do you mean you heard him speak?

11   A.  Correct.

12   Q.  Okay.  Go ahead.

13   A.  Also listened to jail calls that were obtained via subpoena

14   while Mr. Klein was detained at the D.C. Jail.  So there

15   were -- I don't recall the exact number of jail calls, but it

16   was several hours' worth that I was able to listen to.  As

17   well, on Mr. Klein's device, which was searched, there were

18   audio recordings of him in conversations with various

19   individuals.

20   Q.  And you had listened to those as well?

21   A.  Yes.  As part of the search warrant review I had to search,

22   you know, pretty much everything on the phone, and that was

23   some of the stuff that I came across.

24   Q.  Based on your review of video footage from January 6th,

25   your in-person observations, your review of several hours'

```
1    worth of the jail calls, and your review of all of his audio on

2    his cell phone, do you consider yourself to be familiar with

3    Mr. Klein's voice?

4    A.  Yes.

5          MS. AKERS:  In Government Exhibit 523, can we now

6    play until 50 seconds, please.

7          (An audio-visual recording was played.)

8    BY MS. AKERS:

9    Q.  Special Agent Fulp, did you just hear any audio in

10   Government Exhibit 523?

11   A.  I did.

12   Q.  What did you hear?

13   A.  There were several people yelling.  Someone was yelling

14   "Traitor."  But towards the end of the clip, we heard "I need

15   support.  Let's go."

16          MS. AKERS:  And, Mr. Clements, if we could just go

17   back 25 seconds in the video footage.  Great.

18   BY MS. AKERS:

19   Q.  Do you see anyone's face who you recognize in the video

20   footage in Government Exhibit 523?

21   A.  Yes.  I'm going to circle Mr. Klein in green.

22   Q.  And does this video footage in 523 appear to have the same

23   exact audio as the footage in Officer Harvell's body-worn

24   camera that we just looked at?

25   A.  Yes.
```

1   Q.  And does it also appear to have -- be in the same location

2   as Government Exhibit 308, which is on our right-hand side of

3   the screen?

4   A.  Yes.

5   Q.  And when you heard someone say, "I need support.  Let's

6   go," in your opinion who do you believe spoke those words at

7   this point?

8   A.  Based on my familiarity with Mr. Klein's voice and the fact

9   that I can see his mouth moving while those words are being

10  uttered in this video that we just watched, I believe that's

11  Mr. Klein's voice.

12          MS. AKERS:  We can take down the left-hand side,

13  Mr. Clements, and make Government Exhibit 308 the primary

14  exhibit, please.

15  BY MS. AKERS:

16  Q.  And just to familiarize ourselves again, Special Agent

17  Fulp, can you please circle Mr. Klein where you believe

18  Mr. Klein to be in this video footage.

19  A.  (Witness complying.)

20  Q.  Thank you.

21  A.  That's a terrible circle.  I'm sorry.

22  Q.  No problem.

23          MS. AKERS:  Mr. Clements, can you show us what time

24  it is in this video footage, please.

25  ///

1    BY MS. AKERS:

2    Q.  All right.  Is it 2:32:21 p.m.?

3    A.  I read 2:32:21 at the time stamp.

4            MS. AKERS:  Can we please play until 2:32:42.

5    2:23:42.  Play from where we're at now, please.

6            (A video recording was played.)

7    BY MS. AKERS:

8    Q.  Special Agent Fulp, can you put a circle around the area

9    where Mr. Klein is now.

10   A.  (Witness complying.)

11   Q.  And based on your review of this and other footage, what

12   appears -- what does Mr. Klein appear to be doing at this

13   point?

14   A.  He's now facing away from the police line and the Capitol

15   towards the west.

16           MS. AKERS:  Mr. Clements, if we could please pull up

17   Government Exhibit 410 on the left.  And can we please play

18   2:32:42 p.m. as a starting point.  And then we'll play until

19   2:33:50.

20           (An audio-visual recording was played.)

21           MS. AKERS:  Please stop.

22   BY MS. AKERS:

23   Q.  We just stopped Government Exhibit 410 at 2:33:32 p.m.  Did

24   you see anyone in that video footage who you recognize, Special

25   Agent Fulp?

1   A.  I did.  I saw Mr. Klein in the green jacket.

2   Q.  And in what proximity was he to law enforcement at this

3   point?

4   A.  He was touching.

5   Q.  And did you hear any audio associated with this video?

6   A.  Yeah.  There were several things that were said during that

7   video.

8   Q.  At the end of the video, what do you recall hearing in this

9   video footage?

10   A.  I believe I heard the officers say:  Come on, you guys --

11   or y'all stop this and was met with a reply of "You can't stop

12   this," brief interlude, and then "How about that?  We're all

13   wearing fucking face masks."

14   Q.  And based on your investigation into AFO 136, or Mr. Klein,

15   was Mr. Klein, in fact, wearing a face mask at this point?

16   A.  At this point in the day, yes.

17   Q.  And are you able to see that not only in body-worn-camera

18   footage but also in the CCTV footage?

19   A.  Yes.

20   Q.  And based on your law enforcement experience, do people --

21   what do people use face masks for when they're committing

22   criminal activity?

23               MR. WOODWARD:  Objection.

24               THE COURT:  Sustained.

25               MS. AKERS:  All right.  If we're still on Government

1   Exhibit 410, can we please play from 4:33:32, where we're at,

2   to 4:33:47.

3          (An audio-visual recording was played.)

4          MS. AKERS:  All right.  And then on the right-hand

5   side, Government Exhibit 308, can we please check what time it

6   is.  2:32:39.  And then we'll pull that back to the right-hand

7   side, please.

8          And can we please zoom up to the area that we've been

9   looking at, which is the middle bottom of the screen.  And can

10  we please play Government Exhibit 308 until 2:33:50.  I can

11  tell you when to stop.

12         (A video recording was played.)

13         MS. AKERS:  Can we please stop.

14  BY MS. AKERS:

15  Q.  And just for orientation purposes, Special Agent Fulp, I'm

16  circling a person in the, sort of, middle left of the screen.

17  Do you see that person?

18  A.  I do.

19  Q.  Does that person appear to have a white face mask on?

20  A.  Yes.

21         MS. AKERS:  Okay.  Can we continue playing, please.

22         (A video recording was played.)

23         MS. AKERS:  Can we please stop.  Can we go a couple

24  frames forward, Mr. Clements.  Can we resume playing for just a

25  few seconds.

```
 1              (A video recording was played.)

 2              MS. AKERS:  Can we please stop.

 3   BY MS. AKERS:

 4   Q.  Special Agent Fulp, I'm circling in the middle bottom left

 5   of the screen an individual.  Do you see him?

 6   A.  Yes.

 7   Q.  And who does that appear to be?

 8   A.  Mr. Klein.

 9   Q.  Did he appear to be standing next to any particular

10   individual?

11              MR. WOODWARD:  Again, objection, Your Honor.  If she

12   wants to ask the agent to circle him, by all means.  But

13   circling an individual and asking if that's Mr. Klein --

14              THE COURT:  It is suggestive.

15              MS. AKERS:  I can have him do the circling.

16              THE COURT:  I think the agent can.  Why don't we have

17   the agent.

18              MS. AKERS:  Sure.

19   BY MS. AKERS:

20   Q.  Does Mr. Klein appear to be standing next to any

21   individuals at this point?

22   A.  So I see Mr. Klein to the right.  And on the left side of

23   the screen, or his right, there's an individual in what looks

24   like a gray jacket or sweatshirt.  I can't recall what -- what

25   type of article of clothing it was, off the top of my head.
```

1    Q.  It's just gray in nature at least?

2    A.  Yes.

3    Q.  And does that appear consistent with the body-worn-camera

4    footage that we just looked at for Mr. Harvell --

5    Officer Harvell?

6    A.  Could I see it again.

7    Q.  Sure.

8              MS. AKERS:  Can we please pull up Government

9    Exhibit 410 at time stamp 2:33:47.

10   A.  Yes.  So on the left, I think this individual that I'm

11   circling in the gray sweatshirt is the same that I was seeing

12   on the right in the surveillance video.

13   BY MS. AKERS:

14   Q.  All right.  I'm going to clear the screen.  You had just

15   circled an individual in gray in Government Exhibit 410 at

16   2:33:47.

17             MS. AKERS:  And could we make 308 our primary exhibit

18   again.

19   BY MS. AKERS:

20   Q.  Special Agent Fulp, after Mr. Klein stood next to the

21   person in gray, did he retreat from the police line at all or

22   leave the area?

23   A.  No.

24   Q.  What did he do?

25   A.  So kind of one and then the other.  So the officers shortly

1  after here were -- were retreating and filing up the stairs and

2  Mr. Klein basically stays around until they're gone and then

3  moves over to -- moves in a southerly direction and then begins

4  to climb up.

5  Q.  Okay.  We're going to play this, but just so we can orient

6  again.  Can you please circle Mr. Klein in Government

7  Exhibit 308.

8  A.  (Witness complying.)

9  Q.  You've circled sort of center left of the screen?

10  A.  Yes.

11          MS. AKERS:  Okay.  Can we please play.

12          (A video recording was played.)

13          MS. AKERS:  Can we please pause.

14  BY MS. AKERS:

15  Q.  Special Agent Fulp, as part of your review of this video

16  footage, did Mr. Klein make it to the second, like, sort of

17  level up on the Capitol Building?

18  A.  Yes.

19          MS. AKERS:  Okay.  Can we please pull up Government

20  Exhibit 302.

21          THE COURT:  Why don't we stop there for the evening.

22          MS. AKERS:  Sure.

23          THE COURT:  Special Agent Fulp, you may step down.

24  I'll ask you not to discuss the contents of your testimony with

25  anyone overnight.

```
1              THE WITNESS:  Yes, sir.

2              THE COURT:  Ms. Akers, you've got one more witness;

3         is that correct?

4              MS. AKERS:  Correct.

5              THE COURT:  All right.  So I am hoping that we're

6         going to be able to wrap up with the testimony at least

7         tomorrow.  Everybody should make sure you've got your witnesses

8         here tomorrow.  Yeah, I would not expect to grant continuances

9         based on witness availability at this point.

10             So let's try to -- I'm hoping to wrap it up tomorrow.

11        I'll just say -- we'll see what Mr. Woodward has in cross, but

12        my inclination at this point is this is likely Mr. Klein.

13             So I'd say for the rest of Agent Fulp's testimony, why

14        don't we try to home in on specific counts and remember that

15        I've done a dozen of these January 6th trials, including seeing

16        this particular video multiple times.

17             MS. AKERS:  Yes.  Your Honor, I do understand.  I

18        would just like to note, while we want to be efficient, the

19        defense has objected to identification in every one of our

20        video footages and has objected to the authenticity and the

21        admissibility of every footage that proves our counts.  So we

22        won't be as efficient as we would like to be because we have to

23        prove our case, and --

24             THE COURT:  That's why I'm telling you -- ma'am.

25             MS. AKERS:  -- identification is --
```

```
 1                    THE COURT:  Ma'am.

 2                    MS. AKERS:  Sure.

 3                    THE COURT:  That's why I'm telling you, I -- if, you

 4       know, Mr. Woodward does his magic in cross-examination, maybe

 5       he shows this is all a Where's Waldo exercise.  But I think I'm

 6       telling you it looks to me like you found your guy there.

 7            So I understand that Mr. Woodward isn't making it easy

 8       for you, but let's try to move -- you've got a lot of evidence

 9       in.  I think these videos I'm seeing all have been admitted in

10       this case.  So let's focus in on the charges.

11            All right.  Anything else this evening, Ms. Akers?

12                    MS. AKERS:  No.  But just for the record, this is

13       Count 9 and the assault that we have charged.

14                    THE COURT:  Okay.  Yeah, I -- that has not been clear

15       to me.

16                    MS. AKERS:  And I'll make sure to do that tomorrow.

17                    THE COURT:  Thanks.  All right.

18            Mr. Woodward, anything further for your client?

19                    MR. WOODWARD:  No, Your Honor.

20                    THE COURT:  All right.  And Ms. Douenat?

21                    MS. DOUENAT:  Nothing further, Your Honor.

22                    THE COURT:  Thanks, folks.  See you at 9:30 tomorrow.

23                    (Proceedings were concluded at 4:58 p.m.)

24

25
```

1          CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9               Dated this 4th day of August, 2023.

10

11               /s/ Nancy J. Meyer
                Nancy J. Meyer
12              Official Court Reporter
                Registered Diplomate Reporter
13              Certified Realtime Reporter
                333 Constitution Avenue Northwest
14              Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

**'**

**'21** [2] - 673:7, 673:16

**0**

**0** [4] - 588:25, 589:1, 596:3, 596:4
**01/05** [1] - 587:5

**1**

**1** [10] - 555:12, 557:6, 623:17, 624:12, 624:17, 624:20, 632:23, 635:7, 728:15, 729:11
**1-hour-and-11-minute** [1] - 664:14
**10** [13] - 549:25, 554:8, 565:10, 584:23, 585:18, 586:4, 587:25, 609:13, 612:2, 636:7, 638:9, 679:7, 731:25
**1001.1** [5] - 576:15, 597:16, 599:19, 599:23, 600:5
**1001.1.....................** [1] - 516:19
**1001.2** [1] - 600:8
**1001.2.....................** [1] - 516:19
**1001.3** [2] - 600:17, 600:23
**1001.3.....................** [1] - 516:20
**1001.4** [5] - 576:15, 597:16, 599:19, 601:1, 601:8
**1001.4.....................** [1] - 516:20
**105** [1] - 674:18
**10:13** [1] - 592:1
**10:16** [1] - 589:5
**10:51** [2] - 592:8, 592:19
**10:56** [2] - 592:25, 593:8
**10:58** [1] - 593:17
**10:59** [1] - 594:4
**11** [7] - 582:8, 597:13, 607:12, 607:19, 608:1, 643:22, 663:21
**111(a** [1] - 519:13
**111(a)** [1] - 519:25
**111(a)(1** [1] - 525:23
**11:04** [1] - 519:4
**12** [2] - 585:23, 586:6
**123** [9] - 578:25,

579:12, 579:15, 654:19, 654:20, 654:25, 655:15, 655:19, 658:8
**12:01** [1] - 596:4
**12:40** [1] - 601:21
**136** [13] - 718:15, 719:3, 719:6, 719:8, 719:13, 720:1, 720:9, 720:12, 720:17, 720:20, 720:24, 723:24, 739:14
**136's** [1] - 719:5
**136-AFO** [2] - 719:2, 720:6
**15** [8] - 612:8, 635:3, 640:15, 698:5, 698:14, 698:15, 698:17
**1512** [4] - 522:4, 522:7, 522:9, 597:19
**1512(c** [1] - 521:11
**15:21** [1] - 722:13
**16** [8] - 543:9, 695:7, 695:10, 698:5, 698:14, 698:15, 698:17
**17** [3] - 552:24, 644:9, 644:12
**18** [10] - 519:13, 519:14, 519:25, 521:4, 525:23, 597:19, 629:25, 630:14, 639:12, 640:15
**18:22** [1] - 640:16
**18:30** [1] - 641:5
**18:49** [1] - 639:14
**19** [2] - 591:16, 629:21
**1970s** [1] - 682:23
**1983** [3] - 681:4, 681:7, 682:14
**1995** [1] - 518:25
**1:00** [2] - 596:3, 601:15
**1:04** [1] - 597:2
**1:10** [1] - 602:2
**1:22** [1] - 555:11
**1:36** [1] - 610:25
**1:42** [1] - 603:23
**1:43** [1] - 650:9
**1:44** [1] - 651:3
**1st** [10] - 584:6, 585:2, 585:14, 585:22, 586:8, 671:3, 671:9, 671:15, 673:20, 673:21

**2**

**2** [16] - 557:5, 557:9, 557:10, 557:20, 624:20, 625:7, 625:10, 626:5, 626:9, 627:1, 627:4, 627:12, 728:15, 729:11, 729:15, 729:16
**2.....................** [1] - 516:22
**20** [10] - 546:3, 554:8, 592:12, 608:1, 608:4, 612:19, 612:23, 630:17, 631:5, 639:25
**2007** [1] - 519:16
**2018** [2] - 559:24, 714:25
**2020** [3] - 519:21, 581:7, 581:20
**2021** [34] - 529:4, 578:8, 578:17, 579:2, 584:6, 585:2, 588:25, 591:3, 591:24, 593:17, 594:9, 596:3, 597:2, 603:23, 604:16, 605:11, 606:19, 610:25, 613:18, 615:23, 617:3, 617:21, 632:11, 646:7, 649:20, 651:3, 651:13, 654:8, 657:24, 659:19, 671:2, 722:13, 723:12, 724:3
**2022** [2] - 525:5, 528:19
**2023** [1] - 671:3
**20th** [3] - 650:9, 651:3, 651:13
**21** [2] - 593:12, 729:16
**21-40** [1] - 517:3
**2111** [1] - 519:14
**21:54** [1] - 728:12
**22** [2] - 555:12, 594:13
**2272** [1] - 542:6
**231(a** [1] - 521:4
**24** [1] - 647:23
**25** [7] - 544:10, 605:2, 649:9, 722:13, 730:13, 733:10, 736:17
**252** [1] - 675:3
**253** [1] - 519:15
**27** [4] - 536:14, 625:7, 625:10, 626:5

**28** [2] - 538:8, 646:17
**28th** [2] - 581:7, 581:20
**29** [2] - 628:19, 629:18
**2:03** [1] - 604:16
**2:16** [2] - 588:25, 605:11
**2:21** [1] - 606:19
**2:23:42** [1] - 738:5
**2:29** [1] - 666:21
**2:31:40** [1] - 725:23
**2:32:21** [3] - 730:3, 738:2, 738:3
**2:32:34** [1] - 731:9
**2:32:39** [1] - 740:6
**2:32:42** [4] - 731:10, 731:15, 738:4, 738:18
**2:33:32** [1] - 738:23
**2:33:47** [2] - 742:9, 742:16
**2:33:50** [2] - 738:19, 740:10
**2:44** [1] - 613:18
**2:55** [1] - 615:23
**2:59** [2] - 617:3, 617:21
**2d** [2] - 674:18, 675:3

**3**

**3** [9] - 552:24, 627:15, 628:1, 628:4, 628:8, 628:16, 628:18, 629:11, 629:18
**30** [3] - 548:23, 618:7, 730:8
**300** [2] - 533:1
**301.2** [5] - 542:25, 552:22, 632:18, 641:13, 642:25
**302** [2] - 668:24, 743:20
**302s** [1] - 684:5
**308** [8] - 725:23, 726:6, 737:2, 737:13, 740:5, 740:10, 742:17, 743:7
**30th** [2] - 528:19, 582:17
**32** [2] - 526:16, 733:10
**33** [2] - 626:10, 627:1
**34** [3] - 624:4, 624:12, 624:17
**35** [2] - 533:8, 620:13
**353** [1] - 657:3
**36** [1] - 614:16
**39** [1] - 553:22
**3:00** [1] - 706:19

**3:03** [1] - 632:11
**3:07** [1] - 632:19
**3:07:50** [1] - 633:11
**3:10:35** [1] - 641:14
**3:11** [2] - 646:7, 647:13
**3:11:04** [1] - 642:13
**3:11:15** [1] - 642:16
**3:11:27** [1] - 643:3
**3:15** [1] - 706:19
**3:18** [4] - 543:9, 544:9, 544:14, 553:21
**3:18:16** [1] - 543:1
**3:19** [1] - 546:2
**3:29** [2] - 648:3, 648:10
**3:47** [1] - 649:20

**4**

**4** [6] - 521:13, 546:18, 548:19, 629:21, 629:24, 630:14
**40** [7] - 520:1, 521:8, 524:18, 544:15, 622:13, 703:15, 728:15
**402** [1] - 675:3
**403** [1] - 681:19
**410** [10] - 731:8, 731:9, 731:13, 731:20, 732:25, 738:17, 738:23, 740:1, 742:9, 742:15
**411.1** [4] - 730:7, 730:16, 730:20
**42** [1] - 619:1
**43** [1] - 639:12
**45** [1] - 650:1
**46** [2] - 650:2, 730:15
**47** [3] - 650:2, 650:6, 730:8
**48** [1] - 650:22
**4:04** [1] - 648:19
**4:23** [1] - 730:16
**4:33:32** [1] - 740:1
**4:33:47** [1] - 740:2
**4:58** [1] - 745:23

**5**

**5** [11] - 524:20, 546:18, 581:2, 589:5, 589:7, 596:4, 612:18, 613:23, 630:16, 631:5, 635:3
**50** [4] - 539:24, 675:7, 700:2, 736:6
**501** [3] - 526:19, 536:13, 640:14

748

**501.60** [4] - 526:19, 527:6, 527:9, 541:23
**501.60**........................
   [1] - 516:15
**509** [6] - 635:2, 636:10, 636:11, 639:7, 639:8, 639:9
**509**........................
   [1] - 516:15
**5104** [2] - 518:3, 521:8
**515** [1] - 639:11
**523** [6] - 733:9, 733:13, 736:5, 736:10, 736:20, 736:22
**527** [2] - 516:4, 516:15
**53** [1] - 538:10
**532** [3] - 555:4, 555:5, 557:5
**533** [3] - 526:21, 527:2, 527:6
**533.1** [7] - 526:20, 546:17, 548:8, 548:15, 548:16, 548:19, 646:11
**533.1**........................
   [1] - 516:16
**534** [1] - 555:5
**54** [3] - 622:18, 623:17, 729:11
**548** [1] - 516:16
**55** [2] - 627:4, 627:12
**550** [1] - 516:5
**557** [1] - 516:22
**559** [1] - 516:6
**565** [1] - 516:16
**569** [1] - 516:17
**570** [1] - 516:6
**577** [1] - 516:7
**58** [3] - 518:24, 546:18, 548:20
**599** [4] - 516:19, 516:19, 516:20, 516:20
**5:01** [1] - 596:3
**5:34** [2] - 636:8, 636:12
**5:44** [1] - 635:20
**5th** [5] - 579:21, 587:8, 588:25, 589:12, 591:3

**6**
**6** [11] - 548:23, 581:12, 581:15, 582:10, 584:10, 591:24, 603:23, 626:6, 639:25, 644:9, 657:5
**602.1** [1] - 632:17

**611.16** [1] - 586:16
**611.17** [1] - 604:9
**611.18** [1] - 603:25
**611.36** [1] - 669:14
**611.38** [2] - 653:13, 656:9
**612.10** [1] - 610:18
**612.11** [1] - 606:25
**612.12** [1] - 613:11
**612.13** [1] - 611:2
**612.14** [1] - 615:16
**612.15** [2] - 587:19, 613:19
**612.16** [1] - 616:21
**612.17** [1] - 615:25
**612.18** [1] - 617:14
**612.20** [1] - 632:4
**612.21** [2] - 617:23, 630:22
**612.22** [1] - 645:25
**612.23** [1] - 643:15
**612.24** [1] - 649:13
**612.25** [2] - 647:16, 649:2
**612.40** [1] - 595:20
**612.41** [1] - 595:13
**612.42** [1] - 596:20
**612.43** [2] - 596:6, 661:19
**612.44** [1] - 603:13
**612.45** [2] - 603:5, 665:6
**612.48** [1] - 590:21
**612.49** [2] - 589:16, 590:24
**612.50** [2] - 588:15, 588:20
**612.51** [1] - 587:12
**612.6** [1] - 605:5
**612.7** [1] - 604:18
**612.8** [1] - 606:12
**612.9** [1] - 605:13, 617:5, 666:12
**613** [6] - 580:1, 580:5, 586:11, 591:12, 647:17, 650:1
**620** [6] - 561:15, 561:20, 565:4, 565:7, 565:8, 569:1
**620**........................
   [1] - 516:16
**620.1** [4] - 567:19, 569:4, 569:6, 569:7
**620.1**........................
   [1] - 516:17
**639** [1] - 516:15
**654** [1] - 516:8
**667** [1] - 516:8
**669** [1] - 516:9

**67** [2] - 704:5, 704:11
**675** [3] - 518:9, 523:15, 525:17
**677** [3] - 518:11, 522:12, 525:18
**680** [1] - 516:10
**69** [2] - 704:5, 704:11
**693** [1] - 518:24
**699** [1] - 516:10
**6th** [69] - 518:13, 521:12, 529:4, 530:15, 543:8, 549:7, 550:16, 577:2, 578:17, 578:19, 579:2, 591:10, 591:24, 592:8, 592:15, 592:25, 593:17, 593:17, 594:3, 594:9, 596:3, 597:2, 597:7, 604:16, 605:11, 606:19, 606:22, 607:5, 608:19, 609:18, 610:25, 613:18, 614:4, 615:23, 617:3, 617:21, 632:11, 646:7, 648:3, 648:19, 649:20, 662:5, 666:21, 668:7, 683:16, 684:8, 700:24, 701:2, 701:5, 701:8, 701:15, 701:18, 703:7, 704:21, 706:10, 710:7, 710:15, 712:12, 713:6, 715:11, 715:23, 719:7, 721:2, 722:13, 723:12, 724:3, 735:24, 744:15

**7**
**7** [2] - 536:14, 583:9
**70** [2] - 704:5, 704:11
**702** [2] - 518:19, 524:22
**70A** [2] - 704:6, 704:11
**71** [2] - 704:6, 704:12
**712** [1] - 516:11
**714** [1] - 516:12
**719** [1] - 516:17
**72** [2] - 704:6, 704:12
**723** [2] - 516:18, 516:18
**73** [2] - 704:6, 704:12
**730** [1] - 518:25

**740** [1] - 675:7

**8**
**8** [7] - 584:2, 618:18, 627:15, 628:8, 628:16, 631:6, 641:4
**803** [3] - 718:17, 719:16, 719:23
**803**........................
   [1] - 516:17
**807** [7] - 721:6, 721:12, 722:15, 722:17, 722:19, 723:4, 723:5
**807**........................
   [1] - 516:18
**808** [5] - 721:24, 722:15, 722:18, 723:4, 723:5
**808**........................
   [1] - 516:18
**839** [1] - 520:1
**85** [1] - 519:16
**883** [1] - 519:15
**884** [1] - 519:16
**885** [1] - 674:18
**8:00** [1] - 679:2

**9**
**9** [5] - 584:10, 584:24, 611:9, 611:16, 745:13
**90** [1] - 564:17
**95** [1] - 564:17
**9:03** [1] - 581:20
**9:03:04** [1] - 581:12
**9:13** [1] - 591:24
**9:16** [1] - 589:7
**9:28** [1] - 591:3
**9:30** [2] - 549:25, 745:22

**A**
**a.m** [14] - 581:12, 581:20, 589:5, 591:3, 591:24, 592:1, 592:8, 592:19, 592:25, 593:8, 593:17, 594:4, 594:9, 679:2
**A1994** [1] - 571:23
**abetting** [3] - 520:14, 520:16, 520:19
**ability** [13] - 519:23, 520:4, 539:11, 623:11, 685:14, 685:22, 686:2, 686:9, 686:25,

**687**:10, 688:5, 703:5, 717:13
**able** [24] - 549:10, 608:14, 609:8, 656:18, 656:20, 659:12, 660:13, 690:17, 690:22, 704:9, 717:5, 720:16, 724:6, 724:17, 725:13, 727:19, 729:4, 729:8, 729:19, 733:13, 735:2, 735:16, 739:17, 744:6
**absent** [1] - 717:13
**absolutely** [20] - 529:21, 530:4, 531:13, 531:18, 533:14, 534:12, 536:9, 538:16, 538:20, 540:15, 548:6, 550:24, 551:7, 552:12, 552:15, 552:17, 553:9, 553:12, 553:17, 554:21
**acceptable** [1] - 524:21
**accepting** [3] - 710:25, 711:1, 711:2
**access** [1] - 681:17
**AccessData** [1] - 560:5
**according** [18] - 521:23, 543:7, 580:12, 588:23, 591:1, 596:1, 596:25, 603:18, 606:17, 610:23, 613:16, 615:21, 617:1, 617:19, 632:9, 646:5, 649:18, 700:21
**account** [1] - 693:16
**accuracy** [8] - 685:11, 697:7, 697:10, 697:12, 697:20, 709:25, 710:9, 712:4
**accurate** [10] - 548:4, 556:23, 564:25, 568:22, 569:12, 569:14, 689:15, 696:7, 699:23, 700:1
**accurately** [2] - 568:25, 690:22
**acknowledges** [1] - 524:9
**acquaintance** [1] - 720:25

**acquired** [1] - 691:2
**act** [1] - 519:24
**Act** [6] - 520:3,
  670:19, 673:17,
  674:24, 677:6, 679:6
**Action** [1] - 517:3
**actions** [1] - 520:5
**activated** [1] - 642:20
**activities** [1] - 591:5
**activity** [1] - 739:22
**acts** [1] - 715:19
**AD** [1] - 560:6
**add** [2] - 689:9, 689:18
**addition** [8] - 557:15,
  566:7, 601:12,
  672:22, 720:8,
  723:8, 723:23,
  734:24
**additional** [10] -
  524:4, 543:3,
  655:14, 659:2,
  671:17, 704:12,
  704:14, 717:6,
  717:7, 717:21
**address** [3] - 519:9,
  659:6, 682:5
**adept** [1] - 727:25
**adequately** [1] - 520:5
**administered** [6] -
  527:14, 532:20,
  558:22, 577:7,
  680:2, 714:7
**administrator** [1] -
  680:16
**admissibility** [1] -
  744:21
**admissible** [2] -
  519:11, 519:17
**admission** [4] - 565:3,
  569:3, 676:15,
  719:19
**admit** [11] - 519:3,
  548:8, 557:4,
  586:12, 597:15,
  599:8, 639:7, 699:3,
  719:15, 722:14,
  723:3
**admitted** [18] - 526:18,
  526:20, 527:2,
  527:9, 536:13,
  548:16, 557:10,
  565:8, 569:7,
  576:15, 599:19,
  637:2, 637:5, 637:6,
  639:9, 719:23,
  723:5, 745:9
**Admitted** [1] - 516:14
**admitting** [6] - 523:18,
  548:14, 597:23,
  598:3, 639:8, 719:22

**advance** [2] - 555:11,
  671:12
**advantage** [3] -
  539:15, 539:17,
  678:6
**affect** [19] - 523:24,
  570:17, 684:22,
  687:9, 688:8, 688:9,
  688:16, 689:13,
  690:7, 690:11,
  691:12, 693:14,
  694:9, 694:10,
  696:12, 697:16,
  697:17, 708:11,
  712:9
**affected** [4] - 519:23,
  689:24, 709:25,
  710:4
**affiliated** [2] - 660:21,
  661:1
**affirmed** [1] - 519:21
**AFO** [20] - 578:25,
  579:12, 579:15,
  654:20, 654:21,
  655:19, 718:9,
  719:3, 719:5, 719:6,
  719:8, 719:13,
  720:1, 720:9,
  720:17, 720:20,
  720:24, 723:24,
  739:14
**AFOs** [1] - 607:4
**after-first-unlock** [2] -
  564:16, 564:21
**afternoon** [10] -
  654:15, 654:16,
  680:7, 680:8,
  699:17, 699:18,
  714:9, 714:10,
  714:13, 727:8
**afterwards** [1] -
  599:13
**Agent** [157] - 561:6,
  561:8, 561:20,
  563:7, 563:14,
  566:10, 568:18,
  568:23, 569:23,
  572:7, 572:24,
  573:5, 573:9,
  574:10, 576:10,
  576:14, 577:9,
  580:5, 581:6,
  582:13, 584:13,
  586:18, 587:7,
  587:15, 587:22,
  588:5, 588:20,
  589:10, 589:18,
  589:25, 591:4,
  591:20, 595:23,
  596:14, 596:22,

597:3, 599:25,
  600:10, 601:3,
  601:16, 602:14,
  602:17, 602:23,
  603:7, 603:15,
  604:2, 604:12,
  604:20, 605:7,
  605:16, 606:14,
  606:20, 607:2,
  607:15, 608:6,
  608:16, 609:16,
  610:20, 611:4,
  611:12, 612:5,
  612:22, 613:13,
  614:18, 615:5,
  615:18, 616:2,
  616:13, 616:23,
  617:7, 617:16,
  618:3, 618:10,
  618:25, 619:20,
  621:21, 622:17,
  623:20, 624:22,
  625:21, 627:6,
  627:17, 628:10,
  628:21, 630:2,
  631:18, 632:6,
  632:12, 632:25,
  633:19, 634:17,
  635:10, 635:23,
  639:18, 640:3,
  640:20, 641:18,
  642:2, 642:18,
  643:6, 643:17,
  643:25, 644:12,
  645:7, 646:2, 646:8,
  646:19, 646:25,
  647:10, 647:19,
  648:2, 649:4,
  649:15, 649:21,
  650:8, 654:3,
  654:15, 658:23,
  665:11, 669:10,
  669:16, 669:20,
  671:20, 671:21,
  671:24, 672:6,
  674:2, 674:3,
  675:23, 714:4,
  714:9, 714:13,
  718:19, 719:25,
  721:7, 723:8,
  724:25, 725:9,
  726:2, 726:17,
  728:18, 730:2,
  730:18, 731:13,
  732:25, 733:13,
  734:9, 736:9,
  737:16, 738:8,
  738:25, 740:15,
  741:4, 742:20,
  743:15, 743:23,
  744:13

**agent** [32] - 566:16,
  568:18, 574:6,
  574:8, 574:9, 577:5,
  577:21, 577:22,
  579:3, 579:5, 579:6,
  582:4, 621:14,
  623:6, 623:10,
  625:17, 626:22,
  638:3, 638:7,
  638:12, 714:23,
  714:24, 716:14,
  716:16, 723:14,
  727:13, 732:16,
  732:20, 732:23,
  741:12, 741:16,
  741:17
**agents** [3] - 659:21,
  659:23, 675:22
**Agents** [1] - 517:9
**ago** [4] - 522:3,
  525:11, 575:3,
  682:20
**agree** [10] - 517:23,
  518:4, 518:20,
  521:3, 525:22,
  556:22, 664:15,
  682:4, 694:17, 699:6
**agreed** [1] - 637:7
**agreeing** [1] - 520:9
**ahead** [10] - 540:8,
  554:12, 565:25,
  592:1, 632:22,
  639:11, 641:13,
  641:23, 646:16,
  735:12
**aid** [1] - 691:21
**aiding** [3] - 520:14,
  520:16, 520:19
**aim** [1] - 688:23
**air** [1] - 647:4
**AKERS** [95] - 517:7,
  518:4, 525:21,
  526:2, 526:9,
  573:18, 574:16,
  575:2, 575:8,
  575:15, 575:19,
  714:4, 714:12,
  716:7, 718:16,
  718:18, 719:15,
  719:24, 722:14,
  722:22, 723:2,
  723:7, 723:17,
  723:21, 724:24,
  725:3, 725:8,
  725:22, 726:1,
  726:10, 726:14,
  726:16, 727:11,
  727:17, 728:12,
  728:14, 728:17,
  728:23, 729:1,

729:15, 729:18,
  729:23, 730:1,
  730:4, 730:6,
  730:10, 730:12,
  730:17, 731:7,
  731:12, 731:25,
  732:2, 732:24,
  733:8, 733:12,
  733:24, 736:5,
  736:8, 736:16,
  736:18, 737:12,
  737:15, 737:23,
  738:1, 738:4, 738:7,
  738:16, 738:21,
  738:22, 739:25,
  740:4, 740:13,
  740:14, 740:21,
  740:23, 741:2,
  741:3, 741:15,
  741:18, 741:19,
  742:8, 742:13,
  742:17, 742:19,
  743:11, 743:13,
  743:14, 743:19,
  743:22, 744:4,
  744:17, 744:25,
  745:2, 745:12,
  745:16
**Akers** [8] - 517:7,
  517:22, 525:20,
  526:12, 714:3,
  727:12, 744:2,
  745:11
**Akers................** [1] -
  516:12
**Alexander** [1] - 517:14
**algorithm** [1] - 567:2
**alleged** [3] - 519:8,
  522:6, 522:24
**allegedly** [1] - 524:3
**allow** [5] - 526:6,
  658:19, 679:9,
  679:10, 695:23
**alluded** [1] - 670:21
**almost** [6] - 534:2,
  535:15, 539:17,
  545:6, 575:3, 703:14
**alone** [1] - 582:25
**alphanumeric** [1] -
  567:3
**altered** [3] - 566:23,
  567:14, 707:18
**amend** [1] - 723:17
**America** [1] - 517:3
**American** [2] - 556:16,
  675:7
**amount** [5] - 551:5,
  686:5, 686:8, 708:1,
  708:6
**amounts** [1] - 720:2

**ample** [1] - 734:11
**Analysis** [1] - 560:25
**analyze** [1] - 566:13
**angle** [3] - 557:1, 692:18, 693:9
**angles** [1] - 693:4
**angry** [3] - 547:17, 547:22, 667:6
**anonymous** [1] - 720:5
**answer** [9] - 620:2, 620:5, 686:14, 690:20, 693:12, 696:2, 700:15, 723:18
**answered** [1] - 620:7
**answering** [1] - 620:1
**Antonio** [1] - 659:10
**anxiety** [1] - 686:25
**anyway** [2] - 574:24, 582:25
**apologize** [3] - 650:3, 679:21, 727:3
**App'x** [1] - 519:15
**appear** [25] - 580:21, 581:14, 584:13, 590:16, 595:10, 606:21, 610:7, 624:1, 635:25, 638:25, 639:3, 644:12, 648:23, 651:6, 653:15, 653:18, 671:18, 736:22, 737:1, 738:12, 740:19, 741:7, 741:9, 741:20, 742:3
**appearance** [4] - 619:9, 619:10, 633:5, 634:6
**appeared** [2] - 645:19, 735:1
**appearing** [2] - 542:6, 679:15
**Appendix** [5] - 703:9, 703:18, 703:19, 704:23, 705:7
**appendix** [1] - 704:4
**Apple** [6] - 560:16, 564:21, 564:22, 568:13, 571:24
**applied** [1] - 677:24
**apply** [1] - 691:16
**appointment** [1] - 601:21
**approach** [2] - 561:11, 671:7
**approaching** [1] - 618:15
**appropriate** [1] -

521:1, 522:17, 525:15, 574:23, 602:7, 622:7, 626:21, 673:1, 678:19, 679:6, 732:19
**approximate** [1] - 666:22
**apps** [1] - 566:6
**archway** [1] - 616:13
**area** [18] - 532:6, 532:7, 532:20, 543:11, 543:14, 607:5, 610:2, 614:4, 616:5, 616:9, 646:12, 661:16, 680:14, 725:24, 726:5, 738:8, 740:8, 742:22
**areas** [1] - 682:5
**argues** [2] - 524:15, 524:23
**argument** [1] - 523:18
**arguments** [1] - 523:17
**Arizona** [2] - 679:16, 680:13
**Army** [4] - 660:22, 661:2, 661:3, 661:8
**arousal** [1] - 685:24
**arrest** [19] - 619:20, 657:22, 659:18, 659:21, 659:25, 667:17, 668:7, 668:9, 668:14, 668:19, 668:21, 668:22, 668:24, 669:1, 724:4, 724:6, 724:11, 724:14, 735:6
**arrested** [9] - 619:8, 619:10, 654:3, 654:7, 657:24, 659:15, 660:7, 667:21, 717:4
**arrived** [6] - 530:17, 530:18, 530:20, 530:21, 531:19, 591:6
**article** [3] - 653:25, 657:10, 741:25
**articles** [2] - 681:12, 681:13
**Ashley** [1] - 517:7
**aspect** [1] - 664:8
**assault** [7] - 524:11, 578:16, 578:19, 579:1, 654:22, 715:20, 745:13
**assault-of-federal-**

**officer** [1] - 578:19
**assault-on-federal-officer** [1] - 578:16
**assaulted** [3] - 519:24, 524:3, 717:9
**assaulting** [1] - 519:12
**assaultive** [1] - 716:23
**assaults** [5] - 520:15, 524:2, 715:24, 717:6, 727:23
**asserting** [1] - 520:3
**assessing** [1] - 697:10
**assessment** [1] - 702:21
**assessments** [1] - 697:16
**assign** [1] - 718:1
**assigned** [10] - 577:24, 578:5, 578:20, 578:24, 579:11, 715:4, 715:5, 716:9, 716:13, 718:12
**assigning** [1] - 718:7
**assignment** [2] - 531:5, 531:9
**assignments** [1] - 578:18
**assist** [3] - 552:22, 555:3, 713:12
**assistance** [1] - 717:11
**assisted** [2] - 551:19, 619:7
**assisting** [1] - 528:25
**associated** [3] - 563:15, 704:3, 739:5
**assume** [3] - 688:7, 693:6, 709:19
**assuming** [1] - 530:2
**attached** [4] - 584:13, 584:15, 586:21, 651:5
**attachment** [5] - 584:14, 651:4, 653:18, 653:21, 656:20
**attack** [8] - 519:8, 522:6, 522:24, 607:5, 608:20, 609:18, 614:4, 692:18
**attacked** [1] - 657:6
**attempt** [2] - 682:18, 684:15
**attempted** [1] - 735:8
**attempting** [1] - 725:20
**attempts** [1] - 694:3

**attend** [1] - 685:18
**attended** [3] - 591:9, 597:21, 598:5
**attention** [17] - 554:10, 555:21, 575:22, 664:1, 664:9, 665:3, 685:16, 685:17, 685:21, 686:24, 687:14, 687:21, 687:22, 688:6, 689:23, 692:2, 700:7
**attentional** [2] - 687:12, 689:23
**attire** [2] - 719:6, 733:25
**attorney** [1] - 672:10
**Attorney's** [2] - 579:9, 677:15
**attorney-client** [1] - 672:10
**attributes** [1] - 724:15
**audio** [97] - 538:7, 548:21, 555:18, 556:2, 556:9, 557:21, 558:5, 566:5, 587:20, 588:2, 589:23, 595:18, 596:12, 600:6, 600:15, 600:24, 601:9, 603:11, 604:25, 605:3, 605:14, 606:7, 606:10, 607:13, 608:2, 609:14, 610:16, 611:10, 612:3, 612:20, 613:9, 613:24, 614:14, 615:3, 616:19, 617:12, 617:25, 618:8, 618:19, 618:22, 620:18, 622:14, 623:18, 624:5, 624:18, 625:8, 626:7, 627:2, 627:13, 628:6, 628:17, 629:19, 629:22, 630:15, 631:7, 631:16, 635:4, 635:8, 635:18, 636:14, 636:25, 638:20, 639:15, 640:1, 640:12, 640:17, 641:6, 643:23, 644:10, 645:5, 646:22, 647:7, 649:11, 661:21, 665:8, 665:20,

666:14, 687:8, 730:9, 730:11, 731:11, 731:21, 732:1, 732:3, 733:11, 734:13, 734:16, 734:22, 735:1, 735:18, 736:1, 736:7, 736:9, 736:23, 738:20, 739:5, 740:3
**audio-visual** [84] - 538:7, 548:21, 555:18, 556:2, 556:9, 557:21, 558:5, 587:20, 588:2, 589:23, 595:18, 596:12, 600:6, 600:15, 600:24, 601:9, 603:11, 604:25, 605:3, 605:14, 606:7, 606:10, 607:13, 608:2, 609:14, 610:16, 611:10, 612:3, 612:20, 613:9, 613:24, 614:14, 615:3, 616:19, 617:12, 617:25, 618:8, 618:19, 618:22, 620:18, 622:14, 623:18, 624:5, 624:18, 625:8, 626:7, 627:2, 627:13, 628:6, 628:17, 629:19, 629:22, 630:15, 631:7, 631:16, 635:4, 635:8, 635:18, 636:14, 636:25, 638:20, 639:15, 640:1, 640:12, 640:17, 641:6, 643:23, 644:10, 645:5, 646:22, 647:7, 649:11, 661:21, 665:8, 665:20, 666:14, 730:9, 730:11, 731:11, 732:1, 733:11, 736:7, 738:20, 740:3
**auditory** [1] - 687:8
**August** [3] - 654:8, 657:24, 659:18
**AUSA** [1] - 677:17
**authenticate** [2] - 555:16, 638:1
**authentication** [2] - 599:4, 722:20

**authenticity** [1] - 744:20
**authorities** [1] - 520:9
**automatic** [1] - 675:4
**availability** [1] - 744:9
**available** [5] - 579:8, 679:3, 679:17, 679:18, 686:19
**Avenue** [3] - 531:5, 531:7, 531:21
**aware** [6] - 655:4, 672:10, 719:9, 719:12, 720:1, 723:20

## B

**B-r-a-n-d** [1] - 571:20
**baby** [1] - 615:10
**bachelor** [1] - 560:1
**back-and-forth** [1] - 534:6
**backdoor** [1] - 523:1
**backed** [1] - 520:23
**background** [6] - 523:4, 554:23, 559:25, 667:4, 680:19, 682:4
**backwards** [2] - 545:3, 545:5
**bad** [1] - 674:14
**bag** [2] - 562:20, 570:9
**ball** [1] - 606:1
**ballistic** [1] - 547:13
**ballpark** [1] - 705:25
**bank** [1] - 578:13
**barcode** [4] - 562:2, 562:11, 562:13, 562:16
**barricade** [1] - 531:24
**barricades** [1] - 532:9
**based** [27] - 520:3, 548:3, 607:4, 608:19, 609:9, 609:17, 614:3, 621:14, 640:23, 645:20, 648:23, 652:1, 655:2, 668:7, 695:2, 710:1, 717:13, 719:6, 724:10, 724:13, 726:21, 735:24, 737:8, 738:11, 739:14, 739:20, 744:9
**bases** [1] - 658:11
**basis** [7] - 525:16, 619:15, 630:10, 631:24, 673:11, 674:15, 732:10

**baton** [24] - 535:16, 540:14, 540:15, 540:16, 540:19, 540:20, 540:22, 540:25, 541:2, 541:3, 541:5, 541:6, 541:13, 541:17, 541:19, 544:23, 545:6, 545:9, 545:16, 545:18, 545:19, 545:20, 554:1, 644:17
**batons** [2] - 534:5, 534:16
**battalion** [1] - 660:22
**battling** [1] - 545:18
**BDU** [2] - 529:12, 529:14
**BDUs** [1] - 529:9
**beanie** [1] - 606:1
**beanie-style** [1] - 606:1
**bear** [1] - 532:16
**became** [2] - 719:25, 727:25
**become** [9] - 535:10, 690:15, 690:24, 696:22, 696:24, 715:10, 715:12, 719:12, 726:3
**becomes** [3] - 690:15, 690:25, 728:6
**beforehand** [1] - 678:8
**began** [3] - 563:18, 671:12, 672:8
**begin** [2] - 563:23, 684:24
**beginning** [4] - 579:7, 605:2, 608:13, 661:20
**begins** [1] - 743:3
**behalf** [3] - 517:8, 517:13, 517:18
**behind** [1] - 590:19
**believes** [5] - 575:20, 675:25, 676:2, 676:3, 732:20
**belong** [3] - 588:13, 590:5, 613:5
**belonging** [1] - 579:17
**belongs** [2] - 588:14, 640:25
**below** [3] - 546:6, 552:18, 587:5
**Ben** [2] - 517:9, 561:6
**bench** [3] - 523:3, 523:13, 676:21
**Benjamin** [6] - 516:11, 563:7, 568:19,

569:23, 714:5, 714:16
**BENJAMIN** [1] - 714:16
**best** [6] - 532:22, 622:10, 683:12, 717:18, 732:11, 732:17
**better** [3] - 526:6, 584:12, 717:21
**between** [8] - 518:22, 580:9, 647:20, 697:11, 697:19, 701:7, 706:18, 710:15
**beyond** [4] - 553:10, 658:9, 703:5
**bicycle** [1] - 532:11
**bigger** [1] - 584:12
**bit** [10] - 602:3, 618:14, 621:18, 644:23, 654:17, 680:19, 688:20, 698:10, 707:12, 728:24
**black** [7] - 535:24, 554:23, 556:12, 606:3, 644:21, 709:17
**black-and-white** [2] - 554:23, 556:12
**blah** [4] - 574:12, 574:14
**blast** [1] - 620:15
**blended** [1] - 690:24
**blue** [9] - 554:24, 556:13, 556:16, 580:21, 581:3, 633:24, 719:11, 722:7, 731:3
**Blue** [1] - 556:17, 556:18, 556:20
**blue-in-color** [1] - 633:24
**bodily** [1] - 536:3
**Body** [1] - 707:24
**body** [45] - 530:8, 530:11, 691:11, 691:14, 691:21, 704:24, 705:3, 705:4, 705:9, 705:14, 705:18, 705:20, 706:3, 706:9, 706:18, 707:3, 707:6, 707:10, 708:2, 708:5, 708:7, 708:8, 708:10, 708:17, 708:24, 709:1,

709:4, 709:8, 709:10, 712:14, 712:15, 712:20, 717:1, 722:10, 722:12, 731:21, 731:23, 732:3, 733:3, 736:23, 739:17, 742:3
**body-cam** [1] - 712:20
**body-camera** [5] - 705:3, 705:18, 708:8, 712:14, 712:15
**body-worn** [26] - 530:8, 530:11, 691:11, 691:19, 693:3, 704:24, 705:4, 705:9, 705:14, 705:20, 706:3, 706:9, 706:18, 707:3, 707:6, 707:10, 708:2, 708:5, 708:7, 708:17, 709:8, 709:10, 717:1, 733:3, 736:23
**body-worn-camera** [13] - 691:14, 691:24, 708:10, 708:24, 709:1, 709:4, 722:10, 722:12, 731:21, 731:23, 732:3, 739:17, 742:3
**Body-Worn-Camera** [1] - 707:24
**BOLO** [18] - 578:25, 651:8, 654:17, 654:18, 654:19, 654:20, 654:23, 654:25, 655:7, 655:15, 656:7, 656:20, 658:8, 717:22, 718:9, 718:12, 719:1
**BOLOs** [1] - 655:3
**booking** [1] - 735:8
**boots** [1] - 529:9
**bottle** [2] - 622:25, 629:2
**bottom** [10] - 521:13, 543:15, 544:6, 549:1, 581:11, 606:3, 623:21, 643:10, 740:9, 741:4
**box** [2] - 588:17, 722:24
**boys** [1] - 612:12
**Brady** [4] - 672:19, 672:23, 672:25, 673:5

**brand** [5] - 571:15, 571:17, 571:20, 571:21, 571:25
**branded** [1] - 625:1
**breach** [1] - 672:22
**breached** [1] - 551:25
**break** [12] - 540:9, 549:19, 565:9, 565:12, 601:14, 601:17, 602:23, 670:1, 670:7, 670:22, 671:22, 678:16
**breaks** [1] - 535:9
**Brian** [5] - 516:9, 518:9, 594:17, 679:23, 680:11
**brief** [5] - 518:13, 523:11, 605:8, 606:6, 606:15, 619:13, 622:19, 632:25, 684:25, 739:12
**briefly** [5] - 549:18, 559:25, 581:9, 667:14, 669:7
**bright** [2] - 537:3, 642:9
**bring** [5] - 523:1, 575:21, 575:23, 626:21, 665:5
**Bring** [3] - 626:10, 626:13, 627:10
**bringing** [1] - 552:22
**broadly** [1] - 519:10
**broke** [2] - 551:14, 648:6
**broken** [1] - 673:9
**bronze** [1] - 551:12
**brought** [3] - 524:4, 658:18, 702:14
**brown** [2] - 719:11, 734:3
**bubble** [3] - 562:18, 562:20, 581:3
**buddy** [1] - 652:12
**buffer** [1] - 643:20
**building** [12] - 518:2, 521:5, 521:7, 547:21, 549:13, 549:18, 549:22, 550:23, 551:5, 552:14, 597:21, 601:23
**Building** [9] - 531:7, 550:16, 550:21, 552:11, 604:5, 606:22, 607:10, 610:3, 743:17
**buildings** [1] - 528:25

**built** [2] - 532:2, 608:21
**bulletins** [1] - 718:22
**bunch** [1] - 534:15
**burden** [4] - 597:20, 598:11, 678:10, 678:11
**Bureau** [2] - 559:13, 714:21
**bus** [1] - 717:16
**butt** [1] - 644:16
**button** [1] - 566:21
**buttons** [1] - 564:6
**buttress** [1] - 522:7

**C**

**C-o-m-o-t-t-e-r** [1] - 577:15
**C-SPAN** [5] - 576:21, 663:4, 663:8, 663:17, 664:18
**C-SPAN's** [2] - 597:9, 663:5
**C-u-t-l-e-r** [1] - 680:11
**calm** [1] - 521:19
**cam** [1] - 712:20
**Camera** [1] - 707:24
**camera** [54] - 530:8, 530:11, 590:11, 619:25, 628:13, 629:3, 630:2, 631:19, 631:22, 632:13, 634:18, 691:11, 691:14, 691:19, 691:24, 692:3, 692:13, 692:14, 693:3, 704:24, 705:3, 705:4, 705:9, 705:14, 705:18, 705:20, 706:3, 706:9, 706:18, 707:3, 707:6, 707:10, 707:11, 708:8, 708:10, 708:17, 708:24, 709:1, 709:4, 709:8, 709:10, 712:14, 712:15, 717:2, 722:10, 722:12, 731:21, 731:23, 732:3, 733:3, 733:19, 736:24, 739:17, 742:3
**cameras** [5] - 530:14, 708:5, 708:7, 721:17, 725:10
**canisters** [1] - 534:17
**cannot** [2] - 523:19,

621:14
**cap** [1] - 606:1
**capacities** [1] - 687:12
**capacity** [2] - 685:17, 688:6
**Capitol** [66] - 528:15, 528:20, 528:24, 529:4, 529:18, 530:7, 530:10, 530:17, 530:18, 530:21, 531:3, 531:12, 531:22, 531:23, 532:1, 532:10, 534:22, 543:11, 547:22, 549:15, 550:16, 550:21, 550:24, 551:3, 551:10, 551:20, 551:25, 552:2, 552:7, 552:11, 578:17, 579:2, 598:13, 598:15, 598:18, 598:19, 603:2, 604:5, 606:22, 607:6, 607:10, 608:20, 610:3, 614:4, 614:7, 616:5, 625:1, 628:12, 657:5, 667:4, 683:18, 715:11, 716:20, 717:3, 721:16, 723:12, 724:2, 724:8, 726:3, 726:6, 734:5, 738:14, 743:17
**Cappuccio** [92] - 517:3, 517:14, 517:16, 521:14, 521:17, 523:21, 524:3, 578:21, 579:15, 579:18, 580:7, 580:10, 581:7, 583:13, 583:21, 585:8, 585:14, 586:5, 588:14, 589:10, 590:11, 590:16, 591:9, 591:13, 592:24, 593:15, 594:8, 597:24, 599:14, 605:22, 605:25, 613:6, 630:6, 630:8, 631:22, 633:6, 633:22, 633:23, 634:5, 634:17, 634:22, 635:13, 636:4, 636:17, 637:22, 638:25,

639:22, 640:7, 641:1, 641:20, 642:2, 642:10, 642:18, 643:6, 644:1, 644:4, 644:13, 647:4, 647:20, 648:2, 648:11, 648:18, 648:24, 649:23, 650:9, 650:25, 651:7, 651:20, 651:25, 652:11, 652:15, 652:23, 653:4, 653:8, 653:21, 654:3, 655:16, 656:16, 657:11, 658:3, 658:25, 659:1, 661:10, 662:7, 662:12, 665:3, 666:8, 666:17, 666:24, 699:11, 701:11, 702:9
**Cappuccio's** [75] - 518:8, 518:12, 519:5, 520:14, 579:20, 579:21, 580:12, 582:14, 583:3, 584:19, 586:19, 587:8, 587:16, 589:18, 591:5, 591:21, 595:9, 595:15, 596:8, 597:5, 597:18, 597:25, 599:1, 601:12, 602:24, 603:1, 603:7, 604:3, 604:21, 605:16, 606:21, 607:2, 607:24, 611:5, 611:22, 612:16, 613:20, 615:14, 616:2, 617:8, 618:4, 626:3, 631:25, 636:3, 638:13, 638:23, 641:9, 643:13, 643:17, 645:19, 645:21, 646:9, 647:11, 649:4, 649:22, 653:16, 654:1, 656:13, 656:17, 657:21, 658:16, 659:25, 660:13, 662:1, 663:3, 663:7, 663:10, 664:23, 665:23, 669:10, 669:17, 683:5, 684:11, 698:4, 705:15

**caption** [1] - 657:1
**capture** [3] - 663:10, 691:25, 728:1
**captured** [3] - 663:6, 707:7, 717:18
**capturing** [2] - 706:22, 707:20
**car** [1] - 590:14
**caravan** [1] - 590:17
**Caravans** [1] - 587:2
**careful** [1] - 520:10
**cars** [1] - 590:19
**CART** [3] - 560:24, 676:6
**case** [44] - 518:23, 519:14, 520:7, 520:12, 525:4, 525:12, 562:2, 562:5, 562:7, 562:8, 566:20, 567:15, 568:18, 568:23, 576:5, 579:3, 579:5, 579:6, 579:7, 579:11, 602:6, 654:3, 662:24, 664:5, 664:7, 664:8, 670:15, 674:12, 675:2, 675:3, 679:20, 683:3, 683:5, 683:11, 684:20, 712:5, 714:1, 716:14, 716:16, 716:19, 744:23, 745:10
**cases** [10] - 519:9, 524:24, 525:9, 525:11, 578:16, 578:19, 674:13, 674:17, 675:8, 682:24
**castle** [1] - 612:12
**catch** [1] - 660:24
**causing** [1] - 686:23
**cavalry** [1] - 584:9
**caveat** [1] - 522:25
**caveats** [2] - 522:14, 524:7
**cc'd** [1] - 698:4
**CCTV** [5] - 632:13, 642:25, 722:23, 725:10, 739:18
**cell** [26] - 561:9, 561:20, 561:23, 562:19, 563:14, 563:15, 564:4, 571:12, 574:12, 579:17, 579:25, 580:6, 586:19, 633:5, 635:15, 639:23, 640:22,

640:24, 641:22, 642:19, 643:13, 643:18, 658:5, 659:3, 724:7, 736:2
**Cellebrite** [38] - 567:22, 567:23, 567:24, 568:1, 568:5, 568:10, 568:11, 580:21, 581:10, 588:20, 588:23, 589:1, 590:23, 591:1, 595:23, 596:1, 596:22, 596:25, 603:15, 603:18, 604:12, 605:7, 606:14, 606:17, 610:20, 610:23, 613:13, 615:18, 616:23, 617:16, 632:6, 632:9, 646:2, 646:5, 649:15, 649:18, 666:20, 666:23
**center** [7] - 537:2, 544:7, 562:23, 563:9, 570:10, 616:10, 743:9
**central** [1] - 703:13
**Central** [3] - 581:14, 581:15, 581:20
**ceremony** [1] - 608:22
**certain** [3] - 524:10, 629:11, 713:17
**certainly** [7] - 522:4, 523:7, 677:22, 689:25, 690:1, 690:12, 693:14
**certification** [4] - 560:6, 560:9, 560:12, 560:13
**certifications** [2] - 560:3, 560:15
**Certified** [2] - 560:5, 560:8
**cetera** [1] - 561:2
**Chaclan** [2] - 601:22, 602:1
**chain** [19] - 535:9, 540:9, 540:10, 563:2, 563:5, 563:12, 672:3, 672:5, 672:6, 672:20, 672:22, 673:9, 675:25, 676:1, 676:4, 676:10, 676:25, 677:12
**challenge** [2] - 539:22, 656:1

**Chamber** [2] - 551:6, 551:9
**chambers** [1] - 573:23
**change** [5] - 525:5, 569:19, 689:1, 690:3, 690:6
**changed** [2] - 567:17, 707:17
**changes** [3] - 567:5, 689:14
**chanting** [3] - 665:16, 666:5, 666:9
**chaos** [3] - 550:22, 706:25, 712:19
**chaotic** [1] - 712:11
**characteristics** [2] - 687:23, 724:15
**characterization** [1] - 700:16
**characterizes** [1] - 675:18
**charge** [5] - 520:15, 521:11, 522:2, 522:5, 522:7
**charged** [8] - 519:2, 519:19, 519:25, 520:14, 520:25, 521:2, 597:18, 745:13
**charges** [5] - 518:2, 520:20, 521:8, 522:3, 745:10
**chat** [4] - 574:2, 574:22, 576:3, 602:4
**check** [2] - 602:1, 740:5
**checked** [1] - 570:9
**checkered** [1] - 628:14
**cheering** [1] - 625:5
**chest** [1] - 707:4
**Chicago** [1] - 677:15
**chicks** [2] - 666:4, 666:6
**chief** [1] - 714:2
**children** [1] - 660:10
**Childress** [2] - 518:24, 519:14
**chose** [1] - 664:21
**Church** [1] - 667:24
**circle** [23] - 536:24, 542:2, 543:15, 543:18, 544:3, 547:7, 605:23, 614:19, 644:18, 728:11, 728:18, 728:20, 728:22, 729:6, 729:20, 729:21, 733:16, 736:21, 737:17,

737:21, 738:8, 741:12, 743:6
**circled** [23] - 537:2, 537:18, 542:5, 543:19, 544:6, 544:17, 544:18, 609:4, 614:18, 616:13, 623:23, 633:18, 635:10, 641:18, 641:19, 644:2, 646:25, 647:1, 647:3, 727:19, 734:1, 742:15, 743:9
**circling** [19] - 537:13, 609:3, 609:16, 610:1, 618:25, 623:21, 639:18, 640:3, 640:20, 725:24, 726:17, 727:4, 730:25, 733:18, 740:16, 741:4, 741:13, 741:15, 742:11
**circuit** [2] - 520:2, 520:10
**Circuit** [6] - 518:25, 519:16, 519:20, 519:21, 675:6, 675:9
**circumstances** [4] - 564:10, 672:13, 690:22, 712:9
**cite** [3] - 674:13, 674:17, 675:3
**cited** [1] - 520:9
**City** [1] - 659:8
**civil** [3] - 517:25, 521:4, 522:2
**civilian** [1] - 610:10
**civilians** [1] - 609:24
**claiming** [1] - 520:6
**clarify** [3] - 658:6, 723:19, 727:22
**clarity** [1] - 614:9
**class** [1] - 528:22
**clear** [11] - 573:11, 599:11, 623:5, 625:1, 627:21, 642:21, 644:19, 712:3, 729:13, 742:14, 745:14
**clearly** [1] - 674:9
**Clements** [184] - 517:10, 536:12, 538:6, 542:24, 543:22, 544:11, 544:24, 545:24, 546:16, 547:4, 548:22, 554:8, 554:12, 555:13,

557:19, 558:4, 568:2, 580:2, 580:15, 581:2, 582:1, 582:9, 582:11, 582:20, 583:10, 584:16, 584:23, 584:24, 585:19, 585:25, 586:15, 587:11, 587:12, 587:18, 588:1, 588:16, 588:18, 589:15, 589:21, 590:21, 591:18, 592:4, 592:13, 592:21, 593:4, 593:13, 593:22, 594:13, 594:20, 595:19, 596:5, 596:10, 599:22, 600:4, 600:7, 600:16, 600:22, 600:25, 603:4, 603:9, 603:12, 603:19, 603:24, 604:8, 604:10, 604:17, 604:23, 605:4, 605:12, 606:5, 606:24, 607:11, 607:25, 609:12, 610:14, 610:17, 611:1, 611:8, 612:2, 612:18, 613:7, 613:10, 613:23, 614:1, 614:12, 614:15, 615:1, 615:24, 616:17, 616:20, 617:4, 617:10, 617:13, 617:22, 618:6, 618:18, 618:21, 620:12, 620:14, 620:17, 622:12, 623:16, 623:3, 624:16, 625:6, 626:4, 626:25, 627:3, 627:11, 628:1, 628:5, 628:15, 629:17, 629:20, 630:13, 631:4, 631:14, 632:3, 632:16, 632:18, 632:23, 633:11, 635:1, 635:7, 635:16, 635:19, 636:13, 636:24, 638:19, 639:10, 639:13, 639:24, 640:10, 640:13, 641:4, 641:12, 641:16,

641:23, 642:12, 643:3, 643:14, 643:21, 644:8, 645:3, 645:24, 646:16, 646:21, 647:5, 647:15, 647:17, 648:7, 648:16, 649:2, 649:8, 649:12, 649:25, 650:13, 650:22, 651:9, 651:18, 651:23, 652:4, 652:9, 652:21, 653:6, 653:12, 656:8, 661:19, 665:5, 665:7, 666:13, 669:13, 726:12, 728:23, 729:23, 730:6, 730:12, 731:7, 733:9, 736:16, 737:13, 737:23, 738:16, 740:24
**client** [3] - 598:24, 672:10, 745:18
**climb** [1] - 743:4
**clip** [37] - 537:6, 538:10, 540:12, 545:4, 600:19, 607:16, 608:7, 608:11, 611:13, 612:6, 612:23, 613:3, 615:6, 619:13, 620:21, 621:8, 622:19, 622:24, 624:9, 624:23, 625:5, 625:11, 625:21, 626:11, 628:21, 630:20, 631:10, 632:25, 636:18, 642:2, 642:10, 643:7, 656:16, 662:14, 665:7, 665:23, 736:14
**clips** [14] - 576:20, 597:15, 599:25, 600:10, 601:3, 611:20, 663:13, 663:18, 664:12, 664:13, 664:15, 664:17, 664:21, 664:23
**close** [8] - 518:23, 521:21, 524:20, 531:15, 545:21, 695:19, 695:22, 721:3
**closed** [2] - 531:9,

547:21
**closely** [1] - 656:18
**closer** [2] - 540:16, 618:14
**closest** [1] - 628:12
**closing** [1] - 526:8
**clothing** [4] - 610:10, 721:5, 721:8, 741:25
**co** [2] - 517:8, 720:16
**co-counsel** [1] - 517:8
**co-worker** [1] - 720:16
**coats** [1] - 609:9
**code** [1] - 560:18
**cognitive** [2] - 685:1, 687:3
**colleagues** [2] - 535:7, 535:14
**collected** [1] - 717:8
**collecting** [1] - 678:8
**collection** [1] - 561:1
**college** [1] - 538:17
**colloquially** [1] - 718:8
**colloquy** [2] - 675:5, 678:2
**color** [5] - 529:25, 530:1, 623:25, 633:8, 633:24
**colored** [1] - 623:22
**Columbus** [1] - 551:15
**combat** [3] - 521:21, 687:5
**comfortable** [1] - 527:18
**coming** [16] - 529:17, 531:4, 531:5, 534:19, 534:20, 579:7, 602:14, 624:8, 624:22, 625:3, 642:7, 642:8, 662:20, 666:10, 677:14, 735:1
**command** [1] - 560:17
**commercial** [1] - 578:13
**commit** [1] - 525:24
**committed** [2] - 716:21, 716:23
**committee** [1] - 683:23
**Committee** [1] - 683:24
**committing** [2] - 579:1, 739:21
**common** [1] - 524:12
**communicated** [2] - 572:7, 572:10
**communicating** [2] - 573:9, 574:9

**communication** [1] - 574:10

**communications** [4] - 573:8, 573:11, 574:7, 674:3

**Comottor** [112] - 516:7, 517:10, 572:25, 573:5, 576:11, 576:14, 577:15, 577:16, 580:5, 581:6, 582:13, 584:13, 586:18, 587:7, 587:15, 587:22, 588:5, 588:20, 589:10, 589:18, 589:25, 591:4, 591:20, 595:23, 596:14, 596:22, 597:3, 599:25, 600:10, 601:3, 601:16, 602:14, 602:17, 602:23, 603:7, 603:15, 604:2, 604:12, 604:20, 605:7, 605:16, 606:14, 606:20, 607:2, 607:15, 608:6, 608:16, 609:16, 610:20, 611:4, 611:12, 612:5, 612:22, 613:13, 614:18, 615:5, 615:18, 616:2, 616:13, 616:23, 617:7, 617:16, 618:3, 618:10, 618:25, 619:20, 621:21, 622:17, 623:20, 624:22, 625:21, 627:6, 627:17, 628:10, 628:21, 630:2, 631:18, 632:6, 632:12, 632:25, 633:19, 634:17, 635:10, 635:23, 639:18, 640:3, 640:20, 641:18, 642:2, 642:18, 643:6, 643:17, 643:25, 644:12, 645:7, 646:2, 646:8, 646:25, 647:10, 647:19, 648:2, 649:4, 649:15, 649:21, 650:8, 654:3, 654:15, 665:11, 669:10, 669:16, 669:20,

675:23

**compared** [1] - 590:6

**complaint** [1] - 525:1

**complete** [5] - 521:19, 566:25, 567:8, 668:22, 672:5

**completed** [3] - 570:2, 668:23, 678:12

**completely** [4] - 567:5, 696:4, 696:5, 697:5

**completeness** [3] - 685:11, 700:5, 710:10

**completes** [1] - 566:22

**complex** [1] - 685:1

**comply** [2] - 678:22, 678:23

**complying** [5] - 536:25, 605:24, 737:19, 738:10, 743:8

**comprehensive** [2] - 564:14, 726:21

**CompTIA** [1] - 560:12

**Computer** [1] - 560:25

**computer** [5] - 560:13, 560:14, 704:10

**computers** [2] - 560:16, 561:2

**comrades** [1] - 532:7

**concede** [2] - 526:3, 675:4

**concept** [1] - 691:3

**concerned** [1] - 677:23

**concerning** [2] - 671:13, 671:23

**concerns** [5] - 523:1, 523:12, 671:7, 672:10, 672:14

**conclude** [1] - 708:10

**concluded** [1] - 745:23

**concludes** [1] - 709:3

**conclusion** [1] - 573:14

**conclusions** [1] - 524:15

**condition** [1] - 520:8

**conditions** [4] - 524:10, 684:16, 684:17, 685:24

**conduct** [7] - 517:25, 520:8, 521:5, 522:16, 716:21, 716:23, 718:6

**conducted** [5] - 659:2, 659:21, 668:15,

672:12, 682:23

**conducting** [2] - 682:11, 682:13

**confidence** [5] - 674:4, 697:12, 697:18, 697:19, 697:22

**confident** [8] - 659:1, 674:11, 697:13, 697:14, 697:21, 699:22, 700:1, 700:2

**confirm** [3] - 569:14, 627:25, 665:4

**confirmed** [4] - 664:20, 720:20, 720:24, 721:4

**confirming** [1] - 693:8

**confronted** [1] - 530:25

**confuse** [1] - 726:8

**confusing** [1] - 707:9

**Congress** [3] - 528:25, 597:19

**congressmen** [1] - 598:16

**connect** [1] - 566:19

**Connect** [1] - 587:2

**connected** [1] - 564:5

**consequences** [1] - 520:5

**consider** [2] - 521:1, 736:2

**considered** [1] - 664:13

**consistent** [13] - 519:11, 611:19, 626:3, 634:6, 653:18, 653:21, 660:4, 689:10, 709:13, 724:8, 727:20, 731:16, 742:3

**consisting** [1] - 685:1

**consists** [1] - 685:10

**console** [1] - 560:18

**constant** [1] - 719:10

**constantly** [1] - 689:6

**Constitution** [1] - 549:15

**construction** [1] - 546:15

**consult** [1] - 704:9

**contact** [4] - 702:7, 702:8, 725:19, 725:20

**contain** [2] - 568:16, 568:17

**contains** [2] - 568:11, 568:12

**contents** [2] - 565:11,

743:24

**contest** [1] - 532:24

**contesting** [2] - 682:3, 682:6

**context** [3] - 691:20, 708:18, 708:22

**continuances** [1] - 744:8

**continue** [10] - 621:6, 621:16, 622:12, 623:10, 623:14, 625:6, 625:19, 665:19, 674:10, 740:21

**continued** [2] - 525:12, 575:4

**continuing** [2] - 561:4, 656:7

**continuously** [2] - 681:7, 682:13

**control** [13] - 520:4, 534:7, 534:18, 535:5, 538:4, 538:13, 538:22, 540:19, 541:1, 552:5, 562:23, 563:9, 570:10

**conversating** [2] - 735:9, 735:10

**conversation** [2] - 580:9, 675:21

**conversations** [3] - 675:22, 676:24, 735:18

**convicted** [1] - 682:25

**convoy** [1] - 661:15

**cool** [1] - 584:1

**copies** [2] - 570:3, 694:25

**copy** [13] - 563:25, 564:25, 568:22, 569:9, 569:12, 569:16, 569:20, 569:24, 661:10, 670:11, 674:8, 698:3, 698:19

**corner** [2] - 543:8, 729:24

**Corps** [1] - 715:3

**correct** [78] - 529:20, 551:21, 552:11, 553:5, 553:14, 554:5, 557:13, 557:17, 564:5, 566:17, 571:9, 572:8, 572:11, 581:13, 586:9, 610:11, 614:11, 652:2, 654:20, 654:24, 655:5,

655:6, 657:1, 657:6, 657:7, 657:14, 657:25, 658:10, 658:25, 659:4, 659:13, 659:14, 659:16, 660:1, 660:11, 660:14, 661:12, 661:16, 662:8, 662:10, 662:13, 662:21, 663:1, 663:12, 663:14, 663:18, 663:23, 664:18, 664:24, 665:14, 666:22, 678:24, 683:21, 684:9, 684:10, 684:12, 690:6, 692:20, 697:3, 697:13, 697:23, 702:18, 703:7, 703:8, 708:6, 709:12, 709:18, 710:13, 712:6, 712:7, 712:10, 712:20, 713:11, 723:2, 727:21, 735:11, 744:3, 744:4

**correctly** [1] - 732:16

**corresponds** [1] - 581:15

**corroborate** [2] - 723:11, 724:2

**corroborating** [1] - 728:8

**corroboration** [1] - 720:16

**costume** [1] - 662:17

**counsel** [11] - 517:5, 517:8, 574:22, 575:20, 672:9, 673:1, 702:11, 704:15, 705:16, 705:19, 712:23

**Count** [2] - 526:16, 745:13

**counts** [4] - 520:21, 523:8, 744:14, 744:21

**couple** [14] - 522:14, 529:12, 536:10, 547:5, 553:2, 575:3, 580:19, 584:5, 638:2, 638:7, 647:6, 655:24, 726:14, 740:23

**course** [7] - 520:9, 567:14, 569:21, 621:21, 673:12, 678:25, 680:21

**Court** [16] - 573:24,

575:23, 587:3,
670:1, 670:23,
674:7, 674:16,
677:8, 677:13,
678:22, 681:17,
682:4, 695:8,
698:18, 713:13,
735:4
**court** [4] - 664:16,
675:9, 711:8, 711:11
**COURT** [214] - 517:11,
517:15, 517:20,
518:7, 526:1, 526:5,
526:10, 526:22,
526:25, 527:6,
527:10, 527:17,
528:3, 528:6, 537:4,
537:20, 541:7,
541:10, 541:16,
541:18, 541:21,
542:8, 544:8,
545:11, 545:12,
548:9, 548:12,
548:14, 549:4,
550:2, 550:7,
555:10, 555:17,
557:7, 557:9, 558:8,
558:11, 558:13,
558:18, 558:25,
561:12, 565:5,
565:7, 565:9,
565:14, 565:17,
565:20, 565:23,
569:6, 570:21,
572:19, 572:21,
573:1, 573:5,
573:16, 574:1,
574:13, 574:25,
575:6, 575:9,
575:13, 575:17,
575:24, 576:8,
576:12, 576:16,
576:22, 576:24,
577:3, 577:9,
586:13, 587:23,
588:3, 590:9,
594:21, 594:24,
595:1, 595:3, 595:5,
597:17, 597:23,
598:2, 598:6, 598:8,
598:20, 599:2,
599:8, 601:14,
601:19, 601:23,
602:2, 602:11,
602:14, 602:17,
602:21, 616:15,
619:15, 619:18,
619:23, 620:4,
620:10, 620:25,
621:2, 621:13,
621:19, 622:1,

622:11, 622:22,
623:5, 623:13,
625:18, 626:16,
628:3, 629:7,
629:13, 630:22,
630:24, 631:1,
634:10, 636:9,
636:11, 637:3,
637:10, 637:14,
637:25, 638:2,
638:7, 639:8,
642:23, 643:1,
645:2, 650:4,
654:10, 654:12,
655:20, 655:22,
656:4, 658:19,
667:10, 667:13,
669:6, 669:20,
669:23, 670:3,
670:6, 670:20,
672:1, 673:4,
675:14, 675:17,
676:2, 677:5,
677:12, 677:16,
679:1, 679:9,
679:22, 681:20,
681:25, 682:2,
682:7, 692:24,
693:10, 694:5,
694:16, 695:6,
695:19, 695:22,
696:1, 698:22,
698:25, 699:2,
699:6, 699:10,
699:12, 709:22,
711:19, 711:21,
711:24, 713:21,
714:1, 714:9, 716:3,
716:6, 719:17,
719:21, 722:16,
722:25, 723:3,
723:16, 723:18,
725:2, 725:4, 725:7,
727:1, 727:10,
727:12, 732:10,
732:19, 733:23,
739:24, 741:14,
741:16, 743:21,
743:23, 744:2,
744:5, 744:24,
745:1, 745:3,
745:14, 745:17,
745:20, 745:22
**Court's** [1] - 675:2
**courtroom** [3] -
620:15, 724:18,
725:1
**COURTROOM** [9] -
517:2, 527:12,
527:16, 558:21,
558:24, 577:6,

679:25, 680:4, 714:6
**courts** [2] - 702:17,
710:24
**cover** [3] - 686:15,
686:16, 715:20
**covered** [2] - 522:10,
716:1
**crazy** [1] - 536:2
**create** [3] - 569:9,
664:19, 717:14
**created** [20] - 568:20,
568:21, 569:22,
588:24, 591:2,
596:2, 597:1,
603:22, 604:15,
605:10, 606:18,
610:24, 613:17,
615:22, 617:2,
617:20, 632:10,
646:6, 649:19, 651:8
**credibility** [1] -
672:18, 713:10
**Crime** [2] - 715:7,
715:16
**crime** [3] - 525:23,
526:3, 716:4
**crimes** [14] - 517:24,
518:5, 518:6, 519:3,
519:6, 519:12,
520:25, 521:2,
521:3, 578:5, 578:7,
578:11, 578:12,
715:17
**Crimes** [1] - 715:10
**Criminal** [1] - 517:2
**criminal** [2] - 716:21,
739:22
**criticized** [2] - 702:16,
702:19
**CROSS** [2] - 550:8,
570:22, 654:13,
667:15, 699:13
**Cross** [5] - 516:5,
516:6, 516:8, 516:8,
516:10
**cross** [10] - 626:21,
638:1, 672:16,
673:22, 676:11,
711:22, 727:7,
732:21, 744:11,
745:4
**cross-authenticate**
[1] - 638:1
**cross-examination** [2]
- 673:22, 745:4
**CROSS-
EXAMINATION** [5] -
550:8, 570:22,
654:13, 667:15,
699:13

**Cross-Examination**
[4] - 516:6, 516:8,
516:8, 516:10
**Cross-Examination..
............................** [1]
- 516:5
**cross-examine** [2] -
676:11, 727:7
**crossing** [1] - 524:1
**crowd** [22] - 532:9,
535:18, 535:19,
535:20, 535:22,
546:7, 547:11,
547:17, 547:23,
548:1, 549:9,
553:10, 553:19,
554:4, 557:13,
557:16, 624:8,
638:14, 665:16,
725:17, 725:19
**crowd's** [1] - 625:3
**crowds** [1] - 728:1
**Crypt** [1] - 552:16
**cues** [4] - 686:16,
686:17, 686:18,
708:20
**current** [5] - 559:19,
559:20, 560:3,
560:20, 564:25
**cursory** [1] - 672:12
**custody** [16] - 563:2,
563:5, 563:12,
672:3, 672:5, 672:7,
672:20, 672:23,
673:9, 676:1, 676:4,
676:5, 676:10,
676:25, 677:12
**cut** [1] - 623:20
**Cutler** [23] - 516:9,
518:9, 523:19,
523:22, 524:24,
525:18, 679:15,
679:16, 679:24,
679:25, 680:7,
680:11, 682:10,
692:24, 693:12,
695:15, 696:2,
698:3, 698:6, 698:8,
699:15, 712:3,
713:21
**Cutler's** [1] - 523:14
**CV** [2] - 698:5, 698:17
**cybersecurity** [1] -
560:10

# D

**D.C** [15] - 518:25,
578:6, 578:13,
579:22, 587:2,

587:9, 591:6, 675:6,
675:9, 715:7, 715:9,
715:18, 716:4,
717:17, 735:14
**dangerous** [3] - 518:1,
521:6, 521:7
**Daniel** [3] - 704:24,
705:3, 705:4
**dark** [2] - 719:11,
724:23
**data** [20] - 563:25,
564:17, 564:21,
564:22, 566:4,
566:7, 566:8,
566:23, 567:2,
567:5, 567:13,
567:16, 567:25,
568:17, 569:14,
569:19, 569:20,
570:17
**databases** [1] - 566:8
**date** [22] - 562:22,
563:8, 563:10,
582:5, 583:15,
588:23, 591:1,
591:23, 603:22,
604:15, 605:10,
610:23, 617:1,
617:19, 632:9,
646:5, 649:18,
651:2, 651:12,
667:20, 722:9,
722:12
**dates** [4] - 562:4,
563:6, 563:11,
682:19
**David** [1] - 527:25
**Davis** [1] - 675:3
**days** [4] - 525:11,
528:17, 584:5, 721:1
**deadly** [3] - 518:1,
521:6, 521:7
**deal** [2] - 529:11,
577:3
**dealing** [3] - 524:13,
529:16, 541:13
**deals** [1] - 715:16
**dealt** [4] - 529:17,
533:8, 533:9, 547:23
**decades** [2] - 690:12,
696:10
**December** [6] - 525:5,
528:19, 581:7,
581:18, 581:20,
582:17
**decided** [1] - 676:10
**decision** [2] - 673:19,
675:6
**decon** [1] - 532:20
**Deedra** [1] - 517:14

756

**defend** [1] - 549:21
**Defendant** [10] -
516:22, 519:5,
550:12, 557:5,
557:10, 597:24,
619:5, 622:18,
623:4, 725:13
**defendant** [11] -
520:6, 520:20,
521:22, 521:24,
525:3, 525:13,
569:10, 598:10,
599:17, 621:14,
677:8
**defendant's** [11] -
519:18, 519:23,
520:22, 522:6,
522:16, 522:19,
522:21, 522:23,
523:3, 523:5, 523:10
**defendants** [6] -
520:3, 577:2, 598:4,
598:12, 679:19,
717:8
**defendants'** [1] -
599:10
**defended** [1] - 552:3
**defending** [1] - 551:23
**Defense** [2] - 520:2,
698:4
**defense** [24] - 517:23,
519:1, 520:13,
520:23, 522:15,
524:23, 525:6,
525:8, 525:13,
525:16, 526:7,
551:8, 552:10,
569:20, 569:24,
673:1, 679:2,
702:11, 702:14,
704:15, 732:21,
744:19
**defense's** [1] - 522:15
**defenses** [1] - 520:3
**deficient** [1] - 518:18
**degree** [2] - 560:1,
686:7
**Delaware** [3] - 531:5,
531:7, 531:21
**demand** [1] - 673:16
**demonstrated** [1] -
518:21
**deny** [3] - 518:14,
522:12, 525:17
**depart** [1] - 587:5
**Department** [3] -
557:16, 717:2,
720:15
**depict** [6] - 547:16,
547:25, 606:21,

622:8, 634:22,
721:19
**depicted** [10] - 541:25,
543:12, 547:2,
557:23, 604:5,
605:19, 616:6,
622:9, 630:9, 646:12
**depicting** [4] - 601:13,
603:1, 646:9, 717:18
**depiction** [1] - 556:23
**depicts** [3] - 547:17,
621:22, 637:22
**Deplorables** [1] -
615:10
**deploy** [2] - 687:14,
687:22
**DEPUTY** [9] - 517:2,
527:12, 527:16,
558:21, 558:24,
577:6, 679:25,
680:4, 714:6
**derive** [1] - 659:12
**describe** [6] - 522:18,
534:13, 534:15,
546:12, 559:25,
733:25
**described** [5] - 519:1,
529:22, 533:11,
553:13, 720:7
**describes** [2] - 519:7,
521:13
**describing** [4] - 536:6,
542:10, 547:25,
718:23
**description** [1] -
675:20
**desire** [1] - 520:19
**despite** [3] - 672:9,
677:18, 677:19
**destruction** [1] -
547:22
**detail** [4] - 531:14,
687:25, 688:24,
691:7
**details** [6] - 689:9,
689:21, 696:21,
696:24, 707:2, 709:6
**detained** [1] - 735:14
**determine** [6] -
563:21, 633:25,
658:3, 658:7, 720:9,
724:6
**determined** [3] -
634:5, 715:24,
720:15
**determining** [2] -
659:3, 659:6
**deuce** [8] - 611:25,
615:9, 615:10,
660:18, 660:21,

661:5, 669:11
**device** [10] - 563:21,
564:1, 564:6,
568:14, 572:8,
572:10, 717:5,
724:7, 735:17
**diagnosis** [1] - 523:10
**different** [18] - 525:12,
531:14, 532:12,
555:2, 557:1,
571:22, 626:12,
663:13, 684:8,
690:5, 692:1,
692:18, 693:3,
693:4, 693:9, 697:5,
701:4
**differently** [1] - 693:5
**difficult** [5] - 520:7,
673:11, 690:25,
726:20, 728:3
**difficulty** [1] - 689:18
**digital** [8] - 559:17,
559:21, 559:23,
560:1, 560:10,
561:1, 561:4, 688:25
**diligence** [1] - 671:12
**diminished** [1] - 520:4
**dire** [1] - 681:16
**DIRECT** [5] - 527:19,
559:3, 577:10,
680:5, 714:11
**Direct** [5] - 516:4,
516:6, 516:7,
516:10, 516:12
**direct** [9] - 555:21,
573:15, 601:16,
656:10, 658:16,
658:18, 677:8,
679:1, 679:2
**directed** [1] - 692:2
**directing** [1] - 573:11
**direction** [7] - 542:15,
643:9, 644:3, 731:4,
733:25, 734:4, 743:3
**directly** [3] - 576:21,
668:14, 686:8
**dirty** [7] - 611:25,
615:9, 660:18,
660:21, 661:5,
669:11
**Dirty** [1] - 615:9
**disagree** [6] - 518:5,
524:16, 626:20,
675:19, 677:5,
732:15
**disbelief** [1] - 538:25
**disclaims** [1] - 520:18
**disclosed** [1] - 677:3
**discovered** [1] -
720:13

**discovery** [3] - 570:3,
672:18, 674:20
**discuss** [7] - 565:11,
575:20, 601:16,
672:3, 684:24,
743:24
**discussed** [2] -
522:13, 570:16
**discusses** [1] - 672:8
**discussing** [3] -
576:17, 602:23,
683:10
**discussion** [4] -
675:25, 676:4,
695:20, 695:23
**discussions** [2] -
710:1, 710:2
**disorder** [4] - 517:25,
519:10, 521:4, 522:2
**disorderly** [2] -
517:25, 521:5
**disputing** [1] - 594:24
**disregard** [1] - 621:15
**disregarding** [1] -
623:8
**disruptive** [2] -
517:25, 521:5
**dissatisfied** [1] -
673:24
**disseminated** [1] -
717:15
**distance** [3] - 685:24,
700:13, 701:7
**distinct** [2] - 685:2
**distinguish** [3] -
690:17, 690:22,
691:1
**distinguishing** [1] -
689:19
**distorted** [2] - 693:16,
693:17
**distortions** [3] -
687:3, 687:6, 687:9
**distracted** [2] -
687:13, 700:24
**distraction** [1] -
524:11
**distractions** [7] -
685:23, 687:11,
688:1, 688:2, 688:3,
688:12, 700:9
**distributed** [1] -
718:10
**district** [5] - 677:16,
677:23, 711:13,
711:14, 735:7
**District** [1] - 711:3
**disturbance** [1] -
519:10
**dixit** [1] - 622:10

**docket** [1] - 681:18
**document** [4] -
567:19, 568:7,
586:24, 704:4
**documentation** [1] -
676:7
**documented** [3] -
670:14, 676:5,
676:25
**documents** [6] -
683:13, 683:14,
698:12, 698:20,
699:2, 704:8
**done** [11] - 570:7,
570:11, 570:14,
658:8, 671:21,
673:13, 673:25,
674:11, 675:20,
699:9, 744:15
**door** [8] - 533:22,
543:13, 550:19,
551:1, 601:25,
636:21, 706:23,
721:18
**doors** [4] - 551:12,
551:13, 551:15,
608:15
**DOUENAT** [38] -
517:12, 526:24,
548:13, 558:10,
576:23, 637:6,
637:9, 669:25,
679:13, 679:23,
680:6, 681:23,
682:1, 682:8, 682:9,
693:1, 693:23,
694:9, 694:12,
694:20, 694:21,
695:7, 695:21,
695:25, 696:3,
698:2, 698:7,
698:13, 698:17,
698:24, 699:1,
699:3, 699:9,
699:11, 711:25,
712:2, 713:20,
745:21
**Douenat** [13] - 517:13,
523:25, 526:22,
548:12, 558:8,
669:23, 679:9,
692:25, 694:19,
695:6, 696:1,
711:24, 745:20
**Douenat............** [1] -
516:11
**Douenat...............** [1]
- 516:10
**down** [25] - 530:24,
531:1, 531:9,

531:15, 532:1,
532:3, 532:18,
532:19, 535:20,
536:4, 546:25,
548:1, 549:13,
554:4, 558:14,
568:3, 572:22,
573:1, 581:10,
669:21, 687:7,
695:17, 727:18,
737:12, 743:23
**dozen** [1] - 744:15
**dozens** [4] - 678:9,
720:3
**Dr** [23] - 518:9, 518:16,
523:14, 523:19,
523:22, 524:24,
525:18, 679:15,
679:16, 679:23,
679:25, 680:7,
682:10, 692:24,
693:12, 695:15,
696:2, 698:3, 698:6,
698:8, 699:15,
712:3, 713:21
**draws** [1] - 686:24
**dressed** [1] - 662:16
**drive** [2] - 569:20,
584:10
**driven** [1] - 685:19
**driver's** [1] - 588:6
**driving** [1] - 590:17
**drove** [1] - 587:9
**dubbing** [1] - 579:15
**ducking** [1] - 554:3
**due** [5] - 525:12,
671:11, 682:25,
688:11, 690:4
**duplicated** [1] -
574:18
**during** [57] - 521:12,
522:16, 522:23,
523:11, 524:11,
533:24, 539:6,
539:23, 540:14,
567:6, 567:14,
569:21, 579:14,
580:19, 587:22,
588:5, 588:10,
590:11, 590:16,
596:15, 597:6,
598:14, 602:24,
611:23, 619:12,
620:3, 621:8,
621:21, 622:3,
622:19, 622:24,
624:23, 627:18,
630:2, 630:19,
632:25, 633:25,
634:7, 634:20,

638:25, 642:2,
642:5, 645:7,
645:21, 646:8,
652:16, 670:7,
671:22, 680:20,
682:5, 685:18,
709:11, 709:17,
713:6, 720:19,
734:24, 739:6
**duties** [6] - 528:23,
528:24, 529:2,
560:23, 578:10,
716:8
**duty** [2] - 529:7, 539:4

## E

**early** [2] - 601:25,
676:17
**easier** [1] - 728:6
**easily** [3] - 523:12,
530:5, 686:17
**east** [3] - 550:24,
552:1, 731:6
**Eastern** [30] - 589:4,
589:5, 589:6, 591:3,
591:25, 592:19,
592:25, 593:8,
594:4, 594:9, 596:4,
597:2, 603:23,
604:16, 605:11,
606:19, 610:25,
613:18, 615:23,
617:3, 617:21,
632:11, 646:7,
648:3, 648:10,
648:19, 649:20,
650:9, 651:3, 711:3
**eastward** [1] - 614:8
**easy** [1] - 745:7
**ECF** [4] - 518:9,
518:11, 522:12,
523:15
**Edgar** [1] - 517:13
**edge** [1] - 545:17
**edges** [1] - 731:3
**education** [3] - 561:4,
680:21, 681:2
**educational** [3] -
559:25, 680:19,
681:9
**Edward** [1] - 528:2
**effect** [6] - 523:15,
539:10, 571:14,
599:6, 690:13,
691:14
**effects** [4] - 518:10,
686:23, 691:17,
696:14
**efficient** [3] - 650:3,

744:18, 744:22
**efforts** [1] - 552:9
**either** [6] - 574:6,
577:2, 690:4, 694:8,
705:8, 710:12
**elects** [1] - 678:22
**element** [2] - 520:11,
520:17
**elevated** [1] - 614:6
**elevation** [2] - 546:24,
547:1
**eleven** [1] - 577:23
**Eleventh** [1] - 519:16
**elsewhere** [3] -
574:18, 670:14,
683:17
**email** [3] - 564:22,
574:2, 674:7
**emailed** [2] - 698:8,
698:10
**emails** [2] - 683:16,
701:25
**employed** [6] -
528:10, 559:10,
559:12, 559:13,
577:16, 714:17
**employment** [1] -
715:2
**encode** [12] - 685:15,
685:22, 686:2,
686:3, 686:9, 687:1,
687:10, 688:5,
688:13, 688:17,
689:25, 690:1
**encoded** [3] - 685:18,
688:22, 689:3
**encoding** [9] - 685:3,
685:13, 685:16,
686:9, 686:21,
686:22, 688:8,
688:9, 688:10
**encompasses** [1] -
522:9
**end** [44] - 540:12,
545:4, 545:7,
567:12, 569:24,
570:1, 570:5, 579:7,
589:25, 590:1,
607:15, 608:6,
610:15, 611:12,
612:5, 612:22,
615:9, 620:21,
624:8, 625:5,
625:11, 625:21,
626:11, 627:7,
628:21, 630:19,
630:25, 631:10,
631:15, 631:18,
636:17, 638:12,
638:22, 641:8,

642:10, 643:7,
644:16, 645:4,
645:11, 658:15,
670:9, 736:14, 739:8
**ended** [2] - 570:2,
654:18
**ends** [1] - 675:1
**endured** [1] - 712:19
**enforce** [1] - 529:2
**enforcement** [10] -
519:24, 624:1,
634:20, 668:18,
668:25, 683:14,
684:6, 725:20,
739:2, 739:20
**engage** [1] - 564:2
**enhance** [2] - 708:14,
708:23
**enhanced** [1] - 709:5
**enjoying** [1] - 550:14
**enrolled** [1] - 681:5
**ensure** [1] - 673:25
**entered** [3] - 551:10,
551:25, 552:6
**entering** [1] - 560:18
**entire** [6] - 539:7,
649:9, 663:5, 663:8,
663:10, 663:23
**entirely** [1] - 706:12
**entirety** [14] - 587:19,
589:22, 595:17,
596:11, 600:5,
600:14, 600:23,
601:8, 603:10,
604:24, 614:13,
616:17, 617:11,
664:20
**entitled** [1] - 671:6
**entrance** [6] - 533:24,
545:21, 616:10,
618:15, 641:10,
706:22
**entryway** [2] - 540:17,
546:12
**environment** [5] -
685:4, 685:6,
685:23, 687:14,
687:15
**envisioning** [1] -
532:25
**equipped** [5] - 530:8,
530:11, 530:13,
530:14, 530:16
**erode** [1] - 689:4
**error** [8] - 691:3,
691:4, 691:10,
692:8, 692:9,
693:18, 693:21,
697:14
**especially** [3] - 523:3,

523:12, 674:6
**essential** [1] - 520:11
**essentially** [2] - 523:2,
708:19
**establish** [4] - 597:20,
598:11, 599:6,
725:21
**established** [1] -
709:20
**et** [1] - 561:2
**evening** [2] - 743:21,
745:11
**event** [20] - 685:18,
686:8, 688:22,
689:19, 690:13,
690:15, 691:8,
691:12, 691:21,
692:12, 693:15,
693:16, 693:20,
695:2, 696:15,
696:17, 696:23,
708:17, 709:6
**events** [12] - 637:23,
683:17, 685:25,
687:6, 687:15,
692:5, 694:23,
695:1, 696:15,
709:14, 712:12,
715:23
**evidence** [50] -
518:23, 519:11,
519:17, 520:8,
520:10, 522:9,
526:7, 527:9,
548:16, 555:9,
555:15, 557:10,
561:1, 562:2, 562:3,
562:4, 562:13,
562:14, 562:20,
562:21, 562:23,
562:25, 563:7,
563:8, 563:9, 565:8,
569:7, 570:9,
570:10, 579:1,
579:9, 586:11,
595:5, 598:4,
599:16, 599:20,
639:9, 645:20,
666:20, 717:7,
719:16, 719:23,
722:23, 723:6,
732:11, 732:17,
734:25, 745:8
**Evidence** [1] - 524:22
**evidently** [1] - 534:18
**exact** [5] - 637:22,
667:20, 668:3,
735:15, 736:23
**exactly** [7] - 526:8,
660:23, 660:25,

758

663:15, 668:4,
669:2, 707:10
**examination** [19] -
561:1, 563:19,
563:23, 565:24,
567:6, 567:7,
567:12, 567:13,
567:14, 567:15,
567:16, 569:15,
569:21, 570:7,
573:15, 673:22,
677:8, 745:4
**Examination** [11] -
516:4, 516:6, 516:6,
516:7, 516:8, 516:8,
516:9, 516:10,
516:10, 516:11,
516:12
**EXAMINATION** [12] -
527:19, 550:8,
559:3, 570:22,
577:10, 654:13,
667:15, 669:8,
680:5, 699:13,
712:1, 714:11
**Examination.............**
**..................** [1] -
516:5
**examine** [2] - 676:11,
727:7
**examined** [2] -
563:19, 571:9
**examiner** [4] - 559:17,
559:21, 559:23,
560:24
**Examiner** [2] - 560:5,
560:8
**examiner's** [1] - 676:6
**example** [8] - 671:9,
687:3, 687:15,
687:19, 691:10,
692:12, 692:17,
711:3
**examples** [1] - 688:1
**except** [2] - 574:11,
584:12
**exception** [1] - 525:24
**exchange** [1] - 580:13
**exchanged** [2] -
671:19, 701:25
**exchanging** [1] -
591:13
**exclude** [6] - 518:8,
518:17, 523:14,
525:15, 525:18,
525:19
**excluded** [4] - 711:12,
711:13, 711:15,
711:16
**exclusion** [1] - 519:22

**exclusively** [1] -
671:19
**exculpatory** [1] -
673:10
**excuse** [8] - 520:8,
528:5, 541:4, 541:9,
552:23, 569:15,
673:20, 705:2
**excused** [4] - 558:17,
573:4, 669:22,
713:25
**exercise** [1] - 745:5
**Exhibit** [132] - 516:15,
516:15, 516:16,
516:16, 516:17,
516:17, 516:18,
516:18, 516:19,
516:19, 516:20,
516:20, 516:22,
526:20, 527:9,
536:13, 541:23,
542:25, 546:17,
548:8, 548:16,
548:19, 555:4,
557:5, 557:9,
557:10, 561:15,
561:20, 565:4,
565:8, 567:19,
569:1, 569:7, 580:1,
580:5, 586:11,
586:16, 587:12,
587:19, 588:15,
588:20, 589:16,
590:21, 590:24,
591:12, 595:13,
595:20, 596:6,
596:20, 597:16,
599:19, 599:23,
600:5, 600:8,
600:17, 600:23,
601:1, 601:8, 603:5,
603:13, 603:25,
604:9, 604:18,
605:5, 605:13,
606:12, 606:25,
610:18, 611:2,
613:11, 613:19,
615:16, 615:25,
616:21, 617:5,
617:14, 617:23,
632:4, 632:17,
632:18, 635:2,
639:9, 639:11,
640:14, 641:13,
643:15, 645:25,
646:11, 647:16,
647:17, 649:2,
649:13, 650:1,
653:13, 661:19,
665:6, 669:14,

698:5, 704:5,
704:11, 718:17,
719:16, 719:23,
721:6, 721:12,
721:24, 723:5,
725:23, 726:6,
730:16, 730:20,
731:8, 731:9,
731:13, 732:25,
733:9, 733:13,
736:5, 736:10,
736:20, 737:2,
737:13, 738:17,
738:23, 740:1,
740:5, 740:10,
742:9, 742:15,
743:7, 743:20
**exhibit** [52] - 526:21,
542:7, 542:13,
544:11, 544:14,
556:24, 580:2,
580:16, 580:19,
581:3, 581:11,
582:10, 583:9,
584:24, 586:22,
587:3, 591:16,
592:12, 593:12,
594:14, 600:13,
603:9, 604:20,
607:12, 607:19,
609:4, 611:16,
614:16, 622:13,
623:16, 624:3,
630:14, 631:4,
631:18, 632:19,
635:16, 636:9,
637:2, 637:19,
638:22, 642:23,
647:23, 656:9,
698:13, 698:19,
713:2, 718:19,
719:19, 726:10,
737:14, 742:17
**Exhibits** [3] - 516:14,
526:18, 576:15
**exhibits** [6] - 526:17,
526:23, 576:13,
664:19, 704:7
**exists** [1] - 682:15
**exit** [1] - 646:9
**expect** [4] - 566:2,
566:4, 689:25, 744:8
**experience** [11] -
529:6, 548:4, 607:4,
608:19, 609:17,
614:3, 684:17,
704:2, 713:6,
724:13, 739:20
**experienced** [11] -
521:19, 524:2,

524:11, 690:23,
691:1, 691:7, 691:8,
691:12, 702:23,
703:3, 703:4
**experiences** [2] -
708:18, 710:25
**experiencing** [1] -
710:7
**experimental** [1] -
680:22
**expert** [22] - 517:22,
518:5, 518:8,
518:18, 519:22,
522:2, 523:15,
526:10, 669:24,
678:17, 681:17,
681:21, 681:22,
692:22, 695:5,
695:8, 695:17,
698:15, 700:21,
703:25, 710:22,
711:12
**experts** [3] - 519:9,
525:1
**explain** [7] - 562:19,
563:4, 691:3, 691:5,
720:11, 720:23,
735:4
**explained** [5] -
519:17, 531:13,
547:12, 547:20,
693:22
**exploring** [1] - 658:17
**export** [1] - 674:2
**exported** [1] - 574:6
**exposed** [1] - 686:8
**exposure** [1] - 686:7
**extensive** [1] - 695:11
**extent** [7] - 522:5,
522:17, 598:4,
599:6, 676:24,
687:13, 696:20
**exterior** [1] - 721:18
**external** [1] - 689:24
**extortions** [1] - 578:13
**extract** [2] - 566:12,
566:20
**extracted** [1] - 564:24
**extraction** [37] -
563:23, 563:24,
563:25, 564:3,
564:4, 564:6, 564:9,
564:11, 564:14,
564:15, 564:16,
564:19, 564:21,
566:3, 566:10,
566:11, 566:18,
566:21, 566:22,
566:24, 566:25,
567:8, 567:9,

567:17, 567:22,
567:23, 567:25,
568:12, 569:9,
569:12, 569:17,
570:2, 570:11,
570:17, 571:7, 580:6
**extreme** [5] - 524:11,
686:22, 687:2,
688:11
**eye** [1] - 697:9
**eyes** [6] - 532:20,
532:21, 622:25,
629:6, 629:15,
646:19
**eyewitness** [36] -
518:10, 523:16,
523:21, 523:25,
524:13, 524:19,
680:25, 681:3,
681:4, 681:6,
681:23, 681:25,
682:12, 682:16,
682:19, 682:23,
682:25, 684:22,
685:14, 686:13,
687:16, 688:2,
689:25, 690:9,
690:14, 690:17,
692:1, 695:14,
697:11, 703:14,
703:20, 704:3,
712:8, 713:14
**eyewitness's** [2] -
691:23, 692:2
**eyewitnesses** [13] -
686:17, 687:21,
687:24, 689:17,
689:21, 690:21,
692:4, 697:7, 697:9,
697:12, 712:5

---

# F

**F-u-l-p** [1] - 714:16
**F.2d** [1] - 675:7
**F.3d** [1] - 518:24
**face** [11] - 530:22,
532:15, 633:23,
633:24, 726:18,
728:21, 736:19,
739:13, 739:15,
739:21, 740:19
**facial** [1] - 687:23
**facie** [1] - 520:12
**facilitate** [1] - 708:21
**facing** [11] - 542:15,
542:17, 547:10,
721:18, 731:4,
731:6, 731:17,
733:19, 734:1,
734:4, 738:14

**fact** [32] - 524:9,
535:9, 536:2,
538:21, 539:12,
540:1, 549:20,
551:24, 552:16,
562:25, 563:11,
564:12, 573:25,
597:9, 659:15,
663:13, 664:5,
672:4, 672:8, 672:9,
674:21, 677:18,
677:19, 678:9,
691:8, 709:3,
711:15, 713:12,
728:8, 737:8, 739:15
**fact-finder** [1] - 709:3
**factors** [23] - 684:20,
684:24, 685:10,
685:14, 686:1,
688:11, 688:16,
689:25, 690:7,
694:9, 694:10,
696:11, 696:12,
697:16, 697:17,
700:4, 701:12,
701:15, 703:2,
703:4, 709:25,
710:4, 713:15
**facts** [1] - 672:13
**failed** [2] - 573:14,
712:3
**fair** [16] - 548:3, 551:5,
556:22, 560:19,
568:22, 569:12,
664:12, 666:24,
700:2, 700:3,
700:16, 704:1,
707:16, 707:22,
708:6, 732:22
**fairly** [2] - 518:21,
568:25
**faith** [1] - 674:14
**fall** [3] - 545:3, 545:5,
671:4
**Falls** [1] - 667:24
**false** [8] - 696:5,
696:6, 696:7, 696:8,
696:12, 713:16
**familiar** [12] - 572:4,
633:5, 682:24,
705:9, 721:25,
723:10, 723:25,
724:14, 726:3,
728:4, 735:4, 736:2
**familiarity** [1] - 737:8
**familiarize** [1] -
737:16
**Fanone** [2] - 557:15,
558:1
**far** [1] - 697:20

**fault** [1] - 584:25
**FBI** [64] - 559:14,
559:15, 559:16,
559:19, 559:22,
560:16, 560:20,
560:21, 561:6,
562:7, 562:8,
562:14, 562:21,
566:16, 570:11,
572:11, 574:6,
577:19, 577:22,
579:15, 579:19,
579:20, 587:7,
591:4, 591:8, 595:9,
597:4, 601:11,
602:24, 602:25,
643:13, 647:10,
649:21, 651:8,
655:2, 657:3,
657:21, 669:1,
669:10, 676:6,
714:20, 715:2,
715:4, 716:8,
716:20, 716:21,
716:22, 717:9,
717:11, 717:14,
718:1, 718:5, 719:3,
719:12, 719:25,
720:8, 720:19,
720:23, 720:25,
721:2, 723:20,
723:23, 724:1
**FBI's** [2] - 572:4,
649:22
**fear** [1] - 538:25
**feature** [2] - 642:20,
729:8
**February** [3] - 650:9,
651:3, 651:13
**Federal** [3] - 524:22,
559:13, 714:21
**federal** [9] - 578:16,
578:19, 654:22,
711:8, 715:20,
715:24, 717:7,
717:10, 727:24
**Federico** [16] - 517:4,
517:18, 550:13,
561:9, 561:23,
716:10, 718:11,
720:17, 720:21,
723:10, 723:25,
724:15, 724:17,
724:25, 729:4,
734:10
**feet** [2] - 625:23
**fellow** [3] - 533:5,
534:25, 546:8
**felony** [1] - 525:25
**felt** [3] - 538:16,

717:18, 721:10
**female** [1] - 631:10
**fence** [2] - 530:24,
532:3
**fending** [1] - 541:15
**ferreting** [1] - 673:1
**few** [17] - 522:16,
522:24, 525:11,
543:23, 547:5,
549:17, 576:13,
579:24, 586:3,
587:23, 613:22,
621:17, 632:20,
706:13, 711:25,
726:11, 740:25
**field** [2] - 680:20,
690:2
**Field** [4] - 578:2,
578:3, 578:8, 715:5
**Fielding** [1] - 680:16
**fields** [1] - 690:1?
**fight** [4] - 531:16,
549:19, 613:1
**fighting** [1] - 521:25
**figure** [3] - 526:7,
575:18, 602:11
**figured** [2] - 584:9,
689:20
**file** [2] - 670:15, 676:6
**filed** [3] - 525:15,
681:18, 698:18
**files** [5] - 566:4, 566:5,
566:8, 683:13
**filing** [2] - 525:13,
743:1
**filmed** [2] - 662:7,
731:14
**filming** [3] - 588:6,
662:12, 662:16
**final** [1] - 656:9
**finally** [1] - 675:6
**finder** [1] - 709:3
**fine** [1] - 634:12
**finger** [1] - 536:23
**fingerprint** [2] - 567:4,
601:21
**finish** [1] - 558:3
**finished** [1] - 634:24
**first** [26] - 518:16,
528:22, 564:16,
564:21, 567:8,
572:13, 581:3,
582:11, 583:12,
584:3, 584:25,
585:21, 592:13,
594:14, 616:14,
647:24, 650:5,
650:23, 651:18,
655:5, 671:1,
672:17, 679:14,

681:2, 720:4
**fist** [1] - 647:4
**five** [5] - 528:17,
535:23, 559:18,
559:24
**five-ten** [1] - 535:23
**flag** [4] - 554:22,
556:12, 556:15,
556:16
**flagpole** [1] - 556:6
**flashlight** [1] - 642:20
**flat** [3] - 546:13,
546:14
**flyers** [1] - 718:9
**focus** [9] - 540:3,
540:5, 554:10,
680:20, 687:20,
687:21, 692:14,
727:9, 745:10
**focused** [4] - 539:24,
540:5, 540:8, 692:13
**focuses** [2] - 519:18,
521:12
**focusing** [1] - 685:20
**folks** [4] - 517:11,
535:7, 554:10,
745:22
**follow** [5] - 575:25,
587:6, 658:9,
658:24, 709:16
**follow-up** [2] - 658:9,
658:24
**followed** [1] - 608:14
**following** [2] - 518:14,
590:19
**foot** [1] - 734:8
**footage** [66] - 543:3,
543:8, 549:23,
632:13, 634:21,
642:25, 691:12,
691:14, 691:19,
691:23, 691:24,
691:25, 692:4,
692:16, 692:17,
693:3, 693:4, 693:8,
693:14, 693:15,
706:20, 708:8,
708:11, 708:24,
709:1, 709:4, 709:5,
712:14, 712:15,
712:20, 712:22,
722:10, 722:12,
722:23, 725:10,
725:14, 725:16,
725:17, 726:21,
729:5, 731:16,
731:21, 731:23,
732:3, 733:2,
734:11, 734:13,
734:14, 734:16,

734:19, 734:22,
735:24, 736:17,
736:20, 736:22,
736:23, 737:18,
737:24, 738:11,
738:24, 739:9,
739:18, 742:4,
743:16, 744:21
**Footage** [1] - 707:24
**footages** [1] - 744:20
**football** [1] - 538:17
**footing** [1] - 535:5
**force** [6] - 538:15,
578:5, 578:7,
578:11, 715:12,
715:14
**Force** [3] - 715:8,
715:10, 715:16
**forensic** [7] - 559:17,
559:21, 559:23,
560:24, 567:24,
680:23, 680:24
**Forensic** [2] - 560:7,
560:8
**forensics** [5] - 560:2,
560:10, 560:16,
560:17, 561:5
**forget** [1] - 692:13
**forgetting** [4] - 689:5,
692:9, 692:10,
692:15
**forgive** [2] - 551:1,
674:7
**form** [10] - 563:2,
563:12, 563:25,
571:13, 692:15,
693:18, 696:17,
702:21, 708:18,
723:13
**format** [1] - 688:25
**former** [13] - 528:3,
528:6, 576:21,
596:18, 597:7,
598:13, 599:25,
600:19, 601:4,
661:24, 662:14,
662:25, 665:2
**forming** [1] - 534:10
**forth** [5] - 534:3,
534:6, 534:24, 535:4
**forward** [16] - 517:5,
533:10, 537:25,
538:13, 538:18,
538:19, 542:25,
545:5, 546:17,
633:12, 698:6,
716:19, 725:23,
726:15, 740:24
**forwarded** [1] - 698:3
**fought** [1] - 521:22

760

**foul** [1] - 674:14
**Foulds** [2] - 706:4, 712:17
**foundation** [18] - 524:1, 527:5, 548:11, 599:4, 599:7, 619:16, 620:25, 621:25, 622:7, 622:9, 623:11, 637:13, 637:17, 637:19, 638:3, 638:8, 719:19, 722:20
**Fountain** [1] - 680:13
**four** [7] - 653:25, 654:2, 657:1, 657:17, 663:13, 663:18, 679:19
**Fourth** [2] - 519:20, 519:21
**frame** [13] - 522:10, 537:3, 547:4, 547:5, 548:25, 549:1, 616:14, 634:18, 643:6, 705:19, 709:17, 730:13
**frames** [2] - 726:15, 740:24
**frankly** [4] - 524:12, 524:25, 598:23, 625:15
**FRE** [1] - 518:19
**Freddy** [2] - 619:21, 622:18
**free** [4] - 527:17, 558:14, 572:22, 713:22
**freeway** [2] - 590:18, 661:15
**fresh** [3] - 621:9, 622:4
**friend** [1] - 721:3
**friendly** [1] - 571:23
**frightening** [1] - 533:7
**Front** [7] - 530:22, 531:19, 536:5, 607:9, 725:11, 725:18, 726:7
**front** [26] - 534:15, 535:15, 535:16, 536:22, 537:7, 538:13, 539:6, 539:25, 540:4, 540:5, 547:20, 553:4, 562:1, 563:12, 594:2, 621:15, 634:22, 636:5, 644:4, 677:1, 686:6, 705:5, 707:20, 725:18,

731:17, 733:2
**frustrated** [1] - 547:17
**frustration** [2] - 525:2, 525:10
**fucker** [1] - 645:14
**fucking** [3] - 621:9, 739:13
**full** [5] - 527:23, 577:14, 580:16, 711:1, 712:14
**Fulp** [43] - 516:11, 517:9, 561:6, 561:8, 561:20, 563:7, 563:14, 566:10, 568:19, 568:23, 569:23, 572:7, 573:9, 574:10, 671:20, 671:24, 672:6, 714:5, 714:13, 714:16, 714:17, 719:25, 721:7, 723:8, 724:25, 725:9, 726:17, 728:18, 730:2, 730:18, 731:13, 732:25, 733:13, 734:9, 736:9, 737:17, 738:8, 738:25, 740:15, 741:4, 742:20, 743:15, 743:23
**Fulp's** [4] - 671:21, 674:2, 674:3, 744:13
**funded** [1] - 582:19

# G

**G-a-b-r-i-e-l-a** [1] - 572:15
**Gabby** [4] - 572:16, 573:24, 573:25, 574:11
**Gabriela** [5] - 516:5, 558:20, 559:8, 571:2, 572:15
**GABRIELA** [1] - 559:8
**Gabrielle** [1] - 671:15
**gain** [8] - 534:6, 534:18, 535:4, 535:11, 538:3, 538:13, 684:16
**gained** [3] - 538:22, 541:1, 552:5
**gas** [5] - 582:24, 624:15, 630:7, 706:23, 707:7
**gathering** [2] - 579:9, 725:17
**Gatorade** [1] - 622:25

**General** [11] - 518:11, 518:20, 519:2, 519:4, 519:7, 520:24, 521:10, 521:13, 521:18, 521:23, 525:19
**general** [17] - 519:12, 520:25, 522:18, 523:1, 524:7, 525:23, 579:6, 683:18, 691:19, 702:25, 703:1, 703:2, 707:1, 708:7, 710:20, 713:15, 715:19
**general's** [6] - 521:1, 522:7, 522:10, 522:23, 523:4, 523:10
**generally** [13] - 520:7, 523:24, 547:15, 571:24, 580:18, 580:20, 697:9, 699:24, 716:16, 724:14, 725:16, 725:17, 726:7
**generate** [1] - 566:25
**generated** [4] - 567:1, 572:2, 655:2, 655:5
**generates** [2] - 567:3, 567:10
**gentleman** [2] - 538:12, 724:21
**GIAC** [1] - 560:8
**gist** [2] - 695:1, 695:3
**given** [6] - 523:13, 524:20, 525:11, 597:7, 679:11, 716:1
**glad** [1] - 716:6
**goal** [1] - 692:2
**goals** [1] - 685:19
**God** [1] - 535:20
**gotcha** [1] - 676:11
**Government** [60] - 516:15, 516:15, 516:16, 516:16, 516:17, 516:17, 516:18, 516:18, 516:19, 516:19, 516:20, 516:20, 524:23, 525:17, 525:18, 527:9, 548:16, 561:14, 561:19, 565:4, 565:8, 567:19, 569:4, 569:7, 589:16, 599:19, 611:2, 639:7, 639:9, 669:14, 718:16, 719:16, 719:23,

721:6, 721:12, 721:24, 723:5, 725:22, 730:15, 730:20, 731:8, 731:13, 732:25, 733:9, 733:13, 736:5, 736:10, 736:20, 737:2, 737:13, 738:17, 738:23, 739:25, 740:5, 740:10, 742:8, 742:15, 743:6, 743:19
**government** [63] - 517:6, 518:8, 518:17, 518:20, 520:13, 520:18, 522:1, 522:5, 522:20, 522:25, 523:17, 523:19, 524:6, 524:7, 524:15, 527:1, 527:4, 548:7, 552:21, 555:3, 558:18, 571:7, 572:23, 573:14, 574:7, 574:20, 574:22, 575:14, 576:3, 598:21, 598:23, 599:12, 599:15, 602:8, 625:15, 626:18, 639:6, 656:2, 658:15, 670:8, 671:2, 671:3, 671:8, 671:15, 671:17, 671:20, 672:9, 673:9, 673:18, 673:25, 678:11, 678:23, 684:12, 694:17, 695:12, 698:4, 698:18, 704:6, 712:23, 713:1, 714:4, 722:14, 732:12
**government's** [12] - 520:11, 522:9, 523:7, 523:12, 525:2, 525:10, 525:24, 575:25, 576:1, 630:14, 656:10, 714:1
**Government's** [69] - 526:20, 536:13, 541:22, 542:25, 546:17, 548:8, 548:19, 555:4, 557:5, 580:1, 580:5, 586:11, 586:15, 587:12, 587:18, 588:15, 588:20,

590:20, 590:24, 591:12, 595:12, 595:20, 596:6, 596:19, 597:16, 599:22, 600:5, 600:8, 600:17, 600:23, 601:1, 601:7, 603:5, 603:13, 603:25, 604:9, 604:18, 605:5, 605:13, 606:12, 606:25, 610:18, 613:11, 613:19, 615:15, 615:25, 616:21, 617:5, 617:14, 617:23, 632:4, 632:17, 632:18, 635:2, 639:11, 640:14, 641:13, 643:15, 645:25, 646:11, 647:16, 647:17, 649:1, 649:13, 650:1, 653:13, 704:5, 704:11, 722:15
**grab** [1] - 541:19
**grabbed** [2] - 540:20, 564:20
**grabbing** [2] - 532:14, 636:1
**grabs** [1] - 564:17
**Graduate** [1] - 680:16
**grand** [2] - 677:20, 713:3
**grant** [2] - 674:25, 744:8
**granted** [2] - 674:19, 674:20
**gray** [5] - 741:24, 742:1, 742:11, 742:15, 742:21
**GrayKey** [3] - 564:4, 564:5, 566:19
**great** [7] - 521:20, 586:14, 592:2, 620:13, 670:3, 682:8, 736:17
**green** [15] - 557:24, 580:24, 591:17, 719:10, 721:10, 722:8, 724:22, 730:25, 731:2, 733:4, 733:6, 733:18, 734:2, 736:21, 739:1
**ground** [2] - 534:2, 546:13
**Grounds** [1] - 606:22
**grounds** [7] - 518:2,

518:18, 521:6, 521:7, 549:14, 698:21, 726:3
**group** [3] - 538:22, 552:5, 660:22
**guess** [6] - 547:8, 574:1, 652:1, 668:4, 703:1, 724:10
**guessing** [1] - 706:20
**guided** [2] - 536:1, 536:3
**Guillermo** [1] - 517:4
**guilt** [1] - 520:22
**guy** [1] - 745:6
**guys** [1] - 739:10

**H**

**hair** [2] - 686:15, 734:3
**hairline** [1] - 686:15
**half** [2] - 580:3, 645:21
**hallway** [2] - 602:15, 676:21
**hand** [42] - 521:16, 527:12, 539:13, 540:14, 540:15, 540:20, 540:22, 540:23, 540:25, 543:7, 544:19, 544:21, 544:23, 558:1, 558:21, 573:2, 577:6, 633:1, 635:14, 635:23, 635:25, 636:2, 636:3, 639:23, 641:3, 641:21, 642:21, 642:22, 644:13, 680:1, 714:6, 724:21, 729:24, 731:8, 731:14, 731:20, 733:8, 737:2, 737:12, 740:4, 740:6
**handcuffs** [2] - 667:25, 668:9
**handed** [4] - 561:14, 561:16, 627:17, 629:5
**handle** [9] - 518:16, 523:12, 527:7, 533:2, 539:20, 620:11, 631:23, 644:24, 644:25
**handles** [3] - 539:20, 542:15, 542:17
**hands** [5] - 540:24, 545:9, 545:16, 547:19, 636:5
**hang** [1] - 584:1

**happy** [2] - 523:4, 674:7
**hard** [2] - 569:20, 704:3
**harm** [1] - 536:3
**Harvell** [2] - 742:4, 742:5
**Harvell's** [1] - 736:23
**hash** [8] - 567:1, 567:3, 567:9, 567:11, 567:13, 569:15, 569:16
**hashes** [1] - 567:15
**hat** [13] - 537:19, 543:19, 557:24, 606:1, 628:14, 686:12, 719:10, 722:7, 729:10, 731:2, 733:19, 734:2
**hats** [5] - 553:7, 553:11, 554:1, 686:15, 719:9
**head** [3] - 532:15, 642:3, 741:25
**heading** [1] - 641:9
**heads** [1] - 529:1
**Health** [1] - 564:21
**hear** [46] - 523:4, 545:12, 588:8, 588:10, 589:25, 599:10, 607:15, 608:6, 611:12, 612:5, 612:22, 615:5, 619:12, 619:21, 620:21, 621:8, 624:8, 624:14, 625:11, 625:23, 626:9, 626:10, 627:6, 628:21, 630:9, 630:19, 631:10, 638:5, 638:22, 645:7, 645:10, 645:13, 661:24, 663:3, 665:23, 666:5, 678:17, 716:6, 731:21, 731:23, 732:3, 732:5, 734:22, 736:9, 736:12, 739:5
**heard** [29] - 574:16, 596:14, 598:13, 599:5, 613:2, 619:24, 620:2, 620:4, 621:9, 622:3, 624:15, 625:23, 626:12, 630:6, 638:14, 645:14, 663:4, 665:4, 676:8, 732:6, 732:20,

732:23, 733:1, 735:1, 735:10, 736:14, 737:5, 739:10
**hearing** [7] - 533:16, 575:13, 626:20, 665:11, 732:16, 739:8
**hears** [1] - 626:19
**hearsay** [8] - 523:2, 523:8, 523:12, 599:4, 698:21, 698:25, 699:2, 699:4
**heavy** [1] - 551:12
**held** [4] - 534:23, 545:17, 628:13, 662:4
**helmet** [9] - 530:16, 530:19, 531:1, 531:2, 532:14, 542:5, 623:22, 623:25
**help** [9] - 531:9, 531:11, 655:10, 657:4, 657:9, 673:4, 696:19, 706:24, 713:12
**helped** [1] - 547:10
**helpful** [1] - 701:10
**helping** [1] - 523:9
**Henry** [1] - 528:1
**hereby** [1] - 525:8
**herself** [2] - 573:10, 574:8
**Hi** [1] - 699:15
**high** [2] - 521:20, 538:17
**highlighter** [1] - 609:9
**highly** [3] - 697:12, 697:21, 699:22
**Hill** [3] - 516:10, 517:9, 699:15
**hill** [5] - 558:19, 565:17, 576:4, 699:6, 699:12
**HILL** [33] - 558:20, 559:4, 561:11, 561:13, 565:3, 565:16, 565:18, 565:22, 566:1, 568:2, 568:4, 569:3, 569:8, 570:19, 572:20, 576:7, 681:14, 681:16, 682:3, 692:21, 694:4, 694:7, 694:10, 695:4, 695:15, 698:12, 698:15, 698:20, 699:14, 709:23,

711:18, 711:20, 713:18
**Hill................** [1] - 516:6
**Hills** [1] - 680:13
**himself** [6] - 521:24, 574:6, 657:22, 658:17, 666:24, 667:2
**hired** [1] - 683:5
**Hodges** [3] - 519:8, 520:16, 522:6, 522:24, 523:20, 523:23, 524:2, 524:10, 683:15, 700:18, 700:23, 701:9, 701:22, 702:7, 702:12, 702:25, 703:3, 704:20, 704:24, 705:3, 705:4, 706:2, 706:18, 706:22, 707:6, 709:4, 709:21, 710:2, 710:5, 710:7, 710:14, 710:18, 712:15
**Hodges'** [11] - 683:20, 684:17, 703:6, 705:19, 706:9, 709:8, 709:10, 710:8, 710:10, 710:21, 713:6
**hold** [4] - 539:4, 573:6, 692:24, 694:5
**holding** [8] - 540:21, 545:6, 555:24, 639:1, 639:22, 641:2, 642:19, 642:21
**Holguin** [5] - 516:8, 517:13, 598:20, 637:3, 654:12
**HOLGUIN** [29] - 590:8, 594:25, 598:21, 625:14, 626:14, 634:9, 637:4, 645:1, 654:14, 655:21, 655:23, 656:6, 656:8, 656:11, 658:14, 658:21, 658:22, 661:18, 661:22, 665:5, 665:9, 665:10, 665:19, 665:21, 665:22, 666:12, 666:15, 667:9, 667:11
**home** [2] - 657:21, 744:14

**homicide** [1] - 578:14
**honestly** [1] - 703:15
**Honor** [134] - 517:2, 517:7, 517:12, 517:17, 518:4, 525:21, 526:15, 526:24, 537:1, 537:17, 542:4, 544:5, 548:7, 548:13, 550:1, 555:9, 555:14, 557:4, 557:8, 558:10, 558:12, 561:11, 565:3, 565:18, 565:22, 569:3, 570:19, 570:20, 572:20, 573:18, 573:19, 574:16, 576:7, 576:13, 576:19, 586:10, 590:8, 594:23, 594:25, 597:14, 597:18, 598:1, 598:7, 598:21, 598:23, 598:25, 599:3, 599:21, 601:20, 602:16, 616:12, 619:14, 619:17, 621:17, 622:6, 625:14, 626:14, 626:24, 629:10, 630:23, 634:9, 634:12, 637:1, 637:4, 637:12, 637:16, 637:21, 638:5, 639:6, 642:25, 645:1, 650:3, 654:9, 654:11, 655:17, 658:11, 658:14, 658:21, 667:9, 667:12, 667:14, 669:5, 669:7, 669:19, 670:5, 670:7, 670:21, 671:1, 671:7, 671:24, 672:17, 673:3, 674:9, 674:13, 674:17, 675:13, 675:16, 675:24, 677:14, 678:25, 679:13, 679:14, 679:16, 679:21, 681:14, 681:24, 682:4, 692:21, 693:13, 695:4, 695:7, 695:15, 698:2, 698:12, 699:9, 711:18, 711:25,

713:20, 713:24, 719:15, 719:18, 722:14, 722:18, 722:22, 723:13, 724:24, 726:24, 727:11, 732:9, 741:11, 744:17, 745:19, 745:21

**Honor's** [2] - 575:22, 672:15

**hood** [1] - 686:12

**hooded** [1] - 606:2

**hope** [4] - 550:13, 652:24, 717:23, 726:7

**hopefully** [2] - 533:19, 655:9

**hoping** [2] - 744:5, 744:10

**horizontal** [2] - 539:14, 539:18

**horizontally** [3] - 542:11, 542:13, 542:16

**hot** [2] - 666:3, 666:6

**hotels** [1] - 582:24

**hour** [5] - 555:12, 584:10, 592:1, 597:13, 663:21

**hours** [5] - 589:7, 727:24, 728:15, 729:11, 729:15

**hours'** [2] - 735:16, 735:25

**house** [1] - 611:25

**House** [5] - 529:18, 531:6, 551:2, 683:23

**human** [4] - 567:24, 682:18, 682:22, 696:11

**human-readable** [1] - 567:25

**humans** [1] - 685:17

**hundred** [5] - 521:21, 682:19, 682:20, 699:25, 713:17

**hundreds** [2] - 551:17, 695:16

**Hutchinson** [1] - 519:15

**hypervigilance** [1] - 686:24

**I**

**icon** [1] - 728:21

**ID** [3] - 562:2, 568:13, 655:17

**Ida** [1] - 527:25

**idea** [3] - 571:25,

650:12, 655:9

**ideas** [1] - 718:7

**identification** [27] - 523:16, 523:21, 523:25, 524:14, 561:20, 562:7, 567:18, 571:12, 623:10, 656:1, 658:12, 658:15, 680:25, 681:3, 681:6, 681:23, 682:1, 682:16, 686:14, 687:16, 687:18, 695:14, 719:13, 720:9, 721:8, 744:19, 744:25

**identifications** [1] - 686:18

**identified** [11] - 568:19, 611:20, 611:21, 631:25, 671:10, 717:4, 717:9, 718:25, 720:14, 723:14, 724:25

**identifier** [2] - 571:13, 718:2

**identifiers** [1] - 563:20

**identifies** [1] - 571:8

**identify** [22] - 517:5, 579:14, 579:20, 591:4, 621:5, 621:14, 623:6, 623:7, 634:20, 655:10, 668:6, 716:20, 717:11, 717:13, 719:3, 724:17, 725:13, 727:5, 727:13, 729:4, 729:19, 730:23

**identifying** [6] - 562:14, 630:10, 657:4, 716:22, 718:2, 729:8

**identity** [8] - 658:7, 658:25, 659:1, 718:12, 719:5, 720:1, 720:6, 720:24

**image** [17] - 526:19, 541:25, 580:6, 580:12, 584:15, 586:24, 616:14, 651:5, 651:6, 707:11, 717:18, 717:21, 720:5, 721:19, 721:25, 728:4, 733:14

**images** [1] - 657:3

**imagine** [1] - 599:12

**IMEI** [1] - 571:13

**immediately** [2] - 537:7, 623:23

**Impact** [1] - 707:23

**impact** [3] - 708:1, 708:5, 708:8

**impacted** [1] - 519:5

**impacts** [1] - 686:20

**impair** [3] - 686:22, 691:23, 709:1

**impaired** [1] - 709:6

**impeachment** [1] - 652:16

**implies** [1] - 521:22

**importance** [1] - 664:15

**important** [6] - 535:6, 664:7, 664:13, 685:16, 686:16, 728:1

**impossible** [2] - 690:25, 703:21

**impression** [1] - 707:1

**impressions** [1] - 523:5

**improve** [1] - 691:21

**impute** [1] - 598:23

**in-person** [1] - 735:25

**inaccurate** [1] - 689:16

**inauguration** [3] - 532:2, 533:25, 608:22

**incident** [1] - 715:17

**inclination** [1] - 744:12

**inclined** [1] - 575:25

**include** [8] - 521:4, 523:20, 674:18, 680:24, 685:2, 703:17, 704:5, 704:23

**included** [5] - 683:14, 703:9, 703:23, 712:14, 712:19

**includes** [1] - 524:8, 682:21

**including** [12] - 517:25, 518:18, 520:4, 520:15, 672:20, 676:6, 683:23, 684:11, 686:23, 693:9, 706:13, 744:15

**incomplete** [2] - 673:21, 688:10

**incorporate** [1] - 692:6

**incorporated** [2] -

689:14, 690:16

**incorporates** [1] - 696:20

**incorrect** [9] - 519:3, 690:9, 690:10, 690:14, 696:20, 696:21, 696:24, 697:22

**increases** [2] - 686:25, 687:17

**independent** [1] - 697:18

**indicate** [5] - 573:9, 586:5, 591:8, 643:11, 686:20

**indicates** [3] - 598:15, 598:16

**indictment** [1] - 526:16

**individual** [59] - 537:8, 537:12, 537:13, 537:18, 537:23, 539:13, 539:16, 540:20, 540:22, 543:19, 543:20, 547:9, 547:10, 547:12, 547:13, 550:22, 554:3, 557:23, 578:21, 579:1, 579:15, 580:10, 580:14, 621:23, 623:1, 623:22, 623:25, 629:5, 633:18, 635:10, 644:2, 647:20, 655:4, 662:16, 666:1, 666:3, 686:11, 690:1, 694:3, 696:20, 696:23, 716:9, 720:7, 720:17, 726:22, 727:19, 727:20, 728:2, 732:7, 733:4, 733:5, 733:14, 734:4, 741:5, 741:10, 741:13, 741:23, 742:10, 742:15

**individual's** [6] - 544:19, 544:21, 623:23, 690:7, 696:22, 697:1

**individuals** [21] - 530:25, 535:21, 545:19, 546:24, 554:1, 609:3, 609:4, 624:1, 653:25, 657:9, 686:6, 686:16, 716:22,

717:4, 717:24, 718:4, 720:23, 723:24, 730:21, 735:19, 741:21

**induced** [1] - 692:10

**industry** [2] - 560:19, 570:14

**infer** [1] - 688:15

**influence** [7] - 685:11, 685:14, 686:2, 688:1, 696:11, 700:5, 713:15

**influenced** [2] - 518:12, 685:22

**information** [80] - 559:20, 564:18, 564:20, 564:24, 564:25, 566:2, 568:15, 568:25, 571:8, 571:11, 573:22, 655:9, 655:24, 656:2, 657:12, 657:14, 658:5, 659:12, 660:4, 671:13, 672:23, 672:25, 673:8, 673:15, 673:18, 674:5, 676:9, 681:17, 683:7, 685:4, 685:5, 685:15, 685:22, 686:2, 686:9, 687:1, 687:8, 687:9, 687:10, 688:5, 688:15, 688:22, 688:24, 689:2, 689:4, 689:5, 689:12, 689:13, 689:20, 690:2, 690:9, 690:10, 690:11, 690:14, 690:18, 690:24, 691:1, 691:2, 691:9, 692:7, 692:12, 692:14, 694:22, 696:19, 696:20, 701:10, 704:12, 704:14, 704:17, 706:4, 706:5, 706:25, 717:15, 717:24, 718:22, 720:12

**ingrained** [1] - 696:24

**initials** [2] - 562:4, 562:21

**initiate** [1] - 564:6

**initiates** [1] - 566:21

**injured** [2] - 532:19, 684:18

**innocent** [1] - 683:1

Insanity [1] - 520:2
insanity [1] - 520:6
inside [9] - 550:23,
551:5, 551:20,
597:21, 614:19,
625:2, 625:24,
632:13, 721:17
insight [1] - 522:23
insignia [3] - 627:23,
628:11, 628:12
insinuate [1] - 622:7
instance [3] - 564:7,
675:22, 711:4
instances [4] -
690:24, 696:23,
697:21, 734:18
instead [2] - 676:11,
676:20
Institute [1] - 560:9
instructive [1] -
519:21
intact [2] - 562:25,
563:1
intend [1] - 712:4
intending [1] - 598:22
intends [1] - 522:5
intensity [1] - 521:20
intent [14] - 517:24,
518:5, 519:6,
519:12, 519:18,
520:12, 520:17,
520:25, 521:2,
523:6, 525:23,
525:24, 526:3,
538:16
intention [1] - 685:18
intentions [1] - 685:19
interact [1] - 536:23
interaction [4] - 536:6,
569:25, 570:1, 570:6
interested [1] - 675:19
interfere [2] - 686:25,
688:5
interlude [1] - 739:12
internal [2] - 562:7,
689:24
internalized [1] -
696:24
internet [1] - 717:16
interpretation [1] -
732:22
interrupt [1] - 547:24
interview [5] - 685:8,
702:11, 720:8,
720:16, 735:8
interviewed [1] -
684:6
interviewing [2] -
523:20, 702:17
interviews [3] -

683:15, 684:3,
704:21
introduce [2] - 523:2,
526:7
introducing [2] -
598:9, 719:21
investigate [1] -
578:12
investigating [5] -
578:15, 607:4,
608:19, 609:17,
614:3
Investigation [2] -
559:13, 714:22
investigation [46] -
578:20, 578:23,
578:24, 579:3,
579:14, 579:18,
597:6, 602:25,
619:7, 621:21,
632:12, 633:4,
633:25, 634:8,
634:20, 640:23,
646:8, 649:23,
656:21, 658:2,
658:9, 658:24,
659:13, 664:3,
715:10, 715:13,
715:15, 716:2,
716:9, 716:12,
716:13, 717:6,
718:11, 719:6,
720:20, 721:20,
723:11, 723:23,
724:13, 725:9,
726:2, 727:23,
734:10, 734:24,
739:14
investigative [3] -
659:2, 716:17,
716:18
investigator [1] -
716:16
involved [3] - 687:4,
715:10, 715:12
involving [2] - 518:16,
519:7
iPhones [1] - 571:21
ipse [1] - 622:10
irrelevant [1] - 518:19
irritant [1] - 644:3
issue [8] - 518:23,
524:14, 574:22,
575:21, 575:22,
602:4, 658:16, 670:4
issues [1] - 732:13
item [7] - 562:13,
562:15, 563:6,
563:7, 563:8,
644:21, 670:8

items [18] - 568:13,
568:19, 568:22,
569:23, 579:20,
579:24, 591:4,
591:8, 597:4,
601:11, 602:23,
624:22, 627:17,
627:20, 643:12,
649:22, 669:11
itself [18] - 529:18,
547:22, 549:22,
550:25, 551:10,
562:19, 563:19,
565:4, 568:20,
569:1, 570:2, 570:5,
570:8, 625:15,
626:15, 698:23,
732:12, 732:18

## J

J-r [1] - 528:2
jacket [14] - 529:9,
557:24, 662:19,
719:10, 721:10,
722:8, 731:2, 733:4,
733:6, 733:18,
734:2, 739:1, 741:24
jail [3] - 735:13,
735:15, 736:1
Jail [1] - 735:14
Jan [1] - 657:5
January [82] - 518:13,
521:12, 529:4,
530:15, 543:8,
549:7, 550:16,
577:2, 578:8,
578:17, 578:19,
579:2, 579:21,
581:16, 584:6,
585:2, 585:14,
585:22, 586:8,
587:8, 588:25,
589:12, 591:3,
591:10, 591:24,
592:8, 592:15,
592:25, 593:7,
593:17, 594:3,
594:9, 596:3, 597:2,
597:7, 603:23,
604:16, 605:11,
606:19, 606:22,
607:5, 608:19,
609:18, 610:25,
613:18, 614:4,
615:23, 617:3,
617:21, 632:11,
646:7, 648:3,
648:19, 649:20,
662:5, 666:21,
668:7, 683:16,

684:8, 700:24,
701:2, 701:5, 701:8,
701:15, 701:18,
703:7, 704:21,
706:10, 710:7,
710:15, 712:12,
713:6, 715:11,
715:23, 719:7,
721:2, 722:13,
723:12, 724:3,
735:24, 744:15
Jen [1] - 583:7
Jencks [50] - 573:10,
573:14, 573:16,
573:20, 574:21,
575:1, 575:2, 575:7,
575:11, 575:16,
575:18, 576:1,
602:4, 602:8, 602:9,
602:11, 670:4,
670:12, 670:19,
671:1, 671:2, 671:4,
671:8, 672:19,
672:21, 673:16,
673:17, 674:1,
674:5, 674:9,
674:10, 674:12,
674:24, 675:4,
675:9, 675:19,
675:20, 675:25,
676:2, 676:3,
676:24, 677:3,
677:6, 677:23,
677:24, 678:8,
678:13, 679:6
job [4] - 533:8, 560:4,
560:23, 561:4
jog [1] - 692:18
Johnston [2] - 634:4,
634:7
JON [1] - 577:15
Jon [5] - 516:7,
517:10, 572:25,
576:10, 577:15
journal [1] - 681:13
Jr [1] - 527:24
Judge [3] - 655:23,
655:25, 656:3
judging [1] - 697:7
July [6] - 671:3, 671:9,
671:15, 673:19,
673:20, 673:21
jump [1] - 725:23
juncture [1] - 673:1
June [1] - 559:24
junior [1] - 528:2
jury [2] - 677:20, 713:3
justice [1] - 675:1

## K

Kaitlin [1] - 517:9
keep [13] - 538:19,
552:13, 553:23,
576:4, 598:6, 598:8,
601:21, 629:20,
646:19, 648:22,
671:25, 689:7
keeping [1] - 552:10
kick [1] - 608:15
kidnappings [1] -
578:13
kind [19] - 522:14,
524:1, 525:3, 529:8,
540:19, 541:14,
547:10, 552:22,
616:10, 659:10,
661:14, 662:16,
662:20, 668:3,
686:11, 686:12,
693:21, 715:21,
742:25
kinds [1] - 687:9
Klamann [6] - 517:9,
602:21, 623:14,
642:24, 669:6,
675:15
KLAMANN [430] -
526:14, 527:3,
527:8, 527:20,
528:9, 536:12,
536:15, 537:1,
537:5, 537:17,
537:21, 537:22,
538:5, 538:8, 538:9,
541:22, 541:24,
542:4, 542:9,
542:24, 543:2,
543:22, 543:25,
544:1, 544:5, 544:9,
544:14, 544:16,
544:24, 545:2,
545:15, 545:24,
546:2, 546:4,
546:16, 546:20,
547:4, 547:14,
548:7, 548:17,
548:22, 548:24,
549:5, 550:1, 550:3,
550:4, 554:7, 555:6,
555:14, 557:8,
558:12, 572:24,
576:10, 576:13,
576:19, 577:11,
580:1, 580:4,
580:15, 580:17,
581:2, 581:5, 582:1,
582:3, 582:9,
582:12, 582:20,
582:22, 583:1,

583:2, 583:9, 583:11, 583:19, 583:20, 584:2, 584:4, 584:16, 584:18, 584:23, 585:1, 585:6, 585:7, 585:12, 585:13, 585:18, 585:20, 585:24, 586:1, 586:10, 586:14, 586:17, 587:11, 587:14, 587:18, 587:21, 587:25, 588:4, 588:16, 588:19, 589:15, 589:17, 589:21, 589:24, 590:10, 590:20, 590:22, 591:16, 591:19, 592:4, 592:6, 592:12, 592:14, 592:21, 592:23, 593:4, 593:6, 593:12, 593:14, 593:21, 593:23, 594:6, 594:7, 594:13, 594:15, 594:19, 594:23, 595:2, 595:4, 595:7, 595:8, 595:12, 595:14, 595:17, 595:19, 595:22, 596:5, 596:7, 596:10, 596:13, 596:19, 596:21, 597:14, 597:18, 597:25, 598:3, 598:7, 598:11, 599:21, 599:24, 600:4, 600:7, 600:9, 600:13, 600:16, 600:18, 600:22, 600:25, 601:2, 601:7, 601:10, 602:15, 602:22, 603:4, 603:6, 603:9, 603:12, 603:14, 603:19, 603:21, 603:24, 604:1, 604:8, 604:11, 604:17, 604:19, 604:23, 605:1, 605:4, 605:6, 605:12, 605:15, 606:5, 606:8, 606:11, 606:13, 606:24, 607:1, 607:11, 607:14, 607:18, 607:20, 607:25, 608:3, 608:5, 609:12,

609:15, 610:14, 610:17, 610:19, 611:1, 611:3, 611:8, 611:11, 611:15, 611:17, 612:1, 612:4, 612:8, 612:10, 612:18, 612:21, 613:7, 613:10, 613:12, 613:22, 613:25, 614:2, 614:12, 614:15, 614:17, 615:1, 615:4, 615:15, 615:17, 615:24, 616:1, 616:12, 616:16, 616:20, 616:22, 617:4, 617:6, 617:10, 617:13, 617:15, 617:22, 618:1, 618:2, 618:6, 618:9, 618:17, 618:20, 618:23, 618:24, 619:17, 619:19, 620:12, 620:19, 620:20, 621:7, 621:17, 621:20, 622:2, 622:12, 622:15, 622:16, 622:23, 623:15, 623:19, 624:3, 624:6, 624:7, 624:11, 624:13, 624:16, 624:19, 624:21, 625:6, 625:9, 625:20, 626:4, 626:8, 626:24, 627:3, 627:5, 627:11, 627:14, 627:16, 628:1, 628:4, 628:7, 628:9, 628:15, 628:18, 628:20, 629:9, 629:16, 629:20, 629:23, 630:1, 630:13, 630:16, 630:18, 630:23, 630:25, 631:3, 631:8, 631:9, 631:14, 631:17, 632:3, 632:5, 632:16, 632:22, 632:24, 633:11, 633:14, 633:16, 633:17, 634:12, 634:15, 634:16, 635:1, 635:5, 635:9, 635:16, 635:19, 635:22, 636:7, 636:10, 636:12, 636:15, 636:16,

636:23, 637:1, 637:8, 637:21, 638:1, 638:5, 638:9, 638:11, 638:18, 638:21, 639:6, 639:10, 639:16, 639:17, 639:24, 640:2, 640:10, 640:13, 640:18, 640:19, 641:4, 641:7, 641:12, 641:16, 641:17, 641:23, 642:1, 642:12, 642:15, 642:17, 642:25, 643:2, 643:5, 643:14, 643:16, 643:20, 643:24, 644:8, 644:11, 645:3, 645:6, 645:24, 646:1, 646:16, 646:18, 646:21, 646:23, 646:24, 647:5, 647:8, 647:9, 647:15, 647:18, 647:23, 648:1, 648:7, 648:9, 648:15, 648:17, 649:1, 649:3, 649:8, 649:12, 649:14, 649:25, 650:5, 650:7, 650:13, 650:15, 650:21, 650:24, 651:9, 651:11, 651:17, 651:19, 651:22, 651:24, 652:4, 652:5, 652:8, 652:10, 652:13, 652:14, 652:20, 652:22, 652:25, 653:1, 653:6, 653:7, 653:12, 653:14, 654:9, 654:11, 655:17, 658:11, 669:7, 669:9, 669:13, 669:15, 669:19, 670:7, 675:16, 675:24, 676:3, 677:11, 677:14, 678:25
**Klamann**.............. [1] - 516:9
**Klamann**............... [2] - 516:4, 516:7
**Klein** [71] - 516:22, 517:4, 517:18, 517:21, 550:13, 557:9, 557:10, 561:9, 562:9, 598:5,

599:5, 599:11, 619:5, 619:8, 619:21, 621:8, 621:22, 622:8, 622:9, 622:18, 623:4, 623:10, 673:10, 716:10, 718:11, 720:14, 720:18, 720:21, 720:25, 721:4, 721:23, 722:5, 723:10, 723:25, 724:11, 724:15, 724:17, 724:25, 725:10, 725:13, 725:18, 726:25, 727:5, 727:20, 729:4, 729:19, 730:22, 731:1, 731:17, 733:7, 733:17, 734:10, 735:7, 735:14, 736:21, 737:17, 737:18, 738:9, 738:12, 739:1, 739:14, 739:15, 741:8, 741:13, 741:20, 741:22, 742:20, 743:2, 743:6, 743:16, 744:12
**Klein's** [18] - 557:5, 561:23, 562:16, 619:9, 619:12, 620:22, 667:17, 721:3, 721:8, 724:2, 724:7, 734:18, 734:21, 734:25, 735:17, 736:3, 737:8, 737:11
**knocked** [2] - 521:15, 709:11
**knowing** [2] - 655:1, 703:3
**knowledge** [7] - 562:10, 566:12, 661:5, 703:5, 703:6, 704:20, 710:14
**known** [4] - 560:6, 686:22, 696:18, 718:5
**KY** [1] - 584:11
**Kyle** [1] - 517:10

# L

**Lab** [1] - 560:6
**lack** [7] - 520:4, 548:10, 599:3, 619:16, 620:25, 621:25, 637:12

**lacking** [1] - 599:7
**laid** [4] - 523:25, 599:4, 719:20, 722:21
**large** [2] - 683:12, 715:24
**larger** [3] - 522:10, 717:6, 727:23
**Larry** [1] - 527:25
**laser** [1] - 539:24
**laser-focused** [1] - 539:24
**last** [13] - 528:1, 552:10, 554:5, 562:24, 586:4, 587:23, 621:10, 641:8, 649:21, 660:24, 673:12, 676:13, 693:25
**lasted** [1] - 521:24
**lastly** [1] - 524:23
**late** [1] - 525:9
**latter** [2] - 578:18, 645:21
**Laura** [2] - 517:9, 699:15
**law** [12] - 519:24, 529:2, 602:6, 624:1, 634:20, 668:18, 668:25, 683:14, 684:6, 725:20, 739:2, 739:20
**lawmakers** [1] - 549:22
**lay** [6] - 527:5, 619:17, 622:7, 637:17, 638:3, 638:8
**lead** [3] - 689:4, 693:16, 716:16
**leading** [9] - 621:1, 622:21, 634:9, 645:1, 713:18, 721:1, 727:4, 727:15, 733:22
**leads** [3] - 552:16, 636:21, 673:21
**learn** [2] - 688:14, 689:11
**learned** [5] - 673:7, 690:19, 690:23, 691:8, 703:20
**learning** [1] - 693:20
**learns** [2] - 690:9, 690:15
**least** [16] - 530:15, 532:15, 545:18, 581:11, 589:11, 599:16, 651:8, 676:8, 677:22, 677:24, 689:6,

711:4, 719:9, 723:24, 742:1, 744:6
**leave** [4] - 606:11, 643:6, 676:20, 742:22
**leaving** [5] - 582:8, 585:17, 642:5, 661:15, 687:22
**left** [29] - 531:22, 536:2, 540:6, 540:7, 542:6, 543:7, 609:3, 609:16, 623:24, 629:11, 636:3, 642:22, 654:1, 676:21, 729:24, 730:19, 730:20, 730:23, 731:8, 731:14, 731:20, 733:8, 737:12, 738:17, 740:16, 741:4, 741:22, 742:10, 743:9
**left-hand** [6] - 543:7, 729:24, 731:8, 731:14, 733:8, 737:12
**left-hand-side** [1] - 731:20
**legal** [1] - 525:22
**lengthy** [1] - 565:23
**lens** [1] - 688:23
**less** [7] - 521:24, 682:13, 686:17, 687:14, 687:22, 697:14, 734:8
**level** [9] - 533:17, 533:19, 685:25, 700:11, 701:1, 743:17
**leverage** [1] - 539:12
**Lexington** [1] - 584:11
**lieutenant** [2] - 531:10, 531:11
**life** [3] - 533:4, 539:2
**light** [3] - 642:9, 642:20, 674:6
**lighting** [3] - 685:24, 700:13, 701:4
**likelihood** [1] - 696:12
**likely** [8] - 689:11, 692:13, 696:21, 697:13, 699:23, 700:1, 715:25, 744:12
**likeness** [2] - 717:19, 718:8
**lime** [1] - 530:1
**limine** [2] - 518:8, 518:15
**limited** [8] - 519:4,

522:4, 522:16, 671:19, 685:17, 687:13, 688:6, 689:24
**line** [31] - 530:25, 532:22, 534:11, 534:13, 535:14, 539:2, 547:20, 551:23, 552:10, 553:4, 560:17, 570:11, 570:14, 592:3, 609:7, 634:19, 634:23, 636:5, 636:6, 640:8, 642:3, 643:11, 697:5, 725:21, 727:3, 731:5, 731:6, 734:5, 734:6, 738:14, 742:21
**Line** [1] - 556:17
**lines** [1] - 532:4
**link** [8] - 518:22, 572:4, 574:5, 671:17, 671:18, 671:21, 674:2
**Linux** [2] - 560:17, 560:18
**list** [7] - 525:9, 525:11, 526:21, 671:14, 678:7, 698:13, 698:19
**listed** [6] - 522:3, 654:1, 657:20, 703:11, 703:13, 706:7
**listen** [3] - 620:8, 735:2, 735:16
**listened** [8] - 662:25, 663:23, 663:25, 664:19, 665:4, 734:16, 735:13, 735:20
**listener** [1] - 599:7
**listening** [2] - 663:25, 664:11
**listing** [1] - 568:12
**lists** [1] - 567:11
**live** [2] - 680:12, 680:13
**lived** [2] - 659:8, 660:7
**Lives** [2] - 556:18, 556:20
**living** [2] - 660:2, 680:15
**locate** [2] - 591:8, 595:9
**located** [4] - 632:13, 640:8, 643:12, 645:21
**location** [4] - 639:3,

660:2, 668:3, 737:1
**locations** [1] - 564:22
**lock** [1] - 551:14
**locked** [3] - 564:8, 564:9, 564:11
**lodge** [1] - 681:18
**log** [2] - 566:8, 567:10
**logs** [1] - 566:6
**long-sleeve** [1] - 639:22
**look** [25] - 522:18, 536:10, 541:22, 553:10, 563:20, 571:22, 580:16, 580:20, 585:6, 585:12, 585:21, 585:24, 586:4, 589:14, 591:12, 593:21, 594:6, 650:5, 656:18, 656:20, 667:6, 683:4, 683:7, 683:9, 728:9
**looked** [10] - 530:21, 531:1, 534:13, 569:21, 590:18, 633:2, 641:9, 658:4, 736:24, 742:4
**looking** [17] - 519:14, 519:25, 522:22, 531:25, 555:6, 581:10, 583:12, 614:7, 683:10, 724:22, 726:6, 726:20, 727:18, 728:6, 728:7, 728:25, 740:9
**lookout** [1] - 654:23
**looks** [11] - 540:12, 546:24, 556:16, 614:6, 636:21, 642:19, 642:21, 644:16, 666:24, 741:23, 745:6
**lose** [1] - 535:5
**loss** [1] - 687:8
**louder** [1] - 620:15
**love** [2] - 666:3, 666:5
**low** [2] - 674:4, 697:22
**lower** [11] - 524:3, 530:24, 532:3, 533:22, 543:13, 616:9, 618:15, 646:14, 683:17, 706:21, 721:17
**lunch** [6] - 576:3, 576:5, 601:14, 601:17, 670:7, 674:8
**lying** [2] - 697:1, 697:4

## M

**M-a-n-c-i-n-i** [2] - 559:9, 571:6
**M-a-n-z-i-n-i** [1] - 671:16
**ma'am** [9] - 558:25, 570:24, 572:4, 601:14, 636:9, 700:17, 702:3, 744:24, 745:1
**Mac** [2] - 560:16
**mace** [7] - 532:11, 532:16, 532:19, 534:3, 534:17, 539:21
**MAGA_CAVALRY** [1] - 586:25
**magic** [1] - 745:4
**magnified** [1] - 687:8
**maintain** [1] - 670:12
**maintaining** [1] - 534:25
**maintenance** [1] - 560:14
**majority** [1] - 718:4
**males** [1] - 535:22
**Man** [1] - 671:24
**man** [4] - 537:13, 588:6, 588:8, 622:24
**Mancini** [24] - 516:5, 558:20, 559:5, 559:8, 559:10, 565:11, 565:14, 566:2, 568:5, 569:9, 571:2, 571:3, 571:4, 572:21, 573:10, 576:4, 671:13, 672:1, 672:3, 674:3, 675:21, 676:14, 679:3
**Mancini's** [1] - 671:11
**manner** [1] - 673:21
**march** [1] - 603:1
**March** [2] - 671:1, 673:16
**Marina** [1] - 517:12
**Marine** [1] - 715:3
**mark** [1] - 698:2
**marked** [11] - 555:4, 561:14, 561:19, 563:11, 567:18, 568:17, 568:23, 569:1, 665:6, 698:4, 704:6
**marker** [1] - 553:21
**Mary** [2] - 527:24, 528:1
**mask** [11] - 633:24, 634:1, 634:6,

686:12, 706:23, 707:7, 729:10, 731:2, 739:15, 740:19
**masks** [2] - 739:13, 739:21
**mass** [2] - 727:4, 727:6
**master's** [1] - 681:5
**match** [2] - 569:16, 619:9
**matched** [2] - 567:15, 569:20
**matches** [1] - 567:9
**material** [6] - 573:17, 573:20, 574:17, 703:11, 703:13, 704:24
**materials** [8] - 671:5, 675:18, 681:12, 683:16, 683:18, 684:14, 684:15, 684:19
**math** [1] - 589:8
**mathematical** [1] - 567:2
**matter** [4] - 519:7, 538:22, 686:11, 727:9
**Matter** [2] - 556:18, 556:20
**matters** [1] - 547:18
**McCallum** [1] - 674:18
**mean** [24] - 532:13, 532:23, 538:22, 540:1, 547:24, 549:19, 569:18, 573:13, 575:25, 589:2, 654:21, 660:20, 662:19, 668:6, 675:17, 677:13, 677:17, 678:5, 694:25, 695:10, 695:11, 705:18, 716:15, 735:10
**means** [2] - 569:19, 741:12
**mechanically** [1] - 707:18
**media** [3] - 608:22, 689:13, 712:22
**meet** [5] - 523:22, 524:21, 584:9, 584:10, 594:12
**meetings** [1] - 679:18
**megaphone** [1] - 666:10
**member** [1] - 578:11
**members** [3] - 634:21,

766

723:9

**memories** [24] - 686:4,
689:3, 689:13,
689:14, 690:3,
690:24, 691:20,
695:1, 695:2,
695:23, 696:4,
696:7, 696:13,
697:8, 697:10,
697:17, 697:18,
697:22, 697:23,
709:25, 710:17,
710:20, 713:16
**memorized** [1] -
666:23
**memory** [99] - 524:19,
681:3, 681:4, 681:6,
681:23, 681:25,
682:1, 682:12,
682:16, 682:19,
682:22, 682:23,
682:25, 683:10,
683:12, 684:22,
684:25, 685:1,
685:3, 685:6, 685:7,
685:10, 685:11,
685:15, 686:2,
687:6, 687:10,
688:2, 688:10,
688:14, 688:17,
688:18, 689:2,
689:6, 689:7, 689:8,
689:9, 690:6, 690:8,
690:11, 691:3,
691:4, 691:6,
691:12, 691:14,
691:21, 691:22,
691:24, 692:6,
692:18, 693:5,
693:15, 693:17,
693:21, 693:25,
694:9, 694:10,
694:15, 694:24,
695:9, 695:13,
695:16, 695:17,
696:11, 696:17,
696:18, 696:19,
696:21, 697:2,
697:4, 697:5,
699:23, 700:1,
700:5, 702:22,
703:2, 703:6,
703:14, 703:20,
704:3, 704:18,
705:8, 707:13,
708:5, 708:9,
708:11, 708:14,
708:21, 708:23,
709:6, 710:21,
712:8, 713:13,
713:15

**mens** [4] - 518:23,
519:5, 519:12,
520:12
**mental** [4] - 519:10,
520:8, 521:19,
521:23
**mentioned** [12] -
531:3, 533:12,
562:18, 579:11,
684:1, 686:3,
687:12, 688:13,
689:23, 690:3,
692:16, 699:22
**mentioning** [1] - 690:4
**mentions** [1] - 615:9
**mere** [1] - 689:3
**merge** [1] - 718:7
**message** [68] -
574:11, 580:9,
581:6, 581:19,
581:24, 582:2,
582:4, 582:11,
582:13, 582:21,
583:1, 583:12,
583:13, 583:19,
583:21, 584:3,
584:5, 584:14,
584:15, 584:17,
584:25, 585:2,
585:6, 585:12,
585:14, 585:21,
586:2, 586:4, 586:5,
586:8, 586:21,
591:17, 591:20,
592:2, 592:5, 592:7,
592:13, 592:15,
592:22, 592:24,
593:5, 593:7,
593:21, 594:6,
594:8, 594:14,
594:16, 594:19,
648:2, 648:8,
648:10, 648:15,
648:18, 650:8,
650:14, 650:18,
650:19, 650:23,
650:25, 651:4,
651:10, 651:12,
651:22, 651:25,
652:13, 652:25,
657:16
**messages** [18] -
566:5, 566:6,
580:20, 580:21,
580:22, 580:24,
580:25, 591:13,
647:10, 647:20,
648:23, 670:10,
671:18, 671:19,
671:21, 671:23,

702:2
**messaging** [2] -
566:5, 572:10
**met** [3] - 701:23,
709:20, 739:11
**metadata** [1] - 568:12
**methodology** [2] -
523:19, 524:16
**methods** [1] - 524:21
**Metropolitan** [3] -
532:8, 557:16, 717:2
**microphone** [1] -
666:10
**middle** [13] - 537:18,
554:24, 556:13,
604:6, 610:2,
616:13, 633:18,
672:25, 673:15,
728:19, 740:9,
740:16, 741:4
**might** [4] - 536:3,
587:13, 602:15,
717:20
**Mike** [42] - 580:14,
581:25, 582:4,
582:23, 583:13,
583:21, 584:5,
584:13, 585:2,
585:21, 586:2,
586:22, 587:9,
588:8, 590:6,
591:13, 592:7,
592:15, 592:24,
593:7, 593:24,
594:8, 594:16,
598:16, 647:21,
648:22, 648:24,
650:9, 650:16,
650:18, 650:25,
651:12, 651:25,
652:6, 652:18,
653:2, 653:22,
656:16, 656:19,
657:12, 657:16
**Mike's** [1] - 586:5
**military** [4] - 652:12,
660:22, 661:6, 661:8
**mind** [10] - 519:18,
522:19, 522:23,
523:5, 523:11,
538:24, 549:6,
599:1, 599:10,
694:23
**mindset** [3] - 598:17,
598:18, 598:24
**mine** [1] - 540:8
**minimum** [1] - 567:12
**minus** [6] - 581:12,
581:15, 589:5,
589:7, 591:24, 596:4

**minute** [8] - 521:24,
547:16, 623:17,
624:4, 624:12,
624:17, 728:15,
729:11
**minutes** [41] - 536:14,
538:8, 546:18,
548:19, 548:23,
555:12, 557:20,
565:10, 565:19,
597:13, 624:20,
625:7, 625:10,
626:5, 626:9, 627:1,
627:4, 627:12,
627:15, 628:1,
628:3, 628:4, 628:8,
628:16, 628:18,
629:11, 629:18,
629:21, 629:24,
630:14, 630:16,
631:5, 635:3,
639:12, 639:25,
640:15, 663:21,
679:7, 706:13,
729:16
**misconstrues** [1] -
524:7
**misconstruing** [1] -
677:24
**misdemeanor** [2] -
518:2, 521:8
**misleading** [1] -
690:13
**missed** [3] - 564:18,
575:16, 606:8
**mistake** [5] - 692:5,
692:6, 692:7, 707:9
**mistaken** [4] - 551:4,
686:18, 687:17,
697:2
**mistakenly** [1] - 692:6
**mistakes** [2] - 687:24,
691:6
**mistrial** [8] - 670:23,
670:24, 674:19,
675:1, 675:11,
675:12, 678:21
**misunderstanding** [1]
- 598:8
**mobile** [1] - 724:7
**mode** [1] - 521:21
**model** [8] - 563:20,
568:13, 571:15,
571:16, 571:17,
571:22, 571:23,
571:24
**modified** [1] - 526:21
**moment** [18] - 521:12,
522:3, 527:11,
548:5, 550:1,

553:25, 555:19,
570:19, 573:6,
597:5, 620:11,
654:9, 667:9,
676:12, 692:24,
694:5, 694:16,
711:18
**moments** [1] - 598:14
**Monday** [2] - 584:10,
671:12
**monitoring** [1] -
691:10
**month** [2] - 581:15,
581:18
**months** [1] - 528:17
**Moore** [31] - 516:4,
526:14, 526:15,
527:24, 528:1,
528:10, 529:3,
533:11, 535:13,
536:16, 537:2,
537:6, 537:23,
538:10, 541:25,
542:5, 542:10,
543:3, 544:2, 544:6,
544:17, 545:3,
546:5, 546:21,
548:18, 548:25,
549:6, 550:5,
550:10, 557:12
**morning** [28] - 517:7,
517:11, 517:12,
517:15, 517:16,
517:17, 517:20,
517:21, 527:10,
527:21, 527:22,
529:19, 530:15,
531:4, 550:10,
550:11, 558:25,
559:5, 565:21,
570:24, 570:25,
577:12, 577:13,
584:11, 591:10,
670:9, 676:18, 679:2
**Morris** [4] - 516:4,
526:14, 527:24,
558:13
**most** [5] - 533:23,
535:2, 535:3,
629:14, 682:20
**motion** [4] - 523:14,
602:10, 673:11,
677:8
**motions** [2] - 518:7,
518:15
**mountains** [1] -
540:11
**mounted** [1] - 721:17
**mouse** [1] - 728:23
**mouth** [8] - 540:13,

633:1, 645:23, 646:20, 734:18, 734:21, 734:25, 737:9
**Move** [1] - 732:6
**move** [41] - 533:10, 533:19, 536:14, 540:3, 540:11, 542:25, 546:17, 549:9, 552:23, 557:4, 565:3, 569:3, 573:13, 586:12, 595:3, 597:15, 621:12, 632:18, 633:12, 635:2, 637:2, 639:10, 639:11, 640:14, 641:13, 646:16, 647:8, 647:23, 648:15, 650:2, 651:9, 670:25, 682:7, 693:24, 694:19, 698:22, 716:19, 719:15, 728:23, 745:8
**moved** [3] - 551:11, 673:6, 728:4
**moves** [6] - 518:17, 548:7, 639:6, 722:14, 743:3
**movie** [4] - 532:25, 533:3
**moving** [9] - 535:15, 574:23, 643:9, 643:10, 643:11, 734:18, 734:22, 735:1, 737:9
**MPD** [1] - 531:2
**multiple** [17] - 553:7, 554:1, 686:23, 687:16, 696:15, 696:16, 696:17, 696:22, 696:23, 704:21, 710:24, 711:15, 711:16, 711:17, 712:22, 716:25, 744:16
**Murphy** [2] - 634:4, 634:7
**must** [1] - 524:9

**N**

**name** [23] - 527:23, 527:24, 528:1, 530:2, 550:12, 559:6, 559:8, 568:13, 571:1, 571:23, 572:13, 572:14, 575:12, 577:14, 608:14,

671:11, 671:14, 671:15, 680:9, 680:11, 706:4, 714:14, 714:16
**named** [2] - 578:21, 716:10
**narrow** [1] - 682:5
**narrowing** [2] - 695:16, 695:17
**natural** [1] - 697:4
**nature** [1] - 742:1
**near** [2] - 537:2, 537:18
**nearing** [1] - 630:25
**necessarily** [1] - 689:8
**necessary** [1] - 670:18
**need** [14] - 555:16, 576:6, 584:9, 621:9, 625:22, 634:11, 643:20, 678:4, 679:14, 729:13, 732:7, 733:1, 736:14, 737:5
**needed** [1] - 531:9
**needing** [1] - 622:4
**needs** [4] - 523:22, 638:3, 672:6, 673:25
**negate** [2] - 519:12, 519:17
**negating** [1] - 520:11
**negative** [1] - 691:17
**negligence** [1] - 674:15
**never** [2] - 701:9, 702:14
**news** [3] - 652:16, 692:17, 693:9
**next** [51] - 523:14, 524:15, 526:12, 533:17, 533:19, 540:24, 547:5, 558:19, 572:23, 576:2, 576:8, 582:1, 582:9, 582:20, 583:1, 584:16, 585:6, 585:12, 585:24, 586:2, 592:4, 592:21, 593:4, 593:21, 594:6, 594:19, 601:25, 643:25, 648:7, 648:15, 650:13, 650:18, 650:19, 650:21, 651:9, 651:17, 651:22, 652:8, 652:13, 652:20, 652:25, 653:6, 679:17, 679:20, 692:17, 720:4,

733:19, 741:9, 741:20, 742:20
**night** [2] - 549:25, 676:13
**noise** [1] - 625:15
**nomenclature** [1] - 718:7
**non-2021** [1] - 715:21
**none** [3] - 575:10, 675:8, 702:10
**nonetheless** [1] - 678:6
**noon** [1] - 565:15
**normally** [1] - 533:24
**North** [1] - 675:7
**north** [9] - 536:5, 549:13, 549:14, 549:15, 549:16, 549:17, 550:17, 550:19, 551:1
**northern** [1] - 619:8
**notation** [2] - 660:23, 660:25
**note** [6] - 519:1, 521:9, 522:14, 523:25, 677:17, 744:18
**noted** [1] - 668:20
**notes** [3] - 520:13, 631:1, 677:18
**nothing** [5] - 532:9, 570:4, 570:20, 574:17, 745:21
**notice** [11] - 518:6, 522:1, 522:15, 522:21, 683:19, 694:12, 695:12, 697:25, 698:5, 698:17, 698:24
**notification** [1] - 525:7
**notified** [1] - 524:24
**notify** [1] - 695:8
**number** [32] - 542:6, 562:2, 562:3, 562:6, 562:7, 562:8, 562:13, 563:20, 568:14, 571:12, 571:13, 571:14, 571:15, 571:16, 571:17, 571:23, 571:24, 627:6, 654:25, 655:2, 668:20, 683:13, 715:24, 718:7, 718:9, 718:12, 735:15
**numbers** [5] - 571:22, 632:17, 704:7, 713:2
**numerous** [3] - 719:4, 723:9, 723:15

**O**

**o'clock** [1] - 549:25
**oath** [2] - 565:15, 602:19
**Oath** [5] - 527:14, 558:22, 577:7, 680:2, 714:7
**object** [12] - 522:20, 527:4, 556:6, 576:25, 598:20, 598:22, 623:9, 637:11, 637:12, 698:20, 723:13, 725:4
**objected** [2] - 744:19, 744:20
**objecting** [1] - 598:25
**objection** [61] - 526:22, 545:13, 545:14, 548:10, 548:14, 549:3, 555:14, 557:7, 557:9, 565:5, 565:6, 565:7, 569:5, 569:6, 576:20, 576:24, 590:8, 599:3, 599:9, 619:14, 620:11, 620:24, 621:3, 621:12, 621:25, 622:6, 622:11, 623:13, 625:14, 625:18, 626:14, 626:15, 626:17, 637:3, 637:15, 639:8, 645:1, 655:17, 656:5, 658:11, 681:19, 692:21, 693:11, 694:4, 694:7, 694:19, 695:4, 695:24, 699:7, 713:18, 719:22, 722:18, 723:3, 726:24, 727:1, 727:15, 732:9, 732:23, 733:22, 739:23, 741:11
**objections** [3] - 548:13, 576:23, 599:18
**objects** [1] - 524:6
**obligated** [2] - 574:20, 574:21
**obligations** [2] - 575:4, 678:13
**obscured** [1] - 644:23
**observations** [1] - 735:25
**observed** [1] - 701:19

**obstruction** [4] - 521:11, 522:4, 597:19, 700:13
**obstructions** [1] - 685:23
**obtain** [1] - 717:5
**obtained** [2] - 717:5, 735:13
**obviously** [3] - 525:9, 626:19, 732:21
**occasion** [1] - 619:21
**occasions** [1] - 531:14
**occur** [2] - 693:18, 715:17
**occurred** [3] - 672:24, 715:25, 735:9
**occurring** [1] - 686:1
**occurs** [2] - 675:10, 692:10
**ocean** [4] - 527:24, 527:25, 528:1
**October** [1] - 698:18
**offense** [1] - 519:19
**offenses** [1] - 520:15
**offer** [2] - 710:9, 712:4
**offered** [3] - 518:23, 710:19, 713:14
**offering** [4] - 523:23, 709:24, 710:11, 710:17
**offhand** [1] - 706:7
**Office** [7] - 531:6, 578:2, 578:4, 578:8, 579:9, 677:15, 715:5
**office** [5] - 531:14, 577:24, 578:1, 683:13, 715:4
**Officer** [72] - 519:8, 520:16, 522:6, 522:24, 523:20, 523:23, 524:2, 524:10, 536:7, 536:16, 537:2, 537:6, 537:23, 541:25, 542:5, 542:10, 543:3, 544:2, 544:6, 544:17, 545:3, 546:5, 546:21, 548:18, 548:25, 549:6, 550:5, 550:10, 553:2, 557:12, 557:15, 558:1, 683:15, 683:20, 684:17, 700:18, 700:23, 701:9, 701:22, 702:7, 702:12, 702:25, 703:3,

768

703:6, 704:20,
704:24, 705:3,
705:4, 705:19,
706:2, 706:4, 706:9,
706:18, 706:22,
707:6, 709:4, 709:8,
709:10, 709:21,
710:2, 710:5, 710:7,
710:8, 710:10,
710:14, 710:18,
710:21, 712:15,
712:17, 713:6,
736:23, 742:5
**officer** [21] - 519:24,
520:15, 528:4,
528:7, 537:2, 539:1,
542:5, 544:6,
554:20, 555:21,
557:12, 558:9,
578:16, 578:19,
636:21, 654:22,
687:4, 717:10,
732:6, 732:14
**officer's** [2] - 707:3,
733:3
**officer-involved** [1] -
687:4
**officers** [40] - 519:13,
521:23, 521:25,
529:10, 530:10,
530:13, 530:14,
531:8, 532:18,
533:6, 533:23,
534:15, 534:16,
534:21, 534:25,
539:5, 540:7, 546:8,
547:19, 549:18,
554:4, 609:7, 609:8,
609:11, 614:25,
644:3, 657:6,
668:18, 684:6,
687:3, 706:6,
715:21, 715:25,
717:7, 725:20,
727:24, 731:18,
733:20, 739:10,
742:25
**officers'** [1] - 706:3
**official** [2] - 521:11,
598:12
**old** [1] - 551:17
**on-ramp** [1] - 590:18
**once** [9] - 530:18,
545:20, 549:16,
549:17, 567:8,
629:9, 631:19,
659:1, 689:2
**one** [58] - 518:16,
521:22, 534:9,
535:22, 535:23,

535:24, 536:1,
539:17, 540:20,
540:25, 546:23,
550:1, 562:23,
567:9, 567:24,
569:17, 573:6,
574:2, 589:11,
592:1, 598:9,
599:25, 600:10,
601:3, 606:9,
618:20, 619:17,
629:15, 635:6,
638:13, 641:11,
653:8, 654:9, 659:3,
664:8, 665:14,
666:9, 687:18,
691:24, 692:8,
694:5, 700:15,
708:18, 708:23,
711:4, 715:21,
718:22, 721:7,
726:20, 730:10,
731:24, 735:6,
742:25, 744:2,
744:19
**one's** [4] - 520:5,
691:18, 708:8
**one-off** [1] - 715:21
**one-on-one** [1] -
539:17
**online** [1] - 684:3
**open** [4] - 561:15,
562:8, 712:22, 717:1
**open-source** [2] -
712:22, 717:1
**opened** [1] - 562:23
**opens** [1] - 636:21
**operate** [2] - 566:9,
689:2
**operating** [1] - 566:7
**operations** [1] - 561:3
**opine** [1] - 695:8,
706:13, 709:15
**opined** [1] - 699:4
**opining** [3] - 701:17,
710:3, 713:9
**opinion** [14] - 518:6,
520:1, 523:23,
630:10, 683:10,
694:13, 702:21,
702:22, 702:24,
702:25, 703:1,
703:2, 710:20, 737:6
**opinions** [19] - 524:6,
524:19, 680:18,
697:24, 701:20,
702:18, 709:24,
710:6, 710:8, 710:9,
710:11, 710:17,
710:19, 710:24,

711:1, 711:2, 712:4,
713:14
**opportunity** [1] -
561:3, 734:10
**opposed** [2] - 574:23,
693:20
**opting** [1] - 676:11
**orange** [1] - 644:3
**orchestrated** [2] -
676:12, 676:23
**order** [6] - 675:11,
677:9, 678:13,
678:22, 679:10,
718:5
**orders** [1] - 547:19
**orient** [2] - 727:18,
743:5
**orientation** [1] -
740:15
**original** [2] - 569:17,
691:21
**originally** [4] - 525:4,
529:19, 578:25,
579:11
**ornate** [1] - 551:17
**otherwise** [2] -
525:13, 575:20
**ourselves** [2] -
727:18, 737:16
**outcome** [1] - 708:23
**outdoors** [1] - 668:2
**outfit** [1] - 529:8
**outnumbered** [1] -
532:23
**output** [2] - 567:3,
567:5
**outside** [9] - 522:21,
529:15, 545:7,
550:24, 551:6,
625:2, 692:21,
694:18, 695:5
**outstretched** [1] -
633:1
**overall** [1] - 563:22
**overhead** [1] - 625:2
**overlooking** [2] -
614:9
**overnight** [1] - 743:25
**overpowered** [2] -
533:16, 533:18
**overrule** [4] - 621:2,
625:18, 637:14,
693:10
**overruled** [3] - 549:4,
555:17, 622:1
**overruling** [7] -
599:18, 622:11,
623:13, 626:16,
695:24, 727:15,
732:23

**overstate** [1] - 672:11
**overview** [2] - 684:25,
694:14
**own** [13] - 534:23,
539:4, 547:18,
684:11, 688:4,
690:10, 691:18,
697:7, 697:10,
697:17, 732:13,
732:22

## P

**p.m** [30] - 543:9,
588:25, 596:3,
597:2, 603:23,
604:16, 605:11,
606:19, 610:25,
613:18, 615:23,
617:3, 617:21,
632:11, 632:19,
646:7, 647:13,
648:3, 648:19,
649:20, 651:3,
666:21, 706:19,
725:23, 730:3,
738:2, 738:18,
738:23, 745:23
**page** [29] - 518:25,
521:13, 524:20,
568:3, 568:11,
581:2, 582:10,
582:11, 583:9,
584:2, 584:23,
584:24, 585:18,
586:4, 591:16,
591:17, 592:12,
593:12, 594:13,
647:23, 648:8,
650:1, 650:6,
650:21, 651:17,
652:8, 652:20, 653:6
**PAGE** [1] - 516:2
**pages** [2] - 519:16,
520:1
**paid** [1] - 665:3
**pain** [3] - 688:7,
706:24
**pan** [1] - 588:6
**panned** [1] - 614:5
**pants** [1] - 529:9
**paralegal** [2] - 517:10,
517:14
**pardon** [1] - 699:1
**parked** [1] - 668:3
**parking** [1] - 661:16
**parse** [1] - 567:25
**part** [34] - 535:2,
535:3, 549:24,
578:18, 579:18,

590:17, 597:19,
630:9, 631:24,
632:12, 656:21,
662:24, 663:20,
664:3, 664:5,
664:20, 693:19,
696:22, 712:11,
713:1, 715:15,
716:8, 718:1,
721:19, 722:9,
723:10, 723:23,
725:9, 726:2,
727:22, 734:9,
735:21, 743:15
**partial** [1] - 564:18
**partially** [4] - 696:4,
696:5, 696:8
**participate** [3] - 551:8,
561:2, 724:10
**participation** [1] -
633:4
**particular** [21] - 552:1,
553:25, 572:8,
577:24, 578:20,
637:19, 655:15,
657:19, 661:1,
661:8, 662:14,
664:9, 671:9,
680:20, 710:7,
715:4, 715:6, 716:8,
716:13, 741:9,
744:16
**particularly** [3] -
671:23, 675:21,
686:15
**parties** [2] - 521:3,
720:9
**partners** [1] - 735:6
**parts** [4] - 546:14,
661:11, 668:23,
701:4
**party** [2] - 566:5,
721:7
**pass** [4] - 667:12,
674:7, 711:20,
713:20
**passage** [1] - 689:4
**passed** [4] - 553:18,
625:2, 627:21, 629:2
**past** [3] - 531:10,
702:17, 702:20
**path** [1] - 531:20
**Patriot** [1] - 587:2
**patriots** [1] - 621:10
**patterned** [1] - 628:14
**Paul** [1] - 528:1
**Pause** [1] - 608:1
**pause** [32] - 543:25,
548:22, 555:19,
556:3, 556:10,

612:1, 612:19, 613:25, 614:15, 620:19, 622:15, 624:6, 627:3, 627:14, 628:7, 629:23, 631:5, 631:8, 632:20, 632:22, 633:16, 635:5, 635:21, 636:15, 639:14, 640:18, 641:16, 642:15, 646:23, 647:8, 665:9, 743:13
**paused** [2] - 612:8, 612:23
**pausing** [19] - 538:8, 544:14, 546:2, 548:23, 607:18, 608:3, 611:15, 614:16, 622:17, 624:19, 625:10, 626:9, 627:4, 627:15, 628:8, 628:18, 629:24, 630:16, 642:15
**pay** [1] - 582:24
**paying** [2] - 664:1, 664:9
**PDF** [1] - 568:1
**peer** [1] - 681:13
**Pence** [1] - 598:16
**pencil** [1] - 728:25
**pencil-looking** [1] - 728:25
**people** [42] - 528:25, 529:11, 533:1, 540:19, 542:20, 552:10, 554:15, 608:23, 609:1, 609:20, 609:22, 610:7, 614:19, 614:23, 621:9, 622:4, 626:17, 657:4, 657:18, 665:11, 665:16, 682:24, 686:14, 687:2, 687:25, 688:3, 689:12, 690:5, 697:4, 697:9, 697:21, 713:16, 716:20, 718:2, 723:14, 727:4, 727:6, 727:25, 736:13, 739:20, 739:21
**people's** [2] - 697:16, 697:17
**per** [3] - 539:19, 708:5, 710:21
**perceived** [2] - 685:4,

685:6
**percent** [4] - 564:17, 699:25, 700:2, 713:17
**perception** [1] - 685:3
**perceptual** [2] - 687:3, 687:5
**perfect** [6] - 588:18, 618:1, 620:12, 633:14, 697:20, 705:8
**performed** [2] - 564:15, 569:15
**performing** [1] - 716:18
**perhaps** [1] - 576:4
**period** [4] - 518:13, 523:11, 552:3, 688:25
**perpetrator** [1] - 687:18
**perpetrator's** [1] - 687:22
**perpetrators** [1] - 687:17
**person** [38] - 523:20, 541:8, 541:10, 541:18, 558:1, 580:13, 588:5, 619:2, 619:10, 639:19, 640:4, 655:1, 655:10, 658:8, 686:5, 686:13, 690:5, 691:5, 691:9, 694:22, 701:23, 717:9, 717:12, 717:13, 718:24, 718:25, 720:19, 726:17, 728:4, 728:19, 733:18, 734:1, 735:25, 740:16, 740:17, 740:19, 742:21
**personal** [1] - 724:13
**personally** [4] - 638:4, 693:20, 723:9, 723:25
**perspective** [1] - 682:17
**persuaded** [1] - 523:18
**pertain** [1] - 655:16
**pertaining** [1] - 668:23
**pertains** [3] - 518:9, 518:11, 677:11
**pertinent** [3] - 629:14, 703:21, 703:23
**phenomenon** [2] - 691:5, 692:11

**Phoenix** [2] - 679:16, 680:13
**phone** [122] - 521:15, 560:17, 561:9, 561:20, 561:23, 562:16, 562:19, 562:20, 563:9, 563:14, 563:15, 563:19, 563:22, 564:4, 564:5, 564:7, 564:8, 564:9, 564:11, 564:17, 564:24, 564:25, 565:4, 566:8, 566:13, 566:19, 566:20, 568:13, 568:14, 569:1, 569:25, 570:1, 570:5, 570:6, 570:7, 570:8, 571:9, 571:12, 571:18, 574:12, 579:17, 579:21, 579:25, 580:6, 580:12, 580:14, 580:22, 582:14, 583:4, 586:19, 587:8, 587:16, 589:11, 589:19, 591:5, 591:21, 595:9, 595:15, 596:8, 597:5, 597:25, 601:12, 602:24, 603:1, 603:7, 604:3, 604:21, 605:17, 606:21, 607:2, 611:5, 613:20, 616:3, 618:4, 633:2, 633:5, 635:15, 638:13, 639:1, 639:4, 639:23, 640:22, 640:24, 641:9, 641:22, 642:19, 643:13, 643:18, 645:21, 647:11, 647:21, 648:3, 648:6, 649:5, 649:22, 653:16, 654:1, 656:13, 656:17, 658:5, 659:3, 662:1, 663:4, 663:7, 663:10, 664:24, 667:1, 669:10, 669:17, 672:5, 672:9, 672:13, 672:24, 673:7, 676:4, 676:5, 676:10, 676:15, 702:4, 735:22, 736:2
**phones** [3] - 560:17, 561:2, 571:21

**photo** [10] - 586:21, 604:2, 606:3, 651:7, 667:1, 667:7, 721:13, 722:20, 722:25, 727:13
**photograph** [4] - 604:6, 604:13, 604:15, 669:16
**photographic** [1] - 705:14
**photographs** [2] - 606:20, 705:12
**photos** [5] - 601:12, 602:25, 705:3, 705:18, 705:21
**phrase** [2] - 660:21, 669:11
**physical** [9] - 518:1, 521:6, 563:18, 563:22, 570:1, 570:7, 672:4, 687:23, 724:14
**physically** [2] - 667:25, 717:17
**pick** [5] - 585:23, 586:6, 656:8, 704:9, 728:3
**Picture** [1] - 656:9
**picture** [9] - 566:4, 655:1, 656:19, 656:23, 656:25, 666:20, 666:25, 667:2, 719:9
**pictures** [2] - 657:1, 657:2
**place** [6] - 549:8, 549:9, 549:10, 550:22, 636:4, 668:9
**placed** [1] - 668:1
**places** [2] - 676:5, 677:3
**plan** [1] - 601:15
**planned** [1] - 519:22
**plans** [2] - 518:9, 518:11
**platforms** [1] - 717:1
**play** [90] - 537:6, 538:5, 543:22, 547:15, 548:18, 552:24, 555:12, 556:1, 556:8, 557:19, 587:18, 587:23, 588:1, 589:21, 595:17, 596:10, 599:18, 600:4, 600:13, 600:22, 601:7, 603:9, 604:23, 605:1, 606:5, 606:9, 607:11, 609:12,

610:14, 611:8, 612:1, 612:18, 613:7, 613:22, 614:12, 616:17, 617:10, 617:23, 618:6, 618:20, 623:16, 624:3, 626:6, 627:24, 628:5, 629:12, 630:13, 631:4, 631:14, 632:19, 633:11, 633:14, 635:3, 635:6, 635:16, 636:12, 638:18, 639:13, 639:24, 640:10, 640:15, 641:4, 641:14, 641:23, 643:21, 645:3, 646:21, 647:5, 649:9, 661:19, 665:6, 665:7, 674:14, 726:10, 728:12, 729:11, 729:15, 730:7, 730:10, 731:9, 733:10, 736:6, 738:4, 738:5, 738:17, 738:18, 740:1, 740:10, 743:5, 743:11
**played** [112] - 538:7, 543:24, 544:13, 545:1, 546:1, 548:21, 552:25, 554:13, 555:7, 555:18, 556:2, 556:9, 557:21, 558:5, 587:20, 588:2, 589:23, 595:18, 596:12, 600:6, 600:15, 600:24, 601:9, 603:11, 604:25, 605:3, 605:14, 606:7, 606:10, 607:13, 608:2, 609:14, 610:16, 611:10, 612:3, 612:20, 613:9, 613:24, 614:14, 615:3, 616:19, 617:12, 617:25, 618:8, 618:19, 618:22, 620:18, 622:14, 623:18, 624:5, 624:18, 625:8, 626:7, 627:2, 627:13, 628:6, 628:17, 629:9, 629:19, 629:22,

630:15, 631:7, 631:16, 632:21, 633:13, 633:15, 634:14, 635:4, 635:8, 635:18, 636:14, 636:25, 638:20, 639:15, 640:1, 640:12, 640:17, 641:6, 641:15, 641:25, 642:14, 643:4, 643:23, 644:10, 645:5, 646:22, 647:7, 649:11, 661:21, 663:14, 665:8, 665:20, 666:14, 668:8, 726:13, 728:13, 728:16, 729:17, 730:5, 730:9, 730:11, 731:11, 732:1, 733:11, 736:7, 738:6, 738:20, 740:3, 740:12, 740:22, 741:1, 743:12

**playing** [26] - 538:17, 544:11, 544:24, 545:24, 553:23, 558:3, 607:25, 615:2, 618:17, 622:12, 624:16, 625:6, 626:4, 626:25, 627:11, 628:16, 629:17, 629:21, 634:13, 636:23, 642:13, 643:3, 644:8, 665:19, 740:21, 740:24

**plaza** [4] - 533:12, 607:9, 614:10, 726:9

**plus** [6] - 539:19, 539:20, 588:25, 589:1, 596:3

**point** [44] - 517:23, 523:7, 525:22, 530:18, 533:12, 535:13, 537:7, 538:24, 546:5, 546:8, 547:8, 551:20, 553:8, 555:2, 575:15, 575:20, 590:17, 597:14, 599:11, 599:15, 608:16, 629:8, 644:5, 664:9, 678:18, 681:2, 682:2, 687:19, 718:3, 719:12, 729:9, 729:19,

731:1, 734:7, 737:7, 738:13, 738:18, 739:3, 739:15, 739:16, 741:21, 744:9, 744:12

**points** [4] - 549:14, 587:5, 692:1, 719:8

**poles** [1] - 532:13

**police** [38] - 528:3, 528:6, 529:10, 533:6, 534:10, 534:13, 534:21, 537:2, 539:1, 544:6, 547:19, 553:4, 609:7, 609:8, 614:25, 634:19, 634:22, 636:6, 640:8, 642:3, 643:11, 644:3, 644:16, 657:6, 677:17, 677:18, 677:19, 684:6, 725:21, 731:4, 731:6, 731:18, 733:19, 734:5, 734:6, 735:7, 738:14, 742:21

**Police** [11] - 528:15, 528:20, 528:24, 529:4, 530:7, 530:10, 532:10, 557:16, 625:1, 628:12, 717:2

**Police-branded** [1] - 625:1

**policies** [1] - 570:11

**portfolio** [1] - 715:22

**portion** [15] - 587:3, 610:1, 611:23, 614:7, 614:18, 620:8, 627:7, 627:18, 630:8, 631:24, 644:19, 662:7, 665:24, 668:23, 716:2

**portions** [5] - 597:6, 597:9, 629:11, 663:6, 665:2

**ports** [1] - 594:12

**position** [12] - 528:20, 528:23, 560:20, 574:25, 577:20, 614:6, 670:12, 670:22, 671:5, 672:11, 674:10, 714:21

**positive** [2] - 691:17, 691:18

**possessed** [1] - 717:14

**possessing** [1] - 537:14

**possession** [3] - 537:9, 563:5, 672:4

**possibly** [9] - 524:8, 534:7, 540:19, 540:21, 541:1, 549:9, 549:23, 703:19, 720:13

**post** [4] - 567:7, 567:13, 567:16, 690:13

**post-event** [1] - 690:13

**post-examination** [2] - 567:7, 567:13

**posted** [3] - 657:3, 717:1, 717:17

**poster** [1] - 651:8

**posters** [1] - 717:15

**posture** [1] - 668:4

**potential** [4] - 579:10, 673:5, 691:17

**potentially** [3] - 599:9, 672:23, 673:10

**potties** [1] - 594:12

**poured** [2] - 622:25, 629:5

**powered** [2] - 563:21, 570:8

**pre** [2] - 567:7, 567:15

**pre-examination** [2] - 567:7, 567:15

**precedent** [1] - 524:10

**precisely** [1] - 691:25

**predict** [1] - 533:4

**predicted** [1] - 533:3

**preferences** [1] - 564:23

**preliminary** [1] - 568:15

**premature** [2] - 575:22, 575:24

**preparation** [7] - 536:16, 568:7, 597:10, 600:11, 600:20, 601:5, 662:24

**prepare** [2] - 732:12, 732:13

**prerequisites** [1] - 525:14

**presence** [4] - 668:7, 687:16, 723:11, 724:2

**present** [13] - 517:18, 579:9, 619:8, 619:20, 659:18, 668:15, 668:19, 669:1, 669:3,

684:17, 687:20, 687:24, 701:17

**presentation** [1] - 683:16

**presented** [1] - 664:5

**presenting** [1] - 679:20

**preservation** [1] - 561:1

**President** [19] - 534:1, 576:21, 577:1, 596:18, 597:7, 598:13, 598:14, 598:16, 600:1, 600:19, 601:4, 661:24, 662:12, 662:14, 662:25, 664:10, 665:2

**President's** [1] - 662:10

**pressed** [1] - 564:5

**presumably** [2] - 522:9, 674:21

**pretty** [6] - 524:12, 677:5, 682:7, 699:5, 704:3, 735:22

**previous** [7] - 543:20, 548:3, 556:24, 586:22, 608:10, 611:20, 618:14

**prima** [1] - 520:12

**primacy** [1] - 716:1

**primary** [4] - 523:18, 716:22, 737:13, 742:17

**prime** [1] - 691:19

**principal** [2] - 520:21, 534:9

**principal-only** [1] - 520:21

**principle** [1] - 691:16

**principles** [1] - 691:15

**priority** [1] - 657:5

**private** [1] - 528:22

**privilege** [1] - 672:11

**problem** [3] - 525:8, 589:9, 737:22

**procedure** [1] - 564:3

**procedures** [6] - 563:19, 563:23, 564:2, 567:6, 570:12

**proceed** [4] - 565:17, 576:2, 626:23, 679:10

**proceeded** [1] - 540:18

**proceeding** [2] - 521:11, 598:12

**Proceedings** [1] - 745:23

**process** [7] - 685:1, 694:24, 696:18, 697:4, 717:10, 718:1, 720:11

**produce** [8] - 574:20, 574:21, 671:13, 671:17, 673:18, 673:19, 677:9, 732:21

**produced** [7] - 573:21, 673:19, 673:20, 674:1, 674:8, 676:7, 677:1

**product** [1] - 524:16

**productions** [2] - 712:23, 713:1

**professional** [1] - 704:2

**professor** [1] - 680:16

**program** [1] - 681:5

**progress** [1] - 567:10

**progressed** [1] - 717:7

**prohibits** [1] - 520:3

**projectiles** [1] - 532:12

**prong** [2] - 525:25, 526:4

**proper** [5] - 575:5, 623:11, 719:19, 722:19, 727:3

**properly** [2] - 522:20, 525:6

**proposed** [1] - 675:8

**proprietary** [1] - 571:24

**prosecution** [2] - 579:10, 664:22

**prosecutor** [1] - 573:3

**protect** [3] - 528:24, 531:2, 549:22

**protected** [1] - 532:15

**protesters** [1] - 531:1

**prove** [1] - 744:23

**proves** [1] - 744:21

**provide** [9] - 573:14, 573:23, 575:16, 670:8, 671:3, 678:13, 678:20, 679:1, 704:12

**provided** [17] - 518:6, 560:9, 560:15, 561:3, 569:23, 570:3, 575:2, 575:7, 670:11, 671:2, 683:13, 704:20, 705:15, 705:21, 706:2, 717:2, 720:16

**provides** [3] - 560:10, 674:24, 693:16

**providing** [4] - 525:9,

575:1, 678:8, 708:19
**proving** [1] - 599:12
**proximity** [2] - 734:6,
739:2
**psychiatric** [3] -
518:22, 519:17,
520:7
**psychological** [8] -
682:16, 684:20,
690:12, 691:15,
691:20, 708:19,
709:24, 710:4
**psychologically** [2] -
702:23, 703:4
**psychologists** [1] -
682:18
**psychology** [8] -
524:19, 680:20,
680:22, 680:23,
680:24, 691:4
**PTSD** [5] - 518:12,
519:5, 519:9,
519:23, 522:18
**public** [10] - 634:21,
655:7, 655:10,
657:4, 657:8, 658:4,
717:11, 717:24,
719:5, 723:9
**publications** [2] -
682:22
**publish** [1] - 717:22
**published** [3] -
681:10, 681:12,
720:5
**pull** [63] - 536:12,
540:18, 542:24,
545:16, 546:16,
580:1, 582:11,
586:15, 587:11,
589:15, 590:20,
595:19, 596:5,
596:19, 599:22,
600:7, 600:16,
600:25, 603:4,
603:12, 603:24,
604:8, 604:17,
605:4, 605:12,
606:12, 606:24,
610:17, 611:1,
613:10, 615:15,
615:24, 616:20,
617:4, 617:13,
617:22, 632:3,
632:16, 635:1,
640:13, 641:12,
643:14, 645:24,
647:15, 647:17,
649:1, 649:12,
649:25, 650:23,
653:12, 656:8,

669:13, 704:10,
718:16, 721:6,
721:24, 725:22,
731:7, 733:9,
738:16, 740:6,
742:8, 743:19
**pulled** [9] - 536:7,
545:6, 545:20,
546:25, 548:1,
554:15, 557:13,
557:16, 567:18
**pulling** [4] - 532:9,
535:16, 545:9, 555:4
**punched** [1] - 521:18
**purchase** [1] - 634:3
**purchased** [2] - 634:1,
634:6
**purporting** [1] - 720:6
**purports** [1] - 625:16
**purpose** [6] - 526:3,
597:17, 598:22,
598:25, 684:14,
684:15
**purposes** [1] - 740:15
**pursue** [1] - 520:19
**pursuing** [1] - 520:20
**push** [11] - 534:7,
534:10, 534:17,
535:7, 538:19,
539:11, 539:19,
566:20, 630:21,
638:14, 638:23
**pushed** [2] - 538:15,
554:4
**pushing** [21] - 534:3,
534:24, 535:3,
535:10, 535:11,
537:25, 538:3,
538:12, 538:13,
538:18, 538:19,
539:6, 539:25,
542:20, 553:13,
553:16, 554:5
**puts** [2] - 522:1,
656:19
**putting** [3] - 532:14,
695:12, 728:18

### Q

**qualified** [2] - 681:21,
681:22
**qualify** [1] - 682:15
**questioned** [1] -
710:24
**questioning** [1] -
727:3
**questions** [15] - 550:3,
553:2, 558:7, 558:8,
572:18, 621:18,

638:3, 638:8,
654:11, 655:24,
668:16, 669:4,
669:19, 670:17,
711:25
**quick** [1] - 649:9
**quickly** [5] - 605:1,
628:2, 640:13,
678:4, 682:7
**quote** [10] - 518:22,
518:24, 521:17,
521:18, 521:21,
524:17, 524:20,
586:5, 594:16, 711:4

### R

**racks** [1] - 532:11
**radio** [1] - 533:16
**raise** [7] - 527:12,
558:21, 577:6,
658:15, 676:19,
680:1, 714:6
**raises** [2] - 522:25,
523:17
**raising** [1] - 647:4
**rally** [9] - 587:5, 591:9,
595:10, 597:22,
598:5, 601:13,
603:1, 662:4, 662:7
**ramp** [1] - 590:18
**rand** [1] - 571:19
**rather** [3] - 566:10,
582:25, 649:21
**Rayburn** [1] - 531:6
**re** [1] - 695:2
**rea** [4] - 518:23, 519:5,
519:12, 520:12
**reach** [1] - 717:24
**reached** [1] - 576:16
**reaching** [1] - 545:19
**reaction** [1] - 625:3
**read** [3] - 587:3,
713:5, 738:3
**readable** [1] - 567:25
**reads** [1] - 574:11
**ready** [2] - 526:12,
582:10
**real** [2] - 533:4
**reality** [1] - 665:1
**realize** [1] - 678:10
**realized** [1] - 539:1
**really** [9] - 522:22,
523:9, 576:20,
615:5, 634:11,
694:13, 706:1,
706:23, 711:7
**reason** [2] - 601:25,
673:22
**reasoned** [1] - 520:2

**reasoning** [1] - 519:11
**reasons** [4] - 518:14,
522:12, 525:17,
672:17
**recalled** [2] - 685:8,
689:20
**recalling** [6] - 687:25,
689:6, 690:5,
694:22, 695:13,
696:15
**receive** [3] - 524:13,
698:8, 720:4
**received** [15] - 563:6,
563:14, 573:8,
573:10, 580:22,
581:7, 592:7,
592:15, 655:15,
658:9, 658:23,
706:8, 706:11,
719:4, 720:4
**receives** [1] - 656:2
**receiving** [5] - 673:14,
720:2, 720:8,
720:12, 723:8
**recent** [1] - 561:8
**Recess** [3] - 565:13,
602:13, 679:8
**recognition** [2] -
686:13, 686:16
**recognize** [59] -
536:19, 536:21,
543:11, 543:20,
544:18, 567:19,
568:5, 580:5,
587:15, 596:14,
604:20, 605:19,
605:21, 607:5,
607:21, 608:9,
608:10, 609:4,
609:8, 609:18,
610:2, 611:4,
611:18, 613:20,
614:3, 614:19,
614:24, 615:11,
616:5, 617:7, 618:3,
618:10, 619:1,
619:6, 623:1, 623:3,
625:25, 628:10,
633:19, 635:23,
639:19, 640:3,
641:18, 645:16,
646:11, 647:1,
660:13, 718:19,
721:12, 722:2,
726:22, 727:19,
730:21, 733:2,
733:5, 733:14,
733:16, 736:19,
738:24
**recognized** [7] -

620:22, 685:8,
686:17, 720:17,
721:4, 721:8, 733:4
**recognizing** [1] -
687:25
**recollect** [1] - 693:5
**recollection** [2] -
690:16, 710:8
**recollections** [1] -
710:10
**recommended** [1] -
702:11
**reconcile** [1] - 718:5
**reconstruct** [1] -
695:2
**reconstructed** [3] -
696:4, 696:7, 710:17
**reconstructive** [3] -
694:24, 710:19
**record** [22] - 517:6,
537:1, 537:17,
542:4, 544:5, 547:9,
559:7, 575:21,
581:12, 589:10,
607:18, 611:15,
616:12, 623:6,
623:9, 624:11,
679:12, 680:10,
688:24, 714:15,
724:24, 745:12
**recorded** [4] - 581:10,
618:11, 637:22,
661:11
**recording** [111] -
538:7, 543:24,
544:13, 545:1,
546:1, 548:21,
552:25, 554:13,
555:18, 556:2,
556:9, 557:21,
558:5, 587:20,
588:2, 589:23,
595:18, 596:12,
600:6, 600:15,
600:24, 601:9,
603:11, 604:25,
605:3, 605:14,
606:7, 606:10,
607:13, 608:2,
609:14, 610:16,
611:10, 612:3,
612:20, 613:9,
613:24, 614:14,
615:3, 616:19,
617:12, 617:25,
618:8, 618:19,
618:22, 620:18,
622:14, 623:18,
624:5, 624:18,
625:8, 626:7, 627:2,

627:13, 628:6,
628:17, 629:19,
629:22, 630:15,
631:7, 631:16,
632:21, 633:13,
633:15, 634:14,
635:4, 635:8,
635:18, 636:14,
636:25, 638:20,
639:1, 639:15,
640:1, 640:12,
640:17, 641:6,
641:15, 641:25,
642:14, 643:4,
643:23, 644:10,
645:5, 646:22,
647:7, 649:11,
661:21, 663:4,
665:8, 665:20,
666:14, 688:23,
726:13, 728:13,
728:16, 729:17,
730:5, 730:9,
730:11, 731:11,
732:1, 733:11,
736:7, 738:6,
738:20, 740:3,
740:12, 740:22,
741:1, 743:12
**recordings** [1] -
735:18
**records** [1] - 707:15
**recounting** [1] - 690:5
**recourse** [1] - 575:5
**recover** [6] - 587:7,
602:25, 606:20,
647:10, 649:22,
669:10
**recovered** [5] - 579:1,
602:24, 604:2,
653:15, 669:17
**recross** [2] - 675:8,
679:3
**red** [16] - 537:19,
543:19, 553:7,
553:11, 554:1,
557:23, 633:9,
640:22, 719:8,
722:7, 722:24,
728:11, 729:10,
731:2, 733:18, 734:2
**redacted** [4] - 573:12,
573:22, 574:7,
670:10
**Redirect** [2] - 516:9,
516:11
**redirect** [4] - 558:11,
572:19, 572:20,
669:6
**REDIRECT** [2] - 669:8,

712:1
**Redweld** [6] - 561:15,
561:18, 562:1,
562:6, 562:11, 563:2
**refer** [5] - 580:18,
588:8, 669:2,
683:19, 686:7
**reference** [1] - 675:2
**referenced** [1] -
573:21
**references** [4] - 524:8,
524:18, 573:24,
703:16
**referred** [3] - 670:9,
705:21, 718:9
**referring** [11] - 571:11,
572:5, 572:6,
644:22, 663:17,
704:8, 706:17,
707:7, 708:19,
711:7, 724:4
**refers** [1] - 661:5
**reflect** [14] - 520:5,
537:1, 537:4,
537:17, 537:20,
542:4, 542:8, 544:5,
544:8, 548:4,
616:12, 616:15,
724:24, 725:2
**reflective** [1] - 609:9
**Reform** [1] - 520:2
**refresher** [1] - 647:12
**regain** [1] - 549:23
**regarding** [1] - 658:25
**regards** [1] - 660:5
**rehearsal** [4] - 689:5,
696:18, 704:17
**reinforcements** [1] -
623:8
**reinstate** [1] - 691:20
**reinstatement** [2] -
708:18, 708:22
**relate** [3] - 526:11,
560:3, 702:24
**related** [1] - 686:9
**relates** [5] - 560:6,
560:20, 599:1,
700:18, 731:4
**relating** [11] - 579:21,
588:21, 591:5,
607:4, 622:4,
649:22, 669:11,
676:9, 678:3, 678:15
**relation** [1] - 697:11
**relationship** [3] -
518:22, 697:15,
697:19
**relatively** [1] - 708:2
**Relevance** [1] -
655:17

**relevance** [4] - 521:10,
522:4, 598:25,
658:12
**relevant** [18] - 517:24,
519:2, 520:11,
520:24, 522:8,
524:8, 568:19,
568:23, 577:2,
599:9, 655:20,
655:22, 671:5,
676:9, 684:20,
691:15, 703:22,
703:24
**reliable** [3] - 524:16,
655:25, 656:3
**reliance** [1] - 704:23
**relied** [7] - 703:11,
703:13, 703:16,
703:17, 703:25,
704:1
**relieved** [1] - 534:20
**rely** [4] - 522:6,
524:18, 526:10,
699:7
**relying** [2] - 525:24,
705:5
**remain** [1] - 527:11
**remedied** [1] - 525:8
**remedies** [2] - 674:24,
674:25
**remedy** [6] - 574:23,
602:7, 670:22,
673:23, 675:8,
678:19
**remember** [8] -
535:19, 535:21,
668:16, 668:18,
685:15, 692:8,
692:12, 744:14
**remembered** [1] -
689:19
**remembers** [1] -
521:17
**remind** [6] - 527:1,
565:14, 572:13,
602:18, 642:23,
708:20
**reminder** [1] - 647:19
**remove** [3] - 556:5,
668:11, 728:11
**removing** [1] - 551:19
**rendering** [2] -
524:19, 683:9
**renew** [1] - 602:9
**renewed** [1] - 548:10
**repair** [1] - 560:13
**repeat** [1] - 571:1
**repeated** [2] - 615:9,
674:21
**repeatedly** [2] -

630:19, 638:16
**repetition** [1] - 523:16
**replay** [5] - 620:8,
620:11, 625:22,
660:17, 694:22
**reply** [1] - 739:11
**report** [85] - 518:18,
518:20, 521:12,
521:21, 524:20,
567:10, 567:22,
567:23, 568:1,
568:5, 568:10,
568:11, 568:15,
568:16, 568:17,
568:20, 568:21,
569:22, 571:7,
572:2, 580:3, 580:6,
580:21, 581:10,
581:11, 588:21,
588:23, 589:1,
590:23, 591:1,
595:23, 596:1,
596:22, 596:25,
599:18, 603:15,
603:18, 604:12,
605:7, 606:14,
606:17, 610:20,
610:23, 613:13,
613:16, 615:18,
615:21, 616:23,
617:1, 617:16,
617:19, 632:6,
632:9, 646:2, 646:5,
649:15, 649:18,
668:21, 668:22,
669:2, 677:19,
681:18, 683:14,
692:22, 694:7,
694:11, 694:18,
695:5, 695:17,
697:24, 698:15,
698:23, 699:5,
700:21, 703:9,
703:12, 703:16,
703:25, 704:4,
704:9, 704:11,
706:7, 707:23,
709:3, 710:3
**reported** [2] - 677:2,
687:5
**REPORTER** [1] -
545:12
**reporter** [1] - 527:23
**Reporting** [1] - 675:7
**reporting** [2] - 676:6,
676:25
**reports** [5] - 521:14,
521:23, 574:18,
683:14, 684:5
**represent** [3] - 550:12,

580:25, 699:15
**representation** [3] -
575:19, 576:1, 674:6
**represents** [2] -
520:20, 556:17
**reputation** [1] -
523:24
**request** [4] - 525:12,
657:8, 657:13,
704:14
**requested** [1] - 671:1
**requesting** [1] -
681:16
**require** [3] - 673:17,
675:1, 695:10
**required** [4] - 711:4,
711:5, 711:9, 716:18
**requirements** [1] -
525:6
**requires** [1] - 675:5
**research** [26] - 671:11,
681:9, 681:12,
682:11, 682:13,
682:15, 682:21,
686:20, 687:15,
690:13, 691:13,
691:16, 694:15,
695:9, 695:11,
695:16, 696:10,
696:11, 696:14,
697:5, 697:11,
708:1, 708:4, 708:7,
720:13
**researcher** [1] -
682:11
**residence** [1] - 660:5
**resides** [1] - 721:3
**resources** [2] -
534:22, 579:8
**respect** [4] - 637:18,
671:8, 710:18,
722:19
**respond** [9] - 582:23,
593:15, 593:24,
650:16, 651:12,
651:20, 652:11,
652:18, 653:4
**responding** [2] -
573:12, 675:15
**Response** [1] - 560:25
**response** [11] -
573:25, 583:3,
583:23, 584:19,
585:22, 593:17,
594:3, 666:2, 666:3,
685:8, 692:25
**responses** [1] - 574:9
**responsibilities** [3] -
578:10, 579:5,
715:14

773

**responsibility** [1] - 540:8

**responsible** [5] - 560:25, 579:6, 579:7, 678:7, 716:17

**rest** [13] - 517:22, 522:19, 523:9, 533:5, 565:21, 568:16, 568:17, 613:7, 614:12, 631:15, 640:11, 645:3, 744:13

**restricted** [3] - 518:2, 521:5, 521:7

**result** [1] - 697:19

**resulted** [1] - 578:16

**resume** [20] - 544:11, 544:24, 545:24, 607:25, 615:1, 618:17, 624:16, 626:4, 626:25, 627:11, 628:15, 629:17, 634:13, 636:23, 642:12, 643:3, 644:8, 714:1, 730:4, 740:24

**retain** [1] - 696:19

**retained** [1] - 689:7

**retake** [1] - 602:18

**retelling** [2] - 696:15, 696:17

**retire** [1] - 528:18

**retired** [3] - 528:12, 528:14, 528:21

**retirement** [1] - 550:14

**retreat** [2] - 533:16, 742:21

**retreating** [1] - 743:1

**retrieval** [5] - 685:7, 692:10, 693:24, 694:2, 694:3

**retrieval-induced** [1] - 692:10

**retrieving** [1] - 695:23

**returned** [3] - 550:20, 562:22, 563:8

**returning** [1] - 601:11

**review** [23] - 548:3, 563:15, 570:4, 573:19, 597:6, 640:23, 645:20, 672:10, 672:12, 672:24, 684:14, 684:19, 698:6, 716:25, 717:22, 726:21, 734:11, 735:21, 735:24, 735:25, 736:1, 738:11, 743:15

**reviewed** [25] - 543:4,

546:21, 563:18, 568:7, 600:1, 600:10, 600:20, 601:4, 621:22, 626:19, 653:19, 663:5, 663:8, 681:13, 683:11, 683:12, 683:20, 684:3, 705:15, 706:5, 706:8, 709:4, 709:8, 712:11, 713:5

**reviewing** [6] - 628:10, 672:8, 684:15, 708:25, 723:25, 734:25

**right-hand** [4] - 724:21, 737:2, 740:4, 740:6

**rightly** [1] - 520:13

**riot** [11] - 553:18, 625:1, 627:21, 627:23, 634:22, 636:1, 636:5, 642:21, 644:19, 715:11, 724:9

**rioter** [1] - 539:7

**rioter's** [1] - 539:10

**rioters** [24] - 530:23, 534:7, 534:10, 534:17, 534:19, 534:20, 539:19, 542:17, 542:18, 545:8, 545:16, 546:11, 550:22, 551:12, 551:20, 551:24, 552:6, 552:14, 554:5, 609:2, 610:12, 642:5, 644:4, 701:8

**ripped** [2] - 706:23, 707:7

**risk** [1] - 687:17

**road** [2] - 581:23, 661:11

**robberies** [3] - 578:13, 578:14, 715:18

**robbery** [2] - 519:13, 520:15

**Robert** [4] - 527:24, 527:25, 528:1

**role** [4] - 559:22, 578:23, 668:8, 716:12

**roles** [1] - 561:4

**room** [3] - 539:18, 669:25, 697:14

**Rotunda** [4] - 551:11, 551:19, 552:18

**roughly** [2] - 553:21, 639:3

**route** [1] - 590:19

**routes** [1] - 587:6

**row** [2] - 644:4, 718:25

**rows** [1] - 534:15

**Rudolph** [2] - 527:24, 527:25

**Rule** [3] - 524:22, 695:7, 695:10

**rule** [2] - 525:5

**ruled** [1] - 682:4

**rules** [1] - 525:14

**run** [5] - 539:3, 566:8, 567:2, 575:12, 731:24

**rush** [1] - 706:21

**résumé** [1] - 698:23

## S

**Safari** [1] - 564:22

**safe** [4] - 533:19, 549:8, 549:9, 549:10

**Sam** [1] - 527:25

**San** [1] - 659:10

**sanctioned** [1] - 675:9

**sanctions** [1] - 675:4

**SANS** [1] - 560:9

**sardines** [1] - 540:2

**satisfied** [4] - 524:20, 525:6, 525:14, 678:12

**saved** [2] - 580:14, 647:20

**saw** [12] - 530:22, 531:1, 532:7, 556:5, 586:22, 625:1, 630:6, 653:19, 661:14, 717:16, 734:25, 739:1

**scene** [4] - 533:11, 556:23, 688:24, 706:25

**scheduled** [2] - 525:4, 601:20

**scholarship** [1] - 704:2

**school** [1] - 538:17

**science** [1] - 560:1

**scope** [6] - 522:21, 524:21, 677:23, 692:22, 694:18, 695:5

**scoped** [2] - 568:18, 569:23

**screaming** [1] - 638:14

**screen** [34] - 536:19, 536:22, 537:13, 537:18, 543:16, 544:2, 544:7,

544:17, 581:19, 605:23, 608:17, 609:17, 610:2, 614:18, 616:10, 618:25, 623:21, 633:18, 639:18, 640:20, 643:10, 646:12, 646:25, 709:17, 725:25, 728:19, 729:13, 737:3, 740:9, 740:16, 741:5, 741:23, 742:14, 743:9

**screenshot** [7] - 586:18, 653:15, 653:25, 656:17, 657:15, 657:19, 669:16

**scroll** [1] - 568:3

**se** [3] - 539:19, 708:5, 710:21

**sealed** [6] - 562:3, 562:4, 562:20, 562:22, 562:24, 570:8

**search** [9] - 561:2, 563:15, 563:18, 575:12, 579:17, 674:12, 717:4, 735:21

**searched** [1] - 735:17

**seat** [5] - 527:17, 559:1, 577:9, 588:6, 590:12

**second** [20] - 522:25, 574:20, 583:19, 591:17, 617:24, 624:20, 632:23, 635:6, 635:7, 643:21, 673:3, 673:22, 675:2, 685:5, 688:17, 688:19, 718:24, 726:20, 730:10, 743:16

**seconds** [95] - 519:7, 521:24, 522:16, 522:24, 536:14, 538:10, 539:24, 543:9, 543:23, 544:10, 544:15, 546:3, 546:18, 547:5, 548:20, 548:23, 553:22, 554:8, 587:24, 587:25, 605:2, 607:12, 607:19, 608:1, 608:4, 609:13, 611:9,

611:16, 612:2, 612:8, 612:19, 612:23, 613:23, 614:16, 618:7, 618:18, 618:21, 619:1, 620:13, 622:13, 622:18, 623:17, 624:4, 624:12, 624:17, 625:7, 625:10, 626:5, 626:6, 626:10, 627:1, 627:4, 627:12, 627:15, 628:8, 628:16, 628:19, 629:18, 629:21, 629:25, 630:14, 630:17, 631:5, 631:6, 632:20, 635:3, 636:7, 638:9, 639:12, 639:25, 640:15, 641:5, 643:22, 644:9, 644:12, 646:17, 647:6, 649:9, 722:13, 726:11, 728:15, 729:16, 730:8, 730:13, 730:15, 731:25, 733:10, 736:6, 736:17, 740:25

**section** [1] - 707:23

**sectors** [1] - 724:7

**secured** [1] - 543:14

**see** [86] - 532:5, 538:11, 541:1, 541:16, 542:22, 543:16, 545:3, 545:5, 545:18, 546:23, 547:1, 547:3, 547:6, 548:25, 550:20, 553:7, 553:11, 553:13, 553:18, 554:1, 554:3, 554:15, 554:16, 554:17, 554:22, 555:21, 556:12, 557:23, 562:3, 567:13, 573:24, 574:8, 574:10, 588:5, 590:15, 601:25, 606:2, 608:16, 616:9, 619:23, 620:5, 622:18, 622:24, 624:22, 627:17, 629:1, 630:5, 631:21, 633:1, 635:10, 636:4, 636:17, 637:18,

774

642:2, 642:5, 642:9, 643:6, 669:2, 672:6, 692:4, 692:5, 692:17, 693:5, 697:11, 697:20, 726:18, 728:19, 728:22, 729:3, 729:8, 729:10, 730:18, 730:22, 730:23, 731:3, 734:2, 736:19, 737:9, 738:24, 739:17, 740:17, 741:5, 741:22, 742:6, 744:11, 745:22

**seeing** [9] - 553:3, 574:2, 666:22, 692:1, 693:9, 693:14, 742:11, 744:15, 745:9

**seek** [1] - 717:11

**seeking** [6] - 525:18, 657:4, 698:22, 717:15, 718:22

**seeking-information** [2] - 717:15, 718:22

**seem** [1] - 728:3

**sees** [2] - 691:11, 727:14

**seize** [1] - 579:17

**seized** [2] - 561:9, 633:6

**seizure** [1] - 561:3

**Select** [1] - 683:24

**selective** [1] - 692:15

**self** [2] - 654:5, 658:16

**self-surrender** [1] - 654:5

**self-surrendering** [1] - 658:16

**selfie** [1] - 666:17

**Senate** [7] - 528:25, 551:2, 551:3, 551:4, 551:6, 551:9, 551:10

**send** [6] - 593:17, 594:16, 651:2, 651:25, 653:8, 657:21

**sends** [4] - 586:2, 656:19, 657:11, 657:12

**sense** [3] - 571:17, 579:6, 690:19

**sent** [22] - 580:25, 581:24, 582:4, 582:13, 582:16, 582:17, 583:21, 584:14, 591:20, 591:23, 594:9,

647:11, 648:3, 648:10, 648:18, 650:8, 650:25, 652:12, 653:22, 656:16, 657:13, 657:15

**separate** [2] - 529:10, 588:10

**separated** [3] - 535:14, 535:15, 648:24

**sequentially** [1] - 655:2

**serial** [2] - 563:20, 571:13

**serious** [1] - 671:7

**serve** [3] - 528:24, 691:21, 708:18

**service** [1] - 550:13

**session** [1] - 670:9

**set** [1] - 567:2

**setting** [1] - 716:17

**setup** [1] - 560:13

**seventh** [1] - 735:7

**several** [16] - 517:24, 518:18, 520:14, 523:17, 590:19, 608:25, 609:10, 660:16, 660:17, 663:15, 683:21, 693:15, 735:16, 735:25, 736:13, 739:6

**shall** [1] - 677:8

**shield** [27] - 537:8, 537:9, 537:12, 537:14, 538:12, 539:7, 539:10, 539:13, 539:14, 539:16, 539:24, 540:22, 541:8, 541:10, 541:13, 541:17, 541:19, 542:11, 542:20, 543:19, 626:13, 628:12, 636:1, 642:21, 644:20

**Shield** [1] - 627:10

**shield[s** [1] - 626:11

**shields** [9] - 534:4, 534:16, 553:18, 625:1, 625:3, 627:10, 627:21, 627:23, 628:11

**shift** [2] - 521:19, 521:23

**shining** [1] - 642:9

**shirt** [6] - 529:9, 639:22, 719:11, 722:7, 724:23, 731:3

**shit** [1] - 651:16

**shocked** [1] - 521:14

**shoes** [1] - 719:11

**shootings** [2] - 687:4, 715:19

**shore** [1] - 621:18

**short** [1] - 596:15

**shorthand** [1] - 717:23

**shortish** [1] - 734:2

**shortly** [2] - 721:2, 742:25

**shot** [2] - 705:19, 722:9

**shots** [1] - 706:2

**shouldered** [1] - 678:11

**shoulders** [2] - 521:15, 606:4

**shoving** [1] - 535:4

**show** [11] - 562:22, 579:24, 655:23, 706:16, 709:14, 711:5, 711:9, 725:16, 728:22, 729:23, 737:23

**showed** [3] - 664:16, 706:21, 707:11

**showing** [9] - 588:15, 594:21, 595:6, 595:12, 599:10, 613:19, 646:11, 690:4, 721:12

**shown** [3] - 561:19, 597:21, 599:15

**shows** [3] - 692:11, 725:17, 745:5

**shut** [1] - 551:13

**sic** [3] - 532:24, 558:13, 732:14

**side** [40] - 529:18, 531:23, 535:1, 535:3, 535:6, 536:5, 537:12, 539:20, 542:7, 549:13, 549:14, 549:16, 549:17, 550:17, 550:24, 551:3, 551:4, 551:10, 552:1, 552:2, 574:2, 593:20, 609:3, 609:16, 724:21, 730:7, 731:8, 731:14, 731:20, 733:8, 737:2, 737:12, 740:5, 740:7, 741:22

**side-by-side** [1] - 730:7

**sign** [2] - 672:6,

713:22

**Signal** [1] - 566:6

**signed** [2] - 563:7, 563:9

**significant** [1] - 564:22

**similar** [2] - 599:3, 675:22

**similarly** [1] - 708:4

**simply** [2] - 672:16, 722:23

**single** [2] - 533:24, 694:13

**sitting** [1] - 724:21

**situation** [13] - 525:3, 533:2, 533:5, 533:7, 534:6, 534:7, 538:21, 539:3, 540:2, 541:12, 678:6, 678:9, 685:20

**six** [3] - 535:23, 535:24, 559:16

**six-two** [2] - 535:23, 535:24

**sixth** [1] - 674:20

**skeptical** [3] - 521:9, 621:4, 727:12

**skip** [1] - 584:24, 629:13

**Skype** [2] - 572:6, 670:10

**sled** [1] - 538:18

**sleeve** [1] - 639:22

**slightly** [1] - 568:3

**slippery** [1] - 539:22

**slowing** [1] - 687:7

**small** [1] - 708:2

**smiling** [1] - 667:7

**sneak** [1] - 650:19

**social** [2] - 680:22, 680:24

**software** [1] - 560:14

**soldiers** [1] - 533:1

**solid** [1] - 523:25

**solved** [1] - 716:3

**someone** [10] - 598:24, 618:25, 639:18, 640:3, 641:18, 666:5, 727:14, 733:1, 736:13, 737:5

**sometimes** [4] - 572:16, 656:2, 689:15

**somewhat** [1] - 727:20

**sorry** [29] - 544:20, 545:12, 547:24, 557:1, 574:14, 581:18, 584:24,

587:23, 589:8, 598:3, 598:7, 601:20, 614:8, 629:20, 638:5, 639:16, 644:18, 644:19, 647:16, 650:2, 655:21, 658:6, 660:24, 671:25, 689:17, 719:18, 729:21, 737:21

**Sorry** [1] - 608:13

**sort** [10] - 535:1, 536:23, 545:3, 566:7, 578:18, 644:2, 715:14, 740:16, 743:9, 743:16

**sound** [3] - 590:5, 661:20, 675:18

**sounded** [2] - 611:19, 626:3

**sounds** [4] - 606:9, 615:14, 666:10, 666:22

**source** [8] - 691:3, 691:4, 691:6, 691:9, 691:10, 693:21, 712:22, 717:1

**source-monitoring** [1] - 691:10

**sources** [7] - 688:3, 688:15, 689:12, 703:22, 703:23, 716:25, 719:4

**South** [1] - 531:22

**south** [2] - 531:23

**southerly** [1] - 743:3

**SPAN** [5] - 576:21, 663:4, 663:8, 663:17, 664:18

**SPAN's** [2] - 597:9, 663:5

**speaking** [13] - 522:2, 547:15, 580:18, 580:20, 621:23, 645:7, 662:10, 670:9, 697:9, 713:9, 716:16, 723:9, 723:24

**speaks** [4] - 594:12, 625:15, 626:15, 732:11

**Special** [31] - 517:9, 561:6, 563:7, 568:18, 572:24, 576:10, 714:4, 714:13, 718:19, 719:25, 721:6, 723:8, 724:25,

775

725:9, 726:17, 728:18, 730:2, 730:18, 731:13, 732:25, 733:13, 734:9, 736:9, 737:16, 738:8, 738:24, 740:15, 741:4, 742:20, 743:15, 743:23

**special** [7] - 566:16, 577:21, 577:22, 578:3, 714:23, 714:24, 726:2

**specialist** [2] - 517:10, 559:20

**specialized** [1] - 566:14

**specific** [20] - 517:24, 518:5, 518:22, 519:6, 519:18, 520:12, 520:17, 521:2, 521:12, 526:3, 562:9, 562:13, 562:16, 629:4, 668:20, 685:19, 701:20, 703:6, 710:4, 744:14

**specifically** [10] - 523:23, 591:8, 645:10, 663:17, 668:17, 670:10, 682:10, 683:20, 685:20, 693:2

**specifics** [1] - 683:19

**speculate** [1] - 673:13

**speculation** [1] - 590:8

**speech** [25] - 576:21, 577:1, 597:7, 597:9, 597:12, 597:15, 598:13, 598:14, 600:1, 600:19, 601:4, 662:25, 663:3, 663:5, 663:6, 663:8, 663:11, 663:14, 663:18, 663:20, 663:23, 664:14, 664:18, 664:20, 665:2

**speeches** [2] - 598:2, 664:17

**speeding** [1] - 687:7

**spell** [9] - 527:23, 559:6, 571:5, 571:19, 575:12, 577:14, 671:14, 680:9, 714:14

**spelled** [1] - 671:10

**spells** [1] - 671:15

**spent** [1] - 721:1

**spoken** [6] - 599:5, 701:9, 701:22, 702:4, 720:19, 720:23

**spontaneously** [1] - 685:9

**spray** [1] - 532:16

**sprayed** [5] - 532:11, 532:16, 532:19, 534:4, 539:21

**spraying** [2] - 534:17, 644:2

**spreadsheet** [1] - 574:5

**squad** [4] - 578:3, 715:6, 716:1, 716:9

**square** [1] - 718:24

**squared** [1] - 585:5

**stability** [1] - 535:12

**stable** [1] - 689:8

**staff** [1] - 679:18

**stage** [15] - 532:2, 593:20, 685:3, 685:5, 685:7, 685:13, 688:17, 688:19, 688:21, 693:24, 693:25, 694:2, 694:3

**stages** [4] - 685:2, 685:10, 685:12

**stairs** [1] - 743:1

**stairwell** [1] - 609:19

**stamp** [41] - 536:20, 543:1, 543:7, 544:9, 544:14, 548:19, 608:1, 608:3, 614:16, 619:1, 622:13, 622:17, 623:16, 624:12, 624:17, 624:19, 625:7, 625:10, 626:5, 626:9, 627:4, 627:12, 627:15, 628:16, 628:18, 629:21, 629:24, 631:5, 632:19, 635:2, 635:20, 636:12, 640:14, 640:15, 641:13, 642:13, 642:16, 644:12, 646:17, 738:3, 742:9

**stand** [5] - 526:15, 602:18, 672:16, 676:16, 679:23

**standard** [1] - 570:14

**standing** [8] - 527:11, 554:11, 554:16, 555:22, 676:21, 727:3, 741:9, 741:20

**standoff** [1] - 535:16

**stands** [1] - 560:24

**Stanley** [3] - 517:17, 550:12, 555:6

**start** [8] - 566:21, 591:17, 666:5, 681:2, 685:13, 685:16, 699:21, 728:14

**started** [2] - 654:18, 681:4

**starting** [4] - 517:6, 631:4, 728:14, 738:18

**startled** [1] - 521:14

**starts** [1] - 621:10

**State** [2] - 533:25, 720:15

**state** [18] - 519:18, 521:19, 522:19, 522:23, 523:5, 523:10, 527:23, 529:1, 533:24, 559:6, 563:22, 577:14, 599:1, 599:10, 680:9, 714:14, 721:3, 733:16

**statement** [8] - 621:16, 623:7, 623:8, 677:9, 678:2, 678:3, 678:14, 708:12

**statements** [5] - 622:3, 672:17, 672:19, 672:21, 677:2

**States** [30] - 517:3, 517:8, 518:24, 519:15, 519:20, 526:14, 528:15, 529:3, 558:20, 572:24, 576:10, 604:5, 606:22, 610:3, 614:4, 616:5, 674:18, 675:3, 675:7, 677:7, 677:9, 678:22, 699:16, 715:3, 717:3, 723:12, 724:2, 724:8, 726:3, 726:6

**states** [2] - 521:14, 524:17

**stating** [2] - 651:25, 711:8

**stationed** [1] - 529:19

**status** [1] - 590:1

**statute** [2] - 678:20

**stay** [4] - 535:1, 535:6, 587:6, 689:8

**stayed** [3] - 535:3, 535:10, 549:24

**staying** [1] - 535:11

**stays** [2] - 540:10, 743:2

**Steal** [7] - 591:9, 595:10, 597:22, 598:5, 662:4, 665:12, 665:17

**step** [5] - 558:14, 572:22, 573:1, 669:20, 743:23

**steps** [9] - 532:1, 536:4, 546:6, 546:15, 546:25, 659:2, 659:3, 716:18

**Steven** [8] - 517:3, 517:13, 578:21, 579:15, 579:18, 580:7, 580:10, 634:5

**stick** [2] - 556:6, 576:4

**sticks** [2] - 532:12, 534:5

**still** [23] - 520:10, 526:19, 541:25, 565:15, 590:17, 592:3, 602:18, 623:6, 630:22, 640:8, 642:7, 642:8, 642:19, 670:16, 705:19, 706:2, 716:5, 721:16, 721:19, 721:25, 722:9, 728:4, 739:25

**stills** [1] - 705:14

**stip** [1] - 676:15

**stipulated** [2] - 655:18, 658:13

**stipulating** [2] - 681:20, 682:2

**stipulation** [1] - 576:17

**Stomp** [1] - 625:23

**stomp** [1] - 625:23

**stood** [2] - 534:2, 742:20

**stop** [17] - 618:23, 629:12, 634:15, 635:19, 665:21, 726:11, 726:14, 726:15, 730:14, 738:21, 739:11, 740:11, 740:13, 740:23, 741:2, 743:21

**Stop** [7] - 591:9, 595:10, 597:22, 598:5, 662:4, 665:11, 665:16

**stopped** [2] - 521:25,

738:23

**stopping** [2] - 629:10, 730:15

**stops** [1] - 717:16

**StopTheSteal** [1] - 587:2

**storage** [8] - 685:5, 688:16, 688:19, 688:21, 689:15, 690:4, 690:8, 690:11

**store** [4] - 688:24, 689:21, 694:25, 695:1

**stored** [2] - 685:6, 686:3

**storming** [1] - 612:12

**story** [1] - 523:3

**straight** [1] - 540:8

**strategy** [2] - 579:8, 716:17

**Street** [4] - 531:7, 531:21, 531:22

**strength** [1] - 696:19

**strengthen** [2] - 689:6, 704:18

**stress** [10] - 523:16, 523:24, 524:12, 685:25, 686:20, 686:22, 687:2, 700:11, 701:1

**stressors** [2] - 524:5, 688:11

**stretched** [1] - 534:21

**stricken** [1] - 675:13

**strike** [10] - 573:13, 574:23, 602:7, 602:10, 621:12, 670:23, 670:24, 674:16, 674:25, 675:10

**striking** [2] - 678:21, 679:5

**string** [1] - 653:19

**stripe** [2] - 554:24, 556:16

**stripes** [5] - 554:23, 556:13, 606:3, 662:19

**strong** [1] - 540:10

**struck** [2] - 521:15, 674:22

**structure** [4] - 608:17, 608:20, 608:21, 609:18

**struggle** [1] - 538:20

**studied** [1] - 681:6

**studies** [2] - 524:17, 681:9

**study** [1] - 703:20

**studying** [5] - 524:18,

681:3, 681:4,
682:18, 703:14
**stuff** [2] - 677:1,
735:23
**style** [2] - 606:1
**subject** [3] - 678:15,
687:2, 718:6
**subjects** [2] - 702:17,
720:3
**submit** [3] - 599:7,
623:11, 722:19
**submits** [1] - 523:19
**submitted** [2] -
722:23, 724:1
**subpoena** [1] - 735:13
**subsection** [1] - 661:1
**subsequent** [1] -
735:6
**subsequently** [1] -
599:17
**subset** [1] - 703:24
**substance** [1] -
601:17
**substantiative** [1] -
670:13
**suburb** [1] - 659:10
**successful** [1] - 545:9
**sucked** [2] - 535:18,
535:19
**sucker** [1] - 521:18
**sudden** [1] - 687:8
**sufficient** [2] - 673:22,
674:15
**suggest** [2] - 599:17,
684:19
**suggesting** [3] -
674:14, 678:19
**suggestive** [1] -
741:14
**suggests** [2] - 530:2,
691:16
**suit** [1] - 724:23
**summarize** [1] -
697:24
**summarized** [1] -
524:17
**summarizing** [1] -
657:10
**Sunday** [3] - 582:8,
584:10, 585:17
**Superior** [1] - 677:13
**supervisors** [1] -
531:14
**Supp** [2] - 674:18,
675:3
**support** [4] - 732:7,
733:1, 736:15, 737:5
**suppress** [2] - 673:6,
673:11
**surrender** [1] - 654:5

**surrendering** [1] -
658:16
**surrounded** [1] -
546:8
**surrounding** [1] -
684:16
**surveillance** [3] -
717:3, 721:16,
742:12
**sustain** [3] - 656:4,
694:18, 699:7
**sustained** [6] -
545:11, 590:9,
622:22, 645:2,
733:23, 739:24
**swear** [1] - 577:5
**sweater** [1] - 722:8
**sweatshirt** [3] - 606:2,
741:24, 742:11
**swinging** [1] - 535:17
**switched** [1] - 632:17
**sworn** [3] - 534:1,
539:4, 679:14
**symbolizes** [1] -
556:15
**system** [8] - 562:14,
566:7, 572:4, 572:6,
572:11, 574:2,
574:6, 674:2

## T

**table** [2] - 595:20,
724:22
**tag** [1] - 539:19
**tail** [1] - 590:1
**tan** [4] - 535:25,
547:13, 623:22,
623:25
**tan-colored** [1] -
623:22
**tan-in-color** [1] -
623:25
**Taoufik** [1] - 519:20
**tape** [4] - 562:21,
562:25, 570:9,
626:19
**Task** [3] - 715:7,
715:10, 715:16
**task** [7] - 578:5, 578:7,
578:11, 703:21,
715:9, 715:12,
715:14
**tasked** [1] - 578:15
**Team** [1] - 560:25
**team** [2] - 664:22,
702:14
**tear** [2] - 624:15, 630:7
**technique** [1] - 708:22
**techniques** [1] -

717:14
**technology** [1] -
559:20
**temporary** [1] - 608:21
**ten** [2] - 535:23,
565:19
**tend** [1] - 687:21
**tendered** [4] - 684:12,
697:25, 698:13,
712:23
**tens** [1] - 682:21
**term** [3] - 691:4,
708:19, 717:23
**termed** [1] - 578:25
**terminology** [1] -
726:8
**terms** [1] - 691:20
**terrace** [19] - 524:4,
530:24, 531:25,
532:3, 532:25,
533:13, 533:15,
533:20, 533:22,
543:13, 610:5,
610:7, 614:7, 616:9,
618:16, 646:14,
683:17, 706:21,
721:18
**terrible** [2] - 574:14,
737:21
**terrifying** [1] - 538:21
**terse** [1] - 518:21
**testified** [20] - 524:24,
543:5, 638:13,
656:12, 660:12,
662:23, 666:16,
668:6, 672:20,
677:7, 683:21,
695:15, 699:5,
711:14, 711:16,
712:5, 719:25,
731:17, 732:15,
733:1
**testify** [10] - 518:10,
518:12, 519:22,
565:21, 626:22,
665:1, 676:17,
676:20, 727:14,
732:20
**testifying** [5] - 519:9,
663:18, 694:14,
709:5, 712:8
**testimony** [70] -
518:11, 518:17,
518:19, 519:2,
519:4, 520:24,
521:1, 521:10,
522:7, 522:11,
523:2, 523:14,
523:15, 524:1,
524:8, 524:13,

524:21, 526:10,
526:16, 536:17,
543:4, 546:22,
552:4, 553:3,
553:14, 565:12,
568:8, 573:13,
574:21, 580:19,
597:10, 600:2,
600:11, 600:20,
601:5, 601:17,
602:10, 631:25,
654:18, 662:24,
669:21, 670:13,
670:23, 670:24,
674:16, 674:22,
674:25, 675:10,
675:13, 677:11,
677:20, 678:3,
678:15, 678:21,
679:6, 680:25,
682:6, 683:20,
683:23, 695:13,
698:3, 699:8,
700:18, 710:12,
713:3, 713:7,
713:22, 743:24,
744:6, 744:13
**Texas** [1] - 659:8
**text** [25] - 566:5,
580:9, 580:20,
581:6, 584:5,
584:14, 588:17,
591:13, 647:10,
647:19, 647:24,
648:2, 648:23,
650:5, 650:8,
650:23, 650:25,
651:4, 651:5,
651:18, 653:8,
653:19, 656:19,
657:15, 702:2
**theory** [3] - 520:19,
520:21, 520:24
**therefore** [2] - 567:16,
671:6
**Thin** [1] - 556:17
**thin** [1] - 534:21
**thinks** [3] - 676:19,
690:9, 727:14
**third** [3] - 566:5,
720:9, 721:7
**third-party** [2] - 566:5,
721:7
**thirty** [1] - 528:17
**thirty-five** [1] - 528:17
**thorough** [3] - 674:11,
675:20, 678:1
**thoughts** [2] - 688:4
**thousands** [4] - 533:1,
682:21, 682:22,

727:24
**three** [14] - 528:17,
531:14, 545:19,
628:3, 673:12,
674:13, 674:17,
679:19, 685:10,
723:14, 723:17,
723:20, 723:24
**throughout** [3] -
613:2, 615:6, 719:10
**thrown** [2] - 532:12,
534:4
**thumbnail** [5] - 651:8,
656:20, 656:23,
657:12, 657:18
**tie** [1] - 724:23
**timely** [1] - 524:23
**timer** [1] - 552:23
**tip** [1] - 720:4
**tips** [13] - 655:9,
655:15, 655:18,
658:3, 658:9,
658:24, 719:4,
720:2, 720:8,
720:14, 723:8,
723:25
**tipster** [1] - 720:6
**title** [3] - 559:19,
559:20, 586:24
**titled** [1] - 707:23
**today** [24] - 536:17,
543:4, 546:22,
558:14, 568:8,
574:19, 580:19,
597:10, 600:2,
600:11, 600:20,
601:5, 630:10,
631:25, 663:13,
664:16, 676:16,
699:5, 710:11,
710:15, 713:22,
724:18, 725:1, 728:9
**together** [3] - 535:10,
535:11, 587:6
**tomorrow** [7] - 679:4,
679:18, 744:7,
744:8, 744:10,
745:16, 745:22
**took** [9] - 547:18,
552:13, 587:8,
622:25, 664:18,
666:17, 666:25,
671:4, 671:8
**tool** [8] - 560:6, 564:3,
564:4, 564:5,
566:19, 566:20,
566:21, 567:10
**Toolkit** [1] - 560:7
**tools** [3] - 566:25,
567:24, 717:14

777

**top** [8] - 580:3, 583:12, 606:2, 609:20, 654:1, 657:1, 718:25, 741:25
**topic** [1] - 695:17
**total** [1] - 550:22
**totality** [1] - 540:1
**totally** [1] - 696:7
**touch** [2] - 601:21, 636:17
**touching** [1] - 739:4
**tourists** [1] - 529:1
**toward** [1] - 706:21
**towards** [14] - 539:6, 540:12, 549:14, 625:5, 634:18, 641:10, 642:3, 643:11, 645:11, 725:18, 731:6, 734:5, 736:14, 738:15
**tower** [2] - 608:22, 608:23
**towers** [1] - 724:7
**tracking** [1] - 727:25
**tracks** [1] - 563:5
**traffic** [1] - 529:11
**trained** [1] - 680:22
**training** [5] - 560:11, 560:19, 560:20, 566:12, 566:14
**Traitor** [1] - 736:14
**transcript** [4] - 574:15, 625:16, 732:12, 732:13
**transcripts** [1] - 713:5
**transfer** [1] - 728:5
**translating** [1] - 732:16
**transpired** [1] - 712:12
**transported** [1] - 735:7
**travel** [1] - 579:21
**trial** [14] - 520:18, 523:4, 523:13, 524:25, 652:16, 671:2, 671:4, 671:5, 671:10, 671:12, 672:25, 673:15, 676:9, 713:6
**trials** [2] - 683:21, 744:15
**tried** [4] - 551:12, 551:13, 551:22, 601:24
**trier** [2] - 524:9, 713:12
**trip** [2] - 581:23, 661:11

**trouble** [1] - 531:8
**trousers** [1] - 719:11
**trucks** [2] - 529:16, 529:17
**true** [3] - 696:8, 699:24, 702:16
**trump** [1] - 652:17
**Trump** [8] - 594:12, 596:18, 597:7, 598:14, 613:1, 662:14, 665:2
**Trump's** [9] - 576:21, 577:1, 598:13, 600:1, 600:19, 601:4, 661:24, 662:25
**try** [8] - 517:22, 602:11, 658:2, 658:20, 728:1, 744:10, 744:14, 745:8
**trying** [17] - 534:6, 534:10, 535:1, 535:7, 538:3, 538:13, 538:19, 549:8, 549:9, 575:17, 598:23, 599:6, 650:3, 658:7, 668:8, 681:21, 728:21
**tubes** [1] - 662:20
**Tuesday** [2] - 584:10, 679:19
**tug** [3] - 534:3, 534:23, 553:15
**tune** [1] - 692:11
**tunnel** [48] - 524:4, 533:22, 533:23, 534:5, 534:8, 534:10, 534:14, 535:1, 535:8, 535:13, 536:8, 538:14, 538:22, 539:7, 540:13, 540:17, 543:14, 545:7, 545:21, 546:12, 548:1, 551:23, 552:5, 552:10, 552:14, 552:16, 553:7, 553:10, 554:5, 616:11, 618:15, 624:23, 625:2, 625:4, 627:18, 627:22, 632:14, 633:1, 634:23, 636:22, 637:17, 641:10, 642:6, 646:9, 646:14, 646:20, 687:7,

721:17
**turn** [21] - 531:21, 531:22, 533:9, 562:5, 581:2, 583:9, 584:2, 585:18, 590:11, 591:16, 592:12, 593:12, 594:13, 620:14, 642:3, 643:12, 652:8, 657:22, 677:17, 677:19, 677:20
**turned** [8] - 539:14, 539:18, 542:11, 542:13, 630:3, 630:5, 631:19, 631:22
**turning** [1] - 658:17
**two** [27] - 518:2, 518:7, 520:21, 521:8, 526:17, 535:21, 535:22, 535:23, 535:24, 540:24, 541:15, 542:22, 545:19, 602:4, 617:24, 618:21, 625:1, 626:12, 627:21, 672:17, 673:12, 674:24, 676:8, 679:5, 718:7, 719:9
**type** [11] - 524:13, 535:11, 549:23, 564:15, 564:16, 564:18, 634:10, 692:8, 692:9, 741:25
**types** [5] - 566:2, 684:8, 685:14, 685:25, 715:18
**typical** [2] - 566:16, 715:16
**typically** [6] - 564:17, 564:20, 566:4, 572:3, 578:12, 580:23

# U

**U.S** [9] - 543:11, 578:17, 579:2, 579:9, 603:2, 607:6, 661:6, 661:8, 677:15
**U.S.C** [7] - 519:13, 519:14, 519:25, 521:4, 521:8, 525:23, 597:19
**ultimately** [5] - 541:3, 541:5, 579:8, 688:17, 711:11
**unable** [1] - 679:17
**unaltered** [1] - 707:19

**unavailability** [1] - 679:11
**uncovered** [1] - 717:21
**under** [13] - 518:3, 518:19, 519:13, 521:8, 524:11, 525:14, 546:15, 565:15, 587:1, 602:18, 679:6, 687:2
**understood** [4] - 526:9, 552:9, 601:18, 664:6
**unfortunately** [1] - 679:17
**unidentified** [1] - 578:25
**uniform** [2] - 529:15, 609:10
**uniforms** [4] - 609:22, 614:21, 614:23, 614:24
**unintelligible** [2] - 608:14, 621:10
**Union** [1] - 533:25
**union** [1] - 527:25
**unique** [5] - 567:3, 567:4, 571:8, 571:11, 571:12
**unit** [1] - 661:8
**United** [30] - 517:3, 517:8, 518:24, 519:15, 519:20, 526:14, 528:15, 529:3, 558:20, 572:24, 576:10, 604:5, 606:22, 610:3, 614:4, 616:5, 674:18, 675:3, 675:6, 677:7, 677:9, 678:22, 699:16, 715:3, 717:3, 723:12, 724:2, 724:8, 726:3, 726:6
**Universal** [1] - 659:8
**University** [1] - 680:17
**unknown** [2] - 718:5, 718:6
**unlawful** [1] - 547:21
**unless** [1] - 520:6
**unlock** [1] - 564:16, 564:21
**unlocked** [1] - 564:7
**unnamed** [1] - 718:2
**unredacted** [5] - 573:19, 573:23, 670:11, 671:22, 674:3
**unruly** [1] - 547:11
**unusual** [1] - 525:3

**up** [114] - 523:14, 527:7, 529:1, 531:20, 531:21, 531:25, 533:15, 533:17, 533:21, 534:20, 535:15, 536:12, 542:24, 546:16, 546:24, 551:11, 551:14, 555:4, 555:22, 561:15, 567:18, 577:4, 579:7, 579:12, 580:1, 581:19, 581:23, 582:11, 585:23, 586:6, 586:15, 587:11, 588:17, 589:15, 590:20, 595:19, 596:5, 596:19, 599:13, 599:22, 600:7, 600:16, 600:25, 603:4, 603:12, 603:24, 604:8, 604:17, 605:4, 605:12, 606:12, 606:24, 610:17, 611:1, 613:10, 615:10, 615:15, 615:24, 616:20, 617:4, 617:13, 617:22, 618:6, 620:14, 621:18, 632:3, 632:16, 635:1, 639:1, 640:13, 641:12, 643:14, 645:24, 647:15, 647:17, 649:1, 649:12, 649:25, 650:23, 653:12, 656:8, 658:9, 658:24, 661:15, 661:19, 665:5, 666:12, 669:13, 674:7, 677:13, 687:7, 695:21, 702:14, 704:10, 718:6, 718:16, 721:1, 721:6, 721:24, 725:22, 730:4, 731:7, 733:9, 738:16, 740:8, 742:8, 743:1, 743:4, 743:17, 743:19, 744:6, 744:10
**upcoming** [1] - 608:22
**updated** [1] - 717:20
**updating** [1] - 575:4
**upper** [11] - 531:25,

532:24, 533:13, 533:15, 533:20, 543:7, 610:5, 610:7, 614:7, 726:8, 729:24
**user** [1] - 566:7
**UTC** [8] - 581:12, 581:15, 588:25, 589:1, 589:2, 591:24, 596:3, 596:4
**utility** [1] - 529:15
**utilized** [1] - 724:7
**uttered** [1] - 737:10

**V**

**value** [5] - 567:1, 567:4, 567:11, 569:16
**vantage** [2] - 555:2, 692:1
**variables** [1] - 518:10
**variety** [4] - 686:1, 688:2, 689:24, 710:25
**various** [8] - 518:10, 524:4, 524:17, 665:16, 689:3, 715:18, 719:8, 735:18
**vast** [2] - 718:4
**vehicle** [2] - 668:2, 668:11
**vendor** [1] - 560:10
**verification** [4] - 567:7, 567:8, 567:13, 569:16
**verify** [3] - 563:21, 567:9, 567:16
**version** [4] - 526:21, 568:1, 573:19, 573:23
**versus** [3] - 540:25, 690:18, 690:23
**vertical** [1] - 539:16
**vest** [9] - 529:10, 529:11, 529:23, 529:25, 536:21, 537:3, 544:7, 547:6, 547:13
**veterans** [1] - 687:4
**via** [4] - 657:15, 663:5, 717:15, 735:13
**Vice** [1] - 598:15
**vicious** [1] - 532:8
**video** [225] - 536:14, 536:16, 538:5, 538:8, 541:1, 542:1, 543:3, 543:8, 543:20, 543:24, 544:13, 544:25,

545:1, 545:25, 546:1, 546:2, 546:19, 546:21, 547:2, 547:25, 548:3, 548:20, 548:23, 552:23, 552:25, 554:13, 555:6, 555:12, 566:5, 587:12, 587:15, 587:22, 588:5, 588:11, 588:16, 588:21, 588:24, 589:11, 589:18, 589:21, 589:25, 590:6, 590:11, 590:16, 590:23, 591:2, 595:15, 595:24, 596:2, 596:8, 596:15, 596:22, 597:1, 603:7, 603:15, 603:22, 604:21, 604:23, 605:8, 605:10, 605:16, 605:19, 606:6, 606:15, 606:18, 607:2, 608:1, 608:3, 608:16, 608:24, 610:14, 610:20, 610:24, 611:4, 611:24, 612:9, 612:14, 613:8, 613:13, 613:16, 613:20, 614:13, 615:2, 615:5, 615:19, 615:22, 616:2, 616:14, 616:17, 616:23, 617:2, 617:7, 617:10, 617:16, 617:20, 618:3, 618:6, 618:10, 618:17, 619:1, 619:9, 620:6, 620:8, 621:22, 624:19, 625:7, 625:10, 625:14, 626:5, 626:9, 626:15, 626:25, 627:7, 627:12, 627:14, 627:18, 628:4, 628:13, 628:16, 629:7, 629:17, 629:24, 630:2, 630:8, 630:16, 631:15, 631:24, 632:6, 632:21, 633:13, 633:15, 634:14, 634:21, 634:23, 636:4,

637:21, 638:10, 638:12, 638:23, 638:25, 639:4, 640:11, 641:8, 641:15, 641:25, 642:14, 643:4, 643:17, 643:21, 644:13, 645:4, 645:8, 645:11, 645:20, 645:22, 646:3, 646:6, 646:9, 649:4, 649:9, 649:10, 649:16, 649:19, 661:14, 661:23, 661:25, 668:7, 683:13, 688:23, 693:21, 705:11, 707:9, 707:12, 707:13, 707:15, 707:20, 708:17, 712:22, 716:25, 717:1, 717:3, 717:19, 717:21, 723:1, 726:13, 726:21, 727:25, 728:2, 728:13, 728:16, 729:17, 730:5, 731:20, 732:11, 732:17, 732:18, 734:11, 734:13, 734:19, 734:22, 734:25, 735:24, 736:17, 736:19, 736:22, 737:10, 737:18, 737:24, 738:6, 738:24, 739:5, 739:7, 739:8, 739:9, 740:12, 740:22, 741:1, 742:12, 743:12, 743:15, 744:16, 744:20
**videos** [31] - 536:10, 587:8, 595:9, 601:12, 602:25, 606:20, 618:14, 622:3, 622:8, 622:9, 630:11, 637:6, 640:24, 641:11, 660:16, 660:17, 661:11, 683:15, 683:16, 684:8, 684:11, 701:19, 707:18, 707:19, 710:14, 717:6, 727:9, 728:5, 728:8, 745:9
**videotaped** [1] - 683:15
**view** [8] - 628:13,

629:2, 632:13, 643:10, 646:8, 685:23, 686:5, 725:10
**viewed** [1] - 622:8
**Viewing** [1] - 707:23
**viewing** [13] - 691:14, 691:18, 691:19, 691:23, 692:4, 708:5, 708:8, 708:10, 708:17, 708:23, 709:5, 712:19
**views** [2] - 691:11, 700:13
**vigilance** [2] - 521:20, 686:23
**violating** [1] - 597:19
**violation** [10] - 521:4, 602:9, 670:19, 673:5, 674:20, 675:10, 676:24, 677:4, 715:20, 716:1
**violations** [1] - 674:22
**violence** [3] - 518:1, 521:6, 551:5
**Violent** [3] - 715:7, 715:9, 715:16
**violent** [8] - 578:5, 578:7, 578:11, 578:12, 715:9, 715:17, 715:19, 716:3
**Virginia** [3] - 619:8, 667:24, 711:3
**visibility** [7] - 529:10, 529:22, 529:25, 536:21, 537:3, 544:7, 547:6
**visible** [2] - 544:2, 662:15
**vision** [1] - 687:7
**visual** [87] - 538:7, 548:21, 555:18, 556:2, 556:9, 557:21, 558:5, 587:20, 588:2, 589:23, 595:18, 596:12, 600:6, 600:15, 600:24, 601:9, 603:11, 604:25, 605:3, 605:14, 606:7, 606:10, 607:13, 608:2, 609:14, 610:16, 611:10, 612:3, 612:20, 613:9, 613:24, 614:14, 615:3, 616:19, 617:12,

617:25, 618:8, 618:19, 618:22, 620:18, 622:14, 623:18, 624:5, 624:18, 625:8, 626:7, 627:2, 627:13, 628:6, 628:17, 629:19, 629:22, 630:15, 631:7, 631:16, 635:4, 635:8, 635:18, 636:14, 636:25, 638:20, 639:15, 640:1, 640:12, 640:17, 641:6, 643:23, 644:10, 645:5, 646:22, 647:7, 649:11, 661:21, 665:8, 665:20, 666:14, 685:20, 687:21, 690:2, 730:9, 730:11, 731:11, 732:1, 733:11, 736:7, 738:20, 740:3
**visually** [2] - 687:20, 687:24
**voice** [68] - 566:6, 588:8, 588:10, 588:13, 588:14, 590:1, 590:3, 590:5, 590:6, 596:14, 607:15, 607:21, 607:23, 608:6, 608:9, 608:10, 611:12, 611:18, 611:19, 611:21, 611:23, 612:5, 612:11, 612:13, 612:16, 612:22, 612:25, 613:2, 613:5, 615:6, 615:8, 615:11, 615:13, 615:14, 619:12, 619:21, 620:22, 621:5, 625:11, 625:13, 625:25, 626:2, 626:3, 626:10, 628:21, 628:24, 630:9, 630:10, 631:10, 631:12, 632:1, 645:7, 645:10, 645:16, 645:19, 660:13, 661:23, 661:24, 665:14, 665:23, 666:9, 735:2, 735:5, 736:3, 737:8, 737:11
**voices** [4] - 624:8,

624:14, 626:12, 627:6
voir [1] - 681:16
volitional [1] - 520:4
volume [1] - 620:14
voluminous [1] - 720:2

## W

waiting [3] - 669:25, 670:16
Waldo [1] - 745:5
walk [1] - 548:25
walked [2] - 531:3, 531:17
walking [9] - 531:10, 531:21, 531:22, 531:25, 532:1, 532:2, 532:24, 648:22
wall [6] - 554:15, 554:20, 555:22, 556:5, 627:10
wants [2] - 732:12, 741:12
war [3] - 534:3, 534:23, 553:15
warrant [7] - 563:15, 563:18, 657:17, 657:19, 657:21, 657:22, 735:21
warrants [1] - 717:4
washed [1] - 629:15
Washington [13] - 578:2, 578:3, 578:6, 578:8, 578:12, 579:22, 587:9, 591:6, 715:5, 715:7, 715:9, 715:18, 717:17
watch [3] - 543:4, 597:9, 641:11
watched [26] - 536:16, 538:10, 556:22, 556:23, 588:21, 590:24, 595:24, 596:23, 603:16, 606:15, 610:21, 613:14, 615:19, 616:24, 617:17, 618:15, 632:7, 632:25, 637:21, 638:12, 641:8, 646:3, 706:9, 706:11, 710:15, 737:10
watching [2] - 634:24, 727:24
water [8] - 532:20,

532:21, 628:25, 629:2, 629:4, 629:15
ways [5] - 534:9, 535:4, 535:5, 691:24, 693:15
weak [2] - 535:10, 540:10
weakened [1] - 541:14
weapon [7] - 518:1, 521:6, 521:8, 687:20, 687:22, 687:23
weapons [4] - 688:3, 701:17, 701:20, 701:21
wear [1] - 529:15
wearing [20] - 529:7, 537:3, 557:23, 605:25, 609:10, 614:21, 614:23, 623:22, 686:11, 686:14, 719:7, 719:8, 721:11, 722:6, 722:7, 724:22, 731:1, 731:2, 739:13, 739:15
website [3] - 597:10, 657:4, 663:5
Wednesday [1] - 679:17
week [2] - 679:17, 679:21
weeks [1] - 575:3
weigh [1] - 519:23
welcome [1] - 602:17
West [8] - 530:22, 531:19, 536:5, 593:20, 607:9, 725:11, 725:18, 726:7
west [26] - 524:3, 530:24, 531:25, 532:3, 532:25, 533:11, 533:13, 533:15, 533:20, 533:22, 543:13, 552:2, 607:9, 610:5, 610:7, 614:7, 614:9, 616:9, 618:16, 646:14, 683:17, 706:21, 721:17, 721:18, 726:8, 738:15
westward [1] - 614:8
WhatsApp [1] - 566:6
whatsoever [2] - 702:7, 702:8
white [10] - 535:22, 554:23, 556:12,

606:2, 639:22, 724:23, 726:18, 729:10, 731:2, 740:19
whole [5] - 532:13, 532:16, 534:5, 665:7, 694:25
wholly [1] - 673:24
wide [2] - 686:1, 710:25
wife [1] - 660:8
willfully [1] - 519:24
window [1] - 575:16
winter [2] - 529:8, 529:9
wisely [1] - 520:23
wishes [1] - 679:4
WITNESS [23] - 527:15, 528:5, 528:8, 541:9, 541:12, 541:17, 541:20, 558:16, 558:23, 559:2, 577:8, 601:18, 602:20, 620:1, 620:7, 680:3, 693:13, 713:24, 714:8, 714:10, 716:5, 723:19, 744:1
witness [43] - 517:23, 526:13, 558:19, 561:11, 572:23, 573:15, 573:17, 573:20, 575:10, 575:11, 576:2, 576:9, 637:17, 637:20, 667:12, 671:9, 671:14, 672:20, 674:25, 676:20, 677:7, 677:10, 678:7, 678:14, 679:10, 681:21, 689:21, 691:6, 693:17, 693:19, 699:22, 699:25, 702:23, 708:20, 710:22, 711:20, 713:20, 727:4, 727:5, 744:2, 744:9
Witness [10] - 536:25, 551:18, 558:17, 573:4, 605:24, 669:22, 713:25, 737:19, 738:10, 743:8
witness's [10] - 670:13, 674:22, 675:10, 679:5, 679:11, 682:3,

690:16, 691:22, 693:15, 702:22
witnessed [2] - 690:18, 693:19
witnesses [11] - 518:9, 525:16, 575:3, 671:10, 676:8, 676:11, 677:2, 678:10, 701:14, 721:8, 744:7
Witnesses [1] - 516:3
woman [2] - 554:16, 556:5
women [1] - 598:17
wondered [1] - 533:2
Woodstock [1] - 584:12
WOODWARD [80] - 517:17, 527:1, 527:4, 545:14, 548:10, 549:3, 550:9, 552:21, 553:1, 553:23, 553:24, 554:9, 554:12, 554:14, 555:3, 555:8, 555:11, 555:16, 555:19, 555:20, 556:1, 556:3, 556:4, 556:8, 556:10, 556:11, 557:4, 557:11, 557:19, 557:22, 558:3, 558:6, 565:6, 569:5, 570:23, 572:1, 572:18, 573:8, 573:22, 574:4, 574:14, 575:10, 576:25, 599:3, 601:20, 601:24, 602:6, 619:14, 619:16, 620:24, 621:1, 621:12, 621:25, 622:6, 622:21, 623:9, 637:12, 637:16, 637:24, 667:14, 667:16, 669:4, 670:5, 670:21, 672:2, 673:6, 711:23, 719:18, 722:17, 723:13, 725:6, 726:24, 727:2, 727:16, 732:9, 732:11, 733:22, 739:23, 741:11, 745:19
Woodward [34] - 517:18, 517:20, 526:25, 548:9,

550:7, 550:12, 565:5, 565:23, 570:21, 573:7, 576:24, 599:2, 637:8, 637:11, 667:13, 670:4, 670:8, 670:16, 670:20, 675:17, 676:8, 676:10, 676:14, 678:4, 678:19, 679:4, 711:21, 719:17, 722:16, 722:5, 744:11, 745:4, 745:7, 745:18
Woodward's [1] - 599:10
Woodward............. [2] - 516:6, 516:8
wool [1] - 721:10
word [7] - 574:14, 608:13, 621:10, 630:19, 630:21, 657:19, 660:21
words [9] - 598:24, 599:5, 657:2, 659:6, 660:18, 664:11, 732:15, 737:6, 737:9
wore [1] - 609:11
worker [1] - 720:16
works [10] - 532:13, 532:17, 534:5, 677:22, 684:25, 694:15, 697:2, 712:8, 713:13, 713:15
world [1] - 689:11
worn [41] - 530:2, 530:8, 530:11, 691:11, 691:14, 691:19, 691:24, 693:3, 704:24, 705:4, 705:9, 705:14, 705:20, 706:3, 706:9, 706:18, 707:3, 707:6, 707:10, 708:2, 708:5, 708:7, 708:10, 708:17, 708:24, 709:1, 709:4, 709:8, 709:10, 717:1, 722:10, 722:12, 731:21, 731:23, 732:3, 733:3, 736:23, 739:17, 742:3
Worn [1] - 707:24
worth [2] - 735:16, 736:1

**wrap** [5] - 562:18:20, 695:21, 744:6, 744:10
**writes** [1] - 521:18
**writhing** [1] - 706:24
**writing** [2] - 703:12, 703:25
**written** [3] - 574:18, 678:3, 684:5
**wrote** [1] - 668:24

## X

**Xenakis** [7] - 518:11, 518:16, 519:7, 521:13, 521:18, 521:23, 525:19
**Xenakis's** [5] - 518:20, 519:2, 519:4, 520:24, 521:10

## Y

**y'all** [1] - 739:11
**year** [2] - 715:16, 715:21
**years** [14] - 524:18, 528:17, 533:8, 551:17, 559:16, 559:18, 559:24, 577:23, 673:12, 682:19, 682:20, 695:16, 703:15, 704:2
**yell** [1] - 665:11
**yelled** [1] - 630:19
**yelling** [2] - 736:13
**yellow** [2] - 537:3, 544:7
**yesterday** [1] - 520:23
**you-all** [3] - 576:2, 678:7, 716:3
**yourself** [9] - 527:18, 531:4, 531:17, 536:24, 545:3, 557:15, 661:3, 678:9, 736:2
**yourselves** [1] - 517:5

## Z

**zero** [1] - 521:20