1          **UNITED STATES DISTRICT COURT**
           **FOR THE DISTRICT OF COLUMBIA**
2    _____

3    United States of America,       )  Criminal Action
                                      )  No. 1:21-cr-0040-TNM-8, 9
4                      Plaintiff,     )
                                      )
5    vs.                              )  **Bench Trial (Day 5)**
                                      )
6    Steven Cappuccio and Federico    )
     Guillermo Klein,                 )  Washington, D.C.
7                                      )  **July 14, 2023**
                      Defendants.     )  Time:  9:00 a.m.
8    _____

9            **Transcript of Bench Trial (Day 5)**
                    **Held Before**
10        **The Honorable Trevor N. McFadden**
             **United States District Judge**

11

12              A P P E A R A N C E S

13   For the Government:      **Ashley Akers**
                              **Kaitlin Klamann**
14                            **Laura E. Hill**
                              UNITED STATES ATTORNEY'S OFFICE
15                            FOR THE DISTRICT OF COLUMBIA
                              601 D Street, Northwest
16                            Washington, D.C. 20579

17   On Behalf of the Defendant Steven Cappuccio:
                              **Marina T. Douenat**
18                            FEDERAL PUBLIC DEFENDER'S OFFICE
                              Western District of Texas
19                            727 E. Cesar E. Chavez Boulevard
                              San Antonio, Texas 78206
20
                              **Edgar H. Holguin**
21                            FEDERAL PUBLIC DEFENDER
                              Western District of Texas
22                            700 East San Antonio, Suite D-401
                              El Paso, Texas 79901

23

24

25

```
1              A P P E A R A N C E S, (continued)

2    On Behalf of the Defendant Federico Guillermo Klein:
                           Stanley E. Woodward, Jr.
3                          BRAND WOODWARD LAW, LP
                           400 Fifth Street, Northwest
4                          Washington, D.C. 20001

5    _____

     Stenographic Official Court Reporter:
6                          Nancy J. Meyer
                           Registered Diplomate Reporter
7                          Certified Realtime Reporter
                           333 Constitution Avenue, Northwest
8                          Washington, D.C. 20001
                           202-354-3118
9
     Proceedings recorded by mechanical stenography.  Transcript
10   produced by computer-aided transcription.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **I N D E X**

2                                                           PAGE:

3    **Witnesses:**

4    Steven Cappuccio
          Cross-Examination By Ms. Klamann................. 1106
5         Redirect Examination By Ms. Douenat.............. 1179
     Benjamin Fulp
6         Recross-Examination By Mr. Woodward ............. 1186

7

8    **Exhibits Admitted:**

9         Defendant Klein Exhibit 3........................ 1195
          Defendant Klein Exhibit 4........................ 1197
10

11

12   **Closing Arguments:**

          By Ms. Akers.................................... 1213
13        By Ms. Douenat................................. 1282
          By Mr. Woodward................................ 1297
14        By Ms. Akers................................... 1328

15

16

17

18

19

20

21

22

23

24

25

```
1                        P R O C E E D I N G S

2              THE COURTROOM DEPUTY:  Your Honor, this is Criminal

3    Case 21-40, United States of America v. Steven Cappuccio and

4    Federico Guillermo Klein.

5              Counsel, please come forward to identify yourself for

6    the record, starting with the government.

7              MS. AKERS:  Good morning, Your Honor.  Ashley Akers

8    on behalf of the United States.  With me at counsel table is my

9    co-counsel Laura Hill, Kaitlin Klamann; paralegal specialist

10   Kyle Clements; and Special Agents Ben Fulp and Jon Comottor.

11             THE COURT:  Good morning, folks.

12             MS. DOUENAT:  Good morning, Your Honor.  Marina

13   Douenat and Edgar Holguin on behalf of Steven Cappuccio, with

14   our paralegal Deedra Alexandria.

15             THE COURT:  Good morning, folks.

16             MR. WOODWARD:  Good morning, Your Honor.  Stanley

17   Woodward on behalf of Federico Klein, who is present, as is our

18   paralegal for the week, Graeson Claunch.

19             THE COURT:  Good morning, everyone.

20             All right.  We are ready to hear the cross-examination

21   of Mr. Cappuccio.

22             So, sir, if you can take the stand, and I'll remind you

23   you're still under oath.

24             DEFENDANT CAPPUCCIO:  Good morning, Judge.

25             THE COURT:  Good morning, sir.
```

```
 1              DEFENDANT CAPPUCCIO:  Good morning.
 2                       CROSS-EXAMINATION
 3    BY MS. KLAMANN:
 4    Q.  Good morning, Mr. Cappuccio.
 5    A.  Good morning.  How are you doing?
 6    Q.  If I understand your testimony yesterday, you're claiming
 7    that you're basically not responsible for anything that you did
 8    in the three days leading up to and including January 6th; is
 9    that right?
10    A.  I'm not sure I understand what you're saying, like --
11    Q.  You were basically clueless about what was going on in
12    D.C.; is that your testimony?
13    A.  Yeah, I really didn't know what was going on as far as
14    anything.
15    Q.  Same with when you went to the Capitol?  No idea what
16    people were talking about or what was going on; is that right?
17    A.  Yeah.  Yes.
18    Q.  Let's start at the beginning.  You testified that your
19    friend, Mike, put out there that he was looking for someone to
20    go with him to Washington, D.C.; is that right?
21    A.  Yes.
22    Q.  Okay.  And you volunteered; right?
23    A.  Yes.
24    Q.  Okay.  Left your kids, your six kids, and your wife, who
25    has a full-time job to drive from Texas all the way to D.C.
```

1   just on a whim; is that right?

2   A.  Yes.

3   Q.  And you testified that you did basically no preparation to

4   go to Washington, D.C.; is that right?

5   A.  That's correct.

6   Q.  Because this doesn't matter to you?  You didn't care about

7   this; right?

8   A.  Right.

9   Q.  Okay.  You said you packed.  You just threw -- what? -- a

10  couple old pairs of pants, some socks into a bag, and that's

11  all; right?

12  A.  Yep.

13  Q.  And, in fact, you didn't prepare very well, as you said,

14  because it was cold and you didn't have appropriate clothing;

15  is that right?

16  A.  Right.  I mean, being from Texas, the weather even in the

17  winter is warm.  So I wear shorts primarily all the time.  So I

18  was wearing shorts.  I just packed a pair of pants and a shirt,

19  and, you know, that was it.

20  Q.  Yeah.  But you checked the weather before you went, didn't

21  you?

22  A.  I don't know.

23          MS. KLAMANN:  Let's pull up Government's

24  Exhibit 612 -- or 613, rather, Mr. Clements.  Can we turn to

25  page 12.

CAPPUCCIO - CROSS

1    BY MS. KLAMANN:

2    Q.  Mr. Cappuccio, these are text messages that you exchanged

3    with your buddy Mike; right?

4    A.  Yes.

5            MS. KLAMANN:  Okay.  Mr. Clements, can we zoom in on

6    that first text.

7    BY MS. KLAMANN:

8    Q.  So on January 1st, after you guys have decided you want to

9    drive to Washington, D.C., you sent Mike a screenshot of a

10   ten-day weather forecast for Washington, D.C., didn't you?

11   A.  Yeah, I guess so.

12   Q.  Yeah.  So it's not really true, is it, that you had no idea

13   what the weather was going to be and you just threw some stuff

14   in a bag and you were surprised it was cold when you got to

15   D.C.; right?

16   A.  No.  I mean, weather changes.  And like I said, I had been

17   in the military, so I've been in extreme cold weather, so like

18   I said.

19   Q.  But you knew what the weather was going to be; right?

20   A.  I probably forgot about it.

21   Q.  You forgot about it in the three days before you left

22   after you made a point of screenshotting this and sending it to

23   Mike?

24   A.  Yes.

25   Q.  Okay.  Okay.  So you and Mike leave from Texas.  I think

1    you said there were a couple legs to your drive; right?

2    A.  Yes.

3    Q.  And you eventually make it to Lexington, Kentucky; is that

4    right?

5    A.  Yes.

6    Q.  Where you met up with a Trump train?

7    A.  Yes.

8    Q.  Other people in cars also going to Washington, D.C.?

9    A.  Yes.

10   Q.  Okay.  So at this point, surely you know that there's an

11   event happening involving President Trump at Washington, D.C.;

12   right?

13   A.  Oh, yes.

14   Q.  Okay.  And when you get to the meet-up spot, as you

15   described yesterday, you meet someone who tells you about this

16   cool app on your phone where you can all talk over the radio;

17   right?

18   A.  I didn't personally meet him.  He was, like -- he was --

19   just basically made himself, like, the leader, and so he kind

20   of just spit it out there.  I wasn't, like, in the group

21   where -- everybody who was driving.

22   Q.  Right.

23   A.  So --

24   Q.  Yeah.  That's right.  I don't mean to, like, ascribe that

25   you actually did anything; right?  This was just passive;

```
1    right?

2         You didn't meet him?  You want to be clear about that;

3    right?

4    A.  Yeah.

5    Q.  Okay.  You got an app on your phone or Mike's phone so

6    that you could communicate with people in the Trump train;

7    right?

8    A.  Yes.

9    Q.  Okay.  And you turned it on because we heard it in one of

10   the videos that you created?

11   A.  Yes.

12   Q.  So while you're driving, you're listening to folks talking

13   over this radio?

14   A.  (Witness nods head.)

15   Q.  And I'm assuming they're saying stuff about the "Stop the

16   Steal" rally, for example.  Did you hear that?

17   A.  I don't remember specifically "Stop the Steal," like,

18   rally-type stuff.

19   Q.  Uh-huh.

20   A.  A lot of stuff that was talked about was Antifa.

21   Q.  Okay.  And Antifa potentially being at the rally?

22   A.  Yes.

23   Q.  Okay.  And maybe being violent?

24   A.  Yes.

25   Q.  And how you guys should be prepared?
```

1    A.   I don't know about how much being prepared.  I mean --

2    Q.   Mr. Cappuccio, on your drive, did you stop at a Walmart?

3    A.   Yes.

4    Q.   Did you buy some items there?

5    A.   I didn't buy any items that I can recall.

6    Q.   Right.  You didn't do anything.  That's right.

7         Did Mike buy items there?

8    A.   Yes, he did.

9    Q.   Okay.  Was one of those items some goggles?

10   A.   I think so, yes.

11   Q.   Okay.  And did he buy those goggles because he was afraid

12   of what was coming, what was going to happen at the Capitol?

13   A.   Well, not -- like I said, most everybody on there was just

14   talking about Antifa.  So --

15   Q.   That's not my question, Mr. Cappuccio.

16   A.   Okay.  I'm sorry.  What?

17   Q.   He bought goggles for a reason; right?

18   A.   Yes.

19   Q.   Because he was concerned about what was going to happen at

20   the Capitol; right?

21   A.   Like I said, I don't know if it was at the Capitol or not,

22   but --

23   Q.   Where were you going?  Were you going somewhere other than

24   the Capitol?

25   A.   Well, like I said, we didn't -- like I said, I just thought

CAPPUCCIO - CROSS

```
 1    it was the rally or the Trump speech.
 2    Q.  So you were with him at Walmart, though, when he bought the
 3    goggles?
 4    A.  Yes.
 5    Q.  But you didn't ask, like, that's a strange item for you to
 6    be buying?
 7    A.  I just thought it was -- like, why would you be wanting to
 8    buy that.
 9    Q.  Yeah.  Exactly.  So did you ask him?
10    A.  Well, I don't think I specifically asked him.
11    Q.  Okay.  That was kind of your general thing -- right? --
12    asking him questions; is that right?
13    A.  Yeah.  I mean, it wasn't -- I was just like --
14    Q.  You were just passive?  Going along with the flow?
15    A.  Yes.
16    Q.  Okay.  So you stopped and bought some goggles as part of
17    the Trump train; right?
18    A.  Yes.
19    Q.  Eventually, you got to D.C.  You spend the night, as you
20    described, in Arlington; is that right?
21    A.  Yes.
22    Q.  Wake up extra early in the morning?
23    A.  Yes.
24    Q.  That's because you wanted to get there early; right?
25    A.  Yes.
```

1   Q.  Okay.  You go to the rally; right?

2   A.  Yes.

3   Q.  And you wait in a very long line?

4   A.  Yes.

5   Q.  And you actually get separated from Mike?

6   A.  Yes.

7   Q.  That's sort of strange, because isn't Mike the whole reason

8   you're there?

9   A.  Yeah.

10  Q.  But you were fine just to be out on your own at the rally?

11  A.  I mean, I wasn't on my own.  I was in a line.

12  Q.  Did you know any of those people around you?

13  A.  No.

14  Q.  Okay.  Any of them from the Trump train?

15  A.  Not that I can recall.

16  Q.  Okay.  So you wait in line, you get in the rally, and you

17  listen to the speeches by yourself; right?

18  A.  Yes.

19  Q.  Okay.  And you listened to the Trump speech while you were

20  there?

21  A.  Yeah, I tried to listen to all of it.

22  Q.  I'm sorry.  What did you say?

23  A.  I tried to listen to all of it, yeah.

24  Q.  Yeah.  Okay.  Because the crowd was -- was very focused on

25  what the former President was saying; right?  And you were a

1    part of that crowd?

2    A.  Yes.  Yes.

3    Q.  Okay.  And then you met up with your buddy, Mike, after the

4    rally; right?

5    A.  Yes.

6    Q.  I think you described you met him at the porta potty?

7    A.  Yes.

8    Q.  And the two of you -- you said, again -- once again, very

9    passive?  You don't care what you do next; is that your

10   testimony?

11   A.  Yes.

12   Q.  Okay.  But Mike wanted to go to the Capitol?

13   A.  Yes.  It's kind of like what-do-you-want-to-do-type thing.

14   I don't know.  What do you want to do?  Whatever.

15   Q.  So you guys decided to walk along with the crowd and go to

16   the Capitol; right?

17   A.  Yes.

18   Q.  Okay.  And you looked at some video that you took from your

19   phone yesterday of your walk to the Capitol; right?

20   A.  Yes.

21   Q.  And during that walk, there were folks around you who were

22   chanting; right?

23   A.  Yes.

24   Q.  Including chanting "Stop the Steal"?

25   A.  Yes.

1    Q.   Okay.   And you had just listened to former President Trump

2    for an hour; right?

3    A.   Yes.

4    Q.   And so you knew what they were referring to, didn't you?

5    A.   Well, I eventually figured it out, yes.

6    Q.   Eventually, or as you were walking to the Capitol?

7    A.   No.   I mean, it -- like I said, it took me a minute because

8    I was thinking "Stop the Steal," like, what does that mean?

9    Like, I was thinking steal, like something stolen.   But it took

10   me a minute to think, oh, they're talking about, like, the --

11   the voting process or -- like, they had lost the election.   So

12   they -- like, it-got-stolen-from-them-type thing.   So yeah.

13   Q.   So, Mr. Cappuccio, is it your testimony that after the

14   "Stop the Steal" rally, as you were walking to the Capitol, you

15   didn't know anything about this theory that the 2020

16   presidential election had been stolen?

17   A.   Just -- because I wasn't watching any news.   So hearing a

18   lot of the -- that stuff just made me think, oh, okay.   So, you

19   know, they think that the -- the election was stolen from, I

20   guess, Trump or the people.

21   Q.   And this was baffling to you?   You had never heard this

22   before?

23   A.   No.   I mean, like, I just took it as, like, Trump -- I

24   looked at it like, well, Trump just lost.   So, oh, well, that

25   happens.   You know, he surprised everybody in 2016.   Everybody

1    couldn't believe it.  So I was just kind of like, oh, well.

2    Like, that happens.  You win some.  You lose some.  It didn't

3    matter to me.

4    Q.  Uh-huh.  None of this mattered to you?  Nothing that

5    happened to you that day mattered to you, did it?

6    A.  Not what was going on.  I was just there to see the Trump

7    speech.

8    Q.  We talked a little bit about your ride in the Trump train;

9    right?

10   A.  Yes.

11        MS. KLAMANN:  Let's pull up Government's

12   Exhibit 612.49.  Actually, I'm sorry.  It's 612.51.

13   BY MS. KLAMANN:

14   Q.  You took this video, right, Mr. Cappuccio?

15   A.  Yes.

16   Q.  And, again, this is part of the Trump train.  All these

17   cars that we see here on the screen, you were with all of them;

18   right?

19   A.  Yes.

20   Q.  Okay.

21        MS. KLAMANN:  Mr. Clements, can we play.

22        (An audio-visual recording was played.)

23   BY MS. KLAMANN:

24   Q.  So, Mr. Cappuccio, this is January 5th; right?

25   A.  Uh-huh.

```
1    Q.  So this is before you walk to the Capitol from the rally?

2    A.  Uh-huh.

3    Q.  Okay.

4              THE COURT:  Sir --

5              THE WITNESS:  Yes.

6    BY MS. KLAMANN:

7    Q.  And so you're saying in this video, woo-hoo, this is part

8    of history, aren't you?

9    A.  Yes.

10   Q.  But you -- according to your testimony, you have no idea

11   what's happening?

12   A.  True.

13   Q.  So why did you say that?

14   A.  I was referring to just the amount of people that showed up

15   at this thing.  Like, I didn't know --

16   Q.  It's part of history that you're in a caravan with what

17   looks like on the screen to be, like, 12 other cars?  That's

18   what you were referring to?

19   A.  Well, yeah.  Sure.

20   Q.  Okay.  You also said at the end of this clip, quote, it's

21   all true.

22   A.  Uh-huh.  Yes.

23   Q.  And we're going to find out how much more true it is when

24   we get to D.C.; right?

25   A.  Yes.
```

1    Q.  Again, you're referring there to this theory that the

2    election was stolen; right?

3    A.  No.

4    Q.  Okay.  What did you mean?

5    A.  I'm meaning with, like, everybody getting together to go to

6    the Trump rally.  Like, I didn't know how many --

7    Q.  What would not be true about that?

8    A.  Just the support that he had.

9    Q.  It's all true that Trump has this support?

10   A.  Well, yeah.

11   Q.  Okay.  And you're one of his supporters; right?

12   A.  Yes.

13   Q.  As part of this Trump train?

14   A.  Yes.

15   Q.  Okay.  And as one of his supporters, though, you didn't

16   know about this theory that was on the news every day that the

17   2020 election was stolen?

18   A.  I didn't watch much news after the election or before the

19   election.  What bit I did catch, there was talk of, you know,

20   mis- -- like, you know -- not something being stolen, but just

21   votes not being counted, stuff like that.

22   Q.  Okay.  So you're walking to the rally.  You're hearing

23   folks chanting "Stop the Steal."  You don't fully understand

24   what that means?

25   A.  I figured it out.  But, I mean, it didn't matter to me.

1   Q.  Okay.  But you're with them.  You're going with them to the

2   Capitol.  But it didn't matter what they believed; is that your

3   testimony?

4   A.  That's correct.

5   Q.  And then you actually crossed onto Capitol Grounds; right?

6   A.  Yes.

7   Q.  You were on the west side of the building?

8   A.  Yes.

9   Q.  And you saw a very large crowd there, as you described for

10  us yesterday; right?

11  A.  Yes, ma'am.

12  Q.  Okay.  And I think you said that at this point you sensed a

13  change in the crowd; right?

14  A.  Yes.  There was -- eventually, like, seemed, like,

15  everything had changed, the atmosphere.

16  Q.  Yeah.  You didn't turn around and leave, did you,

17  Mr. Cappuccio?

18  A.  No.

19  Q.  Okay.  And it was a very large crowd.  And I think you

20  described them as angry; right?

21  A.  They eventually seemed, like, they got angry.

22  Q.  Okay.  And so you -- you were marching over with folks who

23  were chanting "Stop the Steal," and now you're on

24  U.S. Capitol Grounds with an angry crowd; right?

25  A.  Yes.

1    Q.  Okay.  Did you realize now what they might be angry about

2    and what might be going on?

3    A.  No.  I just -- angry people.

4         MS. KLAMANN:  Mr. Clements, can we pull up

5    Government's Exhibit 612.13.

6    BY MS. KLAMANN:

7    Q.  This is the video that you took on -- on Capitol Grounds;

8    right?

9    A.  Yes.

10   Q.  You're standing, like, on the Capitol.  The Capitol is --

11   is right in front of you?

12   A.  Yes.

13        MS. KLAMANN:  Okay.  Let's play that, Mr. Clements.

14        (An audio-visual recording was played.)

15        MS. KLAMANN:  Let's pause there.

16   BY MS. KLAMANN:

17   Q.  "Storming the castle, boys."  You didn't understand the

18   meaning of those words; is that your testimony?

19   A.  No.  I think I understood, like, what storming the castle

20   meant.

21   Q.  Yeah.  Did you understand that this crowd was storming the

22   U.S. Capitol Building at this time?

23   A.  I knew they were getting onto the Capitol Grounds.

24   That's --

25   Q.  And you're in this crowd, aren't you, Mr. Cappuccio?

CAPPUCCIO - CROSS

1   A.  Yes.

2   Q.  Okay.  So you are storming the Capitol at this time, aren't

3   you?

4   A.  No.  I didn't feel like I was.

5   Q.  So when you said, "Storming the Capitol [sic], boys," were

6   those words you just repeated from somebody nearby?  Or did you

7   have an independent thought maybe this is something I should

8   say?

9   A.  No, I -- I heard other people saying storm the castle, so.

10   Q.  Oh.  You were just repeating other people again?

11   A.  (Witness nods head.)  Yes.

12   Q.  You made no independent decision to say those words even;

13   is that right?

14   A.  I mean, I said the words.  So, I mean, I made the decision

15   to say them.

16          MS. KLAMANN:  Mr. Clements, can you keep playing.

17          (An audio-visual recording was played.)

18          MS. KLAMANN:  Let's pause there.

19   BY MS. KLAMANN:

20   Q.  "Fight for Trump."  Another interesting phrase coming out

21   of your mouth here.  You knew what that meant, didn't you,

22   Mr. Cappuccio?

23   A.  Fight for Trump?

24   Q.  Yeah.

25   A.  Support him.  That's what I --

```
1    Q.  Yeah?

2    A.  -- thought it meant.

3    Q.  Fight for Trump and storming the Capitol [sic], as you have

4    just said a few seconds before this?

5    A.  No.

6    Q.  Those were unrelated statements?

7    A.  To me they were.

8    Q.  And what you're filming here -- right?

9    A.  Uh-huh.

10   Q.  You're filming folks up on scaffolding.  You're filming

11   folks up on the inaugural stage.  There are people all over the

12   Capitol at this point; isn't that right?

13   A.  Yes.

14   Q.  Yeah.  And you knew that they shouldn't be there; right?

15   A.  I was surprised that everybody was there.

16   Q.  But you were there, Mr. Cappuccio; right?

17   A.  Yes.  That's right.  Yes.

18   Q.  Yeah.  So you're surprised that other people are there.

19   But you're right there with them, aren't you?

20   A.  Yes.

21   Q.  Okay.

22            MS. KLAMANN:  Mr. Clements, can you keep playing.

23            (An audio-visual recording was played.)

24   BY MS. KLAMANN:

25   Q.  Mr. Cappuccio, you said you were surprised they were
```

CAPPUCCIO - CROSS

```
 1   there -- right? -- but you didn't turn around, did you?
 2   A.  No.
 3   Q.  You kept going, didn't you?
 4   A.  Yes.
 5   Q.  And you kept going towards the Capitol Building?
 6   A.  Like I said previously, I was trying to get to the
 7   scaffolding that was off to the right.
 8   Q.  I want to talk about, yeah, your use of the word
 9   scaffolding.  That's an interesting word, isn't it?
10   A.  Yes.
11   Q.  Scaffolding is something that's under construction, isn't
12   it?
13   A.  Yes.
14   Q.  Okay.  So you knew, according to your testimony, when
15   you're standing on the west plaza, I want to go up into that
16   place that's under construction; is that right?
17   A.  Yes.
18   Q.  Okay.  It doesn't enter your mind maybe I shouldn't be
19   going somewhere that's under construction?
20   A.  No.  There was people standing on there already.
21   Q.  But you said you were surprised that there was people all
22   around?
23   A.  Yeah.  Yes.
24   Q.  So you knew they shouldn't be there, and yet you wanted to
25   go there too; right?
```

CAPPUCCIO - CROSS

```
1    A.  Yes.

2    Q.  Okay.  And you did?

3    A.  Well, I never made it up there, no.

4    Q.  Well, you made it up to the next level; right?

5    A.  Yes.

6    Q.  The lower west terrace?

7    A.  Yes.

8    Q.  Did you go -- did you walk up the steps through the

9    scaffolding to get there?

10   A.  No.  Like I said before, people were coming down from that

11   direction, and it was -- I didn't want to be a jerk about

12   trying to bust through the line going up there, so.

13   Q.  Oh.  You didn't want to hit any other rioters; is that

14   right?  You didn't want to be a jerk, meaning --

15   A.  I didn't --

16   Q.  -- you didn't want to get in the rioters' way?

17   A.  I mean, I didn't want to be busting into people, no.

18   Q.  How did you get up to that second level?

19   A.  I saw the stairwell was -- was full of people, and some

20   people were getting on the railing and going up the railing.  I

21   saw that's one way to get up there to get to the scaffolding.

22   Q.  So you climbed on top of a railing and went to the second

23   level; is that right?

24   A.  Yes.

25   Q.  That's very active, Mr. Cappuccio.  You made an active
```

1    decision there to keep going into the Capitol; right?

2    A.  Yes.

3    Q.  And at this point, Mike's not with you; right?

4    A.  No.

5    Q.  Okay.  So you testified earlier that you were just going

6    along with Mike because he was your ride; right?

7    A.  Yes.

8    Q.  That's not true anymore, is it?

9    A.  I don't understand.

10   Q.  You could have left at any time; right, Mr. Cappuccio?

11   A.  Yes.

12   Q.  Mike wasn't holding your hand, pulling you along towards

13   the Capitol Building, was he?

14   A.  No.

15   Q.  No.  You made the decision to go up, to actually climb up a

16   railing to the second floor; right?

17   A.  Yes.

18   Q.  Okay.

19        MS. KLAMANN:  Mr. Clements, can we pull up

20   Government's Exhibit 612.15.

21   BY MS. KLAMANN:

22   Q.  Okay.  And, Mr. Cappuccio, this is a video that you took on

23   your phone after you got up to the second floor; right?

24   A.  Yes.

25   Q.  And you're actually standing, like, on the edge?  That's

CAPPUCCIO - CROSS

1    a little scary; right?  That's pretty daring of you, isn't it?

2    A.  Well, ma'am, I'm airborne.  So heights aren't, like, super

3    scary to me.

4    Q.  So you have a high tolerance for --

5    A.  Heights.

6    Q.  -- risky situations?

7    A.  For heights.

8    Q.  Okay.  So you're standing here on the edge?

9    A.  (Witness nods head.)

10   Q.  Of the second story; right?

11   A.  Yes.

12   Q.  Okay.

13            MS. KLAMANN:  Mr. Clements, can you play.

14            (An audio-visual recording was played.)

15            MS. KLAMANN:  Let's pause there.

16   BY MS. KLAMANN:

17   Q.  At the end of that clip, you said, "Deplorables up here,

18   baby."  That's another very specific thing to say; right,

19   Mr. Cappuccio?

20   A.  Yes.

21   Q.  Deplorables, is that a reference to something that

22   Hillary Clinton said?

23   A.  Yes.

24   Q.  Okay.  Earlier you testified you didn't really watch the

25   news; you didn't know anything about the stolen election

1    theory.  But you did know that Hillary Clinton said something

2    using the phrase deplorable; is that right?

3    A.  Yes.  Yes.

4    Q.  It's also interesting that you are saying this in this

5    moment; is that right?

6    A.  Yes.

7    Q.  Because you knew that this crowd was Trump supporters

8    trying to get into the building.  So that was something that

9    would play well with this crowd, yelling out a quote from

10   Hillary Clinton; right?

11   A.  No.

12   Q.  Why did you yell it out?  Why don't you tell us.

13   A.  Because I thought it was funny she had used those words

14   previous in a speech that she had said.  And so to me, I just

15   thought it funny that she mentioned those words and they're

16   just a -- a bunch of -- of people there of all walks of life.

17   And I just thought it was funny.

18   Q.  So you have heard political speeches before?

19   A.  Just from -- bits from what the news would show.

20   Q.  But you said you didn't really watch the news?

21   A.  I didn't sit there and watch it for hours, no.

22   Q.  You were familiar with a speech by Hillary Clinton where

23   she uses the term deplorable; right?

24   A.  Yes.

25   Q.  Because you clearly said it at this moment in this crowd;

1    right?

2    A.  Yes.  Yes.

3    Q.  Okay.  And you said that to rile up the crowd, to get some

4    attention; right, Mr. Cappuccio?

5    A.  No, ma'am.

6    Q.  No.  You just thought it was something that would be funny?

7    A.  Yes.  I mean, deplorables, she was referring to people who

8    shopped at Walmart.  I shop at Walmart.  So I just -- I just

9    thought it was, like, well, look at me.  I'm a deplorable.  I

10   would say it now.

11   Q.  After this you move even closer to the building, don't you?

12   A.  Yes.

13   Q.  You did not turn around?

14   A.  No.

15   Q.  Okay.  You go right up to an entrance to the U.S. Capitol

16   Building; isn't that right?

17   A.  Yes.

18   Q.  And you knew it was an entrance into the building, didn't

19   you?

20   A.  Not like into the building, no.

21   Q.  You testified on direct that when you saw items coming out,

22   you thought that they came from a locker inside the building.

23   So you knew it went into the building, didn't you,

24   Mr. Cappuccio?

25   A.  Well, I was also referring to the people that I saw coming

1    out too that were -- looked like they had been beaten and stuff

2    like that.  So I thought they had ran into Antifa.

3    Q.  Did you know that went into the building?

4    A.  Not, like, into the Capitol Building.  I just -- I mean, I

5    don't know where it went.  I'd never been there so I didn't

6    know where it went.

7            MS. KLAMANN:  Okay.  Let's pull up Government's

8    Exhibit 612.21.

9    BY MS. KLAMANN:

10   Q.  But, Mr. Cappuccio, you knew what was going on inside

11   there, didn't you, when you were standing out there?  You knew

12   a fight was going on in there; right?

13   A.  I -- I just -- I thought if there -- had run into Antifa,

14   maybe there was a fight going on.

15   Q.  You thought Antifa, the -- this very large crowd, had you

16   seen any people that you thought were with Antifa?

17   A.  I had no clue, like, how to recognize Antifa.

18   Q.  But you thought Antifa was in this entryway for some

19   reason?

20   A.  Well, if there was, you know, Antifa people there, I don't

21   know.  But if they were fighting, I don't know.

22           MS. KLAMANN:  Okay.  Let's play a little bit of this,

23   Mr. Clements.

24           (An audio-visual recording was played.)

25           MS. KLAMANN:  You can actually pause right away.

1    BY MS. KLAMANN:

2    Q.  You took this video; right, Mr. Cappuccio?  So this is what

3    you saw?

4    A.  Yes.

5    Q.  Okay.  Two people right in front of you, they've got

6    helmets on.  They've got gas masks on.  Did that seem at all

7    concerning to you?

8    A.  No, because I had seen that while we were waiting in the

9    line to get to the Trump speech.

10   Q.  It wasn't concerning to you when you were waiting in line

11   to get in -- to get in to see a speech that people were wearing

12   helmets and gas masks?

13   A.  I thought they looked stupid.

14          MS. KLAMANN:  Let's keep playing, Mr. Clements.

15          (An audio-visual recording was played.)

16          MS. KLAMANN:  Let's pause there.

17   BY MS. KLAMANN:

18   Q.  Did you hear that rioter right in front saying, "We need

19   fresh fucking bodies in there"?

20   A.  I think so, yeah.

21   Q.  You did hear that?

22   A.  Yeah, I think so.

23   Q.  So you knew there was something going on inside this area;

24   right?

25   A.  Yes.

1    Q.  And, Mr. Cappuccio, you didn't turn around, did you?

2    A.  No.

3            MS. KLAMANN:  Let's keep playing, Mr. Clements.

4            (An audio-visual recording was played.)

5    BY MS. KLAMANN:

6    Q.  Let's pause right there.  Did you just see someone pour

7    something on their face?

8    A.  Yes.

9    Q.  That's a strange occurrence, isn't it, Mr. Cappuccio?

10   A.  Yes.

11   Q.  Yeah.  Any reason why someone would do that?

12   A.  Must have got sprayed with something that irritated their

13   eyes.

14   Q.  Yeah.  So at this point are you thinking there's tear gas

15   in this area?

16   A.  I was thinking there was probably something like that,

17   yeah.

18   Q.  And you didn't at any time turn around; is that right?

19   A.  No.  No.

20           MS. KLAMANN:  Let's keep playing, Mr. Clements.

21           (An audio-visual recording was played.)

22           MS. KLAMANN:  Let's pause there.

23   BY MS. KLAMANN:

24   Q.  Did you hear the rioters around you say pepper spray and

25   tear gas?

1    A.   Yes.

2    Q.   Okay.  Again, so you knew that pepper spray and tear gas

3    were being deployed inside this entrance to the U.S. Capitol,

4    didn't you?

5    A.   Yes.

6              MS. KLAMANN:  Let's keep playing, Mr. Clements.

7              (An audio-visual recording was played.)

8              MS. KLAMANN:  Let's pause right there.

9    BY MS. KLAMANN:

10   Q.   We just saw two shields coming out of this doorway; right?

11   A.   Yes.

12   Q.   And the shields have insignia on them; is that right?

13   A.   That's what it looks like, yeah.

14   Q.   These are police shields; right?

15   A.   I did not know that at the time, no.

16   Q.   But you knew they were shields; right?

17   A.   Yes.

18   Q.   And you know what shields like this are used for; right?

19   A.   Yes.

20   Q.   From your service in the military?

21   A.   Yes.

22   Q.   Okay.  And you didn't think these are coming from police

23   officers inside this area?

24   A.   No, not necessarily.

25   Q.   Is that your testimony?

CAPPUCCIO - CROSS

1    A.  Excuse me?

2    Q.  Is that your testimony?

3    A.  I -- I did not know there were police officers in there,

4    no.

5    Q.  Okay.  And the crowd is cheering as these shields are

6    coming out; isn't that right?

7    A.  Yes.

8    Q.  Okay.  And you're cheering along with them, aren't you?

9    A.  Yes, I guess so.

10   Q.  Yeah.  Because you're happy.  Because now you and your

11   fellow rioters have some weapons that you can use in this

12   fight; right, Mr. Cappuccio?

13   A.  No.

14   Q.  No?

15   A.  No.

16          MS. KLAMANN:  Mr. Clements, let's keep playing.

17          (An audio-visual recording was played.)

18          MS. KLAMANN:  Let's pause there.

19   BY MS. KLAMANN:

20   Q.  Mr. Cappuccio, yesterday you testified that that wasn't you

21   saying that; is that right?

22   A.  Yeah, I don't think that was me.

23   Q.  It's very loud and clear on your video, wouldn't you agree?

24   A.  You can hear that, but I'm not saying I said that.

25   Q.  Did you hear someone near you say it?

```
 1    A.  Perhaps.

 2    Q.  "Stomp your feet.  Stomp your feet.  Let them hear us

 3    inside"?

 4    A.  Yes.

 5    Q.  Right?

 6    A.  Yes.

 7    Q.  So you knew at the time that you were standing right here

 8    at the very foot of an entrance to the United States

 9    Capitol Building; that there were congressmen and -women at

10    work in that building, didn't you?

11    A.  I didn't know who was in there --

12    Q.  The person --

13    A.  -- at the time.

14    Q.  I believe this is you.  But the person near you said, "Let

15    them hear us inside."  That didn't cause you to think that

16    there were people in that building?

17    A.  No, not necessarily.  No.

18    Q.  Not necessarily.

19    A.  No.

20               MS. KLAMANN:  Let's keep playing, Mr. Clements.

21               (An audio-visual recording was played.)

22               MS. KLAMANN:  Let's pause there.

23    BY MS. KLAMANN:

24    Q.  Now, the shields are going back in the building; right,

25    Mr. Cappuccio?
```

```
 1    A.  Yes.
 2    Q.  So you saw them coming out, and you saw them going in;
 3    right?
 4    A.  Yes.
 5    Q.  Okay.  As they're going in, once again, the crowd is very
 6    animated about the shields; right?
 7    A.  Yes.
 8    Q.  There's calls:  "Shield wall.  Shield wall."  Right?
 9    A.  Yes.
10    Q.  Okay.  You understood that that meant you guys were going
11    to use these shields -- right? -- in some way?
12    A.  I wasn't.
13    Q.  That wasn't my question.  You understood that the
14    people around you at least were going to use these shields
15    and they were going to use it in this area in the entryway
16    here?
17    A.  Since I didn't know what was going on in -- in there, I
18    wasn't sure.
19    Q.  Mr. Cappuccio, didn't you know what was going on in there?
20    You knew that tear gas was being deployed; right?
21    A.   Right.
22    Q.  You knew that police shields were coming out of it?
23    A.  Yes.
24    Q.  You knew that people were having to decontaminate their
25    eyes from pepper spray; right?
```

1   A.  Yes.

2   Q.  All things that you saw standing right here before you went

3   in; right?

4   A.  Yes.

5   Q.  So you at least knew those things were happening.  And now

6   you're seeing shields being handed in; right?

7   A.  Yes.

8   Q.  Okay.  You didn't put all of that together?

9   A.  Like I said, I was just filming stuff to send to my

10  friends.  I mean, I -- I wasn't -- like I said, I wasn't

11  thinking that these people were, like, trying to get in -- into

12  the Capitol.  Like, that wasn't -- like, I knew I wasn't there

13  for that.  I wasn't there for any fighting or anything like

14  that, but I didn't.

15  Q.  Yet you have not turned around; right, Mr. Cappuccio?

16  A.  Right.

17  Q.  At any time you could have turned around; right?

18  A.  Yes.

19  Q.  And, in fact, what we're about to see is despite seeing

20  shields -- right?

21  A.  Yes.

22  Q.  Despite knowing that pepper spray was being deployed in

23  there; right?

24  A.  Yes.  Yes.

25  Q.  You went in, didn't you?

1    A.  Yes.

2    Q.  Yeah.

3           MS. KLAMANN:  Mr. Clements, let's keep playing.

4           (An audio-visual recording was played.)

5           MS. KLAMANN:  Let's pause there.

6    BY MS. KLAMANN:

7    Q.  That's you; right, Mr. Cappuccio?

8    A.  Me what?

9    Q.  Someone very loudly is yelling, "We need water."  That was

10   you -- your voice, wasn't it?

11   A.  I don't know.

12          MS. KLAMANN:  Let's go back 5 seconds, Mr. Clements.

13          (An audio-visual recording was played.)

14   A.  I don't think that sounds like me, but.

15   BY MS. KLAMANN:

16   Q.  Do you remember the crowd yelling out for water?

17   A.  Yes.

18   Q.  And do you remember why that was, why you guys wanted

19   water?

20   A.  Well, yes.  People were using them to clean out their eyes

21   and stuff and drinking them.

22   Q.  Yep.  Yep.

23          MS. KLAMANN:  Let's keep playing, Mr. Clements.

24          (An audio-visual recording was played.)

25          MS. KLAMANN:  Let's pause.

1  BY MS. KLAMANN:

2  Q.  And you, actually, just handed water off to somebody,

3  didn't you?

4  A.  I did not see that.

5          MS. KLAMANN:  Let's go back just 3 seconds,

6  Mr. Clements.

7          (An audio-visual recording was played.)

8          MS. KLAMANN:  Pause there.

9  BY MS. KLAMANN:

10  Q.  That's not your hand?

11  A.  Looks like it could be.

12  Q.  Yeah.  Did you hand water off to other rioters while you

13  were standing there?

14  A.  Yes.

15  Q.  So now you're actively helping folks around you; right,

16  Mr. Cappuccio?

17  A.  Yes.

18          MS. KLAMANN:  Let's keep playing, Mr. Clements.

19          (An audio-visual recording was played.)

20          MS. KLAMANN:  Let's pause there.

21  BY MS. KLAMANN:

22  Q.  "Squeeze it into your eyes.  Squeeze it into your eyes."

23  That's you too, isn't it?

24  A.  Well, I don't know if it was me specifically saying that.

25  But I do remember telling people that you could use water but

1    milk was better.  And crazy enough, someone did pour milk on

2    somebody's face.  I was like, whoa.  Where the hell did they

3    get milk from?

4              MS. KLAMANN:  Let's keep playing, Mr. Clements.

5              (An audio-visual recording was played.)

6              MS. KLAMANN:  Let's stop.

7    BY MS. KLAMANN:

8    Q.  That guy right in front of you, squeezing his eyes shut,

9    his face is red, he said, "We can do this all fucking night";

10   right?

11   A.  Yes.

12   Q.  He said, "We can fight the police all fucking night";

13   right?

14   A.  Maybe he could.  Not me, I mean.

15   Q.  You understood him to be saying we, as the crowd, can fight

16   the police all fucking night; right?

17   A.  Like I said, I -- I think he was referring to himself.  I

18   wasn't.

19   Q.  Mr. Cappuccio, you didn't turn around at this point; right?

20   A.  No.

21              MS. KLAMANN:  Let's keep playing, Mr. Clements.

22              (An audio-visual recording was played.)

23              MS. KLAMANN:  Let's pause there.

24   BY MS. KLAMANN:

25   Q.  Do you have something in your hands, Mr. Cappuccio?

CAPPUCCIO - CROSS

1   A.  Just my phone.

2   Q.  Is that something you were holding or someone near you?

3   A.  Someone near me.

4   Q.  Okay.

5           MS. KLAMANN:  Let's keep playing, Mr. Clements.

6           (An audio-visual recording was played.)

7           MS. KLAMANN:  Let's pause there.

8   BY MS. KLAMANN:

9   Q.  You turn the camera around.  You say, "We're going in.

10  We're going in.  They're using tear gas on us."  Surely,

11  Mr. Cappuccio, that's your voice; right?

12  A.  Yes.

13  Q.  Okay.  Because we actually see you talking in this and --

14  in this clip; right?

15  A.  Yes.

16  Q.  Okay.  No denying that that's your voice this time?

17  A.  No.

18  Q.  Okay.  "We're going in.  We're going in.  They're using

19  tear gas on us."  Pretty clear that you knew at the moment you

20  decided to walk into the U.S. Capitol Building, that you knew

21  that they were using tear gas; right?

22  A.  Yes.

23  Q.  Okay.  And you went in anyway?

24  A.  Yes.

25          MS. KLAMANN:  Let's keep playing, Mr. Clements.

```
 1              (An audio-visual recording was played.)
 2              THE COURT:  Actually, I have a question.  So are you
 3      saying when you're saying they're using tear gas, you thought
 4      that was Antifa using tear gas?
 5              THE WITNESS:  I just knew there was tear gas being
 6      used.  I -- like I said, I didn't know if it was Antifa they
 7      were fighting or what was going on.  I just said, you know,
 8      from seeing what people were coming out with, you can feel,
 9      like, the mist.  That was it.
10              THE COURT:  But you didn't know who "they" were?
11              THE WITNESS:  No, who "they" were.
12              THE COURT:  Okay.  You may continue.
13              MS. KLAMANN:  Let's keep playing, Mr. Clements.
14              (An audio-visual recording was played.)
15              MS. KLAMANN:  Let's stop there.
16      BY MS. KLAMANN:
17      Q.  You know now who "they" are; right, Mr. Cappuccio?
18      A.  Yes.
19      Q.  Police officers; right?
20      A.  Yes.
21      Q.  Okay.  So these are not Antifa; right?
22      A.  Right.
23      Q.  These are not rebels fighting against Trump supporters;
24      right?
25      A.  Yes.
```

1    Q.  These are law enforcement officers employed by the city

2    of the District of Columbia or the United States

3    Capitol Building; right?

4    A.  Well, I didn't know who they were employed by.

5    Q.  These are police officers --

6    A.  Okay.

7    Q.  -- that work for -- to protect you; right?

8    A.  Yes.

9              MS. KLAMANN:  Yeah.  Let's keep playing,

10   Mr. Clements.

11             (An audio-visual recording was played.)

12             MS. KLAMANN:  Let's pause.

13   BY MS. KLAMANN:

14   Q.  So you realized they're police officers, and you keep going

15   anyway; right?

16   A.  Once I realized that there were police officers, I was,

17   like, these guys are stupid.  Not the police officers.  But

18   these people that were, like, pressing up against them, and I

19   was just like:  What the fuck are they trying to do?

20   Q.  So you thought these people are stupid; let me join them?

21   A.  No, I wasn't joining them.

22   Q.  You walked towards them; right, Mr. Cappuccio?

23   A.  Yes.

24   Q.  Yeah.  You didn't think, oh, my God, what is happening; let

25   me get out of here.  Right?

```
 1   A.  No.  I thought, oh, my God, what's happening.  I'm going to

 2   film this.

 3   Q.  Oh, my God, what's happening; let me push up against them.

 4   Right, Mr. Cappuccio?

 5   A.  No.  No.

 6          MS. KLAMANN:  Let's keep playing, Mr. Clements.

 7          (An audio-visual recording was played.)

 8          MS. KLAMANN:  Let's pause there.

 9   BY MS. KLAMANN:

10   Q.  You are right up against police officers' shields at this

11   point; right, Mr. Cappuccio?

12   A.  I don't know if it's a police officer shield, but there was

13   a shield there, yes.

14   Q.  Earlier you just said you didn't know that these were

15   police officers.  Are you saying that there was reason to doubt

16   as you got closer that they were police officers?

17   A.  No.  I didn't -- I don't understand, like, what you just

18   said.

19   Q.  Why did you have reason to doubt that you were pushing up

20   against a police officer's shield?

21   A.  I thought you said I was right up against the -- like --

22   like a police officer holding a shield.  I don't -- and I said

23   I don't know -- I was pressed up against a shield, but I don't

24   know if it was the police officer holding it or, like, one of

25   the civilians holding it.
```

1    Q.  Okay.  So you're pushing up against a shield.  And the

2    crowd is screaming freedom.  Shrieking freedom.  Right?

3    A.  Yes.

4                MS. KLAMANN:  Let's keep playing, Mr. Clements.

5                (An audio-visual recording was played.)

6                MS. KLAMANN:  Let's pause there.

7    BY MS. KLAMANN:

8    Q.  You hear someone shrieking, "Let us in.  Let's us in"?

9    A.  Can you replay it.

10   Q.  Sure.

11               MS. KLAMANN:  Let's go back about 8 seconds,

12   Mr. Clements.

13               (An audio-visual recording was played.)

14               MS. KLAMANN:  Let's pause there.

15   BY MS. KLAMANN:

16   Q.  "Let us in.  Let us in," do you hear that, Mr. Cappuccio?

17   A.  I just hear motherfuckers.  That's -- that's all I was

18   hearing at that point.

19   Q.  Were you screaming let us in here?

20   A.  No.

21   Q.  Okay.  But, surely, you heard the noises around you; right?

22   A.  I -- I heard lots of noises, yes.

23   Q.  Yeah.

24               MS. KLAMANN:  Yeah.  Let's keep playing,

25   Mr. Clements.

1          (An audio-visual recording was played.)

2          MS. KLAMANN:  Let's pause there.

3     BY MS. KLAMANN:

4     Q.  Now someone is shrieking, "Push.  Push.  Push" repeatedly;

5     right?

6     A.  Yes.

7     Q.  And you can actually see in your video the shield is moving

8     in unison with the shouts for push.  They are pushing; right,

9     Mr. Cappuccio?

10    A.  Yes.

11    Q.  And you are pushing with them; right?

12    A.  No.

13         MS. KLAMANN:  Let's go back 5 seconds.  Let's play

14    that again, Mr. Clements.

15         (An audio-visual recording was played.)

16    BY MS. KLAMANN:

17    Q.  So your camera is almost -- I don't know -- a foot from

18    police helmets.  But your testimony is that you were not

19    pushing along with these people; is that right?

20    A.  Yes.

21         MS. KLAMANN:  Let's keep playing, Mr. Clements.

22         (An audio-visual recording was played.)

23         MS. KLAMANN:  Let's stop there.

24    BY MS. KLAMANN:

25    Q.  And there are people around you screaming and taunting the

CAPPUCCIO - CROSS

1    police; right?

2    A.  Yes.

3    Q.  Okay.  And you're still at the front of the police line;

4    right, Mr. Cappuccio?

5    A.  Yes.

6    Q.  You could have -- if you were truly interested in just

7    documenting it, you could have backed up and filmed it; right?

8    A.  Yes.

9    Q.  You did not do that, did you, sir?

10   A.  I eventually do that.

11   Q.  You did not do that at this point in the video; right, sir?

12   A.  No, because --

13   Q.  In fact, you've been standing at the police line now -- at

14   least now for a minute.  Sixty seconds is a long time, isn't

15   it, Mr. Cappuccio?

16   A.  Yes.

17   Q.  And so you have been standing at the police line for

18   60 seconds here; right?

19   A.  Yes.

20            MS. KLAMANN:  Let's keep playing, Mr. Clements.

21            (An audio-visual recording was played.)

22            MS. KLAMANN:  Let's pause there.

23   BY MS. KLAMANN:

24   Q.  And now you've moved all the way down the police line to

25   the other side of the tunnel; right, Mr. Cappuccio?

```
 1    A.  I'm not quite sure if I did or not.

 2    Q.  Does it appear from your video footage that you are now on

 3    the other side of the tunnel?

 4    A.  Well, I mean, I -- I had my camera up in the air.  So I'm

 5    not sure, like, you know, if that was my camera arm going that

 6    way or what.

 7            MS. KLAMANN:  Okay.  Let's keep playing,

 8    Mr. Clements.

 9            (An audio-visual recording was played.)

10            MS. KLAMANN:  Okay.  Let's pause.

11    BY MS. KLAMANN:

12    Q.  So, Mr. Cappuccio, at this point it's undeniable that you

13    know the police are under attack here; right?

14    A.  Yes.

15    Q.  And you talked a little bit yesterday about your military

16    training and experience; right?

17    A.  Yes.

18    Q.  Based on your military training and experience, when you

19    see someone being attacked, shouldn't you be helping them?

20    A.  Well, there were people that I was -- that I was helping in

21    there.

22    Q.  Police officers, Mr. Cappuccio?

23    A.  No.  I wasn't at the vantage point to help a police

24    officer, but I was helping civilian people.

25    Q.  Did you tell the people who were attacking the police
```

CAPPUCCIO - CROSS

1   officers to stop?  Because we didn't hear that here.

2   A.  No, I didn't.

3   Q.  No, you didn't; right?

4   A.  No.

5   Q.  Instead, you decided to record the attacks on the police

6   officers; right?

7   A.  I was recording everything.

8   Q.  You decided to record the attacks on the police officers

9   instead of rendering aid; right, Mr. Cappuccio?

10  A.  That was part of my recording, yes.

11           MS. KLAMANN:  Let's keep playing, Mr. Clements.

12           (An audio-visual recording was played.)

13  BY MS. KLAMANN:

14  Q.  Okay.  So, again, you've flipped the camera to yourself

15  there saying, "Can't handle it"; right?  That's because there

16  was some kind of smoke that was deployed; is that right?

17  A.  Well, the -- the gas from the sprays.

18  Q.  Uh-huh.  Why didn't you leave the tunnel at this point?

19  A.  Well, I -- I start to walk, to get out of that area where

20  all that mist was, yes.

21  Q.  But you turned around because another rioter said, "Hold

22  the line"; right, Mr. Cappuccio?

23  A.  No.

24  Q.  Did you hear that other rioter at the end of this video

25  saying, "Hold the line"?

1    A.  Yes.

2    Q.  And you turned around after that, didn't you,

3    Mr. Cappuccio?

4    A.  Not to help them hold the line, no.

5    Q.  You turned around after you heard the rioter say, "Hold the

6    line"; right, Mr. Cappuccio?

7    A.  No.  I backed off.  Like I said, I was trying to get fresh

8    air.

9    Q.  But you did not leave the tunnel --

10   A.  No.

11   Q.  -- right, Mr. Cappuccio?

12   A.  No.

13   Q.  In fact, as we saw, you turned around and walked back

14   towards the police; right?

15   A.  I do walk back in there, yes.

16            MS. KLAMANN:  Let's look at Government's

17   Exhibit 301.2.  Let's go to time stamp 3:10 -- or 3:11:08,

18   please.  Actually, I'm sorry, Mr. Clements.  Can we back up

19   3 seconds, 3:11:05.  Let's go to just 3:11 flat.

20        Thanks, Mr. Clements.  Sorry about that.

21            (A video recording was played.)

22            MS. KLAMANN:  Let's pause.

23   BY MS. KLAMANN:

24   Q.  That's you, Mr. Cappuccio; right?

25   A.  Yes.

1    Q.  Okay.  And there's some kind of light being shone on you?

2    A.  Yes.

3    Q.  Okay.  And your response to that is to turn on a light on

4    your phone and shine it on the police line; right?

5    A.  No.  I didn't know I had done that.

6    Q.  You didn't know you had turned on the light on your phone?

7    A.  Well, no, I didn't purposefully do it.

8    Q.  You didn't purposefully turn the light on on your phone?

9    A.  No.

10             MS. KLAMANN:  Let's play this, Mr. Clements.

11             (A video recording was played.)

12             MS. KLAMANN:  Stop it there.

13   BY MS. KLAMANN:

14   Q.  I see your index finger push something on the side of your

15   phone there.  So it's your testimony that you didn't mean to

16   turn on that light?

17   A.  No.

18   Q.  This is just another thing that day that happened to you;

19   right, Mr. Cappuccio?

20   A.  No.  I mean, I had the phone up there.  You're getting

21   pushed around.  I didn't know I had hit the -- the light thing.

22             MS. KLAMANN:  Okay.  Let's look at Government's

23   Exhibit 612.23.

24   BY MS. KLAMANN:

25   Q.  This is another video you took; right, Mr. Cappuccio?

```
 1    A.  Yes.
 2              MS. KLAMANN:  Let's pay for about 1 second,
 3    Mr. Clements.
 4              (An audio-visual recording was played.)
 5    BY MS. KLAMANN:
 6    Q.  Okay.  There's nobody over here, is there, Mr. Cappuccio?
 7    A.  No.
 8    Q.  There's this little, sort of, alcove on the other side of
 9    the door.  And there's no one located over there at this point;
10    right?
11    A.  That's correct.
12              MS. KLAMANN:  Yep.  Let's keep playing, Mr. Clements.
13              (An audio-visual recording was played.)
14              MS. KLAMANN:  Okay.  Let's stop.
15    BY MS. KLAMANN:
16    Q.  Again, Mr. Cappuccio, you're back right in front of the
17    police; right?
18    A.  No, I'm not in front of the police, but I'm there.
19    Q.  You are in front of the police, aren't you?
20    A.  I wouldn't say in front of the police, no.
21    Q.  And there's a man right next to you with his arm extended
22    spraying an orange liquid all over the police; right?
23    A.  Yes.
24    Q.  Mr. Cappuccio, you could have reached out and stopped
25    him -- didn't [sic] you -- in accordance with your military
```

CAPPUCCIO - CROSS

1    training?

2    A.  I didn't know he was going to do that.

3    Q.  He did it for quite a long time, didn't he?

4    A.  And when that happened, I thought what an effing

5    ass-muncher.

6    Q.  But you're just passive?  You're just there to watch;

7    right, Mr. Cappuccio?

8    A.  Well, like I had said, I didn't know that was going to

9    happen.  I didn't know this person.  I was like --

10   Q.  You didn't have the time to react; is that your testimony,

11   Mr. Cappuccio?

12   A.  Well, like I said, I didn't know that was going to happen.

13   And I said when that happened, like, all of the mist was coming

14   out, and what an ass-muncher for doing that.

15   Q.  And you still didn't leave the tunnel.  You stayed there?

16   A.  Yes.

17   Q.  Now, even though there's plenty of evidence exactly

18   what's going on here, which is people attacking the police;

19   right?

20   A.  Like I said, I was just filming what was going on, yes.

21            MS. KLAMANN:  Let's keep playing, Mr. Clements.

22            (An audio-visual recording was played.)

23            MS. KLAMANN:  Let's pause.  And, actually, let's go

24   back 3 seconds to 16.

25   ///

CAPPUCCIO - CROSS

```
 1    BY MS. KLAMANN:

 2    Q.  Now, you've got a police shield in your hand; right,

 3    Mr. Cappuccio?

 4    A.  Yes.

 5    Q.  Did that just appear in your hand out of nowhere?

 6    A.  No.  People were passing shields up.  I didn't want --

 7    Q.  And you took it; right?

 8    A.  I didn't want to get hit in the head so I -- I -- was like,

 9    ah, and I grabbed it and just passed it on.

10    Q.  I don't think that's what we see.  You didn't just grab

11    it and pass it on.  You held on to it, didn't you,

12    Mr. Cappuccio?

13    A.  No.

14    Q.  You could have just put it down; right?

15    A.  Yes.

16    Q.  But you did not do that, did you?

17    A.  I just -- I had it in my hand and I just --

18    Q.  You gave it to someone else in the crowd; right,

19    Mr. Cappuccio?

20    A.  I didn't specifically give it to anybody, no.

21    Q.  You said you passed it along; right?

22    A.  Just passed it along, yeah.

23    Q.  You also could have given it back to the police; right?

24    A.  I could have, yes.  But, I mean, how was I supposed to do

25    that?  I didn't want to think of throwing over the top and
```

1   think -- like, hit a cop.  I wasn't trying to hit a cop.  I

2   wasn't trying to do anything.

3   Q.  But you didn't put it down, and you didn't give it to the

4   police; right?

5   A.  Right.

6   Q.  You passed it along to someone else?

7   A.  I passed it along, yes.

8           MS. KLAMANN:  Let's keep playing, Mr. Clements.

9           (An audio-visual recording was played.)

10          MS. KLAMANN:  Let's pause there.

11  BY MS. KLAMANN:

12  Q.  You still have the shield in your hand at this point;

13  right, Mr. Cappuccio?

14  A.  I don't know.

15  Q.  You testified earlier that you had the shield in your hand

16  until you got hit from behind; right?

17  A.  I never testified having a shield in my hand.

18          MS. KLAMANN:  Let's just go back 1 second.  Maybe

19  2 seconds, Mr. Clements.  Oh.  That's good, Mr. Clements.

20  BY MS. KLAMANN:

21  Q.  That's the shield in your hand, isn't it, Mr. Cappuccio?

22  A.  I'm not positive it is.

23  Q.  At this point you've moved around the door to the area that

24  we saw earlier where there was no one around; right?

25  A.  Yes.

1    Q.  Okay.  Except for a police officer who's pinned in the

2    door?

3    A.  Well, there was that girl there too.  And so when I saw

4    her, I tried to help her before, and she didn't want any help.

5    And then when I saw her just standing there, I was, like, how

6    is she still standing there and the cops aren't bothering her?

7    So I thought, I'm filming this.  I'm just going to try to get

8    in that -- that open spot where she was and just stand there

9    and film.

10   Q.  Film a person standing on the other side of the glass,

11   that's what you were going to do?

12   A.  No, not just film her on the other side of the glass, but

13   everything that was going on.

14   Q.  And your testimony is at this point you got hit.  And I

15   think your testimony is someone hit you in the back; right,

16   Mr. Cappuccio?

17   A.  Yes.  Yes.

18   Q.  We didn't see any police officers behind you at any point

19   in any of the videos we've seen, did we?

20   A.  No, there's no police officers behind me.

21   Q.  Okay.  And we didn't see anyone generally in this same

22   area; right?

23   A.  Right.

24   Q.  In all the video footage that we've looked at, this is an

25   area that you just said was open and that you moved into;

```
1    right?

2    A.  Open in a sense that I could have space there, yes.

3    Q.  Okay.  And so it's your testimony that you got hit and you

4    dropped your phone?

5    A.  Yes.

6    Q.  Is that right?

7    A.  Yes.

8              MS. KLAMANN:  Okay.  Let's keep playing,

9    Mr. Clements, and I'm going to stop you and ask you to go frame

10   by frame.

11             (An audio-visual recording was played.)

12             MS. KLAMANN:  Let's stop there.

13   BY MS. KLAMANN:

14   Q.  Is this the point, Mr. Cappuccio, where you dropped your

15   phone?

16   A.  I -- that -- my phone, yes.

17             MS. KLAMANN:  Okay.  Let's go frame by frame,

18   Mr. Clements.

19   BY MS. KLAMANN:

20   Q.  It looks like your phone hasn't hit the ground yet; right,

21   Mr. Cappuccio?

22   A.  Not -- I don't know right now, no.

23             MS. KLAMANN:  Let's keep going, Mr. Clements.

24             (A video recording was played.)

25             MS. KLAMANN:  There.  Stop there.
```

1    BY MS. KLAMANN:

2    Q.  We can see the gas mask on the officer in front of you.  So

3    your phone is not on the floor; right, Mr. Cappuccio?

4    A.  Doesn't look like it.

5           MS. KLAMANN:  Let's keep going frame by frame.  Okay.

6    Pause there.

7    BY MS. KLAMANN:

8    Q.  And now we can sort of see your face, but it's pretty up

9    close.  Your phone is not on the floor either at this point, is

10   it, Mr. Cappuccio?

11   A.  Could have been when I had picked it up.

12   Q.  But we didn't see it on the floor before this, did we?

13   A.  I don't know how you could see it on the floor.

14   Q.  We just went frame by frame, Mr. Cappuccio, and the phone

15   was never on the floor, was it?

16   A.  No, it was on the floor.

17   Q.  We just saw that it was depicting the gas mask on the

18   officer in front of you.  We did not see any legs, did we,

19   Mr. Cappuccio?

20   A.  No, depending on how it fell on the ground, how it landed.

21          MS. KLAMANN:  Let's keep going frame by frame,

22   Mr. Clements.

23   BY MS. KLAMANN:

24   Q.  And at this point --

25          MS. KLAMANN:  Let's keep going.  I'm sorry,

 1    Mr. Clements.

 2    BY MS. KLAMANN:

 3    Q.  Looks like there's a part of a shield; right,

 4    Mr. Cappuccio?

 5    A.  I can't tell what that is.

 6            MS. KLAMANN:  Let's keep going, Mr. Clements.

 7            (A video recording was played.)

 8            MS. KLAMANN:  Stop there.

 9    BY MS. KLAMANN:

10    Q.  And it looks like that's the crossbeam in the door and the

11    rioter next to you; right, Mr. Cappuccio?

12    A.  Does look like a beam, yes.

13            MS. KLAMANN:  Let's go frame by frame.

14    BY MS. KLAMANN:

15    Q.  Okay.  At this point you put your phone in your mouth;

16    right, Mr. Cappuccio?

17    A.  Yes.

18    Q.  And you put it in your mouth so that you could have both

19    hands free; right?

20    A.  Yes.

21    Q.  And you used both hands to rip the gas mask off of the

22    officer in front of you?

23    A.  No.

24    Q.  We saw it in the video.  Are you disputing that you didn't

25    rip the gas mask off of the officer in front of you?

1    A.   No.  You said I used both hands.

2    Q.   You used your hands to rip --

3    A.   I used --

4    Q.   -- the gas mask off --

5    A.   -- my hands --

6    Q.   -- right, Mr. Cappuccio?

7    A.   Yes, I did.

8            MS. KLAMANN:  Okay.  Let's play this no longer frame

9    by frame, please.

10           (An audio-visual recording was played.)

11   BY MS. KLAMANN:

12   Q.   Okay, Mr. Cappuccio.  So you were filming the entire time

13   that you were attacking Officer Hodges, weren't you?

14   A.   I didn't know I was filming that entire time.

15   Q.   Okay.  And you say to him, "How do you like me now,

16   motherfucker"; right?

17   A.   Yes.

18   Q.   Okay.  Or "How do you like me now, fucker"; right?

19   A.   Something like that, I guess.

20   Q.   And if I understand your testimony from yesterday, you

21   suddenly became irrationally angry that someone hit you; is

22   that right, Mr. Cappuccio?

23   A.   Yes.

24   Q.   But your first thought was to pick up your phone from the

25   floor?  Someone hits you, and you pick up your phone; is that

1    your testimony?

2    A.  No.  That's not the sequence of how it happened.

3    Q.  Okay.  You get hit.  You said your phone was smacked from

4    your hand; is that right?

5         THE WITNESS:  I'm not sure of the sequence that she's

6    going in, Judge.

7         THE COURT:  Well, just say -- yeah, if you disagree

8    with it, just say no.

9    A.  No.

10   BY MS. KLAMANN:

11   Q.  Your phone didn't fall out of your hand when you got hit

12   from this mystery attacker behind you; is that right?

13   A.  No.  I said I had my phone up.  It got hit.  My phone falls

14   down.

15   Q.  Yep.  That's exactly --

16   A.  Can I explain?

17   Q.  -- what I just said, Mr. Cappuccio.

18   A.  Okay.

19         THE COURT:  Keep going.

20         THE WITNESS:  Okay.  Oh.

21         THE COURT:  Go ahead.

22         THE WITNESS:  But -- what else?

23   BY MS. KLAMANN:

24   Q.  And the fact that you got hit, that's what set you off and

25   made you angry; right, Mr. Cappuccio?

1    A.   No.

2    Q.   Okay.  What made you angry?

3    A.   Well, I didn't know what had happened.  So as I went down

4    to pick up my phone, I was -- I was, you know, going down to

5    the ground, and I was reaching for my phone.  And that's when I

6    felt I got hit.

7    Q.   Oh.  Is it your testimony now you got hit twice?

8              THE COURT:  That's what I understood him to say

9    yesterday.

10   A.   Yes.

11   BY MS. KLAMANN:

12   Q.   You got hit twice.  Then you became irrationally angry and

13   grabbed Officer Hodges; right?

14   A.   I didn't know what had happened when I went to the ground,

15   yes.

16   Q.   Okay.  And as you described yesterday, you rip off his gas

17   mask; right?

18   A.   Yes.

19   Q.   Over the period of several seconds, yanking it around and

20   around; right?

21   A.   Yes.

22   Q.   And just as what we just heard, as you're doing it, you're

23   yelling at him, "How do you like me now fucker"; right,

24   Mr. Cappuccio?

25   A.   Yes.

1    Q.  And you also, with your other hand, took his police baton;

2    right?

3    A.  Yes.

4    Q.  Okay.  And, eventually, you get the gas mask off his face,

5    and you back off.  And Officer Hodges is able to move away from

6    you; right?

7    A.  No.  That's not like the sequence of what happened.

8    Q.  You -- you pulled the gas mask off his face; right?  You

9    took his baton; right?

10   A.  It was, like, kind of simultaneously, but -- you know.

11   Q.  Uh-huh.

12   A.  If I understand you correctly.

13   Q.  And then Officer Hodges is able to actually get unpinned

14   from the door and moves back.  But you stay in that area, don't

15   you, Mr. Cappuccio?

16   A.  I'm -- I unpinned him.

17   Q.  You unpinned him?

18   A.  Well --

19   Q.  Is that --

20   A.  I testified to that, I thought, yesterday, yeah.

21   Q.  Okay.

22   A.  Yes.

23   Q.  So you got him free; is that your testimony, Mr. Cappuccio?

24   A.  Yes.

25   Q.  Okay.  Was this during the time that you were experiencing

1    extreme anger?

2    A.  No.

3    Q.  Okay.  So you did decide to actually take intentional

4    action.  But the only intentional action that you took on

5    January 6th was to help Officer Hodges; is that your testimony?

6    Everything else you didn't -- you had no idea what you were

7    doing?

8    A.  Well, in the sequence of things, I -- I do remember

9    testifying to y'all that once I had pulled -- and I was -- I,

10   like, backed off, I said I heard a voice.  And it said, "Don't

11   hit that person.  He's one of us.  He's an American.  He's

12   doing his job."  And I said -- that's when I was, like, oh,

13   fuck.  What just happened?  What did I just do?

14   Q.  But you --

15   A.  So it snapped me out of what was going on.

16   Q.  But you stood there afterwards, still holding

17   Officer Hodges' baton -- right? -- for several seconds, in the

18   same area?

19   A.  It -- it didn't feel -- I mean, it felt like everything

20   took forever, but I don't know, like, second-wise how long I

21   was standing there.

22            MS. KLAMANN:  Mr. Clements, let's pull up

23   Government's Exhibit 501.  Let's move to time stamp 20:10.

24   Let's play from there, and we're going to pause at 20:15.

25            (An audio-visual recording was played.)

1    BY MS. KLAMANN:

2    Q.  Do you see this item?

3    A.  I see a flag and -- I don't know what that is, a shield or

4    not.

5              MS. KLAMANN:  Let's keep playing, Mr. Clements.

6              (An audio-visual recording was played.)

7              MS. KLAMANN:  Let's pause there.

8    BY MS. KLAMANN:

9    Q.  So you've got your left hand on Officer Hodges' gas mask;

10   right?

11   A.  Yes.

12   Q.  And I think you testified yesterday that you don't remember

13   him trying to get your hand off?

14   A.  No.

15   Q.  Is that right?

16   A.  I said no to her question that I didn't remember his hand

17   on me.

18             MS. KLAMANN:  Let's keep playing, Mr. Clements.

19             (An audio-visual recording was played.)

20             MS. KLAMANN:  Let's pause there.

21   BY MS. KLAMANN:

22   Q.  That's your right hand, isn't it, Mr. Cappuccio?

23   A.  I -- might be.  I'm not sure.  I can't really tell.

24             MS. KLAMANN:  Let's go back a second, Mr. Clements.

25   That's fine, Mr. Clements.  Let's play from there.

CAPPUCCIO - CROSS

1    (An audio-visual recording was played.)

2    BY MS. KLAMANN:

3    Q.  You can tell now -- right? -- Mr. Cappuccio, that's your

4    right hand also grabbing his face?

5    A.  It does look like my right hand.

6        MS. KLAMANN:  Let's keep playing, Mr. Clements.

7        (An audio-visual recording was played.)

8        MS. KLAMANN:  Let's pause there.

9    BY MS. KLAMANN:

10   Q.  Mr. Cappuccio, I didn't see you helping Officer Hodges.

11   Did I miss it?

12   A.  I do help him.

13   Q.  Did I miss it?  Were you helping him at this time?

14   A.  It's probably a few seconds right after that.

15   Q.  But you're still standing there; right, Mr. Cappuccio?  And

16   this is about a minute after you first put hands on

17   Mr. Hodges -- on Officer Hodges?

18   A.  I don't know how long it was at the time, no.

19       MS. KLAMANN:  Let's keep playing, Mr. Clements.

20       (An audio-visual recording was played.)

21       MS. KLAMANN:  Let's pause there.

22   BY MS. KLAMANN:

23   Q.  I see you resting, Mr. Cappuccio.  I see you putting your

24   hand up on the side of the door frame.  Is that right?

25   A.  I see that now, yes.

 1    Q.  Yeah.  You're not helping Officer Hodges, are you?

 2    A.  Not at that particular time, no.

 3              MS. KLAMANN:  Let's keep playing, Mr. Clements.

 4              (An audio-visual recording was played.)

 5              MS. KLAMANN:  Let's pause there.

 6    BY MS. KLAMANN:

 7    Q.  The officer is no longer there; right, Mr. Cappuccio?

 8    A.  When I grabbed him, I pushed him back.  And that one

 9    person is like, "Hey, he needs help.  He needs help."  I do see

10    the cops then grab him, and he starts to walk back into the

11    crowd.

12    Q.  That's not on any of this video; right, Mr. Cappuccio?

13    A.  Doesn't look like it, no.  But I do see him come back and

14    bend over for his keys.

15              MS. KLAMANN:  Let's move to Government's

16    Exhibit 403.1.  Let's go to time stamp 15:13:35.  Stay right

17    there.

18    BY MS. KLAMANN:

19    Q.  You see yourself; right, Mr. Cappuccio?

20    A.  Yes.

21    Q.  Okay.  The officer you were attacking is now gone.  But

22    you're still there; right, Mr. Cappuccio?

23    A.  Yes.

24    Q.  Okay.  You're holding Officer Hodges' baton and examining

25    it right now; right?

```
1    A.  No.

2    Q.  You'd agree that you're holding it in front of your face

3    like this and looking down at it?

4    A.  I am holding it.  I don't know if I'm exactly looking at

5    it, like studying it.

6    Q.  So your testimony is that you're holding an object in front

7    of your -- literally in front of your face, but you're not

8    seeing it; is that your testimony?

9    A.  I'm just saying that I don't know if I'm looking at it.

10   I -- I -- I'm -- I don't know if I'm, like, what is this,

11   like.

12   Q.  So on January 6th, even when an item is inches from your

13   face, you didn't see it; is that your testimony?

14   A.  I'm not saying I didn't see it.  I wasn't concentrating on

15   it.

16   Q.  And this is after the attack; right, Mr. Cappuccio?

17   A.  Yes.

18   Q.  And I think you testified that you felt immediate remorse;

19   right?

20   A.  Yes.

21   Q.  Yet you're standing there holding the very weapon you used

22   to hit Officer Hodges; right?

23   A.  No, I didn't hit him.

24   Q.  You're standing there holding the baton that you took out

25   of Officer Hodges' hands; right?
```

1    A.  Yes.  Yes.

2    Q.  You have not dropped it?

3    A.  No.

4    Q.  You have not said, oh, my God, what have I done, dropped

5    it, and ran; right?

6    A.  I did say, "Oh, my God what have I done," yes.

7    Q.  You're saying, "Oh, my God, what have I done" as you're

8    examining the baton you stole from him in detail?

9    A.  I didn't say I was examining the baton.

10   Q.  You didn't leave the tunnel immediately, though --

11   right? -- Mr. Cappuccio?  At least you can, like, agree with

12   that?

13   A.  Well, that is a still shot, so.  I do leave, yes.

14   Q.  You didn't leave the tunnel immediately, Mr. Cappuccio;

15   right?

16   A.  I -- I leave.  I don't know how fast it was.

17           MS. KLAMANN:  The time stamp on this is 3:13:35 at

18   least.

19        Look at Government's Exhibit 301.2.  Let's go to

20   3:13:46.  Let's play from there, Mr. Clements.

21           (A video recording was played.)

22   BY MS. KLAMANN:

23   Q.  Did we just see you hand off the baton?

24   A.  I didn't hand it off, no.

25   Q.  So this is the second item belonging to police officers

CAPPUCCIO - CROSS

1  that came into your possession while you were in the tunnel;

2  right, Mr. Cappuccio?

3  A.  Yes.

4  Q.  A shield -- first you had a shield; right?

5  A.  Yes.

6  Q.  And then you had a police baton; right?

7  A.  Yes.

8  Q.  Both of those items you gave to other rioters; right?

9  A.  No, I didn't give them to them.

10  Q.  You didn't drop them; right?

11  A.  I -- I didn't give it to them.

12  Q.  You didn't drop them; right?

13  A.  I did not drop it, no.

14  Q.  You did not give them back to police officers; right,

15  Mr. Cappuccio?

16  A.  No.

17  Q.  Instead, they went to other members of the crowd; right?

18  A.  I believe so.

19  Q.  Okay.  And so this is maybe 30 seconds after -- 30 seconds

20  to 60 seconds after you attacked Officer Hodges; right?

21  A.  It looks like it, yes.

22          MS. KLAMANN:  Okay.  Let's keep playing,

23  Mr. Clements.

24          (A video recording was played.)

25          MS. KLAMANN:  Okay.  Let's pause there.

```
 1    BY MS. KLAMANN:
 2    Q.  I think we just saw you disappear; right, Mr. Cappuccio?
 3    A.  Looks like it, yes.
 4              MS. KLAMANN:  Let's pull up Government's
 5    Exhibit 533.1.  Let's move to time stamp 29 seconds.  Let's
 6    play from there, Mr. Clements, just for a few seconds.
 7              (An audio-visual recording was played.)
 8              MS. KLAMANN:  Let's pause there.
 9    BY MS. KLAMANN:
10    Q.  You'd agree that's a strange reaction after you assaulted a
11    police officer; right, Mr. Cappuccio?
12    A.  I -- I testified yesterday that my reaction was when the
13    crowd was chanting "USA.  USA."
14    Q.  I don't see anyone else on the screen right now raising
15    their arms; is that right?
16    A.  I -- I do see hands up in the air, yes.
17    Q.  Do you see anyone raising their arms in a fist on this
18    screen?
19    A.  No, not right now.  No.
20    Q.  Okay.  And so this wasn't a gesture that you were copying;
21    right?
22    A.  No.
23    Q.  This is a gesture of celebration; you'd agree?  Right?
24    A.  I guess celebration, but I wasn't celebrating.  There was
25    nothing to celebrate.
```

 1          MS. KLAMANN:  Let's go to Government's

 2    Exhibit 612.25.  Let's play that.

 3              (An audio-visual recording was played.)

 4          MS. KLAMANN:  And pause there.

 5    BY MS. KLAMANN:

 6    Q.  You also took a photograph after the assault of

 7    Officer Hodges -- right? -- of your hand?

 8    A.  Yes.

 9    Q.  And the knuckles on your hands are bloodied; right?

10    A.  Yes.

11    Q.  Okay.  I understand that you are a Krav Maga enthusiast; is

12    that right, Mr. Cappuccio?

13    A.  Yeah, I like that.

14    Q.  You practice martial arts?

15    A.  No.

16    Q.  You practice Krav Maga; right?

17    A.  No.

18    Q.  You just watch it?  Are you just a fan?

19    A.  No.  Like, when we used to have cable, there was a

20    Jewish channel, and they -- they -- there was a guy on it that

21    used to show it.  But I've never, like -- I've always wanted to

22    try it.  I've learned about, like -- I guess the kind of --

23    knew the history of it.  I've been to one of -- I think a

24    practice with Mike one time, but that was it.

25    Q.  You know, though, Krav Maga or otherwise, bloody knuckles

CAPPUCCIO - CROSS

1    comes from punching someone; right, Mr. Cappuccio?

2    A.  No.  It doesn't have to be from punching people.  And

3    those aren't the knuckles that you would want to hit somebody

4    with anyway.

5    Q.  This is your left hand, isn't it, Mr. Cappuccio?

6    A.  Yes.

7    Q.  And we just went through in very great detail the video of

8    your attack on Officer Hodges; right?

9    A.  Yes.

10   Q.  And we saw your left hand?

11   A.  Yes.

12   Q.  And we saw your left hand grabbing his face mask?

13   A.  Yes.

14   Q.  Okay.  This is an injury what you did to Officer Hodges;

15   right?

16   A.  No.

17   Q.  Okay.  Is it your testimony that you suffered this injury

18   before that time?

19   A.  I -- that's what I was trying to figure out.

20   Q.  So is it your testimony you don't know when you hurt your

21   knuckles?

22   A.  Well, like I said, when the phone gets knocked out of my

23   hand and I'm bending down to pick it up, that's kind of when I

24   noticed like, oh, what the fuck happened to my hand, as I'm

25   picking up my phone.

1    So like I said, I don't -- like I said, I didn't -- I

2    didn't know what had happened.  Like, if it happened then or

3    later or whatever.  I just remember seeing it when I was

4    bending over for my phone, and that was it.

5    Q.  Were you taking a photograph of it on your phone as a

6    battle scar, evidence of a battle scar?

7    A.  No, not at all.

8        THE COURT:  Okay.  I'm sorry.  Did you say you're

9    left-handed?

10        THE WITNESS:  I am not.  I am right-handed, but I do

11    do a lot of things with my left hand.

12        THE COURT:  Would you describe yourself as

13    ambidextrous?

14        THE WITNESS:  With some things.  I can't write that

15    well, but.

16    BY MS. KLAMANN:

17    Q.  Mr. Cappuccio, I think you testified that you were

18    diagnosed with a number of things quite a few years ago; right?

19    A.  Uh-huh.

20    Q.  Depression?

21    A.  Yes.

22    Q.  Anxiety?

23    A.  Yes.

24    Q.  And PTSD?

25    A.  Yes.

1    Q.  And I think you said you were diagnosed with PTSD in 2014?

2    A.  Yes.

3    Q.  And that you have been taking your treatment for PTSD very

4    seriously; right?

5    A.  Yes.

6    Q.  You committed to seeing a psychiatrist?

7    A.  Yes.

8    Q.  Was that part of it?

9    A.  Yes.

10   Q.  You took medication?

11   A.  Yes.

12   Q.  And you were aware that there were certain circumstances

13   that could trigger your PTSD; right?

14   A.  Yes.

15   Q.  Things like loud noises?

16   A.  Yes.

17   Q.  Large crowds?

18   A.  Yes.

19   Q.  Certain smells?

20   A.  Yes.

21   Q.  Violence?

22   A.  Yes.

23   Q.  Okay.  But we just went through your whole day,

24   Mr. Cappuccio.  You started to experience some of those things

25   before you even stepped foot on U.S. Capitol Grounds; right?

1    A.  I was seeing them, yes.

2    Q.  You saw a loud crowd as you marched over; right?

3    A.  Yes.

4    Q.  And they were making a lot of noise?

5    A.  Well, I could recognize the noises that they were making.

6    Q.  It was loud?  At least you can agree with that; right,

7    Mr. Cappuccio?

8    A.  It was loud, yes.

9    Q.  Okay.  And in your mind, aren't you thinking:  This feels

10   like a bad situation for me.  I've worked really hard to deal

11   with my PTSD, and I shouldn't be here?

12   A.  Which part?  Walking?

13   Q.  When you're walking to the Capitol?

14   A.  Okay.  Walking to the Capitol, yes.

15   Q.  Yes.

16   A.  I was -- like I said, to me, it felt like everything was --

17   like, people were happy.  Like, I didn't -- I didn't -- like,

18   people were just -- I've never been in a little procession like

19   that before.  So at the time people just seemed like they were

20   okay.  And that's how I felt too.  I felt fine.

21   Q.  Well, then let's move forward a little bit.

22   A.  Okay.

23   Q.  When you got to the U.S. Capitol Building, your testimony

24   was that there was a shift in the crowd; right?

25   A.  Yes.

```
1    Q.  It got angry?

2    A.  Yes, there was -- people began to get angry, yes.

3    Q.  So now you're standing on the west plaza in the middle of a

4    very angry big crowd; right, Mr. Cappuccio?

5    A.  Yes.

6    Q.  Okay.  Seven years of hard work and treatment; you didn't

7    turn around?

8    A.  No.

9    Q.  You didn't think:  This might be something that turns into

10   a triggering event for me?

11   A.  I was just -- like I said, I was filming it.  And so I

12   wasn't thinking of really anything but trying to get over to

13   that scaffolding to film it.  I wasn't trying to get involved

14   with the crowd.  I wasn't trying to be, like, violent with

15   anything or anybody.  Like I said, I was just trying to get

16   over to where I could get out of the way of everybody and film

17   it.

18   Q.  And you did get up to the second level; right?

19   A.  Yes, I did.

20   Q.  Okay.  And still in the middle of a large crowd; right?

21   A.  I -- I don't know.  Is that a question?

22   Q.  Lots of people around you; right, Mr. Cappuccio?

23   A.  Yes.

24   Q.  Lots of loud noises?

25   A.  Yes.
```

1    Q.  And you went even closer to the Capitol Building after

2    that; right?

3    A.  Yes.

4    Q.  You went to the nearest door to the Capitol Building?

5           MS. DOUENAT:  Objection.  Asked and answered,

6    Your Honor.

7           THE COURT:  Overruled.

8    BY MS. KLAMANN:

9    Q.  You went to the nearest door of the Capitol Building;

10   right?

11   A.  Yes.

12   Q.  Okay.  And when you got there, even more signs, even more

13   things to indicate to you that this might be triggering; right,

14   Mr. Cappuccio?

15   A.  Yes.  But I was also helping people as well, like, with --

16   like when they were coming out, like I said, I saw people who

17   had been bloodied.  So I was curious to find out what the hell

18   was going on.  So I went there to see if I could help them

19   with, you know, first aid or do whatever I could.

20   Q.  I thought your testimony earlier was you thought those

21   people were crazy.  Now you want to help them?

22   A.  Well, I mean, if I see injured people coming out of

23   something, I was going to see what was going on and if there's

24   anything I could do to help.

25   Q.  Except if they're police officers; right, Mr. Cappuccio?

1    A.  Well, no.  That's not it.  I mean, I ended up helping

2    Hodges.  But there was nothing I could do to help out police

3    officers in the situation that was going on.

4    Q.  So now it's your testimony that you weren't there to

5    record.  You were actually there to help people; is that what

6    we're hearing?

7    A.  No.  I'm just saying that I was recording things.  And I

8    saw people that were injured, and I was just trying to help.

9    Q.  Okay.  So you're standing at the tunnel.  We've been

10   through this.  You see people with helmets on; right?

11   A.  Yes.

12   Q.  You see people with gas masks on; right?

13   A.  Yes.

14   Q.  You see riot shields coming out of the tunnel; right?

15   A.  Uh-huh, yes.

16   Q.  You -- as you told Judge McFadden, you could actually smell

17   and feel the effects of pepper spray, chemical irritant, coming

18   out of the tunnel; right?

19   A.  Yes.

20   Q.  And you hear people coming -- talking about the fact that

21   there's pepper spray and tear gas being used in there; right?

22   A.  Yes.

23   Q.  You would agree at this point that all of those things can

24   be triggering for someone with anxiety or depression or PTSD;

25   right, Mr. Cappuccio?

1    A.  They can be, yeah.

2    Q.  And you went in anyway; right?

3    A.  I was -- like I said, I was curious and I wanted to film

4    what was going on.

5            MS. KLAMANN:  Your Honor, may I have a moment?

6            THE COURT:  You may.

7            MS. KLAMANN:  No further questions, Your Honor.

8            THE COURT:  All right.  Mr. Woodward, I take it you

9    don't have any questions.

10            MR. WOODWARD:  No, sir.

11            THE COURT:  All right.  Ms. Douenat, any redirect?

12                    REDIRECT EXAMINATION

13    BY MS. DOUENAT:

14    Q.  Mr. Cappuccio --

15    A.  Yes.

16    Q.  -- when -- when your friend Mike asked everybody if they

17    could go, you didn't take him up on it initially; right?

18    A.  No.

19    Q.  In fact, he then personally asked you because he wanted to

20    have somebody ride along with him?

21    A.  Yes.  That's correct.

22    Q.  And your first questions to him were about funding?

23    A.  Yes.

24    Q.  Because you know you can't afford to go on a trip like

25    that?

```
1    A.  Right.
2    Q.  And then you said you also had to make sure that your wife
3    was okay with it?
4    A.  Yes.
5              MS. KLAMANN:  Objection.  Leading.
6              MS. DOUENAT:  That's true.
7    BY MS. DOUENAT:
8    Q.  So --
9              THE COURT:  I'll sustain the objection.
10   BY MS. DOUENAT:
11   Q.  So, basically, you -- before you went on this trip, you
12   needed to verify that you could go; is that right?
13   A.  That's correct.
14             MS. KLAMANN:  Objection.  Leading.
15             THE COURT:  Sustained.
16   BY MS. DOUENAT:
17   Q.  We're not going to go over the trip except for the fact
18   that did you know what this rally was about, except for the
19   fact that Trump was going to be speaking?
20   A.  I didn't -- I knew he was going to be speaking.  I figured
21   about what.  I didn't know what he was going to say
22   specifically, no.  That part, no.  I just -- talking about the
23   election.  I don't know.  Like, he says crazy stuff all the
24   time, so.
25   Q.  Did you -- did you even know the name of the rally?
```

1    A.   No, I don't remember the name of the rally.  No, I didn't

2    know.

3    Q.   Would you be surprised if it was "Stop the Steal" rally?

4    A.   Yeah.  Yes.

5    Q.   Okay.  And that's because you weren't -- I mean, you

6    weren't focused after the election on anything news related; is

7    that right?

8    A.   That's correct.

9    Q.   You did vote for Trump, did you?

10   A.   Yes.  Yes.

11   Q.   So -- but as you -- as I asked you before, what is your --

12   what do you do before you vote for someone?  Are you

13   politically active, or what do you do?

14   A.   No, I'm not politically active.  I -- I mean, I will try to

15   figure out -- like, if I'm going to vote for somebody, I want

16   to know a little bit about them.  Trump's been around forever.

17   I knew about Trump since the '80s when he had a USFL team, but

18   not like "know him" "know him."  I just -- I thought he was a

19   part owner or something, and his show.

20   Q.   Do you consider yourself a political person?

21   A.   No, not at all.

22   Q.   And you've never been to D.C. before.  We've gone over that

23   as well?

24   A.   Right.  Yes.

25   Q.   All right.  You mentioned you didn't know what the archway

 1    was; is that right?

 2    A.  Correct.

 3    Q.  Yeah.  So you wouldn't have known if that was an entrance

 4    into the Capitol or not; is that right?

 5    A.  That's correct.

 6    Q.  Not until you were in the archway did you notice where it

 7    was going?

 8    A.  Correct.

 9    Q.  It's fair to say in that tunnel, there was a lot of things

10    that were triggering?

11    A.  Yes.

12    Q.  And -- and your recollection of being in there is difficult

13    because you don't remember how long you were in there?

14              MS. KLAMANN:  Objection.  Leading.

15              THE COURT:  Sustained.

16    BY MS. DOUENAT:

17    Q.  How long -- did you feel that you were there for a long

18    time?  Very little time?  How did you feel --

19    A.  I felt like it was forever.

20    Q.  Tell us more about how you were feeling in there.

21    A.  I just -- I don't know.  Like I said, it's -- it just

22    seemed like I was there for a super long time.  I didn't know

23    how long I had been there.  I was just filming things.  You

24    were getting pushed around by people.

25              I -- like I said, I just thought it was super crazy that

1   these people were so pissed off.  And I was just like -- just

2   there, you know.  I wasn't pissed off about it, like anything

3   about what, I guess, they were mad about.

4   Q.  So when you were putting the phone in your mouth and --

5   we're not going to replay the video.  But you hear yourself

6   making noises; is that correct?

7   A.  Yes.

8   Q.  What -- those noises, were they distressful to you?

9   What were you going -- what was going on in your mind at that

10  time?

11  A.  To me, it was more of, like -- like what we do, like, with

12  a battle cry-type thing; where it's -- like, you're -- you -- I

13  don't know.  I guess it's kind of hard to explain to civilians.

14  But it's, like, when you are in basic and things like that,

15  they call it a battle cry when you -- you know, like you're

16  learning bayonet-practice-type stuff.  So you're like ahhhhh.

17  You know, jabbing the thing when you're learning GFT, stuff

18  like that.  It's just like -- it's -- it's like a scream.  It's

19  just shit that comes out of your mouth.  It's not anything

20  particular, just ah.

21  Q.  And that's all that was going on in your mind?  It was

22  about --

23  A.  Yeah.  Yeah.  I was just -- completely just like a battle

24  cry just coming out of my mouth.

25  Q.  We watched what happened to your hand.  And you have no

1    recollection of what happened to it; is that right?

2              MS. KLAMANN:  Objection.  Leading.

3              THE COURT:  Sustained.

4    BY MS. DOUENAT:

5    Q.  Do you have any idea of what happened to your hand?

6    A.  No.

7    Q.  Hindsight is 20/20; right, Mr. Cappuccio?

8    A.  Yes.

9    Q.  Can you tell the Court one more time how you feel about

10   what happened that day in the tunnel.

11   A.  I feel terrible about what happened in that tunnel.  It was

12   a horrible thing that was going on.  I never expected anything

13   like that to ever happen.  I -- I didn't know anything like

14   that was going to happen.

15        And what happened with me and Hodges, I felt

16   tear about -- terrible about.  I never expected anything like

17   that to happen.  And I never wanted anything like that to

18   happen.  I feel sorry for him.  I feel sorry for everybody.  It

19   was a horrible day.  And it was something that I never knew was

20   going to happen, like, ever.

21             MS. DOUENAT:  Thank you.

22             THE COURT:  Thank you, sir.  You may step down.

23             THE WITNESS:  Thank you.

24             (Witness excused.)

25             THE COURT:  Ms. Douenat, anything further for

 1     Mr. Cappuccio?

 2                 MS. DOUENAT:  We close.

 3                 THE COURT:  All right.

 4           Mr. Woodward, any evidence for your client?

 5                 MR. WOODWARD:  No, Your Honor.

 6                 THE COURT:  And, Mr. Woodward, I take it you have now

 7     received the full *Jencks* from the government?

 8                 MR. WOODWARD:  Well --

 9                 THE COURT:  To your knowledge.

10                 MR. WOODWARD:  -- what the government purports to be

11     the full *Jencks*.  And we do have a few questions we'd like to

12     ask Agent Fulp.

13                 THE COURT:  Agent Fulp, I'll ask you to retake the

14     stand, and I'll remind you you're still under oath, sir.

15                 MR. WOODWARD:  I think Your Honor made a clear record

16     of this yesterday, but -- but I just want to make sure you

17     agree that we've done everything we need to do to request

18     *Jencks* with respect to all of the witnesses.  We think you

19     inquired with the government as to whether their disclosure

20     yesterday meant that this affected all of the witnesses.  I

21     believe government counsel said no, this only affected the two

22     agents.

23           And so just so the record is clear from our perspective,

24     we are requesting *Jencks* for every witness the government

25     called, including Ms. Balack [sic] -- Bosowak [sic] -- I'm

1    sorry, Madam Court Reporter.  And we just want to make sure

2    that the government has provided all of that *Jencks* and that

3    given their -- and that their understanding about what *Jencks*

4    requires is consistent with what the Court has ordered for

5    purposes of *Jencks*.

6              THE COURT:  All right.  I think that record is clear.

7    I think I've made my feelings about the scope of the Jencks Act

8    clear.  Okay.

9                        RECROSS-EXAMINATION

10   BY MR. WOODWARD:

11   Q.  Special Agent Fulp, yesterday you testified about the

12   seizure of Mr. Klein's phone; correct?

13   A.  Yes.

14   Q.  And you testified that you obtained the phone through the

15   arrest of Mr. Klein; correct?

16   A.  That I obtained the phone from the arrest?  I don't

17   understand.

18   Q.  Fair enough.  I'll re-ask the question.  You testified that

19   the FBI obtained his phone through his arrest; correct?

20   A.  Incident to his arrest.

21   Q.  Incident to his arrest.

22        The FBI seized his vehicle incident to his arrest;

23   correct?

24   A.  Yes, after he was arrested.

25   Q.  And then upon searching his vehicle, they seized -- they

1    found and seized Mr. Klein's phone; correct?

2    A.  No, that's not correct.

3    Q.  Well, tell us, then, when did they seize Mr. Klein's phone.

4    A.  After it was seized but before it was searched.  We

5    obtained a search warrant for the vehicle.

6    Q.  Okay.  So after Mr. Klein was arrested -- well, let me back

7    up.  At the time of Mr. Klein's arrest, you did not have a

8    search warrant to search his vehicle?

9    A.  No.

10   Q.  You did not have a search warrant to seize or search his

11   phone?

12   A.  We did not have a warrant to search his phone.

13   Q.  Okay.

14   A.  You do not need a warrant to seize an item incident to

15   arrest.

16   Q.  Okay.  You -- you -- nevertheless, you seized his vehicle?

17   A.  I did not seize his vehicle.  His vehicle was seized.

18   Q.  The FBI seized his vehicle?

19   A.  Correct.

20   Q.  And everything within it?

21   A.  Whatever was in the vehicle was seized.

22   Q.  Including his phone?

23   A.  The phone was in his vehicle when it was seized.

24   Q.  Okay.  And so sometime after his arrest you obtained a

25   warrant to search his phone?

FULP - RECROSS

1    A.  Yes.

2    Q.  Okay.  And once you obtained that warrant, what did you do?

3    A.  I recorded that I had received that warrant.  I then

4    notified the CART examiners that I had a warrant.

5         And I don't recall what the exact notification

6    procedures were, but there was a filter review in process.  So

7    that I wasn't a part of.  So those people were notified, and I

8    suppose they did their job, you know, before I ever got access

9    to the phone.

10   Q.  Well, the timing is -- is a little critical here.  Because

11   what I heard you to just say is that the filter review process

12   had begun before you obtained a warrant to search the phone.

13   A.  That's not at all what I just said.

14   Q.  Could you clarify for us, please.

15   A.  Yes.  I obtained a search warrant, at which time I notified

16   all the people I was supposed to notify, and a filter team was

17   established subsequent to the warrant to review the phone prior

18   to me gaining access to it.

19   Q.  Okay.  And did you physically have the phone when you

20   obtained a warrant to search it?

21   A.  Yes.

22   Q.  And so what did you do with the phone after you obtained a

23   warrant to search it?

24   A.  I provided it to the CART examiners.

25   Q.  And how -- just describe -- are they in the same office as

1   you?  Went downstairs?  How did you do that?

2   A.  I work in the Washington, D.C., Field Office.  So I drove

3   it down to Manassas, Virginia, to hand it to the CART examiners

4   because that's where they work.

5   Q.  And that was -- you obtained the warrant on the evening of

6   the 14th of March, 2021; correct?

7   A.  I don't think so.  I would need to -- it's on the warrant.

8   Do you have the warrant?  Can I look at it.

9   Q.  I don't have the warrant.

10  A.  I'm going to ascribe to the date you're giving me.  I would

11  defer to the warrant where it's listed.

12  Q.  Do you recall -- do you recall providing the phone to the

13  CART examiner the morning after you obtained the warrant?

14  A.  No.  I think it was the night of.

15  Q.  The very night that you obtained the warrant?

16  A.  That's my recollection.  But it -- I'm sure it's documented

17  somewhere.

18  Q.  You drove down to Manassas to provide the phone and the

19  warrant to the CART examiner?

20  A.  That's my recollection, yes.

21  Q.  And do you recall giving the CART examiner the warrant

22  also?

23  A.  I think I emailed it.  And it's also uploaded in my case.

24  You have to provide the warrant to the CART examiners before

25  they'll do any work on it because they're not going to perform

FULP - RECROSS

1   a search they're not certain there's a warrant for.  It's

2   standard procedure.

3   Q.  Now, do you remember having a discussion with -- we're

4   speaking about CART Examiner Mancini; correct?

5   A.  Sure.  Yes.

6   Q.  And do you remember having a discussion with her about how

7   she needed chain-of-custody signatures from you?

8   A.  Yes.

9   Q.  And why was it that when the phone was provided to

10  Agent [sic] Mancini those signatures weren't already on chain

11  of custody?

12  A.  Whose signatures?

13  Q.  The signatures of yourself and the other agents on the

14  case.

15  A.  Because I think when I drove it down to her, I did not have

16  the paper chain of custody with me.  So my chain -- I had a

17  chain from me signing it to her.  And then when I realized that

18  I did not have Agent Comottor's on there, I made a new chain to

19  document his seizure, his turning over to me, and then

20  subsequently my handover to Examiner Mancini.

21  Q.  Were you in a hurry to get Examiner Mancini that phone?

22  A.  Of course, because digital evidence is very perishable.

23  And any number of things could happen to a phone which would

24  make it unsearchable.  So I wanted to get it out of my hands

25  and into the expert's hands as soon as I could.

1   Q.  Even when it's in the FBI's possession?

2   A.  Of course.

3   Q.  Do you recall following up with Examiner Mancini mere hours

4   after providing her with the phone?

5   A.  Mere hours?

6   Q.  Do you recall following up with her shortly after providing

7   her the phone?

8   A.  I don't recall how long the time interval was.  I'm sure I

9   followed up with her.

10  Q.  All right.  Would it be helpful if -- those documents I do

11  have.  Would it be helpful to see those?

12  A.  Absolutely.

13          MR. WOODWARD:  Sorry, Your Honor.

14          THE COURT:  That's all right.

15  BY MR. WOODWARD:

16  Q.  You were right, sir.  It was actually March 11th that you

17  obtained the warrant, not the 14th.

18  A.  I thought it might be.

19  Q.  And so your -- your recollection is that you obtained a

20  search warrant for Mr. Klein's phone on March 11th?

21  A.  That's what you just told me.  I -- my testimony was I

22  don't remember exactly what date I got the warrant.  I would

23  have to see the warrant to review the judge's signature and the

24  date and time stamp on that.

25  Q.  Bear with me one second.

FULP - RECROSS

1       Okay.  Do you see the document in front of you?

2   A.  Yes.

3   Q.  And if you could read that just to yourself, please.

4   A.  Which portion?

5   Q.  The top.

6   A.  Okay.

7   Q.  And does that refresh your recollection about when you

8   obtained a search warrant to search Mr. Klein's phone?

9   A.  That tells me when I swore it out.  I don't recall --

10  there's a difference.  It's kind of a two-step process.  You

11  swear it out to the judge, and then at some point you receive a

12  signed copy of it.  So this, I guess, contemporaneously tells

13  me when I swore it out.  This doesn't tell me when I actually

14  received it.  That seems to be the question -- right? -- when I

15  received the warrant.

16  Q.  Attention to detail is important.  I appreciate that,

17  Agent.

18      But your recollection is after you received the warrant,

19  whether it was on March 11th or sometime thereafter, you

20  immediately drove it down to Manassas?

21  A.  Immediately or within -- it wasn't a long delay.  It was

22  pretty soon after I got the warrant, I recall, yes.

23  Q.  The same day?

24  A.  Probably.  I think it was -- yeah, I think I got it there

25  that night.  But I'm sure the chain of custody would show

1    exactly when I delivered it.

2    Q.  Okay.  And so do you recall -- you're familiar with the

3    link system that the FBI utilizes?

4    A.  Yes.

5    Q.  And you communicated with -- with Examiner Mancini on that

6    system?

7    A.  Yes.

8    Q.  Okay.  And so on March 11th you swore out a warrant.  If

9    you could review this document for us again -- well, actually,

10   this is a party-opponent statement.

11           MR. WOODWARD:  So for ease for the Court's reference,

12   we'll just move this in as Defense Exhibit 3.

13           MS. AKERS:  Objection.

14           THE COURT:  On what basis?

15           MS. AKERS:  Relevance.  Hearsay.

16           THE COURT:  Well, Mr. Woodward is suggesting this is

17   evidence of a party-opponent.

18           MS. AKERS:  Who's the opponent?  The special agent?

19           THE COURT:  I think it would be the government.

20           MS. AKERS:  Well, relevance.

21           THE COURT:  All right.

22           MS. AKERS:  He's not moved to suppress the phone.

23   This is a nothing.

24           THE COURT:  I think I am struggling a little bit with

25   where we're going.

FULP - RECROSS

```
 1                 MR. WOODWARD:  I won't test the Court's patience.
 2                 THE COURT:  So is this -- and help me understand how
 3       this is relevant.
 4                 MR. WOODWARD:  I'm just trying to understand --
 5       there's going to be a message here where the agent is speaking
 6       to Examiner Mancini about her review of the phone, which is
 7       occurring before the taint.  We got into this a little bit --
 8       the taint review.  We got into this a little bit yesterday, and
 9       the email correspondence we received overnight, again, alluded
10       to that.
11                 THE COURT:  All right.
12                 MR. WOODWARD:  Clearly, there was a rush here to get
13       into Mr. Klein's phone, and I'm just wanting to make sure I
14       don't overlook anything.
15                 THE COURT:  Okay.  So I'm admitting Defense
16       Exhibit 3.  I think this is -- has some relevance anyway.
17                 MS. AKERS:  Your Honor, I don't believe the
18       party-opponent rule applies to the government.
19                 THE COURT:  Ms. Akers --
20                 MS. AKERS:  Just for the record.  We don't think
21       that's --
22                 THE COURT:  Yeah.  I remember looking at this not too
23       long ago.  I think, at least with the FBI, you're stuck with
24       them.  Whether they like it or not, they're part of the Justice
25       Department.  But, regardless, I'm overruling the objection.
```

1    No. 3 is in.

2             (Defendant Klein Exhibit 3 admitted into evidence.)

3    BY MR. WOODWARD:

4    Q.  So on -- Special Agent, on March 11 you swear out a warrant

5    for the search of Mr. Klein's phone?

6    A.  Yes.

7    Q.  On March 12th at 3:38 p.m. you are following up to ask how

8    the phone is doing.

9    A.  Sure.

10   Q.  You weren't asking about the well-being of the phone at

11   this time; correct?

12   A.  No.  I was probably referring to the extraction of the

13   phone.

14   Q.  Wanting the phone to be extracted.  And then you also

15   expected Examiner Mancini to -- to then start reviewing the

16   contents of the phone; correct?

17   A.  No.

18   Q.  Do you recall the conversation you had with Special Agent

19   Mancini on March 12th at 3:41 a.m.?

20   A.  She's not a special agent.

21   Q.  Excuse me.  Do you recall the conversation you had with

22   Examiner Mancini at 3:41 p.m.?

23   A.  No.

24   Q.  March 12th at 3:41 p.m.?

25   A.  This -- and I don't -- I don't have a message from me at

FULP - RECROSS

```
 1    3:41.  I can't see it.  I just see my name.
 2    Q.  You see there that -- that Examiner Mancini asks:  Do you
 3    have a moment for a Skype call?
 4    A.  Yes.
 5    Q.  Do you recall having a conversation with Special Agent
 6    Mancini on March 12th?
 7    A.  She's not a special agent.
 8    Q.  Attention to detail.
 9        Do you recall having a conversation with
10    Examiner Mancini on March 12th?
11    A.  No.  But I don't -- I don't know if we ever actually had a
12    call or not.  I said, "Sure."  Okay.  There it is.  We did have
13    a call.
14    Q.  So I assume you don't recall what was said on that call?
15    A.  No idea.
16    Q.  Okay.
17    A.  It was two years ago.
18            MR. WOODWARD:  And I would seek to move in as
19    Klein Defense Exhibit 4.
20            MS. AKERS:  Same objections.
21            THE COURT:  On relevance and not party-opponent?
22            MS. AKERS:  Yes.
23            THE COURT:  Were you able to find anything on the
24    party-opponent?
25            MS. AKERS:  No.  I was trying to pay attention.
```

```
 1              THE COURT:  So I'm overruling the objection.

 2              MR. WOODWARD:  We litigated this in the Oath Keepers

 3      case extensively, and we agree with the Court.  The FBI is,

 4      especially the case agent.

 5              THE COURT:  Okay.  Defense 4 is in.

 6              (Defendant Klein Exhibit 4 admitted into evidence.)

 7      BY MR. WOODWARD:

 8      Q.  Do you see here on Monday, March 15th -- those

 9      communications were Friday?

10      A.  Yes.

11      Q.  I know that you-all were working very hard at this time.  I

12      don't mean to suggest otherwise.  But this is now on Monday,

13      the next business day.  And do you see -- you're asking

14      Examiner Mancini whether she's looking at the material also.

15              And so earlier you testified that you didn't expect her

16      to be looking at anything on -- on the phone.  But here you

17      clearly are presuming that she's looking at the material on the

18      phone.

19      A.  I don't think I'm presuming here.  I think I'm clarifying.

20      This was the first case that I had worked that involved a phone

21      extraction.  So I wasn't a hundred percent sure on what her

22      exact role in this was.

23              What she's doing here is clarifying for me that her job

24      is merely to do the extraction and that I'm doing the content

25      review of the phone.  So that's what this is.  CART examiners
```

1    can, upon request, assist with the analysis of a phone.  So I

2    wasn't sure if that was routine or if that was something that

3    needed to be asked.  So that's what I'm asking here.  It's

4    clear that I'm saying that in my question that I lead the

5    sentence with, the first sentence.

6            And then further I go to say that we don't want any

7    review to happen, if that were the case, and I was mistaken.

8    Q.  You referred to Mr. Klein as "Our boy Freddie"; correct?

9    A.  Where is that?

10   Q.  In your communications surrounding his -- his arrest and

11   the search of his phone.

12   A.  On this communication?

13   Q.  No.

14           MS. AKERS:  Objection, relevance.

15   A.  I don't know what communications you're talking about.

16           THE COURT:  So --

17   BY MR. WOODWARD:

18   Q.  Did you refer to --

19           THE COURT:  Sorry.  Why is this relevant?

20           MR. WOODWARD:  I think it shows bias, and I'm

21   challenging their investigative techniques.  This is the first

22   phone he's ever --

23           THE COURT:  No.  Why is "Our boy Freddie" relevant?

24           MR. WOODWARD:  Because it shows bias in his

25   investigation.

1    THE COURT:  Sustained.

2    MR. WOODWARD:  No further questions.

3    THE COURT:  All right.  Any redirect, Ms. Akers?

4    MS. AKERS:  No, Your Honor.

5    THE COURT:  All right.  Agent Fulp, you may step

6    down.

7    Mr. Woodward, anything further for your client?

8    MR. WOODWARD:  Just a legal argument, Your Honor.  I

9    think I need to make a record.

10   The government admitted several exhibits.  I believe

11   Your Honor admitted them provisionally.  Those are the videos

12   of then-President Trump speaking at the Ellipse on January 6th.

13   THE COURT:  Right.

14   MR. WOODWARD:  Your Honor, we don't believe the

15   government has laid any foundation, let alone sufficient

16   foundation, to suggest that the words spoken by then-President

17   Trump were heard by Mr. Klein such that they would have had an

18   effect on the listener.  And so we'd ask that they be admitted

19   only as against Mr. Cappuccio and not Mr. Klein.

20   THE COURT:  Okay.  So I'm -- I am admitting them.

21   I'm happy to hear --

22   MR. WOODWARD:  Argument?

23   THE COURT:  -- argument about what weight, if any,

24   they would have as to your client.

25   MR. WOODWARD:  Thank you, sir.

 1          THE COURT:  But I think on admissibility, I think
 2     they're in.
 3          Ms. Akers, do you remember --
 4          MS. KLAMANN:  1001.1 through 1001.4.
 5          THE COURT:  Yeah, I already have them as in.  But I
 6     know I did say Mr. Woodward could challenge them afterwards.
 7          Mr. Woodward, is your client ready for a colloquy
 8     regarding testifying?
 9          MR. WOODWARD:  Yes, Your Honor.
10          THE COURT:  All right.  Mr. Klein, could you approach
11     the podium, sir.
12          DEFENDANT KLEIN:  Good morning, Your Honor.
13          THE COURT:  All right.  Sir, do you understand
14     that it is your decision whether or not to testify and only
15     yours?
16          DEFENDANT KLEIN:  Yes, Your Honor.
17          THE COURT:  And am I correct in understanding that
18     you've voluntarily decided not to testify in this case?
19          DEFENDANT KLEIN:  Yes, Your Honor.
20          THE COURT:  I'll ask you to sign the form Ms. Chaclan
21     will give you.
22          DEFENDANT KLEIN:  Yes, Your Honor.
23          THE COURT:  All right.  I'm going to rule on the
24     reopening issue as to Mr. Klein.
25          And then let's talk about closings.

1      Before me is a motion to reopen the -- or before me is,

2   kind of, the question of whether it was appropriate to reopen

3   the government's case in chief to allow the government to

4   present evidence about the identity of two officers, A.G. and

5   C.W., who Mr. Klein is accused of assaulting in Count 17 and

6   19.  I appreciate the parties' quick briefing on this

7   overnight.

8      There is not much on-point authority in this circuit.

9   However, numerous regional circuits have recognized it is the

10  sole discretion of the district court to reopen the case after

11  the government has rested.

12     And I'm looking to *United States v. Crawford*,

13  533 F.3d 133, page 139, from the Second Circuit in 2008;

14  *United States of America v. Nunez*, 432 F.3d 573, page 579, from

15  the Fourth Circuit in 2005; *United States v. Trant*,

16  924 F.3d 83, from the Third Circuit in 2019; *United States v.*

17  *Alderete*, 614 F.2d 726, page 727, from the Tenth Circuit in

18  1980; and *United States v. Rodriguez*, 43 F.3d 117, page 125,

19  from the Fifth Circuit in 1995.

20     I believe both parties agree as well -- and I'm looking

21  to Klein's memorandum, page 3, and the government's memorandum,

22  page 1.

23     The Fourth Circuit in *Nunez* identified several factors

24  to guide this exercise of discretion and other circuits have

25  followed that approach.  And I'm looking to the *Rodriguez* case

1       from the Fifth Circuit, page 125.

2              Those factors are the timeliness of the motion; the

3       character of the testimony; the effect of granting the motion;

4       the reasonableness of a parties' explanation for failing to

5       present the evidence in its case in chief; whether the evidence

6       is relevant, admissible, technically adequate and helpful to

7       the fact-finder; and whether the belated receipt of such

8       testimony prejudices the opposing party's case or precludes him

9       from having an adequate opportunity to meet the additional

10      evidence offered.

11             Given the circumstances here, I think that limited

12      reopening of the case to accept Agent Fulp's testimony

13      identifying two of the alleged law enforcement victims is

14      appropriate.  I'm looking to the first point for timeliness.

15      The government moved to reopen almost immediately after I asked

16      about a potential issue involving a discrepancy between the

17      victims named in the indictment and the proof in the

18      government's case in chief.  This was minutes after the

19      government had closed its case in chief.

20             Second, as for the character of the testimony, the

21      government moved to reopen for the limited purpose that

22      Special Agent Fulp could be permitted to identify two law

23      enforcement officers alleged in Count 17 and 19 to be victims

24      of an assault by Defendant Klein.

25             Third, the effect of granting the motion to reopen will

1    be minimal because we have already heard Agent Fulp's

2    testimony, and the defense had the ability to cross-examine him

3    on his identification of Officers A.G. and C.W.

4         Fourth, the government's explanation for not asking the

5    agent to identify the officers in its case in chief was

6    reasonable.  The government stated it had those questions in a

7    script but skipped over them in an effort to streamline the

8    presentation of the evidence, as I had requested.  Under such

9    circumstances, I think this is an understandable error by the

10   government.

11        Fifth, evidence of the officers' identity is, obviously,

12   relevant and admissible to the charged assaults.

13        Sixth, and I don't think the belated -- and belated by

14   only a few moments' -- testimony of this agent in any way

15   prejudiced the defense or precluded him from having an adequate

16   opportunity to meet the additional evidence.

17        It is evidence that would have come into the

18   government's case in chief had I not encouraged them to move

19   more expeditiously through their witnesses.  Indeed, the

20   reopening ask was made before the defense would have put on

21   their case, a factor the Third Circuit has noted makes

22   prejudice unlikely.

23        And I'm looking to *United States v. Coward*, 296 F.3d

24   176, page 181, from 2002, explaining that reopening after the

25   government has rested but before defense has presented any

1    evidence is, quote, unlikely to prejudice the defendant.

2         I appreciate Mr. Klein's argument that he is prejudiced

3    by my raising of the government's burden and the evidence it

4    offered about Officers A.G. and C.W., and I'm looking to

5    Mr. Klein's memorandum, page 3 and 4.  He argues that, surely,

6    the Court would not permit reopening had this issue come up in

7    closing.

8         But I note the trial courts have discretion to reopen

9    cases even when juries have begun deliberating when it finds

10   that the interests of justice so requires.  And I'm looking to

11   *Nunez,* pages 579 and 580.

12        Here this was an issue that I raised in the context of

13   the defendant's motion for a judgment of acquittal.  While

14   Mr. Klein may have strategically decided not to raise the

15   government's omission at that point, nothing prevents me from

16   considering whether the government has met its initial burden

17   on the elements, especially where I am sitting as the finder of

18   fact.

19        I also note that all parties had agreed to a bench trial

20   here.  And we've, thus, proceeded in a slightly less formal

21   fashion than typically would be the case.  For example, I

22   allowed another defendant to put on an expert witness by Zoom

23   during the government's case in chief due to the witness's

24   scheduling issues.  I likely would not have allowed either had

25   this been a jury trial.

1    While this did not benefit Mr. Klein per se, it is

2    evidence of my attempt to accommodate both sides and the

3    flexibility I've shown in this bench trial.

4         Finally, I note that another co-defendant dropped out of

5    the case on the first day, which further scrambled the

6    government's planned presentation of evidence and helps explain

7    the government's oversight here.

8         For all these reasons, I'm going to admit Agent Fulp's

9    supplemental testimony into evidence as a reopened government's

10   case in chief.

11        With that said, I think we are done with all the

12   evidence.

13        I propose that we start the government's closing.  I'll

14   give you-all about 15 minutes.  And then we'll do the

15   government's closing.  And I think defense can plan to do their

16   closings after lunch.

17        Any concerns with that, Ms. Akers?

18        MS. AKERS:  Would it be possible to take a lunch and

19   then we all do them all, sort of, in a chunk?

20        THE COURT:  As I said, I prefer to do --

21        MS. AKERS:  Okay.

22        THE COURT:  Are you going to be doing the closing?

23        MS. AKERS:  Yes.

24        THE COURT:  All right.  You've had all morning off.

25        MS. AKERS:  I've been paying attention.

```
 1              THE COURT:  I'm sure.  I'm sure.

 2         All right.  Mr. Woodward, any concerns about that?

 3              MR. WOODWARD:  No, sir.

 4              THE COURT:  And Ms. Douenat?

 5              MS. DOUENAT:  No, Your Honor.

 6              THE COURT:  I'll see you back at 11:30.

 7              (Recess taken.)

 8              THE COURT:  Mr. Woodward, I realized I forgot to ask

 9    you about the elements of the offenses.  I've got the

10    government's elements and Ms. Douenat's.  Do you agree with

11    Ms. Douenat?

12              MS. DOUENAT:  Yes, Your Honor.  I'm sorry.

13              THE COURT:  I'm asking Mr. Woodward.

14         Do you agree with Ms. Douenat.

15              MR. WOODWARD:  We don't object to the elements that

16    the Court used in the first trial.  I'm going to contradict

17    myself, but if what the government proposed is the same as what

18    the Court adopted in the first trial, then we accept those,

19    subject to the objections that were lodged by defense counsel

20    in that trial, if that makes sense.

21              THE COURT:  No.

22              MR. WOODWARD:  So you did this once already.

23              THE COURT:  Yes.

24              MR. WOODWARD:  And I presume defense counsel

25    objected to the government's version of the elements in the
```

1    first trial, or they just accepted all of the elements as

2    proposed by the government?

3                THE COURT:  You know, we had this expert on memory

4    and all this, and I don't feel really comfortable kind of

5    trying to think back to --

6                MR. WOODWARD:  Well, if there were no objections,

7    then that's on me.  But to the extent that -- for the purposes

8    of the record on appeal that there were objections to the

9    elements in the first trial, then we would just like the record

10   to reflect we adopt those objections.

11               THE COURT:  All right.  So your homework over lunch

12   is to figure out what -- I just -- I'm not going to go back

13   through that record and find all those objections.

14               MR. WOODWARD:  I don't think the Court needs to.  I

15   think if we use the definitions that the Court used in the

16   first trial, then we're on the same page.

17               THE COURT:  Oh.  Okay.  I thought I heard something

18   different from you.

19               MR. WOODWARD:  No, no.  I'm merely wanting to

20   preserve the record.  So if counsel for McCaughey objected in

21   the first trial, you overruled his objection, then I'd like to

22   be able to argue, should it be necessary, that your having

23   overruled his objection was, respectfully, incorrect.

24               THE COURT:  And so that's what I'm asking.  This is a

25   new trial, and I want you to tell me if you think I was wrong,

1    specifically, about anything before.  If you're telling me

2    you're fine with my final jury instructions, I can take that.

3    If there are specific things you disagreed with from what I did

4    before, I need to know that specifically.

5            MR. WOODWARD:  Okay.  The only thing we disagreed

6    with -- and this may be just for closing.  I was planning to

7    address it on closing -- is whether or not there needs to be

8    separate offenses for 111(a) to qualify as an offense that

9    triggers the 230- --

10            THE COURT:  231 civil disorder.

11            MR. WOODWARD:  Exactly right.  Or whether or not the

12    government has to prove that the offense that is a felony that

13    qualifies for 231 was a separate act.  And so our position

14    would be that those require two separate acts.  They can't be

15    occurring at the same time.

16        Your Honor overruled that objection at the first trial,

17    and so we'll preserve the record here, assuming you're not

18    going to change your mind.  We'll preserve the record

19    here that, no, it can't be all part of the same conduct that

20    the -- that the felony that gives rise to the 231 makes --

21    qualifies for the 231 felony.

22            THE COURT:  Understood.  Okay.  And so the other

23    point, there's been -- that I recall there's contention on --

24    and, obviously, Ms. Douenat has raised -- do you agree --

25    you're comfortable with my -- my understanding of the elements

1        of the offense as to obstruction from the last trial?

2                MR. WOODWARD:  No, Your Honor.  We join Ms. Douenat

3        in asserting that following *Fisher*, the definition of corruptly

4        should be adopted in this trial.  Not because Your Honor got it

5        wrong in the first trial, but because the D.C. Circuit has

6        since handed down binding precedent on the Court.  And so

7        corruptly requires some revision for purposes of this trial as

8        well.

9                THE COURT:  Understood.  Okay.  Thank you.

10               MR. WOODWARD:  Your Honor, one other housekeeping

11       matter for purposes of the record.  I think -- well, you tell

12       me if you disagree.  But in Agent Fulp's supplemental testimony

13       about the identification of the officers, we objected to an

14       identification based on hearsay.  The government then asked the

15       question differently.  But I think Your Honor actually asked

16       whether his identification was still based on hearsay, even if

17       the question itself did not elicit the hearsay.

18               And so we would object to the -- we would ask for the

19       identification to be stricken insofar as it relied on hearsay

20       and not on otherwise admissible evidence.

21               THE COURT:  Okay.  So I'm not going -- I'm not

22       inclined to -- to strike the identification.  I will tell

23       you -- and this is, you know, something that you and Ms. Akers

24       can address.

25               But I think I heard Agent Fulp at least -- and you're

1    relying -- you're talking about Mr. Gonell; correct?  Is that

2    what -- there were two identifications.

3              MR. WOODWARD:  There were two identifications.  I

4    believe in both identifications Agent Fulp testified that he

5    was relying on his interview with each; one of which was a

6    telephonic interview.  I think the other was not.

7         But, nevertheless, he was relying on the officers

8    themselves to identify themselves in video footage.  That --

9    that statement would be -- would be testimony that we have not

10   had an opportunity to cross-examine.

11             THE COURT:  I understand.

12             MR. WOODWARD:  Therefore, we submit that the

13   identifications were improper.

14             THE COURT:  All right.  I thought he also said that

15   he had met both of them and thought he recognized them.  So I'm

16   overruling your objection.

17        I do -- I am certainly interested, though, in hearing

18   from the parties, honestly, especially, as to

19   Officer [sic] Gonell.  I thought I heard him largely relying on

20   what he'd heard from Officer Gonell and not really much on his

21   personal identification.  And so I -- I thought those were

22   pretty weak identifications, honestly.  But I'm happy to hear

23   from the parties on that.

24             MR. WOODWARD:  Thank you.

25             THE COURT:  All right.  But I think that's something

1    for argument.

2          Ms. Akers -- well, just to give you-all kind of a sense

3    of where I am.

4          First, I'm inclined to agree with the government that

5    identity -- and I guess this goes to the conversation

6    Mr. Woodward and I just had.

7          I'm inclined to agree with the government that identity

8    isn't an element of 111 and, therefore, a failure to identify

9    the complaining witness isn't fatal to the government's charges

10   there.  So, in other words, I'm suggesting that even if

11   Mr. Woodward is right and those identifications are invalid,

12   that the government can still make their case as to those

13   elements.  I'm not deciding that right now, but I'm just

14   telling you-all my instinct looking at your briefing from this

15   morning.

16         Ms. Akers, as to Mr. Cappuccio on Count 28 -- well, in

17   general as to the assault counts, I hope you're going to go

18   through and show me what acts in particular you're -- you're

19   focused on as to Count 28.  I'm interested in whether you're

20   relying on an aiding and abetting theory.  I don't recall

21   seeing actual assaults by him for that time period, but perhaps

22   you'll show me otherwise.

23         Count 29, I think I need to understand what specific

24   theory or theories you're relying on there.  And one of my

25   questions would be whether you make out 111(b), even if I'm not

1    confident that the officer was struck with a baton.  In other

2    words, just the -- the assault with the gas mask, whether that

3    would be a 111(b).  I think you've got your work cut out for

4    you as to Mr. Cappuccio on obstruction.

5          I don't need you to spend time on civil disorder as to

6    either defendant at this point.  We'll see what the defense

7    attorneys say, and maybe in rebuttal.  But don't focus on that

8    now.

9          And as to Mr. Klein also, I'm especially interested in

10   the specific acts that you're focused on for these various

11   assault charges.  And I'm kind of dubious about the 111(b)

12   charges there.  So just particularly interested in -- in what

13   evidence you think you've got there to make out the 111(b)

14   charges.

15         I don't need you to spend a lot of time on the

16   obstruction and civil disorder as to him at this point.

17         All right.  Ms. Akers.

18         MS. AKERS:  Can I just have 30 seconds, Your Honor,

19   to consult.

20         MR. WOODWARD:  And I'm sorry, Your Honor.  I think

21   there's one more technical housekeeping point we have to make,

22   is I think we have to renew -- I think the circuit wants us to

23   renew our Rule 29 before the government closings.

24         THE COURT:  Thank you.

25         MR. WOODWARD:  And so I have to confess, I'm not

```
1    actually sure if that's necessary if I don't put on a case in
2    chief.
3         But just for the record, we renew our Rule 29.  Assuming
4    the Court wants to take that under advisement, we can deal with
5    that after closing.
6              THE COURT:  Yes.
7         And, Ms. Douenat, are you doing the same.
8              MS. DOUENAT:  Yes, Your Honor.
9              THE COURT:  Thanks, folks.
10             MS. AKERS:  Your Honor, I have a presentation.  Can I
11   approach?
12             THE COURT:  Yes, please.
13             MS. AKERS:  I have two, one for you and your law
14   clerk.
15        And could I please have the screen.
16        Your Honor, this looks to be a lengthy presentation, but
17   I'll move expeditious here.  And so what I'm going to do for
18   you this afternoon -- morning is go through each of the counts.
19   I'll pay particular attention to the issues Your Honor just
20   raised and show you what our best evidence is for each count.
21        I'm not going to spend time on 231, per Your Honor's
22   request.  So I'll skip through that, but I have listed our
23   relevant exhibits there, as well as the misdemeanor counts.
24   I'll go ahead and skip over those.
25             THE COURT:  So on the misdemeanor -- I mean, there's
```

1    some -- I guess I'm not sure if some of these are

2    misdemeanor -- the disorderly with the dangerous weapon.

3            MS. AKERS:  If the dangerous weapon is applied, then

4    you're right.  But the restricted perimeter element I'm not

5    going to address at this point, but we can on rebuttal, if

6    Your Honor is interested.

7            THE COURT:  Thank you.

8            MS. AKERS:  Sure.

9        I'm going to start with Defendant Klein, Your Honor.

10   We've listed all the charges against him.  I'm going to go

11   through them in order, which also happens to be

12   chronologically.

13       Defendant Klein is charged, first, in Count 9 with

14   section 111(a).  This count is based on, primarily, body-worn

15   camera from Officer Harvell and his testimony.

16       You see the physical contact in Officer Harvell's

17   body-worn camera.  You see Defendant Klein turn and yell, "You

18   can't stop this.  I need support.  Let's go."  You see his

19   mouth moving.  You see him pressing.

20       Your Honor heard from Officer Harvell in this trial

21   explain that he remembers Defendant Klein specifically.  His

22   conduct was forceful, it was intentional, and it was

23   aggressive.  He recalled that he was the man in the green

24   jacket pushing in an offensive manner.

25       Your Honor also saw evidence presented that relates to

1    Count 9 of Defendant Klein pushing on the police line for at

2    least 4 minutes.  You can see that in the CCTV footage,

3    which is in the photo on the right, and you can see that he

4    then climbs up over this little wall here in the photo on the

5    left.

6            This is important for the assault charges because you

7    heard many officers who were serving on the West Front

8    describe the force that was being pressed on them on the

9    West Front when they were pushed up against the wall.

10   You heard Officer Harvell testify that he thought he was

11   going to get trampled, it was probably the scariest time of

12   his life, and they were applying all of the force and

13   pressure.

14           Your Honor, you don't have to just take

15   Officer Harvell's words for it.  You can see it on the

16   body-worn camera.  You can see it on the open-source footage.

17           So we'd submit for Count 9, there was the physical

18   contact, and these are the exhibits that support it.

19           And I'll presume, Your Honor -- I'll just keep moving.

20   And if you have questions on any of these counts, please

21   interrupt me.

22               THE COURT:  Thanks.  Well, we'll see what the defense

23   says.  But, obviously, I mean, there's a lot of people there.

24   Why shouldn't I think that he's being pushed into the officers?

25               MS. AKERS:  Sure, Your Honor.  I would submit that

1    Exhibit 523, which is on the left-hand side here, this exhibit

2    turns and pans to Mr. Klein, to the defendant, and there is no

3    one behind him.  You can rewatch this.  I put the time stamp

4    there.  He is pushing forcefully.

5         You can rewatch Officer Harvell's body-worn camera, and

6    you can see that he's sort of going back and forth as he's

7    getting pushed.  And then you have his accompanying testimony

8    that says this person was pushing forcefully.

9         I think it's a little coincidental the fact that that

10   argument is arising given the CCTV footage that shows him right

11   in front of the police line for several minutes.  And if you go

12   through that footage -- I believe I put the time stamps here --

13   he is not always right next to someone, and there's not always

14   someone right behind him.

15        He is not being pushed here.  He is the aggressor here.

16   And Officer Harvell credibly testified that he specifically

17   remembered him because he remembered him yelling things like

18   "You can't stop this."  And we saw that on several exhibits

19   that the government put forth.

20        I'll go next, Your Honor, to Count 17.  After

21   Defendant Klein pushed on the police line for at least

22   4 minutes and climbed up over that wall, he made it up to the

23   Capitol steps, you saw, as he waved rioters in.

24   Defendant Klein was in the first wave of rioters who entered

25   the tunnel.

1          You heard Officer [sic] Bogner testify about the mob

2     that broke through the window and how aggressive they were,

3     especially at the initial part.  You saw him on CCTV footage

4     really aggressively and quickly scurrying into the tunnel and

5     immediately being stopped because the officers were holding

6     their line.

7          You see on not only Officer Bogner's body-worn cam, but

8     several other body-worn cam, officers consistently yelling,

9     "Move back.  Move back."  You heard it on Officer Foulds'

10    body-worn camera too.  They yell it repeatedly over the course

11    of several minutes.

12         Defendant Klein is at the forefront of this push.  And,

13    Your Honor, we charged this in the indictment as a specific

14    time frame.  But the evidence shows he was there pushing

15    forcefully for far longer than the several minutes that we

16    charged.  And so I think Your Honor can rely not only on the

17    body-worn-camera footage that we have cited here but also the

18    open-source footage.

19         The Exhibit 501 shows the rioters yelling and screaming,

20    saying, "Our house.  Our house."  You can hear on that footage

21    as well the officer's yelling, "Move back."  You even hear at

22    one point -- and you heard Officer Bogner -- Sergeant Bogner

23    testify he was even yelling at them, "Stop pushing.  You're

24    hurting her," referring to one of the rioters.  And even then

25    Defendant Klein wouldn't stop pushing.

1    In Exhibit 501, which is the photo on the left here, you

2    can see he's one of the people who is pushing hard on this

3    woman in the red-and-yellow-and-white hat.  And in the middle

4    photo, you can see her distress.

5    So the count certainly relates to the assault on the

6    officers.  But you can see the effect of his force on the

7    rioters as well.

8    During the same time period of the charged conduct, you

9    see the defendant reach for Officer Mastony's shield.  And we

10   saw this frame by frame.  He got within a centimeter or two of

11   his hand on the shield.  And then you hear an officer turn the

12   shield and say, move the F back because Defendant Klein had

13   lunged at the police line.

14   He then bends over and picks up a white pole off the

15   ground.  You can see that in Exhibit 420.  And then just a few

16   seconds later on the right here, on Slide 8, you see him

17   screaming at the officer line in the same exact moment that

18   they are yelling, "Move back."

19   You heard Officer Forrester, who was on the front line

20   at this time, and who identified himself in open-source

21   footage, say that this crowd was very aggressive and that they

22   were physical.  You also heard in body-worn-camera footage a

23   clicking noise.

24   You asked Sergeant Bogner what that was.  And he said I

25   believe that was a cattle prod.  And you heard

1    Officer Forrester's testimony that he was actually the -- the

2    victim of that cattle prod.  This is the same time that

3    Defendant Klein is at the front of this line.

4         You don't have to rely on that because he, in fact, is

5    physically pushing himself, but it certainly goes to his

6    overall conduct during this time period.

7         And so we would submit that not only should you rely

8    on all of the body-worn-camera footage, the open-source

9    footage, but the testimony of Sergeant Bogner,

10   Officer Forrester, and Officer Foulds all addressed to this

11   time period here at trial.

12            THE COURT:  Is this when he was also beckoning

13   people, kind of waving people up?

14            MS. AKERS:  That's later, Your Honor, and I'll

15   address that.

16            THE COURT:  Okay.

17            MS. AKERS:  You do, though, see him when he's coming

18   in CCTV footage.  I think it's 301.2.  You can't hear, but you

19   can see his mouth moving as he enters the tunnel.

20        Moving now to Count 19, Your Honor, this is another

21   section 111(a)(1) charge against officer -- or excuse me,

22   against Defendant Klein.

23            THE COURT:  So sorry.  Back on 17.  That's -- that

24   was charged to Officer Gonell.  You're --

25            MS. AKERS:  Correct.  Yep.  Correct, Your Honor.  And

1    I would point Your Honor to Exhibit 501, specifically at 3:18

2    to 8:17, actually.  It's a lengthy push.

3         You can see Officer [sic] Gonell's black helmet there.

4    To address Your Honor's concern or note about the

5    identification of Officer Gonell, it is true that Special Agent

6    Fulp testified that the first time he interviewed

7    Officer Gonell, it was via phone.  And Officer Gonell pointed

8    himself out.

9         Special Agent Fulp later testified, after I asked him

10   more questions, that he has seen Officer Gonell in person.  In

11   fact, Officer Gonell was in our trial on Monday morning.  I

12   don't know if Your Honor saw him.

13             THE COURT:  I did.

14             MS. AKERS:  Special Agent Fulp has been the lead

15   agent on this case for several years.  He's very familiar with

16   Officer Gonell, who's been named as a victim in other counts.

17   And I think his testimony was not only credible but has been

18   corroborated by the fact that Special Agent Fulp has watched

19   this whole video and other whole videos.

20        He was not cross-examined in a way that would cast doubt

21   upon his ability to rely on his own identification of

22   Officer Gonell.  And so we would submit the identification was

23   sufficient, though, as we briefed, not necessary to prove this

24   count.

25             THE COURT:  So my recollection was that it was really

1    on redirect that you kind of brought out that he'd met, and I

2    think Agent Fulp said something like, you know, I could go back

3    and find him in the crowd, draw him through.  I guess I'm a

4    little concerned.  Mr. Woodward points out -- I think the --

5    the footage we were looking at looks, basically, at a helmet;

6    right?

7              MS. AKERS:  That's correct.

8              THE COURT:  Understandably, the -- the agent

9    couldn't -- or unlikely to be able to specifically identify.

10   And so just how the evidence came out, I'm not sure that there

11   was a point where I could confidently say that Agent Fulp saw

12   and recognized Officer Gonell.  I can certainly believe

13   Officer Gonell told him that's me in that shot there, but

14   that -- that feels like that's problematic.

15             MS. AKERS:  I think, Your Honor, if you were to

16   review the transcript, Agent Fulp testified that he has

17   reviewed this footage in full and he can specifically identify

18   him.

19             I think we also heard testimony during this trial that

20   the majority of the officers in here were Metropolitan Police

21   Department officers, Sergeant Bogner explained.  Officer Gonell

22   is not.  He was one of the only ones in a different uniform.

23   He's in all black.  All of them have numbers across their

24   helmet, like Officer Hodges testified.  Everyone else has

25   Metropolitan Police Department indicia on their clothing.

```
 1          So it's not a situation where he's just picking out one
 2   random person in a sea of the same uniforms.  It's not that
 3   situation at all.
 4          THE COURT:  Hold on just a second.  Mr. Woodward.
 5          MR. WOODWARD:  Your Honor, I don't want to interrupt
 6   you, and I really don't like objecting during closings, but
 7   none of that was in evidence.
 8          THE COURT:  All right.  Thank you.  Great argument to
 9   make in your closing, sir.
10          MS. AKERS:  So as we explained in our briefing, we
11   don't actually believe that it's necessary to prove the
12   identity of the officers.  The defense has really cited no
13   authority to suggest as much.  So although we submit that
14   Special Agent Fulp certainly can credibly identify
15   Officer Gonell and has -- and I think has been limited to very
16   little effective cross-examination -- we believe that he
17   sufficiently did so here.
18          THE COURT:  Okay.
19          MS. AKERS:  Going next, Your Honor, to Count 19, this
20   is another assault count against Defendant Klein.
21          THE COURT:  I forget if I asked.  You are still
22   relying on aiding and abetting as well for 17?
23          MS. AKERS:  Correct.  Correct.
24          THE COURT:  Okay.
25          MS. AKERS:  Count 19 deals with Defendant Klein's use
```

1    of a shield to impede and resist and interfere with law

2    enforcement efforts.  You see in body-worn-camera footage from

3    Officer Mastony in particular -- and Officer Bogner -- that the

4    officers had finally been able to get some breathing room

5    between themselves and the rioters.  They deployed chemical

6    irritant.  They were yelling, "Move back."  And there was some

7    space for a short -- very short period of time between the

8    officers and the rioters.

9         The officers tried to resecure the doors.  And

10   Defendant Klein, along with another rioter, took law

11   enforcement-issued shields and wedged them in the doors.  And

12   you see that just with inches to go when Defendant Klein was

13   able to get his shield in the door and reopen the door.  And it

14   remained reopened, as you heard from Sergeant Bogner, for

15   several more hours.

16        You heard testimony from Sergeant Bogner that his

17   strategy behind closing the door, although one side was

18   broken, was that they could have closed it and used their

19   handcuffs to lock the door.  Then the rioters wouldn't have

20   been able to reopen them.  It would have significantly narrowed

21   the width of the tunnel.  He explained it like a funnel.  The

22   rioters would have to either go over or under the crossbar.

23   And it would have been an incredibly effective way for law

24   enforcement to protect the Capitol and to protect themselves

25   from the mob.

1    Defendant Klein is personally directly responsible for

2    the law enforcement's ability -- or inability -- excuse me --

3    to close these doors.  And you can see that in, like I said

4    here, body-worn-camera footage.  You can see that in

5    open-source footage.  You can see not only in Exhibit 515, but

6    also 508 and 429, the rocking, sort of, that Defendant Klein is

7    using.  He's really pushing on the shield to make sure that it

8    reopens the door.  And you can see that it was, in fact,

9    successful.

10    THE COURT:  So on Count 19, how did you charge

11    assaulting, not impeding?

12    MS. AKERS:  How do we charge it?

13    THE COURT:  Yeah, I thought the indictment was for

14    assault, not impeding.

15    MS. AKERS:  I believe we used all six verbs in every

16    count, but let me confirm.

17    Yes, Your Honor, page 9 of the fifth superseding

18    indictment charges Freddie Klein with forcibly assaulting,

19    resisting, opposing, impeding, and interfering.

20    THE COURT:  Okay.

21    MS. AKERS:  And so --

22    THE COURT:  Go ahead.

23    MS. AKERS:  Sure.  And so on this count, we would

24    rely on not the assaulting verb but the resisting, opposing,

25    impeding, and interfering with law enforcement.

 1          THE COURT:  And I'm not -- defense hasn't raised this

 2     so far, but --

 3          MS. AKERS:  I'm sure they will now.

 4          THE COURT:  -- where you have these charges that are

 5     minutes from each other -- and especially if I'm not confident

 6     on the identification and rely on your backup argument that

 7     identification isn't necessary -- is there a concern about --

 8     overcharging might be the wrong word, but when -- when do

 9     you -- if at all, do we handle duplicitous charges?

10          MS. AKERS:  Sure, Your Honor.  And that's why we put

11     time periods in our indictment so there's no double-jeopardy

12     duplicity concerns.  And we've done that here.  These are

13     separated in time.

14          And, in fact, in this PowerPoint and at trial, you heard

15     more evidence than just the specific time periods.  For

16     example, Count 17 charges 2:56 to 2:58.  So we charged a very

17     specific 2-minute period when Officer Gonell is very visible in

18     all of the evidence when, in fact, the defendant's pushing

19     lasted more like 6 minutes and he was at the front line for

20     more like, actually, 7 minutes.  And so I think that that

21     concern is remedied because of our specific time period that we

22     cited in the indictments.

23          I think the reason -- one of the reasons that we

24     cite officer names -- although it's not necessary -- is to

25     address that concern.  And we've done so in several of the

1     counts here.

2              THE COURT:  Well, I mean, it's at or around 2:58.

3     And then the next is at or around 3:00 p.m.  That's -- I'm not

4     sure that that gives him a lot of comfort, does it?

5              MS. AKERS:  Sure, Your Honor.  There's also plenty

6     case law -- and I can bring it up for you on rebuttal -- that a

7     charged indictment's time is not exact.  That's why we use the

8     at or around language.

9              Your Honor could start his assaultive conduct, like I

10    said, as early as 7 minutes before the charged conduct.  I

11    think there are very clear, distinct lines.  And really just

12    looking at this PowerPoint, if we were to look at Count 17

13    here and we see, for example, that there's charged conduct

14    starting at 2:41, you can see him physically pushing.  And

15    you can see that in -- excuse me, go to Exhibit 301.1.  You

16    can see his conduct goes all the way to 2:57.  Actually,

17    2:58 we can see him pushing in Exhibit 428.  So there's a

18    lengthy time period by which you can really distinguish his

19    conduct.

20             I would distinguish it between these counts in a real

21    practical way.  Count 17 charges him physically pushing,

22    assaulting officers, physical contact, touch.  Count 19, on the

23    other hand, charges impeding, interfering, opposing by the use

24    of the shield.

25             And there's also a temporal distinction as well because

1    Count 17 is when the rioters and the officers are face-to-face,

2    head-to-head clashing, like you heard Officer Forrester and

3    Sergeant Bogner explain.

4         Count 19 there's a complete break between the officer --

5    the officers and the rioters.  So there's a temporal and, sort

6    of, a distance break between these counts.

7         So I understand Your Honor's concern, but the time

8    period in the indictment is lined up, but you can really see

9    the distinct conduct of Defendant Klein when viewing the

10   footage in full.

11        This is one of the counts, Count 19, where

12   Defendant Klein also used his voice to encourage, aid, abet the

13   other rioters and the mob who is coming in the building.  You

14   see in Count 19, like I said, there was a break between the

15   officers and the rioters.  There was space between them.  The

16   officers almost got the door closed.

17        Defendant Klein successfully relodged it open, and he

18   turns around and yells at least four times -- although we can

19   hear and just not see his face in footage -- he yells at least

20   four times where we can see his mouth and footage, "We need

21   fresh people.  We need fresh people."  And at this very time

22   you can see a new wave of rioters coming into the tunnel.

23        This is when he exits the tunnel for the first time.  He

24   was sprayed.  He goes outside the tunnel steps and pours

25   Gatorade on his eyes.  You heard officers testify about this

1    incident, about the door specifically.  You heard

2    Officer Foulds also testify that he was closing the door to try

3    to stave off attacks from the rioters.  So we would submit that

4    Officer Foulds and Sergeant Bogner's testimony is sufficient to

5    support the charge in Count 19.

6         And I think that the useful analogy that I believe

7    Sergeant Bogner talked about was the funnel concept.  And,

8    obviously, when you have a bigger area to enter, more rioters

9    can come in, more assaults can happen, and Defendant Klein was

10   directly responsible for preventing the officers from limiting

11   that area.

12        We then go, Your Honor, to Count 27.  And Count 27 is

13   a really important count.  This is sort of where the

14   defendants converge in the tunnel.  Your Honor is very aware

15   with the Farina video, Government Exhibit 501.  And in the

16   Farina video, we see that really sort of gruesome heave-ho;

17   really the most aggressive one of the day, I would submit, in

18   the tunnel.

19        Defendant Klein, as you can see on the left here, is at

20   the front of that line.  You can actually see

21   Officer Forrester's bike helmet in the same still shot here

22   where you can see Defendant Klein.  You heard Officer Forrester

23   testify that this was a relentless attack.  He was doing

24   everything he could just to stay standing up.  He had been

25   getting sprayed, which you can also see in Government

1    Exhibit 501, just a few seconds later.  He was getting hit with

2    shields.

3         We saw in trial a shield coming directly for

4    Officer Forrester's face.  You heard at the same time period

5    Sergeant Bogner testify that two masses were meeting in a

6    relentless press and he and the other officers didn't know what

7    to do.  This count is happening at the same time that, as you

8    see on the right here, Defendant Cappuccio is violently ripping

9    the mask off of Officer Hodges.

10        In this count Defendant Klein is forcibly pushing and

11   using his body, but he's also aiding and abetting

12   Defendant Cappuccio.  You heard testimony from Officer Hodges

13   that normally, if he were in trouble, he would call for help

14   and his officers would come.  You heard that same testimony

15   from Officer Forrester.  He testified that if another officer

16   yells help, he would drop everything immediately and go to

17   assist.  That's what they do.

18        You heard Sergeant Bogner testify about the 10-33 and

19   officers in need of assistance.  None of that could happen

20   because Defendant Klein and other members of the mob were

21   heave-hoing, were hitting the officer line, and were rendering

22   Officer Hodges completely vulnerable and completely alone in

23   his attack by Defendant Cappuccio at this time.

24        And so not only are we relying on Defendant Klein's

25   intentional, forcible assaults here, there's also a strong

1    aiding and abetting theory for the 111(a).  We would rely

2    primarily on Officer Foulds, Officer Forrester, and

3    Sergeant Bogner's testimony to support this count.

4        All three of these officers identified themselves at the

5    front of the tunnel.  We could also rely on Officer Hodges'

6    testimony because he was the victim in the same time period.

7    But this is a very sort of pivotal moment in the tunnel.  And

8    it's a very violent moment in the tunnel.  And Defendant Klein,

9    to no one's surprise, was at the front of the line.

10       The next slide is just a bit of a continuation on

11   Count 27.  It's a little bit out of order.  You see here the

12   footage that we watched where there's a shield on the left-hand

13   picture, Your Honor, sort of turned on its side, coming towards

14   Officer Forrester's face, his head.  You can see his bike

15   helmet there.  We watched this clip in slow motion because you

16   can see --

17            THE COURT:  I'm sorry.  Where do you see the bike

18   helmet?

19            MS. AKERS:  The white bike helmet.

20            THE COURT:  Okay.  I thought that was part of the

21   shield.

22            MS. AKERS:  We watched this clip in slow motion

23   during the trial because you can see the shield coming towards

24   his face, and his head is sort of rocking back and forth.

25   And this is happening at the same time that the -- excuse me,

1      that the rioters were heave-hoing slightly into the officer

2      line.  And, again, you saw in our last slide that Freddie

3      Klein -- Federico Klein is at the very front of the mob at this

4      time.

5                  THE COURT:  So you're not saying -- are you saying

6      that he was using this shield, or are you saying this is --

7                  MS. AKERS:  No, Your Honor, he's not holding the

8      shield in this time period.  But the shield was coming at the

9      officer line as he was part of the mob who was heave-hoing.

10     Officer Forrester testified about the shields coming at them

11     during the heave-ho and, sort of, the chaos of it.  I think,

12     actually, in this clip we can't tell who's holding the shield,

13     but the government is not submitting it was Mr. Klein.

14                 At the same time you see on the right -- we've seen this

15     in numerous footage.  The one that we cited here is

16     Defendant Cappuccio's own cell-phone video.  You see the spray

17     coming at the officers during the -- this heave-ho minute.

18     You also see a Super-Soaker that a rioter is holding up towards

19     the rioters that's also captured on Defendant Cappuccio's

20     phone.

21                 And then at the bottom of the slide here, we cite ample

22     other evidence and exhibits that we presented to Your Honor at

23     trial of this assaultive conduct by Defendant Klein that shows

24     him, again, at the front of the line, forcefully using his

25     body.  And it's important to note the context here, Your Honor.

1  The defendant -- Defendant Klein had just left the tunnel from

2  being sprayed.  He went outside.  He stood on the steps.  He

3  poured Gatorade all over his face.  He beckoned people.  And

4  then he reentered the tunnel and rejoined the mob and made it

5  to the very front of the mob very quickly.

6  On his way, Your Honor saw in Government Exhibit, I

7  believe, 301.2, the CCTV footage, him handing out water to

8  rioters as he was entering the tunnel.  They were all using it

9  because they were, obviously, having the effects of chemical

10  irritants in the tunnel.

11  He, along with Defendant Cappuccio, was helping the

12  rioters stay fresh.  It was Defendant Klein's own words that we

13  need fresh people.  And after he took a break, he immediately

14  reentered the tunnel, made his way to the front, and joined

15  this violent assaultive heave-ho conduct that led to

16  Officer Hodges getting crushed in the door frame.

17  Our best testimony on this count, as I've already

18  described, is from Officer Forrester, Officer Bogner, and

19  Officer Foulds.

20  I'm moving next, Your Honor, to Count 31.  Count 31 is

21  the first count where Defendant Klein is charged with the

22  enhanced subsection (b) under 111(a), and the theory on this

23  count is such:  The defendant grabbed a shield.  We saw that on

24  the CCTV footage.  He grabbed the shield, he turned, and he

25  progressed towards the police line.  He made his way to the

1    front of the police line, and he used that shield for several

2    minutes to press directly into the officers.

3          At one point Officer Foulds, who you heard testify about

4    this instance, was between the wall and Defendant Klein.  He

5    was pressed between the wall and Defendant Klein.  So here,

6    Your Honor, we have one immovable object, a wall.  We have a

7    shield that Defendant Klein is holding, is pressing.  You hear

8    him grunting on the camera footage, pushing with all of his

9    might.  You see his face cringing because he's pushing so

10   forcibly.  And he's pushing into -- directly into

11   Officer Foulds who, for some time, was pressed against the

12   wall.

13         You can see this also not only in CCTV footage, but you

14   can see this in open-source footage, the Farina video, the

15   Cantwell video.  That's Government Exhibit 501 and 511.  You

16   see Defendant Klein pushing this shield on the left here, 501.

17   You can see the wall right behind Officer Foulds.

18         You can recall from trial testimony that Officer Foulds

19   testified that he was at a huge disadvantage because when

20   you're -- when you have something behind you that's unmovable

21   and you have the force of the mob in front of you, pushing

22   into you with a shield.  There was really nothing that he could

23   do.

24         You heard him testify that he believed and he remembered

25   Mike pushing with as much force as he could.  The defendant had

1    the benefit of having the handles on his side, which we heard

2    testimony, is how the rioter was able to secure and maintain

3    control over that shield.

4         And in this instance, Your Honor, listen to what's going

5    on, especially in Exhibit 501.  It is loud.  It is chaotic.

6    You hear and you see the force of the collective mob.  This is

7    not a shield that was simply being pushed into someone by one

8    person.  This is Defendant Klein facilitating the whole force

9    of the mob behind him aggregating it on to Officer Foulds who

10   is pressed up against the wall.

11        I think --

12            THE COURT:  Sorry.  I guess I'm having a hard time

13   with the logistics there; right?  The mob is going into the

14   tunnel, and he's pushing the officer kind of against a wall;

15   right?

16            MS. AKERS:  I understand what Your Honor is saying.

17   I think the best footage of this is 501, and you can see --

18   in 511 as well, we have the door frame.  Officer Foulds

19   actually testified about these door frames.  So there's the

20   first door frame, and there's the second door frame.

21   Officer Foulds was sort of right in the first door frame.  And

22   the rioters, actually, sort of made their way into the first

23   door frame.

24        And so there was sort of an area between the door frame

25   and the wall.  And Officer Foulds was, essentially, pinned in

1    that little corner.  It was sort of like Defendant Cappuccio

2    was in the corner on the other side of the tunnel when he was

3    assaulting Officer Hodges.

4          Officer Foulds was in this little corner.  And the

5    defendant -- you can see in Exhibit 501 -- I believe you can

6    also see this in 430 -- the shield is sort of tilted to the

7    side right into Officer Foulds.  And Exhibit 430 -- I don't

8    have the best snapshot here, what I'm about to say.  But you

9    can see Officer Foulds' green mask in this exhibit, and you

10   can see on the right side Defendant Klein pushing the shield

11   sort of at an angle, and you can see the wall behind

12   Officer Foulds.

13         And so you're right, Your Honor, it's not that it was a

14   direct one-on-one, but the -- the officer line was here and the

15   defendant was here, the shield was here, and Officer Foulds was

16   here.  And you can really see him.  You can see him turned

17   here.  I think that if you were to watch all four of these,

18   right next to each other -- especially 501 here --

19              THE COURT:  Can you --

20              MS. AKERS:  -- you can see the defendant is facing

21   the wall.

22              THE COURT:  Maybe you can do 501.  Can we just play

23   that clip.

24              MS. AKERS:  Sure.

25              (An audio-visual recording was played.)

1       MS. AKERS:  I think that this is a good angle,

2  Your Honor.  You see how this shield is tilted here.

3  Defendant Klein is facing the wall, and we have -- on the

4  body-worn-camera footage, Officer Foulds is in between the two.

5  I'll continue playing.

6           (An audio-visual recording was played.)

7       MS. AKERS:  I believe that's the end of the relevant

8  portion of this video.

9           THE COURT:  Okay.

10      MS. AKERS:  During the same time when we were

11  listening to Officer Foulds testify and we were listening to

12  his body-worn camera, you heard him exclaim in his

13  body-worn-camera footage he said, "I'm exhausted."

14      And he explained to Your Honor at trial that it was

15  taking everything in him to not only just continue fighting and

16  protecting himself, but to continue, sort of, the fight against

17  the defendant here.  He was concerned about being trapped in

18  this door frame, he testified.  And he testified that he was

19  the recipient of an attack by the shield.

20      You heard a lot of testimony about shields, Your Honor,

21  throughout the course of this trial.  You heard Sergeant Bogner

22  talk about how the shields were being used against the

23  officers.  He talked about how it was more effective when one

24  side had more shields than the other, which seems obvious, but

25  you heard the testimony.

1   Defendant Klein was one of the rioters who used the

2   shield against the officers.  You heard testimony that when the

3   rioters were using shields, that also rendered the officers

4   ineffective.  The officers couldn't spray the rioters.  They

5   couldn't use their batons effectively.  They really had no

6   means to push.  The officers didn't have the same momentum and

7   force coming from outside the tunnel.  So use of the shields

8   really amplified --

9   THE COURT:  I get that.  So you're not -- you know,

10  honing in on the (b) portion here, you're not claiming

11  inflicted bodily injury; is that correct?

12  MS. AKERS:  That's correct, Your Honor.  We did not

13  receive testimony on that.

14  THE COURT:  So we're looking at whether it's a deadly

15  or dangerous weapon.  And I take it you're not arguing that

16  this is an inherently or obviously dangerous weapon.

17  MS. AKERS:  That's correct.  I think it's analogous

18  to the *McCaughey* verdict.  In the *McCaughey* verdict, you

19  explained that behind Officer Hodges was the door frame and an

20  immovable object; a hard, immovable object.  And in front of

21  him was a shield.  And behind that shield was not only

22  Defendant McCaughey, but was the weight and the force of the

23  rioters.  And in that manner, in that time, in that context,

24  the shield certainly falls under the definition of a deadly or

25  dangerous weapon.

1    The same is true here.  An immovable, actually, larger

2  object was behind Officer Foulds, the wall.  We see that he was

3  against the wall.  He testified that he was against the wall.

4  We see the shield being pressed up against him.

5    And Your Honor just saw when the camera panned to the

6  crowd, it was the same time that the mob was doing that really

7  aggressive, collective heave-ho efforts.  So you can only

8  imagine the amount of force that was being imputed onto

9  Officer Foulds at this time.  And so I think --

10    THE COURT:  Do we have an approximation for how long

11  that lasted?

12    MS. AKERS:  The heave-ho?

13    THE COURT:  The defendant pinning Officer Foulds.

14    MS. AKERS:  If we look, Your Honor, to the

15  body-worn-camera footage, we see that there was the physical

16  contact from at least 5:15:52 -- or excuse me, 3:15:52 to

17  3:16:44.  I suppose it could have lasted longer.  These are the

18  time stamps I have for you right now.  So I know at least this

19  long, at least about a minute.

20    THE COURT:  And that's the defendant for that entire

21  period?

22    MS. AKERS:  That's correct.  It's the defendant in

23  both -- he's been identified in both of these exhibits.  And

24  you heard Officer Foulds identify him as well.  I believe it's

25  Exhibit 403 where just maybe a few seconds before or after you

1    can actually see Officer Foulds' face on this side of the

2    shield.

3         You can tell it's Officer Foulds because he testified he

4    wore that lime green face mask, which is great for the

5    government for identification purposes, especially in these

6    heave-ho videos.  So our theory here, Your Honor, is analogous

7    to the *McCaughey* verdict.  It's the hard and immovable object.

8    It's the shield in front of him.  And, specifically, it is the

9    same heave-ho movement that was occurring on the other side of

10   the tunnel against Defendant McCaughey.  This is the same time

11   period.

12        It was the same heave-ho moving that was happening in

13   this tunnel, that amount of force, the same amount of

14   restriction by Officer Foulds.  His hands were deemed useless.

15   His body was deemed useless.  It's difficult for him to

16   breathe, obviously difficult for him to move.  And that is our

17   theory for Count 31, Your Honor.

18        Next, I'm moving to Count 32, is the next 111(b) charge

19   against Defendant Klein.  This charge is premised on the facts

20   when the officers finally were able to gain some momentum and

21   start pushing the rioters out of the tunnel.

22        This is a great instance of the aggression that

23   Defendant Klein exerted not only at this time period but

24   throughout the day.  We saw it in Count 31 with his face and

25   grunts at the front line.  But we see it here, especially in

1    Government Exhibit 501, but also the CCTV, 301.2.  And you see

2    that a lot of the rioters -- you can see on the right-hand side

3    here -- have turned around and are moving out because the

4    officers are gaining ground.

5          Not so true for Defendant Klein.  He pushed the entire

6    way out of the tunnel.  He pushed so hard against

7    Officer Moore, that Officer Moore said he -- it was the most

8    force that he was pushing against and it took everything in

9    Officer Moore to push back to maintain his footing.

10         What is important here, Your Honor -- and Officer Moore

11   testified as much.  He was, he said, laser-focused on defending

12   himself against the shield that Defendant Klein was using.  And

13   while he was laser-focused on defending himself, another rioter

14   reached over the shield and grabbed his baton and started

15   pulling it.

16         So at this exact same time when he was laser-focused on

17   defending himself against Defendant Klein, he starts to get

18   pulled off of the police line into the ground.  You can see it

19   on Government Exhibit 301.2 here on the right.  You can't see

20   Defendant Klein's head in this shot.  We saw that he sort of

21   ducked because he was using his full weight.  He was getting

22   low to the ground.  He was using as much force as he could.

23   And you see another rioter reach overtop, grab that baton, and

24   it starts to pull Officer Moore off the line.

25         You heard Sergeant Bogner, as the boss in the tunnel,

1    the person who's responsible for the safety of his officers,

2    testify how important it is to remain a cohesive unit.  He

3    testified that when one officer gets pulled off of the line, it

4    not only puts that officer at the risk of serious bodily

5    injury -- of course, they're in a mob -- but it also impacts

6    the entire police line because it creates a hole.  He described

7    the mob like a wave.  And when one officer is plucked off, the

8    mob sort of storms through and flows through like that water.

9    That's how he described it at trial.

10        So what we see here is really a long effort by

11   Defendant Klein pushing back.  You see Officer Moore sweating

12   through the video here on the left-hand side.  You see the

13   rioter sort of pulling him off.

14        At the same time, you see in Government Exhibit 301.2,

15   another officer, Officer Fanone, who's identified at trial,

16   being pulled out of the tunnel.  He, too, was unable to be

17   rescued.  What was standing in his way, Your Honor?  Well, it

18   was Defendant Klein using that horizontal shield that

19   Officer Moore testified about so that more rioters could push

20   against him.

21        No one could get to either of these men.  You saw at

22   trial, actually, Officer Fanone was dragged into the crowd.

23   You saw him get retrieved from the crowd and collapse face

24   first at the mouth of the tunnel.

25            THE COURT:  Sorry.  The two men are Officer Moore and

1    Officer Fanone?

2              MS. AKERS:  Correct.

3              THE COURT:  I thought Officer Moore is still on the

4    other side of the --

5              MS. AKERS:  He is right now.  He continues to get

6    dragged out.  And you heard testimony at trial -- and I think

7    you saw that 360 view where he testified that he did, in fact,

8    get dragged into the crowd.  Luckily, he was saved and didn't

9    suffer the same types of injuries that Officer Fanone did, but

10   that was just great luck on his part.

11        You heard Officer Moore testify that in this instance,

12   he said this was like the movie *300*.  There was very few of

13   them, and there was a mob, an angry mob, who he testified was

14   trying to hurt him.  And this example here of Defendant Klein

15   using this shield not only to forcefully push with all of his

16   might for, I would say, at least 30 seconds -- it might be even

17   longer.  And because of his use of the shield, it facilitated

18   another rioter to grab the baton, to pull Officer Moore off of

19   the police line, to pull him into the crowd at the same time

20   that Officer Fanone is getting pulled into the crowd.  You can

21   see a rioter's arm around his neck here.

22        No one could help him.  Defendant Klein was in the way

23   and, actually, was responsible for Officer Moore being pulled

24   off the line, which not only put Officer Moore at great risk,

25   at grave risk, it put the rest of the officer line as well

1    because it broke the line.

2              THE COURT:  So who are these two arrows there, ma'am?

3              MS. AKERS:  Sure.  The first arrow is

4    Defendant Klein.  You heard testimony that he was sort of

5    ducking, but you can see his head pop up.

6         The second arrow is just pointing to the other officer

7    who was behind -- if you're -- if you're looking from the

8    vantage point of the officers -- who was behind

9    Officer [sic] Klein who got pulled off of the line.  And

10   this --

11             THE COURT:  So the top arrow, is that Officer Moore?

12             MS. AKERS:  This is Officer Fanone who's getting

13   pulled off of the line who the officers could not reach.

14             THE COURT:  Yeah.  Yeah.

15             MS. AKERS:  And this is -- this instance right here

16   is Officer Moore, and Defendant Klein.

17             THE COURT:  Okay.

18             MS. AKERS:  And you can see the -- so I'm showing the

19   baton that the other rioter is pulling here.  From the

20   alternate angle you can see the head-to-head combat here

21   between Defendant Klein.

22             THE COURT:  So tell me clearly, what -- what is

23   the -- the theory on (b)?

24             MS. AKERS:  Sure.  The shield was being used as a

25   deadly or dangerous weapon by the force that was being pushed,

1    which led to Officer Moore being pulled off of the police line.

2    You heard him testify that he was using the shield, pushing

3    with his force.  Officer Moore had to push with his force.  It

4    pushed -- that he was pulled out of the tunnel because of him

5    defending against the shield.

6            THE COURT:  Those are going opposite ways; right?  I

7    mean, with the shield, there's a pull out of the tunnel.  The

8    defendant is pushing him into the tunnel.

9            MS. AKERS:  That's correct, Your Honor.  You heard

10   him testify, though, that he was so laser-focused on repelling

11   Defendant Klein's pushing -- so they're essentially going

12   head-to-head, and he had his baton on one hand.  And then he

13   starts -- the -- the other rioter starts pulling the baton.

14   And you see Defendant Klein sort of duck here, and he's still

15   using that shield to impede Officer Moore.

16           And then he slowly starts to get pulled out -- out of

17   the tunnel into the crowd.  So I understand Your Honor's point.

18   There's sort of divergent directions.  But you see him pushing,

19   pushing, pushing here on the left.  You see him ducking here.

20   You see the riot baton being pulled.

21           And because Officer Moore is pushing so hard and the

22   riot baton is being pulled, it sort of propels him off of

23   the police line.  And that's what he testified to.  He

24   testified that he was so focused on pushing into the shield

25   that when the baton started to get pulled, it pulled him off of

1    the line.

2              THE COURT:  Yeah.  I remember what he testified.  I

3    guess I'm having a hard time seeing how this fits the element

4    of the -- the sixth element there.

5              MS. AKERS:  Of the deadly or dangerous weapon?

6              THE COURT:  You're saying the shield is the deadly or

7    dangerous weapon here?

8              MS. AKERS:  Yes, Your Honor.

9              THE COURT:  And it is by pushing him?

10             MS. AKERS:  One, just by using the shield.  And I

11   know Your Honor has disagreed with this in other contexts.  But

12   by using the shield and pushing with his full weight for

13   this -- a long period of time into the officer, we believe that

14   that is sufficient.

15        I understand Your Honor has expressed skepticism in the

16   use of shields in that manner.  I think a very reasonable

17   alternate view of the evidence that's presented here is that

18   the officer was pulled off of the police line into the crowd

19   because of the defendant's use of this shield.  He was using it

20   in a manner which led to him being pulled into the crowd.

21             THE COURT:  You see my difficulty with that.

22             MS. AKERS:  I --

23             THE COURT:  He's being pushed in the opposite

24   direction.

25             MS. AKERS:  He was being impeded by the shield as

1    they pulled the baton.  And so this wasn't just, you know, a

2    quick instance.  This was sort of over the course of the length

3    of the tunnel; right?

4         The defendant was pushing so hard on the shield, and

5    Officer Moore was pushing so hard back, and they eventually

6    were sort of making ground towards the mouth of the tunnel.

7    That facilitated another rioter to grab the baton and start to

8    pull him back.  And I mean, at some point the defendant

9    relented, and he was able to get pulled back.

10        Had Officer Moore been standing here holding his baton

11   and another rioter just started pulling the baton, it's very

12   unlikely he would have been pulled into the crowd during the

13   course of the day.  But because he was already pushing in the

14   direction of the crowd, by the time the rioter pulled the

15   baton, his momentum was into the crowd.  He was focused on the

16   defendant's use of the shield.  And had he --

17        THE COURT:  But he was pushing out into the crowd

18   because that was the direction of the police -- the police line

19   was pushing out.  The defendant was pushing him in the opposite

20   direction.

21        MS. AKERS:  For a time period, yes, Your Honor.

22   It's -- yeah, that is true.  The reason, though, that he was

23   separated from the police line -- they were collectively moving

24   forward.

25        You saw Sergeant Bogner holding the vests in front

1   of them as they were moving forward.  He said it's his job

2   to make sure they stay on the line and collectively move

3   forward.

4        The reason that Officer Moore was so far ahead of the

5   line -- he said he didn't even realize -- was because of this

6   one-to-one, head-to-head combat with the defendant here.  He

7   got pulled off of the line.  He was well ahead of his

8   colleagues.

9        THE COURT:  But, again, he wasn't being pulled by the

10  defendant.  He was being pushed --

11       MS. AKERS:  He wasn't being pulled.  He was pushing

12  to repel the attack of the defendant.

13       THE COURT:  Okay.

14       MS. AKERS:  He just was stronger than the defendant.

15  So he gained more ground.  He got separated from the line.

16  He's several people away from his police line.  He's

17  vulnerable.  And then while the defendant's still holding the

18  shield, still blocking attack from any officer, another rioter

19  takes the baton.  He's already off of the police line because

20  of the defendant's actions and is pulled into the crowd.

21       So I understand it's more complex than our last theory,

22  but it's a unique situation.  It's -- the context of this,

23  Your Honor, can be seen in the example of Officer Fanone.

24  It -- if -- if one uses a weapon or an item like a shield in a

25  way that facilitates an officer being pulled into a vicious

1    mob, there -- risks serious bodily injury.  You see that with

2    Officer Fanone who collapsed immediately after he was

3    eventually pulled back into the tunnel.

4           THE COURT:  And so is this an aiding and abetting

5    theory?

6           MS. AKERS:  Primarily, Your Honor, yes.  And I

7    believe that not only does the video evidence support this,

8    this testimony supports this too.

9           He, Officer Moore, couldn't get help.  The officers

10   couldn't get to him.  No one could get to him.  He -- by

11   Defendant Klein using the shield in concert with another rioter

12   pulling the baton, it's sort of all encompassed in, you know,

13   like a 30- to 45-second action.  So it's not just that the

14   defendant was pushing the shield into Officer Moore, which is

15   certainly assault, and it was certainly forcible, but this

16   wasn't just a push.

17          Rioters and officers were pushing shields at each other

18   all day.  This instance was different.  This caused a break in

19   the police line.  This caused Officer Moore to be in one of the

20   most vulnerable positions that an officer could be in; and that

21   is being in a violent, vicious mob alone, by himself, without

22   his baton and without his shield, mind you, because of the

23   defendant's actions.

24          And so our theory here is that when the means and manner

25   of use leads to pulling a police officer off of the line in

1    concert with the other rioters, the riot shield was used as a

2    deadly or dangerous weapon.

3         THE COURT:  Yeah, I guess -- I mean, but it's the

4    weapon has to be capable of causing serious bodily injury or

5    death to another person.  And what I hear you saying is the

6    danger was in getting pulled into the crowd and having an

7    Officer Fanone-type experience.  And I get that, but that's not

8    the weapon causing that injury.

9         MS. AKERS:  The weapon caused him to be pulled off of

10   the line, which is causing the deadly or dangerous weapon -- or

11   excuse me, the -- the potential.

12        THE COURT:  Okay.

13        MS. AKERS:  I -- I understand -- this is a unique

14   circumstance because it was, you know, very few and far between

15   instances, thankfully, that officers were -- were pulled into

16   the crowd like this on January 6th.  But without the defendant

17   using this shield, this likely wouldn't have happened.

18        The officers would have been able to help him.  He

19   wouldn't have been expelled from the police line.  It wouldn't

20   have broken the police line from their perspective and their

21   vantage point too.  And so it was because of this shield that

22   the officer experienced what he testified to at trial.

23        THE COURT:  All right.  We've been going for a while.

24   Let's give you a break.  Let's come back at 1:45.

25        MS. AKERS:  It's lunchtime.  Sounds great.

```
 1                (Recess taken.)

 2                THE COURT:  All right.  Ms. Akers.

 3                MS. AKERS:  Thank you, Your Honor.

 4          I just finished when we broke for lunch with Count 32.

 5     And now we're moving to Count 34, which is the last count I'll

 6     discuss in detail, absent questions from Your Honor for

 7     Defendant Klein.

 8                THE COURT:  Why don't you keep moving.

 9                MS. AKERS:  Okay.  Sure.

10          I've highlighted some text messages on some slides, and

11     I just want to make one note to make clear for the Court, we

12     put all of this into evidence and people discussed, but the

13     time length that this defendant was in the tunnel was

14     substantial.  So I put the time periods there so you can see

15     how long, in fact, he was in or at the mouth in front of the

16     police officers.

17          And so now, Your Honor, I'm going to

18     Defendant Cappuccio.

19                THE COURT:  I'm sorry.  I did want you to run through

20     the others -- the other charges.  Do you --

21                MS. AKERS:  Oh, sure.

22                THE COURT:  Yeah.

23                MS. AKERS:  By the other charges, are you referring

24     to the 1752?

25                THE COURT:  Yes.
```

```
 1              MS. AKERS:  So the 1752(a)(2) and --

 2              THE COURT:  This is Count 43?

 3              MS. AKERS:  Correct, Count 43.  And (a)(4) is

 4    Count 51.

 5              1752(a)(2) -- and we're charging the (b)(1)(A) for the

 6    use of the shield as well.  Either Count 31 or Count 32, use of

 7    the shield, would suffice to increase the 1752(a)(2) to a

 8    felony here.

 9              The first element of this is the disorderly and

10    disruptive conduct in the restricted building or grounds.  I

11    think that the red map that Lieutenant McCree testified to

12    establishes the restricted perimeter.  We have testimony that

13    the Vice President, who is a Secret Service protectee, was in

14    the building.  Therefore, they created this perimeter.

15              You saw on Sergeant Bogner's body-worn camera the

16    pictures of the area closed signs and the fencing that was

17    around the Capitol at the time he arrived pretty early in the

18    day.

19              The second element of that is that the defendant

20    knowingly and with the intent to --

21              THE COURT:  Yeah.  So why don't we go to the deadly

22    or dangerous weapon.  What --

23              MS. AKERS:  I understand, Your Honor.

24              Our theories remain the same for the 1752(1)(2) and

25    (a)(4), the (b) enhancements.
```

 1          THE COURT:  So for Count 43, what is the time line

 2     that you're looking at?

 3          MS. AKERS:  For Count 43, we are relying both on the

 4     3:15 to 3:18, the use of the shield against Officer Foulds and

 5     the 3:18 to 3:19, which is charged in the indictment, which is

 6     the use of the shield against Officer Moore.

 7          THE COURT:  Okay.

 8          MS. AKERS:  And that's the same for Count 51,

 9     Your Honor.  The shield theory that the government is proposing

10     relates to both usages of the shield.

11          THE COURT:  Got it.

12          MS. AKERS:  Does that answer Your Honor's questions

13     sufficiently?

14          THE COURT:  Yeah.

15          MS. AKERS:  Okay.  I'll now turn, Your Honor, to

16     Defendant Cappuccio and his conduct.

17          The first charge that we'll discuss here is Count 28.

18     It's an 18 U.S.C. 111(a)(1) count.  This is the time period

19     proceeding his attack on Officer Hodges.  You saw in his own

20     video footage, which is the 612 series, him enter the tunnel,

21     make it to --

22          THE COURT:  Sorry.  Back on the last -- with the

23     deadly or dangerous weapon.  I take it this would kind of rise

24     and fall the same as the --

25          MS. AKERS:  On the 111(b)s.  Correct, Your Honor.

1    THE COURT:  Okay.

2    MS. AKERS:  Our position, though, is that if you were

3    to find, for example, one 111(b)(1) charge, you could convict

4    the 1752 on both of the (b)(1)(A)s just because you don't find

5    the 111(b) on the other one, for example.

6    THE COURT:  Understood.

7    MS. AKERS:  So on to Count 28.  Defendant Cappuccio's

8    conduct in the tunnel can really be separated into two

9    instances.  We have his first instance where he entered the

10   tunnel in a time of true chaos.

11   You see him filming on his cell phone.  This is the time

12   that immediately before he entered -- and I'm on Slide 33.

13   Immediately before he entered, he was filming outside of the

14   tunnel.  This is where you saw on his video and heard him

15   testify about the shields that were being passed out, the

16   rioters who were coming out with the effects of chemical

17   irritants, people chanting our house and freedom and all sorts

18   of things outside the tunnel.  He pans his selfie video to

19   himself, and then says he's going to go in and does.

20   So he enters and very quickly makes his way to the front

21   of the police line.  As you can see on the left, which is a

22   little bit before the time on the right, he makes it about a

23   couple rioters back.  And at this time, there's a lot of

24   pushing on the officer line.

25   And then you actually see in his own video and in

1    Government Exhibit 510, he makes it right up into the -- nearly

2    the front of the officers.  He holds a shield for a time.  He

3    at one time puts his hand on the door frame to sort of brace

4    himself.  He's videoing with one hand, and he is there in the

5    mob pushing with the -- the other rioters.

6         You can see in his own video at one point -- and

7    Ms. Klamann showed him on cross-examination -- the -- really,

8    like, the pushing and the jostling and the hitting at the

9    police line while he's right there.

10         THE COURT:  Yeah.  So, I mean, obviously, he's

11    describing himself as kind of --

12         MS. AKERS:  A videographer.

13         THE COURT:  A videographer.  And there is, I think,

14    one of the videos of -- kind of from further back in the tunnel

15    where you can see his right hand, which, you know, he's

16    right-handed, camera outstretched.  He says that, yeah, he gets

17    a shield, but he passes it on right away.

18         Is there actually video evidence of physical violence

19    here by himself, or is this more of an aiding and abetting

20    theory?

21         MS. AKERS:  I think, Your Honor -- I don't know that

22    there is -- there is not, to my knowledge, a recollection of

23    this moment, video evidence of him making physical contact

24    directly with a police officer at this segment.  But he is

25    about one person back holding a shield, and you see in his own

1   video, 612.23, the -- the violent, aggressive, forcible pushing

2   of him and everyone around him.

3        And that certainly constitutes assault, whether it's the

4   resisting, opposing, impeding, interfering.  This was a violent

5   30 seconds in the tunnel.  You heard testimony from

6   Officer Hodges, you heard testimony from Officer Forrester, and

7   Officer -- Sergeant Bogner at this particular time.

8        You see in his own video the movement of the rioters.

9   And this is one of those instances where it's important to --

10  to note something that Your Honor already knows.  But, you

11  know, he's part of a mob here.  So the fact that he's one

12  person back -- these officers would have had no trouble if

13  there were only the first four people on the line defending at

14  this time.

15       This is also, you know, a moment that got to such a

16  heightened conflict that they started -- the officers started

17  using the pepper spray.  You heard Sergeant Bogner testify he

18  was cognizant only to use the pepper spray when he really

19  needed it because he knew he was running low.  This was one of

20  those times.

21       And the defendant actually turned and made his way

22  towards the mouth of the tunnel for a moment because of the

23  officer's use of that spray.  And I think that shows, sort

24  of, the threat level that the officers were under at this

25  time.  This defendant was not at the mouth of the tunnel with

1    space around him.  He was, as you can see on the left here,

2    touching the other rioters in the movement, in the pushing, and

3    you can hear simultaneously the rioters screaming "Push.

4    Push."

5            This immediately precedes when they start doing the

6    collectively heave-ho action.  People are screaming at the

7    officers.  You see in Defendant Cappuccio's own video a rioter

8    come up and start spraying that orange chemical irritant at the

9    officers as he's standing right there in the pushing.

10           And so I think it's certainly sufficient just under him

11   as the principal, but under an aiding and abetting theory as

12   well.

13           THE COURT:  So do you disagree with his claim that

14   he -- somebody -- well, he was afraid he was going to get hit

15   by this shield and so he grabbed it and then passed it on?  Or

16   are you saying that that is evidence of the aiding and

17   abetting?

18           MS. AKERS:  I think, Your Honor, that -- well,

19   I'll talk about this in the next count too.  I think his

20   testimony is incredibly incredible because of the video

21   evidence.

22           So you don't see in his video or Government Exhibit 510

23   where you can see him holding the shield, a shield coming

24   towards his head.  The shield is in front of him.  He reaches

25   out, and he grabs it, and he holds it.  This was not a

1   split-second moment.  You can see it in 612.23, which is his

2   own video.

3          As you can see on the right here in Government

4   Exhibit 510, he's holding the shield, his arm is outstretched

5   such that he has enough room to hold his phone behind it.  This

6   is not a situation like where Officer Forrester had a shield

7   horizontally coming towards his face.

8          This is Defendant Cappuccio standing behind a shield as

9   the rioters push into the officer line.  So I think the Court

10  shouldn't credit any testimony that he was simply passing

11  the shield along.  And even if he was, that would suffice

12  for an aiding and abetting theory because these shields were

13  used in that heave-ho pushing that happened just shortly

14  thereafter.

15          THE COURT:  Do you have a sense of how long he had

16  the shield?

17          MS. AKERS:  I don't, off the top of my head,

18  Your Honor.  But we can -- we can get a better time line and

19  present it to you when we present any rebuttal.

20          THE COURT:  Okay.

21          MS. AKERS:  I think, though, that the shield is

22  certainly important because it's a weapon that was being used

23  against the officers, but that's not encompassing of his whole

24  time in this moment.

25          He also -- as you can see on the left here in 509, he

1    makes his way up as they're pushing.  His chest is literally on

2    the rioter's back in front of him.  They push for a while.  You

3    can sort of see this whole minute on his own camera footage.

4    So it's not as though he got swept up into the crowd and got

5    pushed for a second and then turned around and left.

6         He was -- he was at the front.  He videoed like the

7    thrashing of the shield in front of him into the officer line.

8    You can see Officer Forrester in that -- in that footage.  You

9    can see Sergeant Bogner, and you can hear -- or you heard

10   Officer Foulds testify at about this time.  And he, I believe,

11   testified that there was so much pushing that he sort of got

12   swept off of his feet because he had a lot of officers tightly

13   behind him and the rioters in front of him.

14        And that really shows the collective nature of the mob

15   at this particular time, especially, as Your Honor knows from

16   Exhibit 501, which we briefly watched, the heave-ho that comes

17   after this.

18        The next count is Count 29.  And, contextually, I think

19   it's important to keep in mind, the defendant walked towards

20   the mouth of the tunnel after this spray was being deployed.

21   And then he went back.  He went back towards the front of the

22   line after he saw what he testified were security guards.  We

23   know they're police officers.

24        He saw the spray being deployed at them.  He saw the

25   shields being used at them.  He heard people chanting push and

1   this is our house, you can't stop us, things like that.  And

2   he turned around and went back to the front of the police line.

3        And he testified that he was acting under the guise of

4   being like a photographer.  This man, as you know -- because we

5   would have presented evidence had we had it -- it's not like he

6   has a social media.  He's not like a YouTuber.  It's not like

7   he has a following.  He was filming.  But the -- the testimony

8   that he was there just to film is really just belied by his

9   actions.

10       And he goes immediately up back towards the police line.

11  He makes his way to this corner over here where Officer Hodges

12  is currently being pinned.  That is important.  You can see

13  that in Exhibit 501.  Defendant McCaughey already had

14  Officer Hodges pinned before this attack started.

15       And so Mr. Cappuccio's claim, if I understand it, that

16  he had some sort of attack from the front is entirely

17  incredible.  There's no evidence on his own cell phone that was

18  facing forward the whole time that someone attacked him from

19  the front.  Similarly, his testimony that he was attacked from

20  behind is -- is just completely at odds with the video

21  evidence.  He had his phone recording the whole time.

22       And when Ms. Klamann went through his own phone evidence

23  with him, there were about three frames where you couldn't

24  really tell what it was.  It was a little blurry.  That is less

25  than 1 second.  His claim is that he got attacked from the

1   back, dropped his phone, bent down, picked it up, and put it in

2   his mouth.  But there's less than 1 second on his own video --

3   you can go through frame by frame -- that you can't really tell

4   what it is.

5          THE COURT:  That's not what I understood him to say.

6   I thought he said he'd been struck on the hand, he dropped the

7   phone, then he bent down to pick it up.  And then he was struck

8   again while he was picking it up, and that second strike is

9   what set him off.

10         MS. AKERS:  And perhaps I'm misremembering.  I

11  thought I heard someone reached over his back.  But the record

12  will reflect what it does.

13         The point is that his testimony is that that triggered

14  him.  It set him off.  And we just know he didn't drop his

15  phone because it was recording the whole time, and it was at

16  head or chest level the whole time.

17         You can see Officer Hodges' face [sic] mask.  You can

18  see his own face.  There is not a second that's not accounted

19  for in his phone because it was recording.  It's just a

20  completely incredible claim that is inconsistent with the

21  evidence that the government put forward.

22         It's also inconsistent with Government Exhibit 501 and

23  510, which, essentially, show this whole interaction.  Although

24  they sort of pan different ways at different times, but there's

25  nothing to support this.  And, in fact, his own phone video

1    shows that it just can't be true.

2           After this happens, after he makes his way over to the

3    corner here, as Officer Hodges is pinned, you know what happens

4    next, Your Honor.  Officer Hodges showed you this gas mask,

5    this hefty gas mask, that has like a hat sort of thing on it

6    and goes over your entire head.  This is a CDU gas mask.  This

7    is for -- made for civil disturbance units.  This is made for

8    chaotic, crazy times when officers are fighting or breaking up

9    fights, things like that.  It's made to work in conjunction

10   with his helmet.

11          So his whole head is here, and his helmet goes over.

12   And then these straps, which are -- they're not -- it's not

13   like they're going to break; right?  This is a hefty, hefty

14   piece of equipment.  This was, as Officer Hodges testified,

15   securely placed per his training and protocol and procedure on

16   his face and head.  He secured it.  Obviously, he secured it

17   because he testified that when he was on the West Front he got

18   sprayed because he didn't have it on yet.  So he knew that he

19   needed this that day.

20                THE COURT:  So can we just go to (b)?

21                MS. AKERS:  Sure.

22                THE COURT:  Is your theory that that assault is

23   inflicting bodily injury, or is your theory that the baton

24   strike -- the baton is a deadly or dangerous weapon or both or

25   either?

1    MS. AKERS:  Both, Your Honor.  The baton is certainly

2    a deadly or dangerous weapon, probably by itself.  But when

3    used in the manner that he used it -- you heard testimony from

4    Sergeant Bogner that even MPD policy is that you can't use a

5    baton on the head because it is deadly.  You heard the same

6    testimony from Officer Hodges who said he screamed out in pain

7    because he knew another hit could be fatal.

8        So the baton is deadly or dangerous.  On that front --

9        THE COURT:  So, yeah, I agree.  I'm wondering a

10   little bit about the logistics here.  I mean, looked to me like

11   Officer Hodges was pointing to a -- well, I don't think either

12   of you asked him exactly where he was hit.  But he said he was

13   hit somewhere on his head.  It looks -- and not on his helmet.

14   His helmet, I see, is a little askanced there.

15       So I'm just -- I'm wondering about the -- your kind of

16   theory of the logistics on this, where we -- I know we kind of

17   lose sight for a couple seconds about how this all happened.

18       MS. AKERS:  Sure, we do lose sight.  And I think that

19   Officer Hodges' testimony speaks for itself.  He remembers

20   being pinned, being vulnerable, having his gas mask torn off,

21   and then being hit with the baton.

22       We know that Defendant Cappuccio had the baton.  And if

23   you recall from his direct examination, he said he was doing

24   this (indicating).  It's certainly possible that he didn't take

25   it -- take it over his head and bash it.  I mean, we don't know

1    that that happened.  I think Officer Hodges remembers getting

2    hit in the head with a baton.  That's his testimony.

3         The defendant's testimony -- although I think most of it

4    is largely incredible, testified on direct examination that he

5    grabbed the baton, he had the gas mask, and he was doing this

6    motion to Your Honor yesterday.  And he did it for quite some

7    time.  And so the fact that you have direct evidence and

8    testimony from Officer Hodges that he recalls this; that he has

9    this bloody lip; that he went to the doctor and he had a large

10   contusion on the front of his head that a doctor said, wow, I

11   can't believe you got this with a helmet.

12        Well, he testified he had his own helmet secured the

13   whole day, other than right here.  And, of course, it wasn't

14   secured the whole day because by ripping this off, it dislodged

15   the helmet.  You see there's a bloody lip there.  Your Honor,

16   there's nothing in this gas mask that would cause a bloody lip

17   other than the defendant maybe, like, punching or the baton

18   or -- I mean, it's not like this has a lot of, you know, things

19   poking out.  It's meant to be worn here.

20        So we have bodily injury here, for sure.

21             THE COURT:  And so that would be -- that would be

22   separate from the baton strike.  Nobody has said that he hit

23   the officer in the lip with a baton; right?  I have no evidence

24   to that?

25             MS. AKERS:  I think that's correct.  Well, you have

1    Officer Hodges' testimony; he was hit in the head with a baton.

2              THE COURT:  But he was pointing to something on the

3    scalp.

4              MS. AKERS:  I think he was, yes.  But he also

5    came away with -- as you can see his lip here on the right.

6    So I guess we don't know exactly how the bodily injury

7    happened.

8              THE COURT:  Well, I mean, I took it to be pretty

9    clear it was from the defendant wrestling the face mask away

10   from him.  So, I mean, it seems to me you may well have 111(b)

11   just on that, kind of completely ignoring the baton.  Is that

12   your view?

13             MS. AKERS:  Yes, I think the evidence speaks to that

14   and supports that.  But I also think that with -- in the face

15   of the direct evidence and testimony of Officer Hodges compared

16   with the only, I guess, contrary evidence that's been elicited

17   is Defendant Cappuccio's statement.  And by the way, his

18   statement, his claim, his theory here is that he didn't

19   remember it, he didn't know what was going on.

20             So how convenient that he didn't remember what was going

21   on.  He had no idea what was happening.  He was in this

22   blackout, whatever stage he wants to call it.  And the only

23   thing he can affirmatively say to this Court is he doesn't hit

24   him in the face with the baton.  It's just too convenient,

25   Your Honor.

1     And you have an officer who remembers this.

2  Officer Hodges had no reason to exaggerate here.  Getting your

3  gas mask violently ripped from your face is bad enough.  There

4  was -- there was no reason.  You heard defense counsel

5  cross-examine Officer Hodges about all of the defendant

6  statements that he's given, about the congressional testimony

7  that he gave in the summer of 2021.

8     And what you didn't hear was any impeachment with any

9  inconsistent statement, with any notion that Officer Hodges has

10  manufactured this story or changed this story over time or has

11  otherwise been inconsistent.  You never heard that because he

12  has been consistent since the beginning.

13     If you are pinned -- and like he said, it's not like he

14  had the full free range of motion to look left and right.  He

15  was pinned by Defendant McCaughey.  By the virtue of being

16  pinned, his face was facing Defendant Cappuccio.  He really had

17  nowhere else to look.  It made all the sense why he would

18  remember not only this vicious attack but the baton hitting him

19  in the head.

20     And we saw, of course, Defendant Cappuccio, which we'll

21  look in the next count, holding the baton.

22     Another thing that is on Defendant Cappuccio's video is

23  Officer Hodges' arm smashed in the door here.  So you see this

24  at 612.23 -- Exhibit 612.23 at 1 minute and 14 seconds.  This

25  is on Defendant Cappuccio's own phone video.  So you see that

 1    after this vicious attack, he is pinned here.  His arm is

 2    completely pinned.  And Defendant Cappuccio is responsible for

 3    this.

 4         Sergeant Bogner is the testimony that Your Honor can

 5    rely on as to the deadly or dangerous weapon of the baton.

 6         THE COURT:  All right.  So just -- as I hear it, you

 7    have two independent and -- independently adequate theories.

 8    One is the assault with the face mask that results in that

 9    bloody lip.  And the second is an assault with a baton on his

10    scalp --

11         MS. AKERS:  The contusion.

12         THE COURT:  -- is that correct?

13         MS. AKERS:  Yes.  And I think on that second theory,

14    it's actually sort of two.  Because if he hit him on the head

15    with a baton, that's using a deadly or dangerous weapon, and he

16    also had injury from that, was his testimony, the large

17    contusion on his head.  So I think you get there with the

18    serious bodily injury too.

19         THE COURT:  Okay.

20         MS. AKERS:  I just want to point out here -- and I've

21    already sort of mentioned this, so I'll be brief.  But sort

22    of -- not sort of.  The incredible and unreliable testimony of

23    both Defendant Cappuccio and Dr. Xenakis.

24         I think it's worth noting here that Your Honor heard

25    opening statements, and you heard the defense theory of his

1   PTSD episode.  But what you never heard was testimony during

2   this trial that the defendant suffered a PTSD episode or that

3   he had certain -- like certain symptoms that related to his

4   PTSD.  He, in fact, testify that he has PTSD, as did

5   Dr. Xenakis.  But there is no link between that diagnosis and

6   his actions here in the tunnel.

7        Dr. Xenakis was a very unreliable expert witness.  He

8   refused to concede, I think, what can be considered as obvious

9   points.  For example, I asked him if the defendant's statement

10   is not true that he were attacked, would that change your

11   opinion as to, you know, why he did this?  And he said no, it

12   wouldn't.

13        He also refused to admit that a defendant who is facing

14   criminal charges, their statement is self-serving in ways or

15   can be unreliable or subjective.  He said no, it's objective

16   here.

17        He has been found to be uncredible and unreliable by

18   numerous different courts.  You heard that testimony,

19   Your Honor.  He has been found to have rendered opinions

20   under the guise of his expertise that have had no basis in

21   his experience and his education.  We went through some of

22   those cases that are on the screen here in his testimony

23   yesterday.  And even if the Court were to find him credible, he

24   didn't even offer an opinion linking the diagnosis with the

25   actions here.

1          THE COURT:  Is that right?  I thought -- I thought he

2    did.  And I thought he said he met with the defendant twice

3    and --

4          MS. AKERS:  Well, first, Your Honor, he rendered his

5    opinion and testified he had only met with him once for one

6    hour.

7          THE COURT:  Before --

8          MS. AKERS:  Before trial prep.  And so his opinion

9    was rendered after one meeting with him for one hour.

10         He did not go through what he described to be necessary

11   analysis, the DSM critical.  It's not in his report, and he

12   didn't go through it for the Court in court.  He just said that

13   he did.  It was a conclusion with no basis, and that's exactly

14   what all these prior courts have been -- found him to be

15   incredible on.  He reaches conclusions without citing a basis

16   for it.

17         He says that he diagnosed Defendant Cappuccio with PTSD,

18   and he never described how Defendant Cappuccio's actions relate

19   to or are in line with symptoms that he believed Mr. Cappuccio

20   had.  So he never said, for example, when the defendant, you

21   know, was attacked, it would be common for you to fear an enemy

22   is coming at you.  I mean, I'm not a doctor.  I don't know what

23   his theory would have been.  But his testimony was that the

24   defendant has PTSD, and that was it.

25         And, you know, he -- he got upset because he said

1   I've done this analysis, I just didn't put it in my report, and

2   you want me to write my report differently.  But the problem

3   is --

4              THE COURT:  I don't recall him getting upset.

5              MS. AKERS:  Excuse me.  Yeah.  Yeah.

6         So I think the only other theory that's been put forth

7   by the defendant is that perhaps the officer was hit in the

8   head with a different baton.  And a video was showed -- shown

9   where a baton was in the area of the defendant and

10  Officer Hodges.

11        And I put a different angle of this same instance on the

12  left here in Exhibit 501.  And what you can see in Exhibit 501

13  is that this baton, one, does not hit Officer Hodges in the

14  head.

15        Two, it's really not at the angle to.  And it's actually

16  further back than the defense was suggesting.

17        And three, Officer Hodges is claiming he got hit in the

18  front of the head.  This is, obviously, the back of the head.

19  And you can see on the right here, Exhibit 501, also, the

20  injuries that he was sustaining or already sustained prior to

21  this baton swipe.

22             THE COURT:  So back to General Xenakis.  Do I have

23  to -- if I -- I don't disagree with him, do you lose on this

24  count?

25             MS. AKERS:  No, Your Honor, because, one, we have --

1    the defendant has conceded physical contact.  So we have a

2    general intent crime here on the 111.  So I think no.

3          I don't -- I believe Your Honor limited his testimony to

4    that, sort of, one instance.  And I believe his testimony on

5    the stand was limited to that one instance.

6          THE COURT:  That was my understanding.

7          MS. AKERS:  Now, in his report he says -- he speaks

8    in the plural, as though he were opining on more than that.

9    But there was no testimony that was elicited beyond that.

10   Because the defendant concedes the physical contact, I

11   think that, no, I don't -- I don't know what work this would

12   do.  Perhaps it could be a mitigating factor at sentencing,

13   but I don't know what work it would do for him in a legal

14   matter.

15         THE COURT:  Wouldn't it negate the intent on the

16   111(b)?

17         MS. AKERS:  I guess if -- well, I think -- well, I

18   guess had he rendered an analysis, I suppose it could, but I

19   think what would be prudent is for the Court to re-read the

20   testimony that he gave.

21         And there's just -- he didn't testify as to the

22   defendant's outburst.  I mean, he didn't even say what it was

23   because he never testified about it.  He just said he has PTSD.

24   He never linked it to the actual conduct.  And, in fact, he

25   never even testified to the conduct.  His report never even

1    mentions that the defendant ripped off Officer Hodges'

2    face [sic] mask.  He never even acknowledges the actual facts

3    that we've established here in trial.  So it would be difficult

4    how he could say that his actions were excusable when, in fact,

5    he hasn't acknowledged the actions at all.

6           THE COURT:  Well, I don't know that he needed to

7    describe them as being excusable.  I thought what he was trying

8    to do is show all of these triggers:  -- the crowd, the gas,

9    the loud noises, the being struck -- that would, in his -- from

10   his analysis, have set the defendant into a PTSD episode at

11   this moment.

12          MS. AKERS:  I think that is the portion that's

13   missing from his testimony.  He did say -- he said there

14   were -- there was chaos and there was gas.  And he said -- I

15   think he said perhaps the lights were going on and off, even

16   though it was a strobe light, and he never made the next step.

17       He never said:  And this defendant's symptoms are

18   X, Y, and Z and these factors caused him to have X, Y, or Z

19   outburst or X, Y, or Z experience that led him to black out,

20   which is his testimony.  There's a huge gap there.

21       He acknowledges the circumstances of the environment,

22   and he acknowledges that the defendant has PTSD.  And then

23   there's the missing link there.  There's no bridge between the

24   two.  He didn't testify to that bridge.  Your Honor can review

25   his transcript from yesterday.

1      I asked him:  Is your testimony limited to diagnosing

2  the defendant with PTSD?  And he said yes.  And that doesn't do

3  it for it.  The fact that it was chaotic and that there were

4  strobe lights and gas doesn't negate the specific intent to

5  commit crimes.  And without that linkage, there's really

6  nothing there in terms of what work this does for the

7  defendant.

8      THE COURT:  Okay.

9      MS. AKERS:  Count 30 is the robbery charge for

10  the baton.  Mr. Cappuccio is seen holding the baton immediately

11  after the incident.  You heard Officer Foulds testify that

12  looks to be a police baton.  You heard Officer Hodges

13  testify that he had the baton in his hand and it was ripped

14  from him.

15      You actually saw it on Defendant Cappuccio's own video;

16  Officer Hodges holding the baton immediately before the attack.

17  You heard another rioter yell, "Let go of the stick" during the

18  same time period that the defendant would have been pulling at

19  the baton, and then you see him walking out of the tunnel

20  shortly thereafter with the baton.  I believe that the defense

21  has, essentially, agreed that he -- he did take this baton.

22      THE COURT:  Yeah, that's what I understood.

23      MS. AKERS:  But you don't have to rely just on that.

24  You can rely on this video evidence and the testimony.  And

25  Sergeant Bogner confirmed it was an MPD baton.

1    The next count is 34.  This is the count for

2    Defendant Cappuccio as it relates to the 1512.  And I think

3    that in this instance, it's important, really, to take into

4    account his whole trip, his whole day, all the different steps,

5    all the different words that he spoke, all the different things

6    that he heard, all of the choices that he made along the way

7    that prove this count.

8    When he was in the car with his co-traveler, he says to

9    him -- he says, "It's all true.  We're going to find out when

10   we get to Washington how much more true it was."

11   They drove to Washington, D.C., in this MAGA cavalry

12   that was advertised as a way to go and "Stop the Steal."  This

13   is something that was on the defendant's own cell phone.  He

14   purports very conveniently not to remember, you know, what he

15   was talking about in the car.  He attributes the MAGA cavalry

16   to Mike.  He attributes the idea to Mike.  He attributes,

17   essentially, all of his conduct to everyone else the whole day

18   except for him.

19   And so on the way to Washington, D.C., it was very clear

20   based on the words that were spoken in the car, based on the

21   things that were on his phone that he was aware of a "Stop the

22   Steal" rally.  The fact that Mr. Cappuccio got on the stand and

23   testified he had no idea -- and I believe he said it could have

24   been stealing anything.  It's -- it's just so incredible.

25   He gets to Washington, D.C., and he actually is chanting

1    with other rioters "Stop the Steal" as he's on his way to the

2    Capitol.  You can hear it in his own video footage.

3         Before he starts marching to the Capitol, he does go to

4    the former President's speech.  And there was -- there were

5    some questions during trial about what he heard.  He admitted

6    on the stand today that he heard most of the President's

7    speech.  And the quote that I have on the right here are the

8    words that were spoken by the former President during

9    Defendant Cappuccio's own video when he was filming directly at

10   the President.

11        The former President talks about the election being

12   rigged, talks about stopping the steal, saying, "We'll never

13   give up.  We'll never concede.  We will not take it anymore.

14   We will 'Stop the Steal.'"

15        The defendant then marches to the Capitol with others

16   and chants, in his own words, "Stop the Steal."  The story that

17   he is telling the Court that he didn't know what was going on

18   and that he didn't know what steal he himself was chanting

19   about, he didn't know what steal Trump was talking about, it's

20   just incredible.  It is just not supported by what we see and

21   hear him do.

22        The defendant gets to the Capitol.  And I think

23   something that is interesting here is this defendant traveled

24   all the way across the country.  He said it was just for a fun

25   road trip.  He takes a photo with his co-traveler off -- what

1    looks to be off the Capitol Grounds, and then he very quickly

2    departs from him.  He -- he, essentially, ditches his

3    co-traveler and makes his way directly to the Capitol.

4         On the way there, he's filming.  He's filming

5    everything.  He says, "Shit's getting real."  He says, "You

6    would have loved it.  You would have been able to kick in some

7    doors."  He -- he talks about "Stop the Steal."  He chants with

8    other people, "Our house!".  He says, "USA, motherfucker."  He

9    is vocal about his efforts being there and all along the way

10   making his way closer to the Capitol Building.

11        He sees people on statues climbing.  He sees them on

12   scaffolding climbing.  Very clearly he's not supposed to be

13   there.  You can see officer lines in his own videos, but he

14   keeps going towards the Capitol.  He claims in Court here that

15   he -- he wasn't trying to get into the Capitol.  But it's very

16   convenient because his eyesight, his direction, and his

17   movement was, in fact, towards the Capitol.

18        As he is getting closer, you can see on the left

19   here another one of his videos that he's filming, you know,

20   this fraud sign.  And he -- he says he's storming the castle,

21   boys.  He doesn't attribute that to mean anything here in

22   trial, again, conveniently not taking ownership of his

23   own actions, not taking ownership of his own words.  Why would

24   he be storming the castle?  He didn't even know why he was

25   there.

1    Your Honor, the video that you've now seen several

2    times -- so I would never show it to you again -- 612.21, he

3    stands outside.  This is, I think, like, a 6-minute video.  And

4    you heard the testimony about all of the chaos and the

5    craziness that he was seeing.  He claims he didn't know what

6    Antifa was.  But he just happened to assume that these people

7    were pouring out with tears and coughing.  Defendant Klein was

8    coming out pouring Gatorade on his face.

9    He claims it must have been Antifa in there.  He claims

10   this big, sort of, beautiful archway didn't look like an

11   entrance to the building.  It's just -- it's so incredible.

12   And before he goes in, he turns his camera to himself

13   and very emphatically -- Your Honor's heard it -- says,

14   "We're going in.  We're going in." He makes a mention to the

15   tear gas.  He doesn't care that there's tear gas.  He goes in

16   anyway.

17   He was committed all along the way to going into the

18   Capitol.  He was saying "Stop the Steal."  He was saying he was

19   storming it.  No reasonable person would see people pouring out

20   of a tunnel, crying and yelling and clearly had been gassed;

21   and coming out with shields; and all of these crazy chaotic

22   events -- no one would walk towards that unless they wanted to

23   get in the building.  It doesn't make any sense.

24   But he did.  He did walk right in and very quickly

25   made it to the front of the police line and despite being

1    sprayed with chemical irritant went right back in where he

2    committed his vicious assault on Officer Hodges.  So his

3    testimony that he didn't know about the election being stolen,

4    despite that he was, you know, making fun of Hillary Clinton's

5    words, despite the fact he was chanting "Stop the Steal,"

6    despite the fact that he said he was storming the castle, all

7    of these things are inconsistent with his actions.

8         And his actions on that day show that -- his intent.

9    His actions are indicative of his intent.  And the contrary

10   evidence that's been proffered at this trial is his own

11   testimony, which is all self-serving, which fails to take

12   responsibility for any of his conduct, and that comports even

13   with his assault.  I mean, you heard him, Your Honor, say, I

14   feel really bad for what happened to Officer Hodges.  But what

15   he should feel bad for is what he did to Officer Hodges, what

16   we see on the video.

17        So same true as well with this 1512 count.  It's so

18   convenient that he didn't know what was going on; that he

19   didn't remember saying, you know, "Stomp your feet.  Stomp your

20   feet.  Let them hear us inside" and then immediately go into

21   the tunnel, get to the front of the police line right

22   thereafter.

23             THE COURT:  So, I mean, I guess my difficulty on this

24   one is even if I agree with you that there's a lot of evidence

25   and he wanted to get inside, the government has not charged

1    hundreds of people who did, in fact, go inside with obstruction

2    of an official proceeding; I think rightly so.  So I'm not sure

3    that you get over the hump even taking everything you say as

4    true.

5            MS. AKERS:  Well, you certainly don't have to get

6    inside to want to get inside and want to cause the

7    certification to stop.

8            THE COURT:  True.  But just because you want to get

9    inside doesn't mean you stop the certification either.

10           MS. AKERS:  That's true.  But if you were just trying

11   to get inside and you didn't have all the contemporaneous

12   discussion that was going on about stopping the steal, about

13   storming, about letting them hear us -- if you didn't have that

14   and you didn't get inside, you were just going to the tunnel to

15   fight.  I don't know who would do that.

16           But say you like fighting.  You're just going to the

17   tunnel to fight and you didn't have all these contemporaneous

18   statements, you didn't have on your phone the MAGA caravan,

19   you weren't listening to the Trump train app the whole way

20   there, you didn't stop to get goggles at Walmart on the way

21   there -- so it's not just that he said all these things, that

22   he did all these things beforehand, but his conduct on that

23   day.

24           I think it's telling, also, that he left his

25   co-traveler, who he purports it was his whole idea to even come

1    here to begin with, and he -- he leaves him and goes straight

2    to the tunnel and along the way says and does all of these

3    things.  He takes these videos of this fraud sign.  I mean, all

4    of it is too convenient for him now to get on the stand and

5    claim he didn't intend anything by it.  He intended only, I

6    think he said, to -- to help an officer, which we don't ever

7    see that happen either.

8              THE COURT:  I hear you.  Still, it seems to me

9    there's got to be knowledge of an official proceeding.

10             MS. AKERS:  Well, Your Honor, I think we get there on

11   him videoing the Trump speech.  I mean, that's knowledge.  He

12   videoed not only the Trump speech.  We have the John Eastman

13   speech, the Trump, Jr. -- I forget his name at the moment.

14   They're talking about the certification.  They're saying

15   that -- they used the word certification.  We put the -- you

16   know, we put clips into evidence.  He testified today on the

17   stand that -- the defendant did -- that he was at all the

18   speeches listening and heard most of it, I believe he said.

19             And so there were people around him talking about it.

20   He admits to listening to it.  He didn't testify that he

21   didn't know about the certification.  So there's not contrary

22   evidence that we're trying to overcome here.  What we have are

23   all of these statements by him trying to, in his own words, get

24   in the house, you know.  He even says, you know, dirty deuce,

25   who he refers to himself as, is in the house as he's marching

1    there.

2         How convenient that he drives across the country for the

3    first time ever the day of January 6th and then says and does

4    all these things, hears the former President and his people

5    talk about the stolen election and, specifically, the

6    certification.

7         THE COURT:  But at that point, I mean, I think, you

8    know, at least Mr. Klein, who strikes me as much more

9    sophisticated about the whole election, thought that the

10   Vice President was going to decertify.  I mean -- and with

11   Mr. Klein you have evidence of very intimate knowledge of how

12   the certification process works and knowledge that the

13   Vice President, quote, unquote, betrayed them.

14        And so, you know, I see kind of a coherence in his

15   presence at the Capitol and then anger and deciding -- wanting

16   to break in.  I don't think there's a similar arc that you have

17   here.

18        MS. AKERS:  It's a different arc for sure,

19   Your Honor.  We don't have extensive text messages from

20   Mr. Cappuccio talking like Mr. Klein does.  You heard evidence

21   he was very well aware that the FBI -- his face was

22   circulating, his BOLO was circulating.  He knew that.  I don't

23   think it's all that unsurprising he didn't have text messages

24   on his phone.

25        And, you know, the agent testified about his cell phone.

1    You don't need, I think, you know, to have said in writing that

2    you committed a crime to commit the crime.  I think it's very,

3    you know, infrequently -- maybe January 6th defendants aside --

4    that someone writes it down and texts it and knows they're

5    being looked for and keeps it on their phone.  It's kind of

6    crazy to do that.

7        And so the missing link there of evidence comparable to

8    Mr. Klein, it is different, but it's not insufficient because

9    it's different.  And just because someone doesn't have on the

10   day they're arrested an active social media doesn't mean they

11   can't have formed the intent.  It doesn't mean that all of his

12   actions up until, you know, driving to January 6th and being

13   there and marching to the Capitol and leaving his friend and

14   using all the words -- you know, maybe he formed the intent

15   while he was there.

16       The evidence supports that.  He heard speak- -- speeches

17   about the certification and the election being stolen.  And

18   everything from that moment after supports that he formed or

19   already had that intent.

20       And the fact that he stood outside the tunnel for

21   several minutes and saw what he saw and decided still to go

22   into the tunnel, it really speaks to how -- how much he wanted

23   to get in or how disruptive he wanted to be.  It -- it -- a

24   rational person who's just, you know, wanting to express

25   First Amendment rights doesn't do that.  And they don't say the

1    things that he said, and they don't chant "Stop the Steal."

2    And they don't say they're storming the castle and they're

3    going in the house and yelling push and saying, "Let them hear

4    us inside."

5         Who is they, Your Honor?  I mean, we know who it is.

6    The fact that the defendant wouldn't admit to any of his

7    conduct, can't say who they were, there's not -- there's not

8    much credibility there.  And I think that his statements is --

9    on the stand are just really further indicative he's sort of

10   hiding what his intent was because his statements were

11   completely inconsistent with what he said and did on

12   January 6th.

13            THE COURT:  All right.  Thank you, ma'am.

14            MS. AKERS:  And then I would be remiss without

15   saying that walking out of the tunnel and pumping his fist in

16   the air, that can go to his conscious intent and actions as

17   well.

18            THE COURT:  Thanks.

19        All right.  Ms. Douenat.

20            MS. DOUENAT:  Good afternoon, Your Honor.

21            THE COURT:  Good afternoon, ma'am.

22            MS. DOUENAT:  So I'm going to start with just talking

23   about scienter and what I believe this case is about.  It's,

24   under the circumstances, present on January 6th.  Specifically,

25   Your Honor, in the tunnel itself and the stress revolving

1    and -- the stress in that area, the aggression, the chaos, the

2    screams, the yells, the gas.

3          All of that, including a disproportionate sense of fight

4    or flight response and reliving of trauma is what caused

5    Mr. Cappuccio's actions against Officer Hodges, Your Honor, but

6    they're not at all intentional or willful.  And for that I'm

7    just going to explain a couple of things.  I'm going to start

8    with counts -- not 28, but 29, because -- I'm sorry,

9    Your Honor.  I have to get my notes on that.

10         Count 29, Your Honor.  For one, the indictment -- so

11   we're going to object to -- to the constructive element the

12   government is trying to make by saying that now the gas mask is

13   a dangerous weapon.  They, in the charge itself --

14         THE COURT:  I didn't understand that.  I understood

15   them to be saying that injury sustained during that assault was

16   bodily injury.

17         MS. DOUENAT:  As long as it's not considered a

18   dangerous weapon.

19         THE COURT:  Yeah.

20         MS. DOUENAT:  Okay.  Thank you, Your Honor.

21         THE COURT:  Ms. Akers, am I correct about that?

22         MS. AKERS:  You're correct.

23         THE COURT:  Okay.

24         MS. DOUENAT:  So -- but as far as Count 29,

25   Your Honor, we do want to explain that -- that the best

1    evidence is the video here.  And we have a couple of videos

2    that we'd like to show the Court.

3          I know that the government states that -- actually,

4    we'll start with -- I'm sorry, Your Honor.  I'm going to start

5    Count 28.  Let's start with Count 28.  I know the government is

6    trying to rely on some video footage of the shield that tops

7    3 seconds or 2 seconds that Mr. Cappuccio has the shield in his

8    hand.  There's two videos to look at, and we can pull up those

9    videos under seconds.  It's 509 at 5:29 to 5:48.

10         And this is not quite -- this is not about the shield,

11   but it shows how he enters the tunnel and gets pushed by the

12   crowd.

13              (A video recording was played.)

14              MS. DOUENAT:  Is that 529?

15         We can see Mr. Cappuccio at the bottom -- I guess,

16   bottom of the screen, and you can see both arms up.  And he is

17   being pushed by the crowd.  He is not pushing the crowd in

18   front.  He is being pushed, and he does try to hold onto the

19   door because he's being pushed.

20         And we can stop there.

21         And I know the government was saying he was pushing into

22   the crowd, and it's obvious there that he is not.  And he's got

23   both hands out, and he is being pushed into the crowd.

24         510 at :14 --

25              (A video recording was played.)

1          MS. DOUENAT:  -- is the Cantwell video, Your Honor.

2     And if you look at it, you can see the shield is not even held

3     on tightly.  It's being moved, and he grabs it on the side.  He

4     had ahold of it -- and we can play it over, if the Court wants

5     to see it again.

6          THE COURT:  Sure.

7          (A video recording was played.)

8          MS. DOUENAT:  It kind of falls out of his hands at

9     one point, and then he grabs the side.  It's not -- he's not

10    holding on tightly, and he's not using it as a shield.  He

11    is --

12         THE COURT:  Well, according to him, he passes it on

13    to someone else.

14         MS. DOUENAT:  At that point he does.

15         THE COURT:  Isn't that aiding and abetting,

16    Ms. Douenat?

17         MS. DOUENAT:  I don't think he intentionally passes

18    it on.  And if the Court realizes that this happened -- the

19    shield incident happened after -- and there's video footage

20    because of the spray.  And -- and if you look at the Cantwell

21    video and the Farina video where you can see where the spray

22    happened, and you can also see where the spray happened with

23    the Cantwell video, it happened after he was sprayed and he

24    said, "I can't handle it," which I would argue is when he was

25    initially really heightened and not fully triggered but was

1    getting up to the point where irrational thoughts were a

2    hundred percent.

3         The reason I argue that -- and I'm going to go into that

4    argument in a minute.  I want to first connect the bridge with

5    Dr. Xenakis that the government claims he didn't connect that

6    the incident that happened in the tunnel was a PTSD trigger.

7         THE COURT:  I'm sorry.  Before you do that, so you're

8    arguing that 28 is also covered by the PTSD defense?

9         MS. DOUENAT:  I'm -- I'm arguing that -- yes, I guess

10   I am.  The aiding and abetting, yes.

11        THE COURT:  Okay.

12        MS. DOUENAT:  So -- because that's intentional.

13   And -- and, Your Honor, what happened was the -- the -- the --

14   Dr. Xenakis was asked, you know, how does he know that was a

15   PTSD moment.  And he said because you could hear it in his

16   voice.  He was in distress.

17        And that's when the government was saying, well, how can

18   you attribute that incident to PTSD.  And he specifically

19   testified that it was because of the actions and you hear it in

20   his voice.  You can hear the distress.

21        And he specifically also, when I was directing him,

22   stated that he looked at the videos.  We looked at them with

23   the Court.  He looked at the client's video, and he looked at

24   the Cantwell and Farina video; and that he definitely can say

25   that was him being triggered by PTSD.  And he did say the

1    triggers were OC spray.  Everyone has individual triggers.

2    One person with PTSD may be triggered by OC spray, while

3    another person may be triggered by the loud sounds.  He

4    couldn't specifically say which one of those triggered him,

5    but he did say that when he was hit, he was definitely

6    triggered.

7            THE COURT:  But doesn't this conflict with your

8    client's testimony that it was only at the -- the Hodges'

9    assault that he went from zero to a hundred after getting hit?

10           MS. DOUENAT:  I think -- I think that's when he went

11   into a flashback.  I think you can be triggered and not be

12   fully in a flashback.  There's that kindling moment that the

13   doctor testified about where your senses are heightened and

14   you're on high alert, but you're not fully in a flashback

15   moment.

16           I think that the testimony that my client gave was

17   that -- when he went into flashback mode was right when he was

18   hit in the shoulder blade.  Not the first hit, but the second.

19   And that was after he picked up -- he was picking up his phone

20   and he got hit between the shoulder blades.

21           He never -- Mr. Cappuccio never testified where he got

22   hit from, at least that's my recollection.  I know we all have

23   memory issues about what is being said.  So the Court is the

24   trier of fact on that.  But I do believe he never said he felt

25   like it came from the front.  He just said he got hit and it

1    knocked out the phone from his hand.

2         And then when he got hit between the shoulder blades,

3    that's when he went from zero to a hundred.  And then you hear

4    the battle cry and the awful stuff that happened to

5    Officer Hodges.  And he is sorry about what happened to

6    Officer Hodges.  And if -- you see that right after the

7    incident, he is out.

8         Officer Hodges -- if you look at the tape,

9    Officer Hodges leaves through the back.  They leave -- he's

10   leaving the tunnel at the same time.  He leaves the tunnel at

11   3:14.  Officer Hodges isn't back at 3:14 and -- being taken to

12   the back.  I mean, he doesn't stick around.

13        The testimony that was presented by video evidence,

14   which is the best evidence, is that he arrived at the

15   Capitol -- at 2:22 -- Grounds with his friend, Mike, and then

16   he lost his friend, Mike.  And then at 3:14 he's out of the

17   tunnel heading back to the Ellipse.  And we know that because

18   we have photo evidence that's time-stamped that was testified

19   to.  He was there less than an hour.

20        And if we're going to look at motive and why he was

21   there, there is no -- there is no evidence that he knew the

22   certification was going on.  They're claiming that because he

23   heard the Trump speech and every speech that was present that

24   day, that he heard every word and he understood what was going

25   on and that he was going to stop the certification.  That's not

1    sufficient evidence, and I think that they haven't proved that

2    count beyond a reasonable doubt.

3           As far as the evidence -- oh, and just in generality,

4    they say he has no social media presence, he has no Facebook

5    messages and, therefore, they don't have that.  And they

6    couldn't present it to the Court.

7           What we do have, though, is the text messages that he

8    had with Mike Ingersoll.  So before he went to this rally and

9    how even when Mike sent him the cavalry -- MAGA cavalry

10   attachment, his response to that was, "Haha."  It wasn't like

11   acknowledging, oh, cool, we're going to go to that MAGA rally

12   itself.  The attachment said "Stop the Steal" on top because

13   that's the name of the rally.

14          And it's not like it dawned on him that's what they were

15   going to do.  There's no proof of that.  And there's no proof

16   that he intended to go there to do anything other than to hear

17   the President's speech.

18          The government wants the Court to believe that he

19   intended from San Antonio to drive all the way cross-country to

20   do something nefarious.  And there's no proof of that at all.

21   He not did buy goggles at Walmart.  He had nothing in his hands

22   except for his camera.

23          He was wearing shorts, tennis shoes, a shirt, and a cap,

24   which also lends credibility to the client when you see him

25   entering the tunnel with the cap and then you see right during

1    the assault there is no cap.  It was removed from his head at

2    some point right before it happened.  And that gives

3    credibility to the client's statements that he was hit and hurt

4    and injured right then and there.

5         There is -- I mean, the evidence is undeniable that he

6    has PTSD and that he's had it since 2014.  He gets disability

7    for it.  He didn't make this up, and he has suffered from it.

8    And he has been treated for it, and he continues to get treated

9    for it.

10         As far as the robbery count, Your Honor, we -- we're

11   going to argue here, which I know the Court is not -- I mean,

12   we previously discussed this.  I know it's a general intent

13   crime.  I'm not saying it isn't, but I know in the

14   *U.S. v. Campbell,* 27 F.3d 586, at 591 through -2, there -- the

15   Court basically instructed the jury that the offense of assault

16   on an official officer, which is what the law calls general

17   intent -- to show general intent, the government must prove

18   beyond a reasonable doubt that the defendant knowingly,

19   consciously, and voluntarily committed an act which the law

20   makes a crime, as an act is done knowingly, if done voluntarily

21   and purposefully and not because of mistake, inadvertence, or

22   accident.  This general intent may be inferred from doing the

23   act.

24         And what we would argue here, is -- is, again, when he

25   was having his flashback, he was not knowingly and consciously

1    and purposefully intending to hurt Officer Hodges or take the

2    baton away from him.  And those are our arguments on those

3    counts, Your Honor.

4            THE COURT:  So, you know, I thought the government

5    made some good grounds on questioning your client's

6    credibility, which makes me wonder how much I can rely on his

7    statements both about state of mind at the time of the assault

8    but also what he would have told General Xenakis.

9        Why should I be crediting that version rather than a

10   version that the defendant was -- was angry and did want to

11   storm the castle and he knew exactly who was at the other end

12   of the line and wanted to fight them?

13           MS. DOUENAT:  Well, I think, for one, because of his

14   actions subsequent to what happened.  I think that --

15           THE COURT:  The fist pounding?

16           MS. DOUENAT:  Your Honor, I -- I do believe that he

17   was rather in a daze when he left the -- he was kind of in a

18   daze when he left the tunnel.  And if you look at the video of

19   the baton being taken from his hand, it is taken.  He is not

20   handing it to somebody.  He is not giving it to somebody.  It

21   gets taken from him.  I mean, he's got it in the air holding it

22   like this, and it gets taken from him.  I think that shows that

23   he is not trying to, you know, aid and abet anyone to use the

24   baton against anyone.

25           When he walks out, yes, he does put his hand out in the

1    air.  We believe he was still living at a lower level.  Not in

2    a flashback.  He was not there.  He had come down and realized

3    where he was.  But it was -- a lot of stuff was reminding him

4    of other scenarios.  And he was, basically, remembering coming

5    out from -- from deployment and -- and people screaming,

6    yelling, and saying "USA.  USA."

7         I know the Court is the person who will either believe

8    or not believe what he's saying is the truth.  I do feel like

9    if a person is angry and wants to fight, they'll stay and

10   fight.  They're not going to then:  Oh, shit.  I fucked up.

11   Which I'm sorry I'm using these words, but these were my

12   client's words.  But then he left.  I mean, he did not stick

13   around.  He did not continue any of that.  He went straight to

14   the Ellipse and then left.

15        Yes, he knew that he was being wanted to be questioned,

16   but he didn't know if he had an arrest warrant or not.  He did

17   everything --

18             THE COURT:  I mean, I'm just trying to imagine

19   someone who feels like he's heard a word from the Holy Ghost

20   rebuking him for assaulting a police officer and yet minutes

21   later he goes out and is doing this fist pounding.  It just --

22   it feels completely incongruous with how you would expect

23   someone to act after an appearance of the Almighty.

24             MS. DOUENAT:  And I think that may seem quite

25   different and interesting to hear a voice that tells you to

1    stop.  And I mean, he says it sounded like it was from above.

2    And he is in a PTSD state of mind.  And then it may have come

3    in as such, like feeling like it was from the Holy Ghost, when,

4    obviously, it was somebody there telling him to stop.  But

5    when -- it's what snapped him out of his flashback, Your Honor.

6    And it's how he remembers it.

7           As we've heard from Dr. Cutler, memory is very unique in

8    what you remember and what you don't remember.

9           THE COURT:  I take that.  I'm just saying, even

10   accepting his perspective, that type of reaction moments

11   afterwards does not seem -- you know, doesn't make any sense to

12   me.

13          MS. DOUENAT:  I understand.  And that's why I had him

14   explain it because it doesn't make sense.  And he explained it

15   as, you know, remembering that.  It's not like he stuck around

16   and assisted others to continue on the fight that the

17   government is claiming he was trying to do.

18          There are text messages the Court can review, and there

19   is no Facebook or social media accounts that will say that he's

20   this bad person they're trying to picture him to be.  I mean, I

21   think the evidence speaks for itself.  I think they haven't

22   proved their case beyond a reasonable doubt.

23          And there's -- there's several things that show that he

24   is more credible than not, at least in some of these claims

25   that they're saying and, specifically, has to do with -- yes,

1    they talk about the chants.  Everybody is chanting.  Those are

2    chants -- except for the dirty deuce, that's definitely unique

3    to him and shows that he is very much a military man who was

4    thinking about his military lifestyle.

5         Every other chant is one that everybody else did.  You

6    don't hear him insult the officers -- okay? -- aside from the

7    Hodges part where he does insult him during the assault.

8    There's nothing previously to that.  There's nothing of him

9    saying things specifically to insult anybody who's law

10   enforcement there.

11        THE COURT:  Right.  I mean, I guess this -- and as

12   Ms. Akers points out, there are a lot of statements, though,

13   that would be consistent with someone who knows more than he

14   lets on and -- and really is not just a passive spectator but

15   an active participant in the attempt to "Stop the Steal";

16   right?

17        MS. DOUENAT:  I -- I understand.  I do feel there --

18   there's definitely two -- two ways to view it.  There's a lot

19   of people there who were just chanting.

20        THE COURT:  But then they didn't make their way up

21   into the very heart of the violence.

22        MS. DOUENAT:  Yes.  That's correct.  And that's

23   where -- that's where the -- so the one thing we don't

24   realize -- and I know the government is going to -- has done

25   this at least on cross and is going to probably argue this

1    on -- when they come back up.  And that is, you know, why did

2    Mr. Cappuccio not just leave, turn away.

3         And it's important to understand the profound impact

4    that President Trump has on someone and the ability to make

5    rational decisions in such distressing circumstances.  I think

6    that being on Capitol Grounds, he wasn't triggered into a

7    flashback.  But there's a lot going on that just is probably

8    not the best place that he should have been at, at all.  And he

9    was -- I mean, he did not go to D.C. to go to the Capitol or

10   even march to the Capitol.  He went to hear the President

11   speak, and that, I think, is clear by text messages.

12        The Court can see the demeanors in his videos initially

13   and then how when he gets to the Capitol he's more agitated in

14   his speech.  And you can see where he's becoming more

15   heightened and more heightened.  And then you see him right at

16   the entrance of the -- of the tunnel and how, you know, he's

17   definitely starting to be even more heightened.

18        And then when he gets sprayed and he says I can't handle

19   it, within seconds of saying I can't handle it after he gets

20   sprayed is when the incident happens.  I mean, seconds.  Three

21   or four actually.  Not very long.  Because this videotape stops

22   and then the other videotape where the government is claiming

23   he's videotaping and pressing the flashlight to turn it on.

24   That's right before the incident happens.

25        That is the second video in the tunnel.  He's turning

1       the video to record.  And then within seconds, it gets -- even

2       if it doesn't fall to the ground and that's what he

3       remembers -- but it's still in his hand -- he remembers going

4       down and then getting hit on the shoulder blade.  Because his

5       hat was off him at that point because that's what we see by the

6       other two videos that we do have from other sources showing

7       what happened.

8              And I think that the people who don't have PTSD have an

9       easier time to make a conscious effort to turn around.  But

10      when someone is triggered, it's very difficult.  And their

11      inability to act contrary to their instincts is hard when you

12      are in that state.  And that's why I wanted officer -- not

13      officer.  But Dr. Xenakis to come and testify and explain what

14      PTSD does and how it's difficult to deprogram someone who has

15      had three deployments and has seen so much and done so much and

16      has all these triggers.

17             This is not excusing the fact that he didn't take his

18      medicine that day, but he did not take his medicine that day

19      because he thought he was going to have an opportunity to do so

20      and go to the grounds, but also that didn't help either.

21             So, Your Honor, I feel like at the conclusion of

22      seeing all the evidence, the Court will find Mr. Cappuccio not

23      guilty.

24             I don't know if the Court wants me to answer any other

25      questions on the other counts.

```
 1              THE COURT:  Does the obstruction -- does it make any
 2      difference which elements I use for your client -- I mean, if I
 3      agree with you or the government?
 4              MS. DOUENAT:  On the obstruction count, Your Honor?
 5              THE COURT:  Yes.  I think that's the only one where
 6      you-all disagree.
 7              MS. DOUENAT:  Oh.  The corruptly?  Yes.
 8              THE COURT:  Does that make a difference here?
 9              MS. DOUENAT:  I don't think it does, actually.
10              THE COURT:  Okay.
11              MS. DOUENAT:  So I think as far as state of mind, I
12      don't think it does.
13              THE COURT:  Okay.
14              MS. DOUENAT:  Thank you, Your Honor.
15              THE COURT:  Thank you.
16          Mr. Woodward.
17          Actually, sir, why don't we take a break.  I'll give you
18      10 more minutes and then you're ready.
19              MR. WOODWARD:  Thank you, sir.
20              THE COURT:  I don't know if that helps or hurts you.
21      The rest of us need a break.
22              MR. WOODWARD:  You know how it goes.
23              (Recess taken.)
24              THE COURT:  Mr. Woodward.
25              MR. WOODWARD:  Sir.  Good afternoon, Your Honor.
```

1           THE COURT:  Good afternoon.

2           MR. WOODWARD:  The events of January 6th, 2021, are

3    regrettable.  What we've seen in video, captured in still

4    photographs, transcribed in text messages shows our nation

5    divided in a way we have not seen in some 200 years.  That day

6    will forever be remembered.  But how it will be remembered

7    differs greatly depending on the eye of the beholder.

8           I will not and I cannot defend the events of that day.

9    Today, sir, I am here to defend my client, Federico Klein;

10   Freddie to most.  And, sir, January 6th is not emblematic of

11   Federico Klein.  Freddie Klein is a veteran of the Marine

12   Corps, having served a tour in Iraq.  Most recently he served

13   as a presidential appointee in President Trump's Department of

14   State.

15          Yes, we know that Mr. Klein supported former

16   President Trump.  We know that Mr. Klein took an interest in

17   the 2020 election.  We know that, like many others, he had

18   doubts about the integrity of that election.  We also know that

19   Mr. Klein felt duty-bound to attend the rally on January 6th,

20   2021.

21          But what happened next is less clear.  We know that

22   Mr. Klein slept in that day.  He texted friends, including

23   Alina Banasyak, a woman he had met just four days before.  We

24   know that Ms. Banasyak had no expectation that there would be

25   any violence on January 6th.  We know that together,

1    Ms. Banasyak, Mr. Klein, and several of their colleagues

2    intended to attend those events.

3         We know that she and those that gathered on the date of

4    January 5th believed that Vice President Pence was going to

5    challenge the certification of the Electoral College, send it

6    back to the states, and ultimately they hoped that

7    President Trump would prevail in the 2020 election.

8         What the government has offered no evidence of --

9    none -- is why the person they submit is Federico Klein went to

10   the Capitol that day, why the person they believe to be

11   Mr. Klein was in the tunnel that day.  Whatever the reason, the

12   government cannot establish, let alone beyond a reasonable

13   doubt, that Mr. Klein had any reason to believe that what

14   was happening at the Capitol, at that building -- at the

15   Capitol day -- Capitol Building that day was anything other

16   than a protest, an expression of dissatisfaction that had gone

17   horribly wrong.

18        There are no texts between Ms. Banasyak and Mr. Klein on

19   January 6th about Vice President Pence's decision to certify

20   the Electoral College vote.  And the government hasn't admitted

21   any texts between Mr. Klein and any other person about what was

22   happening that day.  Nor is there any proof that Mr. Klein

23   actually listened to President Trump's speech.

24        We saw evidence of others at the Ellipse that day.  But

25   we also know that there were tens of thousands of people

1    gathered in the wee hours of the morning.  And that because

2    Mr. Klein slept in, it was unlikely he was going to get

3    anywhere near President Trump and his speech that day.  We

4    simply cannot say that President Trump's words had any effect

5    on Mr. Klein in that moment.

6         Now, Your Honor, I'm sure you have heard every analogy

7    that there is given by a defense attorney for what reasonable

8    doubt is.  And you'll forgive me, but as a defense attorney, I

9    have to share my favorite with you.

10         THE COURT:  Go for it.

11         MR. WOODWARD:  The one in my view is more emblematic

12    of this case.

13         Reasonable doubt.  Your Honor, I have four young

14    children, and they've been taught that we don't waste food.

15    And so they bring all sorts of stuff for us, an apple with one

16    bite, an open milk carton, and so it goes into the

17    refrigerator.  Days pass.  In this case I feel like I haven't

18    been home in a week.  You open that refrigerator, Your Honor,

19    and something stinks.  And you don't know what it is, but you

20    know it's in there.  Your Honor, that's reasonable doubt.  In

21    this case, this case stinks, Your Honor.

22         I'll start with the government's first charge, Count 9.

23    Now, Your Honor, we respectfully disagree with the Court's take

24    on what the indictment means here, but we will -- we will

25    highlight it; right?

1    Count 9:  Assaulting, resisting, impeding certain

2    officers; that is, Officer Laschon Harvell, at or around 2:32

3    or 2:34 p.m.  A 2-minute window that, respectfully, Your Honor,

4    Mr. Klein was put on notice of as having engaged in unlawful

5    activity.  Let's watch.

6         THE COURT:  I guess I'm not quite sure at what time

7    you're disagreeing with me on.

8         MR. WOODWARD:  With respect to -- with respect to

9    Officer Harvell?  I agree -- well, I'm not conceding anything.

10   But I disagree that they don't have to prove that the conduct

11   occurred in the time alleged in the indictment and that they

12   don't have to identify the officer where they've identified in

13   the indictment.  Judge Mehta just recently ordered a bill of

14   particulars where the government failed to identify an officer

15   at all.

16        THE COURT:  Here, I mean, I understand you don't need

17   to concede anything.  But this didn't feel -- this wasn't one

18   of the counts that we really were discussing.

19        MR. WOODWARD:  No, no, no.  But we'll get to that.

20        THE COURT:  Okay.  All right.  You just wanted to

21   disagree with me early?

22        MR. WOODWARD:  How does that get recorded in the --

23        Where are we?

24        Okay.  Let's start with Government's Exhibit 308.

25   Your Honor, when we watched Exhibit 308 together, you stole my

1    line from closing.  I'm going to advance the timer to 14:32.

2    Excuse me.  I'm going to advance the clock -- not the

3    counter -- to 14:32.

4         Because as Your Honor astutely observed as Agent Fulp

5    testified about this video, we're playing a game of Where's

6    Waldo here.  Although Agent Fulp was able to identify

7    Mr. Klein -- there we go -- after counsel put a red circle

8    around him, I think -- I think Your Honor astutely observed

9    that it's quite difficult to see what's happening or who any of

10   these people are.

11        Obviously, there are dozens of -- of red hats, but this

12   video will be relevant, Your Honor.  Let's -- you don't have to

13   rely on the government's game of Where's Waldo.  Of course, the

14   government also showed us Officer Harvell's body cam.  And here

15   I'm going to advance to 2:32:20 on the timer.

16        Can I have the speaker?  So we're at 2:32:21.

17        (An audio-visual recording was played.)

18        MR. WOODWARD:  I don't know if the Court heard that

19   this time.  Is that loud enough?

20        THE COURT:  Yes.  Thank you.

21        MR. WOODWARD:  "God bless you guys.  God bless."

22        Agent Fulp blew right past that when he was purporting

23   to identify whom he believed to be Mr. Klein later.

24        (An audio-visual recording was played.)

25        MR. WOODWARD:  Now, we see here what the government

1  described as Mr. Klein forcibly pushing against

2  Officer Harvell.  And yet -- if you saw, Your Honor --

3  Mr. Klein's hands aren't moving, and he's standing directly

4  adjacent to another officer.

5           (An audio-visual recording was played.)

6           MR. WOODWARD:  We also see that there's, obviously, a

7  crowd behind.

8           (An audio-visual recording was played.)

9           MR. WOODWARD:  And here the government -- the person

10 who alleges to be Mr. Klein is pulling someone away from

11 Officer Harvell.

12          (An audio-visual recording was played.)

13          MR. WOODWARD:  Now, Your Honor, another depiction of

14 that scene is also helpful.  I'll just show -- here's a still.

15 I can do it too, Your Honor.

16          Here's a still of Mr. Klein's hands.  If he's intent on

17 assaulting this officer, he doesn't seem to be doing much

18 productive with his hands at this time.  This is Government's

19 Exhibit 411.  I'm going to advance to time counter 14:34:30.

20          (An audio-visual recording was played.)

21          MR. WOODWARD:  Now, we don't see it yet, Your Honor,

22 but this body camera is capturing the scene directly adjacent

23 to the person the government alleges to be Mr. Klein and

24 Officer Harvell.

25          And I'll pause again to ask Your Honor to observe what

1    the crowd is doing, this wave that officers described seeing

2    that day.

3              (An audio-visual recording was played.)

4              MR. WOODWARD:  And so -- one more, 14 -- Government's

5    Exhibit 1412.  Excuse me, 412.  Again, time counter 14:31:34.

6              (An audio-visual recording was played.)

7              MR. WOODWARD:  And I'm not sure if Your Honor had a

8    chance to see, but just right there is our --

9              (An audio-visual recording was played.)

10             MR. WOODWARD:  -- is our favorite man in the green

11   jacket and the red hat.  And so, Your Honor, what the

12   government hasn't shown you before today is what's actually

13   happening around Officer Harvell and the green jacket.

14             What we see that day as the officers are responding to a

15   kerfuffle all around them, Officer Harvell was not responding

16   to a gentleman pushing up against him, sir.  He was responding

17   to the violence that was occurring around him, to the violence

18   that that person had been caught up on, and that was standing

19   docilely with his hands immobile, avoiding confrontation with

20   the police, not challenging him.

21             THE COURT:  Isn't this around the time, though, that

22   he's saying I need some help now, you can't stop this?  I mean,

23   it feels like those statements are pretty difficult for you in

24   terms of what he is intending to do.

25             MR. WOODWARD:  Your Honor, it's difficult for me in

1    cross-examining an agent of the Federal Bureau of Investigation

2    who claims that having listened to jail calls and -- and other

3    examples of Mr. Klein speaking that this voice -- which,

4    forgive me, Your Honor, it sounds like Batman talking while

5    covered with a mask.

6         Now, you're right, Your Honor.  How do I cross-examine

7    an officer who's going to swear an oath and say that that,

8    beyond any doubt, was Federico Klein?  What I would submit to

9    Your Honor is that the voice of "God bless you guys," sounds a

10   lot more like Mr. Klein than the voice of "You can't stop this.

11   We all have masks."

12        And when Your Honor watches the video, at best, it's not

13   clear.  And that stinks, Your Honor.

14        THE COURT:  Isn't -- am I remembering correctly that

15   one of these you actually see, I will say, is your client

16   speaking?  There is a mask.  But I'm sure Ms. Akers will be

17   pointing this out in rebuttal.  But I thought that this is

18   where we actually see him talking and not -- not just kind of a

19   disembodied voice off-screen.

20        MR. WOODWARD:  Well, Your Honor, we hear lots of

21   people talking.  And so to attribute that particular voice to

22   Mr. Klein simply because something is happening behind the mask

23   at that moment, that's not proof beyond any reasonable doubt.

24        THE COURT:  Okay.  But that is the clip I'm

25   remembering?

```
 1              MR. WOODWARD:  Yes, Your Honor.

 2              THE COURT:  All right.  No, that's fine.  It just

 3     strikes me that Agent Fulp is probably on pretty strong

 4     ground at least as to that statement attributing it to your

 5     client.

 6              MR. WOODWARD:  With respect to every statement that

 7     they've attempted to attribute to my client, however, we have

 8     grave doubt about the accuracy of those.

 9              THE COURT:  Do you remember what that statement was?

10     Which one that was?

11              MR. WOODWARD:  I don't, Your Honor.

12              THE COURT:  Okay.

13              MR. WOODWARD:  I don't.

14              THE COURT:  Assuming that it's "You can't stop this"

15     or "I need help now," that doesn't sound like someone who's

16     just been pushed up and is kind of a passive cog in the wheels

17     of this interaction.

18              MR. WOODWARD:  Well, as I say, this is all in the eye

19     of the beholder.  "I need help now" is just as easily a

20     statement attributable to somebody who literally needs help

21     because they're surrounded by the violent scene that day.  We

22     saw plenty of people asking the police for help.  We saw one

23     gentleman ask the police for an ambulance, and we saw Officer

24     Bogner insist to his colleagues that an ambulance be called for

25     that gentleman.
```

1       And so it -- it is difficult to assume -- improper even

2   to assume that those words reflect assaultive intent or

3   obstructive intent.  And it's the government's burden,

4   Your Honor.

5       I'll move on to Count 17, unless Your Honor has any

6   other questions about --

7       Well, I did want to come back to, actually, the

8   government's Where's Waldo exhibit.  Because when you watch

9   that video -- and we have the benefit of the time stamps all

10  being matched up here, and we see that at 2:31 -- this is a

11  55-gigabyte video.  So it's a little bit difficult to

12  manipulate.

13      So at 2:33, mere minutes --

14          (A video recording was played.)

15          MR. WOODWARD:  -- after we watch Officer Harvell's

16  video, you can -- you can see, Your Honor, there are thousands

17  of people in this crowd behind our friend in the green jacket.

18      And so as Your Honor reviews the totality of the

19  video evidence that they've introduced for this exhibit --

20  for this count, rather, it is not clear beyond a reasonable

21  doubt that what -- that what our friend in the green jacket is

22  doing is using his shoulder to heave against Officer Harvell

23  repeatedly.  Your Honor, it's not clear what's happening at

24  all.  And if the Court agrees, then that's not proof beyond a

25  reasonable doubt.

```
 1                    (A video recording was played.)

 2                    MR. WOODWARD:  Now, Your Honor, in Count 17, we turn

 3         to our --

 4                    THE COURT:  This is where you do disagree with me?

 5                    MR. WOODWARD:  Well, I disagree with respect to the

 6         government's assertion, Your Honor, that they need not prove an

 7         identification of Officer Gonell.

 8                    As we articulated in our papers this morning, when the

 9         grand jury returns an indictment specifically identifying an

10         actor that is the victim of an assault, it's not an element of

11         the offense, Your Honor.  It's a requirement of due process

12         that the government then actually prove up what was returned in

13         the indictment.  Otherwise, we don't know that if the

14         government had presented to the grand jury a charge absent the

15         identification of Officer Gonell, that they, in fact, would

16         have returned that indictment.

17                    And, Your Honor, as you well know, the government did

18         not need to present to the grand jury a specific indictment, a

19         speaking indictment; although I'm not sure that I would call

20         this quite speaking.  It's some hybrid between a notice of

21         indictment and a speaking indictment.

22                    I don't know whether the reason they put 2:56 to 2:58

23         and Officer Gonell in there is because of the concern that

24         Your Honor expressed over duplicity.  That's not for us to

25         say.
```

1      But I will say that it does create a much stronger

2   argument for duplicity if they instead return an indictment

3   with five counts of assaulting police officers and they don't

4   specify the time or the individuals involved.  Those counts are

5   all going to be nearly identical.

6      With respect to -- we'll turn to Government's

7   Exhibit 501.  I'm going to move the counter here to 6 minutes

8   and 18 seconds.

9          (An audio-visual recording was played.)

10     MR. WOODWARD:  And according to the government, this

11  is Officer Gonell.  How can they tell that because he's wearing

12  the same helmet that this officer is wearing, that this officer

13  is wearing, that this officer is wearing, that this officer is

14  wearing, that this officer wearing, that this officer is

15  wearing.

16     Now, in closing, the government submitted for the first

17  time that, in fact, Officer Gonell's uniform was distinctive

18  and, therefore, we can be sure that the person the government

19  now claims is Officer Gonell must be Officer Gonell, but (a)

20  that -- that's not in evidence, and (b) it doesn't matter

21  because we can't see the person they purport to be

22  Officer Gonell other than that helmet.

23     Now, Your Honor, the other fact that the government

24  glanced over in watching this video -- and I'll play a few more

25  seconds here.

```
 1                    (An audio-visual recording was played.)

 2              MR. WOODWARD:  If I could direct the Court's

 3     attention -- I can't make this stuff up, Your Honor, to the

 4     striped Where's Waldo hat in front of our friend in the green

 5     jacket, there's a person between the green jacket and

 6     Officer Gonell.  Now, again, Your Honor, I get it.  What is

 7     that person doing there --

 8                    (An audio-visual recording was played.)

 9              MR. WOODWARD:  -- toward the front of the police

10     line?  I appreciate that that's something that we have to

11     overcome as you consider this evidence.

12              But what I will also observe is that that person -- and

13     you've seen a lot of this person -- that person is not acting

14     aggressively.  That person is not acting violently.  That

15     person is not assaulting the officers before then.  That person

16     has their head down.  Why?  Why isn't it?  Because they've

17     realized that they've gotten themselves in the wrong place at

18     the wrong time, and they want to be anywhere but there.

19              The government's going to argue the opposite.  The

20     government is going to argue that person put that themselves in

21     that position because they had every intent to obstruct in

22     those officers' duties.  But it's their burden, Your Honor.

23     It's their burden to prove beyond a reasonable doubt that

24     that's what that person's intent was.

25              And, Your Honor, this, again, is in the eye of the
```

1    beholder.  The video speaks for itself, sir.

2              THE COURT:  So as you know, they have not just

3    charged assault.  They've also charged impeding, resisting.  I

4    mean, strikes me that even if I agreed with you that there's

5    not necessarily an assault there, that doesn't get him out of

6    the briar patch.

7              MR. WOODWARD:  Well, Your Honor, impeding and

8    resisting also requires a finding that the individual there was

9    intending to impede or resist.  And that's -- obviously, I'm

10   biased.  But in our view, that's not what that person is doing.

11   That person has their head down, their arms together.

12             In the seconds just before that, they have their arm

13   around the Where's Waldo hat.  Are they pulling that person

14   back?  The video is not clear, Your Honor.  I'm not suggesting

15   that when you watch the video, it is clear beyond a reasonable

16   doubt that they're trying to remove a protester.  What I'm

17   suggesting is that it's not clear and it's not our burden.

18             THE COURT:  But he goes back again and again.  I

19   might agree with you if he left, but that's just the first of a

20   series of assaults charged here in the tunnel.  And I have a

21   hard time imagining that your theory makes sense that he

22   realizes he got into a place he shouldn't be given that he

23   doesn't leave for quite some time.

24             MR. WOODWARD:  And that's true, Your Honor.  But we

25   don't know why he goes in there.  The government hasn't proven

1     it, and that's our point.

2          This case rests on reasonable doubt.  And unless and

3     until the government can prove that Mr. Klein's intention that

4     day was to interfere with the police, we can't assume

5     otherwise.  We don't come in assuming that he's guilty.  We

6     come in assuming just the opposite, and we ask the government

7     to prove this up.  And the fact that somebody went into the

8     tunnel multiple times, we submit, is not enough to show intent

9     to interfere with the police.

10          THE COURT:  Isn't this also the point where he

11    grabs -- or tries to grab a shield from an officer, possibly

12    repeatedly, and grabs a pole?  Like all of these actions just

13    seem to be inconsistent with your theory.

14          MR. WOODWARD:  If you would permit me to show

15    Government's Exhibit 409, time marker 14:55.  And I'm glad

16    Your Honor observed that because it wasn't -- it wasn't

17    mentioned by the government in their case in chief.  He does

18    grab a pole, and let's watch together what he does with that

19    pole.

20          (An audio-visual recording was played.)

21          MR. WOODWARD:  Is he returning it?  We don't know.

22    He doesn't keep it for himself.  He doesn't use it to assault

23    the officers that are standing there in front of him.  I -- I

24    understand, Your Honor, the government has portrayed these

25    sequence of events as per se nefarious; that he must have been

1    grabbing for a shield and not the pole the first time.  They

2    don't even address the pole at all in the second grab because

3    what they cannot prove is what the intent was here.

4         That person that we see here, again, he's not acting

5    violently.  He's not acting aggressively.  Your Honor has seen

6    video of countless people in this hallway do just that.  This

7    person is meek.  This person is reserved.  This person grabs a

8    pole.  But the fact that they grab the pole does not itself

9    mean that they intended to do violence with it.

10        And just 20 seconds later -- I'm going to play this

11   until 14:55:54.  We'd ask Your Honor to observe what our friend

12   in the green jacket does.

13             (An audio-visual recording was played.)

14             MR. WOODWARD:  He's over there with our Where's Waldo

15   friend, and he's pulling them backwards.

16             (An audio-visual recording was played.)

17             MR. WOODWARD:  It's true it's through the riot

18   shield.  It's hard to see, but that's what reasonable doubt is.

19        Count 19, once again, Your Honor, the government charges

20   Mr. Klein with assaulting, resisting, impeding Officer Carlton

21   Wilhoit.  Once again, Your Honor, the government failed to

22   identify credibly Officer Wilhoit.

23        I'm going to start with Government's Exhibit 429.1, and

24   I would observe, remarkably, we don't hear Officer Wilhoit's

25   name at all in the government's closing.  We barely heard it in

1    the government's case in chief.  And by the time

2    Officer Fulp -- excuse me, Special Agent Fulp had been directed

3    to identify Officer Wilhoit, he knew exactly what was happening

4    here.

5         The government had led him in their identification of

6    Officer Gonell, and he -- and Agent Fulp claims that simply by

7    looking at the back of Officer Wilhoit's head and jacket he

8    knows exactly who this person is.  Now, what's remarkable about

9    this identification is that the body camera that we're watching

10   here is Officer [sic] Bogner.

11        THE COURT:  Did Sergeant Bogner identify

12   Officer Wilhoit?

13        MR. WOODWARD:  No, sir.  Why not?

14        THE COURT:  Because MPD has thousands of officers in

15   it.  Doesn't know everybody.

16        MR. WOODWARD:  I don't think Special Agent Fulp knows

17   all of the MPD officers either.

18        THE COURT:  I bet he doesn't.  But I'm sure he thinks

19   he knows a couple, though.

20        MR. WOODWARD:  The assault -- or, I think, more

21   accurately in the government's recitation of the evidence, the

22   resisting or impeding that is the subject of Count 19 involves

23   the infamous shield in the door.  Your Honor, it's video that

24   I've been familiar with since Mr. Klein's detention hearing

25   back in April of 2021.

 1          And it's infamous, in our view, because, again, the

 2     truth is in the eye of the beholder.  And we ask you to watch

 3     this video with the following in mind:  Mr. Klein -- excuse me.

 4     Our friend in the green jacket clearly does not come to the

 5     door with the riot shield.  Another individual in the tunnel

 6     comes to the door with the riot shield.  And another video

 7     places that riot shield in between the doors preventing the

 8     doors from closing.  Now, our friend in the green jacket has a

 9     hand on the riot shield.

10          But what I'd ask you to think about is whether he's

11     actually pushing the riot shield toward the officers or pulling

12     the riot shield out of the door and what's happening in this

13     video that we've watched together before.

14               (An audio-visual recording was played.)

15               MR. WOODWARD:  Now, what I think speaks volumes about

16     whatever our friend in the green jacket was intending to do

17     there is what happens immediately after the riot shield is

18     dislodged from the door.  Does that person continue to come at

19     the person the government submits is Officer Wilhoit, or does

20     that person duck out of the way of the protester who I suppose

21     is going to use his iPad to do something dangerous here?

22               THE COURT:  It's probably another photojournalist,

23     Mr. Woodward.

24               MR. WOODWARD:  Pardon me, Your Honor?

25               THE COURT:  I think he's probably another

1    photojournalist.

2              (An audio-visual recording was played.)

3              MR. WOODWARD:  What is he doing on the ground?  I

4    don't know, Your Honor.  But what is he not doing?  He's not

5    continuing to charge at Officer Wilhoit like the man with the

6    iPad was.  And we submit that the evidence is equally as clear

7    that he's trying to get the hell out of the way.

8              Except it's not our burden.  It's the government's

9    burden to prove beyond a reasonable doubt that Mr. Klein was

10   engaged in assaultive, resistive, or impeding conduct.

11             I believe you asked at 14:55 and 24 on the counter --

12   14:55:24.  I don't think I have that right.

13             There was a scene that Your Honor may remember.  You

14   asked Officer Bogner about that.  What is that person doing?

15   Why did you -- do you recall why they were ducking out of the

16   way?  And he said no; right?  He was clear that the person was

17   being assaultive in the prior frame but had no idea why that

18   person was ducking away.

19             And, again, I'm not suggesting that that makes

20   Officer Bogner incredible.  Actually, I think Officer Bogner is

21   probably the most credible officer I've ever seen testify.  But

22   what is clear is that Officer Bogner had -- had an agenda.  He

23   had come in here to testify about specific conduct that I'm

24   sure he had reviewed multiple times with the government.

25             And when you asked him about the one piece of video that

1    the government had not shown him in preparation for his

2    testimony, he didn't have an explanation.  And that was

3    genuine, but that also suggests that his testimony -- although

4    it's not incredible -- was biased in favor of the government.

5    And as a result, it fails to be ultimately persuasive in

6    meeting the government's burden of proof beyond a reasonable

7    doubt.

8         Just one more brief clip on the shield, because we see

9    in Exhibit 512 a minute and 45 -- well, an hour, I suppose --

10   no.  A minute and 45 seconds into the counter there are, of

11   course, a number of people here between the videographer and

12   the -- and the doors.  But we see here the doors.  We see here

13   our friend in the green jacket.  And you -- if you watch what

14   our friend in the green jacket is doing, it is not consistent

15   with an effort to get that shield and keep it in between those

16   doors.

17             (An audio-visual recording was played.)

18             MR. WOODWARD:  Your Honor, again, I get it.  I'm

19   biased.  But he's using one hand to grab that shield, and the

20   shield is coming in his direction.  If his goal is to keep that

21   shield in place to prevent the doors from closing, why isn't

22   his entire body behind it keeping it in place?  Reasonable

23   doubt, Your Honor.

24             Here again, we have a voice identification in the middle

25   of a riot.  The government claims that Mr. Klein yells at least

1       four times that we need fresh people.  Their theory on this

2       count is that at the very least the Court can convict him for

3       aiding and abetting.

4            Your Honor, if that's what we're doing now, if we're

5       convicting on voice identifications in the middle of a riot on

6       aiding and abetting theories of liability for 111, I have

7       serious concerns.  There's a lot of people in that tunnel.

8       There's a lot of things being said.  The government hasn't

9       charged them all.

10           THE COURT:  Yet.  Give them time.

11           MR. WOODWARD:  I hope that's not true, Your Honor.

12           Count 27, here the evidence focused on Officer Omar

13      Forrester.  Here, Your Honor, the government gives us 7 minutes

14      to work with; 7 minutes alleged in the indictment.  No officer

15      named, just a time period.  And they claim proof beyond a

16      reasonable doubt that Mr. Klein is engaging in assaultive,

17      resistive, or otherwise impeding conduct.

18           Government Exhibit 510.  Skip that.

19           Government Exhibit 433.15.  The government loves this

20      exhibit.  This is the face that they included in their arrest

21      warrant back in 2021.  It's, obviously, proof, the government

22      says, that Mr. Klein is being aggressive, being assertive.  But

23      what does the video actually show?  What we know from

24      Officer Forrester is that he couldn't see anything at all.  He

25      had just been pepper-sprayed in the face.

1    Now, he did testify that that didn't impact his ability

2    to see what was happening in front of him; that despite the

3    fact that you have pepper spray in your eyes, have not done

4    anything to wash that out, that you can see what's going on.

5    And yet Officer Forrester -- Forrester was clear that the scene

6    we're about to watch was happening in that same period of time,

7    3:07 to 3:14, in which the government alleges our friend in the

8    green jacket --

9              (An audio-visual recording was played.)

10             MR. WOODWARD:  I'm sure the Court saw that, our

11   friend in the green jacket.

12             (An audio-visual recording was played.)

13             MR. WOODWARD:  Now, the government explained in their

14   closing argument, this is the time when Officer Hodges is

15   getting crushed in the door.  And from a personal perspective,

16   that scene is perhaps the hardest in the tunnel to watch.  He's

17   clearly being crushed in the door.

18             There's an individual with a riot shield pressing up

19   against him.  And some -- what they've done in Count 37 --

20   27 -- excuse me -- is they've charged Mr. Klein with engaging

21   in -- again, that wasn't assaultive conduct.  So at best that

22   can be resistive or impeding, or I am sure the government will

23   come up here and explain to the Court how the aiding and

24   abetting theory of liability works.  And their theory of the

25   case is by being in the hallway with this group of protesters

1   at the time that Officer Hodges is being crushed in the door,

2   our friend in the green jacket is criminally culpable for that

3   conduct.

4          Again, that conduct --

5              (An audio-visual recording was played.)

6          MR. WOODWARD:  Your Honor, here our friend in the

7   green jacket is not at the front of the police line.  He's

8   farther back in the crowd.  There's a wave of people moving

9   backwards, moving forwards.  Surely not every person in the

10  tunnel that day is criminally culpable for the assault that

11  happened against Officer Hodges.

12         THE COURT:  I don't think the government is making

13  that suggestion.  I think they're arguing that they're all

14  resisting and impeding that line -- that line of rioters is

15  resisting and impeding that line of officers, or at least

16  aiding and abetting those at the front who were doing so.

17         MR. WOODWARD:  That's a slippery slope, Your Honor,

18  because where does that line stop.  Does it apply to the folks

19  I showed -- I believe it was Officer Bogner -- standing on the

20  side of the tunnel?

21         You recall I asked him, were those folks engaged.  And

22  his response was everybody.  Everybody was.  If you were there,

23  you were engaged.  But that's not -- that's not what the law

24  says, and that's not what our friend in the green jacket was

25  doing then.  You can aid and abet, resisting and impeding, but

1    there's still an intent argument.

2         And we submit that merely one's presence in the tunnel

3    that day does not sufficiently indicate intent in impeding the

4    officers.

5         Count 31.  In closing, Your Honor, the government claims

6    that we see our friend in the green jacket take a riot shield

7    and place it up against Officer Foulds.  But we don't actually

8    see that, Your Honor.  That's not depicted in any body-worn

9    camera that we have, including the body-worn camera of

10   Officer Foulds, who the government contends the riot shield is

11   ultimately placed up against.

12        The Government's Exhibit 301.2 -- I'm starting with this

13   exhibit, Your Honor, at time count 3:16 and 45 seconds because

14   as we will progress deeper into the tunnel to where

15   Officer Foulds is positioned, I think it is important for the

16   Court to appreciate what is happening directly in front of

17   Officer Foulds.  3:16:45.

18             (A video recording was played.)

19        MR. WOODWARD:  We see the heave-ho continuing.  I

20   think it was Officer Bogner, but it could have been Officer

21   Harvell who described this, I thought, perfectly.  It's a wave

22   of people.  They're moving together in and out.

23        These people -- Ms. Akers neglected to remind me to

24   delete the --

25        These people down here on the bottom line, they're not

1    solely responsible for what's happening.  They're not making

2    this crowd move.  It's a mob.  And it's total chaos.  And so

3    while this group is pressing everybody in front of them, I'll

4    note that we don't see our man -- our friend in the green

5    jacket.  We don't see Officer Foulds.

6         What's happening?  Government's Exhibit 501.  I'm going

7    to advance to counter 25:48.

8         This gentleman, Your Honor -- forgive me.  Actually, I

9    have no idea whether it's a gentleman or not.  This

10   videographer is going to capture the angle at the front of that

11   crowd that was cut off just by the camera there.

12             (An audio-visual recording was played.)

13        MR. WOODWARD:  This was the video, Your Honor, that

14   the government said proved beyond a reasonable doubt that our

15   friend in the green jacket had deliberately positioned himself

16   to crush Officer Foulds in a riot shield the same way that

17   Officer Hodges was crushed.

18             (An audio-visual recording was played.)

19        MR. WOODWARD:  Government's Exhibit 430.  I'm

20   advancing to time counter 15:17:10.

21             (An audio-visual recording was played.)

22        MR. WOODWARD:  I've got to say, Your Honor, our

23   friend in the green jacket looks in a lot more precarious

24   position than does Officer Foulds.

25        Government's 403.1.

```
1              THE COURT:  What time was that?

2              MR. WOODWARD:  That was 15:17:10 on the BWC camera

3   clock.

4          This is Government's 403.1.  I'm advancing to 15:16:40.

5              (An audio-visual recording was played.)

6              MR. WOODWARD:  Our friend in the green jacket is not

7   pressing up against Officer Foulds.  Our friend in the green

8   jacket is being crushed himself between two riot shields.

9          Count 32.  Here the government, again, has alleged an

10  assault as against Officer Morris Moore.

11             THE COURT:  Was there -- back on 31, did you see

12  evidence of whether or not the -- Officer Foulds actually had

13  his back against the wall?

14             MR. WOODWARD:  No, sir.  I don't think we can tell

15  what Officer Foulds is doing.

16             THE COURT:  All right.  So I just -- I have his

17  testimony that his back was against the wall.  That's

18  something.

19             MR. WOODWARD:  That's true, but I don't think that

20  you need to discredit him.  Obviously, I'm mindful of the

21  implication of that.  I think what was happening that day in

22  the minds of everyone who participated is -- is unclear.  That

23  Officer Foulds can specifically remember at a specific hour,

24  minute, and second that his back was against the wall, I don't

25  think the video corroborates that.  His back may have been
```

1    against the wall at some point during this mass of people

2    pushing and shoving, but that our friend in the green jacket

3    was responsible for putting him against his back with a shield

4    against him and he was being crushed, the video speaks for

5    itself, Your Honor.

6          This case is all about the eye of the beholder.  And

7    there simply is insufficient proof that Officer Foulds was

8    being assaulted by our friend in the green jacket; that the

9    riot shield was used as a deadly or dangerous weapon; and,

10   Your Honor, respectfully, that the man in the green jacket is

11   even engaging in activity intended to resist or impede or

12   aiding and abetting thereof.  That person has absolutely no

13   control over what's happening right there.

14         May I proceed to Count --

15             THE COURT:  You may.  32?

16             MR. WOODWARD:  -- 32, Officer Morris Moore.  The

17   government's theory on this count is Mr. -- our friend in the

18   green jacket is responsible for pushing Officer Moore out of

19   the hallway.  We would direct the Court's attention back to

20   Government Exhibit 501 at counter mark 27:07.

21             (An audio-visual recording was played.)

22             MR. WOODWARD:  We see somebody has their hand on the

23   back of the man in the green jacket.  We see the entire police

24   line pushing everyone forward and out of the tunnel.

25             (An audio-visual recording was played.)

```
1              MR. WOODWARD:  Your Honor, Government's Exhibit 301.2
2    at counter 29:28.
3              (A video recording was played.)
4              THE COURT:  Certainly looks like he's straining
5    there.
6              MR. WOODWARD:  He, sir?
7              THE COURT:  The man in the green jacket.
8              (A video recording was played.)
9              MR. WOODWARD:  Well, I guess Defense Exhibit 2
10   labeled as Government's Exhibit 532, counter marker 1 hour
11   23 minutes and 35 seconds.
12             (An audio-visual recording was played.)
13             MR. WOODWARD:  And I would just observe, Your Honor,
14   that after playing this video for you, the government's now
15   theory of this video is that our friend in the green jacket is
16   somehow obstructing the police in their efforts to return
17   Officer Fanone to the police line.
18             (An audio-visual recording was played.)
19             MR. WOODWARD:  That's not the action of somebody
20   who's there to stop the police from doing their job.  We don't
21   know what our friend in the green jacket and the law
22   enforcement are discussing.  But, again, it's not our burden,
23   Your Honor.  It's the government's.
24             And in this case, they've had three years -- two years
25   and -- well, if I was good at math, I wouldn't have gone to law
```

1    school -- eight months to bring in any of those officers and

2    tell us that our friend in the green jacket was threatening

3    them, harassing them, cursing at them, telling them that they

4    were traitors.  You've heard and seen it all, in this case and

5    in others.  And here we are, and that's not what we have,

6    Your Honor.

7           Something stinks in this refrigerator.  And we don't

8    have to know quite what it is, because that's reasonable doubt.

9           I agree with Your Honor that if you don't find that the

10   shield was used in a dangerous or deadly way, that Counts 43

11   and -- am I right about that? -- 51 and 52 fall away.  I think

12   I've already --

13           THE COURT:  43 and 51.

14           MR. WOODWARD:  43 and 51.  Excuse me.  I had it right

15   the first time.

16           You've heard my piece on whether or not the government

17   has proven beyond a reasonable doubt that Mr. Klein was engaged

18   in conduct intended to stop the certification.  I appreciate

19   Your Honor's perspective.  You've acquitted once because

20   someone had explained to the Court credibly that they believed

21   the certification was over.

22           But I would -- I build on that, Your Honor.  I think the

23   government has some burden to prove that anyone there, seeking

24   to convict a 1512(c)(2), has to know -- they've got to prove

25   that that person knew that the certification was still going.

1    The fact that Mr. Klein was educated about the

2    certification, the fact that Mr. Klein believed that there was

3    some fraud in the 2020 election, that's not enough to prove

4    that our friend in the green jacket didn't end up on

5    Capitol Grounds that day because a protest expressing sincere

6    disappointment in what they believed had already concluded had

7    happened.

8    We see that all the time.  People don't gather outside

9    the Supreme Court to stop the court from doing something.  They

10   gather outside the Supreme Court after --

11   THE COURT:  I'm not sure --

12   MR. WOODWARD:  -- after a decision is handed down --

13   THE COURT:  That may or may not be correct.

14   MR. WOODWARD:  -- to express their disappointment,

15   sir.

16   And here, too, the government has failed to show that

17   Mr. Klein had any knowledge that any proceeding continued

18   inside the building at any of the times they've identified our

19   friend in the green jacket.

20   Your Honor, I think that when you review all of the

21   evidence, you will find that here, this week, the government

22   failed to meet its burden.  They failed to prove beyond a

23   reasonable doubt that the charges they've lodged against

24   Mr. Klein apply.  I don't know why, but they did.

25   And as a result, we ask you to return a verdict of not

1    guilty as to all counts.

2             THE COURT:  Thank you, Mr. Woodward.

3             MR. WOODWARD:  Thank you, sir.

4             THE COURT:  All right.  Brief rebuttal from the

5    government.

6             MS. AKERS:  I'm glad you had the lunch break early so

7    we could finish today.  You knew.

8         All right, Your Honor.  I'm going to start with

9    Mr. Cappuccio, since he started.  And I want to start with the

10   PTSD issue and just clarify the relevance of the testimony of

11   the expert -- proposed expert.

12        So as Your Honor knows, the expertise is relevant only

13   as it relates to specific intent crimes.  I think at the start

14   of this trial Your Honor limited it as such.  And so when we're

15   in the 111(a) world, 111(a) is a general intent crime, unless

16   you're relying on the intent to commit another felony.

17        In this case for the count relating to Officer Hodges'

18   assault, we don't have to rely on the intent to commit another

19   felony because there was physical contact.  So if there's

20   physical contact, it's a general intent crime.  The fact that

21   it's (b), a deadly or dangerous weapon, doesn't change that.

22        And so I believe Your Honor limited --

23             THE COURT:  But I thought the (b) you've got to have

24   an intent to use a dangerous -- isn't -- isn't the (b) --

25   doesn't that element add an intent, intentionally used a deadly

1    or dangerous weapon or inflicted bodily injury?

2              MS. AKERS:  Can you hold on just one moment.  Thank

3    you.

4         I'm going to come back to that in just a moment,

5    Your Honor.

6              THE COURT:  All right.  Back on 28, I thought when we

7    were discussing this issue early on, you agreed you weren't

8    going to be proceeding on aiding and abetting, again, to avoid

9    this issue.  Am I correct on that?

10             MS. AKERS:  I think we can proceed on both, but

11   yes -- oh, on 28.  I'm sorry.

12             THE COURT:  Yes.

13             MS. AKERS:  Yes, Your Honor.  Yes.

14        But as I understand Your Honor -- and Dr. Xenakis's

15   testimony, his testimony, again, did not relate to that earlier

16   assault.  What we heard in argument from defense counsel was a

17   complete expansion of what seems to be a new diminished

18   capacity defense.

19        Counsel told you that this originated when he was

20   sprayed.  First off, there's no evidence of that.  The

21   defendant himself has testified that this -- you know, this

22   blackout or episode, or whatever it's phrased as, happened when

23   he was in the moment tearing Officer Hodges' face [sic] mask

24   off.

25        The episode did not start earlier.  There's no evidence

1   of that.  The expert wasn't proffered for that.  And,

2   similarly, as to Your Honor's point about why he walked out of

3   the tunnel and raised his fist in the air and pumped it.  And I

4   believe counsel said, well, he was still sort of under that

5   episode or phase.  That's not the testimony that you heard from

6   either Dr. Xenakis or Mr. Cappuccio.

7       And then I want to highlight that counsel said this is

8   how we know that he had a PTSD episode during the face -- the

9   gas mask incident.  She said because Dr. Xenakis testified you

10  can hear it in his voice.

11      And, Your Honor, what he's referring to is when

12  Mr. Cappuccio says several times "How do you like me now,

13  fucker?"  That is not the voice or the words of someone who is,

14  as counsel said, in distress.  The words of someone in distress

15  are those of Officer Hodges who is yelling, for example, "Help.

16  Help."  That's -- that's a word or a phrase of people in

17  distress, not the words that Mr. Cappuccio was using.

18      Counsel also mentioned a flashback moment.  There was

19  no evidence whatsoever of a flashback.  Dr. Xenakis didn't

20  testify that he was having a flashback.  It's a completely

21  different medical terminology that hasn't been introduced into

22  this case until closing.

23      And then I think just to make the time line here,

24  counsel said that Mr. Cappuccio was sprayed and then seconds

25  later is when the assaultive conduct happened.  You saw from

1    Mr. Cappuccio's own video he was sprayed.  Then he retreated to

2    the mouth of the tunnel, and then he went back.  And that is

3    when he attacked Officer Hodges.

4         I would just, again, point Your Honor to his own video

5    and just go frame by frame for a few seconds.  And you can see

6    that there's no dropping of the phone.  That testimony is just

7    altogether incredible.

8              THE COURT:  What about -- I mean, do you agree he

9    loses his hat; right?

10             MS. AKERS:  He does come out with no hat; that's

11   correct.

12             THE COURT:  I mean, isn't that consistent with his

13   claim that his phone is knocked, he ducks down, loses his hat,

14   somebody hits him on the back?

15             MS. AKERS:  Well, Your Honor, there's no testimony as

16   to that in this record.  It was argument from counsel.  He

17   didn't testify that someone knocked his hat off.  And we know,

18   because he was recording the whole time, that his phone didn't

19   get knocked out of his hand.  We know.  You can watch the video

20   frame by frame.

21        His phone is in his hand at all times.  It is not on the

22   ground.  It's just as likely that when, as he said, he was

23   going like this on Officer Hodges, his hat flew off because he

24   was so violently yanking his gas mask.  And we do, in fact,

25   have testimony that happened.

1    So we don't know how his hat fell off.  But we know that

2    his phone wasn't out of his hand.  We know it was in his hand

3    and in his mouth, and it is simply inconceivable that he could

4    have dropped his phone -- excuse me, gotten hit, dropped his

5    phone, bend down, picked up, and put it in his mouth within

6    1 second, which is all the video allows for.

7        I believe that's all I have on Mr. Cappuccio.

8        I'll get back to you on (b) in just one moment.

9        Do you have any further questions on that?

10       THE COURT:  No.

11       MS. AKERS:  Okay.  I'm going to Mr. Klein's statement

12   now.  And I just want to highlight a few points here.

13       Can I please have the screen.  Thank you so much.

14       The first point, Your Honor, is that this man, our

15   friend in the green jacket, a/k/a Federico Klein, is not the

16   victim.  Mr. Woodward stood up here and told you that he was in

17   a more precarious position than Officer Foulds; that he was in

18   the wrong place at the wrong time; that he -- that the

19   circumstances happened to him.

20       Your Honor, it is not true.  You saw over the course of

21   this trial all of the intentional, aggressive, malicious

22   conduct of this defendant.  He was in the tunnel longer

23   than almost any other person, and we'll talk about that in a

24   moment.

25       But, first, I want to talk about identification because

1    this was proven at trial so many times that it's a little

2    shocking that counsel is not --

3              THE COURT:  I don't need you to do that.

4              MS. AKERS:  Okay.  Thank you.

5        But I would just note, Your Honor, in this -- and in

6    these message he, in fact, conceded it was him.  And, in, fact

7    when asked, you know, what video she was referring to, he -- he

8    admits, "I'm afraid not."  It's a bad gesture that he was

9    making.  The same gesture Mr. Cappuccio was making.

10        As it relates to Count 9, I just want to make it clear,

11   Your Honor, that the defendant wasn't turning around and saying

12   I need help.  Counsel is saying a lot of people needed help.

13   Again, he's saying Mr. Klein is the victim here.  Mr. Klein is

14   saying I need support.  Let's go.

15        You can hear it in two body-worn cameras, Sorrell and

16   Officer Harvell.  You can hear it in 523.  You can see his

17   mouth going up and down, and he's saying he needs support.

18   He's not saying he needs help.

19        And what you see in the middle here is him touching

20   Officer Harvell.  You hear Officer Harvell testify in this

21   trial -- I asked him about this "God bless you guys" comment.

22   And what his testimony was, yeah, the rioter said that while he

23   was digging his shoulder into me.  His actions speak louder

24   than his words.  And here we have on his body-worn camera that,

25   thankfully, Mr. Woodward showed you to remind you, the

1    touching.

2          Officer Harvell said he was pushing with his baton,

3    and you can see that.  He's pushing right into Defendant

4    Klein's arm.  And the fact he's not doing anything with his

5    hands is, sort of, neither here nor there.  Because as Officer

6    Harvell testified, he was digging into him with his shoulder.

7    He was aggressively pushing into him.  He wasn't just using his

8    hands.

9          THE COURT:  So the "I need support now," that's the

10   one where you can see his face?

11         MS. AKERS:  You can see, Your Honor -- if you go to

12   grand -- I keep saying grand jury.  If you go to Government

13   Exhibit 523.47, go maybe 1 second back, just put it on, like,

14   half speed -- and I can do it, if you'd like -- you can see his

15   mouth go up and down.  And right here you can see it open.

16   Unless, you know, Defendant Klein is chewing, like, a lot of

17   bubble gum or something, there's really no explanation for

18   that.

19         THE COURT:  And you said the officer did agree he was

20   the one who said, "God bless you guys"?

21         MS. AKERS:  I believe he did, if I recall right.  And

22   I believe Officer Harvell, his testimony as written, will be

23   the best evidence of that.  I believe he also recalls hearing

24   Mr. Klein say things like "I need support.  Let's go."

25         The next is counsel's characterization of Mr. Klein's

1    time in the tunnel.  He says that he was not acting

2    aggressively; that Mr. Klein is meek and reserved.  That is

3    almost probably the most ridiculous claim that we've heard

4    throughout the course of this trial.

5         Mr. Klein, as you can see on the left, as you can see on

6    the right, as we've seen all throughout the last week is

7    yelling, is screaming, is pushing, is grunting, is getting

8    lower to the ground.  He's putting his fists in the air.  He's

9    engaging with the officers.  He's reaching for the shields.

10   He's reaching for the pole.  He's reaching for the officers.

11   He's pushing his arm out on the shield.  He's reaching -- I

12   lost track.  There was a lot of things.  We can just leave it

13   at that.

14        I think that the point here, though, is that Mr. Klein's

15   actions are not only intentional but they're aggressive.  They

16   certainly suffice to meet the elements of 111.

17        And here I had time to do just a little example of the

18   "We need fresh people," and, Your Honor, if you -- if you watch

19   the video, which I know you've seen already, you can actually

20   just watch his mouth move.  And you can see that it says, "We

21   need fresh people."

22        I don't know that this is -- it's not even really

23   necessary for elements, but it shows he's not there

24   unintentionally.  He's not there because he doesn't want to be

25   there.  He's there.  He's asking for help.  He, at a minimum,

1    is aiding and abetting here, and he's also intentionally

2    pushing.

3         And then we get to the time line.  Counsel's asking, you

4    know, where does this end?  The mere presence in the tunnel

5    isn't enough.  And Your Honor asked, well, he didn't leave for

6    quite some time.  And Your Honor is right.  Mr. Klein was in

7    the tunnel for an hour and 18 minutes, like I mentioned before.

8    That is a significant amount of time when compared with almost

9    all of the other people in the tunnel.

10        His second stint there, he stayed at the mouth of the

11   tunnel fighting with officers for an extended period of time,

12   even after they had gained ground.  He wouldn't leave.  He

13   didn't want to leave.  And his conduct here is evidence of his

14   intent to obstruct.  It's evidence of his intent to -- to be

15   there and to want something more than just a First Amendment

16   protest like one does at the Supreme Court.

17        Next, Your Honor, we talked about Count 27, and

18   counsel's saying or arguing that this is a heave-ho and it's

19   just a mob.  The point here is that Mr. Klein is, in fact, part

20   of the mob.  And you're right, Your Honor, that the government

21   isn't charging every single person who's in the tunnel even

22   with assault.  A lot of the people in the tunnel were only

23   charged with 18 U.S.C. 231.  But we are, in fact, charging

24   people who were part of this intentional, aggressive heave-ho

25   mob, like Mr. Klein.

 1          And it's all of the assault counts in the tunnel that

 2    we've charged him with.  He was acting for longer even than the

 3    indictment alleges.  And you can see that.  Essentially, the

 4    entire grand jury -- Government Exhibit 501, which is 20-some

 5    minutes, he's in there, essentially, that entire time acting

 6    and pushing and at the front of the police line.

 7          So that exhibit is incredibly important to prove many of

 8    his changes and yet, again, during the Officer Moore assault

 9    that Mr. Klein calls for support from his fellow rioters.  And

10    so, again, this is not unintentional.  He's not the victim.

11    He's acting.  He's pushing here.  You can see he gets low to

12    the ground, and he calls out for support because Officer Moore

13    is -- is stronger.

14          And then, finally, we talked here about this Fanone

15    incident.  This is just yet another instance where our friend

16    in the green jacket, Federico Klein, is asked to move because

17    the officers are trying to retrieve Officer Fanone.  He says no

18    way.  And then the officers says, "Let me get my friend" and

19    moves out and grabs him.

20          That's where you see Officer Fanone collapse, and the

21    video that counsel showed you is after Officer Fanone had

22    already been brought past him.  He sort of, like, puts his hand

23    out and leads him in.  But this -- and this act, Your Honor, I

24    think, goes to the -- the intent and the bad will that

25    Mr. Klein had on January 6th.

1    THE COURT:  All right.  Thank you, Ms. Akers.

2    And thanks to all of the attorneys for your hard work

3    this week.

4    I will take this under advisement.

5    I want to think about setting a verdict.  Ms. Douenat, I

6    think in particular of you and your client given that you-all

7    are in Texas.  How much of an imposition is it for us to have

8    verdict next Thursday afternoon?

9    MS. DOUENAT:  That works for us, Your Honor.  We were

10    scheduled to be here for two weeks.

11    MR. WOODWARD:  May I approach ex parte on scheduling?

12    THE COURT:  Okay.

13    (Bench conference on the record.)

14    MR. WOODWARD:  It's about my scheduling.  I'm to be

15    in the grand jury with a witness and with special counsel

16    Thursday.  So I don't know --

17    THE COURT:  That's in Florida?

18    MR. WOODWARD:  No.  It is here.

19    THE COURT:  What time?

20    MR. WOODWARD:  They have until noon.

21    THE COURT:  Can I tell the government to work on the

22    schedule?

23    MR. WOODWARD:  I would like you to.

24    THE COURT:  All right.  So, Ms. Akers, could you come

25    forward as well.

```
 1              MS. AKERS:  Sure.

 2              THE COURT:  Mr. Woodward -- so I understand

 3    Mr. Woodward has a grand jury witness on Thursday afternoon.  I

 4    think you-all can make sure that you work around my schedule.

 5              MS. AKERS:  A grand jury witness from my office?

 6              MR. WOODWARD:  It is the special counsel's office.

 7              MS. AKERS:  Oh, okay.

 8              THE COURT:  But they all work for the United States.

 9              MS. AKERS:  Yeah, that's true.  So people from my

10    office.  Yeah.

11              THE COURT:  Great.

12              MS. AKERS:  I can try at least.  I have no power

13    other than asking.

14              THE COURT:  I have more power.

15              MS. AKERS:  Yeah.  Exactly.

16              THE COURT:  Okay.

17              (Proceedings held in open court.)

18              THE COURT:  So I'm going to suggest 2:00 p.m. on

19    July 30th.  That's -- I'm sorry, July 20th.  Thursday,

20    July 20th for a verdict.

21          Ms. Akers, does that work for the government?

22              MS. AKERS:  Yes, Your Honor.

23              THE COURT:  Mr. Woodward, does that work for you?

24              MR. WOODWARD:  Yes, sir.

25              THE COURT:  And, Ms. Douenat, does that work for you?
```

```
 1            MS. DOUENAT:  Yes, Your Honor.

 2            THE COURT:  All right.  I'll direct both the

 3   defendants to return for verdict on Thursday, July 20th.  I'm

 4   going to maintain you on your current release conditions until

 5   then.  But, of course, a warrant would be issued for your

 6   arrest if you do not return for a verdict.

 7            Can I ask attorneys to make sure I get exhibits, to the

 8   extent I don't already have them, this afternoon.

 9            MS. AKERS:  Thank you, Your Honor.

10            THE COURT:  Ms. Akers, anything further for the

11   government?

12            MS. AKERS:  Yes.  I believe I forgot to circle back

13   on our position on the 111(b).  Our position is that the 111(b)

14   doesn't change the intent.  It's still a general intent crime

15   as it relates to what we discussed before.  There is an intent

16   to use a deadly or dangerous weapon, but that's not what's

17   being alleged here as the specific intent that -- that was

18   lacking.

19            THE COURT:  I thought -- wouldn't -- so the baton,

20   though -- wouldn't the baton be the deadly or dangerous weapon?

21            MS. AKERS:  Yes.

22            THE COURT:  That's one theory; right?

23            MS. AKERS:  Correct.

24            THE COURT:  And you would need specific intent for

25   that?
```

1    MS. AKERS:  No.

2    MS. KLAMANN:  Your Honor, the *Arrington* case speaks

3    about this.  The only intent that's required to prove 111(b) is

4    the intentional use of the dangerous weapon.  That's a general

5    intent.

6    THE COURT:  Okay.  All right.  Do you have the cite

7    for me on *Arrington*?

8    MS. KLAMANN:  Sure.

9    THE COURT:  You can just give it to Ms. Rhodes.

10   All right.  Anything further for you, Mr. Woodward?

11   MR. WOODWARD:  Sir, how would like to handle the

12   Rule 29 motions?  I'm not -- I wouldn't be particularly excited

13   about briefing that before Thursday.

14   THE COURT:  Yes.  That -- that's -- just looking to

15   renew the MJOAs?

16   MR. WOODWARD:  I mean, so we've made the motion.  I

17   don't think we need to renew it.  Actually, we do.  You're

18   right.  So, first, I'd like to renew the MJOA post-closings.

19   But I -- I suppose I'd like to be heard on that too.

20   THE COURT:  Okay.  Now is your chance.

21   MR. WOODWARD:  Okay.  I think the -- the legal

22   argument that I would make is the same as before.  And so the

23   record should be clear on that, which is the lack of

24   identification with respect to counts -- I think it's 17 and

25   19 -- and that the government's failure to do that either at

1    all or credibly requires the Court to enter a judgment of

2    acquittal with respect to those counts.

3         So I don't think I would have anything to add at this

4    time.

5         THE COURT:  Okay.  Thank you.

6         Mr. Woodward -- I'm sorry.  Ms. Douenat, anything

7    further for Mr. Cappuccio?

8         MS. DOUENAT:  I just want to make one.  Our Rule 29

9    arguments are due on?

10        THE COURT:  Oh.  I wasn't looking for more briefing.

11   If you would like to make an oral argument, now is your

12   ability.

13        MS. DOUENAT:  No.  That's fine.  If the Court is

14   wanting more briefing, we're fine.

15        THE COURT:  I'm not looking for more briefing.  Thank

16   you, folks.

17        Yes, Ms. Chaclan.

18        (REPORTER'S NOTE:  A sotto voce conference was held

19   between the Court and the courtroom deputy.)

20        THE COURT:  Attorneys, please stay and go over the

21   exhibit list with Ms. Chaclan.  Make sure you have all the

22   exhibits before you leave.

23        Thank you.  Have a good weekend, folks.

24        (Proceedings were concluded at 4:40 p.m.)

25

1     <u>CERTIFICATE OF STENOGRAPHIC OFFICIAL COURT REPORTER</u>

2

3          I, Nancy J. Meyer, Registered Diplomate Reporter,

4     Certified Realtime Reporter, do hereby certify that the above

5     and foregoing constitutes a true and accurate transcript of my

6     stenograph notes and is a full, true, and complete transcript

7     of the proceedings to the best of my ability.

8

9                    Dated this 4th day of August, 2023.

10

11               /s/ Nancy J. Meyer
                 Nancy J. Meyer
12               Official Court Reporter
                 Registered Diplomate Reporter
13               Certified Realtime Reporter
                 333 Constitution Avenue Northwest
14               Washington, D.C. 20001

15

16

17

18

19

20

21

22

23

24

25

**'**

**'80s** [1] - 80:17
**'Stop** [1] - 173:14

## 1

**1** [9] - 50:2, 53:18, 100:22, 158:25, 159:2, 164:24, 224:10, 231:6, 233:13
**10** [1] - 196:18
**10-33** [1] - 128:18
**1001.1** [1] - 99:4
**1001.4** [1] - 99:4
**11** [1] - 94:4
**111** [4] - 110:8, 169:2, 217:6, 234:16
**111(a** [4] - 107:8, 131:22, 227:15
**111(a)** [2] - 113:14, 129:1
**111(a)(1** [2] - 118:21, 151:18
**111(b** [9] - 110:25, 111:11, 111:13, 138:18, 152:5, 163:10, 169:16, 239:13, 240:3
**111(b)** [2] - 111:3, 239:13
**111(b)(1** [1] - 152:3
**111(b)s** [1] - 151:25
**112** [1] - 3:12
**117** [1] - 100:18
**11:30** [1] - 105:6
**11th** [4] - 90:16, 90:20, 91:19, 92:8
**12** [2] - 6:25, 16:17
**125** [2] - 100:18, 101:1
**12th** [5] - 94:7, 94:19, 94:24, 95:6, 95:10
**133** [1] - 100:13
**139** [1] - 100:13
**14** [3] - 164:24, 183:24, 203:4
**1412** [1] - 203:5
**14:31:34** [1] - 203:5
**14:32** [2] - 201:1, 201:3
**14:34:30** [1] - 202:19
**14:55** [2] - 211:15, 215:11
**14:55:24** [1] - 215:12
**14:55:54** [1] - 212:11
**14th** [2] - 88:6, 90:17
**15** [1] - 104:14
**1512** [2] - 172:2, 176:17

**1512(c)(2** [1] - 225:24
**15:13:35** [1] - 65:16
**15:16:40** [1] - 222:4
**15:17:10** [2] - 221:20, 222:2
**15th** [1] - 96:8
**16** [1] - 51:24
**17** [12] - 100:5, 101:23, 115:20, 118:23, 121:22, 124:16, 125:12, 125:21, 126:1, 206:5, 207:2, 240:24
**1752** [2] - 149:24, 152:4
**1752(1)(2** [1] - 150:24
**1752(a)(2** [3] - 150:1, 150:5, 150:7
**176** [1] - 102:24
**18** [4] - 151:18, 208:8, 235:7, 235:23
**181** [2] - 3:13, 102:24
**19** [14] - 100:6, 101:23, 118:20, 121:19, 121:25, 123:10, 125:22, 126:4, 126:11, 126:14, 127:5, 212:19, 213:22, 240:25
**196** [1] - 3:13
**1980** [1] - 100:18
**1995** [1] - 100:19
**1:45** [1] - 148:24
**1st** [1] - 7:8

## 2

**2** [4] - 53:19, 183:7, 189:14, 224:9
**2-minute** [2] - 124:17, 200:3
**20** [1] - 212:10
**20-some** [1] - 236:4
**20/20** [1] - 83:7
**200** [1] - 197:5
**2002** [1] - 102:24
**2005** [1] - 100:15
**2008** [1] - 100:13
**2014** [2] - 73:1, 189:6
**2016** [1] - 14:25
**2019** [1] - 100:16
**2020** [5] - 14:15, 17:17, 197:17, 198:7, 226:3
**2021** [6] - 88:6, 164:7, 197:2, 197:20, 213:25, 217:21
**20:10** [1] - 62:23
**20:15** [1] - 62:24
**20th** [3] - 238:19,

238:20, 239:3
**21-40** [1] - 4:3
**227** [1] - 3:14
**23** [1] - 224:11
**230** [1] - 107:9
**231** [6] - 107:10, 107:13, 107:20, 107:21, 112:21, 235:23
**24** [1] - 215:11
**25:48** [1] - 221:7
**27** [7] - 127:12, 129:11, 189:14, 217:12, 218:20, 235:17
**27:07** [1] - 223:20
**28** [10] - 110:16, 110:19, 151:17, 152:7, 182:8, 183:5, 185:8, 228:6, 228:11
**29** [10] - 69:5, 110:23, 111:23, 112:3, 157:18, 182:8, 182:10, 182:24, 240:12, 241:8
**296** [1] - 102:23
**29:28** [1] - 224:2
**2:00** [1] - 238:18
**2:22** [1] - 187:15
**2:31** [1] - 206:10
**2:32** [1] - 200:2
**2:32:20** [1] - 201:15
**2:32:21** [1] - 201:16
**2:33** [1] - 206:13
**2:34** [1] - 200:3
**2:41** [1] - 125:14
**2:56** [2] - 124:16, 207:22
**2:57** [1] - 125:16
**2:58** [4] - 124:16, 125:2, 125:17, 207:22

## 3

**3** [10] - 37:5, 48:19, 51:24, 92:12, 93:16, 94:1, 94:2, 100:21, 103:5, 183:7
**3** ...................... [1] - 3:9
**30** [7] - 68:19, 111:18, 141:16, 147:13, 154:5, 171:9
**300** [1] - 141:12
**301.1** [1] - 125:15
**301.2** [9] - 48:17, 67:19, 118:18, 131:7, 139:1, 139:19, 140:14,

220:12, 224:1
**308** [2] - 200:24, 200:25
**30th** [1] - 238:19
**31** [7] - 131:20, 138:17, 138:24, 150:6, 220:5, 222:11
**32** [6] - 138:18, 149:4, 150:6, 222:9, 223:15, 223:16
**33** [1] - 152:12
**34** [2] - 149:5, 172:1
**35** [1] - 224:11
**360** [1] - 141:7
**37** [1] - 218:19
**3:00** [1] - 125:3
**3:07** [1] - 218:7
**3:10** [1] - 48:17
**3:11** [1] - 48:19
**3:11:05** [1] - 48:19
**3:11:08** [1] - 48:17
**3:13:35** [1] - 67:17
**3:13:46** [1] - 67:20
**3:14** [4] - 187:11, 187:16, 218:7
**3:15** [1] - 151:4
**3:15:52** [1] - 137:16
**3:16** [1] - 220:13
**3:16:44** [1] - 137:17
**3:16:45** [1] - 220:17
**3:18** [3] - 119:1, 151:4, 151:5
**3:19** [1] - 151:5
**3:38** [1] - 94:7
**3:41** [4] - 94:19, 94:22, 94:24, 95:1

## 4

**4** [6] - 95:19, 96:5, 96:6, 103:5, 114:2, 115:22
**4** ...................... [1] - 3:9
**403** [1] - 137:25
**403.1** [3] - 65:16, 221:25, 222:4
**409** [1] - 211:15
**411** [1] - 202:19
**412** [1] - 203:5
**420** [1] - 117:15
**428** [1] - 125:17
**429** [1] - 123:6
**429.1** [1] - 212:23
**43** [8] - 100:18, 150:2, 150:3, 151:1, 151:3, 225:10, 225:13, 225:14
**430** [2] - 134:6, 134:7, 221:19

**432** [1] - 100:14
**433.15** [1] - 217:19
**45** [3] - 216:9, 216:10, 220:13
**45-second** [1] - 147:13
**4:40** [1] - 241:24

## 5

**5** [3] - 3:4, 36:12, 44:13
**501** [24] - 62:23, 116:19, 117:1, 119:1, 127:15, 128:1, 132:15, 132:16, 133:5, 133:17, 134:5, 134:18, 134:22, 139:1, 157:16, 158:13, 159:22, 168:12, 168:19, 208:7, 221:6, 223:20, 236:4
**508** [1] - 123:6
**509** [2] - 156:25, 183:9
**51** [5] - 150:4, 151:8, 225:11, 225:13, 225:14
**510** [6] - 153:1, 155:22, 156:4, 159:23, 183:24, 217:18
**511** [2] - 132:15, 133:18
**512** [1] - 216:9
**515** [1] - 123:5
**52** [1] - 225:11
**523** [2] - 115:1, 232:16
**523.47** [1] - 233:13
**529** [1] - 183:14
**532** [1] - 224:10
**533** [1] - 100:13
**533.1** [1] - 69:5
**55-gigabyte** [1] - 206:11
**573** [1] - 100:14
**579** [2] - 100:14, 103:11
**580** [1] - 103:11
**586** [1] - 189:14
**591** [1] - 189:14
**5:15:52** [1] - 137:16
**5:29** [1] - 183:9
**5:48** [1] - 183:9
**5th** [2] - 15:24, 198:4

## 6

**6** [2] - 124:19, 208:7

**6-minute** [1] - 175:3
**60** [2] - 45:18, 68:20
**612** [2] - 6:24, 151:20
**612.13** [1] - 19:5
**612.15** [1] - 24:20
**612.21** [2] - 28:8, 175:2
**612.23** [5] - 49:23, 154:1, 156:1, 164:24
**612.25** [1] - 70:2
**612.49** [1] - 15:12
**612.51** [1] - 15:12
**613** [1] - 6:24
**614** [1] - 100:17
**6th** [16] - 5:8, 62:5, 66:12, 98:12, 148:16, 179:3, 180:3, 180:12, 181:12, 181:24, 197:2, 197:10, 197:19, 197:25, 198:19, 236:25

---

**7**

**7** [4] - 124:20, 125:10, 217:13, 217:14
**726** [1] - 100:17
**727** [1] - 100:17
**78** [1] - 3:5

---

**8**

**8** [2] - 43:11, 117:16
**83** [1] - 100:16
**85** [1] - 3:6
**8:17** [1] - 119:2

---

**9**

**9** [7] - 113:13, 114:1, 114:17, 123:17, 199:22, 200:1, 232:10
**924** [1] - 100:16
**94** [1] - 3:9
**96** [1] - 3:9

---

**A**

**a)(4** [2] - 150:3, 150:25
**A.G** [3] - 100:4, 102:3, 103:4
**a.m** [1] - 94:19
**a/k/a** [1] - 231:15
**abet** [3] - 126:12, 190:23, 219:25
**abetting** [18] - 110:20, 121:22, 128:11, 129:1, 147:4, 153:19, 155:11,

155:17, 156:12, 184:15, 185:10, 217:3, 217:6, 218:24, 219:16, 223:12, 228:8, 235:1
**ability** [6] - 102:2, 119:21, 123:2, 194:4, 218:1, 241:12
**able** [14] - 61:5, 61:13, 95:23, 106:22, 120:9, 122:4, 122:13, 122:20, 133:2, 138:20, 145:9, 148:18, 174:6, 201:6
**absent** [2] - 149:6, 207:14
**absolutely** [2] - 90:12, 223:12
**accept** [2] - 101:12, 105:18
**accepted** [1] - 106:1
**accepting** [1] - 192:10
**access** [2] - 87:8, 87:18
**accident** [1] - 189:22
**accommodate** [1] - 104:2
**accompanying** [1] - 115:7
**accordance** [1] - 50:25
**according** [4] - 16:10, 22:14, 184:12, 208:10
**account** [1] - 172:4
**accounted** [1] - 159:18
**accounts** [1] - 192:19
**accuracy** [1] - 205:8
**accurately** [1] - 213:21
**accused** [1] - 100:5
**acknowledged** [1] - 170:5
**acknowledges** [3] - 170:2, 170:21, 170:22
**acknowledging** [1] - 188:11
**acquittal** [2] - 103:13, 241:2
**acquitted** [1] - 225:19
**act** [7] - 107:13, 189:19, 189:20, 189:23, 191:23, 195:11, 236:23
**Act** [1] - 85:7
**acting** [9] - 158:3, 209:13, 209:14,

212:4, 212:5, 234:1, 236:2, 236:5, 236:11
**action** [5] - 62:4, 147:13, 155:6, 224:19
**actions** [20] - 146:20, 147:23, 158:9, 166:6, 166:25, 167:18, 170:4, 170:5, 174:23, 176:7, 176:8, 176:9, 180:12, 181:16, 182:5, 185:19, 190:14, 211:12, 232:23, 234:15
**active** [6] - 23:25, 80:13, 80:14, 180:10, 193:15
**actively** [1] - 37:15
**activity** [2] - 200:5, 223:11
**actor** [1] - 207:10
**acts** [3] - 107:14, 110:18, 111:10
**actual** [3] - 110:21, 169:24, 170:2
**add** [2] - 227:25, 241:3
**additional** [2] - 101:9, 102:16
**address** [7] - 107:7, 108:24, 113:5, 118:15, 119:4, 124:25, 212:2
**addressed** [1] - 118:10
**adequate** [4] - 101:6, 101:9, 102:15, 165:7
**adjacent** [2] - 202:4, 202:22
**admissibility** [1] - 99:1
**admissible** [3] - 101:6, 102:12, 108:20
**admit** [3] - 104:8, 166:13, 181:6
**admits** [2] - 178:20, 232:8
**Admitted** [1] - 3:8
**admitted** [7] - 94:2, 96:6, 98:10, 98:11, 98:18, 173:5, 198:20
**admitting** [2] - 93:15, 98:20
**adopt** [1] - 106:10
**adopted** [2] - 105:18, 108:4
**advance** [5] - 201:1, 201:2, 201:15, 202:19, 221:7

**advancing** [2] - 221:20, 222:4
**advertised** [1] - 172:12
**advisement** [2] - 112:4, 237:4
**affected** [2] - 84:20, 84:21
**affirmatively** [1] - 163:23
**afford** [1] - 78:24
**afraid** [3] - 10:11, 155:14, 232:8
**afternoon** [8] - 112:18, 181:20, 181:21, 196:25, 197:1, 237:8, 238:3, 239:8
**afterwards** [3] - 62:16, 99:6, 192:11
**agenda** [1] - 215:22
**agent** [11] - 92:18, 93:5, 94:20, 95:7, 96:4, 102:5, 102:14, 119:15, 120:8, 179:25, 204:1
**Agent** [32] - 84:12, 84:13, 85:11, 89:10, 89:18, 91:17, 94:4, 94:18, 95:5, 98:5, 101:12, 101:22, 102:1, 104:8, 108:12, 108:25, 109:4, 119:5, 119:9, 119:14, 119:18, 120:2, 120:11, 120:16, 121:14, 201:4, 201:6, 201:22, 205:3, 213:2, 213:6, 213:16
**Agents** [1] - 4:10
**agents** [2] - 84:22, 89:13
**aggregating** [1] - 133:9
**aggression** [2] - 138:22, 182:1
**aggressive** [10] - 113:23, 116:2, 117:21, 127:17, 137:7, 154:1, 217:22, 231:21, 234:15, 235:24
**aggressively** [5] - 116:4, 209:14, 212:5, 233:7, 234:2
**aggressor** [1] - 115:15
**agitated** [1] - 194:13
**ago** [3] - 72:18, 93:23, 95:17

**agree** [23] - 32:23, 66:2, 67:11, 69:10, 69:23, 74:6, 77:23, 84:17, 96:3, 100:20, 105:10, 105:14, 107:24, 110:4, 110:7, 161:9, 176:24, 196:3, 200:9, 210:19, 225:9, 230:8, 233:19
**agreed** [4] - 103:19, 171:21, 210:4, 228:7
**agrees** [1] - 206:24
**ahead** [5] - 59:21, 112:24, 123:22, 146:4, 146:7
**ahhhhh** [1] - 82:16
**ahold** [1] - 184:4
**aid** [5] - 47:9, 76:19, 126:12, 190:23, 219:25
**aiding** [18] - 110:20, 121:22, 128:11, 129:1, 147:4, 153:19, 155:11, 155:16, 156:12, 184:15, 185:10, 217:3, 217:6, 218:23, 219:16, 223:12, 228:8, 235:1
**air** [8] - 46:4, 48:8, 69:16, 181:16, 190:21, 191:1, 229:3, 234:8
**airborne** [1] - 25:2
**AKERS** [140] - 4:7, 92:13, 92:15, 92:18, 92:20, 92:22, 93:17, 93:20, 95:20, 95:22, 95:25, 97:14, 98:4, 104:18, 104:21, 104:23, 104:25, 111:18, 112:10, 112:13, 113:3, 113:8, 114:25, 118:14, 118:17, 118:25, 119:14, 120:7, 120:15, 121:10, 121:19, 121:23, 121:25, 123:12, 123:15, 123:21, 123:23, 124:3, 124:10, 125:5, 129:19, 129:22, 130:7, 133:16, 134:20, 134:24, 135:1, 135:7, 135:10, 136:12, 136:17, 137:12, 137:14,

137:22, 141:2,
141:5, 142:3,
142:12, 142:15,
142:18, 142:24,
143:9, 144:5, 144:8,
144:10, 144:22,
144:25, 145:21,
146:11, 146:14,
147:6, 148:9,
148:13, 148:25,
149:3, 149:9,
149:21, 149:23,
150:1, 150:3,
150:23, 151:3,
151:8, 151:12,
151:15, 151:25,
152:2, 152:7,
153:12, 153:21,
155:18, 156:17,
156:21, 159:10,
160:21, 161:1,
161:18, 162:25,
163:4, 163:13,
165:11, 165:13,
165:20, 167:4,
167:8, 168:5,
168:25, 169:7,
169:17, 170:12,
171:9, 171:23,
177:5, 177:10,
178:10, 179:18,
181:14, 182:22,
227:6, 228:2,
228:10, 228:13,
230:10, 230:15,
231:11, 232:4,
233:11, 233:21,
238:1, 238:5, 238:7,
238:9, 238:12,
238:15, 238:22,
239:9, 239:12,
239:21, 239:23,
240:1
**Akers** [18] - 4:7, 93:19,
98:3, 99:3, 104:17,
108:23, 110:2,
110:16, 111:17,
149:2, 182:21,
193:12, 204:16,
220:23, 237:1,
237:24, 238:21,
239:10
**Akers.........................
...........** [2] - 3:12,
3:14
**alcove** [1] - 50:8
**Alderete** [1] - 100:17
**alert** [1] - 186:14
**Alexandria** [1] - 4:14
**Alina** [1] - 197:23

**alleged** [6] - 101:13,
101:23, 200:11,
217:14, 222:9,
239:17
**alleges** [4] - 202:10,
202:23, 218:7, 236:3
**allow** [1] - 100:3
**allowed** [2] - 103:22,
103:24
**allows** [1] - 231:6
**alluded** [1] - 93:9
**Almighty** [1] - 191:23
**almost** [6] - 44:17,
101:15, 126:16,
231:23, 234:3, 235:8
**alone** [4] - 98:15,
128:22, 147:21,
198:12
**alternate** [2] - 142:20,
144:17
**altogether** [1] - 230:7
**ambidextrous** [1] -
72:13
**ambulance** [2] -
205:23, 205:24
**Amendment** [2] -
180:25, 235:15
**America** [2] - 4:3,
100:14
**American** [1] - 62:11
**amount** [5] - 16:14,
137:8, 138:13, 235:8
**ample** [1] - 130:21
**amplified** [1] - 136:8
**analogous** [2] -
136:17, 138:6
**analogy** [2] - 127:6,
199:6
**analysis** [5] - 97:1,
167:11, 168:1,
169:18, 170:10
**anger** [2] - 62:1,
179:15
**angle** [6] - 134:11,
135:1, 142:20,
168:11, 168:15,
221:10
**angry** [15] - 18:20,
18:21, 18:24, 19:1,
19:3, 58:21, 59:25,
60:2, 60:12, 75:1,
75:2, 75:4, 141:13,
190:10, 191:9
**animated** [1] - 34:6
**answer** [2] - 151:12,
195:24
**answered** [1] - 76:5
**Antifa** [15] - 9:20,
9:21, 10:14, 28:2,
28:13, 28:15, 28:16,

28:17, 28:18, 28:20,
40:4, 40:6, 40:21,
175:6, 175:9
**Antonio** [1] - 188:19
**anxiety** [2] - 72:22,
77:24
**anyway** [6] - 39:23,
41:15, 71:4, 78:2,
93:16, 175:16
**app** [3] - 8:16, 9:5,
177:19
**appeal** [1] - 106:8
**appear** [2] - 46:2, 52:5
**appearance** [1] -
191:23
**apple** [1] - 199:15
**applied** [1] - 113:3
**applies** [1] - 93:18
**apply** [2] - 219:18,
226:24
**applying** [1] - 114:12
**appointee** [1] - 197:13
**appreciate** [6] - 91:16,
100:6, 103:2,
209:10, 220:16,
225:18
**approach** [4] - 99:10,
100:25, 112:11,
237:11
**appropriate** [3] - 6:14,
100:2, 101:14
**approximation** [1] -
137:10
**April** [1] - 213:25
**arc** [1] - 179:16,
179:18
**archway** [3] - 80:25,
81:6, 175:10
**area** [16] - 29:23,
30:15, 31:23, 34:15,
47:19, 53:23, 54:22,
54:25, 61:14, 62:18,
127:8, 127:11,
133:24, 150:16,
168:9, 182:1
**argue** [8] - 106:22,
184:24, 185:3,
189:11, 189:24,
193:25, 209:19,
209:20
**argues** [1] - 103:5
**arguing** [5] - 136:15,
185:8, 185:9,
219:13, 235:18
**argument** [16] - 98:8,
98:22, 98:23, 103:2,
110:1, 115:10,
121:8, 124:6, 185:4,
208:2, 218:14,
220:1, 228:16,

230:16, 240:22,
241:11
**arguments** [2] - 190:2,
241:9
**Arguments** [1] - 3:11
**arising** [1] - 115:10
**Arlington** [1] - 11:20
**arm** [9] - 46:5, 50:21,
141:21, 156:4,
164:23, 165:1,
210:12, 233:4,
234:11
**arms** [4] - 69:15,
69:17, 183:16,
210:11
**arrest** [13] - 85:15,
85:16, 85:19, 85:20,
85:21, 85:22, 86:7,
86:15, 86:24, 97:10,
191:16, 217:20,
239:6
**arrested** [3] - 85:24,
86:6, 180:10
**Arrington** [2] - 240:2,
240:7
**arrived** [2] - 150:17,
187:14
**arrow** [3] - 142:3,
142:6, 142:11
**arrows** [1] - 142:2
**articulated** [2] - 207:8
**arts** [1] - 70:14
**ascribe** [2] - 8:24,
88:10
**Ashley** [1] - 4:7
**aside** [2] - 180:3,
193:6
**askanced** [1] - 161:14
**ass** [2] - 51:5, 51:14
**ass-muncher** [2] -
51:5, 51:14
**assault** [34] - 70:6,
101:24, 110:17,
111:2, 111:11,
114:6, 117:5,
121:20, 123:14,
147:15, 154:3,
160:22, 165:8,
165:9, 176:2,
176:13, 182:15,
186:9, 189:1,
189:15, 190:7,
193:7, 207:10,
210:3, 210:5,
211:22, 213:20,
219:10, 222:10,
227:18, 228:16,
235:22, 236:1, 236:8
**assaulted** [2] - 69:10,
223:8

**assaulting** [12] -
100:5, 123:11,
123:18, 123:24,
125:22, 134:3,
191:20, 200:1,
202:17, 208:3,
209:15, 212:20
**assaultive** [9] - 125:9,
130:23, 131:15,
206:2, 215:10,
215:17, 217:16,
218:21, 229:25
**assaults** [5] - 102:12,
110:21, 127:9,
128:25, 210:20
**asserting** [1] - 108:3
**assertion** [1] - 207:6
**assertive** [1] - 217:22
**assist** [2] - 97:1,
128:17
**assistance** [1] -
128:19
**assisted** [1] - 192:16
**assume** [5] - 95:14,
175:6, 206:1, 206:2,
211:4
**assuming** [6] - 9:15,
107:17, 112:3,
205:14, 211:5, 211:6
**astutely** [2] - 201:4,
201:8
**atmosphere** [1] -
18:15
**attachment** [2] -
188:10, 188:12
**attack** [14] - 46:13,
66:16, 71:8, 127:23,
128:23, 135:19,
146:12, 146:18,
151:19, 158:14,
158:16, 164:18,
165:1, 171:16
**attacked** [8] - 46:19,
68:20, 158:18,
158:19, 158:25,
166:10, 167:21,
230:3
**attacker** [1] - 59:12
**attacking** [4] - 46:25,
51:18, 58:13, 65:21
**attacks** [3] - 47:5,
47:8, 127:3
**attempt** [2] - 104:2,
193:15
**attempted** [1] - 205:7
**attend** [2] - 197:19,
198:2
**attention** [8] - 27:4,
91:16, 95:8, 95:25,
104:25, 112:19,

209:3, 223:19
**attorney** [2] - 199:7, 199:8
**attorneys** [4] - 111:7, 237:2, 239:7, 241:20
**attributable** [1] - 205:20
**attribute** [4] - 174:21, 185:18, 204:21, 205:7
**attributes** [3] - 172:15, 172:16
**attributing** [1] - 205:4
**audio** [78] - 15:22, 19:14, 20:17, 21:23, 25:14, 28:24, 29:15, 30:4, 30:21, 31:7, 32:17, 33:21, 36:4, 36:13, 36:24, 37:7, 37:19, 38:5, 38:22, 39:6, 40:1, 40:14, 41:11, 42:7, 43:5, 43:13, 44:1, 44:15, 44:22, 45:21, 46:9, 47:12, 50:4, 50:13, 51:22, 53:9, 55:11, 58:10, 62:25, 63:6, 63:19, 64:1, 64:7, 64:20, 65:4, 69:7, 70:3, 134:25, 201:17, 201:24, 202:5, 202:8, 202:12, 202:20, 203:3, 203:6, 203:9, 208:9, 209:1, 209:8, 211:20, 212:13, 212:16, 214:14, 215:2, 216:17, 218:9, 218:12, 219:5, 221:12, 221:18, 221:21, 222:5, 223:21, 223:25, 224:12, 224:18
**audio-visual** [78] - 15:22, 19:14, 20:17, 21:23, 25:14, 28:24, 29:15, 30:4, 30:21, 31:7, 32:17, 33:21, 36:4, 36:13, 36:24, 37:7, 37:19, 38:5, 38:22, 39:6, 40:1, 40:14, 41:11, 42:7, 43:5, 43:13, 44:1, 44:15, 44:22, 45:21, 46:9, 47:12, 50:4, 50:13, 51:22, 53:9, 55:11, 58:10, 62:25, 63:6, 63:19, 64:1, 64:7, 64:20, 65:4,

69:7, 70:3, 134:25, 135:6, 201:17, 201:24, 202:5, 202:8, 202:12, 202:20, 203:3, 203:6, 203:9, 208:9, 209:1, 209:8, 211:20, 212:13, 212:16, 214:14, 215:2, 216:17, 218:9, 218:12, 219:5, 221:12, 221:18, 221:21, 222:5, 223:21, 223:25, 224:12, 224:18
**authority** [2] - 100:8, 121:13
**avoid** [1] - 228:8
**avoiding** [1] - 203:19
**aware** [4] - 73:12, 127:14, 172:21, 179:21
**awful** [1] - 187:4

**B**

**b)(1)(A** [1] - 150:5
**b)(1)(A)s** [1] - 152:4
**baby** [1] - 25:18
**backed** [3] - 45:7, 48:7, 62:10
**backup** [1] - 124:6
**backwards** [2] - 212:15, 219:9
**bad** [7] - 74:10, 164:3, 176:14, 176:15, 192:20, 232:8, 236:24
**baffling** [1] - 14:21
**bag** [2] - 6:10, 7:14
**Balack** [1] - 84:25
**Banasyak** [4] - 197:23, 197:24, 198:1, 198:18
**barely** [1] - 212:25
**based** [6] - 46:18, 108:14, 108:16, 113:14, 172:20
**bash** [1] - 161:25
**basic** [1] - 82:14
**basis** [4] - 92:14, 166:20, 167:13, 167:15
**Batman** [1] - 204:4
**baton** [66] - 61:1, 61:9, 62:17, 65:24, 66:24, 67:8, 67:9, 67:23, 68:6, 111:1, 139:14, 139:23, 141:18,

142:19, 143:12, 143:13, 143:20, 143:22, 143:25, 145:1, 145:7, 145:10, 145:11, 145:15, 146:19, 147:12, 147:22, 160:23, 160:24, 161:1, 161:5, 161:8, 161:21, 161:22, 162:2, 162:5, 162:17, 162:22, 162:23, 163:1, 163:11, 163:24, 164:18, 164:21, 165:5, 165:9, 165:15, 168:8, 168:9, 168:13, 168:21, 171:10, 171:12, 171:13, 171:16, 171:19, 171:20, 171:21, 171:25, 190:2, 190:19, 190:24, 233:2, 239:19, 239:20
**batons** [1] - 136:5
**battle** [6] - 72:6, 82:12, 82:15, 82:23, 187:4
**bayonet** [1] - 82:16
**bayonet-practice-type** [1] - 82:16
**beam** [1] - 57:12
**bear** [1] - 90:25
**beaten** [1] - 28:1
**beautiful** [1] - 175:10
**became** [2] - 58:21, 60:12
**beckoned** [1] - 131:3
**beckoning** [1] - 118:12
**becoming** [1] - 194:14
**beforehand** [1] - 177:22
**began** [1] - 75:2
**begin** [1] - 178:1
**beginning** [2] - 5:18, 164:12
**begun** [2] - 87:12, 103:9
**behalf** [3] - 4:8, 4:13, 4:17
**behind** [24] - 53:16, 54:18, 54:20, 59:12, 115:3, 115:14, 122:17, 132:17, 132:20, 133:9, 134:11, 136:19, 136:21, 137:2,

142:7, 142:8, 156:5, 156:8, 157:13, 158:20, 202:7, 204:22, 206:17, 216:22
**beholder** [5] - 197:7, 205:19, 210:1, 214:2, 223:6
**belated** [3] - 101:7, 102:13
**belied** [1] - 158:8
**belonging** [1] - 67:25
**Ben** [1] - 4:10
**Bench** [1] - 237:13
**bench** [2] - 103:19, 104:3
**bend** [2] - 65:14, 231:5
**bending** [2] - 71:23, 72:4
**bends** [1] - 117:14
**benefit** [3] - 104:1, 133:1, 206:9
**Benjamin** [1] - 3:5
**bent** [2] - 159:1, 159:7
**best** [10] - 112:20, 131:17, 133:17, 134:8, 182:25, 187:14, 194:8, 204:12, 218:21, 233:23
**bet** [1] - 213:18
**betrayed** [1] - 179:13
**better** [2] - 38:1, 156:18
**between** [27] - 101:16, 122:5, 122:7, 125:20, 126:4, 126:6, 126:14, 126:15, 132:4, 132:5, 133:24, 135:4, 142:21, 148:14, 166:5, 170:23, 186:20, 187:2, 198:18, 198:21, 207:20, 209:5, 214:7, 216:11, 216:15, 222:8, 241:19
**beyond** [17] - 169:9, 188:2, 189:18, 192:22, 198:12, 204:8, 204:23, 206:20, 206:24, 209:23, 210:15, 215:9, 216:6, 217:15, 221:14, 225:17, 226:22
**bias** [2] - 97:20, 97:24
**biased** [3] - 210:10,

216:4, 216:19
**big** [2] - 75:4, 175:10
**bigger** [1] - 127:8
**bike** [4] - 127:21, 129:14, 129:17, 129:19
**bill** [1] - 200:13
**binding** [1] - 108:6
**bit** [14] - 15:8, 17:19, 28:22, 46:15, 74:21, 80:16, 92:24, 93:7, 93:8, 129:10, 129:11, 152:22, 161:10, 206:11
**bite** [1] - 199:16
**bits** [1] - 26:19
**black** [3] - 119:3, 120:23, 170:19
**blackout** [2] - 163:22, 228:22
**blade** [2] - 186:18, 195:4
**blades** [2] - 186:20, 187:2
**bless** [5] - 201:21, 204:9, 232:21, 233:20
**blew** [1] - 201:22
**blocking** [1] - 146:18
**bloodied** [2] - 70:9, 76:17
**bloody** [5] - 70:25, 162:9, 162:15, 162:16, 165:9
**blurry** [1] - 158:24
**bodies** [1] - 29:19
**bodily** [10] - 136:11, 140:4, 147:1, 148:4, 160:23, 162:20, 163:6, 165:18, 182:16, 228:1
**body** [28] - 113:14, 113:17, 114:16, 115:5, 116:7, 116:8, 116:10, 116:17, 117:22, 118:8, 122:2, 123:4, 128:11, 130:25, 135:4, 135:12, 135:13, 137:15, 138:15, 150:15, 201:14, 202:22, 213:9, 216:22, 220:8, 220:9, 232:15, 232:24
**body-worn** [13] - 113:14, 113:17, 114:16, 115:5, 116:7, 116:8, 116:10, 135:12,

150:15, 220:8, 220:9, 232:15, 232:24

**body-worn-camera** [8] - 116:17, 117:22, 118:8, 122:2, 123:4, 135:4, 135:13, 137:15

**Bogner** [32] - 116:1, 116:22, 117:24, 118:9, 120:21, 122:3, 122:14, 122:16, 126:3, 127:7, 128:5, 128:18, 131:18, 135:21, 139:25, 145:25, 154:7, 154:17, 157:9, 161:4, 165:4, 171:25, 205:24, 213:10, 213:11, 215:14, 215:20, 215:22, 219:19, 220:20

**Bogner's** [4] - 116:7, 127:4, 129:3, 150:15

**BOLO** [1] - 179:22

**Bosowak** [1] - 84:25

**boss** [1] - 139:25

**bothering** [1] - 54:6

**bottom** [4] - 130:21, 183:15, 183:16, 220:25

**bought** [3] - 10:17, 11:2, 11:16

**bound** [1] - 197:19

**boy** [2] - 97:8, 97:23

**boys** [3] - 19:17, 20:5, 174:21

**brace** [1] - 153:3

**break** [11] - 126:4, 126:6, 126:14, 131:13, 147:18, 148:24, 160:13, 179:16, 196:17, 196:21, 227:6

**breaking** [1] - 160:8

**breathe** [1] - 138:16

**breathing** [1] - 122:4

**briar** [1] - 210:6

**bridge** [3] - 170:23, 170:24, 185:4

**brief** [3] - 165:21, 216:8, 227:4

**briefed** [1] - 119:23

**briefing** [7] - 100:6, 110:14, 121:10, 240:13, 241:10, 241:14, 241:15

**briefly** [1] - 157:16

**bring** [3] - 125:6, 199:15, 225:1

**broke** [3] - 116:2, 142:1, 149:4

**broken** [2] - 122:18, 148:20

**brought** [2] - 120:1, 236:22

**bubble** [1] - 233:17

**buddy** [2] - 7:3, 13:3

**build** [1] - 225:22

**building** [18] - 18:7, 26:8, 27:11, 27:18, 27:20, 27:22, 27:23, 28:3, 33:10, 33:16, 33:24, 126:13, 150:10, 150:14, 175:11, 175:23, 198:14, 226:18

**Building** [14] - 19:22, 22:5, 24:13, 27:16, 28:4, 33:9, 39:20, 41:3, 74:23, 76:1, 76:4, 76:9, 174:10, 198:15

**bunch** [1] - 26:16

**burden** [12] - 103:3, 103:16, 206:3, 209:22, 209:23, 210:17, 215:8, 215:9, 216:6, 224:22, 225:23, 226:22

**Bureau** [1] - 204:1

**business** [1] - 96:13

**bust** [1] - 23:12

**busting** [1] - 23:17

**buy** [6] - 10:4, 10:5, 10:7, 10:11, 11:8, 188:21

**buying** [1] - 11:6

**BWC** [1] - 222:2

---

**C**

**C.W** [3] - 100:5, 102:3, 103:4

**cable** [1] - 70:19

**cam** [3] - 116:7, 116:8, 201:14

**camera** [33] - 39:9, 44:17, 46:4, 46:5, 47:14, 113:15, 113:17, 114:16, 115:5, 116:10, 116:17, 117:22, 118:8, 122:2, 123:4, 132:8, 135:4, 135:12, 135:13, 137:5, 137:15,

150:15, 153:16, 157:3, 175:12, 188:22, 202:22, 213:9, 220:9, 221:11, 222:2, 232:24

**cameras** [1] - 232:15

**Campbell** [1] - 189:14

**cannot** [4] - 197:8, 198:12, 199:4, 212:3

**Cantwell** [3] - 132:15, 184:1, 184:20, 184:23, 185:24

**cap** [3] - 188:23, 188:25, 189:1

**capable** [1] - 148:4

**capacity** [1] - 228:18

**Capitol** [67] - 5:15, 10:12, 10:20, 10:21, 10:24, 13:12, 13:16, 13:19, 14:6, 14:14, 16:1, 18:2, 18:5, 18:24, 19:7, 19:10, 19:22, 19:23, 20:2, 20:5, 21:3, 21:12, 22:5, 24:1, 24:13, 27:15, 28:4, 31:3, 33:9, 35:12, 39:20, 41:3, 73:25, 74:13, 74:14, 74:23, 76:1, 76:4, 76:9, 81:4, 115:23, 122:24, 150:17, 173:2, 173:3, 173:15, 173:22, 174:1, 174:3, 174:10, 174:14, 174:15, 174:17, 175:18, 179:15, 180:13, 187:15, 194:6, 194:9, 194:10, 194:13, 198:10, 198:14, 198:15, 226:5

**Cappuccio** [148] - 3:4, 4:3, 4:13, 4:21, 5:4, 7:2, 10:2, 10:15, 14:13, 15:14, 15:24, 18:17, 19:25, 20:22, 21:16, 21:25, 23:25, 24:10, 24:22, 25:19, 27:4, 27:24, 28:10, 29:2, 30:1, 30:9, 32:12, 32:20, 33:25, 34:19, 35:15, 36:7, 37:16, 38:19, 38:25, 39:11, 40:17, 41:22, 42:4, 42:11, 43:16, 44:9, 45:4, 45:15, 45:25, 46:12, 46:22,

47:9, 47:22, 48:3, 48:6, 48:11, 48:24, 49:19, 49:25, 50:6, 50:16, 50:24, 51:7, 51:11, 52:3, 52:12, 52:19, 53:13, 53:21, 54:16, 55:14, 55:21, 56:3, 56:10, 56:14, 56:19, 57:4, 57:11, 57:16, 58:6, 58:12, 58:22, 59:17, 59:25, 60:24, 61:15, 61:23, 63:22, 64:3, 64:10, 64:15, 64:23, 65:7, 65:12, 65:19, 65:22, 66:16, 67:11, 67:14, 68:2, 68:15, 69:2, 69:11, 70:12, 71:1, 71:5, 72:17, 73:24, 74:7, 75:4, 75:22, 76:14, 76:25, 77:25, 78:14, 83:7, 84:1, 98:19, 110:16, 111:4, 128:8, 128:12, 128:23, 131:11, 134:1, 149:18, 151:16, 156:8, 161:22, 164:16, 164:20, 165:2, 165:23, 167:17, 167:19, 171:10, 172:2, 172:22, 179:20, 183:7, 183:15, 186:21, 194:2, 195:22, 227:9, 229:6, 229:12, 229:17, 229:24, 231:7, 232:9, 241:7

**CAPPUCCIO** [2] - 4:24, 5:1

**Cappuccio's** [13] - 130:16, 130:19, 152:7, 155:7, 158:15, 163:17, 164:22, 164:25, 167:18, 171:15, 173:9, 182:5, 230:1

**capture** [1] - 221:10

**captured** [2] - 130:19, 197:3

**capturing** [1] - 202:22

**car** [3] - 172:8, 172:15, 172:20

**caravan** [2] - 16:16, 177:18

**care** [3] - 6:6, 13:9, 175:15

**Carlton** [1] - 212:20

**cars** [3] - 8:8, 15:17,

16:17

**CART** [9] - 87:4, 87:24, 88:3, 88:13, 88:19, 88:21, 88:24, 89:4, 96:25

**carton** [1] - 199:16

**Case** [1] - 4:3

**case** [42] - 88:23, 89:14, 96:3, 96:4, 96:20, 97:7, 99:18, 100:3, 100:10, 100:25, 101:5, 101:8, 101:12, 101:18, 101:19, 102:5, 102:18, 102:21, 103:21, 103:23, 104:5, 104:10, 110:12, 112:1, 119:15, 125:6, 181:23, 192:22, 199:12, 199:17, 199:21, 211:2, 211:17, 213:1, 218:25, 223:6, 224:24, 225:4, 227:17, 229:22, 240:2

**cases** [2] - 103:9, 166:22

**cast** [1] - 119:20

**castle** [8] - 19:17, 19:19, 20:9, 174:20, 174:24, 176:6, 181:2, 190:11

**catch** [1] - 17:19

**cattle** [2] - 117:25, 118:2

**caught** [1] - 203:18

**caused** [5] - 147:18, 147:19, 148:9, 170:18, 182:4

**causing** [3] - 148:4, 148:8, 148:10

**cavalry** [4] - 172:11, 172:15, 188:9

**CCTV** [8] - 114:2, 115:10, 116:3, 118:18, 131:7, 131:24, 132:13, 139:1

**CDU** [1] - 160:6

**celebrate** [1] - 69:25

**celebrating** [1] - 69:24

**celebration** [2] - 69:23, 69:24

**cell** [5] - 130:16, 152:11, 158:17, 172:13, 179:25

**cell-phone** [1] - 130:16

centimeter [1] - 117:10
certain [6] - 73:12, 73:19, 89:1, 166:3, 200:1
certainly [16] - 109:17, 117:5, 118:5, 120:12, 121:14, 136:24, 147:15, 154:3, 155:10, 156:22, 161:1, 161:24, 177:5, 224:4, 234:16
certification [15] - 177:7, 177:9, 178:14, 178:15, 178:21, 179:6, 179:12, 180:17, 187:22, 187:25, 198:5, 225:18, 225:21, 225:25, 226:2
certify [1] - 198:19
Chaclan [3] - 99:20, 241:17, 241:21
chain [7] - 89:7, 89:10, 89:16, 89:17, 89:18, 91:25
chain-of-custody [1] - 89:7
challenge [2] - 99:6, 198:5
challenging [2] - 97:21, 203:20
chance [2] - 203:8, 240:20
change [5] - 18:13, 107:18, 166:10, 227:21, 239:14
changed [2] - 18:15, 164:10
changes [2] - 7:16, 236:8
channel [1] - 70:20
chant [2] - 181:1, 193:5
chanting [12] - 13:22, 13:24, 17:23, 18:23, 69:13, 152:17, 157:25, 172:25, 173:18, 176:5, 193:1, 193:19
chants [4] - 173:16, 174:7, 193:1, 193:2
chaos [6] - 130:11, 152:10, 170:14, 175:4, 182:1, 221:2
chaotic [4] - 133:5, 160:8, 171:3, 175:21
character [2] - 101:3,

101:20
characterization [1] - 233:25
charge [13] - 118:21, 123:10, 123:12, 127:5, 138:18, 138:19, 151:17, 152:3, 171:9, 182:13, 199:22, 207:14, 215:5
charged [20] - 102:12, 113:13, 116:13, 116:16, 117:8, 118:24, 124:16, 125:7, 125:10, 125:13, 131:21, 151:5, 176:25, 210:3, 210:20, 217:9, 218:20, 235:23, 236:2
charges [17] - 110:9, 111:11, 111:12, 111:14, 113:10, 114:6, 123:18, 124:4, 124:9, 124:16, 125:21, 125:23, 149:20, 149:23, 166:14, 212:19, 226:23
charging [3] - 150:5, 235:21, 235:23
checked [1] - 6:20
cheering [2] - 32:5, 32:8
chemical [6] - 77:17, 122:5, 131:9, 152:16, 155:8, 176:1
chest [2] - 157:1, 159:16
chewing [1] - 233:16
chief [11] - 100:3, 101:5, 101:18, 101:19, 102:5, 102:18, 103:23, 104:10, 112:2, 211:17, 213:1
children [1] - 199:14
choices [1] - 172:6
chronologically [1] - 113:12
chunk [1] - 104:19
circle [2] - 201:7, 239:12
circuit [2] - 100:8, 111:22
Circuit [9] - 100:13, 100:15, 100:16, 100:17, 100:19, 100:23, 101:1, 102:21, 108:5

circuits [2] - 100:9, 100:24
circulating [2] - 179:22
circumstance [1] - 148:14
circumstances [7] - 73:12, 101:11, 102:9, 170:21, 181:24, 194:5, 231:19
cite [3] - 124:24, 130:21, 240:6
cited [4] - 116:17, 121:12, 124:22, 130:15
citing [1] - 167:15
city [1] - 41:1
civil [4] - 107:10, 111:5, 111:16, 160:7
civilian [1] - 46:24
civilians [2] - 42:25, 82:13
claim [9] - 155:13, 158:15, 158:25, 159:20, 163:18, 178:5, 217:15, 230:13, 234:3
claiming [6] - 5:6, 136:10, 168:17, 187:22, 192:17, 194:22
claims [11] - 174:14, 175:5, 175:9, 185:5, 192:24, 204:2, 208:19, 213:6, 216:25, 220:5
clarify [2] - 87:14, 227:10
clarifying [2] - 96:19, 96:23
clashing [1] - 126:2
Claunch [1] - 4:18
clean [1] - 36:20
clear [26] - 9:2, 32:23, 39:19, 84:15, 84:23, 85:6, 85:8, 97:4, 125:11, 149:11, 163:9, 172:19, 194:11, 197:21, 204:13, 206:20, 206:23, 210:14, 210:15, 210:17, 215:6, 215:16, 215:22, 218:5, 232:10, 240:23
clearly [8] - 26:25, 93:12, 96:17, 142:22, 174:12, 175:20, 214:4,

218:17
Clements [63] - 4:10, 6:24, 7:5, 15:21, 19:4, 19:13, 20:16, 21:22, 24:19, 25:13, 28:23, 29:14, 30:3, 30:20, 31:6, 32:16, 33:20, 36:3, 36:12, 36:23, 37:6, 37:18, 38:4, 38:21, 39:5, 39:25, 40:13, 41:10, 42:6, 43:4, 43:12, 43:25, 44:14, 44:21, 45:20, 46:8, 47:11, 48:18, 48:20, 49:10, 50:3, 50:12, 51:21, 53:8, 53:19, 55:9, 55:18, 55:23, 56:22, 57:1, 57:6, 62:22, 63:5, 63:18, 63:24, 63:25, 64:6, 64:19, 65:3, 67:20, 68:23, 69:6
clerk [1] - 112:14
clicking [1] - 117:23
client [12] - 84:4, 98:7, 98:24, 99:7, 186:16, 188:24, 196:2, 197:9, 204:15, 205:5, 205:7, 237:6
client's [5] - 185:23, 186:8, 189:3, 190:5, 191:12
climb [1] - 24:15
climbed [2] - 23:22, 115:22
climbing [2] - 174:11, 174:12
climbs [1] - 114:4
Clinton [4] - 25:22, 26:1, 26:10, 26:22
Clinton's [1] - 176:4
clip [4] - 16:20, 25:17, 39:14, 129:15, 129:22, 130:12, 134:23, 204:24, 216:8
clips [1] - 178:16
clock [2] - 201:2, 222:3
close [3] - 56:9, 84:2, 123:3
closed [4] - 101:19, 122:18, 126:16, 150:16
closer [5] - 27:11, 42:16, 76:1, 174:10, 174:18
Closing [1] - 3:11
closing [18] - 103:7,

104:13, 104:15, 104:22, 107:6, 107:7, 112:5, 121:9, 122:17, 127:2, 201:1, 208:16, 212:25, 214:8, 216:21, 218:14, 220:5, 229:22
closings [5] - 99:25, 104:16, 111:23, 121:6, 240:18
clothing [2] - 6:14, 120:25
clue [1] - 28:17
clueless [1] - 5:11
co [6] - 4:9, 104:4, 172:8, 173:25, 174:3, 177:25
co-counsel [1] - 4:9
co-defendant [1] - 104:4
co-traveler [4] - 172:8, 173:25, 174:3, 177:25
cog [1] - 205:16
cognizant [1] - 154:18
coherence [1] - 179:14
cohesive [1] - 140:2
coincidental [1] - 115:9
cold [3] - 6:14, 7:14, 7:17
collapse [2] - 140:23, 236:20
collapsed [1] - 147:2
colleagues [3] - 146:8, 198:1, 205:24
collective [3] - 133:6, 137:7, 157:14
collectively [3] - 145:23, 146:2, 155:6
College [2] - 198:5, 198:20
colloquy [1] - 99:7
Columbia [1] - 41:2
combat [2] - 142:20, 146:6
comfort [1] - 125:4
comfortable [2] - 106:4, 107:25
coming [36] - 10:12, 20:20, 23:10, 27:21, 27:25, 31:10, 31:22, 32:6, 34:2, 34:22, 40:8, 51:13, 76:16, 76:22, 77:14, 77:17, 77:20, 82:24, 118:17, 126:13, 126:22, 128:3,

129:13, 129:23, 130:8, 130:10, 130:17, 136:7, 152:16, 155:23, 156:7, 167:22, 175:8, 175:21, 191:4, 216:20
**comment** [1] - 232:21
**commit** [4] - 171:5, 180:2, 227:16, 227:18
**committed** [5] - 73:6, 175:17, 176:2, 180:2, 189:19
**common** [1] - 167:21
**communicate** [1] - 9:6
**communicated** [1] - 92:5
**communication** [1] - 97:12
**communications** [3] - 96:9, 97:10, 97:15
**Comottor** [1] - 4:10
**Comottor's** [1] - 89:18
**comparable** [1] - 180:7
**compared** [2] - 163:15, 235:8
**complaining** [1] - 110:9
**complete** [2] - 126:4, 228:17
**completely** [10] - 82:23, 128:22, 158:20, 159:20, 163:11, 165:2, 181:11, 191:22, 229:20
**complex** [1] - 146:21
**comports** [1] - 176:12
**concede** [3] - 166:8, 173:13, 200:17
**conceded** [2] - 169:1, 232:6
**concedes** [1] - 169:10
**conceding** [1] - 200:9
**concentrating** [1] - 66:14
**concept** [1] - 127:7
**concern** [6] - 119:4, 124:7, 124:21, 124:25, 126:7, 207:23
**concerned** [3] - 10:19, 120:4, 135:17
**concerning** [2] - 29:7, 29:10
**concerns** [4] - 104:17, 105:2, 124:12, 217:7
**concert** [1] - 147:11,

148:1
**concluded** [2] - 226:6, 241:24
**conclusion** [2] - 167:13, 195:21
**conclusions** [1] - 167:15
**conditions** [1] - 239:4
**conduct** [32] - 107:19, 113:22, 117:8, 118:6, 125:9, 125:10, 125:13, 125:16, 125:19, 126:9, 130:23, 131:15, 150:10, 151:16, 152:8, 169:24, 169:25, 172:17, 176:12, 177:22, 181:7, 200:10, 215:10, 215:23, 217:17, 218:21, 219:3, 219:4, 225:18, 229:25, 231:22, 235:13
**conference** [2] - 237:13, 241:18
**confess** [1] - 111:25
**confident** [2] - 111:1, 124:5
**confidently** [1] - 120:11
**confirm** [1] - 123:16
**confirmed** [1] - 171:25
**conflict** [2] - 154:16, 186:7
**confrontation** [1] - 203:19
**congressional** [1] - 164:6
**congressmen** [1] - 33:9
**conjunction** [1] - 160:9
**connect** [2] - 185:4, 185:5
**conscious** [2] - 181:16, 195:9
**consciously** [2] - 189:19, 189:25
**consider** [2] - 80:20, 209:11
**considered** [2] - 166:8, 182:17
**considering** [1] - 103:16
**consistent** [5] - 85:4, 164:12, 193:13, 216:14, 230:12
**consistently** [1] -

116:8
**constitutes** [1] - 154:3
**construction** [3] - 22:11, 22:16, 22:19
**constructive** [1] - 182:11
**consult** [1] - 111:19
**contact** [9] - 113:16, 114:18, 125:22, 137:16, 153:23, 169:1, 169:10, 227:19, 227:20
**contemporaneous** [2] - 177:11, 177:17
**contemporaneously** [1] - 91:12
**contends** [1] - 220:10
**content** [1] - 96:24
**contention** [1] - 107:23
**contents** [1] - 94:16
**context** [4] - 103:12, 130:25, 136:23, 146:22
**contexts** [1] - 144:11
**contextually** [1] - 157:18
**continuation** [1] - 129:10
**continue** [7] - 40:12, 135:5, 135:15, 135:16, 191:13, 192:16, 214:18
**continued** [1] - 226:17
**continues** [2] - 141:5, 189:8
**continuing** [2] - 215:5, 220:19
**contradict** [1] - 105:16
**contrary** [4] - 163:16, 176:9, 178:21, 195:11
**control** [2] - 133:3, 223:13
**contusion** [3] - 162:10, 165:11, 165:17
**convenient** [1] - 163:20, 163:24, 174:16, 176:18, 178:4, 179:2
**conveniently** [2] - 172:14, 174:22
**converge** [1] - 127:14
**conversation** [5] - 94:18, 94:21, 95:5, 95:9, 110:5
**convict** [3] - 152:3, 217:2, 225:24
**convicting** [1] - 217:5

**cool** [2] - 8:16, 188:11
**cop** [2] - 53:1
**cops** [2] - 54:6, 65:10
**copy** [1] - 91:12
**copying** [1] - 69:20
**corner** [5] - 134:1, 134:2, 134:4, 158:11, 160:3
**Corps** [1] - 197:12
**correct** [46] - 6:5, 18:4, 50:11, 78:21, 79:13, 80:8, 81:2, 81:5, 81:8, 82:6, 85:12, 85:15, 85:19, 85:23, 86:1, 86:2, 86:19, 88:6, 89:4, 94:11, 94:16, 97:8, 99:17, 109:1, 118:25, 120:7, 121:23, 136:11, 136:12, 136:17, 137:22, 141:2, 143:9, 150:3, 151:25, 162:25, 165:12, 182:21, 182:22, 193:22, 226:13, 228:9, 230:11, 239:23
**correctly** [2] - 61:12, 204:14
**correspondence** [1] - 93:9
**corroborated** [1] - 119:18
**corroborates** [1] - 222:25
**corruptly** [3] - 108:3, 108:7, 196:7
**coughing** [1] - 175:7
**counsel** [21] - 4:5, 4:8, 4:9, 84:21, 105:19, 105:24, 106:20, 164:4, 201:7, 228:16, 228:19, 229:4, 229:7, 229:14, 229:18, 229:24, 230:16, 232:2, 232:12, 236:21, 237:15
**counsel's** [4] - 233:25, 235:3, 235:18, 238:6
**Count** [60] - 100:5, 101:23, 110:16, 110:19, 110:23, 113:13, 114:1, 114:17, 115:20, 118:20, 121:19, 121:25, 123:10, 124:16, 125:12, 125:21, 125:22,

126:1, 126:4, 126:11, 126:14, 127:5, 127:12, 129:11, 131:20, 138:17, 138:18, 138:24, 149:4, 149:5, 150:2, 150:3, 150:4, 150:6, 151:1, 151:3, 151:8, 151:17, 152:7, 157:18, 182:10, 182:24, 183:5, 199:22, 200:1, 206:5, 207:2, 212:19, 213:22, 217:12, 218:19, 220:5, 222:9, 223:14, 232:10, 235:17
**count** [33] - 112:20, 113:14, 117:5, 119:24, 121:20, 123:16, 123:23, 127:13, 128:7, 128:10, 129:3, 131:17, 131:21, 131:23, 149:5, 151:18, 155:19, 157:18, 164:21, 168:24, 171:9, 172:1, 172:7, 176:17, 188:2, 189:10, 196:4, 206:20, 217:2, 220:13, 223:17, 227:17
**counted** [1] - 17:21
**counter** [11] - 201:3, 202:19, 203:5, 208:7, 215:11, 216:10, 221:7, 221:20, 223:20, 224:2, 224:10
**countless** [1] - 212:6
**country** [3] - 173:24, 179:2, 188:19
**counts** [19] - 110:17, 112:18, 112:23, 114:20, 119:16, 125:1, 125:20, 126:6, 126:11, 182:8, 190:3, 195:25, 200:18, 208:3, 208:4, 227:1, 236:1, 240:24, 241:2
**Counts** [1] - 225:10
**couple** [7] - 6:10, 8:1, 152:23, 161:17, 182:7, 183:1, 213:19
**course** [14] - 89:22,

90:2, 116:10,
135:21, 140:5,
145:2, 145:13,
162:13, 164:20,
201:13, 216:11,
231:20, 234:4, 239:5
**court** [4] - 100:10,
167:12, 226:9,
238:17
**Court** [46] - 83:9, 85:1,
85:4, 96:3, 103:6,
105:16, 105:18,
106:14, 106:15,
108:6, 112:4,
149:11, 156:9,
163:23, 166:23,
167:12, 169:19,
173:17, 174:14,
183:2, 184:4,
184:18, 185:23,
186:23, 188:6,
188:18, 189:11,
189:15, 191:7,
192:18, 194:12,
195:22, 195:24,
201:18, 206:24,
217:2, 218:10,
218:23, 220:16,
225:20, 226:9,
226:10, 235:16,
241:1, 241:13,
241:19
**COURT** [278] - 4:11,
4:15, 4:19, 4:25,
16:4, 40:2, 40:10,
40:12, 59:7, 59:19,
59:21, 60:8, 72:8,
72:12, 76:7, 78:6,
78:8, 78:11, 79:9,
79:15, 81:15, 83:3,
83:22, 83:25, 84:3,
84:6, 84:9, 84:13,
85:6, 90:14, 92:14,
92:16, 92:19, 92:21,
92:24, 93:2, 93:11,
93:15, 93:19, 93:22,
95:21, 95:23, 96:1,
96:5, 97:16, 97:19,
97:23, 98:1, 98:3,
98:5, 98:13, 98:20,
98:23, 99:1, 99:5,
99:10, 99:13, 99:17,
99:20, 99:23,
104:20, 104:22,
104:24, 105:1,
105:4, 105:6, 105:8,
105:13, 105:21,
105:23, 106:3,
106:11, 106:17,
106:24, 107:10,
107:22, 108:9,

108:21, 109:11,
109:14, 109:25,
111:24, 112:6,
112:9, 112:12,
112:25, 113:7,
114:22, 118:12,
118:16, 118:23,
119:13, 119:25,
120:8, 121:4, 121:8,
121:18, 121:21,
121:24, 123:10,
123:13, 123:20,
123:22, 124:1,
124:4, 125:2,
129:17, 129:20,
130:5, 133:12,
134:19, 134:22,
135:9, 136:9,
136:14, 137:10,
137:13, 137:20,
140:25, 141:3,
142:2, 142:11,
142:14, 142:17,
142:22, 143:6,
144:2, 144:6, 144:9,
144:21, 144:23,
145:17, 146:9,
146:13, 147:4,
148:3, 148:12,
148:23, 149:2,
149:8, 149:19,
149:22, 149:25,
150:2, 150:21,
151:1, 151:7,
151:11, 151:14,
151:22, 152:1,
152:6, 153:10,
153:13, 155:13,
156:15, 156:20,
159:5, 160:20,
160:22, 161:9,
162:21, 163:2,
163:8, 165:6,
165:12, 165:19,
167:1, 167:7, 168:4,
168:22, 169:6,
169:15, 170:6,
171:8, 171:22,
176:23, 177:8,
178:8, 179:7,
181:13, 181:18,
181:21, 182:14,
182:19, 182:21,
182:23, 184:6,
184:12, 184:15,
185:7, 185:11,
186:7, 190:4,
190:15, 191:18,
192:9, 193:11,
193:20, 196:1,
196:5, 196:8,

196:10, 196:13,
196:15, 196:20,
196:24, 197:1,
199:10, 200:6,
200:16, 200:20,
201:20, 203:21,
204:14, 204:24,
205:2, 205:9,
205:12, 205:14,
207:4, 210:2,
210:18, 211:10,
213:11, 213:14,
213:18, 214:22,
214:25, 217:10,
219:12, 222:1,
222:11, 222:16,
223:15, 224:4,
224:7, 225:13,
226:11, 226:13,
227:2, 227:4,
227:23, 228:6,
228:12, 230:8,
230:12, 231:10,
232:3, 233:9,
233:19, 237:1,
237:12, 237:17,
237:19, 237:21,
237:24, 238:2,
238:8, 238:11,
238:14, 238:16,
238:18, 238:23,
238:25, 239:2,
239:10, 239:19,
239:22, 239:24,
240:6, 240:9,
240:14, 240:20,
241:5, 241:10,
241:15, 241:20
**Court's** [5] - 92:11,
93:1, 199:23, 209:2,
223:19
**courtroom** [1] -
241:19
**COURTROOM** [1] -
4:2
**courts** [3] - 103:8,
166:18, 167:14
**covered** [2] - 185:8,
204:5
**coward** [1] - 102:23
**Crawford** [1] - 100:12
**craziness** [1] - 175:5
**crazy** [7] - 38:1, 76:21,
79:23, 81:25, 160:8,
175:21, 180:6
**create** [1] - 208:1
**created** [2] - 9:10,
150:14
**creates** [1] - 140:6
**credibility** [4] - 181:8,

188:24, 189:3, 190:6
**credible** [4] - 119:17,
166:23, 192:24,
215:21
**credibly** [5] - 115:16,
121:14, 212:22,
225:20, 241:1
**credit** [1] - 156:10
**crediting** [1] - 190:9
**crime** [8] - 169:2,
180:2, 189:13,
189:20, 227:15,
227:20, 239:14
**crimes** [2] - 171:5,
227:13
**Criminal** [1] - 4:2
**criminal** [1] - 166:14
**criminally** [2] - 219:2,
219:10
**cringing** [1] - 132:9
**critical** [2] - 87:10,
167:11
**cross** [11] - 4:20,
102:2, 109:10,
119:20, 121:16,
153:7, 164:5,
188:19, 193:25,
204:1, 204:6
**Cross** [1] - 3:4
**CROSS** [1] - 5:2
**cross-country** [1] -
188:19
**Cross-Examination**
[1] - 3:4
**cross-examination** [3]
- 4:20, 121:16, 153:7
**CROSS-
EXAMINATION** [1] -
5:2
**cross-examine** [4] -
102:2, 109:10,
164:5, 204:6
**cross-examined** [1] -
119:20
**cross-examining** [1] -
204:1
**crossbar** [1] - 122:22
**crossbeam** [1] - 57:10
**crossed** [1] - 18:5
**crowd** [59] - 12:24,
13:1, 13:15, 18:9,
18:13, 18:19, 18:24,
19:21, 19:25, 26:7,
26:9, 26:25, 27:3,
28:15, 32:5, 34:5,
36:16, 38:15, 43:2,
52:18, 65:11, 68:17,
69:13, 74:2, 74:24,
75:4, 75:14, 75:20,
117:21, 120:3,

137:6, 140:22,
140:23, 141:8,
141:19, 141:20,
143:17, 144:18,
144:20, 145:12,
145:14, 145:15,
145:17, 146:20,
148:6, 148:16,
157:4, 170:8,
183:12, 183:17,
183:22, 183:23,
202:7, 203:1,
206:17, 219:8,
221:2, 221:11
**crowds** [1] - 73:17
**crush** [1] - 221:16
**crushed** [7] - 131:16,
218:15, 218:17,
219:1, 221:17,
222:8, 223:4
**cry** [4] - 82:12, 82:15,
82:24, 187:4
**cry-type** [1] - 82:12
**crying** [1] - 175:20
**culpable** [2] - 219:2,
219:10
**curious** [2] - 76:17,
78:3
**current** [1] - 239:4
**cursing** [1] - 225:3
**custody** [4] - 89:7,
89:11, 89:16, 91:25
**cut** [2] - 111:3, 221:11
**Cutler** [1] - 192:7

## D

**D.C** [18] - 5:12, 5:20,
5:25, 6:4, 7:9, 7:10,
7:15, 8:8, 8:11,
11:19, 16:24, 80:22,
88:2, 108:5, 172:11,
172:19, 172:25,
194:9
**danger** [1] - 148:6
**dangerous** [28] -
113:2, 113:3,
136:15, 136:16,
136:25, 142:25,
144:5, 144:7, 148:2,
148:10, 150:22,
151:23, 160:24,
161:2, 161:8, 165:5,
165:15, 182:13,
182:18, 214:21,
223:9, 225:10,
227:21, 227:24,
228:1, 239:16,
239:20, 240:4
**daring** [1] - 25:1

date [4] - 88:10, 90:22, 90:24, 198:3
dawned [1] - 188:14
days [4] - 5:8, 7:21, 197:23, 199:17
daze [2] - 190:17, 190:18
deadly [21] - 136:14, 136:24, 142:25, 144:5, 144:6, 148:2, 148:10, 150:21, 151:23, 160:24, 161:2, 161:5, 161:8, 165:5, 165:15, 223:9, 225:10, 227:21, 227:25, 239:16, 239:20
deal [2] - 74:10, 112:4
deals [1] - 121:25
death [1] - 148:5
decertify [1] - 179:10
decide [1] - 62:3
decided [8] - 7:8, 13:15, 39:20, 47:5, 47:8, 99:18, 103:14, 180:21
deciding [2] - 110:13, 179:15
decision [7] - 20:12, 20:14, 24:1, 24:15, 99:14, 198:19, 226:12
decisions [1] - 194:5
decontaminate [1] - 34:24
Deedra [1] - 4:14
deemed [2] - 138:14, 138:15
deeper [1] - 220:14
defend [2] - 197:8, 197:9
defendant [60] - 103:1, 103:22, 104:4, 111:6, 115:2, 117:9, 131:1, 131:23, 132:25, 134:5, 134:15, 134:20, 135:17, 137:13, 137:20, 137:22, 143:8, 145:4, 145:8, 145:19, 146:6, 146:10, 146:12, 146:14, 147:14, 148:16, 149:13, 150:19, 154:21, 154:25, 157:19, 158:13, 162:17, 163:9, 164:5, 166:2, 166:13, 167:2,

167:20, 167:24, 168:7, 168:9, 169:1, 169:10, 170:1, 170:10, 170:22, 171:2, 171:7, 171:18, 173:15, 173:22, 173:23, 178:17, 181:6, 189:18, 190:10, 228:21, 231:22, 232:11
Defendant [93] - 3:9, 3:9, 94:2, 96:6, 101:24, 113:9, 113:13, 113:17, 113:21, 114:1, 115:21, 115:24, 116:12, 116:25, 117:12, 118:3, 118:22, 121:20, 121:25, 122:10, 122:12, 123:1, 123:6, 126:9, 126:12, 126:17, 127:9, 127:19, 127:22, 128:8, 128:10, 128:12, 128:20, 128:23, 128:24, 129:8, 130:16, 130:19, 130:23, 131:1, 131:11, 131:12, 131:21, 132:4, 132:5, 132:7, 132:16, 133:8, 134:1, 134:10, 135:3, 136:1, 136:22, 138:10, 138:19, 138:23, 139:5, 139:12, 139:17, 139:20, 140:11, 140:18, 141:14, 141:22, 142:4, 142:16, 142:21, 143:11, 143:14, 147:11, 149:7, 149:18, 151:16, 152:7, 155:7, 156:8, 161:22, 163:17, 164:15, 164:16, 164:20, 164:22, 164:25, 165:2, 165:23, 167:17, 167:18, 171:15, 172:2, 173:9, 175:7, 233:3, 233:16
DEFENDANT [6] - 4:24, 5:1, 99:12, 99:16, 99:19, 99:22
defendant's [12] -

103:13, 124:18, 144:19, 145:16, 146:17, 146:20, 147:23, 162:3, 166:9, 169:22, 170:17, 172:13
defendants [3] - 127:14, 180:3, 239:3
defending [5] - 139:11, 139:13, 139:17, 143:5, 154:13
Defense [5] - 92:12, 93:15, 95:19, 96:5, 224:9
defense [20] - 102:2, 102:15, 102:20, 102:25, 104:15, 105:19, 105:24, 111:6, 114:22, 121:12, 124:1, 164:4, 165:25, 168:16, 171:20, 185:8, 199:7, 199:8, 228:16, 228:18
defer [1] - 88:11
definitely [5] - 185:24, 186:5, 193:2, 193:18, 194:17
definition [2] - 108:3, 136:24
definitions [1] - 106:15
delay [1] - 91:21
delete [1] - 220:24
deliberately [1] - 221:15
deliberating [1] - 103:9
delivered [1] - 92:1
demeanors [1] - 194:12
denying [1] - 39:16
Department [4] - 93:25, 120:21, 120:25, 197:13
departs [1] - 174:2
depicted [1] - 220:8
depicting [1] - 56:17
depiction [1] - 202:13
deplorable [3] - 26:2, 26:23, 27:9
Deplorables [1] - 25:17
deplorables [2] - 25:21, 27:7
deployed [7] - 31:3, 34:20, 35:22, 47:16, 122:5, 157:20, 157:24

deployment [1] - 191:5
deployments [1] - 195:15
depression [2] - 72:20, 77:24
deprogram [1] - 195:14
deputy [1] - 241:19
DEPUTY [1] - 4:2
describe [4] - 72:12, 87:25, 114:8, 170:7
described [14] - 8:15, 11:20, 13:6, 18:9, 18:20, 60:16, 131:18, 140:6, 140:9, 167:10, 167:18, 202:1, 203:1, 220:21
describing [1] - 153:11
despite [7] - 35:19, 35:22, 175:25, 176:4, 176:5, 176:6, 218:2
detail [5] - 67:8, 71:7, 91:16, 95:8, 149:6
detention [1] - 213:24
deuce [2] - 178:24, 193:2
diagnosed [3] - 72:18, 73:1, 167:17
diagnosing [1] - 171:1
diagnosis [2] - 166:5, 166:24
difference [3] - 91:10, 196:2, 196:8
different [16] - 106:18, 120:22, 147:18, 159:24, 166:18, 168:8, 168:11, 172:4, 172:5, 179:18, 180:8, 180:9, 191:25, 229:21
differently [2] - 108:15, 168:2
differs [1] - 197:7
difficult [11] - 81:12, 138:15, 138:16, 170:3, 195:10, 195:14, 201:9, 203:23, 203:25, 206:1, 206:11
difficulty [2] - 144:21, 176:23
digging [2] - 232:23, 233:6
digital [1] - 89:22
diminished [1] -

228:17
direct [9] - 27:21, 134:14, 161:23, 162:4, 162:7, 163:15, 209:2, 223:19, 239:2
directed [1] - 213:2
directing [1] - 185:21
direction [7] - 23:11, 144:24, 145:14, 145:18, 145:20, 174:16, 216:20
directions [1] - 143:18
directly [11] - 123:1, 127:10, 128:3, 132:2, 132:10, 153:24, 173:9, 174:3, 202:3, 202:22, 220:16
dirty [2] - 178:24, 193:2
disability [1] - 189:6
disadvantage [1] - 132:19
disagree [10] - 59:7, 108:12, 155:13, 168:23, 196:6, 199:23, 200:10, 200:21, 207:4, 207:5
disagreed [3] - 107:3, 107:5, 144:11
disagreeing [1] - 200:7
disappear [1] - 69:2
disappointment [2] - 226:6, 226:14
disclosure [1] - 84:19
discredit [1] - 222:20
discrepancy [1] - 101:16
discretion [3] - 100:10, 100:24, 103:8
discuss [2] - 149:6, 151:17
discussed [3] - 149:12, 189:12, 239:15
discussing [3] - 200:18, 224:22, 228:7
discussion [3] - 89:3, 89:6, 177:12
disembodied [1] - 204:19
dislodged [2] - 162:14, 214:18
disorder [3] - 107:10, 111:5, 111:16
disorderly [2] - 113:2,

150:9
**disproportionate** [1] -
182:3
**disputing** [1] - 57:24
**disruptive** [2] -
150:10, 180:23
**dissatisfaction** [1] -
198:16
**distance** [1] - 126:6
**distinct** [2] - 125:11,
126:9
**distinction** [1] -
125:25
**distinctive** [1] -
208:17
**distinguish** [2] -
125:18, 125:20
**distress** [6] - 117:4,
185:16, 185:20,
229:14, 229:17
**distressful** [1] - 82:8
**distressing** [1] - 194:5
**district** [1] - 100:10
**District** [1] - 41:2
**disturbance** [1] -
160:7
**ditches** [1] - 174:2
**divergent** [1] - 143:18
**divided** [1] - 197:5
**docilely** [1] - 203:19
**doctor** [4] - 162:9,
162:10, 167:22,
186:13
**document** [3] - 89:19,
91:1, 92:9
**documented** [1] -
88:16
**documenting** [1] -
45:7
**documents** [1] - 90:10
**done** [15] - 49:5, 67:4,
67:6, 67:7, 84:17,
104:11, 124:12,
124:25, 168:1,
189:20, 193:24,
195:15, 218:3,
218:19
**door** [37] - 50:9, 53:23,
54:2, 57:10, 61:14,
64:24, 76:4, 76:9,
122:13, 122:17,
122:19, 123:8,
126:16, 127:1,
127:2, 131:16,
133:18, 133:19,
133:20, 133:21,
133:23, 133:24,
135:18, 136:19,
153:3, 164:23,
183:19, 213:23,

214:5, 214:6,
214:12, 214:18,
218:15, 218:17,
219:1
**doors** [10] - 122:9,
122:11, 123:3,
174:7, 214:7, 214:8,
216:12, 216:16,
216:21
**doorway** [1] - 31:10
**double** [1] - 124:11
**double-jeopardy** [1] -
124:11
**doubt** [27] - 42:15,
42:19, 119:20,
188:2, 189:18,
192:22, 198:13,
199:8, 199:13,
199:20, 204:8,
204:23, 205:8,
206:21, 206:25,
209:23, 210:16,
211:2, 212:18,
215:9, 216:7,
216:23, 217:16,
221:14, 225:8,
225:17, 226:23
**doubts** [1] - 197:18
**DOUENAT** [42] - 4:12,
76:5, 78:13, 79:6,
79:7, 79:10, 79:16,
81:16, 83:4, 83:21,
84:2, 105:5, 105:12,
112:8, 181:20,
181:22, 182:17,
182:20, 182:24,
183:14, 184:1,
184:8, 184:14,
184:17, 185:9,
185:12, 186:10,
190:13, 190:16,
191:24, 192:13,
193:17, 193:22,
196:4, 196:7, 196:9,
196:11, 196:14,
237:9, 239:1, 241:8,
241:13
**Douenat** [14] - 4:13,
78:11, 83:25, 105:4,
105:11, 105:14,
107:24, 108:2,
112:7, 181:19,
184:16, 237:5,
238:25, 241:6
**Douenat's** [1] - 105:10
**Douenat............** [1] -
3:5
**Douenat...................
...............** [1] - 3:13
**down** [29] - 23:10,

45:24, 52:14, 53:3,
59:14, 60:3, 60:4,
66:3, 71:23, 83:22,
88:3, 88:18, 89:15,
91:20, 98:6, 108:6,
159:1, 159:7, 180:4,
191:2, 195:4,
209:16, 210:11,
220:25, 226:12,
230:13, 231:5,
232:17, 233:15
**downstairs** [1] - 88:1
**dozens** [1] - 201:11
**Dr** [11] - 165:23, 166:5,
166:7, 185:5,
185:14, 192:7,
195:13, 228:14,
229:6, 229:9, 229:19
**dragged** [3] - 140:22,
141:6, 141:8
**draw** [1] - 120:3
**drinking** [1] - 36:21
**drive** [5] - 5:25, 7:9,
8:1, 10:2, 188:19
**drives** [1] - 179:2
**driving** [3] - 8:21,
9:12, 180:12
**drop** [5] - 68:10,
68:12, 68:13,
128:16, 159:14
**dropped** [9] - 55:4,
55:14, 67:2, 67:4,
104:4, 159:1, 159:6,
231:4
**dropping** [1] - 230:6
**drove** [5] - 88:2,
88:18, 89:15, 91:20,
172:11
**DSM** [1] - 167:11
**dubious** [1] - 111:11
**duck** [2] - 143:14,
214:20
**ducked** [1] - 139:21
**ducking** [4] - 142:5,
143:19, 215:15,
215:18
**ducks** [1] - 230:13
**due** [3] - 103:23,
207:11, 241:9
**duplicitous** [1] - 124:9
**duplicity** [3] - 124:12,
207:24, 208:2
**during** [22] - 13:21,
61:25, 103:23,
117:8, 118:6,
120:19, 121:6,
129:23, 130:11,
130:17, 135:10,
145:12, 166:1,
171:17, 173:5,

173:8, 182:15,
188:25, 193:7,
223:1, 229:8, 236:8
**duties** [1] - 209:22
**duty** [1] - 197:19
**duty-bound** [1] -
197:19

---

# E

**early** [7] - 11:22,
11:24, 125:10,
150:17, 200:21,
227:6, 228:7
**ease** [1] - 92:11
**easier** [1] - 195:9
**easily** [1] - 205:19
**Eastman** [1] - 178:12
**Edgar** [1] - 4:13
**edge** [2] - 24:25, 25:8
**educated** [1] - 226:1
**education** [1] - 166:21
**effect** [5] - 98:18,
101:3, 101:25,
117:6, 199:4
**effective** [3] - 121:16,
122:23, 135:23
**effectively** [1] - 136:5
**effects** [3] - 77:17,
131:9, 152:16
**effing** [1] - 51:4
**effort** [4] - 102:7,
140:10, 195:9,
216:15
**efforts** [4] - 122:2,
137:7, 174:9, 224:16
**eight** [1] - 225:1
**either** [15] - 56:9,
103:24, 111:6,
122:22, 140:21,
150:6, 160:25,
161:11, 177:9,
178:7, 191:7,
195:20, 213:17,
229:6, 240:25
**election** [19] - 14:11,
14:16, 14:19, 17:2,
17:17, 17:18, 17:19,
25:25, 79:23, 80:6,
173:11, 176:3,
179:5, 179:9,
180:17, 197:17,
197:18, 198:7, 226:3
**Electoral** [2] - 198:5,
198:20
**element** [9] - 110:8,
113:4, 144:3, 144:4,
150:9, 150:19,
182:11, 207:10,
227:25

**elements** [12] -
103:17, 105:9,
105:10, 105:15,
105:25, 106:1,
106:9, 107:25,
110:13, 196:2,
234:16, 234:23
**elicit** [1] - 108:17
**elicited** [2] - 163:16,
169:9
**Ellipse** [4] - 98:12,
187:17, 191:14,
198:24
**email** [1] - 93:9
**emailed** [1] - 88:23
**emblematic** [2] -
197:10, 199:11
**emphatically** [1] -
175:13
**employed** [2] - 41:1,
41:4
**encompassed** [1] -
147:12
**encompassing** [1] -
156:23
**encourage** [1] -
126:12
**encouraged** [1] -
102:18
**end** [7] - 16:20, 25:17,
47:24, 135:7,
190:11, 226:4, 235:4
**ended** [1] - 77:1
**enemy** [1] - 167:21
**enforcement** [9] -
41:1, 101:13,
101:23, 122:2,
122:11, 122:24,
123:25, 193:10,
224:22
**enforcement's** [1] -
123:2
**enforcement-issued**
[1] - 122:11
**engaged** [5] - 200:4,
215:10, 219:21,
219:23, 225:17
**engaging** [4] - 217:16,
218:20, 223:11,
234:9
**enhanced** [1] - 131:22
**enhancements** [1] -
150:25
**enter** [4] - 22:18,
127:8, 151:20, 241:1
**entered** [4] - 115:24,
152:9, 152:12,
152:13
**entering** [2] - 131:8,
188:25

**enters** [3] - 118:19, 152:20, 183:11
**enthusiast** [1] - 70:11
**entire** [10] - 58:12, 58:14, 137:20, 139:5, 140:6, 160:6, 216:22, 223:23, 236:4, 236:5
**entirely** [1] - 158:16
**entrance** [7] - 27:15, 27:18, 31:3, 33:8, 81:3, 175:11, 194:16
**entryway** [2] - 28:18, 34:15
**environment** [1] - 170:21
**episode** [7] - 166:1, 166:2, 170:10, 228:22, 228:25, 229:5, 229:8
**equally** [1] - 215:6
**equipment** [1] - 160:14
**error** [1] - 102:9
**especially** [11] - 96:4, 103:17, 109:18, 111:9, 116:3, 124:5, 133:5, 134:18, 138:5, 138:25, 157:15
**essentially** [8] - 133:25, 143:11, 159:23, 171:21, 172:17, 174:2, 236:3, 236:5
**establish** [1] - 198:12
**established** [2] - 87:17, 170:3
**establishes** [1] - 150:12
**evening** [1] - 88:5
**event** [2] - 8:11, 75:10
**events** [5] - 175:22, 197:2, 197:8, 198:2, 211:25
**eventually** [10] - 8:3, 11:19, 14:5, 14:6, 18:14, 18:21, 45:10, 61:4, 145:5, 147:3
**evidence** [83] - 51:17, 72:6, 84:4, 89:22, 92:17, 94:2, 96:6, 100:4, 101:5, 101:10, 102:8, 102:11, 102:16, 102:17, 103:1, 103:3, 104:2, 104:6, 104:9, 104:12, 108:20, 111:13, 112:20, 113:25,

116:14, 120:10, 121:7, 124:15, 124:18, 130:22, 144:17, 147:7, 149:12, 153:18, 153:23, 155:16, 155:21, 158:5, 158:17, 158:21, 158:22, 159:21, 162:7, 162:23, 163:13, 163:15, 163:16, 171:24, 176:10, 176:24, 178:16, 178:22, 179:11, 179:20, 180:7, 180:16, 183:1, 187:13, 187:14, 187:18, 187:21, 188:1, 188:3, 189:5, 192:21, 195:22, 198:8, 198:24, 206:19, 208:20, 209:11, 213:21, 215:6, 217:12, 222:12, 226:21, 228:20, 228:25, 229:19, 233:23, 235:13, 235:14
**ex** [1] - 237:11
**exact** [5] - 87:5, 96:22, 117:17, 125:7, 139:16
**exactly** [14] - 11:9, 51:17, 59:15, 66:4, 90:22, 92:1, 107:11, 161:12, 163:6, 167:13, 190:11, 213:3, 213:8, 238:15
**exaggerate** [1] - 164:2
**Examination** [3] - 3:4, 3:5, 3:6
**examination** [5] - 4:20, 121:16, 153:7, 161:23, 162:4
**EXAMINATION** [3] - 5:2, 78:12, 85:9
**examine** [4] - 102:2, 109:10, 164:5, 204:6
**examined** [1] - 119:20
**examiner** [3] - 88:13, 88:19, 88:21
**Examiner** [11] - 89:4, 89:20, 89:21, 90:3, 92:5, 93:6, 94:15, 94:22, 95:2, 95:10, 96:14
**examiners** [5] - 87:4, 87:24, 88:3, 88:24, 96:25

**examining** [4] - 65:24, 67:8, 67:9, 204:1
**example** [12] - 9:16, 103:21, 124:16, 125:13, 141:14, 146:23, 152:3, 152:5, 166:9, 167:20, 229:15, 234:17
**examples** [1] - 204:3
**except** [8] - 54:1, 76:25, 79:17, 79:18, 172:18, 188:22, 193:2, 215:8
**exchanged** [1] - 7:2
**excited** [1] - 240:12
**exclaim** [1] - 135:12
**excusable** [2] - 170:4, 170:7
**excuse** [16] - 32:1, 94:21, 118:21, 123:2, 125:15, 129:25, 137:16, 148:11, 168:5, 201:2, 203:5, 213:2, 214:3, 218:20, 225:14, 231:4
**excused** [1] - 83:24
**excusing** [1] - 195:17
**exercise** [1] - 100:24
**exerted** [1] - 138:23
**exhausted** [1] - 135:13
**Exhibit** [67] - 3:9, 3:9, 6:24, 15:12, 19:5, 24:20, 28:8, 48:17, 49:23, 62:23, 65:16, 67:19, 69:5, 70:2, 92:12, 93:16, 94:2, 95:19, 96:6, 115:1, 116:19, 117:1, 117:15, 119:1, 123:5, 125:15, 125:17, 127:15, 128:1, 131:6, 132:15, 133:5, 134:5, 134:7, 137:25, 139:1, 139:19, 140:14, 153:1, 155:22, 156:4, 157:16, 158:13, 159:22, 164:24, 168:12, 168:19, 200:24, 200:25, 202:19, 203:5, 208:7, 211:15, 212:23, 216:9, 217:18, 217:19, 220:12, 221:6, 221:19,

223:20, 224:1, 224:9, 224:10, 233:13, 236:4
**exhibit** [8] - 115:1, 134:9, 206:8, 206:19, 217:20, 220:13, 236:7, 241:21
**exhibits** [8] - 98:10, 112:23, 114:18, 115:18, 130:22, 137:23, 239:7, 241:22
**Exhibits** [3] - 3:8
**exits** [1] - 126:23
**expansion** [1] - 228:17
**expect** [2] - 96:15, 191:22
**expectation** [1] - 197:24
**expected** [3] - 83:12, 83:16, 94:15
**expeditious** [1] - 112:17
**expeditiously** [1] - 102:19
**expelled** [1] - 148:19
**experience** [6] - 46:16, 46:18, 73:24, 148:7, 166:21, 170:19
**experienced** [1] - 148:22
**experiencing** [1] - 61:25
**expert** [6] - 103:22, 106:3, 166:7, 227:11, 229:1
**expert's** [1] - 89:25
**expertise** [2] - 166:20, 227:12
**explain** [10] - 59:16, 82:13, 104:6, 113:21, 126:3, 182:7, 182:25, 192:14, 195:13, 218:23
**explained** [8] - 120:21, 121:10, 122:21, 135:14, 136:19, 192:14, 218:13, 225:20
**explaining** [1] - 102:24
**explanation** [4] - 101:4, 102:4, 216:2, 233:17
**express** [2] - 180:24, 226:14

**expressed** [2] - 144:15, 207:24
**expressing** [1] - 226:5
**expression** [1] - 198:16
**extended** [2] - 50:21, 235:11
**extensive** [1] - 179:19
**extensively** [1] - 96:3
**extent** [2] - 106:7, 239:8
**extra** [1] - 11:22
**extracted** [1] - 94:14
**extraction** [3] - 94:12, 96:21, 96:24
**extreme** [2] - 7:17, 62:1
**eye** [5] - 197:7, 205:18, 209:25, 214:2, 223:6
**eyes** [8] - 30:13, 34:25, 36:20, 37:22, 38:8, 126:25, 218:3
**eyesight** [1] - 174:16

## F

**F.2d** [1] - 100:17
**F.3d** [6] - 100:13, 100:14, 100:16, 100:18, 102:23, 189:14
**face** [41] - 30:7, 38:2, 38:9, 56:8, 61:4, 61:8, 64:4, 66:2, 66:7, 66:13, 71:12, 126:1, 126:19, 128:4, 129:14, 129:24, 131:3, 132:9, 138:1, 138:4, 138:24, 140:23, 156:7, 159:17, 159:18, 160:16, 163:9, 163:14, 163:24, 164:3, 164:16, 165:8, 170:2, 175:8, 179:21, 217:20, 217:25, 228:23, 229:8, 233:10
**face-to-face** [1] - 126:1
**Facebook** [2] - 188:4, 192:19
**facilitated** [2] - 141:17, 145:7
**facilitates** [1] - 146:25
**facilitating** [1] - 133:8
**facing** [5] - 134:20, 135:3, 158:18,

164:16, 166:13
**fact** [51] - 6:13, 35:19,
45:13, 48:13, 59:24,
77:20, 78:19, 79:17,
79:19, 101:7,
103:18, 115:9,
118:4, 119:11,
119:18, 123:8,
124:14, 124:18,
141:7, 149:15,
154:11, 159:25,
162:7, 166:4,
169:24, 170:4,
171:3, 172:22,
174:17, 176:5,
176:6, 177:1,
180:20, 181:6,
186:24, 195:17,
207:15, 208:17,
208:23, 211:7,
212:8, 218:3, 226:1,
226:2, 227:20,
230:24, 232:6,
233:4, 235:19,
235:23
**fact-finder** [1] - 101:7
**factor** [2] - 102:21,
169:12
**factors** [3] - 100:23,
101:2, 170:18
**facts** [2] - 138:19,
170:2
**failed** [5] - 200:14,
212:21, 226:16,
226:22
**failing** [1] - 101:4
**fails** [2] - 176:11,
216:5
**failure** [1] - 110:8,
240:25
**fair** [2] - 81:9, 85:18
**fall** [4] - 59:11, 151:24,
195:2, 225:11
**falls** [3] - 59:13,
136:24, 184:8
**familiar** [4] - 26:22,
92:2, 119:15, 213:24
**fan** [1] - 70:18
**Fanone** [14] - 140:15,
140:22, 141:1,
141:9, 141:20,
142:12, 146:23,
147:2, 148:7,
224:17, 236:14,
236:17, 236:20,
236:21
**Fanone-type** [1] -
148:7
**far** [9] - 5:13, 116:15,
124:2, 146:4,

148:14, 182:24,
188:3, 189:10,
196:11
**Farina** [5] - 127:15,
127:16, 132:14,
184:21, 185:24
**fashion** [1] - 103:21
**fast** [1] - 67:16
**fatal** [2] - 110:9, 161:7
**favor** [1] - 216:4
**favorite** [2] - 199:9,
203:10
**FBI** [7] - 85:19, 85:22,
86:18, 92:3, 93:23,
96:3, 179:21
**FBI's** [1] - 90:1
**fear** [1] - 167:21
**Federal** [1] - 204:1
**Federico** [9] - 4:4,
4:17, 130:3, 197:9,
197:11, 198:9,
204:8, 231:15,
236:16
**feelings** [1] - 85:7
**feet** [5] - 33:2, 157:12,
176:19, 176:20
**fell** [2] - 56:20, 231:1
**fellow** [2] - 32:11,
236:9
**felony** [6] - 107:12,
107:20, 107:21,
150:8, 227:16,
227:19
**felt** [10] - 60:6, 62:19,
66:18, 74:16, 74:20,
81:19, 83:15,
186:24, 197:19
**fencing** [1] - 150:16
**few** [14] - 21:4, 64:14,
69:6, 72:18, 84:11,
102:14, 117:15,
128:1, 137:25,
141:12, 148:14,
208:24, 230:5,
231:12
**Field** [1] - 88:2
**fifth** [2] - 102:11,
123:17
**Fifth** [2] - 100:19,
101:1
**fight** [16] - 20:20,
20:23, 21:3, 28:12,
28:14, 32:12, 38:12,
38:15, 135:16,
177:15, 177:17,
182:3, 190:12,
191:9, 191:10,
192:16
**fighting** [8] - 28:21,
35:13, 40:7, 40:23,

135:15, 160:8,
177:16, 235:11
**fights** [1] - 160:9
**figure** [3] - 71:19,
80:15, 106:12
**figured** [3] - 14:5,
17:25, 79:20
**film** [8] - 42:2, 54:9,
54:10, 54:12, 75:13,
75:16, 78:3, 158:8
**filmed** [1] - 45:7
**filming** [17] - 21:8,
21:10, 35:9, 51:20,
54:7, 58:12, 58:14,
75:11, 81:23,
152:11, 152:13,
158:7, 173:9, 174:4,
174:19
**filter** [3] - 87:6, 87:11,
87:16
**final** [1] - 107:2
**finally** [4] - 104:4,
122:4, 138:20,
236:14
**finder** [2] - 101:7,
103:17
**fine** [7] - 12:10, 63:25,
74:20, 107:2, 205:2,
241:13, 241:14
**finger** [1] - 49:14
**finish** [1] - 227:7
**finished** [1] - 149:4
**First** [2] - 180:25,
235:15
**first** [47] - 7:6, 58:24,
64:16, 68:4, 76:19,
78:22, 96:20, 97:5,
97:21, 101:14,
104:5, 105:16,
105:18, 106:1,
106:9, 106:16,
106:21, 107:16,
108:5, 110:4,
113:13, 115:24,
119:6, 126:23,
131:21, 133:20,
133:21, 133:22,
140:24, 142:3,
150:9, 151:17,
152:9, 154:13,
167:4, 179:3, 185:4,
186:18, 199:22,
208:16, 210:19,
212:1, 225:15,
228:20, 231:14,
231:25, 240:18
**Fisher** [1] - 108:3
**fist** [5] - 69:17, 181:15,
190:15, 191:21,
229:3

**fists** [1] - 234:8
**fits** [1] - 144:3
**five** [1] - 208:3
**flag** [1] - 63:3
**flashback** [11] -
186:11, 186:12,
186:14, 186:17,
189:25, 191:2,
192:5, 194:7,
229:18, 229:19,
229:20
**flashlight** [1] - 194:23
**flat** [1] - 48:19
**flew** [1] - 230:23
**flexibility** [1] - 104:3
**flight** [1] - 182:4
**flipped** [1] - 47:14
**floor** [9] - 24:16,
24:23, 56:3, 56:9,
56:12, 56:13, 56:15,
56:16, 58:25
**Florida** [1] - 237:17
**flow** [1] - 11:14
**flows** [1] - 140:8
**focus** [1] - 111:7
**focused** [11] - 12:24,
80:6, 110:19,
111:10, 139:11,
139:13, 139:16,
143:10, 143:24,
145:15, 217:12
**folks** [14] - 4:11, 4:15,
9:12, 13:21, 17:23,
18:22, 21:10, 21:11,
37:15, 112:9,
219:18, 219:21,
241:16, 241:23
**followed** [2] - 90:9,
100:25
**following** [6] - 90:3,
90:6, 94:7, 108:3,
158:7, 214:3
**food** [1] - 199:14
**foot** [2] - 33:8, 44:17,
73:25
**footage** [41] - 46:2,
54:24, 109:8, 114:2,
114:16, 115:10,
115:12, 116:3,
116:17, 116:18,
116:20, 117:21,
117:22, 118:8,
118:9, 118:18,
120:5, 120:17,
122:2, 123:4, 123:5,
126:10, 126:19,
126:20, 129:12,
130:15, 131:7,
131:24, 132:8,
132:13, 132:14,

133:17, 135:4,
135:13, 137:15,
151:20, 157:3,
157:8, 173:2, 183:6,
184:19
**footing** [1] - 139:9
**force** [16] - 114:8,
114:12, 117:6,
132:21, 132:25,
133:6, 133:8, 136:7,
136:22, 137:8,
138:13, 139:8,
139:22, 142:25,
143:3
**forceful** [1] - 113:22
**forcefully** [5] - 115:4,
115:8, 116:15,
130:24, 141:15
**forcible** [3] - 128:25,
147:15, 154:1
**forcibly** [4] - 123:18,
128:10, 132:10,
202:1
**forecast** [1] - 7:10
**forefront** [1] - 116:12
**forever** [4] - 62:20,
80:16, 81:19, 197:6
**forget** [2] - 121:21,
178:13
**forgive** [3] - 199:8,
204:4, 221:8
**forgot** [4] - 7:20, 7:21,
105:8, 239:12
**form** [1] - 99:20
**formal** [1] - 103:20
**formed** [3] - 180:11,
180:14, 180:18
**former** [7] - 12:25,
14:1, 173:4, 173:8,
173:11, 179:4,
197:15
**Forrester** [15] -
117:19, 118:10,
126:2, 127:22,
128:15, 129:2,
130:10, 131:18,
154:6, 156:6, 157:8,
217:13, 217:24,
218:5
**Forrester's** [4] -
118:1, 127:21,
128:4, 129:14
**forth** [4] - 115:6,
115:19, 129:24,
168:6
**forward** [9] - 4:5,
74:21, 145:24,
146:1, 146:3,
158:18, 159:21,
223:24, 237:25

**forwards** [1] - 219:9
**Foulds** [41] - 118:10,
127:2, 127:4, 129:2,
131:19, 132:3,
132:11, 132:17,
132:18, 133:9,
133:18, 133:21,
133:25, 134:4,
134:7, 134:12,
134:15, 135:4,
135:11, 137:2,
137:9, 137:13,
137:24, 138:3,
138:14, 151:4,
157:10, 171:11,
220:7, 220:10,
220:15, 220:17,
221:5, 221:16,
221:24, 222:7,
222:12, 222:15,
222:23, 223:7,
231:17
**Foulds'** [3] - 116:9,
134:9, 138:1
**foundation** [2] -
98:15, 98:16
**four** [8] - 126:18,
126:20, 134:17,
154:13, 194:21,
197:23, 199:13,
217:1
**Fourth** [2] - 100:15,
100:23
**fourth** [1] - 102:4
**frame** [35] - 55:9,
55:10, 55:17, 56:5,
56:14, 56:21, 57:13,
58:8, 58:9, 64:24,
116:14, 117:10,
131:16, 133:18,
133:20, 133:21,
133:23, 133:24,
135:18, 136:19,
153:3, 159:3,
215:17, 230:5,
230:20
**frames** [2] - 133:19,
158:23
**fraud** [3] - 174:20,
178:3, 226:3
**Freddie** [6] - 97:8,
97:23, 123:18,
130:2, 197:10,
197:11
**free** [3] - 57:19, 61:23,
164:14
**freedom** [3] - 43:2,
152:17
**fresh** [9] - 29:19, 48:7,
126:21, 131:12,

131:13, 217:1,
234:18, 234:21
**Friday** [1] - 96:9
**friend** [37] - 5:19,
78:16, 180:13,
187:15, 187:16,
206:17, 206:21,
209:4, 212:11,
212:15, 214:4,
214:8, 214:16,
216:13, 216:14,
218:7, 218:11,
219:2, 219:6,
219:24, 220:6,
221:4, 221:15,
221:23, 222:6,
222:7, 223:2, 223:8,
223:17, 224:15,
224:21, 225:2,
226:4, 226:19,
231:15, 236:15,
236:18
**friends** [2] - 35:10,
197:22
**front** [63] - 19:11,
29:5, 29:18, 38:8,
45:3, 50:16, 50:18,
50:19, 50:20, 56:2,
56:18, 57:22, 57:25,
66:2, 66:6, 66:7,
91:1, 115:11,
117:19, 118:3,
124:19, 127:20,
129:5, 129:9, 130:3,
130:24, 131:5,
131:14, 132:1,
132:21, 136:20,
138:8, 138:25,
145:25, 149:15,
152:20, 153:2,
155:24, 157:2,
157:6, 157:7,
157:13, 157:21,
158:2, 158:16,
158:19, 161:8,
162:10, 168:18,
175:25, 176:21,
183:18, 186:25,
209:4, 209:9,
211:23, 218:2,
219:7, 219:16,
220:16, 221:3,
221:10, 236:6
**Front** [3] - 114:7,
114:9, 160:17
**fuck** [3] - 41:19, 62:13,
71:24
**fucked** [1] - 191:10
**fucker** [3] - 58:18,
60:23, 229:13

**fucking** [4] - 29:19,
38:9, 38:12, 38:16
**full** [9] - 5:25, 23:19,
84:7, 84:11, 120:17,
126:10, 139:21,
144:12, 164:14
**full-time** [1] - 5:25
**fully** [4] - 17:23,
184:25, 186:12,
186:14
**Fulp** [25] - 3:5, 4:10,
84:12, 84:13, 85:11,
98:5, 101:22,
108:25, 109:4,
119:6, 119:9,
119:14, 119:18,
120:2, 120:11,
120:16, 121:14,
201:4, 201:6,
201:22, 205:3,
213:2, 213:6, 213:16
**Fulp's** [4] - 101:12,
102:1, 104:8, 108:12
**fun** [2] - 173:24, 176:4
**funding** [1] - 78:22
**funnel** [2] - 122:21,
127:7
**funny** [4] - 26:13,
26:15, 26:17, 27:6

## G

**gain** [1] - 138:20
**gained** [2] - 146:15,
235:12
**gaining** [2] - 87:18,
139:4
**game** [2] - 201:5,
201:13
**gap** [1] - 170:20
**gas** [41] - 29:6, 29:12,
30:14, 30:25, 31:2,
34:20, 39:10, 39:19,
39:21, 40:3, 40:4,
40:5, 47:17, 56:2,
56:17, 57:21, 57:25,
58:4, 60:16, 61:4,
61:8, 63:9, 77:12,
77:21, 111:2, 160:4,
160:5, 160:6,
161:20, 162:5,
162:16, 164:3,
170:8, 170:14,
171:4, 175:15,
182:2, 182:12,
229:9, 230:24
**gassed** [1] - 175:20
**gather** [2] - 226:8,
226:10
**gathered** [2] - 198:3,

199:1
**Gatorade** [3] - 126:25,
131:3, 175:8
**general** [11] - 11:11,
110:17, 169:2,
189:12, 189:16,
189:17, 189:22,
227:15, 227:20,
239:14, 240:4
**General** [2] - 168:22,
190:8
**generality** [1] - 188:3
**generally** [1] - 54:21
**gentleman** [5] -
203:16, 205:23,
205:25, 221:8, 221:9
**genuine** [1] - 216:3
**gesture** [4] - 69:20,
69:23, 232:8, 232:9
**GFT** [1] - 82:17
**Ghost** [2] - 191:19,
192:3
**girl** [1] - 54:3
**given** [8] - 52:23, 85:3,
101:11, 115:10,
164:6, 199:7,
210:22, 237:6
**glad** [2] - 211:15,
227:6
**glanced** [1] - 208:24
**glass** [2] - 54:10,
54:12
**goal** [1] - 216:20
**God** [11] - 41:24, 42:1,
42:3, 67:4, 67:6,
67:7, 201:21, 204:9,
232:21, 233:20
**goggles** [7] - 10:9,
10:11, 10:17, 11:3,
11:16, 177:20,
188:21
**Gonell** [25] - 109:1,
109:19, 109:20,
118:24, 119:5,
119:7, 119:10,
119:11, 119:16,
119:22, 120:12,
120:13, 120:21,
121:15, 124:17,
207:7, 207:15,
207:23, 208:11,
208:19, 208:22,
209:6, 213:6
**Gonell's** [2] - 119:3,
208:17
**Government** [16] -
127:15, 127:25,
131:6, 132:15,
139:1, 139:19,
140:14, 153:1,

155:22, 156:3,
159:22, 217:18,
217:19, 223:20,
233:12, 236:4
**government** [98] - 4:6,
84:7, 84:10, 84:19,
84:21, 84:24, 85:2,
92:19, 93:18, 98:10,
98:15, 100:3,
100:11, 101:15,
101:19, 101:21,
102:6, 102:10,
102:25, 103:16,
105:17, 106:2,
107:12, 108:14,
110:4, 110:7,
110:12, 111:23,
115:19, 130:13,
138:5, 151:9,
159:21, 176:25,
182:12, 183:3,
183:5, 183:21,
185:5, 185:17,
188:18, 189:17,
190:4, 192:17,
193:24, 194:22,
196:3, 198:8,
198:12, 198:20,
200:14, 201:14,
201:25, 202:9,
202:23, 203:12,
207:12, 207:14,
207:17, 208:10,
208:16, 208:18,
208:23, 209:20,
210:25, 211:3,
211:6, 211:17,
211:24, 212:19,
212:21, 213:5,
214:19, 215:24,
216:1, 216:4,
216:25, 217:8,
217:13, 217:19,
217:21, 218:7,
218:13, 218:22,
219:12, 220:5,
220:10, 221:14,
222:9, 225:16,
225:23, 226:16,
226:21, 227:5,
235:20, 237:21,
238:21, 239:11
**Government's** [23] -
6:23, 15:11, 19:5,
24:20, 28:7, 48:16,
49:22, 62:23, 65:15,
67:19, 69:4, 70:1,
200:24, 202:18,
203:4, 208:6,
211:15, 212:23,
220:12, 221:19,

222:4, 224:1, 224:10
**government's** [33] -
100:3, 100:21,
101:18, 102:4,
102:18, 103:3,
103:15, 103:23,
104:6, 104:7, 104:9,
104:13, 104:15,
105:10, 105:25,
110:9, 199:22,
201:13, 206:3,
206:8, 207:6,
209:19, 212:25,
213:1, 213:21,
215:8, 216:6, 221:6,
221:25, 223:17,
224:14, 224:23,
240:25
**grab** [10] - 52:10,
65:10, 139:23,
141:18, 145:7,
211:11, 211:18,
212:2, 212:8, 216:19
**grabbed** [8] - 52:9,
60:13, 65:8, 131:23,
131:24, 139:14,
155:15, 162:5
**grabbing** [3] - 64:4,
71:12, 212:1
**grabs** [7] - 155:25,
184:3, 184:9,
211:11, 211:12,
212:7, 236:19
**Graeson** [1] - 4:18
**grand** [9] - 207:9,
207:14, 207:18,
233:12, 236:4,
237:15, 238:3, 238:5
**granting** [2] - 101:3,
101:25
**grave** [2] - 141:25,
205:8
**great** [8] - 71:7, 121:8,
138:4, 138:22,
141:10, 141:24,
148:25, 238:11
**greatly** [1] - 197:7
**green** [39] - 113:23,
134:9, 138:4,
203:10, 203:13,
206:17, 206:21,
209:4, 209:5,
212:12, 214:4,
214:8, 214:16,
216:13, 216:14,
218:8, 218:11,
219:2, 219:7,
219:24, 220:6,
221:4, 221:15,
221:23, 222:6,

222:7, 223:2, 223:8,
223:10, 223:18,
223:23, 224:7,
224:15, 224:21,
225:2, 226:4,
226:19, 231:15,
236:16
**ground** [17] - 55:20,
56:20, 60:5, 60:14,
117:15, 139:4,
139:18, 139:22,
145:6, 146:15,
195:2, 205:4, 215:3,
230:22, 234:8,
235:12, 236:12
**Grounds** [9] - 18:5,
18:24, 19:7, 19:23,
73:25, 174:1,
187:15, 194:6, 226:5
**grounds** [3] - 150:10,
190:5, 195:20
**group** [3] - 8:20,
218:25, 221:3
**gruesome** [1] - 127:16
**grunting** [2] - 132:8,
234:7
**grunts** [1] - 138:25
**guards** [1] - 157:22
**guess** [25] - 7:11,
14:20, 32:9, 58:19,
69:24, 70:22, 82:3,
82:13, 91:12, 110:5,
113:1, 120:3,
133:12, 144:3,
148:3, 163:6,
163:16, 169:17,
169:18, 176:23,
183:15, 185:9,
193:11, 200:6, 224:9
**guide** [1] - 100:24
**Guillermo** [1] - 4:4
**guilty** [3] - 195:23,
211:5, 227:1
**guise** [2] - 158:3,
166:20
**gum** [1] - 233:17
**guy** [2] - 38:8, 70:20
**guys** [10] - 7:8, 9:25,
13:15, 34:10, 36:18,
41:17, 201:21,
204:9, 232:21,
233:20

## H

**Haha** [1] - 188:10
**half** [1] - 233:14
**hallway** [3] - 212:6,
218:25, 223:19
**hand** [57] - 24:12,

37:10, 37:12, 52:2,
52:5, 52:17, 53:12,
53:15, 53:17, 53:21,
59:4, 59:11, 61:1,
63:9, 63:13, 63:16,
63:22, 64:4, 64:5,
64:24, 67:23, 67:24,
70:7, 71:5, 71:10,
71:12, 71:23, 71:24,
72:11, 82:25, 83:5,
88:3, 115:1, 117:11,
125:23, 129:12,
139:2, 140:12,
143:12, 153:3,
153:4, 153:15,
159:6, 171:13,
183:8, 187:1,
190:19, 190:25,
195:3, 214:9,
216:19, 223:22,
230:19, 230:21,
231:2, 236:22
**handcuffs** [1] - 122:19
**handed** [7] - 35:6,
37:2, 72:9, 72:10,
108:6, 153:16,
226:12
**handing** [2] - 131:7,
190:20
**handle** [6] - 47:15,
124:9, 184:24,
194:18, 194:19,
240:11
**handles** [1] - 133:1
**handover** [1] - 89:20
**hands** [22] - 38:25,
57:19, 57:21, 58:1,
58:2, 58:5, 64:16,
66:25, 69:16, 70:9,
89:24, 89:25,
138:14, 183:23,
184:8, 188:21,
202:3, 202:16,
202:18, 203:19,
233:5, 233:8
**happy** [4] - 32:10,
74:17, 98:21, 109:22
**harassing** [1] - 225:3
**hard** [17] - 74:10, 75:6,
82:13, 96:11, 117:2,
133:12, 136:20,
138:7, 139:6,
143:21, 144:3,
145:4, 145:5,
195:11, 210:21,
212:18, 237:2
**hardest** [1] - 218:16
**Harvell** [19] - 113:15,
113:20, 114:10,
115:16, 200:2,

200:9, 202:2,
202:11, 202:24,
203:13, 203:15,
206:22, 220:21,
232:16, 232:20,
233:2, 233:6, 233:22
**Harvell's** [5] - 113:16,
114:15, 115:5,
201:14, 206:15
**hat** [12] - 117:3, 160:5,
195:5, 203:11,
209:4, 210:13,
230:9, 230:10,
230:13, 230:17,
230:23, 231:1
**hats** [1] - 201:11
**head** [39] - 9:14,
20:11, 25:9, 52:8,
126:2, 129:14,
129:24, 139:20,
142:5, 142:20,
143:12, 146:6,
155:24, 156:17,
159:16, 160:6,
160:11, 160:16,
161:5, 161:13,
161:25, 162:2,
162:10, 163:1,
164:19, 165:14,
165:17, 168:8,
168:14, 168:18,
189:1, 209:16,
210:11, 213:7
**head-to-head** [4] -
126:2, 142:20,
143:12, 146:6
**heading** [1] - 187:17
**hear** [50] - 4:20, 9:16,
29:18, 29:21, 30:24,
32:24, 32:25, 33:2,
33:15, 43:8, 43:16,
43:17, 47:1, 47:24,
77:20, 82:5, 98:21,
109:22, 116:20,
116:21, 117:11,
118:18, 126:19,
132:7, 133:6, 148:5,
155:3, 157:9, 164:8,
165:6, 173:2,
173:21, 176:20,
177:13, 178:8,
181:3, 185:15,
185:19, 185:20,
187:3, 188:16,
191:25, 193:6,
194:10, 204:20,
212:24, 229:10,
232:15, 232:16,
232:20
**heard** [92] - 9:9, 14:21,

20:9, 26:18, 43:21,
43:22, 48:5, 60:22,
62:10, 87:11, 98:17,
102:1, 106:17,
108:25, 109:19,
109:20, 113:20,
114:7, 114:10,
116:1, 116:9,
116:22, 117:19,
117:22, 117:25,
120:19, 122:14,
122:16, 124:14,
126:2, 126:25,
127:1, 127:22,
128:4, 128:12,
128:14, 128:18,
132:3, 132:24,
133:1, 135:12,
135:20, 135:21,
135:25, 136:2,
137:24, 139:25,
141:6, 141:11,
142:4, 143:2, 143:9,
152:14, 154:5,
154:6, 154:17,
157:9, 157:25,
159:11, 161:3,
161:5, 164:4,
164:11, 165:24,
165:25, 166:1,
166:18, 171:11,
171:12, 171:17,
172:6, 173:5, 173:6,
175:4, 175:13,
176:13, 178:18,
179:20, 180:16,
187:23, 187:24,
191:19, 192:7,
199:6, 201:18,
212:25, 225:4,
225:16, 228:16,
229:5, 234:3, 240:19
**hearing** [7] - 14:17,
17:22, 43:18, 77:6,
109:17, 213:24,
233:23
**hears** [1] - 179:4
**hearsay** [5] - 92:15,
108:14, 108:16,
108:17, 108:19
**heart** [1] - 193:21
**heave** [19] - 127:16,
128:21, 130:1,
130:9, 130:11,
130:17, 131:15,
137:7, 137:12,
138:6, 138:9,
138:12, 155:6,
156:13, 157:16,
206:22, 220:19,

235:18, 235:24
**heave-ho** [15] -
127:16, 130:11,
130:17, 131:15,
137:7, 137:12,
138:6, 138:9,
138:12, 155:6,
156:13, 157:16,
220:19, 235:18,
235:24
**heave-hoing** [3] -
128:21, 130:1, 130:9
**hefty** [3] - 160:5,
160:13
**heightened** [6] -
154:16, 184:25,
186:13, 194:15,
194:17
**heights** [3] - 25:2,
25:5, 25:7
**held** [4] - 52:11, 184:2,
238:17, 241:18
**hell** [3] - 38:2, 76:17,
215:7
**helmet** [16] - 119:3,
120:5, 120:24,
127:21, 129:15,
129:18, 129:19,
160:10, 160:11,
161:13, 161:14,
162:11, 162:12,
162:15, 208:12,
208:22
**helmets** [4] - 29:6,
29:12, 44:18, 77:10
**help** [32] - 46:23, 48:4,
54:4, 62:5, 64:12,
65:9, 76:18, 76:21,
76:24, 77:2, 77:5,
77:8, 93:2, 128:13,
128:16, 141:22,
147:9, 148:18,
178:6, 195:20,
203:22, 205:15,
205:19, 205:20,
205:22, 229:16,
232:12, 232:18,
234:25
**Help** [1] - 229:15
**helpful** [4] - 90:10,
90:11, 101:6, 202:14
**helping** [10] - 37:15,
46:19, 46:20, 46:24,
64:10, 64:13, 65:1,
76:15, 77:1, 131:11
**helps** [2] - 104:6,
196:20
**hiding** [1] - 181:10
**high** [2] - 25:4, 186:14
**highlight** [3] - 199:25,

229:7, 231:12
**highlighted** [1] -
149:10
**Hill** [1] - 4:9
**Hillary** [5] - 25:22,
26:1, 26:10, 26:22,
176:4
**himself** [21] - 8:19,
38:17, 117:20,
118:5, 119:8,
135:16, 139:12,
139:13, 139:17,
147:21, 152:19,
153:4, 153:11,
153:19, 173:18,
175:12, 178:25,
211:22, 221:15,
222:8, 228:21
**hindsight** [1] - 83:7
**history** [3] - 16:8,
16:16, 70:23
**hit** [47] - 23:13, 49:21,
52:8, 53:1, 53:16,
54:14, 54:15, 55:3,
55:20, 58:21, 59:3,
59:11, 59:13, 59:24,
60:6, 60:7, 60:12,
62:11, 66:22, 66:23,
71:3, 128:1, 155:14,
161:7, 161:12,
161:13, 161:21,
162:2, 162:22,
163:1, 163:23,
165:14, 168:7,
168:13, 168:17,
186:5, 186:9,
186:18, 186:20,
186:22, 186:25,
187:2, 189:3, 195:4,
231:4
**hits** [2] - 58:25, 230:14
**hitting** [3] - 128:21,
153:8, 164:18
**ho** [15] - 127:16,
130:11, 130:17,
131:15, 137:7,
137:12, 138:6,
138:9, 138:12,
155:6, 156:13,
157:16, 220:19,
235:18, 235:24
**Hodges** [61] - 58:13,
60:13, 61:5, 61:13,
62:5, 64:10, 64:17,
65:1, 66:22, 68:20,
70:7, 71:8, 71:14,
77:2, 83:15, 120:24,
128:9, 128:12,
128:22, 131:16,
134:3, 136:19,

151:19, 154:6,
158:11, 158:14,
160:3, 160:4,
160:14, 161:6,
161:11, 162:1,
162:8, 163:15,
164:2, 164:5, 164:9,
168:10, 168:13,
168:17, 171:12,
171:16, 176:2,
176:14, 176:15,
182:5, 187:5, 187:6,
187:8, 187:9,
187:11, 190:1,
193:7, 218:14,
219:1, 219:11,
221:17, 229:15,
230:3, 230:23
**Hodges'** [13] - 62:17,
63:9, 65:24, 66:25,
129:5, 159:17,
161:19, 163:1,
164:23, 170:1,
186:8, 227:17,
228:23
**hoing** [3] - 128:21,
130:1, 130:9
**Hold** [3] - 47:21,
47:25, 48:5
**hold** [5] - 48:4, 121:4,
156:5, 183:18, 228:2
**holding** [28] - 24:12,
39:2, 42:22, 42:24,
42:25, 62:16, 65:24,
66:2, 66:4, 66:6,
66:21, 66:24, 116:5,
130:7, 130:12,
130:18, 132:7,
145:10, 145:25,
146:17, 153:25,
155:23, 156:4,
164:21, 171:10,
171:16, 184:10,
190:21
**holds** [2] - 153:2,
155:25
**hole** [1] - 140:6
**Holguin** [1] - 4:13
**Holy** [2] - 191:19,
192:3
**home** [1] - 199:18
**homework** [1] -
106:11
**honestly** [2] - 109:18,
109:22
**honing** [1] - 136:10
**Honor** [234] - 4:2, 4:7,
4:12, 4:16, 76:6,
78:5, 78:7, 84:5,
84:15, 90:13, 93:17,

98:4, 98:8, 98:11,
98:14, 99:9, 99:12,
99:16, 99:19, 99:22,
105:5, 105:12,
107:16, 108:2,
108:4, 108:10,
108:15, 111:18,
111:20, 112:8,
112:10, 112:16,
112:19, 113:6,
113:9, 113:20,
113:25, 114:14,
114:19, 114:25,
115:20, 116:13,
116:16, 118:14,
118:20, 118:25,
119:1, 119:12,
120:15, 121:5,
121:19, 123:17,
124:10, 125:5,
125:9, 127:12,
127:14, 129:13,
130:7, 130:22,
130:25, 131:6,
131:20, 132:6,
133:4, 133:16,
134:13, 135:2,
135:14, 135:20,
136:12, 137:5,
137:14, 138:6,
138:17, 139:10,
140:17, 143:9,
144:8, 144:11,
144:15, 145:21,
146:23, 147:6,
149:3, 149:6,
149:17, 150:23,
151:9, 151:15,
151:25, 153:21,
154:10, 155:18,
156:18, 157:15,
160:4, 161:1, 162:6,
162:15, 163:25,
165:4, 165:24,
166:19, 167:4,
168:25, 169:3,
170:24, 175:1,
176:13, 178:10,
179:19, 181:5,
181:20, 181:25,
182:5, 182:9,
182:10, 182:20,
182:25, 183:4,
184:1, 185:13,
189:10, 190:3,
190:16, 192:5,
195:21, 196:4,
196:14, 196:25,
199:6, 199:13,
199:18, 199:20,
199:21, 199:23,

200:3, 200:25,
201:4, 201:8,
201:12, 202:2,
202:13, 202:15,
202:21, 202:25,
203:7, 203:11,
203:25, 204:4,
204:6, 204:9,
204:12, 204:13,
204:20, 205:1,
205:11, 206:4,
206:5, 206:16,
206:18, 206:23,
207:2, 207:6,
207:11, 207:17,
207:24, 208:23,
209:3, 209:6,
209:22, 209:25,
210:7, 210:14,
210:24, 211:16,
211:24, 212:5,
212:11, 212:19,
212:21, 213:23,
214:24, 215:4,
215:13, 216:18,
216:23, 217:4,
217:11, 217:13,
219:6, 219:17,
220:5, 220:8,
220:13, 221:8,
221:13, 221:22,
223:5, 223:10,
224:1, 224:13,
224:23, 225:6,
225:9, 225:22,
226:20, 227:8,
227:12, 227:14,
227:22, 228:5,
228:13, 228:14,
229:11, 230:4,
230:15, 231:14,
231:20, 232:5,
232:11, 233:11,
234:18, 235:5,
235:6, 235:17,
235:20, 236:23,
237:9, 238:22,
239:1, 239:9, 240:2
**Honor's** [8] - 112:21,
119:4, 126:7,
143:17, 151:12,
175:13, 225:19,
229:2
**hoo** [1] - 16:7
**hope** [2] - 110:17,
217:11
**hoped** [1] - 198:6
**horizontal** [1] - 140:18
**horizontally** [1] -
156:7

1359

horrible [2] - 83:12, 83:19
horribly [1] - 198:17
hour [8] - 14:2, 167:6, 167:9, 187:19, 216:9, 222:23, 224:10, 235:7
hours [5] - 26:21, 90:3, 90:5, 122:15, 199:1
house [7] - 116:20, 152:17, 158:1, 178:24, 178:25, 181:3
house!" [1] - 174:8
housekeeping [2] - 108:10, 111:21
huge [1] - 132:19, 170:20
hump [1] - 177:3
hundred [4] - 96:21, 185:2, 186:9, 187:3
hundreds [1] - 177:1
hurry [1] - 89:21
hurt [4] - 71:20, 141:14, 189:3, 190:1
hurting [1] - 116:24
hurts [1] - 196:20
hybrid [1] - 207:20

**I**

idea [12] - 5:15, 7:12, 16:10, 62:6, 83:5, 95:15, 163:21, 172:16, 172:23, 177:25, 215:17, 221:9
identical [1] - 208:5
identification [20] - 102:3, 108:13, 108:14, 108:16, 108:19, 108:22, 109:21, 119:5, 119:21, 119:22, 124:6, 124:7, 138:5, 207:7, 207:15, 213:5, 213:9, 216:24, 231:25, 240:24
identifications [7] - 109:2, 109:3, 109:4, 109:13, 109:22, 110:11, 217:5
identified [7] - 100:23, 117:20, 129:4, 137:23, 140:15, 200:12, 226:18
identify [16] - 4:5, 101:22, 102:5,

109:8, 110:8, 120:9, 120:17, 121:14, 137:24, 200:12, 200:14, 201:6, 201:23, 212:22, 213:3, 213:11
identifying [2] - 101:13, 207:9
identity [5] - 100:4, 102:11, 110:5, 110:7, 121:12
ignoring [1] - 163:11
imagine [2] - 137:8, 191:18
imagining [1] - 210:21
immediate [1] - 66:18
immediately [17] - 67:10, 67:14, 91:20, 91:21, 101:15, 116:5, 128:16, 131:13, 147:2, 152:12, 152:13, 155:5, 158:10, 171:10, 171:16, 176:20, 214:17
immobile [1] - 203:19
immovable [5] - 132:6, 136:20, 137:1, 138:7
impact [2] - 194:3, 218:1
impacts [1] - 140:5
impeachment [1] - 164:8
impede [4] - 122:1, 143:15, 210:9, 223:11
impeded [1] - 144:25
impeding [18] - 123:11, 123:14, 123:19, 123:25, 125:23, 154:4, 200:1, 210:3, 210:7, 212:20, 213:22, 215:10, 217:17, 218:22, 219:14, 219:15, 219:25, 220:3
implication [1] - 222:21
important [14] - 91:16, 114:6, 127:13, 130:25, 139:10, 140:2, 154:9, 156:22, 157:19, 158:12, 172:3, 194:3, 220:15, 236:7
imposition [1] - 237:7
improper [2] - 109:13, 206:1

imputed [1] - 137:8
inability [2] - 123:2, 195:11
inadvertence [1] - 189:21
inaugural [1] - 21:11
inches [2] - 66:12, 122:12
incident [14] - 85:20, 85:21, 85:22, 86:14, 127:1, 171:11, 184:19, 185:6, 185:18, 187:7, 194:20, 194:24, 229:9, 236:15
inclined [1] - 108:22, 110:4, 110:7
included [1] - 217:20
including [7] - 5:8, 13:24, 84:25, 86:22, 182:3, 197:22, 220:9
inconceivable [1] - 231:3
incongruous [1] - 191:22
inconsistent [7] - 159:20, 159:22, 164:9, 164:11, 176:7, 181:11, 211:13
incorrect [1] - 106:23
increase [1] - 150:7
incredible [12] - 155:20, 158:17, 159:20, 162:4, 165:22, 167:15, 172:24, 173:20, 175:11, 215:20, 216:4, 230:7
incredibly [3] - 122:23, 155:20, 236:7
indeed [1] - 102:19
independent [3] - 20:7, 20:12, 165:7
independently [1] - 165:7
index [1] - 49:14
indicate [2] - 76:13, 220:3
indicating) [1] - 161:24
indicative [2] - 176:9, 181:9
indicia [1] - 120:25
indictment [21] - 101:17, 116:13, 123:13, 123:18, 124:11, 126:8, 151:5, 182:10,

199:24, 200:11, 200:13, 207:9, 207:13, 207:16, 207:18, 207:19, 207:21, 208:2, 217:14, 236:3
indictment's [1] - 125:7
indictments [1] - 124:22
individual [4] - 186:1, 210:8, 214:5, 218:18
individuals [1] - 208:4
ineffective [1] - 136:4
infamous [2] - 213:23, 214:1
inferred [1] - 189:22
inflicted [1] - 136:11, 228:1
inflicting [1] - 160:23
infrequently [1] - 180:3
Ingersoll [1] - 188:8
inherently [1] - 136:16
initial [2] - 103:16, 116:3
injured [3] - 76:22, 77:8, 189:4
injuries [2] - 141:9, 168:20
injury [15] - 71:14, 71:17, 136:11, 140:5, 147:1, 148:4, 148:8, 160:23, 162:20, 163:6, 165:16, 165:18, 182:15, 182:16, 228:1
inquired [1] - 84:19
inside [17] - 27:22, 28:10, 29:23, 31:3, 31:23, 33:3, 33:15, 176:20, 176:25, 177:1, 177:6, 177:9, 177:11, 177:14, 181:4, 226:18
insignia [1] - 31:12
insist [1] - 205:24
insofar [1] - 108:19
instance [13] - 132:4, 133:4, 138:22, 141:11, 142:15, 145:2, 147:18, 152:9, 168:11, 169:4, 169:5, 172:3, 236:15
instances [3] - 148:15, 152:9, 154:9
instead [4] - 47:5, 47:9, 68:17, 208:2

instinct [1] - 110:14
instincts [1] - 195:11
instructed [1] - 189:15
instructions [1] - 107:2
insufficient [2] - 180:8, 223:7
insult [3] - 193:6, 193:7, 193:9
integrity [1] - 197:18
intend [1] - 178:5
intended [7] - 178:5, 188:16, 188:19, 198:2, 212:9, 223:11, 225:18
intending [2] - 190:1, 203:24, 210:9, 214:16
intent [41] - 150:20, 169:2, 169:15, 171:4, 176:8, 176:9, 180:11, 180:14, 180:19, 181:10, 181:16, 189:12, 189:17, 189:22, 202:16, 206:2, 206:3, 209:21, 209:24, 211:8, 212:3, 220:1, 220:3, 227:13, 227:15, 227:16, 227:18, 227:20, 227:24, 227:25, 235:14, 236:24, 239:14, 239:15, 239:17, 239:24, 240:3, 240:5
intention [1] - 211:3
intentional [10] - 62:3, 62:4, 113:22, 128:25, 182:6, 185:12, 231:21, 234:15, 235:24, 240:4
intentionally [3] - 184:17, 227:25, 235:1
interaction [2] - 159:23, 205:17
interest [1] - 197:16
interested [6] - 45:6, 109:17, 110:19, 111:9, 111:12, 113:6
interesting [5] - 20:20, 22:9, 26:4, 173:23, 191:25
interests [1] - 103:10
interfere [3] - 122:1, 211:4, 211:9
interfering [4] - 123:19, 123:25,

125:23, 154:4
**interrupt** [2] - 114:21, 121:5
**interval** [1] - 90:8
**interview** [2] - 109:5, 109:6
**interviewed** [1] - 119:6
**intimate** [1] - 179:11
**introduced** [2] - 206:19, 229:21
**invalid** [1] - 110:11
**investigation** [1] - 97:25
**Investigation** [1] - 204:1
**investigative** [1] - 97:21
**involved** [3] - 75:13, 96:20, 208:4
**involves** [1] - 213:22
**involving** [2] - 8:11, 101:16
**iPad** [2] - 214:21, 215:6
**Iraq** [1] - 197:12
**irrational** [1] - 185:1
**irrationally** [2] - 58:21, 60:12
**irritant** [4] - 77:17, 122:6, 155:8, 176:1
**irritants** [2] - 131:10, 152:17
**irritated** [1] - 30:12
**issue** [7] - 99:24, 101:16, 103:6, 103:12, 227:10, 228:7, 228:9
**issued** [2] - 122:11, 239:5
**issues** [3] - 103:24, 112:19, 186:23
**it-got-stolen-from-them-type** [1] - 14:12
**item** [6] - 11:5, 63:2, 66:12, 67:25, 86:14, 146:24
**items** [6] - 10:4, 10:5, 10:7, 10:9, 27:21, 68:8
**itself** [10] - 108:17, 161:2, 161:19, 181:25, 182:13, 188:12, 192:21, 210:1, 212:8, 223:5

**J**

**jabbing** [1] - 82:17
**jacket** [38] - 113:24,

203:11, 203:13, 206:17, 206:21, 209:5, 212:12, 213:7, 214:4, 214:8, 214:16, 216:13, 216:14, 218:8, 218:11, 219:2, 219:7, 219:24, 220:6, 221:5, 221:15, 221:23, 222:6, 222:8, 223:2, 223:8, 223:10, 223:18, 223:23, 224:7, 224:15, 224:21, 225:2, 226:4, 226:19, 231:15, 236:16
**jail** [1] - 204:2
**January** [19] - 5:8, 7:8, 15:24, 62:5, 66:12, 98:12, 148:16, 179:3, 180:3, 180:12, 181:12, 181:24, 197:2, 197:10, 197:19, 197:25, 198:4, 198:19, 236:25
**Jencks** [8] - 84:7, 84:11, 84:18, 84:24, 85:2, 85:3, 85:5, 85:7
**jeopardy** [1] - 124:11
**jerk** [2] - 23:11, 23:14
**Jewish** [1] - 70:20
**job** [6] - 5:25, 62:12, 87:8, 96:23, 146:1, 224:20
**John** [1] - 178:12
**join** [2] - 41:20, 108:2
**joined** [1] - 131:14
**joining** [1] - 41:21
**Jon** [1] - 4:10
**jostling** [1] - 153:8
**Jr** [1] - 178:13
**Judge** [4] - 4:24, 59:6, 77:16, 200:13
**judge** [1] - 91:11
**judge's** [1] - 90:23
**judgment** [2] - 103:13, 241:1
**July** [4] - 238:19, 238:20, 239:3
**juries** [1] - 103:9
**jury** [11] - 103:25, 107:2, 189:15, 207:9, 207:14, 207:18, 233:12, 236:4, 237:15, 238:3, 238:5
**Justice** [1] - 93:24

**justice** [1] - 103:10

**K**

**Kaitlin** [1] - 4:9
**keep** [49] - 20:16, 21:22, 24:1, 29:14, 30:3, 30:20, 31:6, 32:16, 33:20, 36:3, 36:23, 37:18, 38:4, 38:21, 39:5, 39:25, 40:13, 41:9, 41:14, 42:6, 43:4, 43:24, 44:21, 45:20, 46:7, 47:11, 50:12, 51:21, 53:8, 55:8, 55:23, 56:5, 56:21, 56:25, 57:6, 59:19, 63:5, 63:18, 64:6, 64:19, 65:3, 68:22, 114:19, 149:8, 157:19, 211:22, 216:15, 216:20, 233:12
**Keepers** [1] - 96:2
**keeping** [1] - 216:22
**keeps** [2] - 174:14, 180:5
**Kentucky** [1] - 8:3
**kept** [2] - 22:3, 22:5
**kerfuffle** [1] - 203:15
**keys** [1] - 65:14
**kick** [1] - 174:6
**kids** [2] - 5:24
**kind** [30] - 8:19, 11:11, 13:13, 15:1, 47:16, 49:1, 61:10, 70:22, 71:23, 82:13, 91:10, 100:2, 106:4, 110:2, 111:11, 118:13, 120:1, 133:14, 151:23, 153:11, 153:14, 161:15, 161:16, 163:11, 179:14, 180:5, 184:8, 190:17, 204:18, 205:16
**kindling** [1] - 186:12
**Klamann** [3] - 4:9, 153:7, 158:22
**KLAMANN** [190] - 5:3, 6:23, 7:1, 7:5, 7:7, 15:11, 15:13, 15:21, 15:23, 16:6, 19:4, 19:6, 19:13, 19:15, 19:16, 20:16, 20:18, 20:19, 21:22, 21:24, 24:19, 24:21, 25:13, 25:15, 25:16, 28:7, 28:9, 28:22, 28:25, 29:1, 29:14, 29:16, 29:17, 30:3, 30:5,

30:20, 30:22, 30:23, 31:6, 31:8, 31:9, 32:16, 32:18, 32:19, 33:20, 33:22, 33:23, 36:3, 36:5, 36:6, 36:12, 36:15, 36:23, 36:25, 37:1, 37:5, 37:8, 37:9, 37:18, 37:20, 37:21, 38:4, 38:6, 38:7, 38:21, 38:23, 38:24, 39:5, 39:7, 39:8, 39:25, 40:13, 40:15, 40:16, 41:9, 41:12, 41:13, 42:6, 42:8, 42:9, 43:4, 43:6, 43:7, 43:11, 43:14, 43:15, 43:24, 44:2, 44:3, 44:13, 44:16, 44:21, 44:23, 44:24, 45:20, 45:22, 45:23, 46:7, 46:10, 46:11, 47:11, 47:13, 48:16, 48:22, 48:23, 49:10, 49:12, 49:13, 49:22, 49:24, 50:2, 50:5, 50:12, 50:14, 50:15, 51:21, 51:23, 52:1, 53:8, 53:10, 53:11, 53:18, 53:20, 55:8, 55:12, 55:13, 55:17, 55:19, 55:23, 55:25, 56:1, 56:5, 56:7, 56:21, 56:23, 56:25, 57:2, 57:6, 57:8, 57:9, 57:13, 57:14, 58:8, 58:11, 59:10, 59:23, 60:11, 62:22, 63:1, 63:5, 63:7, 63:8, 63:18, 63:20, 63:21, 63:24, 64:2, 64:6, 64:8, 64:9, 64:19, 64:21, 64:22, 65:3, 65:5, 65:6, 65:15, 65:18, 67:17, 67:22, 68:22, 68:25, 69:1, 69:4, 69:8, 69:9, 70:1, 70:4, 70:5, 72:16, 76:8, 78:5, 78:7, 79:5, 79:14, 81:14, 83:2, 99:4, 240:2, 240:8
**Klamann**.................. [1] - 3:4
**KLEIN** [4] - 99:12, 99:16, 99:19, 99:22
**Klein** [133] - 3:9, 3:9, 4:4, 4:17, 85:15, 86:6, 94:2, 95:19, 96:6, 97:8, 98:17, 98:19, 99:10, 99:24,

100:5, 101:24, 103:14, 104:1, 111:9, 113:9, 113:13, 113:17, 113:21, 114:1, 115:2, 115:21, 115:24, 116:12, 116:25, 117:12, 118:3, 118:22, 121:20, 122:10, 122:12, 123:1, 123:6, 123:18, 126:9, 126:12, 126:17, 127:9, 127:19, 127:22, 128:10, 128:20, 129:8, 130:3, 130:13, 130:23, 131:1, 131:21, 132:4, 132:5, 132:7, 132:16, 133:8, 134:10, 135:3, 136:1, 138:19, 138:23, 139:5, 139:12, 139:17, 140:11, 140:18, 141:14, 141:22, 142:4, 142:9, 142:16, 142:21, 143:14, 147:11, 149:7, 175:7, 179:8, 179:11, 179:20, 180:8, 197:9, 197:11, 197:15, 197:16, 197:19, 197:22, 198:1, 198:9, 198:11, 198:13, 198:18, 198:21, 198:22, 199:2, 199:5, 200:4, 201:7, 201:23, 202:1, 202:10, 202:23, 204:3, 204:8, 204:10, 204:22, 212:20, 214:3, 215:9, 216:25, 217:16, 217:22, 218:20, 225:17, 226:1, 226:2, 226:17, 226:24, 231:15, 233:24, 234:2, 234:5, 235:6, 235:19, 235:25, 236:9, 236:16, 236:25
**Klein's** [24] - 85:12, 86:1, 86:3, 86:7, 90:20, 91:8, 93:13, 94:5, 100:21, 103:2,

103:5, 121:25, 128:24, 131:12, 139:20, 143:11, 202:3, 202:16, 211:3, 213:24, 231:11, 233:4, 233:25, 234:14
**knocked** [5] - 71:22, 187:1, 230:13, 230:17, 230:19
**knowing** [1] - 35:22
**knowingly** [4] - 150:20, 189:18, 189:20, 189:25
**knowledge** [7] - 84:9, 153:22, 178:9, 178:11, 179:11, 179:12, 226:17
**known** [1] - 81:3
**knows** [8] - 154:10, 157:15, 180:4, 193:13, 213:8, 213:16, 213:19, 227:12
**knuckles** [4] - 70:9, 70:25, 71:3, 71:21
**Krav** [3] - 70:11, 70:16, 70:25
**Kyle** [1] - 4:10

**L**

**labeled** [1] - 224:10
**lack** [1] - 240:23
**lacking** [1] - 239:18
**laid** [1] - 98:15
**landed** [1] - 56:20
**language** [1] - 125:8
**large** [7] - 18:9, 18:19, 28:15, 73:17, 75:20, 162:9, 165:16
**largely** [2] - 109:19, 162:4
**larger** [1] - 137:1
**Laschon** [1] - 200:2
**laser** [4] - 139:11, 139:13, 139:16, 143:10
**laser-focused** [4] - 139:11, 139:13, 139:16, 143:10
**last** [6] - 108:1, 130:2, 146:21, 149:5, 151:22, 234:6
**lasted** [3] - 124:19, 137:11, 137:17
**Laura** [1] - 4:9
**law** [16] - 41:1, 101:13, 101:22, 112:13, 122:1, 122:10,

122:23, 123:2, 123:25, 125:6, 189:16, 189:19, 193:9, 219:23, 224:21, 224:25
**lead** [2] - 97:4, 119:14
**leader** [1] - 8:19
**leading** [2] - 5:8, 79:14
**Leading** [3] - 79:5, 81:14, 83:2
**leads** [2] - 147:25, 236:23
**learned** [1] - 70:22
**learning** [2] - 82:16, 82:17
**least** [25] - 34:14, 35:5, 45:14, 67:11, 67:18, 74:6, 93:23, 108:25, 114:2, 115:21, 126:18, 126:19, 137:16, 137:18, 137:19, 141:16, 179:8, 186:22, 192:24, 193:25, 205:4, 216:25, 217:2, 219:15, 238:12
**leave** [17] - 7:25, 18:16, 47:18, 48:9, 51:15, 67:10, 67:13, 67:14, 67:16, 187:9, 194:2, 210:23, 234:12, 235:5, 235:12, 235:13, 241:22
**leaves** [3] - 178:1, 187:9, 187:10
**leaving** [2] - 180:13, 187:10
**led** [5] - 131:15, 143:1, 144:20, 170:19, 213:5
**left** [32] - 5:24, 7:21, 24:10, 63:9, 71:5, 71:10, 71:12, 72:9, 72:11, 114:5, 115:1, 117:1, 127:19, 129:12, 131:1, 132:16, 140:12, 143:19, 152:21, 155:1, 156:25, 157:5, 164:14, 168:12, 174:18, 177:24, 190:17, 190:18, 191:12, 191:14, 210:19, 234:5
**left-hand** [3] - 115:1, 129:12, 140:12

**left-handed** [1] - 72:9
**legal** [3] - 98:8, 169:13, 240:21
**legs** [2] - 8:1, 56:18
**lends** [1] - 188:24
**length** [2] - 145:2, 149:13
**lengthy** [3] - 112:16, 119:2, 125:18
**less** [5] - 103:20, 158:24, 159:2, 187:19, 197:21
**letting** [1] - 177:13
**level** [7] - 23:4, 23:18, 23:23, 75:18, 154:24, 159:16, 191:1
**Lexington** [1] - 8:3
**liability** [2] - 217:6, 218:24
**Lieutenant** [1] - 150:11
**life** [2] - 26:16, 114:12
**lifestyle** [1] - 193:4
**light** [7] - 49:1, 49:3, 49:6, 49:8, 49:16, 49:21, 170:16
**lights** [2] - 170:15, 171:4
**likely** [3] - 103:24, 148:17, 230:22
**lime** [1] - 138:4
**limited** [8] - 101:11, 101:21, 121:15, 169:3, 169:5, 171:1, 227:14, 227:22
**limiting** [1] - 127:10
**line** [89] - 12:3, 12:11, 12:16, 23:12, 29:9, 29:10, 45:3, 45:13, 45:17, 45:24, 47:22, 47:25, 48:4, 48:6, 49:4, 114:1, 115:11, 115:21, 116:6, 117:13, 117:17, 117:19, 118:3, 124:19, 127:20, 128:21, 129:9, 130:2, 130:9, 130:24, 131:25, 132:1, 134:14, 138:25, 139:18, 139:24, 140:3, 140:6, 141:19, 141:24, 141:25, 142:1, 142:9, 142:13, 143:1, 143:23, 144:1, 144:18, 145:18, 145:23, 146:2,

146:5, 146:7, 146:15, 146:16, 146:19, 147:19, 147:25, 148:10, 148:19, 148:20, 151:1, 152:21, 152:24, 153:9, 154:13, 156:9, 156:18, 157:7, 157:22, 158:2, 158:10, 167:19, 175:25, 176:21, 190:12, 201:1, 209:10, 219:7, 219:14, 219:15, 219:18, 220:25, 223:24, 224:17, 229:23, 235:3, 236:6
**lined** [1] - 126:8
**lines** [2] - 125:11, 174:13
**link** [4] - 92:3, 166:5, 170:23, 180:7
**linkage** [1] - 171:5
**linked** [1] - 169:24
**linking** [1] - 166:24
**lip** [6] - 162:9, 162:15, 162:16, 162:23, 163:5, 165:9
**liquid** [1] - 50:22
**list** [1] - 241:21
**listed** [3] - 88:11, 112:22, 113:10
**listen** [4] - 12:17, 12:21, 12:23, 133:4
**listened** [4] - 12:19, 14:1, 198:23, 204:2
**listener** [1] - 98:18
**listening** [6] - 9:12, 135:11, 177:19, 178:18, 178:20
**literally** [3] - 66:7, 157:1, 205:20
**litigated** [1] - 96:2
**living** [1] - 191:1
**located** [1] - 50:9
**lock** [1] - 122:19
**locker** [1] - 27:22
**lodged** [2] - 105:19, 226:23
**logistics** [3] - 133:13, 161:10, 161:16
**look** [21] - 27:9, 48:16, 49:22, 56:4, 57:12, 64:5, 65:13, 67:19, 88:8, 125:12, 137:14, 164:14, 164:17, 164:21, 175:10, 183:8, 184:2, 184:20,

187:8, 187:20, 190:18
**looked** [11] - 13:18, 14:24, 28:1, 29:13, 54:24, 161:10, 180:5, 185:22, 185:23
**looking** [25] - 5:19, 66:3, 66:4, 66:9, 93:22, 96:14, 96:16, 96:17, 100:12, 100:20, 100:25, 101:14, 102:23, 103:4, 103:10, 110:14, 120:5, 125:12, 136:14, 142:7, 151:2, 213:7, 240:14, 241:10, 241:15
**looks** [15] - 16:17, 31:13, 37:11, 55:20, 57:3, 57:10, 68:21, 69:3, 112:16, 120:5, 161:13, 171:12, 174:1, 221:23, 224:4
**lose** [4] - 15:2, 161:17, 161:18, 168:23
**loses** [2] - 230:9, 230:13
**lost** [4] - 14:11, 14:24, 187:16, 234:12
**loud** [10] - 32:23, 73:15, 74:2, 74:6, 74:8, 75:24, 133:5, 170:9, 186:3, 201:19
**louder** [1] - 232:23
**loudly** [1] - 36:9
**loved** [1] - 174:6
**loves** [1] - 217:19
**low** [3] - 139:22, 154:19, 236:11
**lower** [3] - 23:6, 191:1, 234:8
**luck** [1] - 141:10
**luckily** [1] - 143:8
**lunch** [5] - 104:16, 104:18, 106:11, 149:4, 227:6
**lunchtime** [1] - 148:25
**lunged** [1] - 117:13

**M**

**ma'am** [6] - 18:11, 25:2, 27:5, 142:2, 181:13, 181:21
**mad** [1] - 82:3
**Madam** [1] - 85:1
**Maga** [3] - 70:11, 70:16, 70:25

**MAGA** [5] - 172:11, 172:15, 177:18, 188:9, 188:11
**maintain** [3] - 133:2, 139:9, 239:4
**majority** [1] - 120:20
**malicious** [1] - 231:21
**man** [11] - 50:21, 113:23, 158:4, 193:3, 203:10, 215:5, 221:4, 223:10, 223:23, 224:7, 231:14
**Manassas** [3] - 88:3, 88:18, 91:20
**Mancini** [14] - 89:4, 89:10, 89:20, 89:21, 90:3, 92:5, 93:6, 94:15, 94:19, 94:22, 95:2, 95:6, 95:10, 96:14
**manipulate** [1] - 206:12
**manner** [6] - 113:24, 136:23, 144:16, 144:20, 147:24, 161:3
**manufactured** [1] - 164:10
**map** [1] - 150:11
**march** [1] - 194:10
**March** [12] - 88:6, 90:16, 90:20, 91:19, 92:8, 94:4, 94:7, 94:19, 94:24, 95:6, 95:10, 96:8
**marched** [1] - 74:2
**marches** [1] - 173:15
**marching** [4] - 18:22, 173:3, 178:25, 180:13
**Marina** [1] - 4:12
**Marine** [1] - 197:11
**mark** [1] - 223:20
**marker** [2] - 211:15, 224:10
**martial** [1] - 70:14
**mask** [32] - 56:2, 56:17, 57:21, 57:25, 58:4, 60:17, 61:4, 61:8, 63:9, 71:12, 111:2, 128:9, 134:9, 138:4, 159:17, 160:4, 160:5, 160:6, 161:20, 162:5, 162:16, 163:9, 164:3, 165:8, 170:2, 182:12, 204:5, 204:16, 204:22, 228:23, 229:9,

230:24
**masks** [4] - 29:6, 29:12, 77:12, 204:11
**mass** [1] - 223:1
**masses** [1] - 128:5
**Mastony** [1] - 122:3
**Mastony's** [1] - 117:9
**matched** [1] - 206:10
**material** [2] - 96:14, 96:17
**math** [1] - 224:25
**matter** [7] - 6:6, 15:3, 17:25, 18:2, 108:11, 169:14, 208:20
**mattered** [2] - 15:4, 15:5
**McCaughey** [8] - 106:20, 136:18, 136:22, 138:7, 138:10, 158:13, 164:15
**McCree** [1] - 150:11
**McFadden** [1] - 77:16
**mean** [72] - 6:16, 7:16, 8:24, 10:1, 11:13, 12:11, 14:7, 14:8, 14:23, 17:4, 17:25, 20:14, 23:17, 27:7, 28:4, 35:10, 38:14, 46:4, 49:15, 49:20, 52:24, 62:19, 76:22, 77:1, 80:5, 80:14, 96:12, 112:25, 114:23, 125:2, 143:7, 145:8, 148:3, 153:10, 161:10, 161:25, 162:18, 163:8, 163:10, 167:22, 169:22, 174:21, 176:13, 176:23, 177:9, 178:3, 178:11, 179:7, 179:10, 180:10, 180:11, 181:5, 187:12, 189:5, 189:11, 190:21, 191:12, 191:18, 192:1, 192:20, 193:11, 194:9, 194:20, 196:2, 200:16, 203:22, 210:4, 212:9, 230:8, 230:12, 240:16
**meaning** [3] - 17:5, 19:18, 23:14
**means** [4] - 17:24, 136:6, 147:24, 199:24
**meant** [6] - 19:20,

20:21, 21:2, 34:10, 84:20, 162:19
**media** [4] - 158:6, 180:10, 188:4, 192:19
**medical** [1] - 229:21
**medication** [1] - 73:10
**medicine** [2] - 195:18
**meek** [2] - 212:7, 234:2
**meet** [8] - 8:14, 8:15, 8:18, 9:2, 101:9, 102:16, 226:22, 234:16
**meet-up** [1] - 8:14
**meeting** [2] - 128:5, 167:9, 216:6
**Mehta** [1] - 200:13
**members** [2] - 68:17, 128:20
**memorandum** [3] - 100:21, 103:5
**memory** [3] - 106:3, 186:23, 192:7
**men** [2] - 140:21, 140:25
**mention** [1] - 175:14
**mentioned** [6] - 26:15, 80:25, 165:21, 211:17, 229:18, 235:7
**mentions** [1] - 170:1
**mere** [4] - 90:3, 90:5, 206:13, 235:4
**merely** [3] - 96:24, 106:19, 220:2
**message** [3] - 93:5, 94:25, 232:6
**messages** [9] - 7:2, 149:10, 179:19, 179:23, 188:5, 188:7, 192:18, 194:11, 197:4
**met** [9] - 8:6, 13:3, 13:6, 103:16, 109:15, 120:1, 167:2, 167:5, 197:23
**Metropolitan** [2] - 120:20, 120:25
**middle** [6] - 75:3, 75:20, 117:3, 216:24, 217:5, 232:19
**might** [11] - 19:1, 19:2, 63:23, 75:9, 76:13, 90:18, 124:8, 132:9, 141:16, 210:19
**Mike** [21] - 5:19, 7:3, 7:9, 7:23, 7:25, 10:7, 12:5, 12:7, 13:3,

13:12, 24:6, 24:12, 70:24, 78:16, 132:25, 172:16, 187:15, 187:16, 188:8, 188:9
**Mike's** [2] - 9:5, 24:3
**military** [7] - 7:17, 31:20, 46:15, 46:18, 50:25, 193:3, 193:4
**milk** [4] - 38:1, 38:3, 199:16
**mind** [11] - 22:18, 74:9, 82:9, 82:21, 107:18, 147:22, 157:19, 190:7, 192:2, 196:11, 214:3
**mindful** [1] - 222:20
**minds** [1] - 222:22
**minimal** [1] - 102:1
**minimum** [1] - 234:25
**minute** [12] - 14:7, 14:10, 45:14, 64:16, 130:17, 137:19, 157:3, 164:24, 185:4, 216:9, 216:10, 222:24
**minutes** [22] - 101:18, 104:14, 114:2, 115:11, 115:22, 116:11, 116:15, 124:5, 124:19, 124:20, 125:10, 132:2, 180:21, 191:20, 196:18, 206:13, 208:7, 217:13, 217:14, 224:11, 235:7, 236:5
**mis** [1] - 17:20
**misdemeanor** [3] - 112:23, 112:25, 113:2
**misremembering** [1] - 159:10
**miss** [2] - 64:11, 64:13
**missing** [3] - 170:13, 170:23, 180:7
**mist** [3] - 40:9, 47:20, 51:13
**mistake** [1] - 189:21
**mistaken** [1] - 97:7
**mitigating** [1] - 169:12
**MJOA** [1] - 240:18
**MJOAs** [1] - 240:15
**mob** [27] - 116:1, 122:25, 126:13, 128:20, 130:3, 130:9, 131:4, 131:5, 132:21, 133:6, 133:9, 133:13, 137:6, 140:5, 140:7,

140:8, 141:13, 147:1, 147:21, 153:5, 154:11, 157:14, 221:2, 235:19, 235:20, 235:25
**mode** [1] - 186:17
**moment** [27] - 26:5, 26:25, 39:19, 78:5, 95:3, 117:17, 129:7, 129:8, 153:23, 154:15, 154:22, 156:1, 156:24, 170:11, 178:13, 180:18, 185:15, 186:12, 186:15, 199:5, 204:23, 228:2, 228:4, 228:23, 229:18, 231:8, 231:24
**moments** [1] - 192:10
**moments'** [1] - 102:14
**momentum** [1] - 136:6, 138:20, 145:15
**Monday** [3] - 96:8, 96:12, 119:11
**months** [1] - 225:1
**Moore** [31] - 139:7, 139:9, 139:10, 139:24, 140:11, 140:19, 140:25, 141:3, 141:11, 141:18, 141:23, 141:24, 142:11, 142:16, 143:1, 143:3, 143:15, 143:21, 145:5, 145:10, 146:4, 147:9, 147:14, 147:19, 151:6, 222:10, 223:16, 223:18, 236:8, 236:12
**morning** [20] - 4:7, 4:11, 4:12, 4:15, 4:16, 4:19, 4:24, 4:25, 5:1, 5:4, 5:5, 11:22, 88:13, 99:12, 104:24, 110:15, 112:18, 119:11, 199:1, 207:8
**Morris** [2] - 222:10, 223:16
**most** [11] - 10:13, 127:17, 139:7, 147:20, 162:3, 173:6, 178:18, 197:10, 197:12, 215:21, 234:3

1363

**motherfucker** [2] - 58:16, 174:8
**motherfuckers** [1] - 43:17
**motion** [10] - 100:1, 101:2, 101:3, 101:25, 103:13, 129:15, 129:22, 162:6, 164:14, 240:16
**motions** [1] - 240:12
**motive** [1] - 187:20
**mouth** [23] - 20:21, 57:15, 57:18, 82:4, 82:19, 82:24, 113:19, 118:19, 126:20, 140:24, 145:6, 149:15, 154:22, 154:25, 157:20, 159:2, 230:2, 231:3, 231:5, 232:17, 233:15, 234:20, 235:10
**move** [19] - 27:11, 61:5, 62:23, 65:15, 69:5, 74:21, 92:12, 95:18, 102:18, 112:17, 116:9, 117:12, 138:16, 146:2, 206:5, 208:7, 221:2, 234:20, 236:16
**Move** [4] - 116:9, 116:21, 117:18, 122:6
**moved** [7] - 45:24, 53:23, 54:25, 92:22, 101:15, 101:21, 184:3
**movement** [4] - 138:9, 154:8, 155:2, 174:17
**moves** [2] - 61:14, 236:19
**movie** [1] - 141:12
**moving** [17] - 44:7, 113:19, 114:19, 118:19, 118:20, 131:20, 138:12, 138:18, 139:3, 145:23, 146:1, 149:5, 149:8, 202:3, 219:8, 219:9, 220:22
**MPD** [4] - 161:4, 171:25, 213:14, 213:17
**multiple** [2] - 211:8, 215:24
**muncher** [2] - 51:5, 51:14
**must** [5] - 30:12,

175:9, 189:17, 208:19, 211:25
**mystery** [1] - 59:12

## N

**name** [6] - 79:25, 80:1, 95:1, 178:13, 188:13, 212:25
**named** [3] - 101:17, 119:16, 217:15
**names** [1] - 124:24
**narrowed** [1] - 122:20
**nation** [1] - 197:4
**nature** [1] - 157:14
**near** [5] - 32:25, 33:14, 39:2, 39:3, 199:3
**nearby** [1] - 20:6
**nearest** [2] - 76:4, 76:9
**nearly** [2] - 153:1, 208:5
**necessarily** [4] - 31:24, 33:17, 33:18, 210:5
**necessary** [8] - 106:22, 112:1, 119:23, 121:11, 124:7, 124:24, 167:10, 234:23
**neck** [1] - 141:21
**need** [34] - 29:18, 36:9, 84:17, 86:14, 88:7, 98:9, 107:4, 110:23, 111:5, 111:15, 113:18, 126:20, 126:21, 128:19, 131:13, 180:1, 196:21, 200:16, 203:22, 205:15, 205:19, 207:6, 207:18, 217:1, 222:20, 232:3, 232:12, 232:14, 233:9, 233:24, 234:18, 234:21, 239:24, 240:17
**needed** [7] - 79:12, 89:7, 97:3, 154:19, 160:19, 170:6, 232:12
**needs** [7] - 65:9, 106:14, 107:7, 205:20, 232:17, 232:18
**nefarious** [2] - 188:20, 211:25
**negate** [2] - 169:15,

171:4
**neglected** [1] - 220:23
**never** [29] - 14:21, 23:3, 28:5, 53:17, 56:15, 70:21, 74:18, 80:22, 83:12, 83:16, 83:17, 83:19, 164:11, 166:1, 167:18, 167:20, 169:23, 169:24, 169:25, 170:2, 170:16, 170:17, 173:12, 173:13, 175:2, 186:21, 186:24
**nevertheless** [2] - 86:16, 109:7
**new** [4] - 89:18, 106:25, 126:22, 228:17
**news** [7] - 14:17, 17:16, 17:18, 25:25, 26:19, 26:20, 80:6
**next** [24] - 13:9, 23:4, 50:21, 57:11, 96:13, 115:13, 115:20, 121:19, 125:3, 129:10, 131:20, 134:18, 138:18, 155:19, 157:18, 160:4, 164:21, 170:16, 172:1, 197:21, 233:25, 235:17, 237:8
**night** [7] - 11:19, 38:9, 38:12, 38:16, 88:14, 88:15, 91:25
**nobody** [2] - 50:6, 162:22
**noise** [2] - 74:4, 117:23
**noises** [8] - 43:21, 43:22, 73:15, 74:5, 75:24, 82:6, 82:8, 170:9
**none** [4] - 15:4, 121:7, 128:19, 198:9
**noon** [1] - 237:20
**normally** [1] - 128:13
**note** [9] - 103:8, 103:19, 104:4, 119:4, 130:25, 149:11, 154:10, 221:4, 232:5
**NOTE** [1] - 241:18
**noted** [1] - 102:21
**notes** [1] - 182:9
**nothing** [12] - 15:4, 69:25, 77:2, 92:23, 103:15, 132:22,

159:25, 162:16, 171:6, 188:21, 193:8
**notice** [3] - 81:6, 200:4, 207:20
**noticed** [1] - 71:24
**notification** [1] - 87:5
**notified** [3] - 87:4, 87:7, 87:15
**notify** [1] - 87:16
**noting** [1] - 165:24
**notion** [1] - 164:9
**nowhere** [2] - 52:5, 164:17
**number** [3] - 72:18, 89:23, 216:11
**numbers** [1] - 120:23
**numerous** [3] - 100:9, 130:15, 166:18
**Nunez** [3] - 100:14, 100:23, 103:11

## O

**oath** [3] - 4:23, 84:14, 204:7
**Oath** [1] - 96:2
**object** [9] - 66:6, 105:15, 108:18, 132:6, 136:20, 137:2, 138:7, 182:11
**objected** [3] - 105:25, 106:20, 108:13
**objecting** [1] - 121:6
**objection** [14] - 76:5, 79:5, 79:9, 79:14, 81:14, 83:2, 92:13, 93:25, 96:1, 97:14, 106:21, 106:23, 107:16, 109:16
**objections** [6] - 95:20, 105:19, 106:6, 106:8, 106:10, 106:13
**objective** [1] - 166:15
**observe** [5] - 202:25, 209:12, 212:11, 212:24, 224:13
**observed** [3] - 201:4, 201:8, 211:16
**obstruct** [2] - 209:21, 235:14
**obstructing** [1] - 224:16
**obstruction** [6] - 108:1, 111:4, 111:16, 177:1, 196:1, 196:4
**obstructive** [1] - 206:3
**obtained** [16] - 85:14, 85:16, 85:19, 86:5,

86:24, 87:2, 87:12, 87:15, 87:20, 87:22, 88:5, 88:13, 88:15, 90:17, 90:19, 91:8
**obvious** [3] - 135:24, 166:8, 183:22
**obviously** [16] - 102:11, 107:24, 114:23, 127:8, 131:9, 136:16, 138:16, 153:10, 160:16, 168:18, 192:4, 201:11, 202:6, 210:9, 217:21, 222:20
**OC** [2] - 186:1, 186:2
**occurred** [1] - 200:11
**occurrence** [1] - 30:9
**occurring** [4] - 93:7, 107:15, 138:9, 203:17
**odds** [1] - 158:20
**off-screen** [1] - 204:19
**offense** [5] - 107:8, 107:12, 108:1, 189:15, 207:11
**offenses** [2] - 105:9, 107:8
**offensive** [1] - 113:24
**offer** [1] - 166:24
**offered** [3] - 101:10, 103:4, 198:8
**office** [4] - 87:25, 238:5, 238:6, 238:10
**Office** [1] - 88:2
**Officer** [251] - 58:13, 60:13, 61:5, 61:13, 62:5, 62:17, 63:9, 64:10, 64:17, 65:1, 65:24, 66:22, 66:25, 68:20, 70:7, 71:8, 71:14, 109:19, 109:20, 113:15, 113:16, 113:20, 114:10, 114:15, 115:5, 115:16, 116:1, 116:7, 116:9, 116:22, 117:9, 117:19, 118:1, 118:10, 118:24, 119:3, 119:5, 119:7, 119:10, 119:11, 119:16, 119:22, 120:12, 120:13, 120:21, 120:24, 121:15, 122:3, 124:17, 126:2, 127:2, 127:4, 127:21, 127:22, 128:4, 128:9,

128:12, 128:15, 128:22, 129:2, 129:5, 129:14, 130:10, 131:16, 131:18, 131:19, 132:3, 132:11, 132:17, 132:18, 133:9, 133:18, 133:21, 133:25, 134:3, 134:4, 134:7, 134:9, 134:12, 134:15, 135:4, 135:11, 136:19, 137:2, 137:9, 137:13, 137:24, 138:1, 138:3, 138:14, 139:7, 139:9, 139:10, 139:24, 140:11, 140:15, 140:19, 140:22, 140:25, 141:1, 141:3, 141:9, 141:11, 141:18, 141:20, 141:23, 141:24, 142:9, 142:11, 142:12, 142:16, 143:1, 143:3, 143:15, 143:21, 145:5, 145:10, 146:4, 146:23, 147:2, 147:9, 147:14, 147:19, 148:7, 151:4, 151:6, 151:19, 154:6, 154:7, 156:6, 157:8, 157:10, 158:11, 158:14, 159:17, 160:3, 160:4, 160:14, 161:6, 161:11, 161:19, 162:1, 162:8, 163:1, 163:15, 164:2, 164:5, 164:9, 164:23, 168:10, 168:13, 168:17, 170:1, 171:11, 171:12, 171:16, 176:15, 182:5, 187:5, 187:6, 187:8, 187:9, 187:11, 190:1, 200:2, 200:9, 201:14, 202:2, 202:11, 202:24, 203:13, 203:15, 205:23, 206:15, 206:22, 207:7, 207:15, 207:23, 208:11, 208:17, 208:19, 208:22,

209:6, 212:20, 212:22, 212:24, 213:2, 213:3, 213:6, 213:7, 213:10, 213:12, 214:19, 215:5, 215:14, 215:20, 215:22, 217:12, 217:24, 218:5, 218:14, 219:1, 219:11, 219:19, 220:7, 220:10, 220:15, 220:17, 220:20, 221:5, 221:16, 221:17, 221:24, 222:7, 222:10, 222:12, 222:15, 222:23, 223:7, 223:16, 223:18, 224:17, 227:17, 228:23, 229:15, 230:3, 230:23, 231:17, 232:16, 232:20, 233:2, 233:5, 233:22, 236:8, 236:12, 236:17, 236:20, 236:21
**officer** [65] - 42:12, 42:22, 42:24, 46:24, 54:1, 56:2, 56:18, 57:22, 57:25, 65:7, 65:21, 69:11, 111:1, 117:11, 117:17, 118:21, 124:24, 126:4, 128:15, 128:21, 130:1, 130:9, 133:14, 134:14, 140:3, 140:4, 140:7, 140:15, 141:25, 142:6, 144:13, 144:18, 146:18, 146:25, 147:20, 147:25, 148:22, 152:24, 153:24, 156:9, 157:7, 162:23, 164:1, 168:7, 174:13, 178:6, 189:16, 191:20, 195:12, 195:13, 200:12, 200:14, 202:4, 202:17, 204:7, 202:12, 208:13, 208:14, 211:11, 215:21, 217:14, 233:19
**officer's** [3] - 42:20, 116:21, 154:23
**officers** [92] - 31:23,

32:3, 40:19, 41:1, 41:5, 41:14, 41:16, 41:17, 42:15, 42:16, 46:22, 47:1, 47:6, 47:8, 54:18, 54:20, 67:25, 68:14, 76:25, 77:3, 100:4, 101:23, 102:5, 108:13, 109:7, 114:7, 114:24, 116:5, 116:8, 117:6, 120:20, 120:21, 121:12, 122:4, 122:8, 122:9, 125:22, 126:1, 126:5, 126:15, 126:16, 126:25, 127:10, 128:6, 128:14, 128:19, 129:4, 130:17, 132:2, 135:23, 136:2, 136:3, 136:4, 136:6, 138:20, 139:4, 140:1, 142:8, 142:13, 147:9, 147:17, 148:15, 148:18, 149:16, 153:2, 154:12, 154:16, 154:24, 155:7, 155:9, 156:23, 157:12, 157:23, 160:8, 193:6, 200:2, 203:1, 203:14, 208:3, 209:15, 211:23, 213:14, 213:17, 214:11, 219:15, 220:4, 225:1, 234:9, 234:10, 235:11, 236:17, 236:18
**Officers** [2] - 102:3, 103:4
**officers'** [3] - 42:10, 102:11, 209:22
**official** [3] - 177:2, 178:9, 189:16
**old** [1] - 6:10
**Omar** [1] - 217:12
**omission** [1] - 103:15
**on-point** [1] - 100:8
**once** [10] - 13:8, 34:5, 41:16, 62:9, 87:2, 105:22, 167:5, 212:19, 212:21, 225:19
**one** [95] - 9:9, 10:9, 17:11, 17:15, 23:21, 42:24, 50:9, 53:24, 62:11, 65:8, 70:23, 70:24, 83:9, 90:25,

108:10, 109:5, 110:24, 111:21, 112:13, 115:3, 116:22, 116:24, 117:2, 120:22, 121:1, 122:17, 124:23, 126:11, 127:17, 130:15, 132:3, 132:6, 133:7, 134:14, 135:23, 136:1, 140:3, 140:7, 140:21, 141:22, 143:12, 144:10, 146:6, 146:24, 147:10, 147:19, 149:11, 152:3, 152:5, 153:3, 153:4, 153:6, 153:14, 153:25, 154:9, 154:11, 154:19, 165:8, 167:5, 167:9, 168:13, 168:25, 169:4, 169:5, 174:19, 175:22, 176:24, 182:10, 184:9, 186:2, 186:4, 190:13, 193:5, 193:23, 196:5, 199:11, 199:15, 200:17, 203:4, 204:15, 205:10, 205:22, 215:25, 216:8, 216:19, 228:2, 231:8, 233:10, 233:20, 235:16, 239:22, 241:8
**one's** [2] - 129:9, 220:2
**one-on-one** [1] - 134:14
**one-to-one** [1] - 146:6
**ones** [1] - 120:22
**open** [14] - 54:8, 54:25, 55:2, 114:16, 116:18, 117:20, 118:8, 123:5, 126:17, 132:14, 199:16, 199:18, 233:15, 238:17
**open-source** [6] - 114:16, 116:18, 117:20, 118:8, 123:5, 132:14
**opening** [1] - 165:25
**opining** [1] - 169:8
**opinion** [4] - 166:11, 166:24, 167:5, 167:8
**opinions** [1] - 166:19
**opponent** [6] - 92:10,

92:17, 92:18, 93:18, 95:21, 95:24
**opportunity** [4] - 101:9, 102:16, 109:10, 195:19
**opposing** [5] - 101:8, 123:19, 123:24, 125:23, 154:4
**opposite** [5] - 143:6, 144:23, 145:19, 209:19, 211:6
**oral** [1] - 241:11
**orange** [2] - 50:22, 155:8
**order** [2] - 113:11, 129:11
**ordered** [2] - 85:4, 200:13
**originated** [1] - 228:19
**otherwise** [8] - 70:25, 96:12, 108:20, 110:22, 164:11, 207:13, 211:5, 217:17
**outburst** [2] - 169:22, 170:19
**outside** [9] - 126:24, 131:2, 136:7, 152:13, 152:18, 175:3, 180:20, 226:8, 226:10
**outstretched** [2] - 153:16, 156:4
**overall** [1] - 118:6
**overcharging** [1] - 124:8
**overcome** [2] - 178:22, 209:11
**overlook** [1] - 93:14
**overnight** [2] - 93:9, 100:7
**overruled** [4] - 76:7, 106:21, 106:23, 107:16
**overruling** [3] - 93:25, 96:1, 109:16
**oversight** [1] - 104:7
**overtop** [1] - 139:23
**own** [32] - 12:10, 12:11, 119:21, 130:16, 131:12, 151:19, 152:25, 153:6, 153:25, 154:8, 155:7, 156:2, 157:3, 158:17, 158:22, 159:2, 159:18, 159:25, 162:12, 164:25, 171:15, 172:13, 173:2, 173:9,

173:16, 174:13, 174:23, 176:10, 178:23, 230:1, 230:4
**owner** [1] - 80:19
**ownership** [2] - 174:22, 174:23

## P

**p.m** [7] - 94:7, 94:22, 94:24, 125:3, 200:3, 238:18, 241:24
**packed** [2] - 6:9, 6:18
**PAGE** [1] - 3:2
**page** [12] - 6:25, 100:13, 100:14, 100:17, 100:18, 100:21, 100:22, 101:1, 102:24, 103:5, 106:16, 123:17
**pages** [1] - 103:11
**pain** [1] - 161:6
**pair** [1] - 6:18
**pairs** [1] - 6:10
**pan** [1] - 159:24
**panned** [1] - 137:5
**pans** [2] - 115:2, 152:18
**pants** [2] - 6:10, 6:18
**paper** [1] - 89:16
**papers** [1] - 207:8
**paralegal** [3] - 4:9, 4:14, 4:18
**pardon** [1] - 214:24
**part** [23] - 11:16, 13:1, 15:16, 16:7, 16:16, 17:13, 47:10, 57:3, 73:8, 74:12, 79:22, 80:19, 87:7, 93:24, 107:19, 116:3, 129:20, 130:9, 141:10, 154:11, 193:7, 235:19, 235:24
**parte** [1] - 237:11
**participant** [1] - 193:15
**participated** [1] - 222:22
**particular** [9] - 65:2, 82:20, 110:18, 112:19, 122:3, 154:7, 157:15, 204:21, 237:6
**particularly** [2] - 111:12, 240:12
**particulars** [1] - 200:14
**parties** [4] - 100:20,

103:19, 109:18, 109:23
**parties'** [2] - 100:6, 101:4
**party** [5] - 92:10, 92:17, 93:18, 95:21, 95:24
**party's** [1] - 101:8
**party-opponent** [5] - 92:10, 92:17, 93:18, 95:21, 95:24
**pass** [2] - 52:11, 199:17
**passed** [7] - 52:9, 52:21, 52:22, 53:6, 53:7, 152:15, 155:15
**passes** [3] - 153:17, 184:12, 184:17
**passing** [2] - 52:6, 156:10
**passive** [6] - 8:25, 11:14, 13:9, 51:6, 193:14, 205:16
**past** [2] - 201:22, 236:22
**patch** [1] - 210:6
**patience** [1] - 93:1
**pause** [37] - 19:15, 20:18, 25:15, 28:25, 29:16, 30:6, 30:22, 31:8, 32:18, 33:22, 36:5, 36:25, 37:8, 37:20, 38:23, 39:7, 41:12, 42:8, 43:6, 43:14, 44:2, 45:22, 46:10, 48:22, 51:23, 53:10, 56:6, 62:24, 63:7, 63:20, 64:8, 64:21, 65:5, 68:25, 69:8, 70:4, 202:25
**pay** [3] - 50:2, 95:25, 112:19
**paying** [1] - 104:25
**Pence** [1] - 198:4
**Pence's** [1] - 198:19
**people** [106] - 5:16, 8:8, 9:6, 12:12, 14:20, 16:14, 19:3, 20:9, 20:10, 21:11, 21:18, 22:20, 22:21, 23:10, 23:17, 23:19, 23:20, 26:16, 27:7, 27:25, 28:16, 28:20, 29:5, 29:11, 33:16, 34:14, 34:24, 35:11, 36:20, 37:25, 40:8, 41:18, 41:20, 44:19, 44:25, 46:20, 46:24, 46:25, 51:18, 52:6, 71:2, 74:17, 74:18,

74:19, 75:2, 75:22, 76:15, 76:16, 76:21, 76:22, 77:5, 77:8, 77:10, 77:12, 77:20, 81:24, 82:1, 87:7, 87:16, 114:23, 117:2, 118:13, 126:21, 131:3, 131:13, 146:16, 149:12, 152:17, 154:13, 155:6, 157:25, 174:8, 174:11, 175:6, 175:19, 177:1, 178:19, 179:4, 191:5, 193:19, 195:8, 198:25, 201:10, 204:21, 205:22, 206:17, 212:6, 216:11, 217:1, 217:7, 219:8, 220:22, 220:23, 220:25, 223:1, 226:8, 229:16, 232:12, 234:18, 234:21, 235:9, 235:22, 235:24, 238:9
**pepper** [10] - 30:24, 31:2, 34:25, 35:22, 77:17, 77:21, 154:17, 154:18, 217:25, 218:3
**pepper-sprayed** [1] - 217:25
**per** [4] - 104:1, 112:21, 160:15, 211:25
**percent** [2] - 96:21, 185:2
**perfectly** [1] - 220:21
**perform** [1] - 88:25
**perhaps** [7] - 33:1, 110:21, 159:10, 168:7, 169:12, 170:15, 218:16
**perimeter** [3] - 113:4, 150:12, 150:14
**period** [23] - 60:19, 110:21, 117:8, 118:6, 118:11, 122:7, 124:17, 124:21, 125:18, 126:8, 128:4, 129:6, 130:8, 137:21, 138:11, 138:23, 144:13, 145:21, 151:18, 171:18, 217:15, 218:6, 235:11

**periods** [3] - 124:11, 124:15, 149:14
**perishable** [1] - 89:22
**permit** [2] - 103:6, 211:14
**permitted** [1] - 101:22
**person** [58] - 33:12, 33:14, 51:9, 54:10, 62:11, 65:9, 80:20, 115:8, 119:10, 121:2, 133:8, 140:1, 148:5, 153:25, 154:12, 175:19, 180:24, 186:2, 186:3, 191:7, 191:9, 192:20, 198:9, 198:10, 198:21, 202:9, 202:23, 203:18, 208:18, 208:21, 209:5, 209:7, 209:12, 209:13, 209:14, 209:15, 209:20, 210:10, 210:11, 210:13, 212:4, 212:7, 213:8, 214:18, 214:19, 214:20, 215:14, 215:16, 215:18, 219:9, 223:12, 225:25, 231:23, 235:21
**person's** [1] - 209:24
**personal** [2] - 109:21, 218:15
**personally** [3] - 8:18, 78:19, 123:1
**perspective** [5] - 84:23, 148:20, 192:10, 218:15, 225:19
**persuasive** [1] - 216:5
**phase** [1] - 229:5
**phone** [102] - 8:16, 9:5, 13:19, 24:23, 39:1, 49:4, 49:6, 49:8, 49:15, 49:20, 55:4, 55:15, 55:16, 55:20, 56:3, 56:9, 56:14, 57:15, 58:24, 58:25, 59:3, 59:11, 59:13, 60:4, 60:5, 71:22, 71:25, 72:4, 72:5, 82:4, 85:12, 85:14, 85:16, 85:19, 86:1, 86:3, 86:11, 86:12, 86:22, 86:23, 86:25, 87:9, 87:12, 87:17, 87:19, 87:22, 88:12, 88:18, 89:9,

89:21, 89:23, 90:4, 90:7, 90:20, 91:8, 92:22, 93:6, 93:13, 94:5, 94:8, 94:10, 94:13, 94:14, 94:16, 96:16, 96:18, 96:20, 96:25, 97:1, 97:11, 97:22, 119:7, 130:16, 130:20, 152:11, 156:5, 158:17, 158:21, 158:22, 159:1, 159:7, 159:15, 159:19, 159:25, 164:25, 172:13, 172:21, 177:18, 179:24, 179:25, 180:5, 186:19, 187:1, 230:6, 230:13, 230:18, 230:21, 231:2, 231:4, 231:5
**photo** [6] - 114:3, 114:4, 117:1, 117:4, 173:25, 187:18
**photograph** [2] - 70:6, 72:5
**photographer** [1] - 158:4
**photographs** [1] - 197:4
**photojournalist** [2] - 214:22, 215:1
**phrase** [3] - 20:20, 26:2, 229:16
**phrased** [1] - 228:22
**physical** [11] - 113:16, 114:17, 117:22, 125:22, 137:15, 153:18, 153:23, 169:1, 169:10, 227:19, 227:20
**physically** [4] - 87:19, 118:5, 125:14, 125:21
**pick** [5] - 58:24, 58:25, 60:4, 71:23, 159:7
**picked** [4] - 56:11, 159:1, 186:19, 231:5
**picking** [4] - 71:25, 121:1, 159:8, 186:19
**picks** [1] - 117:14
**picture** [2] - 129:13, 192:20
**pictures** [1] - 150:16
**piece** [3] - 160:14, 215:25, 225:16
**pinned** [11] - 54:1, 133:25, 158:12, 158:14, 160:3,

161:20, 164:13, 164:15, 164:16, 165:1, 165:2
**pinning** [1] - 137:13
**pissed** [2] - 82:1, 82:2
**pivotal** [1] - 129:7
**place** [8] - 22:16, 194:8, 209:17, 210:22, 216:21, 216:22, 220:7, 231:18
**placed** [2] - 160:15, 220:11
**places** [1] - 214:7
**plan** [1] - 104:15
**planned** [1] - 104:6
**planning** [1] - 107:6
**play** [17] - 15:21, 19:13, 25:13, 26:9, 28:22, 44:13, 49:10, 58:8, 62:24, 63:25, 67:20, 69:6, 70:2, 134:22, 184:4, 208:24, 212:10
**played** [92] - 15:22, 19:14, 20:17, 21:23, 25:14, 28:24, 29:15, 30:4, 30:21, 31:7, 32:17, 33:21, 36:4, 36:13, 36:24, 37:7, 37:19, 38:5, 38:22, 39:6, 40:1, 40:14, 41:11, 42:7, 43:5, 43:13, 44:1, 44:15, 44:22, 45:21, 46:9, 47:12, 48:21, 49:11, 50:4, 50:13, 51:22, 53:9, 55:11, 55:24, 57:7, 58:10, 62:25, 63:6, 63:19, 64:1, 64:7, 64:20, 65:4, 67:21, 68:24, 69:7, 70:3, 134:25, 135:6, 183:13, 183:25, 184:7, 201:17, 201:24, 202:5, 202:8, 202:12, 202:20, 203:3, 203:6, 203:9, 206:14, 207:1, 208:9, 209:1, 209:8, 211:20, 212:13, 212:16, 214:14, 215:2, 216:17, 218:9, 218:12, 219:5, 220:18, 221:12, 221:18, 221:21, 222:5, 223:21, 223:25, 224:3, 224:8,

224:12, 224:18
**playing** [37] - 20:16, 21:22, 29:14, 30:3, 30:20, 31:6, 32:16, 33:20, 36:3, 36:23, 37:18, 38:4, 38:21, 39:5, 39:25, 40:13, 41:9, 42:6, 43:4, 43:24, 44:21, 45:20, 46:7, 47:11, 50:12, 51:21, 53:8, 55:8, 63:5, 63:18, 64:6, 64:19, 65:3, 68:22, 135:5, 201:5, 224:14
**plaza** [2] - 22:15, 75:3
**plenty** [3] - 51:17, 125:5, 205:22
**plucked** [1] - 140:7
**plural** [1] - 169:8
**podium** [1] - 99:11
**point** [57] - 7:22, 8:10, 18:12, 21:12, 24:3, 30:14, 38:19, 42:11, 43:18, 45:11, 46:12, 46:23, 47:18, 50:9, 53:12, 53:23, 54:14, 54:18, 55:14, 56:9, 56:24, 57:15, 77:23, 91:11, 100:8, 101:14, 103:15, 107:23, 111:6, 111:16, 111:21, 113:5, 116:22, 119:1, 120:11, 132:3, 142:8, 143:17, 145:8, 148:21, 153:6, 159:13, 165:20, 179:7, 184:9, 184:14, 185:1, 189:2, 195:5, 211:1, 211:10, 223:1, 229:2, 230:4, 231:14, 234:14, 235:19
**pointed** [1] - 119:7
**pointing** [4] - 142:6, 161:11, 163:2, 204:17
**points** [4] - 120:4, 166:9, 193:12, 231:12
**poking** [1] - 162:19
**pole** [9] - 117:14, 211:12, 211:18, 211:19, 212:1, 212:2, 212:8, 234:10
**Police** [2] - 120:20, 120:25
**police** [96] - 31:14,

31:22, 32:3, 34:22, 38:12, 38:16, 40:19, 41:5, 41:14, 41:16, 41:17, 42:10, 42:12, 42:15, 42:16, 42:20, 42:22, 42:24, 44:18, 45:1, 45:3, 45:13, 45:17, 45:24, 46:13, 46:22, 46:23, 46:25, 47:5, 47:8, 48:14, 49:4, 50:17, 50:18, 50:19, 50:20, 50:22, 51:18, 52:2, 52:23, 53:4, 54:1, 54:18, 54:20, 61:1, 67:25, 68:6, 68:14, 69:11, 76:25, 77:2, 114:1, 115:11, 115:21, 117:13, 131:25, 132:1, 139:18, 140:6, 141:19, 143:1, 143:23, 144:18, 145:18, 145:23, 146:16, 146:19, 147:19, 147:25, 148:19, 148:20, 149:16, 152:21, 153:9, 153:24, 157:23, 158:2, 158:10, 171:12, 175:25, 176:21, 191:20, 203:20, 205:22, 205:23, 208:3, 209:9, 211:4, 211:9, 219:7, 223:23, 224:16, 224:17, 224:20, 236:6
**policy** [1] - 161:4
**political** [2] - 26:18, 80:20
**politically** [2] - 80:13, 80:14
**pop** [1] - 142:5
**porta** [1] - 13:6
**portion** [4] - 91:4, 135:8, 136:10, 170:12
**portrayed** [1] - 211:24
**position** [7] - 107:13, 152:2, 209:21, 221:24, 231:17, 239:13
**positioned** [2] - 220:15, 221:15
**positions** [1] - 147:20
**positive** [1] - 53:22
**possession** [2] - 68:1, 90:1
**possible** [2] - 104:18,

161:24
**possibly** [1] - 211:11
**post** [1] - 240:18
**post-closings** [1] - 240:18
**potential** [2] - 101:16, 148:11
**potentially** [1] - 9:21
**potty** [1] - 13:6
**pounding** [2] - 190:15, 191:21
**pour** [2] - 30:6, 38:1
**poured** [1] - 131:3
**pouring** [2] - 175:7, 175:8, 175:19
**pours** [1] - 126:24
**power** [2] - 238:12, 238:14
**PowerPoint** [2] - 124:14, 125:12
**practical** [1] - 125:21
**practice** [4] - 70:14, 70:16, 70:24, 82:16
**precarious** [2] - 221:23, 231:17
**precedent** [1] - 108:6
**precedes** [1] - 155:5
**precluded** [1] - 102:15
**precludes** [1] - 101:8
**prefer** [1] - 104:20
**prejudice** [2] - 102:22, 103:1
**prejudiced** [2] - 102:15, 103:2
**prejudices** [1] - 101:8
**premised** [1] - 138:19
**prep** [1] - 167:8
**preparation** [2] - 6:3, 216:1
**prepare** [1] - 6:13
**prepared** [2] - 9:25, 10:1
**presence** [4] - 179:15, 188:4, 220:2, 235:4
**present** [9] - 4:17, 100:4, 101:5, 156:19, 181:24, 187:23, 188:6, 207:18
**presentation** [4] - 102:8, 104:6, 112:10, 112:16
**presented** [7] - 102:25, 113:25, 130:22, 144:17, 158:5, 187:13, 207:14
**preserve** [3] - 106:20, 107:17, 107:18
**President** [22] - 8:11,

12:25, 14:1, 98:12, 98:16, 150:13, 173:8, 173:10, 173:11, 179:4, 179:10, 179:13, 194:4, 194:10, 197:13, 197:16, 198:4, 198:7, 198:19, 198:23, 199:3, 199:4
**President's** [3] - 173:4, 173:6, 188:17
**presidential** [2] - 14:16, 197:13
**press** [2] - 128:6, 132:2
**pressed** [6] - 42:23, 114:8, 132:5, 132:11, 133:10, 137:4
**pressing** [7] - 41:18, 113:19, 132:7, 194:23, 218:18, 221:3, 222:7
**pressure** [1] - 114:13
**presume** [2] - 105:24, 114:19
**presuming** [2] - 96:17, 96:19
**pretty** [9] - 25:1, 39:19, 56:8, 91:22, 109:22, 150:17, 163:8, 203:23, 205:3
**prevail** [1] - 198:7
**prevent** [1] - 216:21
**preventing** [2] - 127:10, 214:7
**prevents** [1] - 103:15
**previous** [1] - 26:14
**previously** [3] - 22:6, 189:12, 193:8
**primarily** [4] - 6:17, 113:14, 129:2, 147:6
**principal** [1] - 155:11
**problem** [1] - 168:2
**problematic** [1] - 120:14
**procedure** [2] - 89:2, 160:15
**procedures** [1] - 87:6
**proceed** [2] - 223:14, 228:10
**proceeded** [1] - 103:20
**proceeding** [5] - 151:19, 177:2, 178:9, 226:17, 228:8
**Proceedings** [2] - 238:17, 241:24
**process** [6] - 14:11,

87:6, 87:11, 91:10, 179:12, 207:11
**procession** [1] - 74:18
**prod** [2] - 117:25, 118:2
**productive** [1] - 202:18
**proffered** [2] - 176:10, 229:1
**profound** [1] - 194:3
**progress** [1] - 220:14
**progressed** [1] - 131:25
**proof** [11] - 101:17, 188:15, 188:20, 198:22, 204:23, 206:24, 216:6, 217:15, 217:21, 223:7
**propels** [1] - 143:22
**propose** [1] - 104:13
**proposed** [3] - 105:17, 106:2, 227:11
**proposing** [1] - 151:9
**protect** [3] - 41:7, 122:24
**protectee** [1] - 150:13
**protecting** [1] - 135:16
**protest** [3] - 198:16, 226:5, 235:16
**protester** [2] - 210:16, 214:20
**protesters** [1] - 218:25
**protocol** [1] - 160:15
**prove** [19] - 107:12, 119:23, 121:11, 172:7, 189:17, 200:10, 207:6, 207:12, 209:23, 211:3, 211:7, 212:3, 215:9, 225:23, 225:24, 226:3, 226:22, 236:7, 240:3
**proved** [3] - 188:1, 192:22, 221:14
**proven** [3] - 210:25, 225:17, 232:1
**provide** [2] - 88:18, 88:24
**provided** [3] - 85:2, 87:24, 89:9
**providing** [3] - 88:12, 90:4, 90:6
**provisionally** [1] - 98:11
**prudent** [1] - 169:19
**psychiatrist** [1] - 73:6
**PTSD** [28] - 72:24, 73:1, 73:3, 73:13,

74:11, 77:24, 166:1, 166:2, 166:4, 167:17, 167:24, 169:23, 170:10, 170:22, 171:2, 185:6, 185:8, 185:15, 185:18, 185:25, 186:2, 189:6, 192:2, 195:8, 195:14, 227:10, 229:8
**pull** [13] - 6:23, 15:11, 19:4, 24:19, 28:7, 62:22, 69:4, 139:24, 141:18, 141:19, 143:7, 145:8, 183:8
**pulled** [31] - 61:8, 62:9, 139:18, 140:3, 140:16, 141:20, 141:23, 142:9, 142:13, 143:1, 143:4, 143:16, 143:20, 143:22, 143:25, 144:18, 144:20, 145:1, 145:9, 145:12, 145:14, 146:7, 146:9, 146:11, 146:20, 146:25, 147:3, 148:6, 148:9, 148:15
**pulling** [13] - 24:12, 139:15, 140:13, 142:19, 143:13, 145:11, 147:12, 147:25, 171:18, 202:10, 210:13, 212:15, 214:11
**pumped** [1] - 229:3
**pumping** [1] - 181:15
**punching** [3] - 71:1, 71:2, 162:17
**purport** [1] - 208:21
**purporting** [1] - 201:22
**purports** [3] - 84:10, 172:14, 177:25
**purpose** [1] - 101:21
**purposefully** [4] - 49:7, 49:8, 189:21, 190:1
**purposes** [5] - 85:5, 106:7, 108:7, 108:11, 138:5
**push** [18] - 42:3, 44:4, 44:8, 49:14, 116:12, 119:2, 136:6, 139:9, 140:19, 141:15, 143:3, 147:16, 155:4, 156:9, 157:2,

157:25, 181:3
**Push** [2] - 44:4, 155:3
**pushed** [22] - 49:21, 65:8, 81:24, 114:9, 114:24, 115:7, 115:15, 115:21, 133:7, 139:5, 139:6, 142:25, 143:4, 144:23, 146:10, 157:5, 183:11, 183:17, 183:18, 183:19, 183:23, 205:16
**pushing** [75] - 42:19, 43:1, 44:8, 44:11, 44:19, 113:24, 114:1, 115:4, 115:8, 116:14, 116:23, 116:25, 117:2, 118:5, 123:7, 124:18, 125:14, 125:17, 125:21, 128:10, 132:8, 132:9, 132:10, 132:16, 132:21, 132:25, 133:14, 134:10, 138:21, 139:8, 140:11, 143:2, 143:8, 143:11, 143:18, 143:19, 143:21, 143:24, 144:9, 144:12, 145:4, 144:5, 145:13, 145:17, 145:19, 146:11, 147:14, 147:17, 152:24, 153:5, 153:8, 154:1, 155:2, 155:9, 156:13, 157:1, 157:11, 183:17, 183:21, 202:1, 203:16, 214:11, 223:2, 223:18, 223:24, 233:2, 233:3, 233:7, 234:7, 234:11, 235:2, 236:6, 236:11
**puts** [3] - 140:4, 153:3, 236:22
**putting** [4] - 64:23, 82:4, 223:3, 234:8

## Q

**qualifies** [2] - 107:13, 107:21
**qualify** [1] - 107:8
**questioned** [1] - 191:15
**questioning** [1] -

190:5
**questions** [16] - 11:12, 78:7, 78:9, 78:22, 84:11, 98:2, 102:6, 110:25, 114:20, 119:10, 149:6, 151:12, 173:5, 195:25, 206:6, 231:9
**quick** [2] - 100:6, 145:2
**quickly** [5] - 116:4, 131:5, 152:20, 174:1, 175:24
**quite** [12] - 46:1, 51:3, 72:18, 162:6, 183:10, 191:24, 200:6, 201:9, 207:20, 210:23, 225:8, 235:6
**quote** [5] - 16:20, 26:9, 103:1, 173:7, 179:13

## R

**radio** [2] - 8:16, 9:13
**railing** [4] - 23:20, 23:22, 24:16
**raise** [1] - 103:14
**raised** [5] - 103:12, 107:24, 112:20, 124:1, 229:3
**raising** [3] - 69:14, 69:17, 103:3
**rally** [21] - 9:16, 9:18, 9:21, 11:1, 12:1, 12:10, 12:16, 13:4, 14:14, 16:1, 17:6, 17:22, 79:18, 79:25, 80:1, 80:3, 172:22, 188:8, 188:11, 188:13, 191:19
**rally-type** [1] - 9:18
**ran** [2] - 28:2, 67:5
**random** [1] - 121:2
**range** [1] - 164:14
**rather** [4] - 6:24, 190:9, 190:17, 206:20
**rational** [2] - 180:24, 194:5
**re** [2] - 85:18, 169:19
**re-ask** [1] - 85:18
**re-read** [1] - 169:19
**reach** [3] - 117:9, 139:23, 142:13
**reached** [5] - 50:24, 139:14, 159:11
**reaches** [2] - 155:24, 167:15

**reaching** [5] - 60:5, 234:9, 234:10, 234:11
**react** [1] - 51:10
**reaction** [3] - 69:10, 69:12, 192:10
**read** [2] - 91:3, 169:19
**ready** [3] - 4:20, 99:7, 196:18
**real** [2] - 125:20, 174:5
**realize** [3] - 19:1, 146:5, 193:24
**realized** [6] - 41:14, 41:16, 89:17, 105:8, 191:2, 209:17
**realizes** [2] - 184:18, 210:22
**really** [45] - 5:13, 7:12, 25:4, 26:20, 63:23, 74:10, 75:12, 106:4, 109:20, 116:4, 119:25, 121:6, 121:12, 123:7, 125:11, 125:18, 126:8, 127:13, 127:16, 127:17, 132:22, 134:16, 136:5, 136:8, 137:6, 140:10, 152:8, 153:7, 154:18, 157:14, 158:8, 158:24, 159:3, 164:16, 168:15, 171:5, 172:3, 176:14, 180:22, 181:9, 184:25, 193:14, 200:18, 233:17, 234:22
**reason** [15] - 10:17, 12:7, 28:19, 30:11, 42:15, 42:19, 124:23, 145:22, 146:4, 164:2, 164:4, 185:3, 198:11, 198:13, 207:22
**reasonable** [25] - 102:6, 144:16, 175:19, 188:2, 189:18, 192:22, 198:12, 199:7, 199:13, 199:20, 204:23, 206:20, 206:25, 209:23, 210:15, 211:2, 212:18, 215:9, 216:6, 216:22, 217:16, 221:14, 225:8, 225:17, 226:23
**reasonableness** [1] -

101:4
**reasons** [2] - 104:8, 124:23
**rebels** [1] - 40:23
**rebuking** [1] - 191:20
**rebuttal** [6] - 111:7, 113:5, 125:6, 156:19, 204:17, 227:4
**recalled** [1] - 113:23
**receipt** [1] - 101:7
**receive** [2] - 91:11, 136:13
**received** [6] - 84:7, 87:3, 91:14, 91:15, 91:18, 93:9
**recently** [2] - 197:12, 200:13
**Recess** [3] - 105:7, 149:1, 196:23
**recipient** [1] - 135:19
**recitation** [1] - 213:21
**recognize** [2] - 28:17, 74:5
**recognized** [3] - 100:9, 109:15, 120:12
**recollection** [10] - 81:12, 83:1, 88:16, 88:20, 90:19, 91:7, 91:18, 119:25, 153:22, 186:22
**record** [22] - 4:6, 47:5, 47:8, 77:5, 84:15, 84:23, 85:6, 93:20, 98:9, 106:8, 106:9, 106:13, 106:20, 107:17, 107:18, 108:11, 112:3, 159:11, 195:1, 230:16, 237:13, 240:23
**recorded** [2] - 87:3, 200:22
**recording** [99] - 15:22, 19:14, 20:17, 21:23, 25:14, 28:24, 29:15, 30:4, 30:21, 31:7, 32:17, 33:21, 36:4, 36:13, 36:24, 37:7, 37:19, 38:5, 38:22, 39:6, 40:1, 40:14, 41:11, 42:7, 43:5, 43:13, 44:1, 44:15, 44:22, 45:21, 46:9, 47:7, 47:10, 47:12, 48:21, 49:11, 50:4, 50:13, 51:22, 53:9, 55:11, 55:24, 57:7, 58:10, 62:25, 63:6,

63:19, 64:1, 64:7, 64:20, 65:4, 67:21, 68:24, 69:7, 70:3, 77:7, 134:25, 135:6, 158:21, 159:15, 159:19, 183:13, 183:25, 184:7, 201:17, 201:24, 202:5, 202:8, 202:12, 202:20, 203:3, 203:6, 203:9, 206:14, 207:1, 208:9, 209:1, 209:8, 211:20, 212:13, 212:16, 214:14, 215:2, 216:17, 218:9, 218:12, 219:5, 220:18, 221:12, 221:18, 221:21, 222:5, 223:21, 223:25, 224:3, 224:8, 224:12, 224:18, 230:18
**Recross** [1] - 3:6
**RECROSS** [1] - 85:9
**Recross-Examination** [1] - 3:6
**RECROSS-EXAMINATION** [1] - 85:9
**red** [6] - 38:9, 117:3, 150:11, 201:7, 201:11, 203:11
**red-and-yellow-and-white** [1] - 117:3
**redirect** [3] - 78:11, 98:3, 120:1
**Redirect** [1] - 3:5
**REDIRECT** [1] - 78:12
**reentered** [2] - 131:4, 131:14
**refer** [1] - 97:18
**reference** [2] - 25:21, 92:11
**referred** [1] - 97:8
**referring** [12] - 14:4, 16:14, 16:18, 17:1, 27:7, 27:25, 38:17, 94:12, 116:24, 149:23, 229:11, 232:7
**refers** [1] - 178:25
**reflect** [3] - 106:10, 159:12, 206:2
**refresh** [1] - 91:7
**refrigerator** [3] - 199:17, 199:18, 225:7

**refused** [2] - 166:8, 166:13
**regarding** [1] - 99:8
**regardless** [1] - 93:25
**regional** [1] - 100:9
**regrettable** [1] - 197:3
**rejoined** [1] - 131:4
**relate** [2] - 167:18, 228:15
**related** [2] - 80:6, 166:3
**relates** [7] - 113:25, 117:5, 151:10, 172:2, 227:13, 232:10, 239:15
**relating** [1] - 227:17
**release** [1] - 239:4
**relented** [1] - 145:9
**relentless** [2] - 127:23, 128:6
**relevance** [6] - 92:15, 92:20, 93:16, 95:21, 97:14, 227:10
**relevant** [9] - 93:3, 97:19, 97:23, 101:6, 102:12, 112:23, 135:7, 201:12, 227:12
**relied** [1] - 108:19
**reliving** [1] - 182:4
**relodged** [1] - 126:17
**rely** [15] - 116:16, 118:4, 118:7, 119:21, 123:24, 124:6, 129:1, 129:5, 165:5, 171:23, 171:24, 183:6, 190:6, 201:13, 227:18
**relying** [10] - 109:1, 109:5, 109:7, 109:19, 110:20, 110:24, 121:22, 128:24, 151:3, 227:16
**remain** [2] - 140:2, 150:24
**remained** [1] - 122:14
**remarkable** [1] - 213:8
**remarkably** [1] - 212:24
**remedied** [1] - 124:21
**remember** [26] - 9:17, 36:16, 36:18, 37:25, 62:8, 63:12, 63:16, 72:3, 80:1, 81:13, 89:3, 89:6, 90:22, 93:22, 99:3, 144:2, 163:19, 163:20, 164:18, 172:14,

176:19, 192:8, 205:9, 215:13, 222:23
**remembered** [5] - 115:17, 132:24, 197:6
**remembering** [4] - 191:4, 192:15, 204:14, 204:25
**remembers** [7] - 113:21, 161:19, 162:1, 164:1, 192:6, 195:3
**remind** [4] - 4:22, 84:14, 220:23, 232:25
**reminding** [1] - 191:3
**remiss** [1] - 181:14
**remorse** [1] - 66:18
**remove** [1] - 210:16
**removed** [1] - 189:1
**rendered** [5] - 136:3, 166:19, 167:4, 167:9, 169:18
**rendering** [2] - 47:9, 128:21
**renew** [6] - 111:22, 111:23, 112:3, 240:15, 240:17, 240:18
**reopen** [9] - 100:1, 100:2, 100:10, 101:15, 101:21, 101:25, 103:8, 122:13, 122:20
**reopened** [2] - 104:9, 122:14
**reopening** [5] - 99:24, 101:12, 102:20, 102:24, 103:6
**reopens** [1] - 123:8
**repeated** [1] - 20:6
**repeatedly** [4] - 44:4, 116:10, 206:23, 211:12
**repeating** [1] - 20:10
**repel** [1] - 146:12
**repelling** [1] - 143:10
**replay** [2] - 43:9, 82:5
**report** [5] - 167:11, 168:1, 168:2, 169:7, 169:25
**Reporter** [1] - 85:1
**REPORTER'S** [1] - 241:18
**request** [3] - 84:17, 97:1, 112:22
**requested** [1] - 102:8
**requesting** [1] - 84:24
**require** [1] - 107:14

**required** [1] - 240:3
**requirement** [1] - 207:11
**requires** [5] - 85:4, 103:10, 108:7, 210:8, 241:1
**rescued** [1] - 140:17
**resecure** [1] - 122:9
**reserved** [2] - 212:7, 234:2
**resist** [3] - 122:1, 210:9, 223:11
**resisting** [11] - 123:19, 123:24, 154:4, 200:1, 210:3, 210:8, 212:20, 213:22, 219:14, 219:15, 219:25
**resistive** [3] - 215:10, 217:17, 218:22
**respect** [8] - 84:18, 200:8, 205:6, 207:5, 208:6, 240:24, 241:2
**respectfully** [4] - 106:23, 199:23, 200:3, 223:10
**responding** [3] - 203:14, 203:15, 203:16
**response** [4] - 49:3, 182:4, 188:10, 219:22
**responsibility** [1] - 176:12
**responsible** [9] - 5:7, 123:1, 127:10, 140:1, 141:23, 165:2, 221:1, 223:3, 223:18
**rest** [2] - 141:25, 196:21
**rested** [2] - 100:11, 102:25
**resting** [1] - 64:23
**restricted** [3] - 113:4, 150:10, 150:12
**restriction** [1] - 138:14
**rests** [1] - 211:2
**result** [2] - 216:5, 226:25
**results** [1] - 165:8
**retake** [1] - 84:13
**retreated** [1] - 230:1
**retrieve** [1] - 236:17
**retrieved** [1] - 140:23
**return** [5] - 208:2, 224:16, 226:25, 239:3, 239:6
**returned** [2] - 207:12, 207:16

**returning** [1] - 211:21
**returns** [1] - 207:9
**review** [13] - 87:6,
87:11, 87:17, 90:23,
92:9, 93:6, 93:8,
96:25, 97:7, 120:16,
170:24, 192:18,
226:20
**reviewed** [2] - 120:17,
215:24
**reviewing** [1] - 94:15
**reviews** [1] - 206:18
**revision** [1] - 108:7
**revolving** [1] - 181:25
**rewatch** [2] - 115:3,
115:5
**Rhodes** [1] - 240:9
**ride** [3] - 15:8, 24:6,
78:20
**ridiculous** [1] - 234:3
**rigged** [1] - 173:12
**right-hand** [1] - 139:2
**right-handed** [2] -
72:10, 153:16
**rightly** [1] - 177:2
**rights** [1] - 180:25
**rile** [1] - 27:3
**riot** [20] - 77:14,
143:20, 143:22,
148:1, 212:17,
214:5, 214:6, 214:7,
214:9, 214:11,
214:12, 214:17,
216:25, 217:5,
218:18, 220:6,
220:10, 221:16,
222:8, 223:9
**rioter** [22] - 29:18,
47:21, 47:24, 48:5,
57:11, 122:10,
130:18, 133:2,
139:13, 139:23,
140:13, 141:18,
142:19, 143:13,
145:7, 145:11,
145:14, 146:18,
147:11, 155:7,
171:17, 232:22
**rioter's** [2] - 141:21,
157:2
**rioters** [46] - 23:13,
30:24, 32:11, 37:12,
68:8, 115:23,
115:24, 116:19,
116:24, 117:7,
122:5, 122:8,
122:19, 122:22,
126:1, 126:5,
126:13, 126:15,
126:22, 127:3,

127:8, 130:1,
130:19, 131:8,
131:12, 133:22,
136:1, 136:3, 136:4,
136:23, 138:21,
139:2, 140:19,
147:17, 148:1,
152:16, 152:23,
153:5, 154:8, 155:2,
155:3, 156:9,
157:13, 173:1,
219:14, 236:9
**rioters'** [1] - 23:16
**rip** [4] - 57:21, 57:25,
58:2, 60:16
**ripped** [3] - 164:3,
170:1, 171:13
**ripping** [2] - 128:8,
162:14
**rise** [2] - 107:20,
151:23
**risk** [3] - 140:4,
141:24, 141:25
**risks** [1] - 147:1
**risky** [1] - 25:6
**road** [1] - 173:25
**robbery** [2] - 171:9,
189:10
**rocking** [2] - 123:6,
129:24
**Rodriguez** [2] -
100:18, 100:25
**role** [1] - 96:22
**room** [2] - 122:4,
156:5
**routine** [1] - 97:2
**Rule** [4] - 111:23,
112:3, 240:12, 241:8
**rule** [2] - 93:18, 99:23
**run** [2] - 28:13, 149:19
**running** [1] - 154:19
**rush** [1] - 93:12

### S

**safety** [1] - 140:1
**San** [1] - 188:19
**saved** [1] - 141:8
**saw** [58] - 18:9, 23:19,
23:21, 27:21, 27:25,
29:3, 31:10, 34:2,
35:2, 48:13, 53:24,
54:3, 54:5, 56:17,
57:24, 69:2, 71:10,
71:12, 74:2, 76:16,
77:8, 113:25,
115:18, 115:23,
116:3, 117:10,
119:12, 120:11,
128:3, 130:2, 131:6,

131:23, 137:5,
138:24, 139:20,
140:21, 140:23,
141:7, 145:25,
150:15, 151:19,
152:14, 157:22,
157:24, 164:20,
171:15, 180:21,
198:24, 202:2,
205:22, 205:23,
218:10, 229:25,
231:20
**scaffolding** [8] -
21:10, 22:7, 22:9,
22:11, 23:9, 23:21,
75:13, 174:12
**scalp** [2] - 163:3,
165:10
**scar** [2] - 72:6
**scariest** [1] - 114:11
**scary** [2] - 25:1, 25:3
**scenarios** [1] - 191:4
**scene** [6] - 202:14,
202:22, 205:21,
215:13, 218:5,
218:16
**schedule** [2] - 237:22,
238:4
**scheduled** [1] -
237:10
**scheduling** [3] -
103:24, 237:11,
237:14
**school** [1] - 225:1
**scienter** [1] - 181:23
**scope** [1] - 85:7
**scrambled** [1] - 104:5
**scream** [1] - 82:18
**screamed** [1] - 161:6
**screaming** [9] - 43:2,
43:19, 44:25,
116:19, 117:17,
155:3, 155:6, 191:5,
234:7
**screams** [1] - 182:2
**screen** [9] - 15:17,
16:17, 69:14, 69:18,
112:15, 166:22,
183:16, 204:19,
231:13
**screenshot** [1] - 7:9
**screenshotting** [1] -
7:22
**script** [1] - 102:7
**scurrying** [1] - 116:4
**se** [2] - 104:1, 211:25
**sea** [1] - 121:2
**search** [17] - 86:5,
86:8, 86:10, 86:12,
86:25, 87:12, 87:15,

87:20, 87:23, 89:1,
90:20, 91:8, 94:5,
97:11
**searched** [1] - 86:4
**searching** [1] - 85:25
**second** [32] - 23:18,
23:22, 24:16, 24:23,
25:10, 50:2, 53:18,
62:20, 63:24, 67:25,
75:18, 90:25,
101:20, 121:4,
133:20, 142:6,
150:19, 156:1,
157:5, 158:25,
159:2, 159:8,
159:18, 165:9,
165:13, 186:18,
194:25, 212:2,
222:24, 231:6,
233:13, 235:10
**Second** [1] - 100:13
**second-wise** [1] -
62:20
**seconds** [41] - 21:4,
36:12, 37:5, 43:11,
44:13, 45:14, 45:18,
48:19, 51:24, 53:19,
60:19, 62:17, 64:14,
68:19, 68:20, 69:5,
69:6, 111:18,
117:16, 128:1,
137:25, 141:16,
154:5, 161:17,
164:24, 183:7,
183:9, 194:19,
194:20, 195:1,
208:8, 208:25,
210:12, 212:10,
216:10, 220:13,
224:11, 229:24,
230:5
**Secret** [1] - 150:13
**section** [2] - 113:14,
118:21
**secure** [1] - 133:2
**secured** [4] - 160:16,
162:12, 162:14
**securely** [1] - 160:15
**security** [1] - 157:22
**see** [230] - 15:6, 15:17,
29:11, 30:6, 35:19,
37:4, 39:13, 44:7,
46:19, 49:14, 52:10,
54:18, 54:21, 56:2,
56:8, 56:12, 56:13,
56:18, 63:2, 63:3,
64:10, 64:23, 64:25,
65:9, 65:13, 65:19,
66:13, 66:14, 67:23,
69:14, 69:16, 69:17,

76:18, 76:22, 76:23,
77:10, 77:12, 77:14,
90:11, 90:23, 91:1,
95:1, 95:2, 96:8,
96:13, 105:6, 111:6,
113:16, 113:17,
113:18, 113:19,
114:2, 114:3,
114:15, 114:16,
114:22, 115:6,
116:7, 117:2, 117:4,
117:6, 117:9,
117:15, 117:16,
118:17, 118:19,
119:3, 122:2,
122:12, 123:3,
123:4, 123:5, 123:8,
125:13, 125:14,
125:15, 125:16,
125:17, 126:8,
126:14, 126:19,
126:20, 126:22,
127:16, 127:19,
127:20, 127:22,
127:25, 128:8,
129:11, 129:14,
129:16, 129:17,
129:23, 130:14,
130:16, 130:18,
132:9, 132:13,
132:14, 132:16,
132:17, 133:6,
133:17, 134:5,
134:6, 134:9,
134:10, 134:11,
134:16, 134:20,
135:2, 137:2, 137:4,
137:15, 138:1,
138:25, 139:1,
139:2, 139:18,
139:19, 139:23,
140:10, 140:11,
140:12, 140:14,
141:21, 142:5,
142:18, 142:20,
143:14, 143:18,
143:19, 143:20,
144:21, 147:1,
149:14, 152:11,
152:21, 152:25,
153:6, 153:15,
153:25, 154:8,
155:1, 155:7,
155:22, 155:23,
156:1, 156:3,
156:25, 157:3,
157:8, 157:9,
158:12, 159:17,
159:18, 161:14,
162:15, 163:5,
164:23, 164:25,

168:12, 168:19,
171:19, 173:20,
174:13, 174:18,
175:19, 176:16,
178:7, 179:14,
183:15, 183:16,
184:2, 184:5,
184:21, 184:22,
187:6, 188:24,
188:25, 194:12,
194:14, 194:15,
195:5, 201:9,
201:25, 202:6,
202:21, 203:8,
203:14, 204:15,
204:18, 206:10,
206:16, 208:21,
212:4, 212:18,
216:8, 216:12,
217:24, 218:2,
218:4, 220:6, 220:8,
220:19, 221:4,
221:5, 222:11,
223:22, 223:23,
226:8, 230:5,
232:16, 232:19,
233:3, 233:10,
233:11, 233:14,
233:15, 234:5,
234:20, 236:3,
236:11, 236:20
**seeing** [12] - 35:6,
35:19, 40:8, 66:8,
72:3, 73:6, 74:1,
110:21, 144:3,
175:5, 195:22, 203:1
**seek** [1] - 95:18
**seeking** [1] - 225:23
**seem** [5] - 29:6,
191:24, 192:11,
202:17, 211:13
**sees** [2] - 174:11
**segment** [1] - 153:24
**seize** [4] - 86:3, 86:10,
86:14, 86:17
**seized** [9] - 85:22,
85:25, 86:1, 86:4,
86:16, 86:17, 86:18,
86:21, 86:23
**seizure** [2] - 85:12,
89:19
**self** [2] - 166:14,
176:11
**self-serving** [2] -
166:14, 176:11
**selfie** [1] - 152:18
**send** [2] - 35:9, 198:5
**sending** [1] - 7:22
**sense** [10] - 55:2,
105:20, 110:2,

156:15, 164:17,
175:23, 182:3,
192:11, 192:14,
210:21
**sensed** [1] - 18:12
**senses** [1] - 186:13
**sent** [2] - 7:9, 188:9
**sentence** [2] - 97:5
**sentencing** [1] -
169:12
**separate** [4] - 107:8,
107:13, 107:14,
162:22
**separated** [5] - 12:5,
124:13, 145:23,
146:15, 152:8
**sequence** [5] - 59:2,
59:5, 61:7, 62:8,
211:25
**Sergeant** [23] -
116:22, 117:24,
118:9, 120:21,
122:14, 122:16,
126:3, 127:4, 127:7,
128:5, 128:18,
129:3, 135:21,
139:25, 145:25,
150:15, 154:7,
154:17, 157:9,
161:4, 165:4,
171:25, 213:11
**series** [2] - 151:20,
210:20
**serious** [5] - 140:4,
147:1, 148:4,
165:18, 217:7
**seriously** [1] - 73:4
**served** [2] - 197:12
**service** [1] - 31:20
**Service** [1] - 150:13
**serving** [3] - 114:7,
166:14, 176:11
**set** [4] - 59:24, 159:9,
159:14, 170:10
**setting** [1] - 237:5
**seven** [1] - 75:6
**several** [19] - 60:19,
62:17, 98:10,
100:23, 115:11,
115:18, 116:8,
116:11, 116:15,
119:15, 122:15,
124:25, 132:1,
146:16, 175:1,
180:21, 192:23,
198:1, 229:12
**share** [1] - 199:9
**Shield** [1] - 34:8
**shield** [128] - 34:8,
42:12, 42:13, 42:20,

42:22, 42:23, 43:1,
44:7, 52:2, 53:12,
53:15, 53:17, 53:21,
57:3, 63:3, 68:4,
117:9, 117:11,
117:12, 122:1,
122:13, 123:7,
125:24, 128:3,
129:12, 129:21,
129:23, 130:6,
130:8, 130:12,
131:23, 131:24,
132:1, 132:7,
132:16, 132:22,
133:3, 133:7, 134:6,
134:10, 134:15,
135:2, 135:19,
136:2, 136:21,
136:24, 137:4,
138:2, 138:8,
139:12, 139:14,
140:18, 141:15,
141:17, 142:24,
143:2, 143:5, 143:7,
143:15, 143:24,
144:6, 144:10,
144:12, 144:19,
144:25, 145:4,
145:16, 146:18,
146:24, 147:11,
147:14, 147:22,
148:1, 148:17,
148:21, 150:6,
150:7, 151:4, 151:6,
151:9, 151:10,
153:2, 153:17,
153:25, 155:15,
155:23, 155:24,
156:4, 156:6, 156:8,
156:11, 156:16,
156:21, 157:7,
183:6, 183:7,
183:10, 184:2,
184:10, 184:19,
211:11, 212:1,
212:18, 213:23,
214:5, 214:6, 214:7,
214:9, 214:11,
214:12, 214:17,
216:8, 216:15,
216:19, 216:20,
216:21, 218:18,
220:6, 220:10,
221:16, 223:3,
223:9, 225:10,
234:11
**shields** [32] - 31:10,
31:12, 31:14, 31:16,
31:18, 32:5, 33:24,
34:6, 34:11, 34:14,
34:22, 35:6, 35:20,

42:10, 52:6, 77:14,
122:11, 128:2,
130:10, 135:20,
135:22, 135:24,
136:3, 136:7,
144:16, 147:17,
152:15, 156:12,
157:25, 175:21,
222:8, 234:9
**shift** [1] - 74:24
**shine** [1] - 49:4
**shirt** [2] - 6:18, 188:23
**shit** [2] - 82:19, 191:10
**Shit's** [1] - 174:5
**shocking** [1] - 232:2
**shoes** [1] - 188:23
**shone** [1] - 49:1
**shop** [1] - 27:8
**shopped** [1] - 27:8
**short** [2] - 122:7
**shortly** [3] - 90:6,
156:13, 171:20
**shorts** [3] - 6:17, 6:18,
188:23
**shot** [4] - 67:13,
120:13, 127:21,
139:20
**shoulder** [7] - 186:18,
186:20, 187:2,
195:4, 206:22,
232:23, 233:6
**shouts** [1] - 44:8
**shoving** [1] - 223:2
**show** [19] - 26:19,
70:21, 80:19, 91:25,
110:18, 110:22,
112:20, 159:23,
170:8, 175:2, 176:8,
183:2, 189:17,
192:23, 202:14,
211:8, 211:14,
217:23, 226:16
**showed** [8] - 16:14,
153:7, 160:4, 168:8,
201:14, 219:19,
232:25, 236:21
**showing** [2] - 142:18,
195:6
**shown** [4] - 104:3,
168:8, 203:12, 216:1
**shows** [14] - 97:20,
97:24, 115:10,
116:14, 116:19,
130:23, 154:23,
157:14, 160:1,
183:11, 190:22,
193:3, 197:4, 234:23
**shrieking** [3] - 43:2,
43:8, 44:4
**shut** [1] - 38:8

42:10, 52:6, 77:14,
**sic** [14] - 20:5, 21:3,
50:25, 84:25, 89:10,
109:19, 116:1,
119:3, 142:9,
159:17, 170:2,
213:10, 228:23
**side** [24] - 18:7, 45:25,
46:3, 49:14, 50:8,
54:10, 54:12, 64:24,
115:1, 122:17,
129:13, 133:1,
134:2, 134:7,
134:10, 135:24,
138:1, 138:9, 139:2,
140:12, 141:4,
184:3, 184:9, 219:20
**sides** [1] - 104:2
**sight** [2] - 161:17,
161:18
**sign** [3] - 99:20,
174:20, 178:3
**signature** [1] - 90:23
**signatures** [4] - 89:7,
89:10, 89:12, 89:13
**signed** [1] - 91:12
**significant** [1] - 235:8
**significantly** [1] -
122:20
**signing** [1] - 89:17
**signs** [2] - 76:12,
150:16
**similar** [1] - 179:16
**similarly** [2] - 158:19,
229:2
**simply** [7] - 133:7,
156:10, 199:4,
204:22, 213:6,
223:7, 231:3
**simultaneously** [2] -
61:10, 155:3
**sincere** [1] - 226:5
**single** [1] - 235:21
**sit** [1] - 26:21
**sitting** [1] - 103:17
**situation** [6] - 74:10,
77:3, 121:1, 121:3,
146:22, 156:6
**situations** [1] - 25:6
**six** [2] - 5:24, 123:15
**sixth** [2] - 102:13,
144:4
**sixty** [1] - 45:14
**skepticism** [1] -
144:15
**skip** [3] - 112:22,
112:24, 217:18
**skipped** [1] - 102:7
**Skype** [1] - 95:3
**slept** [2] - 197:22,
199:2

1371

**Slide** [2] - 117:16, 152:12
**slide** [3] - 129:10, 130:2, 130:21
**slides** [1] - 149:10
**slightly** [2] - 103:20, 130:1
**slippery** [1] - 219:17
**slope** [1] - 219:17
**slow** [2] - 129:15, 129:22
**slowly** [1] - 143:16
**smacked** [1] - 59:3
**smashed** [1] - 164:23
**smell** [1] - 77:16
**smells** [1] - 73:19
**smoke** [1] - 47:16
**snapped** [2] - 62:15, 192:5
**snapshot** [1] - 134:8
**Soaker** [1] - 130:18
**social** [4] - 158:6, 180:10, 188:4, 192:19
**socks** [1] - 6:10
**sole** [1] - 100:10
**solely** [1] - 221:1
**someone** [40] - 5:19, 8:15, 30:6, 30:11, 32:25, 36:9, 38:1, 39:2, 39:3, 43:8, 44:4, 46:19, 52:18, 53:6, 54:15, 58:21, 58:25, 71:1, 77:24, 80:12, 115:13, 115:14, 133:7, 158:18, 159:11, 180:4, 180:9, 184:13, 191:19, 191:23, 193:13, 194:4, 195:10, 195:14, 202:10, 205:15, 225:20, 229:13, 229:14, 230:17
**sometime** [2] - 86:24, 91:19
**somewhere** [4] - 10:23, 22:19, 88:17, 161:13
**soon** [2] - 89:25, 91:22
**sophisticated** [1] - 179:9
**Sorrell** [1] - 232:15
**sorry** [28] - 10:16, 12:22, 15:12, 48:18, 48:20, 56:25, 72:8, 83:18, 85:1, 90:13, 97:19, 105:12,

111:20, 118:23, 129:17, 133:12, 140:25, 149:19, 151:22, 182:8, 183:4, 185:7, 187:5, 191:11, 228:11, 238:19, 241:6
**sort** [47] - 12:7, 50:8, 56:8, 104:19, 115:6, 123:6, 126:5, 127:13, 127:16, 129:7, 129:13, 129:24, 130:11, 133:21, 133:22, 133:24, 134:1, 134:6, 134:11, 135:16, 139:20, 140:8, 140:13, 142:4, 143:14, 143:18, 143:22, 145:2, 145:6, 147:12, 153:3, 154:23, 157:3, 157:11, 158:16, 159:24, 160:5, 165:14, 165:21, 165:22, 169:4, 175:10, 181:9, 229:4, 233:5, 236:22
**sorts** [2] - 152:17, 199:15
**sotto** [1] - 241:18
**sound** [1] - 205:15
**sounded** [1] - 192:1
**sounds** [5] - 36:14, 148:25, 186:3, 204:4, 204:9
**source** [6] - 114:16, 116:18, 117:20, 118:8, 123:5, 132:14
**sources** [1] - 195:6
**space** [4] - 55:2, 122:7, 126:15, 155:1
**speaker** [1] - 201:16
**speaking** [10] - 79:19, 79:20, 89:4, 93:5, 98:12, 204:3, 204:16, 207:19, 207:20, 207:21
**speaks** [9] - 161:19, 163:13, 169:7, 180:22, 192:21, 210:1, 214:15, 223:4, 240:2
**Special** [13] - 4:10, 85:11, 94:4, 94:18, 95:5, 101:22, 119:5, 119:9, 119:14, 119:18, 121:14, 213:2, 213:16

**special** [5] - 92:18, 94:20, 95:7, 237:15, 238:6
**specialist** [1] - 4:9
**specific** [15] - 25:18, 107:3, 110:23, 111:10, 116:13, 124:15, 124:17, 124:21, 171:4, 207:18, 215:23, 222:23, 227:13, 239:17, 239:24
**specifically** [23] - 9:17, 11:10, 37:24, 52:20, 79:22, 107:1, 107:4, 113:21, 115:16, 119:1, 120:9, 120:17, 127:1, 138:8, 179:5, 181:24, 185:18, 185:21, 186:4, 192:25, 193:9, 207:9, 222:23
**specify** [1] - 208:4
**spectator** [1] - 193:14
**speech** [18] - 11:1, 12:19, 15:7, 26:14, 26:22, 29:9, 29:11, 173:4, 173:7, 178:11, 178:12, 178:13, 187:23, 188:17, 194:14, 198:23, 199:3
**speeches** [4] - 12:17, 26:18, 178:18, 180:16
**speed** [1] - 233:14
**spend** [4] - 11:19, 111:5, 111:15, 112:21
**spit** [1] - 8:20
**split** [1] - 156:1
**split-second** [1] - 156:1
**spoken** [3] - 98:16, 172:20, 173:8
**spot** [2] - 8:14, 54:8
**spray** [19] - 30:24, 31:2, 34:25, 35:22, 77:17, 77:21, 130:16, 136:4, 154:17, 154:18, 154:23, 157:20, 157:24, 184:20, 184:21, 184:22, 186:1, 186:2, 218:3
**sprayed** [13] - 30:12, 126:24, 127:25, 131:2, 160:18, 176:1, 184:23,

194:18, 194:20, 217:25, 228:20, 229:24, 230:1
**spraying** [2] - 50:22, 155:8
**sprays** [1] - 47:17
**squeeze** [2] - 37:22
**squeezing** [1] - 38:8
**stage** [2] - 21:11, 163:22
**stairwell** [1] - 23:19
**stamp** [7] - 48:17, 62:23, 65:16, 67:17, 69:5, 90:24, 115:3
**stamped** [1] - 187:18
**stamps** [3] - 115:12, 137:18, 206:9
**stand** [9] - 4:22, 54:8, 84:14, 169:5, 172:22, 173:6, 178:4, 178:17, 181:9
**standard** [1] - 89:2
**standing** [29] - 19:10, 22:15, 22:20, 24:25, 25:8, 28:11, 33:7, 35:2, 37:13, 45:13, 45:17, 54:5, 54:6, 54:10, 62:21, 64:15, 66:21, 66:24, 75:3, 77:9, 127:24, 140:17, 145:10, 155:9, 156:8, 202:3, 203:18, 211:23, 219:19
**stands** [1] - 175:3
**Stanley** [1] - 4:16
**start** [22] - 5:18, 47:19, 94:15, 104:13, 113:9, 125:9, 138:21, 145:7, 155:5, 155:8, 181:22, 182:7, 183:4, 183:5, 199:22, 200:24, 212:23, 227:8, 227:9, 227:13, 228:25
**started** [8] - 73:24, 139:14, 143:25, 145:11, 154:16, 158:14, 227:9
**starting** [4] - 4:6, 125:14, 194:17, 220:12
**starts** [5] - 65:10, 139:17, 139:24, 143:13, 143:16, 173:3
**State** [1] - 197:14
**state** [4] - 190:7,

192:2, 195:12, 196:11
**statement** [12] - 92:10, 109:9, 163:17, 163:18, 164:9, 166:9, 166:14, 205:4, 205:6, 205:9, 205:20, 231:11
**statements** [11] - 21:6, 164:6, 165:25, 177:18, 178:23, 181:8, 181:10, 189:3, 190:7, 193:12, 203:23
**States** [11] - 4:3, 4:8, 33:8, 41:2, 100:12, 100:14, 100:15, 100:16, 100:18, 102:23, 238:8
**states** [2] - 183:3, 198:6
**statues** [1] - 174:11
**stave** [1] - 127:3
**stay** [7] - 61:14, 65:16, 127:24, 131:12, 146:2, 191:9, 241:20
**stayed** [2] - 51:15, 235:10
**Steal** [19] - 9:16, 9:17, 13:24, 14:8, 14:14, 17:23, 18:23, 80:3, 172:12, 172:22, 173:1, 173:14, 173:16, 174:7, 175:18, 176:5, 181:1, 188:12, 193:15
**steal** [5] - 14:9, 173:12, 173:18, 173:19, 177:12
**stealing** [1] - 172:24
**step** [4] - 83:22, 91:10, 98:5, 170:16
**stepped** [1] - 73:25
**steps** [5] - 23:8, 115:23, 126:24, 131:2, 172:4
**Steven** [3] - 3:4, 4:3, 4:13
**stick** [3] - 171:17, 187:12, 191:12
**still** [30] - 4:23, 45:3, 51:15, 53:12, 54:6, 62:16, 64:15, 65:22, 67:13, 75:20, 84:14, 108:16, 110:12, 121:21, 127:21, 141:3, 143:14, 146:17, 146:18, 178:8, 180:21,

191:1, 195:3, 197:3, 202:14, 202:16, 220:1, 225:25, 229:4, 239:14
**stinks** [4] - 199:19, 199:21, 204:13, 225:7
**stint** [1] - 235:10
**stole** [2] - 67:8, 200:25
**stolen** [11] - 14:9, 14:12, 14:16, 14:19, 17:2, 17:17, 17:20, 25:25, 176:3, 179:5, 180:17
**Stomp** [1] - 176:19
**stomp** [3] - 33:2, 176:19
**stood** [4] - 62:16, 131:2, 180:20, 231:16
**stop** [29] - 10:2, 38:6, 40:15, 44:23, 47:1, 49:12, 50:14, 55:9, 55:12, 55:25, 57:8, 113:18, 115:18, 116:25, 158:1, 177:7, 177:9, 177:20, 183:20, 187:25, 192:1, 192:4, 203:22, 204:10, 205:14, 219:18, 224:20, 225:18, 226:9
**Stop** [19] - 9:15, 9:17, 13:24, 14:8, 14:14, 17:23, 18:23, 80:3, 116:23, 172:12, 172:21, 173:1, 173:16, 174:7, 175:18, 176:5, 181:1, 188:12, 193:15
**stopped** [3] - 11:16, 50:24, 116:5
**stopping** [2] - 173:12, 177:12
**stops** [1] - 194:21
**storm** [2] - 20:9, 190:11
**storming** [11] - 19:17, 19:19, 19:21, 20:2, 21:3, 174:20, 174:24, 175:19, 176:6, 177:13, 181:2
**Storming** [1] - 20:5
**storms** [1] - 140:8
**story** [4] - 25:10, 164:10, 173:16
**straight** [2] - 178:1, 191:13

**straining** [1] - 224:4
**strange** [4] - 11:5, 12:7, 30:9, 69:10
**straps** [1] - 160:12
**strategically** [1] - 103:14
**strategy** [1] - 122:17
**streamline** [1] - 102:7
**stress** [2] - 181:25, 182:1
**stricken** [1] - 108:19
**strike** [4] - 108:22, 159:8, 160:24, 162:22
**strikes** [3] - 179:8, 205:3, 210:4
**striped** [1] - 209:4
**strobe** [2] - 170:16, 171:4
**strong** [2] - 128:25, 205:3
**stronger** [3] - 146:14, 208:1, 236:13
**struck** [4] - 111:1, 159:6, 159:7, 170:9
**struggling** [1] - 92:24
**stuck** [2] - 93:23, 192:15
**studying** [1] - 66:5
**stuff** [16] - 7:13, 9:15, 9:18, 9:20, 14:18, 17:21, 28:1, 35:9, 36:21, 79:23, 82:16, 82:17, 187:4, 191:3, 199:15, 209:3
**stupid** [3] - 29:13, 41:17, 41:20
**subject** [2] - 105:19, 213:22
**subjective** [1] - 166:15
**submit** [13] - 109:12, 114:17, 114:25, 118:7, 119:22, 121:13, 127:3, 127:17, 198:9, 204:8, 211:8, 215:6, 220:2
**submits** [1] - 214:19
**submitted** [1] - 208:16
**submitting** [1] - 130:13
**subsection** [1] - 131:22
**subsequent** [2] - 87:17, 190:14
**subsequently** [1] - 89:20
**substantial** [1] - 149:14
**successful** [1] - 123:9

**successfully** [1] - 126:17
**suddenly** [1] - 58:21
**suffer** [1] - 141:9
**suffered** [3] - 71:17, 166:2, 189:7
**suffice** [3] - 150:7, 156:11, 234:16
**sufficient** [6] - 98:15, 119:23, 127:4, 144:14, 155:10, 188:1
**sufficiently** [1] - 121:17, 151:13, 220:3
**suggest** [4] - 96:12, 98:16, 121:13, 238:18
**suggesting** [6] - 92:16, 110:10, 168:16, 210:14, 210:17, 215:19
**suggestion** [1] - 219:13
**suggests** [1] - 216:3
**summer** [1] - 164:7
**super** [3] - 25:2, 81:22, 81:25
**Super** [1] - 130:18
**Super-Soaker** [1] - 130:18
**superseding** [1] - 123:17
**supplemental** [2] - 104:9, 108:12
**support** [15] - 17:8, 17:9, 20:25, 113:18, 114:18, 127:5, 129:3, 147:7, 159:25, 232:14, 232:17, 233:9, 233:24, 236:9, 236:12
**supported** [2] - 173:20, 197:15
**supporters** [4] - 17:11, 17:15, 26:7, 40:23
**supports** [4] - 147:8, 163:14, 180:16, 180:18
**suppose** [6] - 87:8, 137:17, 169:18, 214:20, 216:9, 240:19
**supposed** [3] - 52:24, 87:16, 174:12
**suppress** [1] - 92:22
**Supreme** [3] - 226:9, 226:10, 235:16

**surely** [5] - 8:10, 39:10, 43:21, 103:5, 219:9
**surprise** [1] - 129:9
**surprised** [7] - 7:14, 14:25, 21:15, 21:18, 21:25, 22:21, 80:3
**surrounded** [1] - 205:21
**surrounding** [1] - 97:10
**sustain** [1] - 79:9
**sustained** [6] - 79:15, 81:15, 83:3, 98:1, 168:20, 182:15
**sustaining** [1] - 168:20
**swear** [3] - 91:11, 94:4, 204:7
**sweating** [1] - 140:11
**swept** [2] - 157:4, 157:12
**swipe** [1] - 168:21
**swore** [3] - 91:9, 91:13, 92:8
**symptoms** [3] - 166:3, 167:19, 170:17
**system** [2] - 92:3, 92:6

## T

**table** [1] - 4:8
**taint** [2] - 93:7, 93:8
**talks** [3] - 173:11, 173:12, 174:7
**tape** [1] - 187:8
**taught** [1] - 199:14
**taunting** [1] - 44:25
**team** [2] - 80:17, 87:16
**tear** [14] - 30:14, 30:25, 31:2, 34:20, 39:10, 39:19, 39:21, 40:3, 40:4, 40:5, 77:21, 83:16, 175:15
**tearing** [1] - 228:23
**tears** [1] - 175:7
**technical** [1] - 111:21
**technically** [1] - 101:6
**techniques** [1] - 97:21
**telephonic** [1] - 109:6
**temporal** [2] - 125:25, 126:5
**ten** [1] - 7:10
**ten-day** [1] - 7:10
**tennis** [1] - 188:23
**tens** [1] - 198:25
**Tenth** [1] - 100:17
**term** [1] - 26:23
**terminology** [1] - 229:21

**terms** [2] - 171:6, 203:24
**terrace** [1] - 23:6
**terrible** [2] - 83:11, 83:16
**test** [1] - 93:1
**testified** [62] - 5:18, 6:3, 24:5, 25:24, 27:21, 32:20, 53:15, 53:17, 61:20, 63:12, 66:18, 69:12, 72:17, 85:11, 85:14, 85:18, 96:15, 109:4, 115:16, 119:6, 119:9, 120:16, 120:24, 128:15, 130:10, 132:19, 133:19, 135:18, 137:3, 138:3, 139:11, 140:3, 140:19, 141:7, 141:13, 143:23, 143:24, 144:2, 148:22, 150:11, 157:11, 157:22, 158:3, 160:14, 160:17, 162:4, 162:12, 167:5, 169:23, 169:25, 172:23, 178:16, 179:25, 185:19, 186:13, 186:21, 187:18, 201:5, 228:21, 229:9, 233:6
**testify** [33] - 99:14, 99:18, 114:10, 116:1, 116:23, 126:25, 127:2, 127:23, 128:5, 128:18, 132:3, 132:24, 135:11, 140:2, 141:11, 143:2, 143:10, 152:15, 154:17, 157:10, 166:4, 169:21, 170:24, 171:11, 171:13, 178:20, 195:13, 215:21, 215:23, 218:1, 229:20, 230:17, 232:20
**testifying** [2] - 62:9, 99:8
**testimony** [111] - 5:6, 5:12, 13:10, 14:13, 16:10, 18:3, 19:18, 22:14, 31:25, 32:2, 44:18, 49:15, 51:10, 54:14, 54:15, 55:3, 58:20, 59:1, 60:7,

61:23, 62:5, 66:6, 66:8, 66:13, 71:17, 71:20, 74:23, 76:20, 77:4, 90:21, 101:3, 101:8, 101:12, 101:20, 102:2, 102:14, 104:9, 108:12, 109:9, 113:15, 115:7, 118:1, 118:9, 119:17, 120:19, 122:16, 127:4, 128:12, 128:14, 129:3, 129:6, 131:17, 132:18, 133:2, 135:20, 135:25, 136:2, 136:13, 141:6, 142:4, 147:8, 150:12, 154:5, 154:6, 155:20, 156:10, 158:7, 158:19, 159:13, 161:3, 161:6, 161:19, 162:2, 162:3, 162:8, 163:1, 163:15, 164:6, 165:4, 165:16, 165:22, 166:1, 166:18, 166:22, 167:23, 169:3, 169:4, 169:9, 169:20, 170:13, 170:20, 171:1, 171:24, 175:4, 176:3, 176:11, 186:8, 186:16, 187:13, 216:2, 216:3, 222:17, 227:10, 228:15, 229:5, 230:6, 230:15, 230:25, 232:22, 233:22
**Texas** [4] - 5:25, 6:16, 7:25, 237:7
**text** [9] - 7:2, 7:6, 149:10, 179:19, 179:23, 188:7, 192:18, 194:11, 197:4
**texted** [1] - 197:22
**texts** [3] - 180:4, 198:18, 198:21
**thankfully** [2] - 148:15, 232:25
**themselves** [7] - 109:8, 122:5, 122:24, 129:4, 209:17, 209:20
**then-President** [2] -

98:12, 98:16
**theories** [4] - 110:24, 150:24, 165:7, 217:6
**theory** [34] - 14:15, 17:1, 17:16, 26:1, 110:20, 110:24, 129:1, 131:22, 138:6, 138:17, 142:23, 146:21, 147:5, 147:24, 151:9, 153:20, 155:11, 156:12, 160:22, 160:23, 161:16, 163:18, 165:13, 165:25, 167:23, 168:6, 210:21, 211:13, 217:1, 218:24, 223:17, 224:15, 239:22
**thereafter** [4] - 91:19, 156:14, 171:20, 176:22
**therefore** [5] - 109:12, 110:8, 150:14, 188:5, 208:18
**thereof** [1] - 223:12
**they've** [15] - 29:5, 29:6, 199:14, 200:12, 205:7, 206:19, 209:16, 209:17, 210:3, 218:19, 218:20, 224:24, 225:24, 226:18, 226:23
**thinking** [8] - 14:8, 14:9, 30:14, 30:16, 35:11, 74:9, 75:12, 193:4
**thinks** [1] - 213:18
**third** [1] - 101:25
**Third** [2] - 100:16, 102:21
**thoughts** [1] - 185:1
**thousands** [3] - 198:25, 206:16, 213:14
**thrashing** [1] - 157:7
**threat** [1] - 154:24
**threatening** [1] - 225:2
**three** [8] - 5:8, 7:21, 129:4, 158:23, 168:17, 194:20, 195:15, 224:24
**threw** [2] - 6:9, 7:13
**throughout** [4] - 135:21, 138:24, 234:4, 234:6
**throwing** [1] - 52:25

**Thursday** [6] - 237:8, 237:16, 238:3, 238:19, 239:3, 240:13
**tightly** [3] - 157:12, 184:3, 184:10
**tilted** [2] - 134:6, 135:2
**time-stamped** [1] - 187:18
**timeliness** [2] - 101:2, 101:14
**timer** [2] - 201:1, 201:15
**timing** [1] - 87:10
**today** [5] - 173:6, 178:16, 197:9, 203:12, 227:7
**together** [8] - 17:5, 35:8, 197:25, 200:25, 210:11, 211:18, 214:13, 220:22
**tolerance** [1] - 25:4
**took** [22] - 13:18, 14:7, 14:9, 14:23, 15:14, 19:7, 24:22, 29:2, 49:25, 52:7, 61:1, 61:9, 62:4, 62:20, 66:24, 70:6, 73:10, 122:10, 131:13, 139:8, 163:8, 197:16
**top** [6] - 23:22, 52:25, 91:5, 142:11, 156:17, 188:12
**tops** [1] - 183:6
**torn** [1] - 161:20
**total** [1] - 221:2
**totality** [1] - 206:18
**touch** [1] - 125:22
**touching** [3] - 155:2, 232:19, 233:1
**tour** [1] - 197:12
**toward** [2] - 209:9, 214:11
**towards** [18] - 22:5, 24:12, 41:22, 48:14, 129:13, 129:23, 130:18, 131:25, 145:6, 154:22, 155:24, 156:7, 157:19, 157:21, 158:10, 174:14, 174:17, 175:22
**track** [1] - 234:12
**train** [8] - 8:6, 9:6, 11:17, 12:14, 15:8, 15:16, 17:13, 177:19
**training** [4] - 46:16, 46:18, 51:1, 160:15

**traitors** [1] - 225:4
**trampled** [1] - 114:11
**transcribed** [1] - 197:4
**transcript** [2] - 120:16, 170:25
**Trant** [1] - 100:15
**trapped** [1] - 135:17
**trauma** [1] - 182:4
**traveled** [1] - 173:23
**traveler** [4] - 172:8, 173:25, 174:3, 177:25
**treated** [2] - 189:8
**treatment** [2] - 73:3, 75:6
**trial** [44] - 103:8, 103:19, 103:25, 104:3, 105:16, 105:18, 105:20, 106:1, 106:9, 106:16, 106:21, 106:25, 107:16, 108:1, 108:4, 108:5, 108:7, 113:20, 118:11, 119:11, 120:19, 124:14, 128:3, 129:23, 130:23, 132:18, 135:14, 135:21, 140:9, 140:15, 140:22, 141:6, 148:22, 166:2, 167:8, 170:3, 173:5, 174:22, 176:10, 227:14, 231:21, 232:1, 232:21, 234:4
**tried** [4] - 12:21, 12:23, 54:4, 122:9
**trier** [1] - 186:24
**tries** [1] - 211:11
**trigger** [2] - 73:13, 185:6
**triggered** [10] - 159:13, 184:25, 185:25, 186:2, 186:3, 186:4, 186:6, 186:11, 194:6, 195:10
**triggering** [4] - 75:10, 76:13, 77:24, 81:10
**triggers** [5] - 107:9, 170:8, 186:1, 195:16
**trip** [5] - 78:24, 79:11, 79:17, 172:4, 173:25
**trouble** [2] - 128:13, 154:12
**true** [27] - 7:12, 16:12, 16:21, 16:23, 17:7, 17:9, 24:8, 79:6, 119:5, 137:1, 139:5,

145:22, 152:10, 160:1, 166:10, 172:9, 172:10, 176:17, 177:4, 177:8, 177:10, 210:24, 212:17, 217:11, 222:19, 231:20, 238:9
**truly** [1] - 45:6
**Trump** [38] - 8:6, 8:11, 9:6, 11:1, 11:17, 12:14, 12:19, 14:1, 14:20, 14:23, 14:24, 15:6, 15:8, 15:16, 17:6, 17:9, 17:13, 20:20, 20:23, 21:3, 26:7, 29:9, 40:23, 79:19, 80:9, 80:17, 98:12, 98:17, 173:19, 177:19, 178:11, 178:12, 178:13, 187:23, 194:4, 197:16, 198:7, 199:3
**Trump's** [4] - 80:16, 197:13, 198:23, 199:4
**truth** [2] - 191:8, 214:2
**try** [6] - 54:7, 70:22, 80:14, 127:2, 183:18, 238:12
**trying** [33] - 22:6, 23:12, 26:8, 35:11, 41:19, 48:7, 53:1, 53:2, 63:13, 71:19, 75:12, 75:13, 75:14, 75:15, 77:8, 93:4, 95:25, 106:5, 141:14, 170:7, 174:15, 177:10, 178:22, 178:23, 182:12, 183:6, 190:23, 191:18, 192:17, 192:20, 210:16, 215:7, 236:17
**tunnel** [101] - 45:25, 46:3, 47:18, 48:9, 51:15, 67:10, 67:14, 68:1, 77:9, 77:14, 77:18, 81:9, 83:10, 83:11, 115:25, 116:4, 118:19, 122:21, 126:22, 126:23, 126:24, 127:14, 127:18, 129:5, 129:7, 129:8, 131:1, 131:4, 131:8, 131:10, 131:14, 133:14, 134:2,

136:7, 138:10, 138:13, 138:21, 139:6, 139:25, 140:16, 140:24, 143:4, 143:7, 143:8, 143:17, 145:3, 145:6, 147:3, 149:13, 151:20, 152:8, 152:10, 152:14, 152:18, 153:14, 154:5, 154:22, 154:25, 157:20, 166:6, 171:19, 175:20, 176:21, 177:14, 177:17, 178:2, 180:20, 180:22, 181:15, 181:25, 183:11, 185:6, 187:10, 187:17, 188:25, 190:18, 194:16, 194:25, 198:11, 210:20, 211:8, 214:5, 217:7, 218:16, 219:10, 219:20, 220:2, 220:14, 223:24, 229:3, 230:2, 231:22, 234:1, 235:4, 235:7, 235:9, 235:11, 235:21, 235:22, 236:1

**turn** [20] - 6:24, 18:16, 22:1, 27:13, 30:1, 30:18, 38:19, 39:9, 49:3, 49:8, 49:16, 75:7, 113:17, 117:11, 151:15, 194:2, 194:23, 195:9, 207:2, 208:6

**turned** [15] - 9:9, 35:15, 35:17, 47:21, 48:2, 48:5, 48:13, 49:6, 129:13, 131:24, 134:16, 139:3, 154:21, 157:5, 158:2

**turning** [3] - 89:19, 194:25, 232:11

**turns** [4] - 75:9, 115:2, 126:18, 175:12

**twice** [3] - 60:7, 60:12, 167:2

**two** [31] - 13:8, 29:5, 31:10, 84:21, 91:10, 95:17, 100:4, 101:13, 101:22, 107:14, 109:2, 109:3, 112:13, 117:10, 128:5,

135:4, 140:25, 142:2, 152:8, 165:7, 165:14, 168:15, 170:24, 183:8, 193:18, 195:6, 222:8, 224:24, 232:15, 237:10

**two-step** [1] - 91:10

**type** [7] - 9:18, 13:13, 14:12, 82:12, 82:16, 148:7, 192:10

**types** [1] - 141:9

**typically** [1] - 103:21

### U

**U.S** [8] - 18:24, 19:22, 27:15, 31:3, 39:20, 73:25, 74:23, 189:14

**U.S.C** [2] - 151:18, 235:23

**ultimately** [3] - 198:6, 216:5, 220:11

**unable** [1] - 140:16

**unclear** [1] - 222:22

**uncredible** [1] - 166:17

**undeniable** [2] - 46:12, 189:5

**under** [20] - 4:23, 22:11, 22:16, 22:19, 46:13, 84:14, 102:8, 112:4, 122:22, 131:22, 136:24, 154:24, 155:10, 155:11, 158:3, 166:20, 181:24, 183:9, 229:4, 237:4

**understandable** [1] - 102:9

**understandably** [1] - 120:8

**understood** [12] - 19:19, 34:10, 34:13, 38:15, 60:8, 107:22, 108:9, 152:6, 159:5, 171:22, 182:14, 187:24

**uniform** [2] - 120:22, 208:17

**uniforms** [1] - 121:2

**unintentional** [1] - 236:10

**unintentionally** [1] - 234:24

**unique** [4] - 146:22, 148:13, 192:7, 193:2

**unison** [1] - 44:8

**unit** [1] - 140:2

**United** [1] - 4:3, 4:8,

33:8, 41:2, 100:12, 100:14, 100:15, 100:16, 100:18, 102:23, 238:8

**units** [1] - 160:7

**unlawful** [1] - 200:4

**unless** [5] - 175:22, 206:5, 211:2, 227:15, 233:16

**unlikely** [5] - 102:22, 103:1, 120:9, 145:12, 199:2

**unmovable** [1] - 132:20

**unpinned** [3] - 61:13, 61:16, 61:17

**unquote** [1] - 179:13

**unrelated** [1] - 21:6

**unreliable** [4] - 165:22, 166:7, 166:15, 166:17

**unsearchable** [1] - 89:24

**unsurprising** [1] - 179:23

**up** [110] - 5:8, 6:23, 8:6, 8:14, 11:22, 13:3, 15:11, 16:14, 19:4, 21:10, 21:11, 22:15, 23:3, 23:4, 23:8, 23:12, 23:18, 23:20, 23:21, 24:15, 24:19, 24:23, 25:17, 27:3, 27:15, 28:7, 41:18, 42:3, 42:10, 42:19, 42:21, 42:23, 43:1, 45:7, 46:4, 48:18, 49:20, 52:6, 56:8, 56:11, 58:24, 58:25, 59:13, 60:4, 62:22, 64:24, 69:4, 69:16, 71:23, 71:25, 75:18, 77:1, 78:17, 86:7, 90:3, 90:6, 90:9, 94:7, 103:6, 114:4, 114:9, 115:22, 117:14, 118:13, 125:6, 126:8, 127:24, 130:18, 133:10, 137:4, 142:5, 153:1, 155:8, 157:1, 157:4, 158:10, 159:1, 159:7, 159:8, 160:8, 173:13, 180:12, 183:8, 183:16, 185:1, 186:19, 189:7, 191:10, 193:20, 194:1, 203:16, 203:18,

205:16, 206:10, 207:12, 209:3, 211:7, 218:18, 218:23, 220:7, 220:11, 222:7, 226:4, 231:5, 231:16, 232:17, 233:15

**uploaded** [1] - 88:23

**upset** [2] - 167:25, 168:4

**USA** [5] - 69:13, 174:8, 191:6

**usages** [1] - 151:10

**useful** [1] - 127:6

**useless** [2] - 138:14, 138:15

**uses** [2] - 26:23, 146:24

**USFL** [1] - 80:17

**utilizes** [1] - 92:3

### V

**vantage** [3] - 46:23, 142:8, 148:21

**various** [1] - 111:10

**vehicle** [10] - 85:22, 85:25, 86:5, 86:8, 86:16, 86:17, 86:18, 86:21, 86:23

**verb** [1] - 123:24

**verbs** [1] - 123:15

**verdict** [9] - 136:18, 138:7, 226:25, 237:5, 237:8, 238:20, 239:3, 239:6

**verify** [1] - 79:12

**version** [3] - 105:25, 190:9, 190:10

**vests** [1] - 145:25

**veteran** [1] - 197:11

**via** [1] - 119:7

**Vice** [5] - 150:13, 179:10, 179:13, 198:4, 198:19

**vicious** [5] - 146:25, 147:21, 164:18, 165:1, 176:2

**victim** [7] - 118:2, 119:16, 129:6, 207:10, 231:16, 232:13, 236:10

**victims** [3] - 101:13, 101:17, 101:23

**video** [111] - 13:18, 15:14, 16:7, 19:7, 24:22, 29:2, 32:23, 44:7, 45:11, 46:2, 47:24, 48:21, 49:11,

49:25, 54:24, 55:24, 57:7, 57:24, 65:12, 67:21, 68:24, 71:7, 82:5, 109:8, 119:19, 127:15, 127:16, 130:16, 132:14, 132:15, 135:8, 140:12, 147:7, 151:20, 152:14, 152:18, 152:25, 153:6, 153:18, 153:23, 154:1, 154:8, 155:7, 155:20, 155:22, 156:2, 158:20, 159:2, 159:25, 164:22, 164:25, 168:8, 171:15, 171:24, 173:2, 173:9, 175:1, 175:3, 176:16, 183:1, 183:6, 183:13, 183:25, 184:1, 184:7, 184:19, 184:21, 184:23, 185:23, 185:24, 187:13, 190:18, 194:25, 195:1, 197:3, 201:5, 201:12, 204:12, 206:9, 206:11, 206:14, 206:16, 206:19, 207:1, 208:24, 210:1, 210:14, 210:15, 212:6, 213:23, 214:3, 214:6, 214:13, 215:25, 217:23, 220:18, 221:13, 222:25, 223:4, 224:3, 224:8, 224:14, 224:15, 230:1, 230:4, 230:19, 231:6, 232:7, 234:19, 236:21

**videoed** [2] - 157:6, 178:12

**videographer** [4] - 153:12, 153:13, 216:11, 221:10

**videoing** [2] - 153:4, 178:11

**videos** [15] - 9:10, 54:19, 98:11, 119:19, 138:6, 153:14, 174:13, 174:19, 178:3, 183:1, 183:8, 183:9, 185:22, 194:12, 195:6

**videotape** [2] - 194:21, 194:22
**videotaping** [1] - 194:23
**view** [7] - 141:7, 144:17, 163:12, 193:18, 199:11, 210:10, 214:1
**viewing** [1] - 126:9
**violence** [7] - 73:21, 153:18, 193:21, 197:25, 203:17, 212:9
**violent** [8] - 9:23, 75:14, 129:8, 131:15, 147:21, 154:1, 154:4, 205:21
**violently** [5] - 128:8, 164:3, 209:14, 212:5, 230:24
**Virginia** [1] - 88:3
**virtue** [1] - 164:15
**visible** [1] - 124:17
**visual** [78] - 15:22, 19:14, 20:17, 21:23, 25:14, 28:24, 29:15, 30:4, 30:21, 31:7, 32:17, 33:21, 36:4, 36:13, 36:24, 37:7, 37:19, 38:5, 38:22, 39:6, 40:1, 40:14, 41:11, 42:7, 43:5, 43:13, 44:1, 44:15, 44:22, 45:21, 46:9, 47:12, 50:4, 50:13, 51:22, 53:9, 55:11, 58:10, 62:25, 63:6, 63:19, 64:1, 64:7, 64:20, 65:4, 69:7, 70:3, 134:25, 135:6, 201:17, 201:24, 202:5, 202:8, 202:12, 202:20, 203:3, 203:6, 203:9, 208:9, 209:1, 209:8, 211:20, 212:13, 212:16, 214:14, 215:2, 216:17, 218:9, 218:12, 219:5, 221:12, 221:18, 221:21, 222:5, 223:21, 223:25, 224:12, 224:18
**vocal** [1] - 174:9
**voce** [1] - 241:18
**voice** [17] - 36:10, 39:11, 39:16, 62:10, 126:12, 185:16, 185:20, 191:25,

204:3, 204:9, 204:10, 204:19, 204:21, 216:24, 217:5, 229:10, 229:13
**volumes** [1] - 214:15
**voluntarily** [3] - 99:18, 189:19, 189:20
**volunteered** [1] - 5:22
**vote** [4] - 80:9, 80:12, 80:15, 198:20
**votes** [1] - 17:21
**voting** [1] - 14:11
**vulnerable** [4] - 128:22, 146:17, 147:20, 161:20

**W**

**wait** [2] - 12:3, 12:16
**waiting** [2] - 29:8, 29:10
**wake** [1] - 11:22
**Waldo** [6] - 201:6, 201:13, 206:8, 209:4, 210:13, 212:14
**walk** [11] - 13:15, 13:19, 13:21, 16:1, 23:8, 39:20, 47:19, 48:15, 65:10, 175:22, 175:24
**walked** [4] - 41:22, 48:13, 157:19, 229:2
**walking** [8] - 14:6, 14:14, 17:22, 74:12, 74:13, 74:14, 171:19, 181:15
**walks** [2] - 26:16, 190:25
**wall** [23] - 34:8, 114:4, 114:9, 115:22, 132:4, 132:5, 132:6, 132:12, 132:17, 133:10, 133:14, 133:25, 134:11, 134:21, 135:3, 137:2, 137:3, 222:13, 222:17, 222:24, 223:1
**Walmart** [6] - 10:2, 11:2, 27:8, 177:20, 188:21
**wants** [7] - 111:22, 112:4, 163:22, 184:4, 188:18, 191:9, 195:24
**warm** [1] - 6:17
**warrant** [38] - 86:5, 86:8, 86:10, 86:12,

86:14, 86:25, 87:2, 87:3, 87:4, 87:12, 87:15, 87:17, 87:20, 87:23, 88:5, 88:7, 88:8, 88:9, 88:11, 88:13, 88:15, 88:19, 88:21, 88:24, 89:1, 90:17, 90:20, 90:22, 90:23, 91:8, 91:15, 91:18, 91:22, 92:8, 94:4, 191:16, 217:21, 239:5
**wash** [1] - 218:4
**Washington** [11] - 5:20, 6:4, 7:9, 7:10, 8:8, 8:11, 88:2, 172:10, 172:11, 172:19, 172:25
**waste** [1] - 199:14
**watch** [19] - 17:18, 25:24, 26:20, 26:21, 51:6, 70:18, 134:17, 200:5, 206:8, 206:15, 210:15, 211:18, 214:2, 216:13, 218:6, 218:16, 230:19, 234:18, 234:20
**watched** [8] - 82:25, 119:18, 129:12, 129:15, 129:22, 157:16, 200:25, 214:13
**watches** [1] - 204:12
**watching** [3] - 14:17, 208:24, 213:9
**water** [8] - 36:9, 36:16, 36:19, 37:2, 37:12, 37:25, 131:7, 140:8
**wave** [6] - 115:24, 126:22, 140:7, 203:1, 219:8, 220:21
**waved** [1] - 115:23
**waving** [1] - 118:13
**ways** [4] - 143:6, 159:24, 166:14, 193:18
**weak** [1] - 109:22
**weapon** [30] - 66:21, 113:2, 113:3, 136:15, 136:16, 136:25, 142:25, 144:5, 144:7, 146:24, 148:2, 148:4, 148:8, 148:9, 148:10, 150:22, 151:23, 156:22, 160:24, 161:2, 165:5, 165:15, 182:13, 182:18,

223:9, 227:21, 228:1, 239:16, 239:20, 240:4
**weapons** [1] - 32:11
**wear** [1] - 6:17
**wearing** [10] - 6:18, 29:11, 188:23, 208:11, 208:12, 208:13, 208:14, 208:15
**weather** [7] - 6:16, 6:20, 7:10, 7:13, 7:16, 7:17, 7:19
**wedged** [1] - 122:11
**wee** [1] - 199:1
**week** [5] - 4:18, 199:18, 226:21, 234:6, 237:3
**weekend** [1] - 241:23
**weeks** [1] - 237:10
**weight** [4] - 98:23, 136:22, 139:21, 144:12
**well-being** [1] - 94:10
**west** [4] - 18:7, 22:15, 23:6, 75:3
**West** [3] - 114:7, 114:9, 160:17
**what-do-you-want-to -do-type** [1] - 13:13
**whatsoever** [1] - 229:19
**wheels** [1] - 205:16
**whim** [1] - 6:1
**white** [3] - 117:3, 117:14, 129:19
**whoa** [1] - 38:2
**whole** [22] - 12:7, 73:23, 119:19, 133:8, 156:23, 157:3, 158:18, 158:21, 159:15, 159:16, 159:23, 160:11, 162:13, 162:14, 172:4, 172:17, 177:19, 177:25, 179:9, 230:18
**width** [1] - 122:21
**wife** [2] - 5:24, 79:2
**Wilhoit** [6] - 212:21, 212:22, 213:3, 213:12, 214:19, 215:5
**Wilhoit's** [2] - 212:24, 213:7
**willful** [1] - 182:6
**win** [1] - 15:2
**window** [2] - 116:2, 200:3

**winter** [1] - 6:17
**wise** [1] - 62:20
**witness** [7] - 84:24, 103:22, 110:9, 166:7, 237:15, 238:3, 238:5
**WITNESS** [9] - 16:5, 40:5, 40:11, 59:5, 59:20, 59:22, 72:10, 72:14, 83:23
**Witness** [4] - 9:14, 20:11, 25:9, 83:24
**witness's** [1] - 103:23
**Witnesses** [1] - 3:3
**witnesses** [3] - 84:18, 84:20, 102:19
**woman** [2] - 117:3, 197:23
**women** [1] - 33:9
**wonder** [1] - 190:6
**wondering** [2] - 161:9, 161:15
**woo** [1] - 16:7
**woo-hoo** [1] - 16:7
**WOODWARD** [121] - 4:16, 78:10, 84:5, 84:8, 84:10, 84:15, 85:10, 90:13, 90:15, 92:11, 93:1, 93:4, 93:12, 94:3, 95:18, 96:2, 96:7, 97:17, 97:20, 97:24, 98:2, 98:8, 98:14, 98:22, 98:25, 99:9, 105:3, 105:15, 105:22, 105:24, 106:6, 106:14, 106:19, 107:5, 107:11, 108:2, 108:10, 109:3, 109:12, 109:24, 111:20, 111:25, 121:5, 196:19, 196:22, 196:25, 197:2, 199:11, 200:8, 200:19, 200:22, 201:18, 201:21, 201:25, 202:6, 202:9, 202:13, 202:21, 203:4, 203:7, 203:10, 203:25, 204:20, 205:1, 205:6, 205:11, 205:13, 205:18, 206:15, 207:2, 207:5, 208:10, 209:2, 209:9, 210:7, 210:24, 211:14, 211:21, 212:14,

212:17, 213:13,
213:16, 213:20,
214:15, 214:24,
215:3, 216:18,
217:11, 218:10,
218:13, 219:6,
219:17, 220:19,
221:13, 221:19,
221:22, 222:2,
222:6, 222:14,
222:19, 223:16,
223:22, 224:1,
224:6, 224:9,
224:13, 224:19,
225:14, 226:12,
226:14, 227:3,
237:11, 237:14,
237:18, 237:20,
237:23, 238:6,
238:24, 240:11,
240:16, 240:21
**Woodward** [27] - 3:6,
4:17, 78:8, 84:4,
84:6, 92:16, 98:7,
99:6, 99:7, 105:2,
105:8, 105:13,
110:6, 110:11,
120:4, 121:4,
196:16, 196:24,
214:23, 227:2,
231:16, 232:25,
238:2, 238:3,
238:23, 240:10,
241:6
**Woodward................
..................** [1] - 3:13
**word** [7] - 22:8, 22:9,
124:8, 178:15,
187:24, 191:19,
229:16
**words** [27] - 19:18,
20:6, 20:12, 20:14,
26:13, 26:15, 98:16,
110:10, 111:2,
114:15, 131:12,
172:5, 172:20,
173:8, 173:16,
174:23, 176:5,
178:23, 180:14,
191:11, 191:12,
199:4, 206:2,
229:13, 229:14,
229:17, 232:24
**wore** [1] - 138:4
**works** [3] - 179:12,
218:24, 237:9
**world** [1] - 227:15
**worn** [22] - 113:14,
113:17, 114:16,
115:5, 116:7, 116:8,

116:10, 116:17,
117:22, 118:8,
122:2, 123:4, 135:4,
135:12, 135:13,
137:15, 150:15,
162:19, 220:8,
220:9, 232:15,
232:24
**worth** [1] - 165:24
**wow** [1] - 162:10
**wrestling** [1] - 163:9
**write** [2] - 72:14, 168:2
**writes** [1] - 180:4
**writing** [1] - 180:1
**written** [1] - 233:22

## X

**Xenakis** [11] - 165:23,
166:5, 166:7,
168:22, 185:5,
185:14, 190:8,
195:13, 229:6,
229:9, 229:19
**Xenakis's** [1] - 228:14

## Y

**y'all** [1] - 62:9
**yanking** [2] - 60:19,
230:24
**years** [7] - 72:18, 75:6,
95:17, 119:15,
197:5, 224:24
**yell** [4] - 26:12,
113:17, 116:10,
171:17
**yelling** [16] - 26:9,
36:9, 36:16, 60:23,
115:17, 116:8,
116:19, 116:21,
116:23, 117:18,
122:6, 175:20,
181:3, 191:6,
229:15, 234:7
**yellow** [1] - 117:3
**yells** [5] - 126:18,
126:19, 128:16,
182:2, 216:25
**yesterday** [19] - 5:6,
8:15, 13:19, 18:10,
32:20, 46:15, 58:20,
60:9, 60:16, 61:20,
63:12, 69:12, 84:16,
84:20, 85:11, 93:8,
162:6, 166:23,
170:25
**you-all** [7] - 96:11,
104:14, 110:2,
110:14, 196:6,
237:6, 238:4

**young** [1] - 199:13
**yourself** [9] - 4:5,
12:17, 47:14, 65:19,
72:12, 80:20, 82:5,
89:13, 91:3
**YouTuber** [1] - 158:6

## Z

**zero** [2] - 186:9, 187:3